SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
DANIEL N. YANNUZZI, Cal. Bar No. 196612
dyannuzzi@sheppardmullin.com
GRAHAM (GRAY) M. BUCCIGROSS, Cal. Bar No. 234558
gbuccigross@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California  92130-2006
Telephone:   858.720.8900
Facsimile:   858.509.3691

STEVEN M. HANLE, Cal. Bar No. 168876
shanle@sheppardmullin.com
650 Town Center Drive, 4th Fl.
Costa Mesa, CA 92626
Telephone:   714.513.5100
Facsimile:   714.513.5130
Attorneys for Defendants,
Performance Designed Products LLC and
Energizer Holdings, Inc.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NYKO TECHNOLOGIES, INC. a California Corporation,, <br><br> Plaintiff, <br><br> v. <br><br> ENERGIZER HOLDINGS, INC., a Missouri Corporation, and PERFORMANCE DESIGNED PRODUCTS LLC, a California Limited Liability Company, <br><br> Defendant. | Case No. CV12-03001 <br><br> **DEFENDANTS' OPPOSITION TO EX PARTE APPLICATION FOR TRO** <br><br> The Hon. Gary A. Feess <br><br> [Complaint Filed:  April 5, 2012] |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................ 3

   A. PDP Development History .......................................................................... 3

   B. The Accused Products ................................................................................. 6

   C. The Crowded Art ........................................................................................ 8

   D. The Patent-in-Suit ..................................................................................... 10

   E. PDP Has Been Selling the Accused Products for Years,
      Including Selling to Walmart ..................................................................... 11

III. POINTS AND AUTHORITIES ....................................................................... 13

   A. The Standard for a Temporary Restraining Order and
      Preliminary Injunction ............................................................................... 13

   B. There Are At Least Substantial Questions As to the Validity of
      the Asserted Claims ................................................................................... 14

      1. Claims 1, 2, 5, 7 and 10 are unpatentable under 35 U.S.C.
         102(e) as being anticipated by Cole ......................................... 14

      2. Claim 8 is unpatentable under 35 U.S.C. 103 as being
         obvious over Cole in view of Brake. ....................................... 188

      3. Claims 11 and 12 are unpatentable under 35 U.S.C. 103 as
         being obvious over Cole in view of Kumar ............................. 18

      4. Unpatentability of Claims 1, 2, 5, 7-8, and 10-12 Based
         Upon Erickson As The Primary Reference ............................... 18

   C. The Accused Products do Not Infringe the Asserted Patent ................. 20

   D. Nyko Will Not Suffer Immediate and Irreparable Injury .................... 21

      1. Nyko is Not Entitled to a Presumption of Irreparable Harm ...... 21

2.     Nyko's Presents No Evidence of Irreparable Harm ..................22

3.     Nyko's Delay in Moving for a TRO Shows it Will Not Be Irreparably Harmed .......................................................................23

4.     Loss of Sales or Market Share Does Not Constitute Irreparable Harm ..........................................................................24

E.     The Balance of Hardships and Equities Tips Strongly in PDP's Favor ................................................................................................25

F.     The Public Interest Weighs Against a Preliminary Injunction .............25

IV.   CONCLUSION .................................................................................................25

Page

1

<u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

<u>Federal Cases</u>

4

*3570 East Foothill Blvd., Inc. v. City of Pasadena*
5
    912 F. Supp. 1257 (C.D. Cal. 1995)...................................................................... 16

6

*Aurora World, Inc. v. TY Inc.*
    719 F. Supp. 2d 1115 (C.D. Cal. 2009).......................................................... 24, 26
7

*Bd. of Trustees of the Leland Stanford Univ. v. Roche Molecular Sys., Inc.*
8
    563 F. Supp. 2d 1016 (N.D. Cal. 2008) ................................................................ 4

9

*Caribbean Marine Serv. Co., Inc. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988)................................................................................. 5
10

11

*Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*
    15 F.3d 1573 (Fed. Cir. 1993) ............................................................................ 23
12

*eBay Inc. v. MercExchange, L.L.C.*
13
    547 U.S. 388 (2006) ........................................................................................... 24

14

*Eli Lilly and Co. v. Am. Cyanamid Co.*
    82 F.3d 1568 (Fed. Cir. 1996) ............................................................................ 27
15

16

*Erico Int'l Corp. v. Doc's Marketing, Inc.*
    No. CV 05-2924, 2007 U.S. Dist. LEXIS 1367 (N.D. Ohio Jan. 9, 2007) ............................ 24

17

*Genentech, Inc. v. Novo Nordisk, A/S*
18
    108 F.3d 1361 (Fed. Cir. 1997)...................................................................... 4, 16

19

*General Elec. Co. v. Nintendo Co.*
    179 F.3d 1350 (Fed. Cir. 1999) .......................................................................... 22
20

*Hansen Beverage Co. v. Vital Pharm., Inc.*
21
    2008 U.S. Dist. LEXIS 105447 (S.D. Cal. Dec. 30, 2008) .................................... 26

22

*Hologic, Inc. v. Senorx, Inc.*
    No. C 08-133, 2008 U.S. Dist. LEXIS 36693 (N.D. Cal. Apr. 25, 2008).............................. 24
23

24

*Horwitz v. Southwest Forest Indus., Inc.*
    604 F.Supp. 1130 (D. Nev. 1985) ........................................................................ 5
25

26

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*
    906 F.2d 679, 15 U.S.P.Q.2D (BNA) 1307 (Fed. Cir. 1990).................................. 27

27

*Kerr Corp. v. N. Am. Dental Wholesalers, Inc.*
28
    No. SACV 11-0313 DOC, 2011 U.S. Dist. LEXIS 61779 .................................... 26

*KSR Int'l Co. v. Teleflex Inc.*
    550 U.S. 398 (2007) ............................................................................ 4

