1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4        THE HON. JUDGE GARY ALLEN FEESS, JUDGE PRESIDING

5

6    NYKO TECHNOLOGIES INC.,            )
                                        )
7                        Plaintiff,     )
                                        )
8           vs.                         ) NO. 12-CV-03001-GAF
                                        )
9    ENERGIZER HOLDINGS INC., et al.,   )
                                        )
10                       Defendants.    )
     _____)

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Los Angeles, California

16                    Tuesday, May 29, 2012

17

18

19

20

21

22

23          LISA M. GONZALEZ, CSR No. 5920, CCRR
      Edward R. Roybal Federal Building & U.S. Courthouse
24          255 East Temple Street - Room 181-C
             Los Angeles, California 90012
25                    csrlisag@aol.com

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:    CHRISTIE, PARKER AND HALE LLP
                           BY:  ART HASON
 4                          and JOHN DAVID CARPENTER
                           655 North Central Avenue
 5                         Suite 2300
                           Glendale, California  91203-1445
 6                         626-795-9900

 7

     FOR THE DEFENDANT:    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
 8                         BY:  GRAHAM M. BUCCIGROSS
                           12275 El Camino Real
 9                         Suite 200
                           San Diego, California  92130-2006
10                         858-720-8900

11                         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                           BY:  STEVEN M. HANLE
12                         650 Town Center Drive
                           4th Floor
13                         714-513-5100

14

15

16

17

18

19

20

21

22

23

24

25
```

*Los Angeles, California, Tuesday, May 29, 2012*

*1:30 p.m.*

*-o0o-*

THE CLERK:  Calling case number CV 12-3001-GAF,

NYKO Technologies, Incorporated, versus Energizer Holdings,

Incorporated, et al.

Counsel, state your appearances.

MR. HASON:  Good afternoon, Your Honor.  Art Hason

and John Carpenter of Christy Parker & Hale LLC for

plaintiff NYKO Technologies, Inc.

THE COURT:  Good afternoon.

MR. HANLE:  Good afternoon, Your Honor.  Steve

Hanle and Gray Buccigross of Sheppard Mullin Richter &

Hampton for the defendants.

THE COURT:  Good afternoon.

All right.  The matter is on today's calendar for

hearing on an application for a temporary restraining order.

The order that is sought essentially would preclude the

defendants from selling the allegedly infringing item to

Wal*Mart stores.

I have a number of concerns about the requested

TRO.  Let me briefly identify those, and then I want to hear

from the plaintiff.

The first matter is that I'm not entirely

persuaded that this is an injunction that would maintain the

1    status quo.  It seems to me that it's a definitional

2    problem.  Wal*Mart altered the status quo in December and

3    gave notice to NYKO of about six months in length indicating

4    what it intended to do in terms of the sale of chargers.

5    And it seems to me that what you're asking me to do

6    essentially is to undo a decision that Wal*Mart made seven

7    months ago.  And even if I do that, even if I issue an

8    injunction and say, well, these people over here can't sell

9    to Wal*Mart, that doesn't even assure me that Wal*Mart is

10   going to sell the plaintiff's product.

11          We don't know that for sure, and that brings me to

12   the issue of irreparable harm.  The problem that the

13   plaintiff identifies as irreparable harm principally is that

14   it's going to be taken off the shelves, that it's going to

15   lose visibility, that there will be an impact on its

16   goodwill, and that it will suffer in ways as a result of

17   that that can't be compensated in dollars.

18          But if there's no assurance that Wal*Mart is even

19   going to take the product and market it even if I issue the

20   injunction, then the premise may be incorrect in the first

21   instance.

22          In addition, the idea that losing shelf space now

23   means that shelf space will never be regained in the future

24   seems to me to be undermined by the very evidence that NYKO

25   has presented.  NYKO tells me that Wal*Mart does a

```
 1   twice-a-year review of its products and vendors, at which
 2   time presumably NYKO has its option opportunity to explain
 3   why it should be back on the shelves.  And the history of
 4   the sale of the chargers at least for the XBox 360 is such
 5   that it shows that the claim that there is a preference for
 6   incumbent vendors is not necessarily the case.  I mean, we
 7   had PDP selling its charger, and then as I understand the
 8   plaintiff's evidence, then its charger was put in place in
 9   favor, in lieu of the PDP charger, and now Wal*Mart's
10   changing back again.  So that's at least two changes in a
11   relatively short period of time.
12            In addition -- by the way, with respect to status
13   quo it appears to me, if I'm reading the record correctly,
14   that Wal*Mart has been selling the Ps3 version of the
15   charger for years.  And to issue an injunction stopping that
16   certainly wouldn't maintain the status quo; it would
17   radically alter the status quo.
18            Plaintiffs also talk about the reverse engineering
19   and copying that the defendants have done and how unfair it
20   is that the plaintiff should go through the cost of the R&D
21   and have it essentially be free-ridden by the defendants,
22   but there's no evidence to support that that I could see.
23            If it's in the record, I'm sure you're going to
24   point it out to me, but I spent the entire holiday afternoon
25   rereading materials in this case and focusing on the
```

1   evidentiary materials, and I didn't find anything to support

2   that argument.  It's an argument, but it's unsupported as

3   far as I can tell.

4           And then with respect to likelihood of success on

5   the merits, I think that there is a big validity question in

6   this case.  I grew up in the law in the era of Anderson

7   BlackRock, so I have a sense especially since KSR

8   International has recently reminded us that that's still

9   good law; that when we're talking about taking standard

10  elements and putting standard elements together in a

11  predictable way with completely predictable results, that

12  for patent purposes you have an obviousness problem.

13          And with that, then, I think the balance of the

14  equities and the public interest would tend to disfavor an

15  injunction, especially with respect to the public interest.

16  The public has an interest in competition in the

17  marketplace.

18          We allow that interest to be overridden for a

19  period of years when an inventor has patented a device; but

20  where the likelihood of success that that patent is valid is

21  questionable, the public interest in my mind tends to weigh

22  against issuing the injunction.

23          So I have obviously several concerns about issuing

24  an injunction in this case, and I need to hear from the

25  plaintiff.  So, counsel, if you would, please.

