1  **ART HASAN, CA Bar No. 167323**
art.hasan@cph.com
2  **G. WARREN BLEEKER, CA Bar No. 210834**
warren.bleeker@cph.com
3  **KATHERINE L. QUIGLEY, CA Bar No. 258212**
katherine.quigley@cph.com
4  **CHRISTIE, PARKER & HALE, LLP**
**655 North Central Avenue, Suite 2300**
5  **Glendale, California 91203-1445**
**Telephone: (626) 795-9900**
6  **Facsimile:   (626) 577-8800**

7  Attorneys for Plaintiff and Counterdefendant,
NYKO Technologies, Inc.
8

9  UNITED STATES DISTRICT COURT

10  CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  NYKO TECHNOLOGIES, INC., a California corporation, | Case No. CV12-03001 GAF (VBKx) |
| 13 | |
| 14  Plaintiff, | **PLAINTIFF NYKO TECHNOLOGIES, INC.'S** |
| 15  vs. | **OPENING CLAIM CONSTRUCTION BRIEF** |
| 16  ENERGIZER HOLDINGS, INC., a Missouri corporation, EVEREADY BATTERY COMPANY, INC., a | |
| 17  Delaware corporation, and PERFORMANCE DESIGNED | **DATE:     April 29, 2013**<br>**TIME:     10:00 A.M.**<br>**CTRM:   740** |
| 18  PRODUCTS LLC, a California limited liability company, | **Hon. Gary Allen Fees** |
| 19  Defendants. | |
| 20 | |
| 21 | |
| 22  AND RELATED COUNTERCLAIM. | |

23       Pursuant to the Court's Order (Dkt. # 69), Plaintiff Nyko Technologies,

24  Inc. ("Nyko") hereby submits its opening claim construction brief.  This brief

25  relies upon the evidence presented in the Confidential Declaration of Katherine L.

26  Quigley (filed under seal) and the Declaration of Garry Kitchen, both filed

27  concurrently herewith.

28

CHRISTIE, PARKER & HALE, LLP

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................... 1

      A.    Overview of the Patent-in-Suit .......................................... 1

      B.    Overview of Nyko's Claim Constructions ........................... 2

II.   LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION ........... 4

III.  NYKO'S PROPOSED CLAIM CONSTRUCTIONS ....................... 5

      A.    PROPOSED CONSTRUCTION - "BASE" ........................ 6

            1.    Intrinsic Evidence ................................................ 6

            2.    Extrinsic Evidence ................................................ 9

            3.    Defendants' Proposed Construction of the Term "Base"
                  Should be Rejected ............................................ 11

      B.    PROPOSED CONSTRUCTIONS - "AT LEAST ONE
            STRUCTURE" AND "AT LEAST ONE DOCKING
            STRUCTURE" .................................................................. 11

            1.    Intrinsic Evidence ............................................. 12

            2.    Extrinsic Evidence ............................................. 15

            3.    Defendants' Proposed Construction of the Term "At
                  Least One" Should be Rejected ............................. 16

      C.    PROPOSED CONSTRUCTION OF "TO COUPLE TO"
            (MECHANICAL CONTEXT) ............................................. 16

            1.    Intrinsic Evidence ............................................. 17

            2.    Extrinsic Evidence ............................................. 19

      D.    PROPOSED CONSTRUCTION OF "ELECTRICALLY
            COUPLED TO" (ELECTRICAL CONTEXT) ....................... 21

            1.    Intrinsic Evidence ............................................. 21

            2.    Extrinsic Evidence ............................................. 21

      E.    DEFENDANTS' ATTEMPT TO DEFINE THE TERMS "TO
            COUPLE TO" AND "ELECTRICALLY COUPLED TO" IN
            EXACTLY THE SAME WAY TO MEAN "TO CONNECT
            DIRECTLY OR INDIRECTLY TO" IS IMPROPER ............... 22

IV.   CONCLUSION ......................................................................... 24

CHRISTIE, PARKER & HALE, LLP

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054 (Fed. Cir. 2004) ........................................................................................................ 6

*In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142 (Fed. Cir. 2012) .................. 19, 23

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996) .............. 5

*Mems Tech. Berhad v. ITC, 447 Fed. Appx. (*Fed. Cir. 2011)................................ 23

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)................. passim

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ..... 4, 5, 11, 23

**OTHER AUTHORITIES**

*American Heritage Dictionary of the English Language* (2006)........................... 10

*Dictionary of Mechanical Engineering* (2006) ....................................... 20

http://www.wolframalpha.com/input/?i=at+least+one............................................. 15

*McGraw-Hill Dictionary of Elect. and Comp. Engineering* (2004) ...................... 22

*McGraw-Hill Dictionary of Scientific and Technical Terms* (2003) ............... 10, 20

