1   **ART HASAN, CA Bar No. 167323**
    art.hasan@cph.com
2   **G. WARREN BLEEKER, CA Bar No. 210834**
    warren.bleeker@cph.com
3   **KATHERINE L. QUIGLEY, CA Bar No. 258212**
    katherine.quigley@cph.com
4   **CHRISTIE, PARKER & HALE, LLP**
    **655 North Central Avenue, Suite 2300**
5   **Glendale, California 91203-1445**
    **Telephone: (626) 795-9900**
6   **Facsimile:  (626) 577-8800**

7   Attorneys for Plaintiff and Counterdefendant,
    NYKO Technologies, Inc.

8

9                   UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12  NYKO TECHNOLOGIES, INC., a          Case No. CV12-03001 GAF (VBKx)
    California corporation,
13
            Plaintiff,
14                                       **DECLARATION OF GARRY**
        vs.                              **KITCHEN IN SUPPORT OF**
15                                       **PLAINTIFF NYKO**
    ENERGIZER HOLDINGS, INC., a          **TECHNOLOGIES, INC.'S**
16  Missouri corporation, EVEREADY       **OPENING CLAIM**
    BATTERY COMPANY, INC., a             **CONSTRUCTION BRIEF**
17  Delaware corporation, and
    PERFORMANCE DESIGNED                 **DATE:    April 29, 2013**
18  PRODUCTS LLC, a California limited    **TIME:    10:00 a.m.**
    liability company,                   **CTRM:    740**
19
            Defendants.                  **JUDGE:  Gary Allen Feess**
20                                                **Judge Presiding**

21

22

23                                       Hon. Gary Allen Feess

24  ─────────────────────────────
    AND RELATED COUNTERCLAIM.
25

26

27

28

CHRISTIE, PARKER & HALE, LLP

I, Garry Kitchen, declare as follows:

1.     I am President/CEO of SGK Service, Inc. and I have been retained as an expert for Plaintiff and Counterdefendant NYKO Technologies, Inc. ("NYKO"). I make this declaration based on personal knowledge and could competently testify to the facts stated herein if called upon to do so.

2.     Attached hereto as Exhibit A is a true and correct copy of my expert report dated April 3, 2013 and entitled, "Expert Report of Garry Kitchen Re: Claim Construction of U.S. Patent No. 8,153,848."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 3, 2013 in Danville, California.


Garry Kitchen

SES PAS1228155.1-*-04/3/13 4:20 PM

CHRISTIE, PARKER & HALE, LLP

# EXHIBIT A

**EXPERT REPORT OF GARRY KITCHEN**
**RE: CLAIM CONSTRUCTION OF U.S. PATENT No. 8,143,848**
**APRIL 3, 2013**

## I.    <u>Introduction</u>

1.    I have been retained by the law firm of Christie, Parker & Hale, LLP on behalf of Plaintiff NYKO Technologies, Inc. (the "Plaintiff"). I have been asked by counsel for the Plaintiff to opine on the meaning to one of ordinary skill in the art of certain claim terms found in U.S. Patent No. 8,143,848 ("the '848 patent").

**Background and Qualifications**

2.    I am an engineer, video game designer and consultant. I received a Bachelor of Science in Electrical Engineering in 1980 from Fairleigh Dickinson University, where I was a member of the Eta Kappa Nu Honor Society. As an EE student, I was twice chosen to receive the Engineering Merit Scholarship from Panasonic / Matsushita Corporation of Japan, one of the largest consumer electronics companies in the world.

3.    My career in the electronic entertainment/video game industry includes over 30 years of experience running game development companies, with significant hands-on technical and creative experience in all game genres, including console, PC retail and download, online, mobile, and dedicated electronic. I have been directly involved in the design of hundreds of commercially-released video game products, across a breadth of hardware platforms, from the earliest Atari machine to the present day Apple iPhone. I have personally developed video game software products that have generated career sales in excess of $350 million.

4.    I invented and developed the handheld electronic game *Bank Shot* for Parker Brothers, named one of the "10 Best Games of 1980" by

2

OMNI Magazine, and also recognized as one of the year's top games by Games Magazine. Bank Shot utilized a customized version of the American Microsystems (AMI) S-2000 4-bit microprocessor, a state-of-the-art (at the time) single chip microcomputer. As lead engineer on the project, I was involved in all aspects of the development, including hardware, software and game play. I was awarded U.S. patent #4,346,892 ("Electronic Pool Game") for the invention of Bank Shot.

5.     In 1980, I reverse engineered the hardware and software of the Atari 2600 game platform, developing one of the first third-party compatible games for the Atari 2600 system (*Space Jockey*).

6.     In 1982, I designed and programmed the Atari 2600 adaptation of the hit arcade game *Donkey Kong*, which achieved revenues in excess of $100 million on 4 million units sold.

7.     From June 1982 to March 1986, I was a Senior Designer for Activision, Inc., during which time I designed and developed the hit title *Keystone Kapers*, which earned a Video Game of the Year – Certificate of Merit from Electronic Games Magazine in 1983.