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*
    357 F.3d 1319 (Fed. Cir. 2004) ..................................................... 3, 4

*Nutrition 21 v. U.S.*
    930 F.2d 867 (Fed. Cir. 1991) ......................................................... 26

*Publications Int'l, Ltd. v. Meredith Corp.*
    88 F.3d 473 (7th Cir. 1996) .............................................................. 5

*QBAS Co., Ltd. v. C Walters Intercoastal Corp.*
    No. SACv 10-406 AG, 2010 U.S. Dist. LEXIS 143945 (C.D. Cal. Dec. 16, 2010) 3, 5, 15, 16,
    .................................................................................................... 24

*Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*
    320 F.3d 1081 (10th Cir. 2003) ...................................................... 16

*Sid Berk, Inc. v. Uniroyal, Inc.* (C.D. Cal. 1977) .............................. 16

*Titan Tire Co. v. Goodyear Tire & Rubber Co.*
    566 F.3d 1372 (Fed. Cir. 2009) ................................................ 15, 16

*Winter v. Natural Res. Def. Council, Inc.*
    *129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)* ............................... 15, 27

<u>Federal: Statutes and Rules</u>

35 U.S.C. § 102 ................................................................ 4, 17, 19, 20, 21

35 U.S.C. § 103 ......................................................... 4, 13, 20, 21

<u>Other Authorities</u>

http://www.merriam-webster.com/dictionary/base ........................... 23

Schwarzer, et al., *Federal Civil Procedure Before Trial*, (2012) .......... 16, 24

# I.    INTRODUCTION

An injunction or restraining order is a "drastic and extraordinary remedy that is not to be routinely granted." *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004); *QBAS Co., Ltd. v. C Walters Intercoastal Corp.*, No. SACv 10-406 AG, 2010 U.S. Dist. LEXIS 143945, at *12 (C.D. Cal. Dec. 16, 2010).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*  The function of a TRO is to preserve the status quo and prevent irreparable loss of rights.  *QBAS Co.*, *supra*, at *12.

Plaintiff Nyko Technologies, Inc. ("Nyko") has failed to meet its heavy burden to establish <u>any</u> of the requirements for a temporary restraining order.  First, despite its misleading presentation, it is <u>Nyko</u> that seeks to alter the status quo among the parties.  PDP has been selling the accused PS3 charger to Walmart for over three years.  Walmart made the decision to carry the accused Xbox 360 charger in December 2011.  Nyko now seeks to fundamentally change that status quo based on extremely weak claims, speculative harms, and wholly unsupported and outrageous allegations of wrongful conduct by Defendants Performance Designed Products LLC ("PDP") and Energizer Holdings, LLC ("Energizer").[1]

Second, as established below and in the supporting documentation, the asserted claims of Nyko's patent are invalid based a mountain of prior art located within just a few days after Nyko filed the instant lawsuit.  At a minimum, PDP has raised numerous substantial questions as to the validity of asserted claims, any one of which is all that is required to defeat a TRO based on alleged patent infringement. *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997); see

---

[1]    The accused devices are manufactured and sold by PDP.  Energizer merely licenses its trademarks and branding used to market the accused products.

1  *Nat'l Steel Car*, 357 F.3d at 1335 (with respect to invalidity, defendant need only

2  show "vulnerability … at the preliminary injunction stage").  Nyko's allegations of

3  its own innovation and of copying by others are entirely lacking in support and

4  lacking in context.  The claimed "invention" is exceedingly simple and mundane -- a

5  charging stand for wireless game controllers.  As addressed in section III.B below

6  and in the claim charts attached to the accompanying Hanle Declaration as Exhibits

7  U and V, it is undisputed that such charging stands existed in the prior art.  The only

8  purported novelty of the asserted claims is open "docking bays" with "opposite

9  surfaces" and a DC port on the base between the surfaces.  Yet the prior art is

10  replete with charging stands with these features.  Thus, in addition to being invalid

11  under 35 U.S.C. § 102, this is a clear case of "applying a known technique to a

12  known device (method, or product) ready for improvement to yield predictable

13  results," rendering the asserted claims invalid as obvious under Section 103.  *Bd. of*

14  *Trustees of the Leland Stanford Univ. v. Roche Molecular Sys., Inc.*, 563 F. Supp. 2d

15  1016, 1037-38 (N.D. Cal. 2008); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.

16  398, 417, 421 (2007)[2]

17      Nyko's infringement contentions are also fatally flawed.  As addressed below,

18  the accused chargers do not have a DC port <u>on the base</u> or docking bays formed by

19  opposite surfaces <u>on the base</u>, as required by the asserted claims.  Thus, there is at

20  least a substantial question as to the validity and infringement of the asserted claims,

21  and Nyko has not met its burden to show a likelihood of success on its claims.

22      Third, Nyko's dire predictions of irreparable injury are highly speculative, and

23  not sufficient to warrant granting a preliminary injunction.  *Caribbean Marine Serv.*

24  *Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *QBAS Co., supra*, at *33.

---

[2]      Nyko's implicit accusation that PDP copied its "invention" is preposterous. PDP and Nyko are both in the business of developing and selling gaming accessories.  When Sony and Microsoft came out with wireless controllers, the need for a charging stand or dock was obvious, and the configuration of the charging system was dictated by the configuration of the controllers.

There is no presumption of irreparable harm, and Nyko has no assurance that its products would be carried by Walmart if PDP's sales were to be enjoined. Moreover, Nyko acknowledges that Walmart revisits its decisions on what products to carry twice each year.  Money damages are certainly measurable and adequate in the hypothetical event that Nyko were to prevail on its claims.  Fourth, any immediacy allegedly favoring a TRO was of Nyko's own making.  Nyko delayed serving its complaint for three weeks after it was filed on April 5, 2012, and did not seek a TRO for a full five weeks, thus preventing a fair opportunity for the requested relief to be decided based on a fully investigated and briefed preliminary injunction hearing.  PDP should not be prejudiced by Nyko's delay.