```
 1          MR. HASON:  Your Honor, if I may start with the
 2   validity question and focus on the substantial issue that
 3   Your Honor raised, one thing I'd like to point out here to
 4   start off with is that this patent is a combination of
 5   elements, and the combination of elements that are set forth
 6   in this claim are unobvious and taught away from in the
 7   prior art.
 8          THE COURT:  Look, I read your arguments.  I know
 9   the words, but sometimes words obfuscate.  It's a cradle
10   with a plug.  I mean, that's what it is.  And the design of
11   the offending device, in my mind when I looked at them -- I
12   read the papers first because I thought, hmm, the argument
13   suggests that it's copied, that it's not just infringing but
14   that it's copied.  And the allegedly infringing device
15   doesn't appear to me to be at all like the device that is
16   patented by the plaintiff.
17          But to the extent that there are similarities in
18   elements, it seems to me that the similarities are driven by
19   the device that's being charged.  I mean, there's only so
20   many ways you can plug that device into a charger.  Chargers
21   have been around forever.  Slots have been around forever.
22   Cradles have been around forever.  USB ports have been
23   around forever.
24          I just don't see anything particularly unique, and
25   I don't understand what the patent examiner was thinking
```

1  about frankly when it came down to that last addition to the

2  patent, because it didn't seem to me to add anything but

3  words.  And I don't know why those words were persuasive to

4  the patent examiner, but they're not terribly persuasive to

5  me.

6          MR. HASON:  Your Honor, there are many ways to

7  tackle the problem.  For example, if you look at the Cole

8  patent -- first of all, I'd like to note that --

9          THE COURT:  Well, you say it's not prior art at

10  all; right?

11          MR. HASON:  It's not prior art at all.  And

12  there's no prior art that the defendants have been able to

13  show that disclose each and every element of this invention.

14  And in the video game arts, the fact of placing an entire

15  controller onto a stand to charge it with these elements and

16  having two chargers concurrently charge is highly unobvious.

17          THE COURT:  Really?

18          MR. HASON:  Yes.  And the reason why is because --

19          THE COURT:  Okay.  I mean, just saying it doesn't

20  make it so.  I mean --

21          MR. HASON:  Let me give you an example,

22  Your Honor -- and this is in the evidence.

23          THE COURT:  Okay.

24          MR. HASON:  When Sony and Microsoft came out with

25  their devices, their controller devices, in 2006, their

1    solution to the problem of recharging the controllers was to

2    tether the controller using a USB cable to the console.  The

3    reason for that is because the prevalent thinking until this

4    invention came along was that you did not want to disrupt

5    the ability of the user to play the game.  So you would give

6    them an opportunity either through swappable battery packs

7    which would come out of the controller -- they could swap

8    it -- or you would have them tethered to the video game

9    console device.

10          This invention, by requiring that the video game

11   controllers themselves be lodged into the charger, removed

12   the charger from the user's ability to play it while it's

13   being charged.  So one way that the user could tackle this

14   is they could get another set of controllers.

15          Another thing that they could do is that they

16   could stop playing.  But this was taught away from in the

17   prior art.  When you talk about driving the design from the

18   device, NYKO itself came out with multiple designs before it

19   centered on this design, and tellingly PDP came up with a

20   design which is in the evidence which I can put up here --

21   this is in their brief.  It's the Roberts exhibit.

22          THE COURT:  Which letter is it?

23          STPHAO:

24          MR. HASON:  Sorry.  It's Roberts Exhibit C,

25   Your Honor.  It's on the screen now.

```
 1            THE COURT:  Okay.  Yeah, I've looked at this.

 2            MR. HASON:  This is what they came up with.

 3            THE COURT:  One of the things that they came up

 4   with.

 5            MR. HASON:  Sure, and we'll get to when they came

 6   up with -- the one thing that they came up with here has a

 7   movable arm.  It's a very cumbersome design.  It's driven in

 8   different ways by the same device.  And what the defendants

 9   say they did is that their design evolved into the design

10   that is now being accused of infringement.

11            THE COURT:  Isn't that how it always works?  I

12   mean, that would be how most things are developed; right?

13   They start from one idea and they evolve over time.

14            MR. HASON:  Sure.  This one here changed

15   substantially.  This has a movable arm.  It's a two-step

16   process.  There are many issues with this.  But let me tell

17   you what happened in the meantime, and this is the evidence

18   of copying.

19            Here at the consumer electronics show in 2007 NYKO

20   introduced its product and announced it, and the product was

21   met by great fanfare.  As a matter of fact, in one of the

22   exhibits that we provided, Jerry Block, the person who

23   reviewed and found this to be a good product, works for PDP,

24   and he was talking about the NYKO product.