U.S. Patent 8,143,848 ....................................................................... passim

CHRISTIE, PARKER & HALE, LLP

I.       **INTRODUCTION**

A.       **Overview of the Patent-in-Suit**

The asserted patent in this suit, U.S. Patent 8,143,848 ("the '848 Patent") discloses a novel wireless game controller charging system having a docking structure.[1]  The embodiments of the patented invention that are the subject of this suit are set forth in FIGs. 11-23 of the '848 Patent.  The charging system includes a base and a plurality of docking bays on the base.  Each docking bay is defined by a pair of opposite walls and a protruding DC port between the walls.  Each docking bay accepts a video game controller from one direction and aligns the small and fragile charging receptacle on the controller to mechanically couple to and receive power from the protruding DC port on the base.  Together, the plurality of docking bays align, support and concurrently charge a plurality of video game controllers on the base.

An LED charge status indicator is located on a top surface of the base, a power input port is located on the side of the base, and an AC-to-DC converter and current detector on a printed circuit board is housed within the body of the base. The printed circuit board includes circuit elements that make the controllers believe they are being charged by the video game console.



*FIG.18*

docking bays to receive video game controllers

DC ports

base

*Exemplary Embodiment of Invention in the '848 Patent*

---

[1] The '848 Patent is attached as Exhibit A to the Confidential Declaration of Katherine L. Quigley in Support of Nyko Technologies, Inc. Claim Construction Brief ("Quigley Decl."), filed concurrently herewith.

CHRISTIE, PARKER & HALE, LLP

The '848 Patent contains 27 claims. Independent claims 1 and 13 and dependent claims 2-5, 7, 8, 10-12 and 14-17 disclose a system for charging a plurality of video game controllers and additional features of the system.  Claims 6 and 18-27 are not being asserted at this time.

## B.   Overview of Nyko's Claim Constructions

The '848 Patent requires minimal claim construction to clarify a few terms and phrases whose meaning is in dispute. These terms should be construed in context of their ordinary meaning in the relevant art and the patent specification.

Nyko advances constructions focused on the following terms and phrases, shown in bold, in Claims 1 and 13:

Independent Claim 1

*1.* A video game controller charging system for charging a plurality of video game controllers using externally supplied power, the video game controller charging system comprising:

a **base**;

**at least one structure on the base** for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged; and

a plurality of DC ports on the **base**, each of the DC ports configured **to couple to** and provide DC power to a power input port of a respective one of the plurality of video game controllers,

wherein the **at least one structure on the base** comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction, and

wherein the **at least one structure on the base** further comprises a plurality of pairs of opposite surfaces, each pair of

-2-

surfaces defining a respective docking bay of the plurality of docking bays, each of the DC ports being on the base between a respective one of the pairs of surfaces.

Independent Claim 13

*13.* A charging system for charging a plurality of video game controllers, each having a power input port, the charging system comprising:

a **base**;

a plurality of male mini-USB connectors **supported by the base** and each adapted to provide DC power to a respective one of the plurality of video game controllers;

**at least one docking structure** defining a plurality of docking bays open in a first direction and configured to receive from the first direction and align respective ones of the plurality of video game controllers **to couple to** respective ones of the plurality of male mini-USB connectors; and

a power input for connecting to a power supply, the power input **electrically coupled to** the plurality of male mini-USB connectors, wherein the **at least one docking structure** comprises a plurality of pairs of substantially parallel opposite planar surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays, each of the docking bays being open on opposite sides between the respective pair of surfaces.

['848 Patent, col. 15, lines 30-52 & col. 16, lines 28-49.]

For the reasons discussed in detail below, the bolded phrases should be given the following constructions:

(1) "**base**" means "*the foundation or support upon which structures rest*";

-3-

(2) "**at least one structure**" means "*one or more structures*";

(3) "**at least one docking structure**" means "*one or more docking structures*";

(4) "**to couple to**" (mechanical context) means "*to join, link or connect structures together without the use of external wires or cables*";

(5) "**electrically coupled to**" (electrical context) means "*directly or indirectly connected to for the purpose of energy transfer.*"

Each of these constructions is supported if not mandated by the intrinsic evidence, *i.e.*, the '848 Patent's claims, specification and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc).

## II.   LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

The Federal Circuit summarized and restated *en banc* its clear and definitive pronouncements regarding claim construction in *Phillips*, 415 F.3d 1303.  Claim terms are generally given the ordinary meaning they would have to a person of ordinary skill in the art at the time the invention was made, after that person has read the entire patent. *Id.* at 1312-13, 1321.  "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The determination thus starts with the text of the patent itself, specifically, the claims. *Phillips*, 415 F.3d at 1313.  "It is a bedrock principle of patent law that the claims of the patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (internal punctuation omitted).  "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.*  "Other claims of the patent in question, both asserted and unasserted, can also be valuable source of enlightenment as to the meaning of a claim term." *Id.*

-4-

"The claims, of course, do not stand alone.  Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims.  For that reason, claims must be read in light of the specification, of which they are a part. . . . [T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal punctuation and citation omitted).