8.     From 1984–1985, I developed *Garry Kitchen's GameMaker*, a suite of 5 professional quality design tools connected to an easy-to-use programming language that allowed novice game makers to create commercial quality video games. I was named Video Game Designer of the Year in 1985 by Computer Entertainer Magazine for my work on *Garry Kitchen's GameMaker*.

9.     In 1986, I co-founded Absolute Entertainment, Inc. and served as Chairman, President & CEO until November 1995.  Absolute Entertainment, Inc. was a console game publisher licensed by Nintendo, Sega, Sony, 3DO and Atari and was a video game developer of over 100 marketed titles from 1986 to 1995.

10.     In 1995, I co-founded Skyworks Technologies, Inc., an early, pioneering online game company that has become a leading publisher of games on the Apple iPhone platform.  I served as Chairman, President & CEO from 1995 to December 2007.  I then served as Chief Operating Officer from January 2008 to September 2009.

11.     Most recently I served as the Vice President of Game Publishing for Viacom Media Networks, a division of Viacom Inc., a $15 billion media conglomerate whose holdings include BET Networks, MTV, VH1, CMT, Nickelodeon, Spike TV, Comedy Central and Paramount Pictures.

12.     Having worked in the video game industry for over 30 years, I am very familiar with the video game accessory market, including game controllers.  I have direct experience working with hundreds of video game controllers, including the Atari 2600 8-direction joystick and analog game paddles, Atari 5200 analog joystick, Atari 7800 joystick controller, Commodore 64 8-direction joystick, Apple II analog joysticks and game paddles, Nintendo game controllers for the Famicom, NES, and Super NES, Nintendo Wii Wiimote motion controller and nunchuk controller, Microsoft Xbox 360 controllers (both wired and wireless), Sony Playstation (PSOne, PS2, PS3) game controllers, (both wired and wireless), Mac and PC single

button and multi button mouse controllers, accelerometer controls as implemented in the Apple iPhone/iPad and iPod products, and numerous rhythm action music game controllers, including guitars, electronic drum pads, dance pads, and microphones.

13.    In addition to the working knowledge of game controllers and video game accessories I have gained from over 30 years of experience in creating home video games, I have also served as a technical expert in numerous cases involving video game accessories and video game controller hardware and software.

14.    For example, I served as a technical expert for Nintendo of Japan in a copyright suit involving the Game Genie video game accessory.

15.    I have served numerous times as a technical expert in cases regarding patent and copyright issues for rhythm action video games played with custom game controllers.  The custom game controllers in these matters have included simulated drums, guitars, dance pads and microphones.

16.    I have also served as a technical expert for Sony Computer Entertainment of America (SCEA) in a patent infringement suit involving Sony's tactile feedback technology as implemented in their line of video game controllers.

17.    I recently served as a technical expert for Nintendo of America in a patent dispute involving the Wii Fit and Wii Fit Plus custom game controllers.

18.    I am currently serving as a technical expert for Nintendo of America in a patent dispute involving the Wiimote motion game controller.

19.    I have been recognized numerous times for my contributions to video games.  For example, in 1992 I received a Lifetime Achievement Award in Video Games from The Doctor Fad Show, a syndicated educational television program.  In 2003, I was honored with the Lifetime Achievement Award in Video Games from Classic Gaming Expo.  In addition to these personal honors, individual games that I have developed have also received awards.

**Compensation**

20.    I am compensated in this matter at a rate of $425/hour.  My compensation is in no way affected by the outcome of this litigation.  Attached to this report is my most recent curriculum vitae, which outlines my employment history and prior work as an expert witness.

**Facts or Data Considered**

21.    I have reviewed the operative First Amended Complaint filed by the Plaintiff against Defendants, the '848 Patent, the parties' Joint Claim Construction Statement and various dictionary definitions of pertinent terms.

**II.    <u>Legal Understandings</u>**

22.    I am not an attorney.  Information regarding legal concepts such as the legal standard for construing patent claims have been explained to me by counsel for Plaintiff.

**Intrinsic Evidence**

23.    I have been informed that claim terms are generally given the ordinary meaning they would have to a person of ordinary skill in the art at

6

the time the invention was made, after that person has read the entire patent. In interpreting an asserted claim, a Court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Claims must be read in light of the specification, of which they are a part. The specification is therefore highly relevant to claim construction analysis and typically is the single best guide to the meaning of a disputed term.

**Extrinsic Evidence**

24. I have been informed that extrinsic evidence, which consists of all evidence external to the patent specification and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises, may also be used to assist in claim construction. However, I understand that extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of claim language. While extrinsic evidence may be useful to the Court, it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence, and it must be discounted if it is at odds with the intrinsic evidence.

**Level of Ordinary Skill of the Art**

25. Based on my technical and educational background and my in-depth experience in the field of video game hardware, video game accessories, and video game controllers, and having read and analyzed the '848 Patent, I believe one of ordinary skill in the art at the time the application that issued as the '848 patent was filed (October 2006) would have a bachelor's degree in engineering or equivalent degree with

approximately two years of relevant experience working in the area of video games and/or video game accessories, or have enough work experience in the relevant fields to be of a level of skill equivalent to the degreed engineer above.