Fifth, the balance of hardships does not favor the requested relief.  Rather, Nyko simply seeks to shift to PDP the hardships it complains of (possible long-term displacement at Walmart).  Sixth, injunctive relief may be refused where it would adversely affect the rights of persons who are not parties to the litigation.  *Horwitz v. Southwest Forest Indus., Inc.*, 604 F.Supp. 1130, 1136 (D. Nev. 1985); see *Publications Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996).  Here, Nyko concedes that Walmart has chosen, for its own reasons and after years of carrying both parties' products, to continue only with PDP's charger products.  Nyko seeks to force Walmart to reverse that decision, and carry only Nyko's products, or none at all.  Finally, given the invalidity of the patent, the public interest will best be served by allowing competition, and not granting a rash TRO.

## II.      BACKGROUND

### A.      PDP Development History

Performance Designed Products LLC ("PDP") began manufacturing and selling hardware accessories for video games in 1997.[3]  PDP is now an industry

---

[3]      PDP was originally named Electro Source LLC, and operated under a DBA as Performance Designed Products until August 2007.  In August 2007, Electro Source LLC formally changed its name to Performance Designed Products LLC.

leader in designing and manufacturing products for all major video game platforms including the Sony systems (e.g., PlayStation 2, PlayStation 3, and the handheld PSP and PS Vita); the Microsoft systems (e.g., Xbox 360 console, and the Xbox 360 Kinect); and the various Nintendo platforms (e.g., the various Nintendo DS handheld devices and the Wii console systems).

PDP has a long history of innovation in video gaming accessories, including bringing new and original products to market, as well as innovative modifications to existing products.  PDP was the industry leader in bringing the highly popular AFTERGLOW® series of lighted controllers and video game accessories to market, as well as innovating the look, feel, and overall gamer experience for a variety of popular video game accessories, including for the Nintendo® DS line of handheld games, Nintendo, Wii®, Microsoft Xbox 360®, Sony PlayStation® 3.  Some specific examples of PDP's innovations are:

- A universal stylus (patented design, fits all recent models of Nintendo DS handheld video games)
- Foam video game controllers (first ever video game controller made out of soft foam, for easy gripping and damage resistance)
- A "trick" controller (patented video game controller allowing a combination of moves to be programmed into a single button)

(Roberts Decl. ¶ 3.)  These are just a few of PDP's gaming innovations.  PDP has at least sixteen (16) issued design and utility patents, and forty-three (43) additional patent applications pending.  (*Id.*)  PDP also respects the intellectual property rights of third parties, and in addition to developing its own intellectual property, PDP has licensed patented technology and trademarks from notable third parties, including Disney, Hasbro, Marvel, MTV, the NBA, Konami, Warner Bros., Microsoft, Sony, and Nintendo. (*Id.* ¶ 4.)

For more than 10 years, PDP has been developing and selling innovative charging systems and battery systems for video games.  Starting as early as 2001 or 2002, PDP sold charging docks for the Nintendo Game Boy Color system.  (*Id*. ¶ 5.)

As new and different systems were released by Nintendo, Sony and Microsoft, PDP has consistently continued to develop new charging systems, such as an audio and charging station for Sony PSP.  (*Id.* Ex. A.) In a 2005 Walmart sales presentation, PDP showed its charging dock system for the handheld GameBoy Advance, with a configuration similar to the charger disclosed and claimed in the asserted '848 patent.  (*Id.* Ex. B.)

**Charge 'N Go**



Throughout the 2000s, it was natural for PDP to start working on charging systems as soon as the latest generation of video gaming systems were announced or appeared on the market.  (*Id.* ¶ 6.)  Sony announced at least as early as May 2006 that its PS3 system would use wireless rechargeable controllers that could be charged via an electrical port.  (Hanle Ex. D.)  At least as early as August 2006, PDP spent considerable effort designing a charging system for two PlayStation wireless controllers, as reflected in the exemplary figures (of many) below. (Roberts Decl. ¶ 6, Ex. C.)



1   These development efforts were conducted over a year before the earliest priority

2   date of the asserted claims of the Navid '848 patent.[4]

3         PDP's initial design for its PlayStation charging system evolved into the

4   design sold today.  Based on the information available, the basic current design for

5   PDP's PS3 charging system was first displayed and promoted at the E3 trade show

6   in June 2007, and the charging system was first shipped to a customer in November

7   2007.[5]  (Roberts Decl. ¶ 7.)  Based on the information available, PDP's Xbox 360

8   charging system, with essentially the same external configuration as PDP's PS3

9   charging system, was developed under PDP branding in late 2007.  It first shipped

10   as an Energizer-branded product in September 2008.  (*Id.* ¶ 8.)

11       **B.**    **The Accused Products**

12         PDP was unaware of the '848 Patent, and PDP developed its PS3 and Xbox

13   360 charging systems completely independently from Nyko's patented charging

14   stand.  (*Id.* ¶ 9.)  Indeed, the designs are markedly different from the '848 charger

15   design, as shown in the figures below.  Nyko's allegation that PDP copied its

16   patented design is utterly unsupported, frivolous, irresponsible and outrageous.

17

18

19

20

21

---

22   [4]    Although the Navid '848 patent claims priority to a provisional application filed October 24, 2007, the provisional only disclosed and claimed a charging system requiring the use of adapters to make the connection between the base and the controllers.  (Hanle Decl. Ex. J.)  Thus, it appears the priority date for the asserted claims is March 7, 2008, the filing date of the non-provisional application for the Navid '848 patent.