25            Here is the actual product, Your Honor, that
```

1   was shown and sold after January 2007, long before PDP came

2   out with their device, long before.  And in the intermediate

3   portion they went from this -- they saw this because it was

4   widely announced at the CES show -- and then they came up

5   with the accused device.  There's no explanation of -- you

6   know, they don't deny that they saw this.  They don't deny

7   that they knew about it.  They say they didn't know about

8   the patent.

9        THE COURT:  No, but they say -- they definitely

10  deny copying it, and they have presented evidence from

11  people within their company saying that they had a variety

12  of independent R&D people working on it and developed it

13  through their own process.

14       MR. HASON:  Which is additional evidence of

15  non-obviousness, because when a company like PDP, Microsoft,

16  and Sony all throw large amounts of R&D effort at the

17  problem, NYKO comes up with it first.  And then of all the

18  other types of products that can exist, all of them, well,

19  at least Sony and PDP end up selling this design?

20       THE COURT:  Well, if you want to contend that it

21  is the same design.  I'm not sure that I would -- that I'm

22  going to hear that it is exactly the same design.  I'm

23  guessing that the compression forces, for example, are in a

24  different location and in a different way in the design

25  which is the PDP design, but we'll hear from them

1  eventually.

2          MR. HASON:  All they did, Your Honor, is that they

3  inclined this thing further.  This has an incline on it.

4  The NYKO product has an incline.  They inclined it further.

5  Everything else is the same, and it certainly literally

6  infringes the claim.  I mean, if you look at the argument

7  that they're making, there is no valid noninfringement

8  argument.

9          And it is admitted that multiple other designs

10  existed.  We have several examples of that here, including

11  the wire, yet they and several others gravitated toward this

12  design while NYKO's patent -- after NYKO came up with this

13  product and while the patent was pending in the patent

14  office.

15          THE COURT:  Is there a reason why you haven't sued

16  Wal*Mart in this case?  Aren't they a contributory infringer

17  if they're selling it?

18          MR. HASON:  They are, Your Honor.  They would be

19  an infringer actually.  However, we have taken the position

20  that it's the manufacturer who's local here and who

21  understands the product and who made the product that we

22  would file suit against initially.  We have that right.

23          THE COURT:  But really what you want is leverage

24  with Wal*Mart; right?  That's what your client wants.  They

25  want leverage with Wal*Mart so that they can eliminate a

1  competitor.  And if they eliminate that competitor, I would

2  imagine that there will be other competitors who will get

3  letters as well, because some of the other devices look like

4  they might have similar bases and stands.  I'm not positive

5  because I can't tell exactly what the design is from just

6  looking at photographs, but that's what your client wants;

7  right?  It wants leverage so it can get Wal*Mart to put its

8  product back on the shelves; true?

9            MR. HASON:  Well, it's not that simple in this

10  sense, Your Honor.  The decision was initially made in

11  December, but we have emails that we can submit to

12  Your Honor in camera because they're Wal*Mart confidential

13  that state that they could potentially revisit the issue.

14            Now, this process, as you noted, takes six months

15  to do.  I went to Wal*Mart stores personally yesterday, and

16  the NYKO product is still on the shelf.  So the status quo

17  at this time is that the products of NYKO are still on the

18  shelf.  They have not been discounted.  They have not been

19  moved to a different location.

20            THE COURT:  But you submit a declaration saying

21  that all that was going to happen.

22            MR. HASON:  Yes.  Absolutely.

23            THE COURT:  Maybe your irreparable harm argument

24  is wrong.

25            MR. HASON:  No, Your Honor.  It's imminent.  It

1    just hasn't happened yet.  And in these emails it says that.

2    It says that -- and there's no dispute over this.

3           THE COURT:  You shouldn't argue evidence to me

4    that you haven't submitted.  You had plenty of time to

5    submit all the evidence that you wanted, and now you're

6    arguing evidence that I haven't seen.  That's unfortunate.

7           MR. HASON:  Your Honor, this is Wal*Mart

8    confidential, so we had an issue there.

9           THE COURT:  I don't care whose confidential it is.

10   It's evidence you're arguing to me to get what you want from

11   me, and that means either you give it to me or you don't.

12   And if you don't and you haven't, it won't be considered.

13          MR. HASON:  Yes, Your Honor.

14          THE COURT:  Simple as that.

15          Tell me more about the status quo, why you think

16   that on the eve, virtual eve of June 2012, that an

17   injunction at this point preserves status quo when the

18   decision was made by Wal*Mart six months ago.

19          MR. HASON:  Wal*Mart in its supply agreement which

20   we did provide to the Court has -- requires that the

21   suppliers abide by intellectual property laws and not sell

22   products that infringe any patents or trademarks or

23   copyrights.  That is in there, and the patent issued after

24   the December decision.

25          At that time NYKO made efforts and spoke to

1    Wal*Mart about reviewing the patent in view of their seller

2    agreement.  Nothing has changed at this time at Wal*Mart as

3    far as I could tell by going to a couple of stores -- which

4    I did yesterday, Your Honor.  And so the status quo at this

5    time is that NYKO's products are still on the shelf and

6    PDP's products are not.

7          THE COURT:  At least at a couple of stores.  Which

8    Wal*Mart stores did you go to?

9          MR. HASON:  Santa Clarita store, Your Honor, and

10   Panorama City, I believe.  It's in the valley.

11         THE COURT:  That one I know.  I don't know Santa

12   Clarita.  All right.  Let me go back.  I want to make one

13   point.  I want to make sure I'm clear on something.  As I

14   understand your reverse engineering argument, then, your

15   reverse engineering argument is a timing argument; is that

16   right?  It's that the design that the defendants are now

17   selling was defended after the NYKO product was released

18   into the marketplace; is that correct?

19         MR. HASON:  Essentially, Your Honor.  But just to

20   go just a bit further, it's uncontroverted that PDP had a

21   different design and that Sony had a different design, for

22   example.  Then it's uncontroverted here with the evidence

23   that we provided in the Abergast declaration, Exhibit A --

24   which I'll put up here -- that at the Consumer Electronics

25   Show in January 2007, to some fanfare NYKO announced this

1    product.

2           Then at a time in the future, PDP and Sony in fact

3    and others came to this design which the prior art taught

4    away from.  There is no prior art here, Your Honor, which is

5    significant.  There is no prior art here that discloses the

6    combination of elements where an entire video game

7    controller is put in a first direction into a cradle of this

8    type where there's two that are being charged simultaneously

9    and with the other features in the claim.  That's simply not

10   in there, and the prior art taught away from it.

11          It's significant in the sense that, you know, we

12   taught -- there could be a tendency to trivialize this.  But

13   what we feel is occurring is this is all based on hindsight

14   reconstruction.  People are looking at the patented product,

15   and now we're coming back to the prior art and saying,

16   okay --

17          THE COURT:  But that's mandated, I mean, that's

18   mandated when you apply for a patent.  You are supposed to

19   disclose to the patent examiner all relevant prior art, all

20   of it.

21          MR. HASON:  Yes.

22          THE COURT:  That's mandated.  So to say we're

23   that, well, you know, we're looking at hindsight, of course

24   we are.  We have no choice.  I mean, that's the only option

25   available to us.

1          MR. HASON:  True, Your Honor, but the Federal

2    Circuit and the law is very clear.  What the Court -- what

3    is supposed to occur is that the Court and the litigants put

4    themselves, the hypothetical ordinary skill in the art, at

5    what the state of the art was at the time the invention was

6    made.

7          THE COURT:  Counsel, I do understand that.  I've

8    had a few patent cases over the years, so I understand that.

9    But I must say that as I look at the prior art, it's just

10   not so clear in my mind -- it's very clear in yours

11   obviously that it teaches away from what your client

12   developed.  It's not quite as clear in my mind that that's

13   the case, but I do understand your point.

14         MR. HASON:  If I may just explain it.  Video game

15   controllers have been around for a long time.  They've been

16   around for a long time.  There's not one piece of prior art

17   that the defendants have been able to show that showed a

18   video game controller in this complete configuration.

19         THE COURT:  That may be true.  That may be true,

20   but I don't think that is the KSR -- that's definitely not

21   what the Supreme Court had in mind in KSR.  And the chargers

22   have been around for an extremely long time -- I mean

23   extremely long time in the sense of our current electronic

24   age, maybe 20 years or so.

25         But one has -- one can't just say, well, I'm only