Extrinsic evidence, "which consists of all evidence external to the patent specification and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," may be used to assist in claim construction. *Id.* at 1317.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)) (internal punctuation omitted).  However, extrinsic evidence "is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.*  "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips.*, 415 F. 3d at 1319. It must be discounted if it is at odds with the intrinsic evidence.  *Id.* at 1318.

Specifically, inventor testimony must not be allowed to alter the meaning of claim terms conferred by the intrinsic evidence. *Vitronics Corp.*, 90 F.3d at 1583.  Further, dictionary definitions outside the field of the art may not be helpful in cases where the claim terms have a particular meaning in the field of art. *See Phillips.*, 415 F. 3d at 1319-24.  The purpose of claim construction is not to pursue the abstract meaning of words, but instead to determine the meaning of claim terms with the context of the patent.  *Id.*

## III.   NYKO'S PROPOSED CLAIM CONSTRUCTIONS

Nyko has attempted to keep to a minimum the quantity of terms for which it requests construction. There is no reason to engage in unnecessary construction

where the claim terms are straightforward. *See, e.g., Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1059 (Fed. Cir. 2004) ("[t]he plain language of the claim is relatively straightforward, and the district court correctly gave the claim term its ordinary and customary meaning.")   The following terms and constructions are those Nyko believes would most aid a fact finder. The support for these constructions is found in the intrinsic evidence — the claims and the specification of the '848 Patent itself.

## A.   PROPOSED CONSTRUCTION - "BASE"

The term "base" appears throughout the claims of the '848 Patent.  As the invention deals fundamentally with a base for charging and supporting a plurality of wireless video game controllers, it is useful for a fact finder to understand the nature of such information, and so the term may be helpfully construed as meaning "*the foundation or support upon which structures rest*."

Defendants' proposed construction of the base as the bottom part of the charging system that provides physical support for the system against an external surface, such as wall or surface, should be rejected.  Defendants' proposal is vague as to "bottom part" and does not capture the full entrée of features and functions that the base, as described in the '848 Patent, can provide.

### 1.   Intrinsic Evidence

The intrinsic evidence supports Nyko's proposed construction.  The claim language recites the foundational nature of the "base" for the docking bays and the controllers within the docking bays.  By way of example, Claim 1 recites the following features:

1. "at least one structure **on the base** for providing physical support to the plurality of video game controllers,"

2. "a plurality of DC ports **on the base** … configured to couple to" the power input ports of the plurality of video game controllers,

-6-

3. "the … structure **on the base** compris[ing] a plurality of docking bays … configured to receive" the video game controllers, and

4. "the … structure **on the base** further compris[ing] a plurality of pairs of opposite surfaces," which further define the "docking bays … configured to receive" the video game controllers.

['848 Patent, col. 15, lines 35-28.]  According to the claim language, the "base" is the body on which the docking bays are found that receive and couple to the controllers.  Hence, the "base" must include the foundation on which structures rest, not merely the part that touches a wall or table.  *Phillips,* 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.").

The dependent claims in the '848 Patent also shed light on the proper construction of the base as the body of the charging system.  Claim 9 recites that "the AC-to-DC converter is *in* the base." ['848 Patent, col. 16, lines 17-18 (emphasis added).]  Claim 18 recites that "the base further compris[es] a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact [of the base]." ['848 Patent, col. 17, lines 2-5.]  For it to be able to house other structures within it, the base must be a substantive body, not one restricted to a bottom surface.  *See  Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable source of enlightenment as to the meaning of a claim term.")

The '848 Patent specification also supports Nyko's construction.  FIGs. 11-23 show various embodiments of the patented invention.  For example, the specification references the "charging station" and "charger base" interchangeably, equating the charger base with the entire charger. ['848 Patent, col. 14, lines 33-36.]  It also describes the "base 524 with two docking bays 512,

514." ['848 Patent, col. 12, lines 1-2.]  For the base to include two docking bays, it must refer to the entire charger body, as shown in FIGs. 11 and 18.



**FIG. 18 of the '848 Patent (red text added)**

The block diagrams of FIGs. 15 and 22 depict the charger base as incorporating several components, including a USB Host, electrical contacts, current detectors, an LED indicator, a power supply and an AC-DC converter.