## III.    <u>Summary of Opinions</u>

26.    Based on my technical and educational background and my in-depth experience in the field of video game hardware, video game accessories, and video game controllers, and having read and analyzed the '848 Patent and other pertinent materials, it is my opinion that one of ordinary skill in art to which the invention of the '848 patent pertains would understand, in the context of the '848 Patent:

    a.  The correct meaning of the term "to couple to" is "to join, link or connect structures together without the use of external wires or cables."  I disagree, and it is my opinion that one skilled in the art would disagree, with Defendants' proposed claim construction "to connect directly or indirectly to."  There is no instance in the '848 patent in which the term "to couple to" refers to an "indirect" connection between two objects.

    b.  The correct meaning of the term "electrically coupled to" is "directly or indirectly connected to for the purpose of energy transfer."  The intrinsic evidence supports this conclusion, including the usage in the '848 patent of the phrase "electrically coupled to" to refer to and describe objects which are directly or indirectly connected.

EXHIBIT A
Page 10

c.   The correct meaning of the term "at least one structure" is "one or more structures." Defendants' proposed claim construction for the term "at least one structure on the base for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged" as "one or more structures on the base, each for providing physical support to a plurality of video game controllers while they are being charged" is not supported by the intrinsic evidence.

d.   The correct meaning of the term "base" is "the foundation or support upon which structures rest". I disagree, and it is my opinion that one skilled in the art would disagree, with Defendants' proposed claim construction for the term "base" as "the bottom part of the charging system that provides physical support for the system against an external adjacent surface (e.g., a table or wall)". Defendants' proposed construction is not supported by the intrinsic evidence.

## IV.   Analysis of Claim Terms of U.S. Patent No. 8,143,848

27.   The following section from a chart in a joint claim construction filing the parties made with the Court shows Nyko's proposed construction next to Defendants proposed construction for given claim language. Following the chart, I give my reasons why I believe persons skilled in the art would understand Nyko's constructions to be correct.

9

| Claim Language | NYKO's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|---|
| "each of the DC ports configured **to couple to** and provide DC power to a power input port of a respective one of the plurality of video game controllers" | "to couple to" means *to join, link or connect structures together without the use of external wires or cables*. | "to couple to" means *to connect directly or indirectly to*. |

28.     To understand the meaning of the phrase "to couple to", it is helpful to examine the usage of the phrase throughout the body of the '848 patent.

29.     As background, the '848 patent sites as an example of a game controller or accessory device the Playstation 3 game controller.

"The DC ports 408 of the video game controller charging system 400 are configured to connect to a power input port of the video game controller 420 to be charged. In the present embodiment, the DC ports 408 are male mini-USB (universal serial bus) connectors adapted to connect to a female mini-USB connector on a video game controller for a video game console, such as the PlayStation3®." [9:33-39]

"In one embodiment, the connector 542 is a male mini-USB (universal serial bus) connector adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the PlayStation3®." [12:58-62]

30.     The following photograph shows the female mini-USB connector (the "power input port") on the bottom of a Playstation 3 Dualshock wireless controller:



31.     Note that the female mini-USB connector shown above on the Playstation 3 controller is a mechanical (mating) match to the male mini-USB DC port 408 as illustrated below in a close up from Figure 11.  It is also a mechanical (mating) match to the male mini-USB connector 542 on the top of the adapter, as illustrated below in a close up from Figure 17:



**Close up of Figure 11**          **Close up of Figure 17**

32.     The phrase "to couple to" appears approximately six (6) times in the body of the '848 patent (excluding the claim language).  As shown

11

below, "to couple to" is used only in the case where two objects are mechanically connected directly to each other (i.e. mated), either as the female connector on the bottom of a PS3 controller mating with the male connector DC port 408 or as the female connector on the bottom of a PS3 controller mating with the male connector 542 on the top of the external adapter:

### 1 of 6 - Male connector DC port 408 mating to female connector power input port on bottom of game controller

"A video game controller charging system is provided. The video game controller charging system includes a base; at least one structure on the base for providing physical support to at least one video game controller while it is being charged; and at least one DC port on the base configured **to couple to** and provide DC power to a power input port of the at least one video game controller." [Abstract], emphasis added.

### 2 of 6 - Male connector DC port 408 mating to female connector power input port on bottom of game controller

"In one exemplary embodiment, a video game controller charging system for charging at least one video game controller using externally supplied power includes: a base; at least one structure on the base for providing physical support to the at least one video game controller while the at least one video game controller is being charged; and at least one DC port on the base configured **to couple to** and provide DC power to a power input port of the at least one video game controller." [1:66-2:7], emphasis added.

### 3 of 6 - Male mini-USB connector mating to female connector power input port on bottom of accessory device

"In another exemplary embodiment, a charging system for at least one accessory device having a power input port includes: a base; at least one male mini-USB connector supported by the base and adapted to provide DC power to the at least one accessory device; at least one docking structure configured to receive and align the at least one accessory device **to couple to** the at least one male mini-USB connector; and a power input for connecting to a power supply, the

power input electrically coupled to the at least one male mini-USB connector." [2:44-53], emphasis added.