25   [5]    PDP is investigating whether its own products constitute prior art that may be asserted against the '848 patent.  PDP's PS3 charging station was originally branded under the "Pelican" brand (owned by PDP). The same general design was modified and sold under the Energizer brand (under a license between Energizer and PDP). The Energizer branded PS3 charger was launched in September 2008.  (Roberts Decl. ¶ 7.)

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



PDP's PS3 Charging System (June 2007)

Navid '848 Charging Stand (March 2008)

19  Nyko's patented charger lays flat on a horizontal surface, has roughly vertical

20 "partition" structures 406 with opposite surfaces extending upwards from the base to

21 support the controllers and has DC ports 408 on the base 402.  PDP's chargers have

22 an arc-shaped support extending upwards from the base, with structures extending in

23 a horizontal direction from the arc-shaped support.  At the end of the horizontal

24 structures are plastic guides that hold the controllers in an upright position, i.e., in

25 the position in which they are used, while they are being charged.  PDP believes this

26 configuration is more aesthetically pleasing and more functional than the design in

27 the Navid '848 patent.

28

In any event, as addressed in section III.C below, PDP's PS3 and Xbox 360 charging systems do not have at least the following elements of the asserted claims of the Navid '848 patent:  (1) a plurality of DC ports <u>on the base</u>; and (2) docking bays comprised of opposite surfaces <u>on the base</u>.  Significantly, as discussed below, these structural limitations were added to the asserted claims to distinguish over prior art, and must be strictly construed.

## C.    The Crowded Art

There are numerous prior art charging stations for wireless devices.  These chargers were made for many different types of wireless handheld devices, such as mobile phones, computer mice, rechargeable tools and for rechargeable batteries themselves.  (See Hanle Decl. Exs. W, X and Y.)






*Leman* Battery Charger        *Chang* Mouse Charger        *Shaddle* Cell Phone Charging
Stand

When video game consoles began using battery-powered wireless controllers (including the PS3 system with a built-in rechargeable lithium battery), it was only logical that charging stations for video game controllers would be introduced. Several charging stations for video game controllers exist in the prior art.

1
2
3
4
5
6
7
8
9
10





*Cole* Charging Stand
With USB Ports

*Erickson* Charging Stand

11  (*Id.* Exs. K, N.)  The alleged point of novelty disclosed in the '848 patent is a video

12  game controller charging system that is configured to have "open" docking bays,

13  each defined by a pair of opposite surfaces on the base and a DC port located on the

14  base between the surfaces.  However, the prior art is replete with charging devices

15  with such a configuration.  For example, the Scholder, Huang and Brake prior art

16  patents each show a base with a plurality of docking bays configured to accept

17  rechargeable devices.  As the below figures from these patents illustrate, the bays

18  include at least a pair of opposite surfaces, and DC ports located on the base

19  between the opposite surfaces.

20
21
22
23
24







25  *Scholder* Charging Stand
With Docking Bays

*Huang* Charging Stand
With Docking Bays

*Brake* Charging Stand
With Docking Bays

26
27  (*Id.* Exs. R, T, Q.)  In sum, the '848 patent discloses a simple video game controller

28  charging system that merely utilizes or combines existing prior art.

### D.    The Patent-in-Suit

Claim 1 is the only independent claim asserted by Nyko:

1. A video game controller charging system for charging a plurality of video game controllers using externally supplied power, the video game controller charging system comprising:

a base;

at least one structure on the base for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged; and

a plurality of DC ports on the base, each of the DC ports configured to couple to and provide DC power to a power input port of a respective one of the plurality of video game controllers,

[A] *wherein the at least one structure on the base comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction, and*

[B] <u>*wherein the at least one structure on the base further comprises a plurality of pairs of opposite surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking hays [sic] each of the DC ports being on the base between a respective one of the pairs of surfaces*</u>.

According to the '848 patent file history, its points of novelty over the prior art are the final, italicized limitations, denoted "[A]" and "[B]."

The United States Patent and Trademark Office ("PTO") Examiner initially rejected all 27 pending claims as anticipated and obvious.  (Hanle Decl. Ex. I.) In particular, claim 1 was rejected as being anticipated by U.S. Patent Application Publication No. 2006/0202660 to Chang ("Chang").  (*Id.*)  In response, the applicant added limitation [A], namely, that the structure comprises a plurality of docking bays that are open in a first direction and configured to receive video game controllers from that direction.  (*Id.*)

In a subsequent office action, the PTO once again rejected all pending claims. This time, claim 1 was rejected under 35 U.S.C. § 103 as being obvious over Chang in view of U.S. Patent Application Publication No. 2009/0072784, to Erickson ("Erickson").  (*Id.*)  The Examiner cited Erickson as disclosing a plurality of DC

ports on <u>the base</u> of the charging system, each DC port connecting to a video game controller.  (*Id.*)  The applicant responded by adding another element [B] to claim 1, which requires the structure to comprise a plurality of pairs of opposite surfaces, each pair defining a docking bay, with a DC port being on the base between each pair of opposite surfaces.  (*Id.*)

Based on these amendments, the PTO issued a notice of allowability.  In sum, the Examiner allowed the claims only because the applicant introduced docking bays and DC ports that are <u>on the base</u>.  This is important because, the accused PDP products do not have DC ports on the base.   Figure 13 of the specification shows the docking bays and DC ports on the base:



As mentioned above, this same configuration exists in prior art charging stations, including Scholder, Huang and Brake.