1  going to look at video game controllers because that's the

2  only relevant prior art that one could even think about it;

3  is it?  Really?

4          MR. HASON:  Certainly not.  KSR says that for

5  analogous arts and the like, for example, then teachings may

6  be irrelevant.  But here the video game industry and the

7  problems that are associated with the video game controllers

8  and the teaching away from the prior art in the context of

9  video game controllers is very significant.

10          Granted, the patent office and the defendants have

11  brought up rechargeable batteries.  Well, that's a solution.

12  We could have had -- NYKO could have come up with some type

13  of a system where you just take out the battery and you

14  stick the battery in there, and you swap out that battery

15  and you continue to play with the same controller.

16          Here NYKO came up with an invention where the

17  entire controller in two of them need to be put onto this

18  device, and there are many advantages here.  The claim

19  includes a limitation that the docking bay is open in the

20  first direction; the coupling to the DC port, all of these

21  limitations lend benefits.

22          One big benefit is that when the controller,

23  Your Honor, is on the cradle, the handles extend outwardly

24  because of where the attachment is.  And by that, there is a

25  one-step process by which I as a user can grasp the handle

1  in close to a playing configuration and remove it from the

2  dock for easy playing.

3       That is something that Cole, which they cited, got

4  backwards.  If you look at Cole figure 4, which I'll put up

5  here -- and this is very significant, we feel -- Cole got it

6  backwards.  Coal had this rack where they put this here.

7  This isn't even prior art, but this is what they came up

8  with after --

9       THE COURT:  I was going to say, you're talking

10  about it but your view, your point is it's not prior art in

11  the first place.

12       MR. HASON:  But it's instructive, because it shows

13  that if it was so simple and so straightforward and so

14  generated by the design of this, then why is it on

15  backwards?  They don't even disclose -- you know, I think

16  what's happening here -- this Cole reference is unclear --

17  but they have a cable that actually wraps up and over the

18  device, and that's the cable that comes with the Sony

19  controller to begin with.

20       So in the video game arts they're very restricted,

21  a different set of solutions and problems and other types of

22  things.  For example, just a rechargeable battery or a

23  phone, for example, they are very different issues.  In the

24  context of a video game controller, the goal of the user

25  typically is to play as long as possible using a game.  And

1   what many users do, I can attest, is that they will have --

2   you know, they'll want to swap out the battery really

3   quickly; they'll want to pause the game and then resume it

4   right away if it's an action game.  And here the entire

5   controller is locked into this and has to be charged.  And,

6   in fact, there are two of them where this has to be done.

7           This system here displays the controllers in a

8   neat way where video game controllers may take pride in

9   their controller and they would want to display it.  So this

10  is a very neat display for them to do it, even in this

11  article Mr. Jerry Block talks about in the review about how

12  it's a handsome design that shows this.

13          The second thing that we have here is that there's

14  cable management, no external cables between the charger and

15  controller.  And this is significant, too, because these

16  come with cables.  So what NYKO in the invention was telling

17  you to do is take this cable and throw it away.  You bought

18  a cable; it came with it, but you don't need it anymore.

19  Get rid of that cable that came with it.

20          Third, there's simultaneous charging of separate

21  controllers.  Even for one-player games you would

22  potentially want to swap out one for the other.  So in a

23  one-player game you can put this on the dock and then take

24  the other one off in this configuration.  And you can do it

25  quickly.

1          So these are -- in the prior art you have nothing

2      like that.  In Sony, for example, it talks about -- in

3      Microsoft and Sony.  We have the box here.  We submitted

4      this evidence, Your Honor.  In the Sony product they talk

5      about having a nine-foot USB cable that they use.  So if

6      you're playing the game, then you have a long cable to do

7      it.

8          But in playing video games, many times people get

9      excited or they're doing action moves in playing the video

10     game, and it's have difficult to be tethered to the console.

11     It can damage the console, for example, which happens if you

12     pull on it the wrong way.  By using this, you're not -- you

13     don't have those issues.

14         And these unique set of issues that come in in the

15     video game area are not apparent in the arts that they're

16     citing.  We must -- well, we're required to give some

17     deference to the patent examiner because typically the

18     patent examiners are ones that have experience in the field.

19         The patent examiner saw all the same prior art or

20     cumulative prior art to what the defendants are providing

21     now.  The examiner found it very significant that this

22     related to a video game controller and that these features

23     were part of this.  And so --

24         THE COURT:  Well, the patent examiner said no

25     twice.  And then finally, as more and more words were added,

1    finally said yes.  But as I said, I read through the history

2    and how it developed, and unfortunately the history doesn't

3    tell me why it was -- at least I couldn't tell from reading

4    it -- what it was that the patent examiner looked at that

5    made him think, ah, now it's good.  Now it's fine.

6              MR. HASON:  We would submit, Your Honor, what the

7    examiner looked at is the fact that there was no prior art

8    in the video game area that had these features, and

9    that's -- you know, even though the examiner presumably knew

10   that video game controllers have been around since way back

11   when I was a child in the '80s.  I used to play the Atari

12   800, the Atari system, with controllers.

13             THE COURT:  Way back then?  Way back in the '80s?

14   I can hardly remember those days.

15             MR. HASON:  I apologize, Your Honor.

16             THE COURT:  Well, all right.  Look, I think I get

17   your point.  I want to hear from the defense and I want the

18   defense's response to these issues as well, including the

19   points that you've made in your argument here today.

20             Mr. Hanle, you're up.

21             MR. HANLE:  Do you mind if I address the Court

22   from the table here so I can control -- I've got some slides

23   that I think will help the Court.

24             THE COURT:  Go ahead.

25             MR. HANLE:  Also we just filed some additional

1    evidence.  We just e-filed it and I've given a copy to

2    plaintiff's counsel.  It goes to the issues -- there's two

3    issues that it goes to.  One is the status quo and what's

4    currently being carried in Wal*Mart stores, because we did

5    our own investigation and would like to submit actual

6    evidence of what's going on in Wal*Mart and other stores.

7    We've e-filed that.

8         Then we have a declaration that also presents

9    evidence of a 102(b) on-sale bar defense as well.  That's

10   something that in our continued investigation we discovered.

11   And could I hand those to the Court?

12        THE COURT:  Yes.

13        MR. HANLE:  Thank you.  And I've also got a hard

14   copy of my slides for counsel and the Court.  I will skip

15   over -- given Your Honor's preparation you mentioned,

16   yesterday you covered quite a bit what I was going to cover,

17   so I will skip over the vast majority of this.  So I

18   appreciate the Court's indulgence when I get to the relevant

19   points.

20        As to Your Honor's points, I think we completely

21   agree with Your Honor on the status quo.  The injunction

22   would not preserve the status quo; it would alter the status

23   quo.

24        THE COURT:  What's your status with Wal*Mart at

25   this point?  I mean, aren't they worried about selling

1  infringing items?

2          MR. HANLE:  No, because we don't believe we're

3  infringing.  We believe the patent is invalid very strongly,

4  and we can get into that.  But the status quo is that the

5  Ps3 chargers have been in Wal*Mart for years.  And the

6  XBoxes were there, and then they weren't there, and now

7  they're back there as of recently.  The decision, as Your

8  Honor pointed out, to recarry the PDP XBox chargers was made

9  in December.

10          So we do believe that this injunction would not

11  maintain the status quo; it would disrupt the status quo.

12          THE COURT:  Counsel for plaintiff mentioned some

13  email traffic with Wal*Mart, which I'm sure exists.  I have

14  no doubt that there has been substantial communication with

15  Wal*Mart between and among the three; that is, Wal*Mart,

16  NYKO, and PDP.  And I assume that you have some information

17  regarding those communications as well.

18          MR. HANLE:  We absolutely do not.  We're not privy

19  to any communications between NYKO and Wal*Mart.

20          THE COURT:  Well, how about between your client

21  and Wal*Mart?

22          MR. HANLE:  We've gotten orders and we've filled

23  the orders.  That's the communication that we're having.

24  We're aware of the suit.  We don't believe it has merit.

25  That's the nature of our communications with Wal*Mart.