**FIG. 22 of the '848 Patent (red highlighting added)**

The LED indicators that are part of the charger base (see FIG. 22) are disposed on its top surface, adjacent to and above the docking bays (see FIG. 18), suggesting a definition of the base that includes the entire body of the charging system, not just

CHRISTIE, PARKER & HALE, LLP

its bottom portion.

Additional support for Nyko's construction is found in other described embodiments. For example, FIG. 11 shows that the base can include the two vertical surfaces that make up the structure of the two outermost docking bays 404. "There are locators 410 on each of the two surfaces of the partitions 406, **as well as the two surfaces of the base 402**, which face the DC ports 408." ['848 patent, col. 9, lines 47-49 (emphasis added).]



**FIG. 11 of the '848 Patent (red highlighting added)**

As these surfaces (shown by the red arrows above) are not on the bottom of the charging system, the base cannot be limited only to the "bottom part of the charging system that provides physical support for the system against an external adjacent surface." The intrinsic evidence, therefore, supports Nyko's proposed construction.

## 2. Extrinsic Evidence

The extrinsic evidence is consistent with the intrinsic evidence and also supports Nyko's construction.

-9-

### a)      Expert Testimony

Nyko has retained Garry Kitchen, a preeminent expert in the video game field, as an expert witness in this matter.  Mr. Kitchen has a degree in Electrical Engineering and over 30 years of experience.  [*See* Expert Report of Garry Kitchen in Support of Nyko's Proposed Claim Constructions ("Kitchen Expert Report") at ¶¶ 2-3, attached to the Declaration of Garry Kitchen filed concurrently herewith.]  Mr. Kitchen offers opinions that persons of ordinary skill in the art would understand Nyko's constructions to be correct, including for the term "base".  [See Kitchen Expert Report, ¶¶ 26-27, 48-53.]

### b)      Dictionary Definitions

The technical definition of the term "base" is a "foundation or part upon which an object or instrument rests."  *McGraw-Hill Dictionary of Scientific and Technical Terms* (2003), Quigley Decl., Exh. F.  This definition supports Nyko's proposed construction of the "base" according to the '848 Patent.  Lay definitions also support Nyko's proposed construction.  See *American Heritage Dictionary of the English Language* (2006), Quigley Decl., Exh. C.

### c)      Inventor Testimony

Amir Navid, inventor on the '848 patent, testified as to the importance of reading "base" in the context of the patent.  At his deposition, Mr. Navid testified that "outside the context of this patent, the word [base] can have different meanings." [Deposition of Amir Navid ("Navid Depo."), p. 241, ll. 8-10, Quigley Decl. Exh. K.]  However, "in the context of this patent, what a base is, is the entire charging device.  It's the charging system." [Navid Depo, 239:24 – 240:1, Quigley Decl. Exh. K.]

### d)      Use of the Term "Base" in the Field of Art

The use of the term "base" in the video game accessories industry also supports Nyko's construction.  Providers of video game accessories refer to the entire charging station as the "base."  Defendant PDP, for example, repeatedly

CHRISTIE, PARKER & HALE, LLP

refers to the entirety of the accused product as a charge base, including on its own website and in engineering specifications. [Quigley Decl., Exhs. N, O.] Komodo, another competitor, sells a charging system under the name "Komodo Quad Charge Base for PS3." Nyko sells its family of products under the mark "Charge Base." [*See* Quigley Decl., Exh. P.] These uses in the industry of the term "base" to refer to the entire charging station also support Nyko's construction.

Thomas Roberts, Chief Technical Officer of Defendant PDP with 18 years of experience in the video game accessories industry, testified that he understands the term "base" to mean "a structure upon which another object rests," which is essentially Nyko's proposed definition. [Deposition of Thomas J. Roberts ("Roberts Depo."), pp. 11-14; p. 41 ll. 9-13, Quigley Decl., Exh. M.]

3. **Defendants' Proposed Construction of the Term "Base" Should be Rejected**

Defendants' proposed construction reads out the preferred embodiment of the invention. Defendants' proposed construction for base is "the bottom part of the charging system that provides physical support for the system against an external adjacent surface (e.g., a table or wall)." The preferred embodiment of the '848 Patent discloses the "base" to be a substantive foundational body, capable of housing multiple structures and having top and side surfaces to support and charge the video game controllers in the docking bays. If the term "base" is restricted to Defendants' construction, it would inappropriately read out this preferred embodiment. *See Vitronics*, 90 F.3d at 1583 (Fed. Cir. 1996) (holding that a claim interpretation that reads out a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support.")

B. **PROPOSED CONSTRUCTIONS - "AT LEAST ONE STRUCTURE" AND "AT LEAST ONE DOCKING STRUCTURE"**

The related phrases "at least one structure" and "at least one docking

-11-

structure" appear throughout the specification and claims of the '848 Patent, and make clear that "at least one" means "one or more structures." The "one or more structures" define a plurality of docking bays for the wireless video game controllers. To read otherwise undermines the plain meaning of the term and the described embodiments in the specification.