### 4 of 6 - Male connector 542 on top of external adapter mating to the power input port of one of the accessory devices

"The base further includes a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact. The charging system also includes at least one external adapter including a connector configured **to couple to** the power input port of one of the accessory devices, the at least one external adapter also including at least one electrical lead." [3:18-25], emphasis added.

### 5 of 6 - Male connector DC port 408 mating to female connector power input port on bottom of game controller

"In one embodiment, a video game controller charging system is provided. The video game controller charging system includes a base, at least one structure on the base for providing physical support to at least one video game controller while it is being charged, and at least one DC port on the base configured **to couple** to and provide DC power to a power input port of the at least one video game controller." [5:66-6:5], emphasis added.

### 6 of 6 - Male connector 542 on top of external adapter mating to the power input port of one of the accessory devices

"In other embodiments, the base of a charging system (or "charging station") may include a recess having at least one electrical contact and a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact. The charging station also includes an external adapter with a connector configured **to couple to** a power input port of the accessory device, and with at least one electrical lead."[6:11-18], emphasis added.

33.     As there is no instance in the '848 patent in which the term "to couple to" refers to an "indirect" connection between two objects, I disagree, and it is my opinion that one skilled in the art would disagree, with Defendants' proposed claim construction "*to connect directly or indirectly to*."  Therefore, based on this analysis, it is my opinion that persons skilled

in the art would conclude that the correct meaning of the term "to couple to" is "*to join, link or connect structures together without the use of external wires or cables*."

| **Claim Language** | **NYKO's Proposed Claim Construction** | **Defendants' Proposed Claim Construction** |
|---|---|---|
| "electrically coupled to" | "electrically coupled to" means *directly or indirectly connected to for the purpose of energy transfer*. | directly or indirectly electrically connected to |

34.     Conversely, the phrase "electrically coupled to" is used in cases where the two objects are in the same circuit (i.e. electrically connected) but may or may not be directly connected in a mechanical way.  In other words, the objects may be "directly or indirectly connected".  As shown in the above section of a chart from the parties' joint claim construction filing, there is substantial agreement as to the term "electrically connected to."

35.     For example, in the text excerpt below taken from Claim 15 of the '848 patent, the AC-to-DC converter is external to the base (and consequently "indirectly connected"), but is "electrically coupled to the power input".  In this case "electrically coupled to" is used to describe two objects that are "indirectly connected."

> "15. The charging system of claim 13, wherein the charging system further comprises an AC-to-DC converter **external to the base** and **electrically coupled to** the power input." [16:54-56], emphasis added.

14

36.     The excerpt below illustrates an example in which the phrase "electrically coupled to" is used in an instance where the two objects are in the same circuit (i.e. electrically connected) and are also directly connected in a mechanical way:

> "Electrical contacts 520 in the docking bays 512, 514 make contact with electrical leads 522 on the adapters 516 (see FIG. 19B) to provide an electrical connection through which power can be transmitted. **The adapters 516 are electrically coupled to the power input port on the hand-held controllers**." [11:59-64], emphasis added.

37.     As discussed above in paragraph 31, the connector 542 at the top of the adapter 516 is mated with the power input port on the hand-held controller, making a direct connection.

38.     Consequently, as there are examples of usage of the phrase "electrically coupled to" in cases in which objects are directly or indirectly connected, it is my opinion that persons skilled in the art would conclude that the correct meaning of the term "electrically coupled to" is "*directly or indirectly connected to for the purpose of energy transfer*."

| Claim Language | NYKO's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|---|
| "at least one structure" | "at least one structure" means one or more structures. | Defendants believe this term needs to be construed in the context of the claim language it is used. See below. |
| **"at least one structure on the base** for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged" | NYKO contends that all claims terms in this claim limitation that are not construed above or below by NYKO are entitled to their plain and ordinary meaning within the context of the specification and claim language. | one or more structures on the base, each for providing physical support to a plurality of video game controllers while they are being charged |

39.     I believe persons skilled in the art would conclude that Nyko's proposed construction above for the term "at least one structure" is correct. In determining the meaning of the phrase "at least one structure", it is helpful to look up the ordinary meaning of the word "at least" (in the context it is used in the claim language).

40.     The Merriam-Webster Dictionary Online defines "at least" as:

— **at least**
: at the minimum <at least once a week>[1]

41.     The Oxford Dictionary Online similarly defines "at least" as:

— **at least**
: not less than; at the minimum:

---

[1] http://www.merriam-webster.com/dictionary/at%20least

*clean the windows at least once a week*[2]

42.    From the above definitions and the example usages given ("at least once a week"), it is clear that "at least" means no less than, but possibly more.  In the context of "at least one", it would mean no less than one, but possibly more than one.  This is also apparent from the usage of the phrase "at least one" elsewhere in the patent.  For example, the text excerpt below makes it clear that "at least one" means one or a plurality (more than one):

> "In one embodiment, the **at least one** DC port comprises **a plurality of** DC ports, the **at least one** video game controller comprises **a plurality of** video game controllers, and the plurality of DC ports is configured to concurrently couple to and provide the DC power to the plurality of video game controllers." [2:26-31], emphasis added.