### E.    PDP Has Been Selling the Accused Products for Years, Including Selling to Walmart

PDP started shipping both its PS3 and Xbox 360 Energizer-branded chargers to Walmart in April 2009.  PDP has been selling its PS3 charging system to Walmart continuously from April 2009 to the present.  (Roberts Decl. ¶ 10.)  With respect to this accused product, Nyko's requested TRO seeks to change the status quo that has existed since 2009.  Walmart made a decision to discontinue selling PDP's Xbox 360 charger in December 2009, and PDP stopped shipping this product to Walmart in the first half of 2010.  (*Id.*.)  In December 2011, Walmart informed PDP that it had made the decision to consolidate its line of video game charging

1   solutions, and thus it would again carry PDP's Energizer-branded Xbox 360 charger,

2   and Walmart has recently begun placing new orders with PDP for the Xbox 360

3   charger.  (Otte Decl. ¶ 3.)  It is PDP's understanding that Walmart has been selling

4   Nyko's chargers for PS3 (alongside PDP's charger) for all or most of the time during

5   which PDP's chargers have been sold.[6]  (Roberts Decl. ¶ 10.)  Thus, Nyko's

6   implication that Walmart's sale of PDP chargers will somehow permanently displace

7   Nyko chargers in inconsistent with Walmart's past practice.  Moreover, while PDP

8   adamantly denies that it infringes any valid claims of the '848 patent, there is ample

9   historical information that would assist the determination of monetary damages.

10      According to Walmart's website, Walmart currently sells 44 different Nyko

11   products.  (Hanle Decl. Ex. F.)  Nyko does not explain how Walmart's apparent

12   decision to discontinue its sales of only _two_ of those 44 products, a decision which

13   Walmart revisits at least twice a year, could cause irreparable damage to Nyko's

14   overall purported good will and "visibility. "  Walmart's website also reveals that it

15   sells at least four other charging stations (in addition to PDP's) for PS3 controllers

16   and two other charging stations (in addition to PDP's) for Xbox controllers.  (Hanle

17   Decl. Exs. G, H.)  Therefore, Nyko's _argument_ that PDP's chargers are "replacing"

18   or "displacing" Nyko's chargers is unsupported by the evidence.

19      Nyko's statements regarding the actions Walmart may take under various

20   circumstances are completely speculative, and Nyko would not be in a position to

21   predict Walmart's actions.  (Otte Decl. ¶ 4.)  For example, Nyko cannot know about

22   Walmart's future pricing or shelf placement of Nyko's charger products (see DE 12 ¶

23   14); what actions Walmart would take with respect to Nyko chargers if an injunction

24   were issued (see _id._ ¶¶ 15-16); Walmart's "favoring the incumbent" or preference to

25

26   ───────────────────────
     [6]    Nyko acknowledges that it PS3 charger has "struggled" against competing
27   designs.  (DE 12 ¶ 8.)  This fact, together with the weakness of its patent claims,
     suggests that the real reason for this lawsuit is Nyko's inability to compete in the
     marketplace.

28

offer <u>one</u> company's product line (see *id.* ¶¶ 16); Walmart's future decisions on what charger products to carry (see *id.* ¶¶14, 17).  (Otte Decl. ¶ 4.)

Indeed, Walmart's <u>actions</u> contradict Nyko's speculation.  In 2010, Walmart apparently chose Nyko's Xbox 360 charger over the incumbent PDP charger (DE 12 ¶ 10) and in 2011, Walmart chose PDP's Xbox 360 charger over the new incumbent (Nyko's charger).  And Walmart carries <u>several</u> companies' chargers, not just one company's.  (Hanle Decl. Exs. G, H.)  Further, Nyko acknowledges that Walmart revisits its decisions on what products to carry at least twice a year.  (DE 12 ¶ 11.)

## III.   POINTS AND AUTHORITIES

### A.   The Standard for a Temporary Restraining Order and Preliminary Injunction

The function of a temporary restraining order and preliminary injunction "is to preserve the status quo and prevent irreparable loss of rights before judgment." *QBAS Co., supra,* at *12 (citing *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)).  A plaintiff must establish four factors:  "[1] that he is likely to succeed on the merits, [2] that  [**5] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.' *Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)* (citing Supreme Court cases)." *Titan Tire Co. v. Goodyear Tire & Rubber Co.*, 566 F.3d 1372, 1375-76 (Fed. Cir. 2009).

"[B]ecause the primary purpose of a preliminary injunction is to preserve the status quo, preliminary injunctions which change the status quo are viewed with hesitancy and carry a heavy burden of persuasion."  *3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F. Supp. 1257, 1260 (C.D. Cal. 1995); *see also Sid Berk, Inc. v. Uniroyal, Inc.*, (C.D. Cal. 1977) (agreeing with defendant that preliminary injunction would alter the status quo because "granting the relief requested by [plaintiff] would seriously disrupt an established line of goods on which defendant

has spent hundreds of thousands of dollars in advertising and three years of effort developing good will.").  Preliminary injunctions that "disturb the status quo" are thus "disfavored" and "closely scrutinized." Schwarzer, et al., *Federal Civil Procedure Before Trial*, § 13:46 (2012).  As such, the factors for a preliminary injunction must "weigh heavily and compellingly in movant's favor."  *Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1099 (10th Cir. 2003).

**B.      There Are At Least Substantial Questions As to the Validity of the Asserted Claims**

At a minimum, PDP has raised numerous substantial questions as to the validity and infringement of the asserted claims.  One such question is all that is required to defeat a TRO based on alleged patent infringement.  *Genentech,* 108 F.3d at 1364 (Fed. Cir. 1997).  "Instead of the alleged infringer having to persuade the trial court that the patent is invalid, at this stage it is the patentee, the movant, who must persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue." *Titan Tire*, 566 F.3d at 1377.  "In other words, 'after considering the evidence on both sides of the of the validity issue,' the trial court must decide whether 'the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit.'" *QBAS Co., supra,* at *16 (quoting *Titan Tire*, 566 F.3d at 1379).  In *Titan Tire*, the "Federal Circuit … emphasized that in preliminary injunctions motions, the ultimate burden is on a patentee to show that the patent is not invalid." *Id*.

In summary, various patents and patent application publications render the patent-in-suit anticipated or otherwise obvious.  Exhibits U and V submitted herewith, are invalidity charts that detail how the references summarized below render all asserted claims invalid.