```
1              THE COURT:  All right.  Go ahead.
2              MR. HANLE:  And we also agree with Your Honor that
3   the injunction -- and there's a recent federal circuit case
4   on this -- that the injunction, there's no evidence that the
5   injunction would prevent the irreparable harm that they're
6   seeking to remedy.  And that's the Apple versus Samsung
7   case, and I'll get Your Honor a cite.  It's in our
8   PowerPoint slides, but I'll get it to you as I get there in
9   my presentation.
10             And basically what it says is when there are other
11  competitors out there who are selling the same or
12  competitive products, the injunction stopping the
13  defendant's sales wouldn't indicate or wouldn't provide
14  evidence that the retailers in this case would be selling
15  the plaintiff's product, because they are competing
16  products.  So the injunction wouldn't remedy the very harm
17  that the injunction seeks to, you know, seeks to address.
18             With respect to goodwill, there's no evidence of
19  goodwill.  None.  Zero.  So the notion that this would
20  disrupt goodwill, it seems to me that you would have to
21  present evidence that there is goodwill.  Survey evidence is
22  commonly done in trademark cases.  There's no evidence of
23  goodwill, nor is there evidence that this would disrupt
24  goodwill.
25             We've also submitted evidence that there are
```

1    multiple other NYKO products in Wal*Mart, both online -- I

2    think there are 44 products online -- and there are also --

3    we've submitted evidence today that there are additional

4    NYKO products in the stores.  So this notion that the remove

5    of one product will harm their goodwill when they carry

6    other products, I don't think there's any support for that.

7         THE COURT:  At least before today it was my

8    understanding that most of what they sold of NYKO's products

9    was sold through the internet and not in their brick and

10   mortar stores.

11        MR. HANLE:  That's been sort of a vague and

12   generalized statement.  I agree that there are more NYKO

13   products sold on the internet, but there are also -- and

14   we've submitted it today -- evidence of NYKO products that

15   are still in Wal*Mart stores.  So there are -- certainly

16   Wal*Mart is continuing to offer the products, the NYKO

17   products, not necessarily the chargers.

18        Your Honor is also correct that there's absolutely

19   no evidence of copying.  Mr. Hason, with respect, came up

20   here and talked about January of 2007 and then said that

21   sometime after that that the products came out.  There's no

22   evidence of when that R&D effort started.  In fact, the

23   evidence is to the contrary, that the R&D effort started

24   back in 2006 with this dual controller charger, that then

25   the design evolved.  So there's no evidence of copying that

1   the plaintiff came out with this product and all of a sudden

2   the defendant, despite all the prior art out there of

3   chargers with various designs, that we all of a sudden said,

4   ah-hah, we're going to adopt that configuration.

5          In fact, as Your Honor noted, that products look

6   completely different.  So there's no evidence of copying at

7   all in this case.  We agree that there's a big validity

8   question, and I will go right there on my slides here.  And

9   I'll skip over some of these legal issues.

10         So this is -- with respect to Cole, it does

11  include DC ports on the base, and those are labeled 22 in

12  the figure there.

13         THE COURT:  What do you say to the issue --

14  there's this back and forth, the latest from the reply was

15  this argument that Cole is not prior art.  So what do you

16  say to the argument that regardless of what it teaches or

17  doesn't teach, it's not prior art in the first instance?

18         MR. HANLE:  It's not a close call, Your Honor.

19  All that's required is that the earlier application -- in

20  this case it's the Cole PCT application -- disclose the

21  substance of what is claimed.  And we've presented evidence

22  which is, I believe, Exhibit M -- excuse me.  Let me get the

23  exhibit number.

24         Yes.  First of all, on the law -- and this is law

25  cited in the plaintiff's brief, in the plaintiff's reply

1   brief -- the requirement is that the disclosure was

2   contained in substance in the earlier application and the

3   support can be either words or figures or both.  The

4   plaintiff's argument is that there is no figure in the Cole

5   PCT with a USB or power port, but there is very clearly a

6   description of the power port.

7          And here it is on the slide now, and it reads --

8   and this is the language from Cole PCT application, which

9   has a filing date of March 3rd, 2006.  It says:  The cradle

10  formed by the plurality of cantilevered posts has a

11  universal serial bus adapter.  The USB adapter connects to

12  the game controller, allowing the game controller rack tend

13  to recharge the wireless game controller.

14         So right there in the Cole PCT you have a

15  disclosure of the only missing element that the plaintiff

16  claims is not present to the PCT that would entitle it to

17  that priority.  So the Cole PCT is -- again, we're

18  entitled -- the Cole patent is entitled to the priority of

19  the Cole PCT of March 3rd, 2006.  So it's very clearly prior

20  art.

21         In addition, the PCT, the Cole PCT which is

22  Exhibit L, was published July 12, 2007.  So that publication

23  date would also entitle it to priority over the earliest

24  proposed priority date of the '848 Patent.  So we think Cole

25  is good prior art from the prospective of the priority date.

1   It also discloses all the elements, and specifically the

2   element that's alleged to be missing in Cole is that each of

3   the DC ports being on the respective base between a

4   respective one of the pairs of surfaces -- and we've got a

5   figure there on the slide that shows that the DC ports are

6   on the base between the opposite surfaces.  The opposite

7   surfaces are the top and bottom of the support structures

8   that form the cradle.  And, yes, a docking bay is a cradle.

9   And there's no -- there's been no evidence submitted on some

10  construction of docking bay that's anything different than

11  just an opening to receive the gaming controllers.  That's

12  exactly what the cradle is in Cole.

13          So plaintiff made an argument about the

14  orientation of the controllers and how there was some magic

15  to the orientation of the controllers in an upright position

16  similar to the gaming position.  Well, take a look at the

17  Naveed patent figure on the left in this slide, the '848

18  Patent, and what you see is that the charger rests on a

19  table and the chargers are face down into the table.

20          The picture to the right -- and for some reason

21  it's cut off on the screen here, but you can see it on your

22  slide.  It's slide 12.  This is from the Cole provisional

23  which is Exhibit M, and look at the orientation there --

24  right side up, just as plaintiff said.  So that orientation

25  of controllers on a rack is in the prior art.

1          Another point with respect to Cole, there's an

2    argument that Cole did not disclose a direct connection

3    between the charging rack and the controller.  Well, the

4    patent claims do not require a direct connection.  Here's

5    some cases that deal with the construction of coupling, and

6    these cases construe coupling as connected directly or

7    indirectly.  Both of the cases we've cited there, and there

8    are many more just like that.

9          So the notion that Cole is not good prior art

10   because it doesn't disclose a direct connection is wrong on

11   the law because coupling does not require direct connection.

12   Also, just comparing the language of claim one of the Naveed

13   patent with the language of the Cole PCT, it's very similar.

14   The Naveed patent says DC ports configured to couple, and

15   the Cole PCT says that USB adapter connects to the game

16   controller, allowing it to recharge.  So connecting,

17   coupling, it's disclosed lin Cole.

18          So there was an argument made in the reply papers

19   as well that the Naveed '848 Patent was entitled to priority

20   based on its provisional, and we think that is wrong.  And