Defendants' construction inappropriately proposes to essentially limit the term "at least one" to "exactly one," by adding the extraneous word "each" to the definition. Defendants' construction is contrary to the intrinsic and extrinsic evidence.

## 1.    Intrinsic Evidence

The intrinsic evidence supports Nyko's proposed construction. Claim 1 recites "at least one structure on the base for providing physical support for the plurality of video game controllers." ['848 Patent, col. 15, lines 35-36.] The claim continues to define what the "at least one structure" is by referring to it in subsequent elements of the claim as "*the* at least one structure." For example, claim 1 recites "**the *at least one structure*** on the base comprises a plurality of docking bays" and "**the *at least one structure*** on the base further comprises a plurality of pairs of opposite surfaces." ['848 Patent, col. 15, lines 43-48.] The phrase "at least one structure" is repeatedly used in claim 1 as a term to emphasize that the structure can be *either* one structure or more than one structure.

The same is true of "at least one docking structure." In claim 13, which recites "**the *at least one docking structure*** comprises a plurality of pairs of substantially parallel opposite planar surfaces," the phrase "at least one docking structure" is used as a term to emphasize that the structure can be either one structure or more than one structure. ['848 Patent, col. 16, lines 44-46.]

This understanding is the only appropriate one in light of the specification. The specification describes that the system is not limited to a single structure

-12-

which comprises a plurality of docking bays, but can include multiple structures to make up the plurality of docking bays (hence the understanding of "at least one" to mean "one or *more*").  As an example, the preferred embodiment, shown in FIG. 18 below, depicts the docking bays 512 and 514 as being composed of multiple structures, including multiple surfaces of partition 528.



*FIG. 18 of the '848 Patent (red highlighting added)*

In addition, another embodiment shown in FIG. 11 depicts multiple structures making up the plurality of docking bays, including multiple surfaces of multiple partitions.

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*FIG. 11 of the '848 Patent (red highlighting added)*

The specification confirms the construction of "at least one" as "one or more," as it describes several structures for providing physical support to the video game controllers.  ['848 Patent, col. 9, lines 51-55 ("Each pair of opposite surfaces, a portion of the base 402, a corresponding docking bay 404, and/or the locators 410 may comprise a structure for providing physical support to one of the video game controllers 420 during charging.")]  The "at least one structure [is] on the base for providing physical support for the plurality of video game controllers." ['848 Patent (Claim 1), col. 15, lines 35-36.]  Thus, the specification discloses that said "at least one structure" can include any or all of the structures listed.

Other parts of the specification that use the same language in the same vein as the claim language are instructive.  For example, the specification states: "[i]n one embodiment, the at least one DC port comprises a plurality of DC ports, [and]

CHRISTIE, PARKER & HALE, LLP

the at least one video game controller comprises a plurality of video game controllers." ['848 Patent, col. 2, lines 26-28.]  The only logical understanding of "at least one" is for it to mean "one or more," as each DC port is indisputably an independent and distinct structural element, and each video game controller is indisputably an independent and distinct structural element.   Defendants' proposed construction would mean that the one or more DC ports *each* has a plurality of DC ports and the one or more video game controllers *each* has a plurality of video game controllers, which does not make sense.

The intrinsic evidence supports the construction of "at least one structure" as meaning "one or more structures" without the additional extraneous and illogical limitations that Defendants attempt to read in.

### 2.     Extrinsic Evidence

The extrinsic evidence is consistent with the intrinsic evidence and supports Nyko's proposed construction.

### a)     Expert Testimony

Nyko's expert Garry Kitchen provides an opinion that persons skilled in the art would understand Nyko's proposed construction of the term "at least one" in the context of the '848 Patent to be correct.  [*See* Kitchen Expert Report ¶¶ 39-47.]

### b)     Dictionary Definitions in the Relevant Art

Online technical dictionary Wolfram Alpha clearly states that "'[a]t least one' is a mathematical term meaning one or more." Wolfram Alpha, http://www.wolframalpha.com/input/?i=at+least+one (*last accessed* March 31, 2013), Quigley Decl., Exh. H.

### c)     Inventor Testimony

Mr. Navid also testified in support of the "at least one structure" being capable of including more than one structure.  At his deposition, when asked if he could point to "at least one structure on the base for providing physical support,"

-15-

he said "So it would be [partitions] 406. These are the structures, the support structures." [Navid Depo, p. 243, ll. 5-9, Quigley Decl., Exh. K]  He further stated that each of these partitions 406 were separate structures, in further support of the understanding that there are several structures for providing physical support to the video game controllers. [Navid Depo, p. 244, ll. 6-12, Quigley Decl., Exh. K.]