43.    Consequently, based on the above analysis, it is my opinion that persons skilled in the art would conclude that the correct meaning of the term "at least one structure" is "one or more structures."

44.    Regarding the term "**at least one structure on the base** for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged", by adding the word "each", Defendants' proposed claim construction is placing an artificial limitation on the claim language, requiring that any one structure must "provide physical support to a plurality of video game controllers".  In fact, the '848 patent clearly states that a structure can in fact provide physical support to <u>one</u> (not a plurality) of video game controllers:

---

2

http://oxforddictionaries.com/us/definition/american_english/least?q=at+least#least__10

"Each pair of opposite surfaces, a portion of the base 402, a corresponding docking bay 404, and/or the locators 410 **may comprise a structure** for **providing physical support to one of the video game controllers** 420 during charging."] [9:51-55], emphasis added.

45. Based on the above language, Figure 11 shows four structures (four pairs of opposite surfaces, each forming a corresponding docking bay 404, with four sets of locators 410), each structure supplying physical support to "one of the video game controllers 420."

*FIG.11*



EXHIBIT A
Page 20

46.     Figure 14 goes on to show the four video game controllers being supported by the four structures.

*FIG.14*



47.     Therefore, based on this analysis, I disagree, and it is my opinion that one skilled in the art would disagree, with Defendants' proposed claim construction for the term "**at least one structure on the base** for providing physical support to the plurality of video game

19

controllers while the plurality of video game controllers are being charged"
as "one or more structures on the base, each for providing physical support
to a plurality of video game controllers while they are being charged".

| Claim Language | NYKO's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|---|
| "base" | "base" means *the foundation or support upon which structures rest*. | the bottom part of the charging system that provides physical support for the system against an external adjacent surface (e.g., a table or wall) |

48.    I believe persons skilled in the art would understand Nyko's
proposed construction for the term "base" to be correct.  Defendants'
Proposed Claim Construction for the term "base" attempts to limit the term
"base" to mean only the bottom part of the charging system that provides
physical support for the system against an external adjacent surface, such as
a table or a wall.  I find no basis in the '848 patent specification for this
restrictive limitation.  In fact, I find numerous examples in the '848 patent
that teach against the Defendants' Proposed Construction.

49.    For example, Figures 15 and 22 (shown below) are schematic
drawings indicating that the DC Ports 408, USB Host, Current Detectors 460,
LED Indicators 452, Power Supply and AC/DC Converter 440 are all part of
the Charger Base.



FIG.15



FIG.22

21

EXHIBIT A
Page 23

50.    In fact, the text that accompanies Figure 22 uses the terms charging station and charger base interchangeably, teaching away from the hypothesis that the base is just the "bottom part of the charging system."

> "As can be seen in FIG. 22, the charging station **(or charger base)** 510 includes electrical contacts 520 that are adapted to be electrically coupled with the accessory device 526 via the adapter 516." [14:32-35], emphasis added.

51.    The specification also teaches an embodiment containing an AC-to-DC converter which could be either external to the base or "in the base":

> "In one embodiment, the video game controller charging system further includes an AC-to-DC converter adapted to convert the externally supplied power to the DC power provided to the power input port of the at least one video game controller.  In one embodiment, the AC-to-DC converter is **in the base**. In another embodiment, the AC-to-DC converter is external to the base." [2:32-38], emphasis added.

52.    If the base was in fact "the bottom part of the charging system that provides physical support for the system", as the Defendants' Proposed Claim Construction contends, then the AC-to-DC converter would in fact be on the base, rather than "in the base", as the '848 patent requires.  If the base was nothing more than the bottom part of the charging system that sits against an external adjacent surface, as defined by Defendants' Proposed Claim Construction, then no circuitry could be "in the base", certainly not the power supply and AC/DC converter as shown in Figures 15 and 22.

53.    The '838 patent goes on to teach that the surface of the base includes the two vertical surfaces that make up the structure of the two

outermost docking bays 404.  The text refers to Figure 11, which I have included below, modified to show in three dimensions the two planes referred to in the text.

> "There are locators 410 on each of the two surfaces of the partitions 406, **as well as the two surfaces of the base 402**, which face the DC ports 408." [9:47-49], emphasis added.



*FIG.11*

54.    The '838 patent teaches in the above text that the surfaces I have highlighted in the above illustration are "surfaces of the base 402."  As these surfaces are not on the bottom of the charging system, the base cannot be limited only to the "bottom part of the charging system that provides physical support for the system against an external adjacent surface."

24

53.     Given the above analysis outlining the overwhelming intrinsic evidence to the contrary, I disagree, and it is my opinion that one skilled in the art would disagree, with Defendants' proposed claim construction for the term "base" as "the bottom part of the charging system that provides physical support for the system against an external adjacent surface (e.g., a table or wall)". It is my opinion that persons skilled in the art would conclude that the correct meaning for the term base is "the foundation or support upon which structures rest".