1.      <u>Claims 1, 2, 5, 7 and 10 are unpatentable under 35 U.S.C. 102(e) as being anticipated by Cole</u>

1    Cole was filed on November 1, 2007, and issued on May 17, 2011 as U.S.

2    Patent No. 7,942,747.  (Hanle Ex. K.)  Cole claims priority to a continuation-in-part

3    of application No. PCT/US2006/016944, filed on May 3, 2006.  Cole discloses a "a

4    video game controller charging system for charging a plurality of video game

5    controllers using external power" as recited by claim 1.  In particular, it discloses a

6    "video game controller rack" supports multiple video game controllers.  Cole 3:30-

7    31.  Further, Cole also discloses USB ports, that receive power from a power supply,

8    that connect to and charge the video game controllers.  Cole 4:42-44, Fig. 4.  Cole

9    discloses "a base" as recited by claim 1.  In particular Cole discloses a vertical

10   member or a game controller base that is attached to and supported by an external

11   surface, e.g., a wall.  Cole 3:46, Fig. 4.

12   Cole further discloses "at least one structure on the base for providing

13   physical support to the plurality of video game controllers while the plurality of

14   video game controllers are being charged."  In particular, the rack comprises

15   multiple cantilever angle members or posts that are fixed in pairs to the vertical base

16   or the game controller base.  These members provide a docking bay which supports

17   and securely stores game controllers.  Cole 3:38-42.  Cole also discloses "a plurality

18   of DC ports on the base, each of the DC ports configured to couple to and provide

19   DC power to a power input port of a respective one of the plurality of video game

20   controllers."  Specifically, Cole discloses a USB port for individual game controllers

21   that are connected to the controllers.  The game controllers are charged using power

22   from the USB ports.  Cole 4:37-44.

23

24

25

26

27

28



*FIG.4*

*FIG.I0*

Cole additionally discloses "at least one structure on the base comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction" as recited by claim 1.  Cole discloses cradle defined by a pair of cantilever angle members in conjunction with a portion of the vertical member or base member of the game controller rack.  Cole 3:53-55.  Finally, Cole discloses "at least one structure on the base further comprises a plurality of pairs of opposite surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking hays each of the DC ports being on the base between a respective one of the pairs of surfaces" as recited by claim 1.  Cole's game controller rack discloses a pair of cantilever angle members in conjunction with a portion of the vertical member or base member of the game controller rack defining a docking bay.  The USB port is

1  located on the base between the opposite surfaces of the cantilever angle members.

2  See, Cole Fig. 4 and 10.

3  Therefore, because Cole discloses all of the limitations of claim 1 in

4  combination as claimed, this claim is anticipated under 35 U.S.C. § 102.

5  Claim 2 depends from claim 1 and further requires "plurality of DC ports

6  comprises a plurality of male mini-USB connectors."  Cole discloses USB ports that

7  are used to charge the video game controllers.  Cole 4:42-44.  (Cite.)

8  Claim 5 depends from claim 1 and further requires "the pairs of opposite

9  surfaces are configured to align respective ones of the plurality of video game

10  controllers such that the power input ports of the respective ones of the plurality of

11  video game controllers couple to respective ones of the plurality of DC ports."  Cole

12  discloses a pair of cantilever angle members that are fixably attached to a vertical

13  member to create a docking bay for a game controller.  Cole 3:56-60  Cole further

14  discloses the cantilever angle members or ports are mounted to vertical member or

15  base which are provided with USB ports, one for each game controller position.

16  Cole 4:39-43.  The cantilever angle members provide a cradle that allows the

17  controller to slide into the docking bay, placing the controller in position to couple

18  with the respective USB ports.  Cole Fig. 4.

19  Claim 7 depends from claim 1 and further requires "the plurality of DC ports

20  is configured to concurrently couple to and provide the DC power to the plurality of

21  video game controllers."  Cole discloses USB ports that are positioned at each

22  docking bay, that connect and provide charge to a corresponding controller.  Cole

23  4:39-43.

24  Claim 10 depends from claim 8 and further requires "the AC-to-DC converter

25  is external to the base."  Cole discloses a power supply that is external to the base as

26  shown in Figure 4.

27  Therefore, because Cole discloses all of the limitations of claims 2, 5, 7

28  and 10 in combination as claimed, this claim is anticipated under 35 U.S.C. § 102.

2.      <u>Claim 8 is unpatentable under 35 U.S.C. 103 as being obvious over Cole in view of Brake.</u>

Claim 8 depends from claim 1 and further requires "an AC-to-DC converter adapted to convert the externally supplied power to the DC power provided to the power input ports of the respective video game controllers."  Brake discloses a power supply that receives external AC power and converts it to DC power.  Brake 5:28-30.  (Hanle Ex. Q.)  One of ordinary skill in the art at the time of the invention would be motivated to combine Cole and Brake.  It is well known that many electronic devices are connected to outlets that provide AC power to operate parts that require DC power.  Baker 5:25-30.  Therefore many devices are provided with AC-to-DC converters to operate these parts.  *Id*.

3.      <u>Claims 11 and 12 are unpatentable under 35 U.S.C. 103 as being obvious over Cole in view of Kumar.</u>

Claim 11 depends from claim 8 and further requires "the AC-to-DC converter is adapted to convert an AC voltage in the range of 100V to 240V corresponding to the externally supplied power into a DC voltage corresponding to the DC power."  Kumar discloses a switching power supply that can run on signals from 85 to 265 VAC.  Kumar 6:1-2.  (Hanle Ex. P.)  One of ordinary skill in the art at the time of the invention would be motivated to combine Cole and Kumar.  It is well known that the many electronic devices use a power supply that can run on AC voltage range of 100V to 240V.