21   so I'll talk just briefly about that.  It doesn't matter

22   with respect to Cole.  It may matter with respect to other

23   prior art because Cole is prior art that even predates the

24   provisional.  But the Naveed provisional required adapters

25   that went onto the base before you can connect a controller.

1          So it's ironic that plaintiff is arguing that Cole

2    doesn't disclose a direct connection between the controller,

3    between the controller and the stand, yet they are trying to

4    rely on their provisional, the Naveed provisional, which

5    also is an indirect connection between the core control and

6    the stand because it requires this adapter to go between.

7          They can't have it both ways.  They can't say that

8    Cole is not entitled to priority based on this indirect

9    connection alleged, and then argue that they are on the

10   other hand entitled to priority based on this indirect

11   connection.

12         So now I want to get to some of the new evidence

13   we've cited.  So we believe that the priority date for the

14   Naveed '848 Patent in suit is the filing date of the

15   nonprovisional application, which was March 7, 2008.  We've

16   uncovered evidence that the Ps3 charge base by NYKO was on

17   sale by NYKO as of January 8, 2007.

18         There's a press release dated January 8, 2007,

19   that's still accessible through NYKO's website that says

20   that the charge base for Ps3 ensures that all PlayStation 3

21   controllers are charged and it enlists a suggested retail

22   price.  That's clearly on sale.  That's the supplemental

23   Hanle declaration just filed, Exhibit A.

24         There's also -- there's an internet archive site

25   called the Wayback Machine, and we've taken a look at that,

1   at NYKO's website on the Wayback Machine as of March 6th,

2   2007.  And you can see right there the --

3           THE COURT:  There really is one called that?

4           MR. HANLE:  Yes, it is called that.  But it's a

5   very reputable site.  It's been around a long time.  We'd be

6   happy to submit evidence about that -- about how that's done

7   and what have you.

8           THE COURT:  I just haven't heard that since I was

9   watching cartoons many years ago.

10          MR. HANLE:  That's what it's called, the Wayback

11  Machine.  It's a very fascinating site because literally any

12  site, if you want to go back and see what's on that site

13  years back, you go on the Wayback Machine, type in the URL,

14  and it pops it up.  And there are page grabs, and it lists

15  all the dates that they've grabbed pages over the years.

16          THE COURT:  All right.

17          MR. HANLE:  So that's what we've done.  We've got

18  a page grab that shows that the Ps3 charger by NYKO was on

19  sale as of this page grab, which is March 6, 2007, which is

20  before the -- which is more than one year before the

21  priority date of the Naveed '848 Patent.

22          So we think there is a serious on-sale bar issue.

23  At least there's a substantial question as to validity of

24  claims based on this on-sale bar.  In addition to Cole

25  anticipating and the evidence Your Honor mentioned with

1    respect to obviousness, we've submitted this evidence in our

2    briefs that the art is very crowded.  There are multiple

3    game controller chargers.  There's the Charge and Go, that

4    this is a PDP product that was for one of the handheld

5    games, but it's the same concept.  It's a wireless handheld

6    game where the screen is actually on the game rather than on

7    the TV.  But that charging configuration is very similar to

8    the plaintiff's, the patented configuration.

9           Ericsson is prior art.  The patent office relied

10   on it, and that's a charging stand for Wii Gaming

11   controllers.  So the notion that -- any suggestion that

12   Mr. Naveed invented a charger for wireless gaming

13   controllers is simply false.  And then you see Cole there.

14          There's also, you know, multiple examples of art

15   with docking bays on the base.  Your Honor asked the

16   question of why did the patent office finally allow this

17   claim.  And interestingly in this case the notice of

18   allowance doesn't tell us.  Typically you --

19          THE COURT:  I was going to say, I mean, I

20   looked -- I read through that, and I said normally I get

21   some specific explanation, which is:  Here's what happened

22   between here and here, and here is why I am now going to

23   allow it.  Let's put it this way:  If it's there, I couldn't

24   find it.

25          MR. HANLE:  We agree.  We couldn't find it either,

1  so we don't know why the examiner allowed it.  What we do

2  know is that the examiner cited Ericsson among others as

3  disclosing all of the elements that were then in the claims

4  as then pending and in the next amendment added this claim

5  where they had docking bays formed by opposite surfaces and

6  a DC port between the opposite surfaces.  So that supposedly

7  was the point of novelty as best we can tell.

8          Well, the prior art discloses that.  It discloses

9  docking bays formed by opposite surfaces with a port, a

10  power port on the base between those surfaces, particularly

11  the Wong reference there in the middle, Exhibit T.  You have

12  very clearly docking bays with opposite surfaces, and you

13  have 161 and 162, both a USB port and a separate power port

14  down there.

15          So very clearly you have Wong disclosing that

16  specific point of novelty.  And so with respect to

17  combinations we would submit that Cole does it by itself.

18  But even if it doesn't, the combination of Cole and Wong

19  clearly discloses all the elements from the claimed

20  invention.  Similarly, the combination of Ericsson and Wong

21  discloses all the elements.

22          And significantly there is actual evidence of a

23  reason to combine a charger for a battery or a charger for a

24  cell phone and wireless gaming controllers, and here it is

25  from the Naveed provisional.  And it says:  While the

1    consumer electronics devices described in the above

2    embodiments is a video game console -- and it goes on -- the

3    invention may be used for other consumer electronic devices

4    and accessory devices such as cell phones, wireless

5    headsets.

6              So right in the art, right in the plaintiff's own

7    provisional patent, you have evidence of a motivation to

8    combine art references.  Similarly in Wong it says the

9    connection boxes -- which are the docking bays -- include a

10   USB ethernet receiving box, a USB combo hub, a USB MP3 hub.

11             So you have multiple different functionalities for

12   these docking bays, and so the prior art does provide an

13   actual teaching of a motivation to combine.  We agree with

14   Your Honor that this is applying a known technique, which is

15   the chargers with docking bays and DC ports, to a known

16   device ready for improvement.  You have got now wireless

17   controllers and you need a way to charge them to yield

18   predictable results.

19             We think that is exactly what this supposed

20   invention is, and we think it will be invalidated as obvious

21   or anticipated either by the patent office or by a Court.

22             THE COURT:  All right.  Do you have anything else

23   you want to add?  I want to hear final words from the

24   plaintiff.  So does that conclude your presentation?

25             MR. HANLE:  I've got a little more, but I'm going

1    to skip through it.  Let me just tell you we do believe this

2    is a substantial question of infringement.  It was addressed

3    in our brief, and the accused products -- and this is

4    something that I don't believe this.  In fact, I know this

5    picture hadn't been submitted previously.  This is a picture

6    of the accused products.  You will see that there is a base

7    and there's what the plaintiffs call the upper arch member,

8    which is shipped separately from the base and you can attach

9    the two.

10           So we think that there are at least two

11   noninfringement -- two elements that are missing from the

12   accused devices.  The accused chargers do not have DC ports

13   on the base.  The DC ports are on this upper arch member.

14   And they do not have opposite surfaces defining docking bays