### 3. **Defendants' Proposed Construction of the Term "At Least One" Should be Rejected**

Defendants' awkwardly phrased construction of "at least one" is "one or more structures on the base, *each* has a plurality of pairs of opposite surfaces." This added limitation of "each" is not in the claim.  Defendants are attempting to limit the "at least one structure" to a single structure that must compose the plurality of the docking bays and the plurality of pairs of opposite surfaces.  This appears to be an intentional misinterpretation of the claim in an attempt to avoid infringement.  There is no support for this construction in the specification, as each one of the embodiments of the specification disclose *multiple* structures defining the docking bays and the plurality of pairs of opposite surfaces, as discussed above.  The law does not support a misconstruction that contradicts the specification.  *Phillips*, 415 F.3d at 1315 ([T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.")

### C. **PROPOSED CONSTRUCTION OF "TO COUPLE TO" (MECHANICAL CONTEXT)**

Nyko's proposed construction for this phrase, "*to join, link or connect structures together without the use of external wires or cables*," eliminates confusion by providing a definition for the phrase in the proper context in which it is used; here, the mechanical context. The claims in which this term occurs and the rest of the specification always present the act of coupling the protruding DC port on the base to the corresponding receptacle on the controller in the context of

CHRISTIE, PARKER & HALE, LLP

a direct mechanical insertion (i.e., joining or attaching) without the use of wires or cables. Nyko's construction clarifies this for a fact finder.

### 1. **Intrinsic Evidence**

The intrinsic evidence supports Nyko's proposed construction that "to couple to" is used in the mechanical context and should be so construed.  Claim 1, for example, recites "a plurality of DC ports on the base, each of the DC ports configured ***to couple to and provide DC power to*** a power input port of a respective one of the plurality of video game controllers." ['848 Patent, col. 15, lines 39-42 (emphasis added).] As seen in claim 1, the DC ports are configured to couple to and also configured to provide DC power.  These two limitations are separately enumerated, supporting the fact that "to couple to" has a separate meaning from the electrical limitation that the DC ports are configured to electrically "provide DC power" to the video game controllers.

In addition, several of the dependent claims recite an element where two electrical components are "electrically coupled" to each other.  For example, claim 3 recites "a current detector ***electrically coupled to*** the plurality of DC ports" and "an indicator ***electrically coupled to*** the current detector." ['848 Patent, col. 15, lines 58-60 (emphasis added).] The claim language specifically points out the circumstances where "couple to" is meant to be understood in an electrical context by specifically using the term "electrically" prior to "coupled to."  Hence, in order not to read out the term "electrically" in the dependent claims, the phrase "to couple to" (without the term electrical) should have a separate meaning, i.e. it must have a meaning outside of the electrical context.

Focusing on the claim language in light of the specification, the claim recites "DC ports" configured to couple to the "power input port[s]" of the video game controllers.  Thus, this element recites the coupling of two ports, two mechanical structures, which suggests the construction of "to couple to" in a mechanical context.  This is exemplified in the preferred embodiment of the

-17-

invention.  The charging station 510 disclosed in the embodiment of Figs. 16-23B includes male mini-USB ports 542 "adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the PlayStation 3®." ['848 Patent, col. 12, lines 58-63.]  This is indisputably a direct connection between the male and female mini-USB connectors.  FIG. 21 shows the video game controllers on the base with the protruding male mini-USB ports mated with the corresponding female receptacles:



**FIG. 21 of the '848 Patent (red highlighting added)**

The same is true for all of relevant embodiments in FIG. 11-23 of the '848 Patent - there is a direct connection between the DC ports on the base and the power input ports of the video game controllers.  With respect to the embodiment disclosed in FIGs. 11-15, for example, the specification recites that "the power input port of the video game controller 420 *slides down onto* and connects to the DC port 408." ['848 Patent, col. 10, lines 4-8 (*emphasis added*).]  Sliding and connecting are mechanical operations, providing the proper context for the claim language.

CHRISTIE, PARKER & HALE, LLP

Significantly, the Federal Circuit has held that the claim term "couple[d] to" is properly construed in the mechanical context to mean "connectivity [occurring] without the inclusion of cables or wires." *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012). The facts and issues here are substantially the same as in *In re Abbott*. In that case, the parties' primary dispute centered on whether the proper construction of electrochemical sensor includes external cables and wires for connecting the sensor to its control unit. Focusing first on the claims, the Court found that the claim language itself suggested connectivity without cables or wires because the claims recite that the sensor's contact pads are "coupl[ed] to" conductive contacts. *Id.* Further, the Court found that all relevant teachings of the patent in suit showed a direct coupling without the use of wires or cables, and therefore the teachings and context of the patent-in-suit mandated such a construction. *Id.* ("Even more to the point, every embodiment disclosed in the specification shows an electrochemical sensor without external cables or wires.").