54.     I understand that Defendants have raised the issue of indefiniteness, but to date, have not yet articulated any explanation or analysis to support this claim. Further, it is my understanding that discovery in this matter is ongoing. Also, I understand that certain documents, testimony and other information produced in this matter has been designated as confidential by Defendants, and as of this date, I have not yet been able, under the terms of the Protective Order entered in this case, to review information designated by Defendants as confidential. Finally, Plaintiff has not yet received Defendants' opening brief in support of Defendants' proposed claim constructions. I reserve the right to modify or supplement the opinions expressed herein.

Dated: April 3rd, 2013

_____
Garry Kitchen
Danville, California

25

**Garry E. Kitchen**
SGK Service Inc.
3494 Camino Tassajara #403
Danville, CA 94506
925-553-7909
http://www.garrykitchen.com
gk@garrykitchen.com

**EDUCATION**

**Bachelor of Science, Electrical Engineering,** 1980
Fairleigh Dickinson University, Teaneck, New Jersey
Eta Kappa Nu Honor Society, 1977-1980
Engineering Merit Scholarship - Matsushita Corp, 1978-1979

**AFFILIATIONS**

AIAS - Academy of Interactive Arts and Sciences
IGDA - International Game Developers Association
IEEE - Institute of Electrical & Electronics Engineers
BOSSLEVEL - The World's Top 100 Game Developers (invitation only)
*Elite Expert* for IMS Expert Services, Pensacola, Florida
Gerson Lehrman Group Councils
Guidepoint Global (FNA Vista Research - Society of Industrial Leaders)
Coleman Research Group
Eta Kappa Nu Honor Society

**EXPERIENCE**

• 30+ years of technical management experience running game development companies, with an unmatched 17 years of management experience in Internet gaming.

• Hands-on technical and creative experience in all genres of game development, including console, PC retail and download, online, mobile and dedicated electronic.

• Performed as Legal Expert Witness in numerous cases involving patents, copyrights, video game business issues and software development for clients including Konami Entertainment, Nintendo of America, Sony Computer Entertainment, Zynga, NCR, Taito and Activision (see **Expert Consulting Experience** section below).

**Garry E. Kitchen**
page 2

**EXPERIENCE**
(cont'd)

- Strategic business planning - a history of anticipating and influencing industry trends with pioneering initiatives:
  **1980** Back-engineered the Atari 2600 in anticipation of the video game revolution
  **1986** Established the 1st North American-based Nintendo development studio
  **1996** Pioneered *Advergaming* with development of LifeSavers' Candystand.com
  **2005** Applied dynamic in-game advertising technology to casual games
  **2008**  Repositioned Skyworks as leading iPhone publisher with 11M downloads

- Expertise in developing comprehensive business plans, with application toward raising investment capital, either through IPO or private equity investment.

- Recognized as an industry expert in online gaming by numerous trade conferences, including Digital Hollywood, iMedia Breakthrough, GDC, CES, Gamer Technology Conference, Casual Game Conference, Advertising in Games conference, DMEXPO, VNU Digital Marketing conference, National Cable Show.

- Experience in dealing with broadcast and print media, including CNBC, ABC Eyewitness News, CNN, Good Morning Atlanta, The Today Show and various consumer and trade publications.

- Personally developed video game software products generating career retail sales in excess of $350 million.

- Co-founded Skyworks Technologies, Inc., an industry pioneer in *Advergames* - sponsorship-supported video games used as advertising vehicles.  Skyworks was named a Top 50 Interactive Agency by Advertising Age for the years 2003 and 2004.  Skyworks' client list included Nabisco/Kraft Foods, BMW, Toyota, Ford, PepsiCo, Campbell's, Fox Sports, CBS, Mattel, Weather Channel, Microsoft Network, Yahoo!, Miller Brewing Company, GlaxoSmithKline and MTV.

- Developed strategy and business plan for the Casual Games Network (CGN), Skyworks' initiative applying dynamic in-game advertising to online casual games, partnering with Massive Incorporated.

**Garry E. Kitchen**
page 3

**EXPERIENCE**
(cont'd)

• Co-founded Absolute Entertainment, Inc., console game publisher licensed by Nintendo, Sega, Sony, 3DO and Atari and video game developer of over 100 marketed titles from 1986 to 1995, generating product retail sales of over $300 million.  Successfully lead Absolute through oversold IPO, raising $12 million.

• Consulted for RCA David Sarnoff Research Labs (1986-1987) on entertainment applications of Digital Video Interactive (DVI), the first technology to store digital full-motion video on a CDROM.

• Designed & programmed Atari 2600 adaptation of hit arcade game Donkey Kong, 1982 wholesale revenues in excess of $100 million on four million units sold.

• Conceived, designed and developed Bank Shot, an innovative electronic pool game marketed by Parker Brothers, named "10 Best Games of 1980", *Omni Magazine*.

• Reverse-engineered Atari 2600 game system in 1980, creating one of the first third party 2600-compatible game cartridges - Space Jockey.