Claim 12 depends from claim 11 and further requires "the DC voltage is :DC 5 V."  Kumar discloses an output signal that is a relatively constant 5V.  Kumar 5:53-54.  One of ordinary skill in the art at the time of the invention would be motivated to combine Cole and Kumar.  It is well known that the 5V output signal is applied to many components in a charger as power and/or reference signals.  Kumar 5:58-59.

4.      <u>Unpatentability of Claims 1, 2, 5, 7-8, and 10-12 Based Upon Erickson As The Primary Reference</u>

Erickson was filed on April 16, 2008 and published on March 19, 2009 as U.S. Patent Publication No. US 2009/0072784.  (Hanle Ex. N.)  Erickson claims priority from a provisional application No. 12/148,266 filed on September 17, 2007, and thus constitutes prior art under at least 35 U.S.C. § 102(e).  Erickson discloses a charging station for charging battery operated remote controls, in particular hand-held remotes such as for PlayStation 3, XBox 360 and Wii.  Erickson also discloses multiple bays that support remote controls during charging.   Erickson further discloses coupling inductors included on the base that are used to charge the batteries.  As detailed in Exhibit V, the asserted claims are unpatentable over Erickson.

Claim 1 is unpatentable under 35 U.S.C. § 103 as being obvious over *Erickson* in view numerous additional references, each of which discloses docking bays on the base formed by opposite surfaces and a DC port on the base between the opposite surfaces



*Scholder Figure 2*



*Huang Figure 2*



*Brake Figure 4*

*Kaji Figure 7*

*Kumar Figure 1*

## C.    The Accused Products do Not Infringe the Asserted Patent

Defendants have raised at least a substantial question regarding infringement, which is sufficient to defeat Nyko's request for a TRO.  Infringement is found only if each and every claim element is present in the accused device.  *General Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1359 (Fed. Cir. 1999).  To determine literal infringement, the Court must first construe the patent claim and then compare it to the accused device.  *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993).

PDP's PS3 and Xbox 360 charging systems do not have at least the following elements of the asserted claims of the Navid '848 patent:  (1) a plurality of DC ports on the base; and (2) docking bays comprised of opposite surfaces on the base. Significantly, as discussed above, these structural limitations were added to the asserted claims to distinguish over prior art and must be strictly construed.  Instead,

the DC ports and plastic insertion guides (opposite surfaces) in PDP's products are on horizontal members extending from the arc-shaped support which is, in turn, attached to the base.

Nyko contends that the term "base" includes a horizontal component in contact with a surface in addition to all other components attached to it except docking bays.  (App. p. 10)  However, this is not consistent with the plain meaning of "base" or the written description of the '848 patent.  The term "base" as described in the specification of the '848 patent discloses a component of the charging system which "includes a base [402]" and allows for "structures [to be] on the base."  In addition, Figures 11, 12 and 18 of the '848 patent shows a "base" that is in contact with a supporting surface, such as a table or wall.  A general purpose dictionary describes "base" as used in this context as:  "the bottom of something considered as its support."  (See http://www.merriam-webster.com/dictionary/base .)  This definition is consistent with the plain meaning and with the written description and figures.  Thus, for purposes of this application, "base" as used in the '848 patent should be construed as the bottom of the charging system which provides support. Under this construction, the structures identified by Nyko on PDP's products as DC ports and opposite surfaces forming docking bays and DC ports are <u>not</u> "on the base" as required by every asserted claim of the '848 patent and PDP's products do not infringe.  At minimum, there is a substantial question as to infringement, and the requested TRO must be denied.

### D.   Nyko Will Not Suffer Immediate and Irreparable Injury

#### 1.   Nyko is Not Entitled to a Presumption of Irreparable Harm

A patent infringement plaintiff is not entitled to a presumption of irreparable harm.  *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006) (reversing a "'general rule,' unique to patent disputes, 'that a permanent injunction will issue once infringement and validity have been adjudged.'").  The majority approach after *eBay* is that the presumption of irreparable harm does not apply in the preliminary

injunction context.  *See, e.g., Nano-Second Tech. Co., Ltd. v. Dynaflex Int'l*, No. CV 10-9776 RSWL, 2011 U.S. Dist. LEXIS 111836, at ** 9-10 (C.D. Cal. Sept. 28, 2011) (holding a shift of burden in patent cases "is now inappropriate in light of the Supreme Court's decision in *eBay*"); *QBAS Co.,supra*,  at *32 ("Harm cannot be presumed based on patent infringement alone."); *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1167-69 (C.D. Cal. 2009); *Hologic, Inc. v. Senorx, Inc.*, No. C 08-133, 2008 U.S. Dist. LEXIS 36693, at *15 (N.D. Cal. Apr. 25, 2008) ("it does not appear that presumption of irreparable harm should be extended to preliminary injunction applications involving patents"); Schwarzer, et al., *Federal Civil Procedure Before Trial*, § 13:58.36 (2012).[7]

## 2.   Nyko's Presents No ***Evidence*** of Irreparable Harm

As addressed above, Nyko's purported evidence of irreparable harm is completely speculative and unsupported.  Walmart regularly adds and removes vendors, and there is no basis to say that Nyko will be "displaced."  Further, both PDP and Nyko have a track record of Walmart sales, and monetary damages will be easy to calculate and fully adequate if Nyko were to, hypothetically, prevail. Further, Nyko's assertion of lost good will is belied by the numerous Nyko products that will apparently remain on sale by Walmart.  (Hanle Ex. F.)  Further, there is no evidence that a TRO would prevent the alleged harm, as there is no evidence that Walmart would sell Nyko's chargers (particularly since it sells several chargers made by non-parties). (Hanle Exs. G, H.)