15   on the base.  Those are also on the upper arch member.

16           Plaintiff submitted in their reply papers an

17   argument, and they showed the picture of the a base of a

18   column and say:  Look.  The bottom part of that column is a

19   base, but what they're relying on there is a definition, a

20   different definition of base that refers to architectural

21   features.  And it's at the site for the definition as cited

22   in the reply papers, and Your Honor will see that definition

23   number one has to do with architectural features.

24   Definition number two is the one that plaintiffs rely on,

25   which is a more generic, multi-purpose definition.

1          THE COURT:  You're talking about the picture that

2    has the -- I can't remember what all the particulars are,

3    but the plinth is like the base of the base --

4          MR. HANLE:  Right.

5          THE COURT:  -- and then there's the architectural

6    features.  Okay.

7          MR. HANLE:  And even if one would sort of look at

8    that definition as that, oh, well, the bottom part of a

9    structure that goes upward could be the base.  Well, they're

10   accusing -- and remember, the patent requires a plurality of

11   opposite surfaces forming docking bays.  And one of those is

12   at the top of that upper arch member on the accused devices.

13   So there's no argument that that's the base.  So we believe

14   there's a very substantial question as to noninfringement.

15         The only other point -- and here's the cite to the

16   Apple v. Samsung case that I referred to.  That's a very

17   recent case -- May 14th, 2012.  And one of the interesting

18   points about that case was -- well, two things.  It said

19   that because there are other chargers out there, that that

20   undercuts the plaintiff's irreparable harm injury, and that

21   there's no evidence that the injunction would cure the

22   irreparable harm that was complained of.

23         But it would certainly -- an injunction in that

24   case as in this case would certainly harm the defendant.  In

25   this case the defendant's products are already at Wal*Mart,

1  and so we know that the injunction would hurt the defendant.

2  We don't know whether or not the injunction would help or

3  hurt plaintiff, and that's exactly what the scenario was in

4  the Apple case.

5        One more interesting holding of that case was that

6  to show irreparable harm, it's necessary to show that the

7  infringement caused --

8        THE COURT:  Too fast, counsel.

9        MR. HANLE:  I apologize -- that the sales loss to

10  an infringing product cannot be shown if consumers buy that

11  product for reasons other than the patented feature.  So

12  there's no evidence that's been submitted that consumers

13  purchased the defendant's product based on the patented

14  feature versus the fact that they like the Energizer

15  labeling.  It could be any number of reasons.  There's just

16  been no evidence.

17        So given the failure to establish that nexus,

18  that's an additional reason that the injunctive relief

19  should be denied.  I believe everything else has been

20  covered in the papers, but if you will bear with me and --

21  yes, that's pretty much the presentation.  I'll be happy to

22  respond to anything else Your Honor has or the plaintiff.

23        THE COURT:  All right.  I don't think I have

24  anything else.  I'll hear from the plaintiff.  And by the

25  way, since I've received this additional evidence today,

1   I'll give you to the close of business tomorrow to submit

2   any additional evidence you want to submit on this

3   application.

4           MR. HASON:  Thank you, Your Honor.

5           THE COURT:  All right.

6           MR. HASON:  This would be the first case that I'm

7   aware of where the primary references that defendants are

8   relying upon for their invalidity argument, Ericsson and

9   Cole, don't constitute prior art.

10          When defendant's counsel, Mr. Hanle, is trying to

11   make arguments here about the Cole reference, he's pointing

12   to the figure of the U.S. application that is not prior art.

13   The PCT in that figure doesn't even disclose what is

14   claimed.  That figure has it backwards and uses a wire.  It

15   doesn't even disclose that the USB port is male or female.

16   That's not anywhere in the Cole reference.

17          If you look at here, Your Honor, 22, there's no

18   disclosure in either this application, which is '747 Patent,

19   which is not prior art, or the PCT application of whether

20   that is male or female.  And it is undisputed that the power

21   input port for the controller is at the top of the device

22   opposite the handles.  The power input port is up here.  And

23   so by having this thing backwards like it is, what they're

24   doing is that there would have to be a cable that comes

25   around and attaches to it, the cable that comes with the

1  device, the first-party controller.

2         The PCT application doesn't even have this

3  drawing, and the PCT application just says there's a USB

4  port.  It doesn't say where it's located.  It doesn't show

5  it, and it doesn't have anything more than this.  So after

6  Cole had more time to develop their invention between the

7  PCT, which is prior art, and this one, they ended up with a

8  device that is completely different.

9         The cases that Mr. Hanle is focusing on on couple,

10 those are in the electrical arts, and here the word "coupled

11 to" is used in the mechanical context.  And when reading the

12 specification of the Naveed patent, it's clear from all of

13 the drawings and everything in this that this is a direct

14 connection to the power input port without the use of

15 cables, external cables.

16        When you look at the provisional application which

17 was filed on October 24th prior to Cole, it says in one

18 embodiment the adapter is placed into the docking bay by a

19 push fit, press fit, or snap fit.  That's just a preferred

20 embodiment.  It can be snap fit into the base.  And if you

21 look at this provisional on the drawings, they clearly show

22 the features of the invention.

23        For example, on figure 3, Your Honor, figure 3

24 shows the features of the invention.  Then you turn to

25 figure 6, it shows two controllers disposed onto that base

1   with the handle side up and the projecting out from a first

2   direction, and that is disclosed in this provision.  So the

3   Cole patent application is not prior art to this.

4           Similarly, the Ericsson reference was filed five

5   weeks before this provisional was filed.  So we have NYKO

6   which introduces the product, an actual product, in

7   January 2007.  Then Ericsson files his patent application in

8   September 2007.  And then in October NYKO files its

9   application.  But the Ericsson reference is prior art only

10  under 35 USC Section 102(e), and we are able to swear behind

11  that reference by showing prior invention to Cole's filing

12  date.

13          That prior invention is here in a product that

14  discloses each and every feature of the patented invention.

15  There's been a tendency I see here, Your Honor, with some of

16  the arguments that were made to just reduce this invention

17  to, oh, it's just a cradle.  But there's claim language

18  there.  It talks about how the controllers fit in in a first

19  direction, how the power input port couples to a

20  corresponding DC port on the base, and how these chargers

21  are charged concurrently.

22          And out of those mechanical limitations that are

23  there, they're the benefits that I brought up and that are

24  taught away from in the prior art, the one-step removal, the

25  ability to grasp in a plain configuration.  None of that is

1  there in the prior art.

2          And so in the case of the substantial issue, what

3  is the Court left to rely upon?  It can't rely upon

4  Ericsson.  It can't properly rely upon Cole.  And defendants

5  don't even believe that their prior art arguments can

6  survive without those two references, because if you look at

7  the charts that they provided in Exhibits U and V of their

8  Hanle declaration, those charts specifically rely on Cole

9  and Ericsson as the foundation for the invalidity and

10  obviousness defenses.  And those are not there.

11          With respect to irreparable harm, you know, we

12  will provide additional evidence on that by tomorrow.  But