The same construction is suggested if not mandated here. The relevant claim language in the '848 Patent uses the phrase "to couple to" and the relevant embodiments in FIGs. 11-23 all show a direct connection between the protruding DC port on the base and the female receptacle on the controller without the use of wires or cables. The intrinsic evidence and controlling precedent demonstrate that Nyko's proposed construction of "to couple to" to mean "to join, link or connect structures together without the use of external wires or cables" is proper.

### 2.    **Extrinsic Evidence**

The extrinsic evidence is consistent with the intrinsic evidence and supports Nyko's construction.

#### a)    **Dictionary Definitions in the Relevant Art**

Because "coupled" is a term of art, the proper sources of definitions for this term are technical dictionaries in the field of art. *Phillips*, 415 F.3d at 1317 ("We

-19-

CHRISTIE, PARKER & HALE, LLP

have especially noted the help that technical dictionaries may provide to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms.")  In the mechanical context, a "coupling" is defined as "a device for connecting together two or more parts of a mechanism." *Dictionary of Mechanical Engineering* (2006), Quigley Decl., Ex. E; See also *McGraw-Hill Dictionary of Scientific and Technical Terms* (2003)(defining "couple" as "to connect with a coupling, such as of two belts or two pipes."), Quigley Decl., Ex. F.  Each dictionary describes a direct connection between the two structures being coupled, without the use of intermediate wires or cables.

### b)    <u>Expert Witness Testimony</u>

Nyko's expert, Mr. Kitchen opines the persons skilled in the art would understand Nyko's construction of the phrase "to couple to" to be correct.  [*See* Kitchen Expert Report ¶¶ 28-33.]

### c)    <u>Inventor Testimony</u>

Mr. Navid, the inventor of the invention disclosed in the '848 patent, testified that "couple to" requires a direct connection, in particular that "couple to" means "that they mate. So a plug, a direct connection, where, you know, it's mating. So that's -- that's what I meant by it." [Navid Depo, p. 222, ll. 11-16, Quigley Decl., Exh. K]. He further explained that "[i]f you have a piece of that base and that's directly engaging and going within the charging port of the other device, then that's what I mean. That's what I mean as coupling. ***You have a piece of that charge base directly connecting to the device that's being charged***." [*Id.* at p. 226, ll. 10-16 (emphasis added).]

Based on the foregoing, the proper construction of "couple to" as used in the claims in the mechanical context means "*to join, link or connect structures together without the use of external wires or cables*."

-20-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D. **PROPOSED CONSTRUCTION OF "ELECTRICALLY COUPLED TO" (ELECTRICAL CONTEXT)**

Nyko's proposed construction of "electrically coupled to" is "*directly or indirectly connected to for the purpose of energy transfer.*"  Defendants' proposed construction is "directly or indirectly electrically connected to."  The parties agree that the phrase "electrically couple to" includes "directly or indirectly connected to."  The real issue is that Defendants wish to apply this electrical definition of the phrase "electrically coupled to" to the mechanical phrase "to couple to" described above.   Nyko sets forth the intrinsic evidence regarding "electrically coupled to" below to assist the Court to review the phrase in the proper context.

### 1.   **Intrinsic Evidence**

The phrase "electrically coupled to" is used in the '848 Patent in cases where the two objects are in the same circuit (i.e. electrically connected) but may or may not be directly connected in a mechanical way.  In other words, the objects may be "directly or indirectly connected." For example, Claim 15 of the '848 Patent states:  "The charging system of claim 13, wherein the charging system further comprises an AC-to-DC converter external to the base and *electrically coupled to* the power input."   [16:54-56] (emphasis added).  In this case, the AC-to-DC converter is external to the base (and consequently "indirectly connected"), but is "electrically coupled to the power input".  In this case "electrically coupled to" is used to describe two objects that are "indirectly connected."

### 2.   **Extrinsic Evidence**

The extrinsic evidence is consistent with the intrinsic evidence and supports Nyko's construction.

### a)   **Dictionary Definitions in the Relevant Art**

As is true for the phrase "to couple to," "electrically coupled" is a term of art and the proper sources of definitions for this term are technical dictionaries in

-21-

the relevant field. *Phillips*, 415 F.3d at 1317.  The technical definition for "electrically couple" is "to connect two circuits so signals are transferred from one to the other."  *McGraw-Hill Dictionary of Elect. and Comp. Engineering* (2004), Quigley Decl, Ex. G.  It is readily understood from this definition that as long as the two circuits are connected so as to transfer a signal, then the two circuits are electrically coupled.  Hence, these definitions support the construction of "electrically coupled to" as "directly or indirectly connected to for the purpose of energy transfer."