**EMPLOYMENT HISTORY**

**President/CEO**
SGK Service Inc., Danville, California
March 2007 - Present

**Vice President Game Publishing**
Viacom Media Networks, San Francisco, California
December 2010 - May 2012

**President/CEO**
AppStar Games Inc., Paramus, New Jersey
February 2010 - Present

**Chief Operating Officer**
Skyworks Interactive, Inc., Hackensack, New Jersey
December 2007 - September 2009

**Garry E. Kitchen**
page 4

**EMPLOYMENT HISTORY**
(cont'd)

>**Chairman, President & CEO**
>Skyworks Technologies, Inc., Hackensack, New Jersey
>November 1995 - December 2007

>**Chairman, President & CEO**
>Absolute Entertainment, Inc., Upper Saddle River, New Jersey
>March 1986 - November 1995

>**Senior Designer**
>Activision, Inc., Mountainview, California
>June 1982 - March 1986

>**President**
>Imaginative Systems Software, New Milford, New Jersey
>November 1981 - May 1982

>**Engineer/Designer**
>James Wickstead Design Associates, Cedar Knolls, New Jersey
>April 1976 - October 1981

**HONORS AND AWARDS**

- 2012 Official Honoree - Games (Handheld Devices)
  AddictingGames Mobile for iOS platform
  *International Academy - Digital Arts & Sciences WEBBY AWARDS - 2012*

- Nomination as an *Elite Expert* by IMS Expert Services
  *IMS Expert Services (www.ims-expertservices.com) - 2009*

- Nomination to the Advisory Committee: "Reinventing Advertising: VOD,
  PVR, Broadband, Games, PODs & Mobile Consortium"
  *Digital Hollywood* - 2005, 2006

- Lifetime Achievement Award in Video Games
  *Classic Gaming Expo* - 2003

- New Jersey Entrepreneur of the Year - Finalist
  *Inc. Magazine*, *Merrill Lynch* and *Ernst & Young* - 1993

**Garry E. Kitchen**
page 5

**HONORS AND AWARDS**
(cont'd)

• Best Simulation Game
<u>Super Battletank</u>
*Game Informer Magazine* - 1992

• Sega Seal of Quality Award Nominee - Best Flying/Driving Genesis
<u>Super Battletank</u>
*Sega of America* - 1992

• Lifetime Achievement Award in Video Games
*The Doctor Fad Show*
Syndicated educational television program - 1990

• Video Game Designer of the Year
*Computer Entertainer Magazine* - 1985

• Best Creativity Product - Nominee
<u>Garry Kitchen's GameMaker</u>
*SPA Excellence in Software* - 1985

• Video Game of the Year - Certificate of Merit
<u>Keystone Kapers</u>
*Electronic Games Magazine* - 1983

• U.S. Patent #4,346,892
<u>Bank Shot</u>
Electronic Pool Game marketed by Parker Brothers - 1981

• Ten Best Games of 1980
<u>Bank Shot</u>
*OMNI Magazine* - 1980

• The Games 100 - The Top 100 Games of 1980
<u>Bank Shot</u>
*Games Magazine* – 1980

• Engineering Merit Scholarship
Panasonic / Matsushita Corporation of Japan
Fairleigh Dickinson University - 1978, 1979