Without any support whatsoever, Nyko irresponsibly alleges that PDP copied its patented charger design and thus avoided research and development costs.  (DE 12 ¶¶ 18-24.)  As addressed above, PDP started designing a charging station for PS3

---

[7]     This approach makes perfect sense, because "entitlement to a permanent injunction requires a showing of *actual success* on the merits rather than a *likelihood* of success on the merits."  *Aurora World*, 719 F. Supp. 2d at 1168 n. 111; *see also Erico Int'l Corp. v. Doc's Marketing, Inc.*, No. CV 05-2924, 2007 U.S. Dist. LEXIS 1367, at *7 (N.D. Ohio Jan. 9, 2007)

1    almost two years before the priority date of the '848 patent and over two years

2    before the application published, and publicly displayed its PS3 charging station

3    over a year before that publication date.  Once again, chargers for all manner of

4    wireless devices were well known and the design of a charger for wireless gaming

5    controllers was obvious as soon as the wireless controllers were released.  Further,

6    PDP has two entire engineering offices –in San Diego and in Hong Kong –with

7    approximately ten full-time employees dedicated almost exclusive to engineering,

8    research and development. (Roberts Decl. ¶ 10.) In addition to these engineering

9    employees, PDP has literally dozens of other employees at its headquarters in

10   California, and in its office in Shenzhen, China, who are directly involved in product

11   development, as well as research and development of new products.  (*Id.*)

12         Nyko's assertions that PDP piggy-backed on Nyko's viability and design

13   improvements is also utterly unsupported.  Nyko never states when it brought its

14   products to market, what they looked like, how the market reacted, how the designs

15   changed, or how Nyko's competitors purportedly took advantage of Nyko's efforts.

16   (See DE 12 ¶¶21-22.)  Further, PDP designed a two-port charger for PS3 in August

17   2006, long before Nyko's patented design was even conceived.  (Roberts Decl. Ex.

18   C.)  There is simply no evidence that Nyko was first to do anything, much less

19   anything that was copied by PDP.  (See DE 12 ¶ 23.)  Even if Nyko's competitors

20   reacted to market acceptance or rejection of Nyko's products (of which there is no

21   evidence), there is nothing illegal or unethical about that.  Nyko's implication that

22   PDP reverse-engineered Nyko's design and circuitry is an outrageous red herring

23   and completely unsupported by any evidence.  (See DE ¶ 24.)

             3.    <u>Nyko's Delay in Moving for a TRO Shows it Will Not Be
                   Irreparably Harmed</u>

24

25         Nyko's delay in moving for injunctive relief belies any claim of immediacy.

26   *See Kerr Corp. v. N. Am. Dental Wholesalers, Inc.*, No. SACV 11-0313 DOC, 2011

27   U.S. Dist. LEXIS 61779, at ** 8-9 (C.D. Cal. June 9, 2011) (delays in seeking an

28

injunction, "necessarily suggest that a lack of urgency exists"); *Hansen Beverage Co. v. Vital Pharm., Inc.*, 2008 U.S. Dist. LEXIS 105447, at *6 (S.D. Cal. Dec. 30, 2008) ("Delays in requesting an injunction, whether for months or years, tend to negate a claim of irreparable harm.").

          4.   <u>Loss of Sales or Market Share Does Not Constitute Irreparable Harm</u>

"Loss of sales alone will not support a finding of irreparable injury' because acceptance of that position would require a finding of irreparable harm to every' plaintiff regardless of the circumstances." *Aurora World*, 719 F. Supp. 2d at 1169 (quoting *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994)). "Similarly potential loss of market share does not constitute irreparable injury." *Id.* Accordingly, "neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." *Nutrition 21 v. U.S.*, 930 F.2d 867, 871 (Fed. Cir. 1991).

Nyko's contention that it will suffer irreparable harm because it will lose money needed for research and product development has been soundly rejected by the Federal Circuit:

> [T]hat claim of injury is not materially different from any claim of injury by a business that is deprived of funds that it could usefully reinvest.  If a claim of lost opportunity to conduct research were sufficient to compel a finding of irreparably harm, it is hard to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary injunctive relief.  Such a rule would convert the 'extraordinary' relief of a preliminary injunction into a standard remedy, available whenever the plaintiff has shown a likelihood of success on the merits.

*Eli Lilly and Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996).  In fact, the Federal Circuit went on to find that such a rule would "disserve the patent

system." *Id.* (citing *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683, 15 U.S.P.Q.2D (BNA) 1307, 1310 (Fed. Cir. 1990)).

### E.   The Balance of Hardships and Equities Tips Strongly in PDP's Favor

In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter*, 555 U.S. at 24 (citation omitted). Here, Nyko would have the Court merely shift the hardships — lost sales — to PDP. Each argument that Nyko makes about reputation, goodwill, and lost sales, would apply equally if not more strongly to PDP. This is especially so considering that PDP has been selling one of the accused products to Walmart for several years.

### F.   The Public Interest Weighs Against a Preliminary Injunction

Here, the "public interest in continued marked competition for these products disfavors a preliminary injunction, especially in light of Plaintiff's small likelihood of success in proving infringement for these products." *Nano-Second Tech. Co., Ltd. v. Dynaflex Int'l*, No. CV 10-9176 RSWL, 2011 U.S. Dist. LEXIS 111836, at *13 (C.D. Cal. Sept. 28, 2011); *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990). Given Nyko's weak arguments on the merits, these public interests certainly outweigh any interest in the slim possibility of protecting Nyko's patent rights.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's application for a TRO.

1   Dated:  May 15, 2012

2                                   Respectfully submitted,

3                                   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

4

5

6                                   By      /s/Steven M. Hanle
                                            DANIEL Y. YANNUZZI
7                                           STEVEN M. HANLE
                                     GRAHAM (GRAY) M. BUCCIGROSS
8                                         Attorneys for Defendants,
                                     Performance Designed Products LLC and
9                                         Energizer Holdings, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28