13  from the stores that I've been to, and it was only two, we

14  have noted that PDP's products displacing the XBox

15  controller at least was not there.  The NYKO product was

16  still on the shelf.  So we would submit that the status quo

17  is that the NYKO products are on the shelf and the PDP

18  products have not yet displaced them.

19          To the extent that there are other products that

20  are out there, including by Sony, NYKO has already informed

21  these companies that they may have infringing products as

22  well, and it seems to be relying upon other infringing

23  products, which there might be a couple that they pointed

24  out here possibly, and to say, well, there are other

25  infringing products, so we should be able to continue as we

1   are with an allegedly infringing product.  That, we don't

2   believe that that is something that is condoned by the case

3   law that exists here.

4          As far as the argument on infringement,

5   Your Honor, I don't know if Your Honor has considered that

6   carefully, but not even the claim language supports their

7   argument because claim 11 of the patent, of the Naveed

8   patent, points out that AC to DC converter is contained in

9   the base.

10         Now, that type of AC to DC converter is a

11  substantial component.  If we come now and say that this

12  flat part or a flat part, the bottommost part or the bottom

13  of this, is the only thing that can be the base, then that

14  doesn't even pass muster on the written description of the

15  claims of the patent itself.

16         The base here is meant to be more substantial.

17  And if you look at the provisional application in figure 8,

18  it points this out very clearly.  It shows there,

19  Your Honor, the charger base, and on that charger base it

20  has the LED indicator, the power supply and AC to DC

21  converter, the current detector, the contacts, the USB host.

22  All of these are within the base.

23         If the base were meant in the application to be

24  only the bottommost surface of the product, there is no way

25  that they could house all of these components.  And we're

1   not reading those into the claim, but it's claim

2   interpretation of what the specification is educating one

3   about what is a base.

4          Your Honor, the examiner in this case was

5   presumably someone with technical abilities and experience

6   in the video game arts.  And for all of the reasons that we

7   pointed out here, the one-step removal, all of the other

8   things that I brought up and how these things face outwardly

9   in view of the prior art, the examiner was compelled and

10  issued this application.  Sure, he rejected it before, but

11  he was compelled when additional limitations were added.

12         And it's easy to say that those are just words,

13  but every word in the claim has weight.  Every word is a

14  limitation.  The words are not extraneous.  And the

15  limitations that were added and the combination as a whole

16  is what makes this invention unobvious.

17         THE COURT:  Well, but here is the point that I was

18  trying to make.  If you look at the prior applications and

19  you look at what the examiner had, he had everything.  I

20  mean, he knew what the invention was, and there were

21  additional -- there was additional language added.  And I

22  just wish the examiner had provided me with more information

23  or some information about what it was about the additional

24  language that enlightened him in a way that made him realize

25  that this was patentable when previously he thought that it

1   wasn't.  And it isn't in the prosecution history.

2           MR. HASON:  Yes.

3           THE COURT:  You can argue what it means and I

4   understand.  I've already heard your argument.  I understand

5   your point.  I'm just saying it would have been useful and

6   helpful if the patent examiner had told us what he or she

7   was thinking.

8           MR. HASON:  And you look at the limitations that

9   were added.  The limitations had to do that this was limited

10  to concurrently focusing on video game controllers, and you

11  have opposite surfaces with a DC port located between the

12  surfaces.

13          In the context of a video game controller where

14  the DC port couples to the video game controller that is

15  placed within that docking structure -- so there are many

16  limitations within this claim that are --

17          THE COURT:  You just told me what he did.  I mean,

18  I know.  I know what he did.  I know what happened.  I just

19  don't know why.  That's what I'm telling you.  I know what

20  happened.

21          MR. HASON:  Presumably if the examiner in this

22  case, I believe that he was compelled and felt that this

23  wasn't a patentable invention, he would have rejected it

24  again.  But he didn't.

25          THE COURT:  I don't disagree with that either.  I

1  mean, I think we must assume that the patent examiner had in

2  mind that thought.  It doesn't move the ball forward.  I

3  still say why.  What was it that put him in that frame of

4  mind at that point?  And I'll say for the last time, it

5  would have been useful to me and helpful to understanding

6  this case if I'd had that thinking articulated in the

7  prosecution history.

8         MR. HASON:  Certainly.  Here, Your Honor, the

9  defendants are using the same prior art.  If you take away

10 the Cole and Ericsson references which are not prior art,

11 although the examiner did review Ericsson.  That's an

12 induction charger.  That teaches away from this.  It doesn't

13 have any electrical connection whatsoever, no DC port, no

14 nothing; but that isn't prior art either.  The examiner

15 considered that.  The examiner considered other references

16 that are cumulative.  There's nothing new here.  There's

17 nothing new here that the patent office has not already

18 considered.

19        THE COURT:  All right.  Here's what I'm going to

20 do.  I want you to get me whatever additional evidence you

21 think is pertinent, and I think you'd better find a way to

22 get it to me so that you're not a witness in this case,

23 because you don't want to be a witness.  If you are, you're

24 going to have a hard time being counsel.

25        So whatever you're going to get me, you'd better

1  get to me in the form of a third-party witness or

2  investigator, somebody like that.  Get that to me by the

3  close of business tomorrow.  We will try to have an order,

4  and it's going to be brief.  When it comes out, it is not

5  going to be like responding to a preliminary injunction.

6  It's going to be a brief order, and it's going to be a yes

7  or a no essentially.  So we'll get that out ASAP.

8       If it ultimately turns out to be a deny, it's

9  obviously going to be without prejudice to renewing it as a

10 preliminary injunction.  And if it's a matter that plaintiff

11 wants to pursue, you're going to want to meet and confer and

12 do expedited discovery, I would assume.  You might all start

13 thinking about that at this point.

14      If it's a grant, then it's without prejudice to

15 the defense to at some point ask the Court to undo it --

16 well, obviously we'll have to have a preliminary injunction

17 hearing unless the parties reach some agreement that it

18 stays in effect for some period of time for discovery.  But

19 you all might want to be thinking about scheduling and

20 discovery and those issues because I would imagine that the

21 case isn't going to go away on my ruling.  So start talking

22 to each other.

23      Okay.  We'll get it out as soon as we can.

24      MR. HANLE:  Thank you, Your Honor.

25      MR. HASON:  Thank you, Your Honor.

1    (Proceeding concluded at 2:46 p.m.)

2

3

4                          *-oOo-*

5

6                        *CERTIFICATE*

7

8         *I hereby certify that pursuant to Section 753,*

9    *Title 28, United States Code, the foregoing is a true and*

10   *correct transcript of the stenographically reported*

11   *proceedings held in the above-entitled matter and that the*

12   *transcript format is in conformance with the regulations of*

13   *the Judicial Conference of the United States.*

14

15   *Date:  July 16, 2012*

16

17

18                    */s/_____*
                      *Lisa M. Gonzalez, U.S. Court Reporter*
19                    *CSR No. 5920*

20

21

22

23

24

25