### b)      Expert Witness Testimony

Expert witness, Garry Kitchen provides an opinion that persons skilled in the art would understand Nyko's proposed construction of the phrase "electrically coupled" to be accurate.  [*See* Kitchen Expert Report ¶¶ 34-38.]

Based on the foregoing, the intrinsic and extrinsic evidence supports Nyko's proposed construction of the term "electrically coupled."

### E.      DEFENDANTS' ATTEMPT TO DEFINE THE TERMS "TO COUPLE TO" AND "ELECTRICALLY COUPLED TO" IN EXACTLY THE SAME WAY TO MEAN "TO CONNECT DIRECTLY OR INDIRECTLY TO" IS IMPROPER

First, Defendants' construction ignores the fact that the terms are not the same, one is *to couple to*, and the other is *electrically coupled to*.  Separate and distinct phrases are not presumptively entitled to the same meaning regardless of the commonality of certain words, particularly where, as here, the phrases as a whole are meant to convey distinct concepts.

Second, Defendants' construction ignores the distinction between the mechanical and electrical contexts of the claim terms.  In the claims of the '848 Patent, the term "to couple to" is used in the mechanical context to define the mating connection between the receptacle of the video game controller and the protruding DC port of the docking bay.  The term "electrically coupled to" is used

-22-

1    in the electrical context to define a transfer of energy.

2         Third, Defendants' citation to portions of the inventor Amir Navid's

3    deposition as to these phrases is lacking in foundation and is inherently out of

4    context.  Defendants' counsel instructed Mr. Navid to "forget about this patent"

5    when providing the cited testimony.   Navid Depo., p. 227, lines 2-3, Quigley

6    Decl., Exh. K.

7         Further, inventor testimony is extrinsic evidence that should be disregarded

8    to the extent it is inconsistent with the intrinsic evidence.  *Vitronics Corp.*, 90

9    F.3d at 1583.

10        The Federal Circuit has recognized that "coupled to" has a different

11   meaning in these two different engineering contexts.  As recited above, in *In re*

12   *Abbott Diabetes Care, Inc*., the Federal Circuit held that the claim language that

13   "contact pads" that are "coupl[ed]" to "conductive contacts" means connectivity

14   without the inclusion of cables or wires. *In re Abbott Diabetes Care, Inc*., 696

15   F.3d at 1149.  This is a mechanical use of the word "coupled," analogous to the

16   '848 Patent's claim language reciting "DC ports configured to be coupled to" the

17   power input ports of the video game controllers.

18        On the other hand, in the electrical context, the Federal Circuit has held

19   that the plain and ordinary meaning of "electrically coupled" is a direct or indirect

20   connection where electrical signals are conveyed.  *Mems Tech. Berhad v. ITC,*

21   *447 Fed. Appx.*, 142, 151 (Fed. Cir. 2011) ("electrically coupled," held to mean

22   "arranged so that electrical signals may be passed either directly, or indirectly via

23   intervening circuitry, from one component to another.") Just like Nyko's

24   construction, this construction defines "electrically coupled" to include both

25   direct and indirect connections where electrical signals may be passed or

26   transferred.

27        In the mechanical context, the central attribute is the joining or linking of

28   physical structures; in the electrical context, the central attribute is the transfer or

CHRISTIE, PARKER & HALE, LLP

1  electrical energy between two components.   Nyko's constructions (and the
2  controlling legal authority) account for these distinctions, while Defendants'
3  constructions gloss over them.

4  **IV.    CONCLUSION**

5         Nyko's proffered claim constructions are fair and accurate, and derive from
6  the intrinsic evidence, i.e., the claims, specification and prosecution history of the
7  '940 Patent.  Nyko's constructions are supported by extrinsic evidence, taken in
8  the proper context of the field of the patented invention.  By contrast, Defendants'
9  constructions are strained and unsubstantiated.    Defendants' use of lay
10 dictionaries is out of context of the field of the art and their use of inventor
11 deposition testimony is confusing and lacking in proper foundation.

12        Accordingly, Nyko requests that this Court accept its proposed
13 constructions. Nyko further requests that the Court reject Defendants' proposed
14 constructions, which range from the burdensome and unhelpful all the way to
15 importation of extraneous limitations.

16

17 DATED: April 3, 2013                    Respectfully submitted,
18                                         CHRISTIE, PARKER & HALE, LLP
19
20                                         By */s/ Katherine L. Quigley*
21                                             Art Hasan
                                              G. Warren Bleeker
22                                             Katherine L. Quigley
23                                         Attorneys for Plaintiff and
24                                         Counterdefendant,
                                           NYKO Technologies, Inc.
25
26
27
28

CHRISTIE, PARKER & HALE, LLP