**Garry E. Kitchen**
page 6

## EXPERT CONSULTING EXPERIENCE

| Year | Law Firm | Client | Case | Description | Report/ Declaration | Deposition | Trial Testimony |
|---|---|---|---|---|---|---|---|
| 2013- | Kirkland & Ellis LLP | Zynga Inc. | Promotional Technologies LLC v. Zynga Inc. | Video game related patent infringement case | | | |
| 2013- | Paul Hastings LLP | Zynga Inc. | Zynga Inc. v. Alan Patmore, Kixeye Inc. et al | Video game related trade secret dispute | √ | | |
| 2012- | Mishcon de Reya LLP | Confidential | n/a | Analysis of video game related patent | | | |
| 2012- | Paynter Law Firm, PLLC | Robin Antonick | Robin Antonick v. Electronic Arts Inc. | Video game related contractual dispute | √ | √ | |
| 2012 | Perkins Coie LLP | Nintendo of America Inc. | Impulse Technology Ltd. v. Nintendo of America Inc., et al | Video game related patent infringement case | √ | √ | |
| 2012- | Cooley LLP | Nintendo of America Inc. | SSD v. Nintendo of America Inc. | Video game related patent infringement case | | | |
| 2012- | K&L Gates LLP | Sony Computer Entertainment of America Inc | Walker Digital, LLC v. Sony Computer Entertainment Inc. et al | Video game related patent infringement case | | | |
| 2010-2012 | Morgan, Lewis & Bokius LLP | Sony Computer Entertainment of America Inc. | Craig Thorner and Virtual Reality Feedback Corp v. Sony Computer Entertainment America Inc. et al | Video game related patent infringement case involving video game controller technologies. | √ | | |
| 2010 | Mudd Law Offices LLP | Jeremy Wise and Wise Buy Now LLC | David Allison dba Cheat Code Central vs. Jeremy Wise and Wise Buy Now LLC | Retained as a consultant/expert witness in the area of copyright infringement related to a game information website. | √ | | |
| 2009-2010 | Paul, Hastings, Janofsky & Walker LLP | Zynga Game Network Inc. | Zynga Game Network Inc. v Playdom Inc. et al. Superior Court of the State of California, County of Santa Clara | Retained as a consultant/expert witness in the areas of game design, copyright infringement and related business issues. | √ | | |
| 2009 | Skadden Arps | Jakks Pacific, Inc. | Jakks Pacific, Inc. v THQ Inc. (arbitration) | Case involved contractual issues in a video game licensing/distribution agreement   Retained as a consultant/expert witness in the areas of game design and | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | related video game business/contract issues. | | | |
| 2008-2010 | Paul, Hastings, Janofsky & Walker LLP | Konami Digital Entertainment Co, LTD. and Konami Digital Entertainment, Inc. | Konami Digital Entertainment Co., LTD and Konami Digital Entertainment, Inc. v. Harmonix Music Systems, Inc., MTV Networks, Co, and Viacom, Inc.  United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:08-CV-286 | Patent infringement case against Rock Band & Rock Band 2 involving three key patents in the area of rhythm-action video games utilizing custom game controllers.  Retained by the patent holder (Konami) as a consultant/expert witness in the areas of video game software development, patent infringement and validity.  Tasks to date include analysis of prior art, opinions on claim construction, analysis of software code regarding infringement. | √ | √ | |
| 2008-2010 | Pillsbury, Winthrop, Shaw, Pitman LLP | Activision Publishing Inc. | n/a | Retained as a consultant regarding a number of patent reexaminations by the USPTO. | √ | | |
| 2008-2009 | Kirkland & Ellis | Activision Publishing Inc. | Activision Publishing v. CONFIDENTIAL | Confidential arbitration case involving patent infringement and invalidity, copyright infringement and related video game industry business issues in the field of rhythm-action video games utilizing custom game controllers.  Tasks included prior art research and analysis, numerous reports including Patent Invalidity and Copyright Infringement.  Deposed numerous times and testified in front of the Arbitration Panel. | √ | √ | √ |
| 2008 | Allan Law Group, PC | CONFIDENTIAL | n/a | Retained to undertake pre-litigation search and analysis of potential prior art regarding a virtual world patent.  Uncovered critical | √ | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | prior art, which lead to a significant modification in the client's litigation strategy. | | | |
| 2007- | McDonne ll Boehnen Hulbert & Berghoff LLP | NetJumper Software, LLC | NetJumper Software, LLC vs Google Inc.  United States District Court, Eastern District of Michigan, Southern Division, Case No. 04-70366-CV | Patent infringement cast involving search technology.  Wrote infringement report including demonstrative video presentation. | √ | | |
| 2005-2009 | Valauskas & Pine LLC | Neomedia Technologies | Scanbuy Inc. vs. Neomedia Technologies, Inc. United States District Court, Southern District of New York, Civil Action No. 04 CV 02443 (JES) | Copyright and patent infringement case involving UPC barcode recognition software on mobile devices.  Tasks included comparing source codes for Copyright Infringement and opining on Patent Infringement/Validity. | √ | √ | |
| 2005 | Laura Ringelhei m, Esq. | Hopeton Overton Browne | Hopeton Overton Browne, p/k/a Scientist vs. Greensleeves Records, LTD, Take Two Interactive Software, Inc. and Rockstar Games, Inc.  United States District Court, Southern District of New York, Civil Action No. 03 CV 7696 (MGC) | Case involved copyright infringement for unauthorized inclusion of the client's music in the video game Grand Theft Auto 3.  Wrote report opining on licensing costs and potential damages for usage of music in video games. | √ | √ | |
| 2003 | Rich Barbuto, Esq. | Tritech | Tritech v. Ectaco, United States District Court, Southern District of New York, Civil Action. | Retained as a consultant/expert witness in a case involving defective language translator units purchased by the client from an overseas manufacturer.  My tasks included an engineering analysis to determine the cause for the malfunction (software), writing a report and testifying at trial. | √ | | √ |
| 2002 | Jenkins & Gilchrist | NCR | NCR Corporation v. Palm, Inc. and Handspring, Inc. United States | Client (NCR) sued Palm & Handspring for patent infringement | √ | √ | |

| | | | District Court, Delaware, Civil Action No. 01-169-RRM | regarding a handheld, tethered computing device.  Tasks included code analysis to opine on patent infringement, associated report and deposition testimony. | | | |
|---|---|---|---|---|---|---|---|
| 2000 | Jacob Weingarten | Sylvan Gonska | Gonska v. Gonska | Web development | √ | | |
| 2000 | Wilson, Sonsini, Goodrich & Rosati | Engineering Animation Inc. | Engineering Animation Inc. v. THQ | Video game development | √ | √ | |
| 1998 | Drinker, Biddle & Reath | QQP/Bruce Williams | QQP v. Impact | Video game contractual and business issues | √ | √ | |
| 1995-1997 | Brinks, Hofer, Gilson & Leone | Taito of America | Magnavox v. Taito of America | Patent infringement | √ | √ | |
| 1995 | Brinks, Hofer, Gilson & Leone | Taito of America | Atari v. Taito of America | Copyright infringement | √ | √ | |
| 1991 | Latham & Watkins LLP | Nintendo of America | Atari v. Nintendo | Video game contractual issues | √ | √ | √ |
| 1990 | - | Nintendo of Japan | Nintendo v. Codemasters | Copyright infringement | √ | √ | √ |