# EXHIBIT F

# McGraw-Hill
## Dictionary
of

# SCIENTIFIC
# and
# TECHNICAL
# TERMS



# Sixth Edition

Exhibit F
Page 86

**On the cover:** Representation of a fullerene molecule with a noble gas atom trapped inside. At the Permian-Triassic sedimentary boundary the noble gases helium and argon have been found trapped inside fullerenes. They exhibit isotope ratios quite similar to those found in meteorites, suggesting that a fireball meteorite or asteroid exploded when it hit the Earth, causing major changes in the environment. *(Image copyright © Dr. Luann Becker. Reproduced with permission.)*

Over the six editions of the Dictionary, material has been drawn from the following references: G. M. Garrity et al., *Taxonomic Outline of the Procaryotes,* Release 2, Springer-Verlag, January 2002; D. W. Linzey, *Vertebrate Biology,* McGraw-Hill, 2001; J. A. Pechenik, *Biology of the Invertebrates,* 4th ed., McGraw-Hill, 2000; *U.S. Air Force Glossary of Standardized Terms,* AF Manual 11-1, vol. 1, 1972; F. Casey, ed., *Compilation of Terms in Information Sciences Technology,* Federal Council for Science and Technology, 1970; *Communications-Electronics Terminology,* AF Manual 11-1, vol. 3, 1970; P. W. Thrush, comp. and ed., *A Dictionary of Mining, Mineral, and Related Terms,* Bureau of Mines, 1968; *A DOD Glossary of Mapping, Charting and Geodetic Terms,* Department of Defense, 1967; J. M. Gilliland, *Solar-Terrestrial Physics: A Glossary of Terms and Abbreviations,* Royal Aircraft Establishment Technical Report 67158, 1967; W. H. Allen, ed., *Dictionary of Technical Terms for Aerospace Use,* National Aeronautics and Space Administration, 1965; *Glossary of Stinfo Terminology,* Office of Aerospace Research, U.S. Air Force, 1963; *Naval Dictionary of Electronic, Technical, and Imperative Terms,* Bureau of Naval Personnel, 1962; R. E. Huschke, *Glossary of Meteorology,* American Meteorological Society, 1959; *ADP Glossary,* Department of the Navy, NAVSO P-3097; *Glossary of Air Traffic Control Terms,* Federal Aviation Agency; *A Glossary of Range Terminology, White Sands Missile Range, New Mexico,* National Bureau of Standards, AD 467-424; *Nuclear Terms: A Glossary,* 2d ed., Atomic Energy Commission.

**McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, Sixth Edition**

Copyright © 2003, 1994, 1989, 1984, 1978, 1976, 1974 by The McGraw-Hill Companies, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

    2 3 4 5 6 7 8 9 0      DOW/DOW      0 8 7 6 5 4 3

ISBN 0-07-042313-X

**Library of Congress Cataloging-in-Publication Data**

McGraw-Hill dictionary of scientific and technical terms--6th ed.
    p.    cm.
    ISBN 0-07-042313-X (alk. paper)
    1. Science--Dictionaries.   2. Technology--Dictionaries.   I. Title: Dictionary of scientific and technical terms.

    Q123.M15    2002
    503—dc21                                                      2002026436

Case 2:12-cv-03001-GAF-VBK   Document 105-2   Filed 04/09/13   Page 4 of 178   Page ID #:2094

**BARYON OCTET**



The baryon octet, arrayed with respect to $I_3$ as abscissa and $Y$ as ordinate. The charge number $Q$ is given by $Q = I_3 + Y/2$.

**BASALT**



Textures of basalt. (a) Pilotaxitic texture with feldspar microlites and some interstitial, microcrystalline material. (b) Intersertal texture with feldspar microlites and some granular pyroxene and much interstitial glass. (c) Hyalopilitic texture with feldspar microlites in glass. (d) Intergranular texture with feldspar laths and some interstitial granular pyroxene.

**baryon octet** [PARTIC PHYS] The group of one lambda, three sigma, and two xi hyperons and two nucleons, all having spin $1/2$ and positive parity, and forming a symmetrical pattern as suggested by $SU_3$ symmetry. { 'bar·ē,än äk'tet }

**baryon resonance** [PARTIC PHYS] A cross section anomaly indicating the existence of an unstable baryon. { 'bar·ē,än 'rez·ən·əns }

**baryon spectroscopy** [PARTIC PHYS] The science of the energy levels and changes of state occurring among baryon particles. { 'bar·ē,än spek'träs·kə·pē }

**baryon-to-photon ratio** [ASTRON] The estimated ratio of the number of baryons (mostly protons and neutrons) to photons (mostly in the cosmic microwave radiation) in the universe. { 'bar·ē,än tə 'fō,tän 'rā·shō }

**barysphere** *See* centrosphere. { 'bar·ə,sfir }

**baryta feldspar** *See* hyalophane. { bə'rīd·ə 'fel,spär }

**baryta water** [CHEM] A solution of barium hydroxide. { bə'rīd·ə 'wȯd·ər }

**baryte** *See* barite. { 'ba,rīt }

**Barytheriidae** [PALEON] A family of extinct proboscidean mammals in the suborder Barytherioidea. { ,bar·ə·thē'rī·ə,dē }

**Barytherioidea** [PALEON] A suborder of extinct mammals of the order Proboscidea, in some systems of classification. { ,bar·ə,thir·ē'ȯid·ē·ə }

**barytine** *See* barite. { 'bar·ə,tēn }

**barytocalcite** [MINERAL] $CaBa(CO_3)_2$ A colorless to white, grayish, greenish, or yellowish monoclinic mineral consisting of calcium and barium carbonate. { bə,rīd·ə'kal,sīt }

**barytropic gas** [PHYS] A gas whose pressure depends only on its density. { ,bar·ə'träp·ik 'gas }

**basal** [BIOL] Of, pertaining to, or located at the base. [PHYSIO] Being the minimal level for, or essential for maintenance of, vital activities of an organism, such as basal metabolism. { 'bā·səl }

**basal arkose** [PETR] Partially reworked feldspathic residuum in the lower section of a sandstone that overlies granitic rock. { 'bā·səl 'är,kōs }

**basal body** [CYTOL] A cellular organelle that induces the formation of cilia and flagella and is similar to and sometimes derived from a centriole. Also known as kinetosome. { 'bā·səl ,bäd·ē }

**basal-cell carcinoma** [MED] A locally invasive, rarely metastatic nevoid tumor of the epidermis. Also known as basal-cell epithelioma. { 'bā·səl ,sel ,kärs·ən'ō·mə }

**basal-cell epithelioma** *See* basal-cell carcinoma. { 'bā·səl ,sel ,ep·ə,thē·lē'ō·mə }

**basal cleavage** [CRYSTAL] Cleavage parallel to the base of the crystal structure or to the lattice plane which is normal to one of the lattice axes. { 'bā·səl 'klēv·ij }

**basal complex** *See* basement. { 'bā·səl 'käm,pleks }

**basal conglomerate** [GEOL] A coarse gravelly sandstone or conglomerate forming the lowest member of a series of related strata which lie unconformably on older rocks; records the encroachment of the seabeach on dry land. { 'bā·səl kən'gläm·ə·rət }

**basal coplane** [GRAPHICS] The condition of exposure of a pair of photographs in which the two photographs lie in a common plane parallel to the air base. { 'bā·səl 'kō,plān }

**basal disc** [BIOL] The expanded basal portion of the stalk of certain sessile organisms, used for attachment to the substrate. { 'bā·səl 'disk }

**basal ganglia** [NEURO] The corpus striatum, or the corpus striatum and the thalamus considered together as the important subcortical centers. { 'bā·səl 'gaŋ·glē·ə }

**basal groundwater** [HYD] A large body of groundwater that floats on and is in hydrodynamic equilibrium with sea water. { 'bā·səl 'graȯnd,wȯd·ər }

**basalia** [VERT ZOO] The cartilaginous rods that support the base of the pectoral and pelvic fins in elasmobranchs. { bə'sāl·ē·ə }

**basalis** [HISTOL] The basal portion of the endometrium; it is not shed during menstruation. { bə'sāl·əs }

**basal lamina** [EMBRYO] The portion of the gray matter of the embryonic neural tube from which motor nerve roots develop. { 'bā·səl 'lam·ə·nə }

**basal membrane** [ANAT] The tissue beneath the pigment layer of the retina that forms the outer layer of the choroid. { 'bā·səl 'mem,brān }

**basal metabolic rate** [PHYSIO] The amount of energy utilized per unit time under conditions of basal metabolism; expressed as calories per square meter of body surface or per kilogram of body weight per hour. Abbreviated BMR. { 'bā·səl med·ə'bäl·ik 'rāt }

**basal metabolism** [PHYSIO] The sum total of anabolic and catabolic activities of an organism in the resting state providing just enough energy to maintain vital functions. { 'bā·səl mə'tab·ə,liz·əm }

**basal orientation** [CRYSTAL] A crystal orientation in which the surface is parallel to the base of the lattice or to the lattice plane which is normal to one of the lattice axes. { 'bā·səl ,ȯr·ē·ən'tā·shən }

**basal plane** [CRYSTAL] The plane perpendicular to the long, or $c$, axis in all crystals except those of the isometric system. { 'bā·səl 'plān }

**basal rot** [PL PATH] Any rot that affects the basal parts of a plant, especially bulbs. { 'bā·səl 'rät }

**basalt** [PETR] An aphanitic crystalline rock of volcanic origin, composed largely of plagioclase feldspar (labradorite or bytownite) and dark minerals such as pyroxene and olivine; the extrusive equivalent of gabbro. { bə'sȯlt }

**basalt glass** *See* tachylite. { bə'sȯlt ,glas }

**basaltic dome** *See* shield volcano. { bə'sȯl·tik 'dōm }

**basaltic hornblende** [PETR] A black or brown variety of hornblende rich in ferric iron and occurring in basalts and other iron-rich basic igneous rocks. Also known as basaltine; lamprobolite; oxyhornblende. { bə'sȯl·tik 'hȯrn,blend }

**basaltic lava** [PETR] A volcanic fluid rock of basaltic composition. { bə'sȯl·tik 'lav·ə }

**basaltic magma** [GEOL] Mobile rock material of basaltic composition. { bə'sȯl·tik 'mag·mə }

**basaltic rock** [PETR] Igneous rock that is fine-grained and contains basalt, diabase, and dolerite; if andesite is included the rock is dark in color. { bə'sȯl·tik 'räk }

**basaltic shell** [GEOL] The lower crystal layer of basalt underlying the oceans and beneath the sialic layer of continents. { bə'sȯl·tik 'shel }

**basaltiform** [GEOL] Similar to basalt in form. { bə'sȯl·tə,fȯrm }

**basaltine** *See* basaltic hornblende. { bə'sȯl,tēn }

**basalt obsidian** *See* tachylite. { bə'sȯlt əb'sid·ē·ən }

**basal tunnel** [ENG] A water supply tunnel constructed along the basal water table. { 'bā·səl 'tən·əl }

**basaluminite** [MINERAL] $Al_4(SO_4)(OH)_{10}·5H_2O$ A white mineral consisting of hydrated basic aluminum sulfate; occurs in compact masses. { ,bās·ə'lüm·ə,nīt }

**basal wall** [BOT] The wall dividing the oospore into an anterior and a posterior half in plants bearing archegonia. { 'bā·səl 'wȯl }

**basal water table** [HYD] The water table of basal groundwater. { 'bā·səl 'wȯd·ər ,tā·bəl }

**basanite** [PETR] A basaltic extrusive rock closely allied to chert, jasper, or flint. Also known as Lydian stone; lydite. { 'bas·ə,nīt }

**basculing fault** *See* wrench fault. { 'ba·skyə,läd·iŋ 'fȯlt }

**bascule** [ENG] A structure that rotates about an axis, as a seesaw, with a counterbalance (for the weight of the structure) at one end. { 'ba,skül }

**bascule bridge** [CIV ENG] A movable bridge consisting primarily of a cantilever span extending across a channel; it rotates about a horizontal axis parallel with the waterway. { 'ba ,skül ,brij }

**bascule leaf** [CIV ENG] The span of a bascule bridge. { 'ba ,skül ,lēf }

**base** [CHEM] Any chemical species, ionic or molecular, capable of accepting or receiving a proton (hydrogen ion) from another substance; the other substance acts as an acid in giving of the proton. Also known as Brønsted base. [CHEM ENG] The primary substance in solution in crude oil, and remaining after distillation. [COMPUT SCI] *See* root. [ELECTR] **1.** The region that lies between an emitter and a collector of a transistor and into which minority carriers are injected. **2.** The part of an electron tube that has the pins, leads, or other terminals to which external connections are made either directly or through a socket. **3.** The plastic, ceramic, or other insulating board that supports a printed wiring pattern. [ENG] Foundation or part upon which an object or instrument rests. [GEN] *See* nitrogenous base. [GRAPHICS] A transparent

Exhibit F
Page 88

plastic film on which a photographic emulsion is applied. [LAP] *See* pavilion. [MATH] **1.** A side or face upon which the altitude of a geometric configuration is thought of as being constructed. **2.** For a logarithm, the number of which the logarithm is the exponent. **3.** For a number system, the number whose powers determine place value. **4.** For a topological space, a collection of sets, unions of which form all the open sets of the space. [ORD] Station or installation from which military forces operate and from which supplies are obtained. { bās }

**base address** *See* address constant. { bās ə′dres }

**base-altitude ratio** [GRAPHICS] The ratio between the airbase length and the flight altitude of a stereoscopic pair of photographs. Also known as base-height ratio; K factor. { ′bās ′al·tə‚tüd ‚rā·shō }

**base analog** [MOL BIO] A molecule similar enough to a purine or pyrimidine base to substitute for the normal bases, resulting in abnormal base pairing. { ′bās ′an·ə‚läg }

**base anchor** [BUILD] The metal piece attached to the base of a doorframe for the purpose of securing the frame to the floor. { ′bās ‚aŋ·kər }

**base angle** [MATH] Either of the two angles of a triangle that have the base for a side. { ′bās ‚aŋ·gəl }

**base apparatus** [ENG] Any apparatus designed for use in measuring with accuracy and precision the length of a base line in triangulation, or the length of a line in first- or second-order traverse. { ′bās ‚ap·ə′rad·əs }

**base area** [GRAPHICS] A portion of the lower edge of a microfilm jacket that provides an area for notching. { ′bās ′er·ē·ə }

**baseball** [PL PHYS] A machine used in controlled fusion research to confine a plasma; consists of a linear magnetic bottle sealed by magnetic mirrors at both ends, and has current-carrying structures, which resemble the seams of a baseball in shape, to stabilize the plasma. { ′bās‚bȯl }

**baseband** [COMMUN] The band of frequencies occupied by all transmitted signals used to modulate the radio wave. { ′bās‚band }

**baseband frequency response** [COMMUN] Frequency response characteristics of the frequency band occupied by all of the signals used to modulate a transmitted carrier. { ′bās‚band ′frē·kwən·sē ri′späns }

**baseband system** [COMMUN] A communications system in which information is transmitted over a single unmodulated band of frequencies. { ′bās‚band ‚sis·təm }

**base bias** [ELECTR] The direct voltage that is applied to the majority-carrier contact (base) of a transistor. { ′bās ‚bī·əs }

**base block** [BUILD] **1.** A block of any material, generally with little or no ornament, forming the lowest member of a base, or itself fulfilling the functions of a base, as a member applied to the foot of a door or to window trim. **2.** A rectangular block at the base of a casing or column which the baseboard abuts. **3.** *See* skirting block. { ′bās ‚bläk }

**baseboard** [BUILD] A finish board covering the interior wall at the junction of the wall and the floor. Also known as skirt; skirting. { ′bās‚bȯrd }

**baseboard heater** [BUILD] Heating elements installed in panels along the baseboard of a wall. { ′bās‚bȯrd ′hēd·ər }

**baseboard radiator** [CIV ENG] A heating unit which is located at the lower portion of a wall and to which heat is supplied by hot water, warm air, steam, or electricity. { ′bās‚bȯrd ′rād·ē‚ād·ər }

**base box** [MET] A unit of area used for tin-plated steel sheet; one base box is equivalent to 112 sheets, 14 by 20 inches (35.6 by 50.8 centimeters), or 62,720 square inches of surface, coated on two sides; 1 pound (0.454 kilogram) of tin per base box is equal to a coating of tin 0.000059 inch (0.0014986 millimeter) thick. { ′bās ‚bäks }

**base bullion** [MET] Crude lead that has enough silver in it to make the extraction of silver worthwhile; gold may be present. { ′bās ‚bül·yən }

**base cap** *See* base molding. { ′bās ‚kap }

**base-centered lattice** [CRYSTAL] A space lattice in which each unit cell has lattice points at the centers of each of two opposite faces as well as at the vertices; in a monoclinic crystal, they are the faces normal to one of the lattice axes. { ′bās ‚sen·tərd ′lad·əs }

**base circle** [DES ENG] The circle on a gear such that each tooth-profile curve is an involute of it. { ′bās ‚sər·kəl }

**base conditions** [PETRO ENG] Standard conditions of 14.65 psia pressure and 60°F (15.6°C) used to calculate the amount of gas contained in oil from a well (the gas-oil ratio). { ′bās kən′dish·ənz }

**base correction** [ENG] The adjustment made to reduce measurements taken in field exploration to express them with reference to the base station values. { ′bās kə′rek·shən }

**base course** [BUILD] The lowest course or first course of a wall. [CIV ENG] The first layer of material laid down in construction of a pavement. { ′bās ‚kȯrs }

**base density** [OPTICS] The value of the inherent optical transmission density of a film base; does not include any contribution from the emulsion layer. { ′bās ′den·səd·ē }

**Basedow's disease** [MED] See exophthalmic goiter. { ′bäz·ə‚dōz di‚zēz }

**base-displacement** [COMPUT SCI] In machine-language programming, a technique in which addresses are specified relative to a base address where the beginning of the program is stored. { ′bās dis‚plās·mənt }

**base drag** [FL MECH] Drag owing to a base pressure lower than the ambient pressure; it is a part of the pressure drag. { ′bās ‚drag }

**base elbow** [DES ENG] A cast-iron pipe elbow having a baseplate or flange which is cast on it and by which it is supported. { ′bās ‚el‚bō }

**base electrode** [ELECTR] An ohmic or majority carrier contact to the base region of a transistor. { ′bās i′lek‚trōd }

**base exchange** [GEOCHEM] Replacement of certain ions by others in clay. { ′bās iks′chānj }

**base excision repair** [CELL MOL] A deoxyribonucleic acid (DNA) repair system in which an altered base is removed from the sugar backbone by action of a specific DNA glycolase and then the abasic sugar is removed by apurinic/apyrimidinic (AP) lyase and AP endonuclease, leaving a one-nucleotide gap that is then filled in and ligated. { ′bās ek′siz·zhən ri‚per }

**base flashing** [BUILD] **1.** The flashing provided by upturned edges of a watertight membrane on a roof. **2.** Any metal or composition flashing at the joint between a roofing surface and a vertical surface, such as a wall or parapet. { ′bās ‚flash·iŋ }

**base flow** [HYD] The flow of water entering stream channels from groundwater sources in the drainage of large lakes. { ′bās ‚flō }

**base font** [COMPUT SCI] The font used in a document if none other is specified. { ′bās ‚fänt }

**base for the neighborhood system** *See* local base. { ′bās fər t͟hə ′nā·bər‚hud ‚sis·təm }

**base fracture** [MIN ENG] In quarrying, the broken condition of the base after a blast; it may be a good or bad base fracture. { ′bās ′frak·chər }

**base fuse** [ORD] A fuse installed in the bottom of a projectile. { ′bās ‚fyüz }

**base-height ratio** *See* base-altitude ratio. { ′bās ‚hīt ′rā·shō }

**base initiation** [ORD] Detonation initiated at the base (rear) of the charge. { ′bās i‚nish·ē′ā·shən }

**base insulator** [ELEC] Heavy-duty insulator used to support the weight of an antenna mast and insulate the mast from the ground or some other surface. { ′bās ′in·sə‚lād·ər }

**base isolators** [CIV ENG] Components placed within a building (not always at the base) which are relatively flexible in the lateral direction, yet can sustain the vertical load. When an earthquake causes ground motions, base isolators allow the structure to respond much more slowly than it would without them, resulting in lower seismic demand on the structure. Isolators may be laminated steel with high-quality rubber pads, sometimes incorporating lead or other energy-absorbing materials. { ′bās ‚ī·sə′lād·ərz }

**base language** [COMPUT SCI] The component of an extensible language which provides a complete but minimal set of primitive functions, such as elementary data types, and simple operations and control constructs. { ′bās ′laŋ·gwij }

**base level** [GEOL] That critical plane of erosion and deposition represented by river level on continents and by wave or current base in the sea. { ′bās ‚lev·əl }

**base-leveled plain** [GEOL] Any land surface changed almost to a plain by subaerial erosion. Also known as peneplain. { ′bās ‚lev·əld ′plān }

**base-leveling epoch** *See* gradation period. { ′bās ‚lev·əl·iŋ ′ep·ək }

**base line** Abbreviated BL. [ELECTR] The line traced on





**BASE-CENTERED LATTICE**

Two of fourteen Bravais lattices. (*a*) Base-centered orthorhombic. (*b*) Base-centered monoclinic.

Case 2:12-cv-03001-GAF-VBK   Document 105-2   Filed 04/09/13   Page 6 of 178   Page ID #:2096

**COUPLED CIRCUITS**



A pair of coupled circuits.

specimen to color elements other than those demonstrated by the principal stain. { 'kaůnt·ər‚stān }

**counter sun** *See* antehelion. { 'kaůnt·ər‚sən }

**countersunk bolt** [DES ENG] A bolt that has a circular head, a flat top, and a conical bearing surface tapering in from the top; in place, the head is flush-mounted. { 'kaůn·tər‚səŋk 'bolt }

**counter terms** [QUANT MECH] Additional terms added to a Lagrangian in quantum field theory in order to absorb the typical divergences that occur in a perturbation expansion of the theory. { 'kaůnt·tər ‚tərmz }

**countertransference** [PSYCH] The conscious or unconscious emotional reaction of the therapist to the patient, which may interfere with psychotherapy. { 'kaůnt·ər·tranz'fər·əns }

**counter tube** [ELECTR] An electron tube having one signal-input electrode and 10 or more output electrodes, with each input pulse serving to transfer conduction sequentially to the next output electrode; beam-switching tubes and cold-cathode counter tubes are examples. [NUCLEO] An electron tube that converts an incident particle or burst of incident radiation into a discrete electric pulse, generally by utilizing the current flow through a gas that is ionized by the radiation; used in radiation counters. Also known as radiation counter tube. { 'kaůnt·ər ‚tůb }

**counter voltage** [ELEC] The reverse voltage that appears across an inductor when current through the inductor is shut off. { 'kaůnt·ər ‚vōl·tij }

**counterweight** [MECH ENG] A device which counterbalances the original load in elevators and skip and mine hoists, going up when the load goes down, so that the engine must only drive against the unbalanced load and overcome friction. **2.** Any weight placed on a mechanism which is out of balance so as to maintain static equilibrium. Also known as counterbalance; counterpoise. { 'kaůnt·ər‚wāt }

**counting chamber** [MICROBIO] An accurately dimensioned chamber in a microslide which can hold a specific volume of fluid and which is usually ruled into units to facilitate the counting under the microscope of cells, bacteria, or other structures in the fluid. { 'kaůnt·iŋ ‚chām·bər }

**counting circuit** [ELECTR] A circuit that counts pulses by frequency-dividing techniques, by charging a capacitor in such a way as to produce a voltage proportional to the pulse count, or by other means. Also known as counter circuit. { 'kaůnt·iŋ ‚sər·kət }

**counting-down circuit** *See* frequency divider. { 'kaůnt·iŋ ‚daůn ‚sər·kət }

**counting glass** [TEXT] A magnifying glass for counting the number of threads per inch in textile fabrics. { 'kaůnt·iŋ ‚glas }

**counting ionization chamber** *See* pulse ionization chamber. { 'kaůnt·iŋ ‚ī·ə·nə'zā·shən ‚chām·bər }

**counting number** [MATH] One of the numbers used in counting objects, either the set of positive integers or the set of positive integers and the number 0. { 'kaůnt·iŋ ‚nəm·bər }

**counting rate** [PHYS] The average rate of occurrence of events as observed by means of a counting system. { 'kaůnt·iŋ ‚rāt }

**counting rate meter** [NUCLEO] An instrument that indicates the time rate of occurrence of input pulses to a radiation counter, averaged over a time interval. Also known as rate meter. { 'kaůnt·iŋ ‚rāt ‚mēd·ər }

**counting rate-voltage characteristic** *See* plateau characteristic. { 'kaůnt·iŋ ‚rāt 'vōl·tij ‚kar·ik·tə'ris·tik }

**country rock** [GEOL] **1.** Rock that surrounds and is penetrated by mineral veins. **2.** Rock that surrounds and is invaded by an igneous intrusion. { ‚kən·trē 'räk }

**count system** *See* numerical system. { 'kaůnt ‚sis·təm }

**couplant** [ENG] A substance such as water, oil, grease, or paste used to avoid the retarding of sound transmission by air between the transducer and the part during ultrasonic examination. { 'kəp·lənt }

**couple** [CHEM] Joining of two molecules. [ELEC] To connect two circuits so signals are transferred from one to the other. [ELECTR] Two metals placed in contact, as in a thermocouple. [ENG] To connect with a coupling, such as of two belts or two pipes. [MECH] A system of two parallel forces of equal magnitude and opposite sense. { 'kəp·əl }

**coupled antenna** [ELECTROMAG] An antenna electromagnetically coupled to another. { 'kəp·əld an'ten·ə }

**coupled circuits** [ELEC] Two or more electric circuits so arranged that energy can transfer electrically or magnetically from one to another. { 'kəp·əld 'sər·kəts }

**coupled column** [ARCH] One of two columns used as a grouped pair. { 'kəp·əld 'käl·əm }

**coupled engine** [MECH ENG] A locomotive engine having the driving wheels connected by a rod. { 'kəp·əld 'en·jən }

**coupled field vectors** [ELECTROMAG] The electric-and magnetic-field vectors, which depend upon each other according to Maxwell's field equations. { 'kəp·əld 'fēld ‚vek·tərz }

**coupled harmonic oscillators** [PHYS] Linear oscillators with an interaction, often also linear or weak. { 'kəp·əld här'-män·ik 'äs·ə‚lād·ərz }

**coupled modes** [ACOUS] Modes of acoustic transmission along a duct having a discontinuity, so that the reflected and transmitted waves contain modes other than the incident ones. { 'kəp·əld 'mōdz }

**coupled oscillators** [ELECTROMAG] A set of alternating-current circuits which interact with each other, for example, through mutual inductances or capacitances. [MECH] A set of particles subject to elastic restoring forces and also to elastic interactions with each other. { 'kəp·əld 'äs·ə‚lād·ərz }

**coupled reaction** [CHEM] A reaction which involves two oxidants with a single reductant, where one reaction taken alone would be thermodynamically unfavorable. { 'kəp·əld rē'ak·shən }

**coupled systems** [COMPUT SCI] Computer systems that share equipment and can exchange information. [PHYS] Mechanical, electrical, or other systems which are connected in such a way that they interact and exchange energy with each other. { 'kəp·əld 'sis·təmz }

**coupled transistors** [ELECTR] Transistors connected in series by transformers or resistance-capacitance networks, in much the same manner as electron tubes. { 'kəp·əld tran'zis·tərz }

**coupled wave** [FL MECH] A surface wave which is being continuously generated by another wave having the same phase velocity. Also known as C wave. { 'kəp·əld 'wāv }

**coupler** [ELEC] A component used to transfer energy from one circuit to another. [ELECTROMAG] **1.** A passage which joins two cavities or waveguides, allowing them to exchange energy. **2.** A passage which joins the ends of two waveguides, whose cross section changes continuously from that of one to that of the other. [ENG] A device that connects two railroad cars. [GRAPHICS] A substance that can react with the unexposed diazonium salt in a diazo material to produce the visible dye image. [NAV] The portion of a navigation system that receives signals of one type from a sensor and transmits signals of a different type to an actuator. { 'kəp·lər }

**coupling** [ELEC] **1.** A mutual relation between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other device. **2.** A hardware device used to make a temporary connection between two wires. [ENG] **1.** Any device that serves to connect the ends of adjacent parts, as railroad cars. **2.** A metal collar with internal threads used to connect two sections of threaded pipe. [MECH ENG] The mechanical fastening that connects shafts together for power transmission. Also known as shaft coupling. { 'kəp·liŋ }

**coupling agent** [CHEM] A substance that can react with both reinforcement and matrix components of a composite material to form a binding link at their interface. { 'kəp·liŋ ‚ā·jənt }

**coupling aperture** [ELECTROMAG] An aperture in the wall of a waveguide or cavity resonator, designed to transfer energy to or from an external circuit. Also known as coupling hole; coupling slot. { 'kəp·liŋ ‚ap·ə·chər }

**coupling capacitor** [ELECTR] A capacitor used to block the flow of direct current while allowing alternating or signal current to pass; widely used for joining two circuits or stages. Also known as blocking capacitor; stopping capacitor. { 'kəp·liŋ kə'pas·əd·ər }

**coupling coefficient** [ELECTR] The ratio of the maximum change in energy of an electron traversing an interaction space to the product of the peak alternating gap voltage and the electronic charge. [PHYS] *See* coupling constant. { 'kəp·liŋ ‚kō·i'fish·ənt }

**coupling constant** [PARTIC PHYS] A measure of the strength of a type of interaction between particles, such as the strong

Exhibit F
Page 90

# EXHIBIT G

# McGraw-Hill Dictionary of Electrical & Computer Engineering

**McGraw-Hill McGraw-Hill**

Exhibit G
Page 91

The **McGraw·Hill** Companies

All text in the dictionary was published previously in the McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, Sixth Edition, copyright © 2003 by The McGraw-Hill Companies, Inc. All rights reserved.

McGRAW-HILL DICTIONARY OF ELECTRICAL AND COMPUTER ENGINEERING, copyright © 2004 by The McGraw-Hill Companies, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

1 2 3 4 5 6 7 8 9 0     DOC/DOC     0 9 8 7 6 5 4

ISBN 0-07-144210-3



This book is printed on recycled, acid-free paper containing a minimum of 50% recycled, de-inked fiber.

This book was set in Helvetica Bold and Novarese Book by TechBooks, Fairfax, Virginia. It was printed and bound by RR Donnelley, The Lakeside Press.

McGraw-Hill books are available at special quantity discounts to use as premiums and sales promotions, or for use in corporate training programs. For more information, please write to the Director of Special Sales, Professional Publishing, McGraw-Hill, Two Penn Plaza, New York, NY 10121-2298. Or contact your local bookstore.

Library of Congress Cataloging-in-Publication Data

McGraw-Hill dictionary of electrical and computer engineering.
        p.     cm.
    ISBN 0-07-144210-3
    1. Computer engineering—Dictionaries.   2. Electric engineering—Dictionaries.

TK7885.A2M37    2004
004'.03—dc22                                    2004049888

Preface ...............
Staff ...............
How to Use the Dictionary
Fields and Their Scope ...
Pronunciation Key ......
A-Z Terms ...............
Appendix ...............
        Equivalents of comm
            Customary System
        Conversion factors fo
            metric system, and
        Standard equations .
        Special constants ...
        Physical constants ...
        Electrical and magne
        Dimensional formula
        Internal energy and
        Trigonometric functi
        General rules of diffe
        Basic integral transf
        Mathematical notat
        Schematic electroni
        Partial family tree o
        ASCII code ..........
        Electromagnetic sp
        Microwave frequen
        Radio spectrum ....

## counter/frequency meter

**counter/frequency meter** |ENG| An instrument that contains a frequency standard and can be used to measure the number of events or the number of cycles of a periodic quantity that occurs in a specified time, or the time between two events.   { 'kaủnt-ər 'frē-kwən-sē ,mēd-ər }

**countermeasures set** |ELEC| A complete electronic set specifically designed to provide facilities for intercepting and analyzing electromagnetic energy propagated by transmitter and to provide a source of radio-frequency signals which deprive the enemy of effective use of his electronic equipment.   { 'kaủnt-ər,mezh-ərz ,set }

**counterpoise** |ELEC| A system of wires or other conductors that is elevated above and insulated from the ground to form a lower system of conductors for an antenna. Also known as antenna counterpoise.   { 'kaủnt-ər,pȯiz }

**counter tube** |ELECTR| An electron tube having one signal-input electrode and 10 or more output electrodes, with each input pulse serving to transfer conduction sequentially to the next output electrode; beam-switching tubes and cold-cathode counter tubes are examples.   { 'kaủnt-ər ,tüb }

**counter voltage** |ELEC| The reverse voltage that appears across an inductor when current through the inductor is shut off.   { 'kaủnt-ər ,vōl-tij }

**counting circuit** |ELECTR| A circuit that counts pulses by frequency-dividing techniques, by charging a capacitor in such a way as to produce a voltage proportional to the pulse count, or by other means. Also known as counter circuit.   { 'kaủnt-iŋ ,sar-kət }

**counting-down circuit** See frequency divider.   { 'kaủnt-iŋ ,daủn ,sar-kət }

**counting rate-voltage characteristic** See plateau characteristic.   { 'kaủnt-iŋ ,rāt 'vōl-tij ,kar-ik-tə'ris-tik }

**couple** |ELEC| To connect two circuits so signals are transferred from one to the other.   |ELECTR| Two metals placed in contact, as in a thermocouple.   { 'kəp-əl }

**coupled antenna** |ELECTROMAG| An antenna electromagnetically coupled to another.   { 'kəp-əld an'ten-ə }

**coupled circuits** |ELEC| Two or more electric circuits so arranged that energy can transfer electrically or magnetically from one to another.   { 'kəp-əld 'sər-kəts }

**coupled systems** |COMPUT SCI| Computer systems that share equipment and can exchange information.   { 'kəp-əld 'sis-təmz }

**coupled translators** |ELECTR| Transistors connected in series by transformers or resistance-capacitance networks, in much the same manner as electron tubes.   { 'kəp-əld tran'zis-tərz }

**coupler** |ELEC| A component used to transfer energy from one circuit to another.   |ELECTROMAG| **1.** A passage which joins two cavities or waveguides, allowing them to exchange energy.   **2.** A passage which joins the ends of two waveguides whose cross section changes continuously from that of one to that of the other.   { 'kap-lər }

**coupling** |ELEC| **1.** A mutual relation between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other device.   **2.** A hardware device used to make a temporary connection between two wires.   { 'kap-liŋ }

**coupling aperture** |ELECTROMAG| An aperture in the wall of a waveguide or cavity resonator, designed to transfer energy to or from an external circuit. Also known as coupling hole, coupling slot.   { 'kap-liŋ ,ap-ə-char }

**coupling capacitor** |ELECTR| A capacitor used to block the flow of direct current while allowing alternating or signal current to pass; widely used for joining two circuits or stages. Also known as blocking capacitor; stopping capacitor.   { 'kap-liŋ kə'pas-əd-ər }

**coupling coefficient** |ELECTR| The ratio of the maximum change in energy of an electron traversing an interaction space to the product of the peak alternating gap voltage and the electronic charge.   { 'kap-liŋ ,kō-i'fish-ənt }

**coupling hole** See coupling aperture.   { 'kap-liŋ ,hōl }

**coupling loop** |ELECTROMAG| A conducting loop projecting into a waveguide or cavity resonator, designed to transfer energy to or from an external circuit.   { 'kap-liŋ ,lüp }

**coupling probe** |ELECTROMAG| A probe projecting into a waveguide or cavity resonator, designed to transfer energy to or from an external circuit.   { 'kap-liŋ ,prōb }

**coupling slot** See coupling aperture.   { 'kap-liŋ ,slät }

**course programmer** |CONT SYS| An item which initiates and processes signals in a manner to establish a vehicle in which it is installed along one or more projected courses.   { 'kȯrs 'prō ,gram-ər }

**courseware** |COMPUT SCI| Computer programs designed to be used in computer-aided instruction or computer-managed instruction.   { 'kȯrs,wer }

**coverage** |ELECTROMAG| A spatial account of the regions of useful sensitivity in a radar's surroundings that can be affected, for example, by multipath propagation or by obscuring terrain.   { 'kəv-rij }

**COZI** |COMMUN| An ionospheric sounding system for determining propagation characteristics of the ionosphere at various angles at any instant; used to determine how well long-distance, high-frequency broadcasts are reaching their intended destinations. Derived from communications zone indicator.   { kō̇zē }

**CPA** See color-phase alternation.

**CPE** See computer performance evaluation.

**CPM** See critical path method.

**C power supply** |ELECTR| A device connected in the circuit between the cathode and grid of a vacuum tube to apply grid bias.   { sē 'paủr sə ,plī }

**CPU** See central process[...]

**CPU-bound program** [...] program that involve[...] calculation and inte[...] data, so that the s[...] pends on the speed [...] ing unit (GPU) and [...] cycle-bound program; [...]   { ,sē,pe'yü !baủnd ,prō[...]

**CPU fan** |COMPUT SCI| [...] over the integrated-c[...] computer's central pr[...] overheating.   { !sē,pē!y[...]

**crash** |COMPUT SCI| **1.** [...] failure, or software [...] computer system Inop[...]   { krash }

**crash locator beacon** [...] radio beacon carried in [...] forces in the event of a [...]   { ,bē-kən }

**crater lamp** |ELECTR| A [...] as a point source of [...] proportional to the si[...] the tube used for ph[...] facsimile signals.   { '[...]

**CRC** See cyclic redunda[...]

**creation operator** |CO[...] data structure which [...] created.   { krē'ā-shən [...]

**credence** |ELECTROMAG| [...] of confidence in a [...] ally proportional to [...]   { 'krēd-əns }

**creep** |ELECTR| A slow [...] with time or usage.

**creepage** |ELEC| The [...] across the surface of a [...]

**crest value** See peak va[...]

**crest voltmeter** |ELEC[...] peak value of the volta[...]   { 'krest 'vōlt,mēd-ər }

**crimp contact** |ELEC| A [...] tion is a hollow cylind[...] after a bared wire is i[...] applied to crimp the ce[...] the wire. Also known [...]   { 'krimp ,kän,takt }

**crippled leap-frog test** [...] of the leap-frog test; [...] tests are repeated fro[...] locations rather than a [...]   { 'krip-əld 'lēp-fr äg ,te[...]

**crippled mode** |COMP[...] computer at reduced c[...] are not working.   { 'k[...]

**critical anode voltage** [...] age at which breakd[...]   { 'krid-ə-kəl 'a,nōd ,vō[...]

**critical area** See pict[...]   { [...] }

**critical coupling** |ELE[...] that provides maximu[...] from one radio-freq[...] another when both [...]

# EXHIBIT H

at least one - Wolfram|Alpha

HOME    EXAMPLES    PRODUCTS    BLOG    ABOUT                              Sign in »

**Personalize your Wolfram|Alpha experience for FREE!**

Sign in to save your history, annotate favorite queries, set preferences and more!

at least one

                                                          Examples    Random

Favorites
History
Preferences
Downloads
Uploads
Account

Related Queries

abstract nonsense
Abelian
terminology

Input interpretation:

Definition:

"At least one" is a mathematical term meaning one or more. It is commonly used in situations where existence can be established but it is not known how to determine the total number of solutions.

One of the three jokes known to Christopher, the protagonist in the novel *The Curious Incident of the Dog in the Night-Time*, concerns the preciseness with which mathematicians apply the term "at least one." As told by Christopher, the joke runs as follows. "There are three men on a train. One of them is an economist and one of them is a logician and one of them is a mathematician. And they have just crossed the border into Scotland (I don't know why they are going to Scotland) and they see a brown cow standing in a field from the window of the train (and the cow is standing parallel to the train). And the economist says, 'Look, the cows in Scotland are brown.' And the logician says, 'No. There are cows in Scotland of which at least one is brown.' And the mathematician says, 'No. There is at least one cow in Scotland, of which one side appears to be brown.' And this is funny because economists are not real scientists and because logicians think more clearly, but mathematicians are best."

                                                          More information »

Related topics:

Subject classification:                                   Show details

MathWorld:

Computed by **Wolfram** *Mathematica*                     Download page

Related Links

At Least One (MathWorld) »

**Give us your feedback:**                                Send

About    Pro    Products    Mobile Apps    Business Solutions    For Developers    Resources & Tools

Blog    Forum    Participate    Contact    Connect

© 2013 Wolfram Alpha LLC—A Wolfram Research Company    Terms    Privacy

Advertisement          Don't want to see ads any more? (And get all the features of Pro) Upgrade to Pro »

3/31/13    Case 2:12-cv-03001-GAF-VBK    Document 105-2    Filed 04/09/13    Page 13 of 178    Page ID
at least one - Wolfram|Alpha
#:2103

# EXHIBIT I

MERITLINE.com

Check Back Daily for Our Best Deals    [ Like ] 54k

Login | My Account | Help | Wish List | Contact Us | Site Map

**Shop All Departments** ▼   SEARCH   🔍 Over 60,000 Gadgets   [ GO ]   0 Item(s)

Daily Deals | Clearance | Dollar Store | Best Sellers | New Arrivals | Wholesales | Bargain Center

**Home** > **Electronics** > **Nintendo DS, Playstation 3, Sony PSP, WII, Xbox 360 Games & Accessories** > **PS2 / PS3 Accessories**

Brand: **Komodo**

📷 **Photos**



*Controllers not included

### Komodo Quad Charge Base For PS3, MODEL# KMD-P3-8060

⭐⭐⭐☆☆ (13 reviews)   See All Reviews

SKU: 247-463-001

**In Stock**
Sold by Meritline.com

**Today: $16.99**  ($16.99 each)    QTY: [ 1 ]    [ Add to Cart ]
🛒 **Free Shipping**

[ Like ]   3 people like this.

Share this:  [f] [t] [✉]

Add To Wishlist

For quantities over 100, please contact us.

**Ships from U.S warehouse. Most customers receive within one week.**

---

### Frequently Bought Together

 +  + 

**Price For All Three: $44.97**

[ Add all three to cart ]

☑ **This item:** Komodo Quad Charge Base For PS3, MODEL# KMD-P3-8060  $16.99
☑ Wireless 2.4 GHZ Controller For PS3, Black, Model NXP3-062  $15.99
☑ 1 Pack 10 Port USB 2.0 Hub with AC Adapter, Black  $11.99

---

### Customers Who Viewed This Item Also Viewed

‹


Komodo KMD-W-9861 Mini Dual Charge Dock For ...
SKU: 247-351-001
**$12.99**


1 Pack 4 Player Multi Tap for PS2
SKU: 267-091-001
**$8.99**

1 Pack Eye Camera with EyeCreate for Sony ...
SKU: 267-390-001
**$23.99**


Komodo Battery Rechargeable Internal Controller...
SKU: 247-305-001
**$9.99**


1 Pack Slim AC Adapter Charger Power Cord ...
SKU: 0001602-001
**$8.99**


PlayStation Move Charging Station - 4 Slot ...
SKU: 267-330-001
**$19.99**

›

---

### Description & Specs

**Komodo Quad Charge Base For PS3, MODEL# KMD-P3-8060**

**Manufacturer Part # KMD-P3-8060**

Simultaneously charge up to 4 PS3 controllers! This charge dock for the Sony PS3 will give you all the juice you need to keep those online slaughters going all night! The red LED lights indicate when your controller is charging while an ambient blue LED light indicates a full charge. When you're not busy owning the competition you can use the charge dock as a storage for your unused weapons of destruction!

**Features**

**Features**

- Compatible with any Sony PS3 controllers
- Charges up to 4 controllers simultaneously
- Red LED light indicates when your controller is charging while a blue LED light indicates full charge.
- Provides hours of gameplay!
- Compact design provides easy storage!

**Return Policy**

Satisfaction 30 days Return Policy:

- Return for refund: 30 days from invoice day
- Return for replacement: 30 days from invoice day

(other terms and condition may apply, please click here for full return policy.)

---

**Recently Viewed Items**



---

**Product Reviews**                                                   Sort By:   Newest   Most Helpful

Average Review: (3.23)   Total # of Reviews: 13   Write a review

**Click Here to see all comments**



**Meritline.com Verified Buyer**

my charging base came doa, dead on arrival. never powered up. tried with a working cable adapter from another appliance. i just bout a $15 door

stop. ive never had a problem with any of my meritline products but this just isnt right. ive yet to be contacted bacck about this base from meritline. this just isnt like them.

Was this comment helpful? ● yes ○ no   (5 people found this comment helpful, 1 did not)                     platinumprod on 2/15/2011

**Meritline.com Verified Buyer**

I was excited to get this since I would not need to keep my PS3 on to charge my controllers. Unfortunately, I tried leaving them in overnight and the charge actually went DOWN on them. I tried making sure that they were in right too because it seemed like you needed to make sure that it sat properly in order for the individual slot lights to register. That didn't help either. I think it sends more power to the blue lights underneath. I wouldn't buy this again.

Was this comment helpful? ○ yes ○ no   (3 people found this comment helpful, 0 did not)                     Cesar on 3/4/2011

**Meritline.com Verified Buyer**

I am not sure about the other 3 reviews. My recharger did not work, instead this discharged the controllers. I am not sure whether all the 3 reviews are legitimate.

Was this comment helpful? ○ yes ○ no   (3 people found this comment helpful, 1 did not)                     Srinath on 2/13/2011

I have owned this product for almost 2 years, and it began failing to charge recently. I disassembled, and replaced the 1000uF 10V swollen capacitor on the power supply board. That fixed it; my controllers charge just fine now. The manufacturer needs to use a low ESR capacitor instead of the current component. Please pass this info along to the manufacturer so they can improve their product.

Was this comment helpful? ○ yes ○ no   (2 people found this comment helpful, 0 did not)                     JerryT on 12/12/2012

**Meritline.com Verified Buyer**

I am surprised over the number of poor reviews. I purchased this charger two months ago, and have been very happy with it. It sets up easily and plugs directly into your wall outlet. No bulky AC adapter! No USB connection to the PlayStation is required. I connected my three DualShock3 controllers, and they charged within a few hours. As with a lot of PS3 chargers, the USB connector on the DualShock3 controller can be a tad difficult to connect, so I gave one star off for this. It seems most PS3 chargers on the market have the same problem. I can't test how well four controllers work since I only have three. All the charging slots work correctly. My Kill-A-Watt meter shows less than one Watt is used with three fully charged controllers connected. That's amazing considering the bright blue lights that are always on! Overall I am very pleased and would purchase this again.

Was this comment helpful? ● yes ○ no   (2 people found this comment helpful, 0 did not)                     Jerry T on 3/24/2011

**Meritline.com Verified Buyer**

Works fine. I have not had a PS3 for long and not sure how other chargers are, but this one is sometimes not the easiest to line up the ports. Once you get it in, it works like a champ.

(1 people found your comment helpful, 0 did not)                                                            Daniel Lemke on 5/5/2011

★★★★☆

**Meritline.com Verified Buyer**

Performs as advertised, although getting the controller to fit onto the charging plug takes a bit of fiddling.

(1 people found your comment helpful, 0 did not)      brian bellinger on 3/27/2011

★★★★★

**Meritline.com Verified Buyer**

This is an awesome product. It has worked great and I have had no problem with it. The price was inexpensive and it's a good buy.

Was this comment helpful? ○ yes ○ no   (1 people found this comment helpful, 1 did not)      Josh Jimenez on 3/18/2011

★★★★★

**Meritline.com Verified Buyer**

Works great, no more wires!!

(1 people found your comment helpful, 3 did not)      David Cooper on 12/28/2010

★★★★★

**Meritline.com Verified Buyer**

great product

(1 people found your comment helpful, 3 did not)      Raymond Ortiz on 12/28/2010

Showing comments 1-10 of 13 (Next 10)

---

### Today's Deals











| 20 PCS B/O Classic Toy Railway Train Set with ... (0000868) | Logitech Z520 Speaker System Refurbished, Black (0021452) | Logitech Harmony 650 Universal Remote Control Refurbished... (0017828) | Logitech MK750 Wireless Solar Keyboard K750 & Marathon... (0024958) | Panasonic KX-TG4743B DECT 6.0 Cordless Phone with... (0027493) | La Crosse Technology Atomic Digital Wall Clock with... (239-142) |
|---|---|---|---|---|---|
| **$19.99** | **$49.99** | **$39.99** | **$49.99** | **$54.95** | **$29.95** |
| Free Standard Shipping | Free Standard Shipping | Free Standard Shipping | Free Standard Shipping | Free Standard Shipping | Free Standard Shipping |

---

#### Customer Service

▸ My Account
▸ FAQ
▸ Contact Us
▸ Site Map
▸ Links
▸ Questions & Comments
▸ Shop All Departments

#### Policies

▸ Privacy Policy
▸ Claim Policy
▸ Return Policy
▸ Shipping Policy

#### Company Information

▸ About Us
▸ Affiliate Program
▸ Career
▸ Blog
▸ 商家入驻
▸ 寻求供应商
▸ 招聘信息

**Subscribe to the Meritline Newsletter**

Enter Your E-mail

Subscribe

Copyright 2000 - 2013 Meritline.com

# EXHIBIT J

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "base" | "base" means the foundation or support upon which structures rest | "base" means the bottom part of the charging system that provides physical support for the system against an external adjacent surface (e.g., a table or wall) | **Intrinsic Evidence:** The claims, written description and drawings of the '848 patent support NYKO's construction of the claim language. [Quigley Decl., Exhs. A & B ('848 patent & '848 patent with highlights).] For example, at least the following sections support the claim construction: Claim 1 recites: 1. "at least one structure *on the base* for providing physical support to the plurality of video game controllers," 2. "a plurality of DC ports *on the base* … configured to couple to" the power input ports of the plurality of video game controllers, 3. "the … structure *on the base* compris[ing] a plurality of docking bays … configured to receive" the video game controllers, and 4. "the … structure *on the base* further compris[ing] a plurality of pairs of opposite surfaces," which further define the "docking bays … configured to receive" the video game controllers. ['848 patent, Claim 1 (emphasis added)]. Claim 9 recites that "the AC-DC converter is *in the base.*" ['848 patent, Claim 9 (emphasis added)]. Claim 18 recites that "*the base* further compris[es] a power input for connection to a power supply, the power input being electrical coupled to the at least one electrical contact [of the base]." ['848 patent, Claim 18 (emphasis added)]. *See* '848 patent, FIGS. 16-18, 21, 22. "As shown in FIG. 16, the charging station 510 includes *a base* 524 with two docking bays 512, 514." ['848 Patent, col. 12, lines 1-2 (emphasis added)]. |

2

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "base" (cont'd) | | | "As can be seen in FIG. **22**, the charging station (or charger *base*) . . . ." [848 Patent, col. 14, lines 33-36 (emphasis added).]<br><br>"There are locators 410 on each of the two surfaces of the partitions 406 as well as the *two surfaces of the base 402*, which face the DC ports 408." [848 patent, col. 9, lines 47-49 (emphasis added).]<br><br>**Extrinsic Evidence:**  The following is exemplary extrinsic evidence, in addition to other extrinsic evidence with Nyko's claim construction briefing, such as expert testimony.<br><br>*American Heritage Dictionary* (2006): "base". *n*. A supporting part or layer; a foundation. [Quigley Decl., Exh. C at 148.]<br><br>*Dictionary of Scientific and Technical Terms* (McGraw-Hill 2003) - engineering definition of "base": *n*. Foundation or part upon which an object or instrument rests. [Quigley Decl., Exh. F at 206.]<br><br>Mr. Navid testified that "outside the context of this patent, the word [base] can have different meanings." [Quigley Decl., Exh. K (Navid Depo), pg. 241, lines 8-10.] However, "in the context of this patent, what a base is, is the entire charging device.  It's the charging system." [Navid Depo, pg. 239, line 24 - pg. 240, line 1.]<br><br>Thomas Roberts, CTO of defendant PDP and who has 18 years of experience in the video game accessories industry, testified that he understands the term base to mean "a structure upon which another object rests." [Quigley Decl., Exh. M (Roberts Depo), pgs. 7-10 and pg. 41, lines 9-13.]<br><br>Komodo, another competitor in the video game accessories market, sells a charging system under the name "Komodo Quad Charge Base for PS3." [Quigley Decl., Exh. I.] |

3

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "base" (cont'd) | | | Nyko sells its family or products under the name "Charge Base." [Quigley Decl., Exh. P]<br><br>Defendant PDP has itself repeatedly referred to its accused products as a "charge base" - in specifications for the accused products and on its own website. [Quigley Decl., Exhs. N & O.]<br><br>In its non-infringement contentions, PDP notes that "'[t]he term 'base' as described in the specification of the '848 patent discloses a component of the charging system which 'includes a base [402]' and allows for 'structures [to be] on the base.'" [Quigley Decl., Exh. Q "PDP's Response to Nyko's First Set of Interrogatories" at 7]. PDP argues that this is the plain meaning of base as used in the '848 patent. Even the language cited by PDP demonstrates how broadly the term "base" is used. |
| "at least one structure" | "at least one structure" means *one or more structures* | Defendants believe this term needs to be construed in the context of the claim language it is used. See below:<br><br>**"at least one structure on the base** *for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged" means one or more structures on the base, each for providing physical* | **Intrinsic Evidence:**  The written description and drawings of the '848 patent support NYKO's construction of the claim language.  For example, at least the following sections support the claim construction:<br><br>Claim 1 recites:<br><br>1. "*at least one structure* on the base for providing physical support to the plurality of video game controllers,"<br><br>2. "*the at least one structure* on the base compris[ing] a plurality of docking bays … configured to receive" the video game controllers, and<br><br>3. "*the at least one structure* on the base further compris[ing] a plurality of pairs of opposite surfaces," which further define the "docking bays … configured to receive" the video game controllers.<br><br>['848 patent, Claim 1 (emphasis added)].<br><br>*See* '848 patent, FIGS. 16-18, and 20 (these figures show multiple structures ("partition 528") and surfaces of the base 524 physically supporting each video game controller, creating the docking bays and |

Exhibit J
Page 101

4

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "at least one structure" (cont'd) | | *support to a plurality of video game controllers while they are being charged*<br><br>**"at least one structure on the base** comprises a plurality of docking bays" means one or *more structures on the base each defines a plurality of docking bays*<br><br>**"at least one structure on the base** further comprises a plurality of *pairs of opposite surfaces" means one or more structures on the base, each has a plurality of pairs of opposite surfaces* | composed of opposite surfaces); *and see* FIGS. 11-14 (also showing docking bays 404 composed of multiple partitions 406 and surfaces of the base 402).<br><br>"Each pair of opposite surfaces, a portion of the base 402, a corresponding docking bay 404, and/or the locators 410 may comprise a structure for providing physical support to one of the video game controllers 420 during charging." [848 Patent, col. 9, lines 51-55.]<br><br>"In one embodiment, the at least one DC port comprises a plurality of DC ports, the at least one video game controller comprises a plurality of video game controllers." [848 Patent, col. 2, lines 26-28.]<br><br>**Extrinsic Evidence:** The following is exemplary extrinsic evidence, in addition to other extrinsic evidence with Nyko's claim construction briefing, such as expert testimony.<br><br>*Wolfram MathWorld* (Wolfram Research, Inc., 1999-2012) – mathematical definition of "at least one": "At least one" is a mathematical term meaning one or more. [Quigley Decl., Exh. H.]<br><br>At Amir Navid's deposition, when asked if he could point to "at least one structure on the base for providing physical support," he said, "So it would be [partitions] 406. These are the structures, the support structures." [Navid Depo, pg. 243, lines 6-9.] He further stated that each of these partitions 406 were "separate structures," in further support of the understanding that there are several structures for providing physical support to the video game controllers. [Navid Depo, pg. 244, lines 6-12.] |

5

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "each of the DC ports configured **to couple to** and provide DC power to a power input port of a respective one of the plurality of video game controllers" | "to couple to" means *to join, link or connect structures together without the use of external wires or cables* | "to couple to" means *to connect directly or indirectly to* | **Intrinsic Evidence:** The written description and drawings of the '848 patent support NYKO's construction of the claim language.  For example, at least the following sections support the claim construction:<br><br>Claim 1 recites "a plurality of DC ports on the base, each of the DC ports configured *to couple to* and provide DC power to a power input port of a respective one of the plurality of video game controllers."  The DC ports are configured to couple to and *also* configured to provide DC power. ['848 patent, Claim 1 (emphasis added)].<br><br>Claim 3 recites "a current detector *electrically coupled to* the plurality of DC ports" and "an indicator *electrically coupled to* the current detector." ['848 patent, Claim 3 (emphasis added)].<br><br>*See* '848 patent, FIGS. 7, 15, 18, 19a, 19c, 20, 21.<br><br>The charging station 510 disclosed in the embodiment of Figs. 16-23B includes male mini-USB ports 542 "adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the PlayStation 3." ['848 Patent, col. 12, lines 58-63.]<br><br>With respect to the embodiment disclosed in Figs. 11-15, the detailed description recites that "the power input port of the video game controller 420 *slides down onto* and connects to the DC port 408." ['848 Patent, col. 10, lines 4-7 (emphasis added).] As described, the power input port of the video game controller physically slides down onto the DC port and mechanically couples the two ports.<br><br>**Extrinsic Evidence:**  The following is exemplary extrinsic evidence, in addition to other extrinsic evidence with Nyko's claim construction briefing, such as expert testimony.<br><br>*Dictionary of Scientific and Technical Terms* (McGraw-Hill 2003) - |

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "to couple to" (cont'd) | | | "couple": *v.* to connect with a *coupling*, such as two belts or two pipes. [Quigley Decl., Exh. F at 501.] |
| | | | *Dictionary of Scientific and Technical Terms* (McGraw-Hill 2003) - mechanical engineering definition of "coupling": *n.* The mechanical fastening that connects shafts together for power transmission. [Quigley Decl., Exh. F at 501.] |
| | | | *Dictionary of Mechanical Engineering* (2006), a "coupling": *n.* a device for connecting together two or more parts of a mechanism. [Quigley Decl., Exh. E at 90.] |
| | | | Mr. Navid testified that "couple to" means "that they mate. So a plug, a direct connection, where, you know, it's mating. So that's -- that's what I meant by it." [Navid Depo, pg. 222, lines 11-16]. He further expounded that "[i]f you have a piece of that base and that's directly engaging and going within the charging port of the other device, then that's what I mean. That's what I mean as coupling. *You have a piece of that charge base directly connecting to the device that's being charged.*" [Navid Depo, pg. 226, lines 10-16.] |
| | | | The Federal Circuit has itself stated that the language "couple[d] to" supports a claim construction where "connectivity [occurs] without the inclusion of cables or wires." *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012). In *In re Abbott Diabetes Care, Inc.*, the parties' primary dispute centered on whether the broadest reasonable construction of "electrochemical sensor" includes external cables and wires connecting the sensor to its control unit. The Federal Circuit found that the claims themselves suggested connectivity without the inclusion of cables or wires because the claims recited an "electrochemical sensor" having "contact pads" that are "coupl[ed]" to "conductive contacts." *Id.* This is analogous to our situation. In *In re Abbott Diabetes Care, Inc.*, the claims recite the coupling of contact pads to conductive contacts – a direct |

7

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "to couple to" (cont'd) | | | mechanical coupling of contacts to contact pads. Claim 1 of the patent-in-suit recites that the DC ports are configured to couple to the power input ports of the video game controllers – the direct physical coupling of two types of ports. |
| "electrically coupled to" | "electrically coupled to" means *directly or indirectly connected to for the purpose of energy transfer.* | "electrically coupled to" means *directly or indirectly electrically connected to* | **Intrinsic Evidence:** The written description and drawings of the '848 patent support NYKO's construction of the claim language.  For example, at least the following sections support the claim construction: <br><br> Claim 3 recites "a current detector *electrically coupled to* the plurality of DC ports," and "an indicator *electrically coupled to* the current detector." ['848 patent, Claim 3 (emphasis added)]. <br><br> *See* '848 patent, FIGS. 15-18, 19b, 19c, 21-23b. <br><br> "[T]he LEDs 550, 552 may be electrically coupled to a current detector 521 (see Fig. 22) which *provides the signals* to illuminate the LEDs." ['848 Patent, col. 14, lines 25-27.] <br><br> "As can be seen in Fig. 22, the charging station (or charger base) 510 includes 35 electrical contacts 520 that are adapted to be *electrically coupled* with the accessory device 526 via the adapter 516. *This way, the charging station 510 is capable of supplying the power* received from a power adapter or a power supply to the accessory device 526 (e.g., for charging)." ['848 Patent, col. 14, lines 33-39.] <br><br> **Extrinsic Evidence:**  The following is exemplary extrinsic evidence, in addition to other extrinsic evidence with Nyko's claim construction briefing, such as expert testimony. <br><br> *McGraw-Hill Dictionary of Electrical and Computer Engineering* (2004), [electricity] "couple": *v.* to connect two circuits so signals are transferred from one to the other. [Quigley Decl., Exh. G at 124.] |

8

| Claim Language | NYKO's Preliminary Proposed Claim Construction | Defendants' Proposed Terms | Evidence in Support of NYKO's Proposed Claim Construction |
|---|---|---|---|
| "electrically coupled to" (cont'd) | | | *Dictionary of Scientific and Technical Terms* (McGraw-Hill 2003) - [electricity] "couple": *v*. To connect two circuits so signals are transferred from one to the other. [Quigley Decl., Exh. F at 501.]<br><br>*Dictionary of Scientific and Technical Terms* (McGraw-Hill 2003) - [electricity] "coupling": *n*. A mutual relation between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor, or other device. [Quigley Decl., Exh. F at 501.]<br><br>*ASTM Dictionary of Engineering Science & Technology* (2005), "coupling": two electric circuits are said to be coupled to each other when they have an impedance in common so that a current in one causes a voltage in the other. [Quigley Decl., Exh. D at 148.]<br><br>In *Mems Tech. Berhad*, the Court found that there was no special meaning of "electrically coupled" in the intrinsic evidence and that the appropriate construction was the plain and ordinary meaning of "electrically coupled," which the Court held to be "arranged so that electrical signals may be passed either directly or indirectly via intervening circuitry, from one component to another." *Mems Tech. Berhad v. ITC, 447 Fed. Appx.*, 142, 151 (Fed. Cir. 2011). |

# EXHIBIT K

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NYKO TECHNOLOGIES, INC., a          )
California Corporation,             )
                                    )
            Plaintiff,              )
                                    )
        v.                          )  NO. CV12-03001-GAF-VBK
                                    )
ENERGIZER HOLDINGS, INC. a          )
Missouri Corporation, EVEREADY      )
BATTERY COMPANY, INC., a            )
Delaware Corporation, and           )
PERFORMANCE DESIGNED PRODUCTS       )
LLC, a California Limited           )
Liability Company,                  )
                                    )
            Defendants.             )
_____)


(THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL.)


DEPOSITION OF AMIR NAVID

January 30, 2013


Shana K. Clifford, CSR No. 10154

353104




(310) 207-8000 Los Angeles       (415) 433-5777 San Francisco     (949) 955-0400 Irvine           (858) 455-5444 San Diego
(916) 922-5777 Sacramento        (408) 885-0550 San Jose          (760) 322-2240 Palm Springs     (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills    (212) 808-8500 New York City     (347) 821-4611 Brooklyn         (518) 490-1910 Albany
(516) 277-9494 Garden City       (914) 510-9110 White Plains      (312) 379-5566 Chicago          (702) 366-0500 Las Vegas
            +33 1 70 72 65 26 Paris        +971 4 8137744 Dubai        +852 3693 1522 Hong Kong

09:24  1    you're stating the date, so I -- it's not a date

2    that I'm giving.  So I'm not quite sure what the

3    exact date of it was, but I do recall being deposed.

4        Q    Okay.  Do you recall whether your duties

09:24  5    have changed since -- at Nyko have changed since

6    October of 2008?

7        A    I would say in general it's -- it's the

8    same duties.  Obviously, you know, I'm involved

9    with, you know, different aspects of the business as

09:25  10   far as it relates to the product and product

11   development and, you know, product from conception

12   to -- to bringing it to market, final product.  So I

13   would say in general, it's the same -- same function

14   at the company.

09:25  15       Q    Okay.  Has -- has your title or position

16   changed since October of 2008?

17       A    Since 2008, I don't believe so.  I think

18   if -- it would be similar, if anything.  It would

19   have been something product development manager to

09:25  20   VP of product development, if anything.  But I'm not

21   sure if, by 2008, I may have already been -- I may

22   have already had my new title.

23       Q    What is your official title at this time?

24       A    Vice president of product development.

09:26  25       Q    One of your declarations says vice

14

Exhibit K
Page 108

AMIR NAVID

BARKLEY
Court Reporters

09:46  1    actual invention, not necessarily how it looks.

2           So whether or not it's a charging stand --

3    I mean, is your question whether or not it was --

4    you know, it's a charging system.  It's a charging

09:46  5    device, what we -- typically is called a charge base

6    or a charge station.  These are common terms that

7    are used for it.  And, you know, we innovated in

8    that field, as it's very well documented and known.

9    And we've used and popularized these terminologies,

09:46  10   both "charge station," "charge base."  These are

11   things that we've sold very -- a lot of units of and

12   have popularized in the market.  They've become

13   common terms to use.  As far as "charging stand," I

14   mean, I don't understand really.

09:46  15        Q    BY MR. HANLE:  Using your terms, are you

16   aware of any charging stations or charging bases

17   that were on the market as of March 7, 2007?

18        A    I don't recall --

19             MR. HASAN:  Objection as to form.

09:46  20             (Request for clarification by the

21             deposition officer.)

22             THE DEPONENT:  I don't recall exactly what

23   was there at this point.  It's -- a lot of time has

24   passed, so --

09:47  25        Q    BY MR. HANLE:  Did you do any

33

AMIR NAVID

BARKLEY
Court Reporters

11:12  1   see if we can get it on screen here.

2         If the videographer could tell us if this

3   is showing up on screen.

4         I want you to point to the structures on

11:12  5   the base.

6   A   The structures on the base?

7   Q   As that claim term is used.  So --

8         MR. HASAN:  Objection as to form.

9         Go ahead.

11:13  10        MR. HANLE:  Okay.  So is that -- is that

11   showing up?

12        VIDEOGRAPHER:  He's going to have to hold

13   it up.

14   Q   BY MR. HANLE:  Can you hold that up and

11:13  15   point to the structures on the base.

16   A   (Complying.)

17   Q   So what you're pointing to are the --

18   they're sort of a clear plastic structure; is that

19   right?

11:13  20   A   That's correct.

21   Q   And so each one of those is a structure on

22   the base; is that correct?

23   A   Is a structure on the base?  It's a pair

24   of structures, yes.  So the top and bottom, kind of

11:13  25   the docking bay --

Exhibit K
Page 110

AMIR NAVID

BARKLEY
Court Reporters

11:54  1        A      Okay, sir.

2        Q      Page 8.  And starting at the bottom,

3    paragraph 18, I'm going to read the paragraph.  It's

4    short.

11:54  5               "There are secondary considerations of

6               nonobviousness as well that support the

7               validity of my patent.  The patent

8               covered" -- excuse me -- "the product

9               covered by the patent has enjoyed

11:55 10               tremendous commercial success, and it has

11               received positive reviews for the patented

12               features."

13        Do you see that?

14        A      Mm-hmm.

11:55 15        Q      What do you mean by "the patented

16    features"?

17        A      Well, the novel features of the design,

18    which -- which support the controller.  So -- and

19    guide it towards a jack, a direct-connecting jack

11:55 20    that's located in between those two structures

21    that's holding it and removing the need for a cable.

22    So it's a very clean finish.  It holds the

23    controller.  It holds it in the direction where you

24    can easily remove it.  So those are all what I

11:55 25    consider to be novel features.

122

Exhibit K
Page 111

AMIR NAVID

BARKLEY
Court Reporters

11:55    1        Q    Are there any other novel features that
         2    you can think of at this time?
         3        A    The fact that it charges multiple
         4    controllers.  The fact that you don't need to have
11:56    5    the console on.  The fact that you don't have any
         6    cables around.  Fact that it has a small footprint.
         7        Q    Any others that you can think of at this
         8    time?
         9        A    I mean, the majority is related to the
11:56   10    structures that guided into it and hold it and
        11    charge it directly without a use of a cable.
        12        Q    And in that sentence you reference
        13    positive reviews.  Who -- whose reviews are you
        14    referring to there?
11:56   15        A    Those positive reviews would be from
        16    users.  Obviously, you know, this kind of charging
        17    device became very popular after we took this step
        18    and made it this -- basically this unique way where
        19    it eliminated the need for you to keep your system
11:57   20    on; and also charges everything neatly; and also
        21    allows you, actually, to have a backup controller
        22    where you have one charging while you're using
        23    another one and you could rotate in between them.
        24           So, you know, the positive reviews are --
11:57   25    at this point, you know, we're talking about

                                    123

02:01    1          A      Okay.

         2          Q      Are you familiar with that term, "charge

         3    base 2"?  It's a term you used earlier in the

         4    deposition.

02:01    5          A      Sure.  It's the name of the product.

         6          Q      Okay.  And is it true that figures 16

         7    through 23 depict charge base 2?

         8               MR. HASAN:  Objection as to form.  Asked

         9    and answered.

02:01   10               THE DEPONENT:  Yeah, I think -- I've

        11    answered that, yes.  This -- this is charge base 2.

        12    It has the same underlying design as the original

        13    charge base.

        14          Q      BY MR. HANLE:  Okay.  And --

02:02   15               You know, Counsel, I'm going to ask -- I

        16    know that you're holding your hand up so the witness

        17    will pause to object -- to allow you to object to

        18    the question.  I ask you not to hold your hand up.

        19    It could be perceived as coaching the witness.  So

02:02   20    I'd ask you not -- you've done it repeatedly, and

        21    I'd just ask you not to do it.

        22               MR. HASAN:  I'm holding the hand up so you

        23    don't interrupt him when I see you starting to speak

        24    up.  That's why I'm holding my hand up.

02:02   25               MR. HANLE:  Okay.  I'd ask you --

                                    163

Exhibit K
Page 113

AMIR NAVID

BARKLEY
Court Reporters

02:22  1    charging system 400 includes a base 402...."

       2              Do you see that?

       3    A    Yes, I see it.

       4    Q    Okay.  So now let's take a look at

02:22  5    figure 22.  And here would you agree that the

       6    charger base is what's inside of the box that says

       7    "charger base"?

       8              MR. HASAN:  Objection as to form.

       9              (Mr. Buccigross entered the room.)

02:23  10             THE DEPONENT:  Yes, except it appears just

       11   like the other diagram where some of the parts are

       12   not quite accurate.  You have the adapter as a

       13   separate portion to the base.  And that's part of

       14   the charger base.  It's included with the charger

02:23  15   base.  You can't use the charge base without it.

       16   That's a primary core function, is to be used with

       17   that charge base.  It's part of the charge base.  So

       18   it should be in this block diagram.

       19   Q    BY MR. HANLE:  And --

02:23  20   A    The adapter.

       21   Q    Have you informed the patent office that

       22   the figure is incorrect?

       23             MR. HASAN:  Objection as to form.

       24             THE DEPONENT:  I have not.

02:23  25             MR. HASAN:  Misstates the witness'

                                179

AMIR NAVID

BARKLEY
Court Reporters

02:59   1    the base, rather than lying flat on a table, for

2    example -- where the base is in a vertical

3    orientation, such as attached to a wall?

4              MR. HASAN:  Objection as to form.

02:59   5              THE DEPONENT:  May I read this for a

6    second?

7         Q    BY MR. HANLE:  Sure.

8         A    "While the" --

9              I'm sorry.

03:01   10             So based on this statement, it's -- it's

11   saying that it can be in either vertical or

12   horizontal orientation.  It doesn't say anything as

13   far as it -- at least the portion that I've read, as

14   far as it being mounted on a wall, as you say.

03:01   15        Q    Okay.  But whether it's vertical --

16   oriented vertically or horizontally --

17        A    Mm-hmm.

18        Q    -- the part that has the docking bays and

19   electrical leads is still a base, whether it's

03:01   20   oriented horizontally or vertically; is that right?

21             MR. HASAN:  Objection as to form.

22             THE DEPONENT:  Is it still a base?  Yes.

23   The entire unit is a base.

24        Q    BY MR. HANLE:  Okay.  And that's whether

03:01   25   it's oriented vertically or horizontally?

204

AMIR NAVID

BARKLEY
Court Reporters

03:05  1  Yes, obviously, taken out of the context of, you

2  know, what's described in the first paragraph of the

3  field of invention, yes.  If you take it out of

4  context, I could see that.

03:06  5        But the very first paragraph of this

6  document we filed is:

7              "...present invention relates to a

8              charging station for a consumer

9              electronics device, more particularly, to

03:06 10             a charging station for one or more

11             hand-held controllers for a video game

12             console."

13      Q     BY MR. HANLE:  Okay.  But the claims

14  aren't limited to a charging station for a video

03:06 15  game controller; correct?

16             MR. HASAN:  Objection as to form.

17             THE DEPONENT:  Really I'm not an expert,

18  but I would say if a document that's filed starts

19  with a paragraph that it's a device that's for a

03:06 20  charging station for a video game controller, that

21  that's what we're referring to.  That's the best

22  answer I can give.  I'm sorry.

23      Q     BY MR. HANLE:  So which is it?  Do you

24  look at the claims, or do you look at the written

03:07 25  description?

Exhibit K
Page 116

AMIR NAVID

BARKLEY
Court Reporters

03:07 1          MR. HASAN:  Objection as to form.

2    Objection as to form.

3          THE DEPONENT:  I think you look at the

4    claims and also what -- what we're trying to patent

03:07 5    here.  And it's very clear.  The field of invention

6    is relating "to a charging station for a consumer

7    electronic device, more particularly, a charging

8    station for one or more hand-held controllers for

9    video game consoles."  I think it's very clear.

03:07 10         Q    BY MR. HANLE:  Okay.  Yeah, I do too.  I

11   think paragraph 9 makes it perfectly clear that this

12   is describing a charging station for other accessory

13   devices, not -- not limited to video game

14   controllers.

03:07 15         Do you disagree with that statement?

16         MR. HASAN:  Objection:  Argumentative.

17         THE DEPONENT:  I'm sorry, what -- what

18   paragraph?  9?

19         Q    BY MR. HANLE:  Paragraph on page 9 that we

03:07 20   read --

21         A    Okay.

22         Q    -- that says it's about all kinds of

23   consumer electronics devices.  Do you want to

24   disregard that one?

03:08 25         A    But that's not a description of what

210

AMIR NAVID

BARKLEY
Court Reporters

03:08  1    we're -- I mean, what -- it's the first paragraph,

       2    what this field of invention, right --

       3         Q    Uh-huh.

       4         A    -- not the background, okay, the field of

03:08  5    invention is talking specifically about a charging

       6    station for handheld controllers.

       7         Q    So --

       8         A    I'm not -- I'm not a patent lawyer.  I'm

       9    not going to claim to know why this is the way, but

03:08  10   I wouldn't say that we would disregard something

       11   when it's very obvious right there.  I mean, if

       12   you're going to say, "Okay, in this line it says

       13   that" -- you know, I'm not a patent lawyer.  I'm not

       14   sure what the legalities of that are.  I believe,

03:08  15   yes, you're saying that.  But I also think that here

       16   it's very clear what we're trying to patent.

       17        Q    Okay.  Take a look at figure 1.

       18        A    Mm-hmm.  On which document?

       19        Q    8, Exhibit 8.

03:08  20        A    Okay.  Yes, sir.

       21        Q    Would you agree that in figure 1 -- as

       22   shown in figure 1, there are no DC ports on the

       23   base?

       24        A    Yes.

03:09  25        Q    Would you agree that -- and I'm looking at

                                   211

AMIR NAVID

BARKLEY
Court Reporters

03:09   1    figure 2 -- the DC ports are on the adapter 16?

        2            MR. HASAN:  Objection as to form.

        3            THE DEPONENT:  Yes.

        4       Q    BY MR. HANLE:  And would you agree that in

03:09   5    figure 3 the DC ports are still on the adapter 16,

        6    which has now been dropped into the recess on the

        7    base?

        8            MR. HASAN:  Objection as to form.

        9            THE DEPONENT:  We're coming back to the

03:09  10    same thing, and I -- I think I understand what

       11    you're hoping to accomplish, but the truth is this

       12    is a part of the base; right?

       13       Q    BY MR. HANLE:  Okay.  It's --

       14       A    And we've clarified that; right?  That

03:09  15    this is a part of the base.  It ships with it.  It

       16    cannot be used without it.  So this is, yes, a DC

       17    port on the base.

       18       Q    Okay.  I didn't ask about it on the base.

       19    I asked about -- asked is the DC port, as shown in

03:10  20    figure 3, on the adapter 16, or did it somehow

       21    magically move off the adapter to some other part?

       22            MR. HASAN:  Objection --

       23            THE DEPONENT:  It's on the base.

       24            MR. HASAN:  -- argumentative.

03:10  25            THE DEPONENT:  It's a piece of the base.

                              212

03:10  1      Q    BY MR. HANLE:   Is it on the adapter?

       2      A    The adapter is a piece of the base.

       3      Q    Is it --

       4      A    So yes, it's on the adapter, which is a

03:10  5    piece of the base.

       6      Q    Okay.

       7      A    Is that what you want?

       8      Q    So the DC --

       9           MR. HASAN:   Objection --

03:10 10      Q    BY MR. HANLE:   -- port is on the adapter,

      11    which is a part of the base.   Is that your

      12    testimony?

      13           MR. HASAN:   Objection.   Objection as to

      14    form.   You're yelling at the witness.   You're

03:10 15    badgering the witness.   It's on the video, my

      16    friend.   It's on the video.

      17           MR. HANLE:   Be glad to look at that later.

      18           MR. HASAN:   You know, you're trying to

      19    talk fast so I can't insert my objection.   You're

03:10 20    trying to cut me off.   You're cutting the witness

      21    off.   Please don't do this; okay?   Don't do this.

      22           MR. HANLE:   Okay.

      23      Q    So just to be sure I understand your

      24    testimony --

03:10 25      A    Sure.

                            213

Exhibit K
Page 120

AMIR NAVID

BARKLEY
Court Reporters

03:10  1      Q    -- the DC port is still on the adapter,

2   but your belief is that the adapter is part of the

3   base.  Is that your testimony?

4              MR. HASAN:  Objection as to form.

03:11  5              THE DEPONENT:  The adapter is a part of

6   the base.

7      Q    BY MR. HANLE:  Okay.  And let's focus on

8   the first part of the question.  But the DC port is

9   on the adapter.  Can -- is that yes or no?  Can you

03:11  10  answer that yes or no?

11             MR. HASAN:  Objection as to form.

12             Answer it how you'd like.

13             THE DEPONENT:  So the DC port is on the

14  base because the adapter is part of the base.  Does

03:11  15  that answer your question?

16     Q    BY MR. HANLE:  No, but we'll -- we'll move

17  on.

18     A    Oh --

19     Q    So the next figures, figures 4A, B, and C,

03:11  20  those all show the adapter alone and don't show any

21  other part of the base; correct?

22     A    Yes.

23     Q    Okay.  And each -- and in figure 4A the DC

24  port is on the adapter; correct?

03:11  25     A    Which is a part of the base, yes.

214

03:11   1        Q     Which is -- but the base isn't shown in

   2   this figure.

   3        A     Yes, but it's shown in other figures, like

   4   figure 3, where it's sitting on the base.

03:11   5        Q     And in figure 4C the DC port is on the

   6   adapter; correct?

   7        A     I'm sorry.  Can you repeat that question,

   8   please?

   9        Q     Yeah.  It's just, in figure 4C --

03:12  10        A     Okay.

  11        Q     -- the DC port is on the adapter; correct?

  12        A     Yes, it's on the adapter, which is a part

  13   of the charge base.

  14        Q     Okay.  And in figure 4B that's showing the

03:12  15   bottom of the adapter; correct?

  16        A     The bottom -- I mean, that's relative.  It

  17   depends which way you're looking at it.  So yes,

  18   it's one side of it.

  19        Q     Well, it's the bottom in the orientation

03:12  20   as the charging device is shown in figures 1, 2, and

  21   3; is that right?

  22        A     It could be.

  23        Q     Could be or it is?  It's your patent, your

  24   application.

03:12  25              MR. HASAN:  Objection as to form.

                                 215

AMIR NAVID

BARKLEY
Court Reporters

03:19  1                       couple to and provide DC power to a power

2                       input port of a respective one of the

3                       plurality of video game controllers."

4                       You see that language?

03:19  5          A    I do.

6          Q    And I want to focus on the language "to

7     couple to."  And my question is did you -- when you

8     approved this patent application, did you intend a

9     special meaning of the phrase "to couple to"?

03:19  10                MR. HASAN:  Objection as to form.

11                THE DEPONENT:  Special meaning -- to me,

12     what "couple to" means -- and when I reviewed it,

13     where I felt this was sufficiently covering it --

14     coupling means that they mate.  So a plug, a direct

03:19  15     connection, where, you know, it's mating.  So

16     that's -- that's what I meant by it.

17          Q    BY MR. HANLE:  Okay.  And is that your --

18     is that your understanding of the term "to couple

19     to" outside of the context of this patent?

03:20  20                MR. HASAN:  Objection as to form.

21                THE DEPONENT:  Typically when I will come

22     across it, yes.  It's -- it's where something is

23     directly contacting something.

24          Q    BY MR. HANLE:  So -- so it's your belief

03:20  25     that the term "to couple to," regardless of the

222

AMIR NAVID

BARKLEY
Court Reporters

03:20   1    context used, means direct coupling without a --

        2    without a cable in between?

        3        A    Absolutely, yeah.

        4        Q    Okay.  And what about without an adapter

03:20   5    in between?  Would "to couple to" include with an

        6    adapter in between?

        7            MR. HASAN:  Objection as to form.

        8            THE DEPONENT:  No.  So again, the main

        9    thing is that it doesn't have a cable, which is an

03:20   10   elongated, messy wire.  Coupling is something -- a

        11   physical part going into the direct jack that's the

        12   power jack and powering it.

        13           So an adapter -- what you're calling an

        14   adapter, which is a piece of it, which is the DC

03:20   15   jack, still is inserted directly into the actual

        16   controller the device is charging.  So I don't think

        17   an adapter is the same thing as tethering it to a --

        18   to a cable.

        19       Q    BY MR. HANLE:  So "to couple to" would

03:21   20   include having an adapter in between two components

        21   but would exclude having a cable in between two

        22   components; is that right?

        23           MR. HASAN:  Objection as to form.

        24   Misstates the testimony.

03:21   25           THE DEPONENT:  So again, what I believe

                                223

03:21 1   coupling is, is when a part of the base is inserted

2   into -- directly into the jack of the device that it

3   is charging.

4       Q   BY MR. HANLE:   Okay.   And I want to focus

03:21 5   on adapter.

6       A   Okay.

7       Q   And so -- and cables.   You mentioned

8   connecting by cables, in your view, would not be

9   coupling; right?

03:21 10      A   The whole purpose of this invention is to

11   get rid of cables.   I think that's very clear.

12      Q   I don't want to know about the purpose of

13   the invention.   I want to know about coupling.

14      A   Okay.

03:21 15      Q   Only coupling.   For the next 10 minutes

16   we're going to talk about only coupling.

17          MR. HASAN:   No, no.

18          THE DEPONENT:   I'd love to answer all your

19   questions.

03:22 20          MR. HASAN:   Objection as to form.

21          And you answer how you need to answer.

22          Don't say for the next 10 minutes we're

23   going to sit here with -- no.

24          You answer the question how you --

03:22 25          Please don't tell him these things.   You

224

AMIR NAVID

BARKLEY
Court Reporters

03:22 1   know it's improper.

2              MR. HANLE:  To tell him that I'm talking

3   about coupling as opposed to something else?

4              MR. HASAN:  For the next 10 minutes you're

03:22 5   going to do this?  Come on.

6        Q    BY MR. HANLE:  Okay.  So I just want to

7   make sure it's clear that my questions are as to

8   coupling; okay?  And I'm looking for what you meant

9   by "coupling" and how you use the term; okay?

03:22 10             And there's a -- and there's this concept

11   of plain and ordinary meaning in construing claim

12   terms.

13       A    Mm-hmm.

14       Q    And I want to know if we're using plain

03:22 15   and ordinary meaning or some sort of special

16   meaning.  So I'm really going to focus on the

17   definition.  And I apologize for that preface, but I

18   just -- that's the preface for my questions until

19   further notice.

03:22 20       A    Mm-hmm.

21       Q    So the question now --

22       A    Mm-hmm.

23       Q    -- is -- is, based on your understanding

24   of the term "to couple to" --

03:22 25       A    Mm-hmm.

Exhibit K
Page 126

AMIR NAVID

BARKLEY
Court Reporters

03:22    1          Q     -- does that include two parts coupling

         2    with an intervening adapter?

         3               MR. HASAN:  Objection as to form.  Asked

         4    and answered.

03:23    5               THE DEPONENT:  So a coupling, in my

         6    eyes -- if what you're saying is an adapter -- now

         7    adapter, if it's a piece -- "adapter" has loose

         8    meanings.  I think that's my biggest problem, is you

         9    just say "adapter."  Adapter -- well, you know, a

03:23   10    lot of things can be called an adapter.  If you have

        11    a piece of that base and that's directly engaging

        12    and going within the charging port of the other

        13    device, then that's what I mean.  That's what I mean

        14    as coupling.  You have a piece of that charge base

03:23   15    directly connecting to the device that's being

        16    charged.

        17          Q    BY MR. HANLE:  Okay.  I don't want to --

        18    I'm not going to talk about in the context of

        19    this -- I'm going to take it outside of the context

03:23   20    of this patent --

        21          A    Mm-hmm.

        22          Q    -- and just talk about your understanding

        23    of the word "couple to."

        24          A    Mm-hmm.

03:23   25          Q    Is it your testimony that coupling --

                              226

AMIR NAVID

BARKLEY
Court Reporters

03:23  1          A       Mm-hmm.

2          Q       Forget about this patent for a moment.

3          A       Yes, sir.

4          Q       -- that coupling, to couple to, can

03:24  5    include coupling through an adapter but would

6    exclude connecting through a cable?

7                MR. HASAN:  Objection as to form.  Asked

8    and answered.

9                THE DEPONENT:  So if we're not looking at

03:24  10   it within the context of this, coupling still, to

11   me, would mean something that has a direct

12   connection.  Has cable versus adapter, all of these

13   things you're talking about, especially outside of

14   the context of this patent, makes no sense

03:24  15   whatsoever.  What is an adapter?  Like I said, an

16   adapter can be many things.

17               To me, coupling, within this, outside of

18   this, means that you have a direct connection; that

19   two parts are coming and attaching directly to one

03:24  20   another and it's mating.

21          Q    BY MR. HANLE:  Okay.  And -- and so a

22   direct connection may include connection through an

23   adapter or may not, depending on the particular

24   adapter; is that right?

03:24  25               MR. HASAN:  Objection as to form.  Asked

227

Exhibit K
Page 128

AMIR NAVID

BARKLEY
Court Reporters

03:24  1    and answered.

2              THE DEPONENT:   So again, an adapter the

3    way you intended, which I don't even know what that

4    means -- and I've tried to explain that as far as

03:25  5    what you keep calling an adapter is a piece of the

6    actual charge base.   So if the charge base is

7    directly engaging with the controller with a direct

8    connection and it's mating, you have a male plug

9    inserted into a female plug and it's charging the

03:25  10   device, then that's what I understand as coupling.

11           Q     BY MR. HANLE:   Okay.   You keep using the

12   term "direct."

13           A     Mm-hmm.

14           Q     And that could cause confusion in the

03:25  15   record because -- because "direct," as I understand

16   it, would mean -- would mean there's no intervening

17   pieces.   And so -- or I understand it.   Maybe I'm

18   just dumb.

19              So my question is, is -- and again, taking

03:25  20   you outside of the context of this patent and

21   talking about plain and ordinary meaning of "to

22   couple to" --

23           A     Coupling to -- may I answer?

24              MR. HASAN:   Objection as to form.

03:25  25           Q     BY MR. HANLE:   I'm not done with the

228

Exhibit K
Page 129

AMIR NAVID

BARKLEY
Court Reporters

03:25  1    question yet.

2                      So to couple to, can that include

3          connection through an adapter or not, depending on

4          the particular configuration of the adapter?

03:26  5                   MR. HASAN:   Objection as to form.   Asked

6          and answered.

7                      THE DEPONENT:   An adapter, especially

8          outside the context of what you're talking about,

9          can be many things.   So I have no idea what you mean

03:26 10   by that.   I can't accurately answer your question.

11   But as far as how I interpret coupling, it means

12   that you're directly connecting a male jack into a

13   female jack.   So a part of that device, that

14   invention connecting directly to the device that is

03:26 15   charging.

16         Q    BY MR. HANLE:   Okay.   Take a look at

17   column 2 of your '848 patent.

18         A    Yes, sir.

19         Q    Okay.   And it -- starting at line 10,

03:27 20   there's a statement:

21              "In one embodiment, the video game

22              controller charging system further

23              includes a current detector electrically

24              coupled to the at least one DC port...."

03:27 25              And I'll stop there for a moment.

229

AMIR NAVID

BARKLEY
Court Reporters

03:27  1        A    Mm-hmm.

2        Q    So in that case how is the current

3    detector coupled to the DC port?  Is it through a

4    cable or wire or -- or some other way?

03:27  5             MR. HASAN:  Objection as to form.  Calls

6    for a legal conclusion.

7             THE DEPONENT:  So "In one embodiment, a

8    video game controller charging system further

9    includes a current detector electronically" --

03:27 10             DEPOSITION OFFICER:  Excuse me.

11             THE DEPONENT:  I'm sorry.  I should just

12    read silently.  I just don't read silent.

13        Q    BY MR. HANLE:  Do you have the question in

14    mind?

03:28 15        A    I don't think it defines it.  It just says

16    it's connected to it.  So it's saying that it's

17    connected to that DC port.

18        Q    It says "coupled"; right?

19        A    Yes, it says --

03:28 20             MR. HASAN:  Objection as to form.

21             THE DEPONENT:  Yes -- does it say

22    "coupled"?  Yes, it says "coupled."

23        Q    BY MR. HANLE:  Okay.  And so in this

24    instance it's not specifying whether the coupling is

03:28 25    direct or indirect; correct?

230

Exhibit K
Page 131

AMIR NAVID

BARKLEY
Court Reporters

03:28  1      A    Direct or indirect.

       2           MR. HASAN:  Objection as to form.

       3           THE DEPONENT:  It -- it seems that it's

       4  direct.

03:28  5      Q    BY MR. HANLE:  Okay.  And is that through

       6  a -- through a wire or some other way?

       7           MR. HASAN:  Objection as to form.

       8           THE DEPONENT:  It could be a particular

       9  component that sits in a -- you know, a PC, PCB,

03:28 10  where it plugs into it.  It could be anything.  It

      11  just -- legal terminology here, it's -- it's open to

      12  interpretation.

      13      Q    BY MR. HANLE:  So it could include a wire

      14  connecting the current detector to the DC port?

03:29 15           (Admonition by the deposition officer to

      16           speak one at a time.)

      17           MR. HASAN:  Objection as to form.

      18           Go ahead.

      19           THE DEPONENT:  I don't think we're in the

03:29 20  business of what could; right?  I think what it's

      21  describing is that this port has a current detector

      22  on the circuitry that detects the current.

      23           So I'm not sure, you know, what you would

      24  like me to say for you, but I think it's open to

03:29 25  interpretation.  I don't know specifically if it's

                                231

03:29  1    saying it's by a wire, it's on the PC board, or

2    directed -- connect directly to the LED.  It's just

3    saying that it can have a current detector in the

4    circuit.

03:29  5        Q    BY MR. HANLE:  And that current detector

6    would be coupled to the DC port is what it says;

7    right?

8            MR. HASAN:  Objection as to form.

9            THE DEPONENT:  That's -- that's what it

03:29  10   says, yes.

11       Q    BY MR. HANLE:  Okay.  And so this doesn't

12   limit how it would be coupled.  It could be -- it

13   could be directly, it could be through a wire, or it

14   could be through some other way; is that right?

03:30  15           MR. HASAN:  Objection as to form.

16           THE DEPONENT:  It's open to

17   interpretation.  I wouldn't want to guess whether or

18   not it's indicating that it's direct or not.  I can

19   just say, as far as our claim, as far as what my

03:30  20   understanding was when we wrote those claims, that

21   coupling, to me, means that.

22       Q    BY MR. HANLE:  Okay.  We're not looking at

23   claims right now.  We're looking at the written

24   description, which you also either wrote or signed

03:30  25   off on.

232

Exhibit K
Page 133

AMIR NAVID

BARKLEY
Court Reporters

03:30 | 1              Do you understand that?

2        A    I understand that.

3        Q    Okay.  And so -- and so the terms, as used

4 in the specification, the written description, can

03:30 | 5 inform how we interpret the claim.  So that's why I

6 want to have an understanding of the word "coupled

7 to" as used here.

8        A    Sure.

9        Q    And so that's why it's very important.

03:30 | 10              So -- so I guess my question to you --

11        A    Mm-hmm.

12        Q    Let's ask about the commercial embodiment

13 of what's described here.

14        A    Mm-hmm.

03:30 | 15        Q    Is there a current detector coupled to the

16 DC port in the commercial embodiment of this

17 invention, as described?

18        A    Is it coupled to?  There's -- there's,

19 obviously, that on there.  Whether or not it's

03:31 | 20 connected via cable or it's as a component simply on

21 a PC board, I would imagine it's something on a PC

22 board, not necessarily by a wire.

23        Q    Okay.  So you don't know, in the

24 commercial embodiment, whether the current detector

03:31 | 25 is -- is coupled by a wire or some other way to the

233

Exhibit K
Page 134

AMIR NAVID

BARKLEY
Court Reporters

03:31  1    DC port?  Is that your testimony?

2           A    I -- I expect that it's on a PC board.

3    That's my testimony.

4           Q    Is it -- but you don't know?

03:31  5         A    I expect that it's on the PC board.  It

6    wouldn't be -- it shouldn't be on a wire.  And I'm

7    not an electrical engineer.  I'm a designer.  I'm a

8    project manager, so I manage it.  I don't

9    specifically -- we have engineers for that.

03:31  10        Q    Yeah.  The only -- the only reason I was

11   trying to zero in, you said "expect."  And it wasn't

12   clear to me whether that means you're guessing or

13   not, which we don't want you to do.  So --

14          A    Okay.  Yeah.

03:32  15        Q    So that's why I was trying to bury down.

16               So that sentence goes on, and it says,

17   "...and an indicator electrically coupled to the

18   current detector."

19               So do you have an understanding -- first

03:32  20   of all, in the commercial embodiment is there an

21   indicator electrically coupled to the current

22   detector?

23          A    Yes.  It's part of the circuit.

24          Q    And is it connected through a wire or some

03:32  25   other way?

234

Exhibit K
Page 135

AMIR NAVID

BARKLEY
Court Reporters

03:32  1                  MR. HASAN:  Objection as to form.

       2                  THE DEPONENT:  Is the LED or the current

       3       detector?

       4          Q    BY MR. HANLE:  Well, it says the indicator

03:32  5       is coupled to the current detector.  So I want to

       6       know, that coupling, is it through a wire or through

       7       something else?

       8                  MR. HASAN:  Objection as to form.

       9                  THE DEPONENT:  I expect that it's on the

03:32  10      PC board.

       11                 MR. HASAN:  Mr. Hanle, can we take a break

       12      when you get a chance or -- when you're done with

       13      your questioning -- your line of questioning.

       14                 MR. HANLE:  Okay.

03:33  15                 MR. HASAN:  I've got -- I have to use the

       16      restroom, but it's not -- we can wait five minutes

       17      or --

       18                 MR. HANLE:  Yeah, we're close to a natural

       19      stopping point.

03:33  20                 MR. HASAN:  Go ahead.

       21                 MR. HANLE:  Thank you, Counsel.

       22          Q    Okay.  Take a look at the same column.

       23      And it's line 50 -- excuse me -- line 51.  And it

       24      states, "...and a power input for connecting to a

03:33  25      power input electrically coupled

                                   235

03:33  1    to the at least one male mini-USB connector...."

2              Do you see that?

3         A    Mm-hmm.

4         Q    And again, the use of the word "coupling."

03:33  5    How is the power input coupled to the male mini USB

6    connectors?

7              MR. HASAN:  Objection as to form.

8              THE DEPONENT:  Through the PC board.

9         Q    BY MR. HANLE:  Okay.  And so the power

03:33  10   input is -- attaches to a PC board; is that right?

11        A    Mm-hmm.

12        Q    And then the male mini USB connectors, do

13   they connect directly to the PC board or through

14   some wiring?

03:34  15        A    Directly to the PC board.

16             MR. HASAN:  Objection as to form.

17        Q    BY MR. HANLE:  And so in that case the

18   power supply is not directly coupled to the mini USB

19   connectors because there's an intervening PC board;

03:34  20   is that correct?

21             MR. HASAN:  Objection as to form.

22             THE DEPONENT:  It depends.  I understood

23   your question to be how the USB jack is coupled to

24   the device itself.  And it's soldered directly onto

03:34  25   the PC board.  Did I misunderstand --

236

Exhibit K
Page 137

AMIR NAVID

BARKLEY
Court Reporters

03:34  1              MR. HASAN:  Objection --

       2              THE DEPONENT:  -- your question?

       3              MR. HASAN:  Objection as to form.

       4        Q    BY MR. HANLE:  You said the USB -- the USB

03:34  5   port is soldered directly to the --

       6        A    Depends on which version of it you're

       7   talking about, obviously.  But, you know, we

       8   have -- you know, what this patent covers is a lot

       9   of things.  It's not just whether or not it's a USB.

03:35 10   It could be a jack.  It could be anything.

      11              So I'm not sure if I'm answering your

      12   question.

      13        Q    Yeah, the question is to do with just this

      14   word "coupling."

03:35 15        A    Mm-hmm.

      16        Q    And so the question is the -- between the

      17   power input --

      18        A    Mm-hmm.

      19        Q    -- and the -- and the male mini USB

03:35 20   connectors --

      21        A    Mm-hmm.

      22        Q    -- there's a board -- there's a circuit

      23   board in between those two; right?

      24        A    Yeah.  I'm sure there's a lot of different

03:35 25   components in between.

                                237

Exhibit K
Page 138

AMIR NAVID

BARKLEY
Court Reporters

03:35  1              MR. HANLE:  Okay.

       2              MR. HASAN:  Ready or --

       3              MR. HANLE:  Yeah.

       4              MR. HASAN:  Okay.

03:35  5              MR. HANLE:  That's fine.

       6              MR. HASAN:  Sure.

       7              VIDEOGRAPHER:  We're off the record at

       8  3:35.

       9              (Recess taken.)

03:49 10              VIDEOGRAPHER:  We're back on the record at

      11  3:49.

      12       Q   BY MR. HANLE:  Okay.  So we were talking

      13  about some of the terms that are used in the claims

      14  of the '848 patent, which is Exhibit 1.  And the

03:49 15  first element of claim 1, in column 15, which is the

      16  second-to-last page -- the first element after the

      17  preamble is "a base."  And -- give you a minute

      18  to --

      19       A   There we go.

03:50 20       Q   -- get there.

      21       A   Okay, sir.

      22       Q   Do you see that?

      23       A   Where?

      24       Q   So column 15, claim 1.

03:50 25       A   Okay.

                            238

AMIR NAVID

BARKLEY
Court Reporters

03:50  1          Q      First element after the preamble, line 34,

2      "a base."

3              Do you see that?

4          A      Yes, sir.

03:50  5          Q      Okay.  So again, I want to get the plain

6      and ordinary -- your understanding of the plain and

7      ordinary meaning of the term "base" outside of the

8      context of this patent.  And then we can talk about

9      what it means in the context of the patent.

03:50  10             So -- so --

11             MR. HASAN:  Objection as to form.

12             MR. HANLE:  I haven't asked anything yet.

13          Q      So question -- question is, is -- so let's

14      take, for example, this table.  What would you

03:50  15      consider the base of this table?

16             MR. HASAN:  Objection as to form.

17             THE DEPONENT:  I -- I'm sorry, but I don't

18      understand how that relates to the patent at hand

19      and what we're trying to do.  Table -- I'm not in

03:50  20      the business of making tables.  I'm not an expert in

21      tables.  What is considered a base or a top of it is

22      not my expertise.  I don't claim that it's my

23      expertise.

24             In the context of this patent, what a base

03:51  25      is, is the entire charging device.  It's the

                              239

AMIR NAVID

BARKLEY
Court Reporters

03:51  1    charging system.

2         Q    BY MR. HANLE:  Okay.  I asked you a

3    different question, so please answer my question.

4    And if the answer is "I don't know," feel free to

03:51  5    say so.

6         A    I don't know.  I'm not a table specialist.

7    So I don't know, outside the context of this --

8         Q    Okay.  So --

9         A    -- what "a base" could mean.

03:51 10        Q    What about the chair you're sitting in?

11   What would you consider the base of that chair?

12             MR. HASAN:  Same objections.

13             THE DEPONENT:  I'm not a carpenter.  I

14   don't build chairs.  I have no idea what a base is

03:51 15   or if there is a base, per se, part on this chair.

16   I don't know.

17        Q    BY MR. HANLE:  Okay.  So as a person

18   skilled in the art, you have no understanding of the

19   term --

03:51 20        A    In the skill of the art, as far as

21   applying to this --

22        Q    Just let me finish the question.  You're

23   interrupting me, and the court reporter is going to

24   kill us all.

03:51 25             So -- so are you saying that outside of

240

AMIR NAVID

BARKLEY
Court Reporters

03:51  1    the context of this patent, you have no independent

2    understanding of the meaning of the term "base"?  Is

3    that -- is that what you're telling me?

4              MR. HASAN:  Argumentative.  Objection as

03:52  5    to form.

6              THE DEPONENT:  I'm telling you that --

7              MR. HASAN:  Misstates the testimony.

8              THE DEPONENT:  What I'm saying is that

9    outside the context of this patent, the word can

03:52 10    have different meanings.

11        Q    BY MR. HANLE:  And with respect to the

12   chair you're sitting on, do you have an

13   understanding of what part of it would be the base?

14             MR. HASAN:  Objection as to form.

03:52 15             THE DEPONENT:  I don't.  I'm not a -- I'm

16   not a chair specialist.  I have no idea which part

17   would be considered a base of a chair or if any part

18   of a chair is considered a base.

19        Q    BY MR. HANLE:  So is the -- is the cord a

03:53 20   part of the base in your invention?  The power cord?

21             MR. HASAN:  Objection as to form.

22             THE DEPONENT:  Is the cord a part of the

23   base?

24        Q    BY MR. HANLE:  I think you -- the reason I

03:53 25   ask that, you said -- I understood you to say that

                              241

Exhibit K
Page 142

AMIR NAVID

BARKLEY
Court Reporters

03:53  1    the entire charging system is the base.  And so --

2          A    What I mean is the actual physical

3    charging station portion of it, the entire portion.

4    You can have -- and we define that.  As far as

03:53  5    having a power cable that is detachable or external

6    AC, that's something else.  But what -- within the

7    context of this patent, what we're referring to is

8    the charger and all its parts.

9          Q    Okay.  So your patent also uses the

03:54  10   term -- in fact, several times -- and we pointed it

11   out earlier.  It says -- it uses, in three different

12   paragraphs of claim 1, "at least one structure on

13   the base."

14         A    Mm-hmm.

03:54  15         Q    And so I'm -- can you -- can you show me,

16   in the figures of your patent, what is referred to

17   by "the structure on the base"?  And then I'll refer

18   you to figure 11.

19         A    Figure 11?  Okay.

03:54  20         Q    Yeah.  And --

21         A    So what -- what I construe as being the

22   base on this?  Is that what you want me to say?

23         Q    No.  That was -- my question was directed

24   to the word "structure."

03:54  25         A    Okay.

242

03:54  1        Q     So it says, "at least" -- and I can read

2   it:   "at least one structure on the base for

3   providing physical support to the plurality of video

4   game controllers...."

03:55  5        Could you point to what is referred to by

6   the phrase "at least one structure on the base for

7   providing physical support."

8        A     So it would be 406.   These are the

9   structures, the support structures.

03:55  10       Q     Okay.   So the structures, as used in your

11   patent, are 406?

12       A     I believe the terminology used is "support

13   structures" where you took it out of that paragraph.

14   And yes, those are the support structures.

03:55  15       Q     Okay.   The claim language just -- and I'll

16   read it again -- is "at least one structure on the

17   base for providing physical support to the plurality

18   of video game controllers...."

19       A     Yes.   So that's --

03:55  20       MR. HASAN:   Objection for an incomplete

21   reading.   Are you going to read the rest of it,

22   Steve, or you're going to -- I don't know if you're

23   intending to do that, but --

24       MR. HANLE:   All I want to know is about

03:55  25   the structures on the base for providing support to

243

AMIR NAVID

BARKLEY
Court Reporters

03:55  1    the plurality of video game controllers.

2              MR. HASAN:  Asked and answered.

3              THE DEPONENT:  So I've pointed them out

4    and mentioned that, in figure 11, these would be

03:56  5    406.

6          Q    BY MR. HANLE:  Okay.  And is each one of

7    those a separate structure?

8              MR. HASAN:  Objection as to form.

9              THE DEPONENT:  Are they each a separate

03:56 10   structure?

11         Q    BY MR. HANLE:  Yes.

12         A    Yes.

13         Q    Okay.  And it also -- the patent says "at

14   least one structure on the base."  And would you

03:56 15   agree that "at least one" could mean only one?

16         A    No.  "At least one" means one or more.

17         Q    I think we said the same thing, so --

18   but -- so "at least one" could -- "at least one"

19   could include a single one, or it could include --

03:56 20        A    No.

21         Q    -- where there are multiple?

22         A    No, multiple.  So that's -- otherwise, we

23   would say one; right?  So we're saying one or more,

24   so it's multiple structures.  That's -- that's what

03:57 25   it means.

244

Exhibit K
Page 145

AMIR NAVID

BARKLEY
Court Reporters

03:57 1      Q    Okay.  You just said "one or more."  So it

2     could be one, is what I'm trying to get to.  Could

3     "at least one" mean just one?

4           MR. HASAN:  Objection as to form.

03:57 5           THE DEPONENT:  I believe it means more

6     than one, in my understanding of it.

7      Q    BY MR. HANLE:  Then we should clarify

8     because a moment ago you said it could mean one or

9     more, so --

03:57 10     A    That's what I meant.  So -- and thank you

11     for clarifying that for me, but that's what I mean.

12     It means -- otherwise, we would be -- claim one

13     structure there.  I mean, we're claiming multiple

14     structures there.

03:57 15     Q    Okay.  And then it also uses the term that

16     we just read, "plurality of video game controllers."

17     What's your understanding of the term "plurality"?

18     A    It means more than one, several.

19     Q    Okay.  So two or more?

03:58 20     A    Two or more.

21     Q    What's the difference, in your mind,

22     between "at least one" and "a plurality"?

23     A    "At least one" and "a plurality."  To me,

24     it's very similar, same thing.  Basically different

03:58 25     ways of saying that you have more than one thing

245

03:58  1    or --

2            Does that answer your question?

3       Q    Is there any difference between "at least

4    one" and "a plurality"?

03:58  5            MR. HASAN:  Objection as to form.

6       Q    BY MR. HANLE:  Based on your

7    understanding.

8       A    No, in my understanding, it's the same.

9    It means more than one.

03:58  10      Q    And so claim 13, on the same page -- and

11   you can -- save -- we're going to come back to

12   figure 11 --

13      A    Okay, sir.

14      Q    -- but take a look at claim 13, which

03:59  15   is -- it's over here, the second-to-last page.

16   Right there.

17            So claim 13 uses, in the third element --

18   this is column 16, about line 35 -- instead of --

19   instead of saying "at least one structure," it says,

03:59  20   "at least one docking structure defining a plurality

21   of docking bays...."

22            Can you point to, in figure 11, what is

23   referred to by a "docking structure"?

24      A    It's -- it would be the same thing.  These

03:59  25   are docking structures.  It's what supports the

246

03:59  1    controller.  So that's what I understand them to be.

2          Q    So items 406 are docking structures?

3          A    Well, it's -- I would need to read -- let

4    me read it in the context of what we're --

03:59  5          Q    Sure.

6          A    -- what's being said.  "A plurality" --

7               I'm sorry, what line was that?

8          Q    Oh, boy.  It was line 35.

9          A    Okay.  "A" --

04:00  10               So in the context of this, it appears it

11   is the structure, but it's basically -- a docking

12   bay is defined by more than one of them and the area

13   basically where it supports the controller in the

14   middle.

04:00  15          Q    Okay.  I want to differentiate between the

16   term "docking structure" and "docking bay."  So I

17   want to focus on, for now, the word "docking

18   structure."

19               And so I want to know, in figure 11, is it

04:01  20   your understanding that the docking structure is

21   406?

22               MR. HASAN:  Objection as to form.

23               THE DEPONENT:  So -- so as I tried to

24   explain in the context of what it's saying, it's

04:01  25   saying that those structures, what we refer to as

247

AMIR NAVID

BARKLEY
Court Reporters

04:01   1   "structures" -- and when we're saying "docking

2   structure," it's one or more of these -- I'm

3   sorry -- two or more of these that actually create a

4   docking bay.  That's my understanding --

04:01   5       Q    BY MR. HANLE:  Okay.  And --

6       A    -- in that context.

7       Q    So the two or more structures in figure 11

8   that form a docking bay could be, for example, two

9   of items 406?

04:01   10      A    Yes.  I mean, it's the area in between

11  those structures.

12      Q    Okay.  So the docking bay is the area in

13  between the two docking structures 406; is that --

14  is that correct?

04:02   15      A    Yes, I -- from, you know, a quick reading,

16  that's what it appears to me.

17      Q    So that claim, claim 13 in column 16, also

18  uses the term -- and this is just a couple lines

19  above that.  It says, "a plurality of male mini-USB

04:02   20  connectors supported by the base...."

21          Do you see that?

22      A    Yes, sir.

23      Q    And would USB connectors supported by the

24  base include USB connectors actually on the base?

04:02   25          MR. HASAN:  Objection as to form.

248

AMIR NAVID

BARKLEY
*Court Reporters*

04:02  1          THE DEPONENT:  I don't even understand

2     that question.  Would you like to repeat it, and

3     I'll try to --

4               MR. HANLE:  You can read it back.

04:03  5               (The record was read as follows:

6               "Q    So that claim, claim 13 in

7               column 16, also uses the term -- and this

8               is just a couple lines above that.  It

9               says, 'a plurality of male mini-USB

04:02 10               connectors supported by the base....'

11               "Do you see that?

12               "A    Yes, sir.

13               "Q    And would USB connectors

14               supported by the base include USB

04:02 15               connectors actually on the base?")

16               THE DEPONENT:  Yes.

17          MR. HANLE:  Okay.

18          Okay.  I will mark as the next exhibit a

19     document dated -- the printout is dated 5/29/2012,

04:04 20     and it's a press release -- a Nyko press release

21     dated January 8th, 2007.  This is Exhibit 9.

22               (Exhibit 9 was marked for the record.)

23          Q    BY MR. HANLE:  Are you familiar with this

24     document?

04:05 25          A    No, I'm not.

249

Exhibit K
Page 150

AMIR NAVID

BARKLEY
Court Reporters

# EXHIBIT L

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3   _____
                                    )
 4   NYKO TECHNOLOGIES, INC., a     )
     California corporation,        )
 5                                  )
             Plaintiff,             )
 6                                  )No. CV 12-3001 GAF
        vs.                         )          (VBKx)
 7                                  )
     ENERGIZER HOLDINGS, INC., a    )
 8   Missouri corporation,          )
     EVEREADY BATTERY COMPANY,      )
 9   INC., a Delaware Corporation,  )
     and PERFORMANCE DESIGNED       )
10   PRODUCTS LLC, a California     )
     limited liability company,    )
11                                  )
             Defendants.            )
12   _____)
                                    )
13   AND RELATED COUNTERCLAIM.      )
     _____)
14
15   **HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**
16       VIDEOTAPED DEPOSITION OF GERARD L. BLOCK
17               Los Angeles, California
18             Friday, February 15, 2013
19                    Volume I
20
21   Reported by:
     Melissa M. Villagran, RPR, CLR
22   CSR No. 12543
23   Job No. 1611199
24   PAGES 1 - 330
25
```

Page 1

Exhibit L
Page 151

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      Q    As part of the articles that you wrote, there

2   were opinions that you had to provide based on your

3   gaming experience, correct?

4           THE DEPONENT:   That's true.

5           MR. HANLE:   Objection to form.                10:07:25

6           Just pause before you answer so I can get my

7   objection.

8           DEPOSITION OFFICER:   What's your answer?

9   "True"?

10          THE DEPONENT:   True.                          10:07:29

11   BY MR. HASAN:

12     Q    And -- did you do your best to give truthful

13   and accurate opinions?

14     A    Yes.

15     Q    Did you rely on your gaming experience to      10:08:00

16   give the opinions?

17          MR. HANLE:   Objection to form.

18          THE DEPONENT:   Yes.

19   BY MR. HASAN:

20     Q    Do you have gaming experience?                 10:08:13

21     A    I do.

22     Q    Please describe that for us.

23     A    I started playing video games when I was

24   about 4 years old, discovered that I liked them

25   quite a lot, and pursued that interest from the age   10:08:28

                                                    Page 23

Exhibit L
Page 152

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    of 4 onwards.

2        Q    What platform did you play when you were 4?

3    Just curious.

4        A    I had an Atari 2600.

5        Q    One of the classics, one of the best.  I        10:08:40

6    played that one as well, yes.

7            MR. HANLE:  I played Pong.

8    BY MR. HASAN:

9        Q    How long were you editor-in-chief at IGN.com

10   gaming channel -- excuse me.                              10:09:19

11           How long were you editor-in-chief for the

12   Gears channel at IGN?

13       A    Around three years.

14       Q    Did your responsibilities change over the

15   three years you were there, generally speaking?          10:09:35

16       A    In the last year I also began acting as

17   editor-in-chief for the Cars channel on IGN channel

18   as well.

19       Q    What is the Cars channel?

20       A    Similar to all other channels in IGN, again,    10:09:58

21   specializing in news, previews, and reviews of

22   products; in this case, cars.

23       Q    And did you rely upon your gaming experience

24   to write articles and -- for cars?

25       A    No.                                             10:10:15

                                                             Page 24

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    you understand that for purposes of this deposition,

 2    the ones that are accused of infringement?

 3       A   Yes.

 4       Q   The PDP accused products here have docking

 5    bays, correct?                                    11:31:26

 6           MR. HANLE:  Objection; lacks foundation,

 7    vague.

 8           THE DEPONENT:  They have means for charging

 9    controllers.

10    BY MR. HASAN:                                     11:31:36

11       Q   Have you ever used the word "docking bay"?

12       A   Yes.

13       Q   What is a docking bay, in your understanding?

14           MR. HANLE:  Objection; lacks foundation,

15    vague.                                            11:31:46

16           THE DEPONENT:  A receptacle into which a

17    foreign body can join.

18    BY MR. HASAN:

19       Q   Does the accused PDP product have docking

20    bays --                                           11:32:04

21           MR. HANLE:  Objection.

22    BY MR. HASAN:

23       Q   -- by that definition?

24           MR. HANLE:  Objection; lacks foundation,

25    vague.                                            11:32:08
```

Page 77

Exhibit L
Page 154

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

```
 1          THE DEPONENT:  It has receptacles into which

 2    one inserts controllers.

 3    BY MR. HASAN:

 4        Q    And your understanding based on your

 5    experience is that those are docking bays?        11:32:20

 6             MR. HANLE:  Objection; misstates his

 7    testimony.

 8    BY MR. HASAN:

 9        Q    Is that right?

10             MR. HANLE:  Also lacks foundation, vague.   11:32:24

11             THE DEPONENT:  The PDP products have

12    receptacles.

13    BY MR. HASAN:

14        Q    Do they have docking bays, in your

15    understanding?                                     11:32:35

16             MR. HANLE:  Same question.  Same objections;

17    asked and answered.

18             MR. HASAN:  Let me finish.

19             Please reread with the question.

20             (Record was read back by the             11:32:44

21             deposition officer as follows:

22                 "QUESTION:  Do they have

23             docking bays, in your

24             understanding?")

25             MR. HANLE:  Same objections.  Asked and  11:32:48
```

Page  78

Exhibit L
Page 155

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      answered.

2      BY MR. HASAN:

3          Q    Yes or no.   If you can answer.

4          A    They have -- they have receptacles for

5      charging.   I mean, you know, use it as a synonym or      11:33:06

6      not.   I -- you know, I would define them as, in the

7      most exact terms, receptacles, literal meanings of

8      the word.

9          Q    Would you understand the accused products to

10     have docking bays?                                        11:33:24

11         MR. HANLE:   Objection; asked and answered a

12     third time.   Objection -- and restate my other

13     objections.

14         You can just repeat your answer if you want.

15     You can read it from here if you want.                    11:33:36

16         THE DEPONENT:   The accused products have

17     receptacles.

18     BY MR. HASAN:

19         Q    Do they have docking bays?

20         MR. HANLE:   Same objections; asked and              11:33:42

21     answered, argumentative, badgering the witness.

22     BY MR. HASAN:

23         Q    Yes or no, sir, in your understanding.

24         A    In my understanding, the definition I would

25     apply would be receptacle.   It's the appropriate,        11:34:01

                                                        Page 79

Exhibit L
Page 156

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL—PURSUANT TO PROTECTIVE ORDER

1    literal use of the word.

2        Q   Sir, I'm not asking you for that.

3            Have you ever used the word "docking bay"

4    before?

5        A   I'm sure.  Yes.                          11:34:13

6        Q   You have, right?

7        A   Yes.

8        Q   Why are you sure you've used it before?

9        A   It's a term that would circulate.  I mean, I

10   can imagine myself using it.                      11:34:21

11       Q   Why?

12       A   Docking bays by definition are not solely

13   appropriate to the terminology of controller

14   charging situations.

15           I may well have used docking bay to refer   11:34:42

16   to -- the landing space on a spaceship for the

17   smaller fighter's also a docking bay.  There are a

18   variety of terms in which I could use that, that

19   phrase "docking bay."

20       Q   Like in "Star Wars" when they go on the death  11:34:57

21   star into the docking bay, right?

22       A   The docking bay.

23       Q   That's right.  Okay.

24       A   You know, I talk about "Star Wars."  I may

25   well have said docking bay in relation to the       11:35:06

Page 80

Exhibit L
Page 157

HIGHLY CONFIDENTIAL—PURSUANT TO PROTECTIVE ORDER

1      Millennium Falcon.

2          Q    Would you -- would you -- do you have any

3      recollection of ever using the term "docking bay"

4      with respect to a controller, video game controller

5      charging solution?                                    11:35:17

6          A    I can imagine I applied it to controller.

7          Q    Do you have any recollection of applying it

8      to a video game controller charging solution?

9          A    In my tenure at IGN as a writer, I aim not to

10     repeat phraseology excessively.  Thus a good writer   11:35:38

11     looks for synonyms to apply to commonly used

12     phrases.

13          So in the course of a review of a controller

14     charging solution I may, in describing it, have

15     referred to the receptacle by any number of similar   11:35:59

16     terms.  In the common parlance one could call them

17     charge stations.  I mean, there are a variety of

18     terms that one could use.

19          Q    Have you ever used the term "docking bay" in

20     relation to a video game controller charging          11:36:20

21     solution?  Yes or no or you don't know.

22          A    Don't know.

23          MR. HANLE:  Art, can we take another just

24     short break.  And then, also, we can either talk off

25     the record or on the record about what you want to    11:36:44

                                                        Page 81

Exhibit L
Page 158

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    do for lunch in terms of time.
 2          MR. HASAN:  Sure.  We'll get off the record.
 3          MR. HANLE:  Okay.
 4          THE VIDEOGRAPHER:  This marks the end of
 5    Media No. 1.  Going off the record at 11:37 a.m.      11:36:58
 6       (Recess.)
 7          THE VIDEOGRAPHER:  This marks the beginning
 8    of Media No. 2.  Going back on the record at
 9    11:48 a.m.
10    BY MR. HASAN:                                         11:48:36
11       Q   Have you ever used the term "couple with" or
12    "coupled"?
13       A   Yes.
14       Q   What does coupled mean?
15          MR. HANLE:  Objection; lacks foundation.        11:49:11
16    BY MR. HASAN:
17       Q   As you used it.
18       A   To come together, most likely.
19       Q   How many products, just approximately, have
20    you reviewed while you were at IGN?                   11:49:26
21       A   Hundreds.
22       Q   How many video game accessories?
23       A   Hundreds.
24       Q   How many video game controller charging
25    accessories?                                          11:49:42
```

Page 82

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          THE DEPONENT:  I don't recall.

 2          MR. HASAN:  We have this marked as Exhibit 35

 3     for identification.

 4          (Exhibit 35 was marked for

 5          identification by the deposition            11:53:48

 6          officer and is attached hereto.)

 7     BY MR. HASAN:

 8      Q   Do you recognize this document?

 9      A   It lacks the formatting of an IGN article as

10     it would appear on the Web site.                 11:54:02

11      Q   Your name is there, Gerry Block, correct?

12      A   That's correct.

13      Q   And it bears the date of October 18th, 2007?

14      A   Yes.

15      Q   Do you have any reason to believe that you    11:54:14

16     didn't write this article?

17      A   It would -- it would -- it would appear that

18     I wrote it.  To your question as do I recognize the

19     document, no.  This is not how the article appears

20     on IGN.com.                                       11:54:33

21      Q   So you are stating that this printed page is

22     not how it appears on the on-line Web site?

23      A   That's correct.

24      Q   Okay.  Why don't you take a look at it, and

25     tell me whether these are your words or not.      11:54:44
```

Page 85

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          Are those your words, Mr. Block, in

2   Exhibit 35?

3      A   Yes.

4      Q   That's your article, right?

5      A   Yes.                                    11:56:07

6      Q   You wrote it?

7      A   Yes.

8      Q   Is it true, truthful article?

9          MR. HANLE:   Objection; vague.

10  BY MR. HASAN:                                  11:56:13

11     Q   Let me ask you this.

12         MR. HANLE:   Lacks foundation.

13  BY MR. HASAN:

14     Q   Would you intend to be truthful in this

15  article?                                       11:56:17

16     A   I did not aim to transmit any false

17  information to my readers.

18     Q   And you testified based on your estimates you

19  had 30- to 60,000 readers, correct?

20     A   I testified that average readership of an    11:56:34

21  article tended to be 30- to 60,000 users.

22     Q   That included your articles, right?

23     A   That figure refers to articles on IGN Gear.

24     Q   Your articles were on IGN Gear?

25     A   Yes.                                    11:56:55

Page 86

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      Q    Do you have any reason to believe that your

2   readership was different than the readership for

3   articles in general on IGN Gear?

4      A    Yes.

5      Q    How?                                        11:57:04

6      A    Well, you say my articles versus articles on

7   IGN Gear?

8      Q    No.   Is -- was your readership in the 30- to

9   60,000 range, or was it different for your articles,

10   to your knowledge?                                 11:57:20

11      A    My other -- my articles versus others

12   published in IGN Gear?

13      Q    Yes.

14      A    They should be about the same.

15      Q    Was your intent to be accurate in this      11:57:36

16   article --

17         MR. HANLE:   Objection; asked and answered.

18   BY MR. HASAN:

19      Q    -- Exhibit 35?

20      A    Yes.                                        11:57:43

21      Q    Did you have to think about it?   There was a

22   pause over there for several seconds.   Why?

23      A    I debate the legitimacy of applying accuracy

24   to a preview story that really doesn't address truth

25   versus falsehoods or accuracy versus inaccuracy with  11:58:26

Page 87

Exhibit L
Page 162

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    regard to what's covered in this article.

2         Accurate as applied to the fact that the

3    retail price will be 29.99, yes.   I was aiming to be

4    accurate to the information that I was given for the

5    article.                                             11:58:42

6    Q   How about accurate that it has docking bays?

7         MR. HANLE:   Objection; lacks foundation,

8    vague.

9    BY MR. HASAN:

10   Q   Let me back up.                                  11:58:47

11        Does this article say that the Pelican

12   PlayStation 3 charge station has docking bays?

13   A   It does say that.

14   Q   Is that accurate?

15        MR. HANLE:   Objection; lacks foundation,       11:58:57

16   vague.

17        THE DEPONENT:   It's accurate that I wrote

18   that.

19   BY MR. HASAN:

20   Q   So it may not be accurate, but it's accurate     11:59:04

21   that you wrote it.   Is that what you're testifying

22   to?

23   A   Yes.

24   Q   And it's truthful that it says that, but it

25   may not be truthful in how you meant it to be read?  11:59:19

Page 88

Exhibit L
Page 163

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          MR. HANLE:   Objection; vague,

2     incomprehensible.

3     BY MR. HASAN:

4          Q    Is it truthful?   Let me back up -- let me --

5     let me strike that.                                    11:59:31

6          Is it truthful that the Pelican PS3 charge

7     station has docking bays?

8          MR. HANLE:   Objection; asked and answered,

9     vague, lacks foundation.

10         THE DEPONENT:   It's truthful that I used     11:59:58

11    those words to describe it in this article.

12    BY MR. HASAN:

13         Q    Is that different from it being truthful that

14    it has docking bays, in your mind?

15         A    It is truthful that the product I'm        12:00:08

16    describing in the article has what I -- what --

17    receptacles that I refer to in the article as

18    docking bays.

19         Q    Is there anything untruthful about it, your

20    article that you wrote?                               12:00:37

21         A    Not to my knowledge.

22         Q    Is there anything inaccurate, to your

23    knowledge, about this article that you wrote?

24         A    Not to my knowledge.

25         Q    So, to your knowledge, it's accurate that the   12:00:52

Page 89

Exhibit L
Page 164

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1     Pelican PS3 charge station has docking bays?

2            MR. HANLE:   Objection; asked and answered

3     multiple times.

4            THE DEPONENT:   It's accurate that in this

5     article I use that term to describe what the product          12:01:13

6     has.

7     BY MR. HASAN:

8         Q   Would you turn this over for the video,

9     please.   Turn it around.

10           Where are the docking bays that you wrote              12:01:20

11    about?   Point for it (sic) to the camera.

12        A   On the spire right here.

13        Q   Okay.   Point to -- how many docking bays are

14    there?

15        A   Two docking bays on the spire.                        12:01:29

16        Q   Okay.   And what is in the docking bay?

17        A   A male mini USB port at the center.

18        Q   Okay.   Prior to 2007 when you wrote about the

19    Nyko charge base in this Pelican PlayStation

20    solution, did you know of any other video game              12:02:12

21    controller solutions that included a docking bay

22    with a male DC port in it for controlling more

23    than -- charging more than one controller?

24        A   I can't recall.

25        Q   Do you believe that -- strike that.                   12:02:32

Page 90

HIGHLY CONFIDENTIAL—PURSUANT TO PROTECTIVE ORDER

```
1    pejorative term?

2        A    That is true.

3        Q    And that's how you used it here?

4        A    Yes.

5        Q    It was a negative to have a USB cord?        12:05:49

6        A    That is the meaning I aimed to transmit.

7        Q    Do the wireless PS3 controllers couple with

8    the docking bays in the Pelican solution, the PS3

9    charge station?

10           MR. HANLE:   Objection; vague, lacks          12:06:10

11    foundation.

12           THE DEPONENT:   I would say so.

13    BY MR. HASAN:

14       Q    Why do you say that, in your understanding?

15       A    As I said before, you know, to couple, to    12:06:24

16    join, to come together, that is accurate in terms of

17    what the controllers do with the docking station.

18       Q    What do you mean by that's accurate with what

19    the controllers do with the docking station?

20       A    The controllers interact with the Pelican    12:06:42

21    solution by coupling, by coming together.

22       Q    When you are referring to coupling or coming

23    together, do you mean that the female receptacle on

24    the wireless video game controller joins with the

25    male DC port that's in the docking bay?            12:07:02
```

Page 93

Exhibit L
Page 166

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          MR. HANLE:   Objection; lack of foundation.

2    Objection to form.

3          THE DEPONENT:   Yes, they come together.

4    BY MR. HASAN:

5       Q   If someone put a wire over there and had a        12:07:21

6    cable coming out, is that, in your opinion, coming

7    together?

8          MR. HANLE:   Objection; lacks foundation.

9          THE DEPONENT:   What do you refer to as

10   "there"?                                                 12:07:33

11   BY MR. HASAN:

12      Q   The docking bay.

13      A   And where --

14         MR. HANLE:   Wait.   Wait for a question.

15   There's no question pending.   Wait for a question.      12:07:38

16   BY MR. HASAN:

17      Q   Does this -- does this -- okay.   Let me

18   strike that.

19         Does this Pelican PlayStation 3 charge

20   station have a cord?                                     12:07:52

21      A   Not as pictured.

22      Q   Is it intended to be used with a cord in the

23   docking bay, a cable?

24      A   Well, the cord can go in these USB ports down

25   here (indicating).   That's what they are designed       12:08:17

                                                   Page 94

Exhibit L
Page 167

```
 1    protruding therefrom?

 2        A   I can't see specifically in the case of this

 3    picture, but that is what I recall.

 4        Q   And then those DC ports are meant to couple

 5    to the controller?                              12:09:38

 6            MR. HANLE:  Objection; lacks foundation.

 7            THE DEPONENT:  The mini USB ports, yeah,

 8    couple with the controllers.

 9    BY MR. HASAN:

10        Q   Have you ever heard the term "charge base"?   12:10:00

11        A   Yes.

12        Q   What is a charge base, your understanding?

13        A   It's the term Nyko uses to refer to it's

14    controller charging solutions.

15        Q   Apart from Nyko, have you ever used the term   12:10:16

16    "base" to refer to a charging solution?

17        A   Possibly.

18        Q   In what context would you use it?

19            MR. HANLE:  Objection; calls for speculation.

20    BY MR. HASAN:                                    12:10:34

21        Q   According to your understanding.

22            MR. HANLE:  Tell him what you recall.

23            MR. HASAN:  No.  Wait a second.  Mr. Hanle,

24    please don't coach.

25            ///
```

Page 96

HIGHLY CONFIDENTIAL—PURSUANT TO PROTECTIVE ORDER

```
 1    BY MR. HASAN:

 2       Q   Would you write "base" next to it if that's

 3    what you think it is.

 4       A   (The deponent complies.)

 5       Q   So we have marked up on Exhibit 36 that --      01:42:18

 6    you wrote "base" in there.  You have an arrow and

 7    you have that circled around the entire device.

 8    That, to you, is the base?

 9       A   Yeah.  The whole thing that sits on the

10    table.                                                 01:42:32

11       Q   Okay.

12           On this one here, would the charge station --

13    the Charge Base 2, where are the -- where are the

14    docking bays?

15           MR. HANLE:  Objection; lacks foundation,        01:42:54

16    vague.

17    BY MR. HASAN:

18       Q   Are there docking bays?

19       A   Yes.

20       Q   Where -- where are the docking bays?  Would     01:43:02

21    you please point to them with an arrow or however to

22    describe where they are.

23       A   The receptacles for charging are here and

24    here (indicating).

25       Q   Okay.  Would you please write an arrow to it    01:43:15
```

                                              Page 119

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1       again or -- indicate it somehow where you believe

2       that these docking bays are, the receptacles?

3           A    (The witness complies.)

4           Q    Thank you.  Okay.

5           MR. HANLE:  I would like to see that.          01:44:07

6           MR. HASAN:  Let's actually mark this next

7       exhibit, which is a copy of Exhibit 35, as 35A

8       please.

9           (Exhibit 35A was marked for

10          identification by the deposition             01:44:41

11          officer and is attached hereto.)

12      BY MR. HASAN:

13          Q    Do you recognize 35A to be a copy of 35?

14          A    Yes.

15          Q    Okay.  Now, on -- on Exhibit 35A -- that's  01:44:48

16      the article that you wrote, correct?

17          A    Yes.

18          Q    About the Pelican system, right?

19          A    Yes.

20          Q    Would you please put arrows to the docking  01:45:00

21      bays on this product, as you understand it.

22              MR. HANLE:  Objection; lacks foundation.

23              But you can go ahead.

24      BY MR. HASAN:

25          Q    And would you please point to the male DC   01:45:31

                                                    Page 120

Exhibit L
Page 170

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1    you circled is the base in view of your words

2    regarding the state of the spire?

3       A   No.

4       Q   Excuse me.  I misspoke.

5           Do you want to change your indication of the    02:02:36

6    base, as you've written and circled it there, in

7    view of your words regarding the base of the spire?

8       A   No, I do not.

9       Q   Okay.  Now, you -- you believe that the

10   docking bays are also the female ports?  Those are   02:02:55

11   docking bays?

12          MR. HANLE:  Objection; vague and lacks

13   foundation.

14          THE DEPONENT:  Inasmuch as they can also be

15   called receptacles.                                  02:03:07

16   BY MR. HASAN:

17      Q   Are those docking bays?  I mean, you wrote

18   lines to them.

19          MR. HANLE:  Same objections.

20          THE DEPONENT:  Docking bay receptacle.        02:03:15

21   BY MR. HASAN:

22      Q   But you stand by your -- your depiction that

23   docking bays not only refers to the plastic

24   components, the see-through with the -- with -- and

25   the female DC ports?                                 02:03:34
```

Page 135

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1          MR. HANLE:  Objection; vague and lacks

 2     foundation.

 3          THE DEPONENT:  In that I would say that

 4     docking bay and receptacle are synonyms.

 5          The terms could apply to everything that I've    02:03:48

 6     illustrated in this picture.

 7     BY MR. HASAN:

 8        Q   And you drew -- you -- in your opinion there

 9     are four docking bays on a -- on the image in

10     Exhibit 35?                                           02:04:01

11          MR. HANLE:  Same objections.

12          THE DEPONENT:  One could define them as such.

13     BY MR. HASAN:

14        Q   How do you define them based on your

15     experience, sir?                                      02:04:06

16          MR. HANLE:  Objection; asked and answered.

17     Also vague.

18     BY MR. HASAN:

19        Q   Are they defined by the four lines?

20        A   To accept docking bay as the common term,     02:04:13

21     yes.

22        Q   Okay.  And did you -- okay.  So let's --

23     let's read -- read the sentence that starts "The

24     leading edge of the spire."

25        A   Can you point out where that is.               02:04:52
```

Page 136

# EXHIBIT M

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4

    NYKO TECHNOLOGIES INC., a

 5  California Corporation,

                                  No. CV12-03001

 6          Plaintiff,

 7      vs.

 8  ENERGIZER HOLDINGS, INC., a

    Missouri Corporation, EVEREADY

 9  BATTERY COMPANY, INC, a Delaware

    Corporation, and PERFORMANCE

10  DESIGNED PRODUCTS LLC, a

    California Limited Liability

11  Company,

12          Defendants.

13  _____

14

15      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16              ATTORNEYS' EYES ONLY

17

18      VIDEOTAPED DEPOSITION of THOMAS J. ROBERTS

19              San Diego, California

20              Tuesday, March 26, 2013

21                  Volume I

22  Reported by:

    Kae F. Gernandt

23  RPR, CSR No. 5342

24  Job No. 1635403

25  PAGES 1 - 331
```

                                                    Page 1

Exhibit M
Page 173

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | record. | 10:19:05 |
| 2 | A. Thomas John Roberts. | |
| 3 | Q. Mr. Roberts, what is your home address, | |
| 4 | please? | |
| 5 | A. 2010 Coronado View, Alpine, California. | 10:19:13 |
| 6 | Q. You understand you're here for a | |
| 7 | deposition in the case of Nyko Technologies vs. PDP | |
| 8 | and Energizer? | |
| 9 | A. Yes. | |
| 10 | Q. Let's start off with your background, | 10:19:38 |
| 11 | sir, your educational background. Would you please | |
| 12 | describe that for us? | |
| 13 | A. Graduated in design engineering and | |
| 14 | technology from Brigham Young University in 1987. | |
| 15 | Q. What kind of work experience did you | 10:19:59 |
| 16 | have after that? | |
| 17 | A. Worked for General Dynamics in aerospace | |
| 18 | engineering, and subsequently Hughes Aircraft | |
| 19 | acquired them, so I worked for them until 1994. | |
| 20 | Q. What were your responsibilities for | 10:20:20 |
| 21 | General Dynamics and Hughes generally? | |
| 22 | A. Design, electromechanical design, | |
| 23 | electrooptical design, engineering, analysis, test. | |
| 24 | Q. You mentioned 1994. Did you take a new | |
| 25 | position at that time? | 10:20:36 |

Page 11

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1          A.    Yes.                                        10:20:37

2          Q.    What did you do?

3          A.    I came to Mad Catz, which is a video

4    game accessory company.

5          Q.    Did you found Mad Catz?              10:20:49

6          A.    You'll need to define "found."  But no,

7    I was not an initial investor.

8          Q.    What was your role with Mad Catz when

9    you joined?

10         A.    Primarily operational and product    10:21:06

11   development-related manufacturing design.

12         Q.    What type of products did you develop?

13         A.    Video game accessory products,

14   controllers, battery packs, cases, things like that.

15         Q.    How long were you with Mad Catz?      10:21:25

16         A.    Till 2004.

17         Q.    What happened in 2004 that led you to

18   leave Mad Catz?

19         A.    Mad Catz was acquired by Games Trader,

20   which is a company in Canada, and I had a contract   10:21:50

21   still, and that was when my contract expired.

22         Q.    Were you an employee of Mad Catz?

23         A.    Yes.

24         Q.    You mentioned your contract.  Would you

25   please describe your contract?  Was that an         10:22:07

                                                  Page 12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    employment contract or some other contract?        10:22:09

 2         A.   Yeah, it was an employment contract.

 3         Q.   You had an employment contract for a

 4    fixed time?

 5         A.   Yes.                                       10:22:17

 6         Q.   And it expired at the time that Mad Catz

 7    was acquired?

 8         A.   Well, it was -- it was -- it was a --

 9    yeah, that's true.  It expired when I left, but it

10    was basically time to move on for me.  So, I let    10:22:28

11    it -- I worked through my contract, and then I left

12    the company.

13         Q.   And where did you move?

14         A.   I ran a company for a little over a

15    year, Quasimodo.                                     10:22:46

16         Q.   And what was the business of Quasimodo?

17         A.   It was video arcade systems related to

18    video games, in-home arcade systems.

19         Q.   And what were your responsibilities for

20    Quasimodo?                                           10:23:02

21         A.   Basically the same.  Just build a

22    company from, you know, early start, develop

23    product, establish distribution channels, market and

24    sell, distribute, ship it, warehouse it,

25    manufacture.  Pretty much small business, whole      10:23:28
```

Page 13

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    thing, you know.  Many hats.                    10:23:31

 2         Q.   When did you leave Quasimodo?

 3         A.   I don't have a clear recollection.  It

 4    was sometime in 2005.

 5         Q.   Where did you go?                       10:23:46

 6         A.   PDP.

 7         Q.   What was your position at PDP when you

 8    began?

 9         A.   It was chief technical officer, senior

10    EVP, same as it is today.                        10:24:02

11         Q.   What were your responsibilities when you

12    began at PDP?

13         A.   Essentially the same.  Primarily

14    product-development related, manufacturing,

15    engineering.                                     10:24:39

16         Q.   Have your responsibilities changed since

17    then?

18         A.   Not particularly.  We've grown, so roles

19    have, you know, grown as well.

20         Q.   But you're essentially still involved in 10:25:00

21    product development, manufacturing, engineering,

22    operations and the like?

23         A.   Yeah.

24         Q.   Have you heard of Nyko Technologies,

25    Inc.?                                            10:25:27
```

Page 14

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1            A.   Yes, I do.                         10:33:46

 2            Q.   You also worked for Mad Catz and

 3     Quasimodo for approximately ten years in which you

 4     designed and developed video games and accessories?

 5            A.   Very few video games, but primarily  10:34:05

 6     accessories.

 7            Q.   You -- have you played video games?

 8            A.   Not very much.

 9            Q.   And from 2005 onward, you've been the

10     chief technical officer of PDP, and in that position  10:34:17

11     you have developed video game accessories?

12            A.   Yes.

13            Q.   Would PDP put somebody in as chief

14     technical officer if they didn't have skill and

15     understanding in the area of video game accessories?  10:34:36

16            MR. HANLE:  Objection.  Vague, lacks

17     foundation.

18            THE WITNESS:  I wouldn't think so.

19     BY MR. HASAN:

20            Q.   You believe you have skill in the art of  10:34:50

21     video game accessories, correct?

22            MR. HANLE:  Objection.  Vague, and lacks

23     foundation, asked and answered.

24     BY MR. HASAN:

25            Q.   Sir?                                10:34:57
```

                                                      Page 22

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1        A.    Some level of skill, yes.                10:34:59

2        Q.    Do you have any understanding of why PDP

3   hired you as chief technical officer?

4        A.    Yeah, I think so.

5        Q.    And --                                    10:35:25

6        A.    Because of what we've been discussing.

7        Q.    And what's that?

8        A.    Experience and level of skill, ability.

9        Q.    In designing and developing video game

10  accessories, among other things?                     10:35:41

11       A.    Yes.

12       Q.    Do you have approximately 18 years of

13  direct experience in the video game segment of the

14  consumer electronics industry?

15            MR. HANLE:  Objection.  Vague.             10:36:15

16            THE WITNESS:  Approximately, yes.

17  BY MR. HASAN:

18       Q.    What is the video game segment of the

19  consumer electronics industry?

20       A.    It's the part of the consumer electronic  10:36:28

21  industries that addresses the video game market.

22       Q.    What do you mean by "addresses the video

23  game market"?

24       A.    Attempts to provide products that would

25  satisfy the demand for the video game consumer.      10:36:47

                                                Page 23

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    understanding.                                    10:51:29

 2         A.   That's an example of a docking bay:  The

 3    spine docks in the base.

 4         Q.   So, can you point to that for the

 5    camera, what you were saying about what you think  10:51:37

 6    the docking bay is?

 7         MR. HANLE:  Objection.  Vague,

 8    mischaracterizes testimony.

 9         THE WITNESS:  Where this attaches, it docks.

10    BY MR. HASAN:                                     10:51:50

11         Q.   So, you're saying that that stem docks

12    to the bottom?

13         A.   Yes.

14         Q.   That's a docking bay?

15         MR. HANLE:  Objection.  Vague, lacks         10:51:56

16    foundation.

17         THE WITNESS:  Could be.  It depends on your

18    definition of docking bay.

19    BY MR. HASAN:

20         Q.   Sir, you have 18 years of experience in  10:52:02

21    the video game industry; is that right?

22         A.   That's correct, as I said earlier.

23         Q.   What is your -- what is your

24    understanding of a docking bay?

25         MR. HANLE:  Objection.  Vague, lacks         10:52:14
```

Page 35

Exhibit M
Page 180

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
1    foundation.                                      10:52:15

2          MR. HASAN:   If you have one.

3          MR. HANLE:   Assumes facts not in evidence.

4          THE WITNESS:   Something that accepts a --

5    another item.                                     10:52:23

6    BY MR. HASAN:

7          Q.   The clear plastic there, would you hold

8    that up and point to the clear plastic parts?

9          A.   (Witness complying.)

10         Q.   And there's another one too, correct?   10:52:33

11         A.   There's two, yeah.

12         Q.   What is the purpose of those in the

13   accused device?

14         A.   To hold the controller when it's

15   charging.                                         10:52:47

16         Q.   Are each of those docking bays?

17         MR. HANLE:  Objection.  Vague, lacks

18   foundation.

19         MR. HASAN:  In your understanding of the

20   term.                                             10:52:53

21         MR. HANLE:  Calls for a legal conclusion.

22         THE WITNESS:  It depends on what you --

23   again, it depends on what you mean by "docking bay."

24   It accepts the controller.

25   /  /  /
```

Page 36

Exhibit M
Page 181

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1            Q.   If somebody had referred to it as a          10:57:23

 2    "charge base," that would be inaccurate?

 3            MR. HANLE:  Objection.  Incomplete

 4    hypothetical, vague.

 5            THE WITNESS:  Again, it would depend on the        10:57:31

 6    selection of the terms, I think.  Somebody may refer

 7    to it as that.  I -- I don't think I would.

 8    BY MR. HASAN:

 9            Q.   In your understanding of the term

10    "base," that is a structure upon which another           10:57:47

11    object rests; is that right?

12            MR. HANLE:  Objection.  Vague.

13            THE WITNESS:  Yeah.

14    BY MR. HASAN:

15            Q.   When the controllers are within the          10:58:04

16    plastic structures, those controllers are being

17    supported by the charger; is that right?

18            MR. HANLE:  Objection.  Vague.

19            THE WITNESS:  They're being supported by the

20    charger as a whole, yeah.                                 10:58:31

21    BY MR. HASAN:

22            Q.   In that respect, the charger as a whole

23    is a base because it is supporting the controllers?

24            MR. HANLE:  Is there a question, Counsel?

25    /  /  /
```

Page 41

Exhibit M
Page 182

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. HASAN: | 10:58:46 |
| 2 | Q.   Is that right? | |
| 3 | MR. HANLE:  Objection.  Lacks foundation, | |
| 4 | calls for a legal conclusion, vague, misstates his | |
| 5 | testimony. | 10:58:50 |
| 6 | THE WITNESS:  I would say not directly. | |
| 7 | It -- it -- the base supports part of the charger. | |
| 8 | BY MR. HASAN: | |
| 9 | Q.   Explain how the base supports part of | |
| 10 | the charger? | 10:59:07 |
| 11 | A.   Well, this is a part of the charger. | |
| 12 | This is -- I would -- I would use "base" for | |
| 13 | describing this piece here (indicating). | |
| 14 | Q.   You swear by it, that that is accurate, | |
| 15 | to the best of your knowledge? | 10:59:25 |
| 16 | MR. HANLE:  Objection.  Vague. | |
| 17 | THE WITNESS:  Yes, yeah. | |
| 18 | MR. HASAN:  Take a look at what's been marked | |
| 19 | as Exhibit 73, sir. | |
| 20 | (Deposition Exhibit 73 marked for | 11:00:02 |
| 21 | identification.) | |
| 22 | MR. HASAN:  I believe this has been produced, | |
| 23 | but we printed it out yesterday so you can see that | |
| 24 | it's still there. | |
| 25 | /  /  / | |

Page 42

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    BY MR. HASAN:                                          11:00:18

2         Q.    This is -- this is a description of the

3    accused product on the PDP.com website; is that

4    correct?

5         A.    It looks like it, yes.                      11:00:31

6         Q.    Is PDP.com the website that is run by

7    PDP?

8         A.    Yes.

9         Q.    And is the product that is described

10   there, the Energizer Power & Play for PS3 Charging      11:00:47

11   System, that's the accused product?

12        A.    It looks like it is, yeah.

13        Q.    Then it says "Product Description."  Do

14   you see that?

15        A.    Yes.                                         11:01:04

16        Q.    Read the product description, please,

17   the first two sentences, out loud.

18        A.    "In just 2.5 hours, the Energizer

19   Power & Play Charging System for PS3 charges up to

20   two controllers and your headset simultaneously.        11:01:33

21   The charge base offers a sleek and unique design

22   that is impressive and functional."

23        Q.    You see the reference to "charge base"

24   over there?

25        A.    Yes.                                         11:01:55

Page 43

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1        Q.   Okay.   That's referring to the accused        11:01:55

2   device, correct?

3        MR. HANLE:   Objection.   Vague, lacks

4   foundation.

5        THE WITNESS:   Yes.                                 11:02:05

6   BY MR. HASAN:

7        Q.   Do you believe it's a mistake that this

8   product description is referring to the entire

9   accused device as a charge base?

10       MR. HANLE:   Objection.   Vague and lacks           11:02:36

11  foundation.

12  BY MR. HASAN:

13       Q.   Or not?

14       MR. HANLE:   Objection.   Vague and lacks

15  foundation.                                              11:02:42

16       THE WITNESS:   Again, I -- I -- it's not

17  terminology that I would use, but it's obviously a

18  term that a marketing guy would use, using -- making

19  the website.

20  BY MR. HASAN:                                            11:03:01

21       Q.   To be clear then, it's your testimony

22  that a marketing guy making the website chose to

23  refer to the entire device as the "charge base"?

24       MR. HANLE:   Objection.   Lacks foundation,

25  calls for speculation.                                   11:03:12

Page 44

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1          Q.   What is the sleek and unique design of          11:17:35

2    the charge base referred to in the website?

3          MR. HANLE:  Objection.  Lacks foundation,

4    calls for speculation.

5          MR. HASAN:  Let me ask you this.  Let me          11:17:53

6    withdraw that.

7    BY MR. HASAN:

8          Q.   Do you have an understanding of what the

9    sleek and unique design that is offered by the

10   charge base is, as described in the PDP website?          11:17:59

11         A.   What is -- could you repeat the

12   question?

13         MR. HASAN:  Would you read the question,

14   please.

15              (The record was read.)          11:18:17

16         THE WITNESS:  I think just the overall

17   product as a whole is -- is sleek and unique, you

18   know.

19              Have you ever seen anything look like

20   this?          11:18:44

21   BY MR. HASAN:

22         Q.   Is there anything else?

23         MR. HANLE:  Objection.  Vague.

24         THE WITNESS:  No.  I think as a -- as a -- as

25   a whole, it's -- it's -- it's sleek.  Again, very          11:18:53

Page 54

Exhibit M
Page 186

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  Again, I think it depends on      11:20:44
 2    who may be describing it.
 3    BY MR. HASAN:
 4            Q.   Under --
 5            A.   I wouldn't refer to them that way.         11:20:52
 6    That's just me.
 7            Q.   Would it be incorrect, in your
 8    understanding, to refer to the plastic portions as
 9    docking bays?
10            MR. HANLE:  Objection.  Asked and answered.    11:21:03
11            THE WITNESS:  Not -- not necessarily
12    incorrect, no.
13    BY MR. HASAN:
14            Q.   Why wouldn't it be incorrect?
15            MR. HANLE:  Objection.  Lacks foundation,      11:21:10
16    vague, calls for a legal conclusion.
17            THE WITNESS:  Again, it sort of depends on
18    how you define certain mechanical features.  And in
19    the truest sense, you know, a docking bay, to me,
20    implies sort of gravitational component to it rather  11:21:32
21    than a -- you know, which is a vertical component
22    rather than a horizontal component, which this is.
23    BY MR. HASAN:
24            Q.   So -- so, a docking bay, in your
25    opinion, has to be vertical --                         11:21:48
```

Page 56

Exhibit M
Page 187

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    question?  I --                                    11:23:46

 2          MR. HASAN:  Make your objection.

 3          MR. HANLE:  -- didn't want to interrupt you.

 4          MR. HASAN:  Make your objection.  Go ahead.

 5          MR. HANLE:  Okay.  It's objection.  Vague and   11:23:49

 6    incomplete hypothetical, misstates the testimony,

 7    lacks foundation.

 8          THE WITNESS:  You'll have to reread the

 9    question.

10              (The record was read.)                   11:23:57

11          MR. HANLE:  I'm looking at the record.

12    There's three questions after that.  So, I mean, if

13    we're going back to that question, I'm happy for him

14    to answer that question.  I'm looking at the record.

15    You asked questions that -- your question continued  11:24:27

16    to go on after that.

17              Can you answer that question?

18          THE WITNESS:  The three questions ago, "In

19    this respect," that one?

20          MR. HASAN:  Okay.  All right.  All right.      11:24:40

21    BY MR. HASAN:

22      Q.   The video game controllers dock in these

23    plastic portions of the accused product as you

24    understand it; is that correct?

25          MR. HANLE:  Objection.  Vague, lacks           11:24:57
```

Page 60

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    foundation, misstates his testimony.                    11:24:58

2         THE WITNESS:  If you define it that way, then

3    I can certainly use that terminology.

4    BY MR. HASAN:

5         Q.   Do you believe that definition is            11:25:08

6    incorrect?

7         MR. HANLE:  Objection.  Asked and answered.

8         THE WITNESS:  Not necessarily.

9    BY MR. HASAN:

10        Q.   Can you explain to me anything that's         11:25:25

11   incorrect about that definition?

12        MR. HANLE:  Objection.  Vague.

13        THE WITNESS:  Again, for me, my experience

14   is -- is a dock has a -- has a gravitational

15   component.  It's almost like I would want this to be    11:25:47

16   mounted this way (indicating), so it can sit in

17   there.  So, that's my -- that's my --

18        MR. HASAN:  Show it to the camera so we can

19   explain what you're --

20        THE WITNESS:  In this way.  So, if you want        11:26:06

21   to refer to it as docking, I can accept that.

22   BY MR. HASAN:

23        Q.   But in your mind, though, it's docking

24   if it were turned sideways?

25        A.   Again, that's the essence of the term         11:26:18

                                                    Page 61

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    fine.  But for me, it -- it's more of a -- it's more    11:27:16

 2    of a mount.  This is the technical terminology I

 3    would use.

 4         Q.   The definition of "docking bay," then,

 5    depends on the orientation of the plastic portions?     11:27:30

 6         MR. HANLE:  Objection.  Lacks foundation.

 7         THE WITNESS:  It could.  It could.

 8    BY MR. HASAN:

 9         Q.   That's the -- that's the definition that

10    you believe?                                           11:27:42

11         MR. HANLE:  Objection.  Vague, misstates his

12    testimony.

13         THE WITNESS:  Yeah.

14    BY MR. HASAN:

15         Q.   But it would not be incorrect to state       11:27:48

16    that the plastic portions in the regular orientation

17    of this charge base are docking bays?

18         A.   It --

19         MR. HANLE:  Objection.  Lacks foundation,

20    calls for a legal conclusion.                          11:28:04

21              Just wait for him to finish so I can

22    object, and then you can answer.

23         THE WITNESS:  It would not be incorrect.

24         MR. HASAN:  Okay.  Let me move you to a

25    different topic, sir.                                  11:28:14
```

Page 63

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1            MR. HANLE:  Is now a good time for a short      11:28:17

 2  break?

 3            MR. HASAN:  Sure.

 4            MR. HANLE:  Thank you.

 5            THE VIDEOGRAPHER:  Going off the record.  The    11:28:21

 6  time is 11:28 a.m.

 7                 (A brief recess was taken.)

 8            THE VIDEOGRAPHER:  Back on the record.  The

 9  time is 11:37 a.m.

10            MR. HASAN:  Let's show you what's been marked    11:44:07

11  as Exhibit 74.

12                 (Deposition Exhibit 74 marked for

13  identification.)

14            THE VIDEOGRAPHER:  I'm sorry.  Did I say

15  11:37?  I meant to say 11:44.  Sorry about that.         11:44:19

16  BY MR. HASAN:

17       Q.   Do you recognize this document?

18       A.   It looks like it's the -- it's the user

19  guide for the Xbox version of the charging system.

20       Q.   That's the Xbox version of the accused         11:44:55

21  product; is that right?

22       A.   It's the user guide, yeah.  I think.

23  Yeah, not from the website.  I mean, it's not a web

24  page.

25       Q.   Exhibit 74 is the user guide for the           11:45:17
```

Page 64

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1   Xbox version of the accused product; is that right?   11:45:21

2        A.   Yes.

3        Q.   That is not something that you

4   understand is part of the website, is it?

5        A.   I think you can download it from the   11:45:31

6   website, but I'm not sure.

7        Q.   And let me take it from you for one

8   second.

9             The reference to PL-3628, is that the

10  part number that PDP uses for the Xbox version of   11:46:15

11  the accused product?

12       A.   Yes.

13       Q.   Do you know what the part number that --

14  strike that.

15            This user guide explains how to use the   11:46:38

16  charging system?

17       A.   Yes.

18       Q.   That's what it says, right?

19       A.   Yes.

20       Q.   What is shown in -- let me strike that.   11:46:47

21            And there are -- there are pictures, if

22  you will, that illustrate, for example, plugging in

23  the accused product?

24       A.   Yes, uh-huh.

25       Q.   Would you hold that up for the camera.   11:47:07

Page 65

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    On the left there of the -- there is --                11:47:10

2         A.   Oh, right there.

3         Q.   -- there are depictions of the -- how to

4    use the accused product; is that correct?

5         A.   Yes.                                          11:47:20

6         Q.   Okay.  The first one shows a plug, the

7    second one shows some rechargeable batteries; is

8    that right?

9         A.   The bottom of the controller, is that

10   the part you're talking about?                          11:47:32

11        Q.   Yes.

12        A.   Yeah.

13        Q.   Would you read the -- read the

14   instruction marked 3?

15        A.   Uh-huh.                                       11:47:40

16        Q.   Please read it out loud.

17        A.   "Firmly press the Xbox 360 controller

18   onto one of the charging system's docking points."

19        Q.   What are the docking points that are

20   being referenced here, if you understand?              11:47:55

21        A.   It looks like it's depicted by the arrow

22   in the picture.

23        Q.   Would you please turn that for the

24   camera and show that.  Please -- please raise it a

25   bit.  Let's zoom in on that.  Raise it just a bit,     11:48:17

Page 66

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1      Mr. Roberts.                                              11:48:24

2             In the depiction that you're holding

3      there, there's an arrow at the bottom left

4      depiction.  That is the reference to the docking

5      point, in your understanding; is that correct?      11:48:35

6             A.   That is correct.

7             Q.   Let me ask you this question:  Who

8      prepares this user's manual?

9             A.   I don't know who.  It would have -- I

10     don't know.                                            11:49:00

11            Q.   It's prepared by someone at PDP,

12     correct?

13            A.   Probably.

14            Q.   Is it important for user's manuals that

15     accompany the accused products to be correct, in    11:49:10

16     your opinion?

17            A.   Yes.

18            Q.   Is this user's manual, to your

19     understanding, correct from your standpoint?

20            MR. HANLE:   Objection.  Vague.              11:49:23

21            THE WITNESS:   I think it's correct in its

22     intended purpose, which is to show you how to use

23     it.

24     BY MR. HASAN:

25            Q.   Does PDP intend to confuse its customers  11:49:34

                                              Page  67

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    when it gives instructions on how to use its          11:49:37

2    products?

3            A.    Does not intend to.

4            Q.    PDP wants to be clear, does it not, when

5    it instructs its users how to use its products?        11:49:44

6            A.    PDP wants to be clear.

7            Q.    Instruction 3 shows clearly how the Xbox

8    360 controller is put into the docking point, right?

9        MR. HANLE:    Objection.    Vague.

10       THE WITNESS:    As I read it before, yeah.         11:50:14

11   BY MR. HASAN:

12           Q.    This user's manual appears to be in a

13   few different languages?

14           A.    Yeah, it appears to be.

15           Q.    Do you understand any Spanish?          11:50:32

16           A.    Not very much.

17           Q.    On the right side where the instructions

18   appear to be in Spanish, do you see that?

19           A.    Uh-huh.

20           Q.    You see next to No. 1?                   11:50:57

21           A.    Yes.

22           Q.    You see the statement "posterior de la

23   base"?

24           A.    In No. 1?

25           Q.    Yes.                                     11:51:18

Page 68

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
1              MR. HANLE:  Objection.  Compound, vague.        11:54:25

2              THE WITNESS:  I think the picture is

3      accurate, and I think if you -- if -- I think the

4      language is subject to interpretation.

5      BY MR. HASAN:                                          11:54:40

6              Q.   By whom?

7              A.   By the user.

8              Q.   The consumer?

9              A.   Yeah.

10             Q.   The consumer may or may not agree that    11:54:46

11     that would be a docking point shown by the arrow?

12             A.   It would depend on their definition.

13             Q.   They shouldn't rely on what PDP is

14     saying?

15             MR. HANLE:  Objection.  Vague.                 11:54:58

16     BY MR. HASAN:

17             Q.   Is that your testimony?

18             MR. HANLE:  Objection.  Vague.

19             THE WITNESS:  You do the best you can to --

20     to show how the thing works, as a --               11:55:05

21     BY MR. HASAN:

22             Q.   Do you have any understanding of why

23     somebody at PDP would put into the user's manual of

24     the accused device the term "docking point" to

25     explain how to put the controller into the plastic    11:55:21
```

Page 72

Exhibit M
Page 196

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    portions?                                                11:55:24

2           MR. HANLE:   Objection.   Calls for

3    speculation.

4           THE WITNESS:   I'm sorry.   Why PDP would want

5    to do that, did you say?                                 11:55:32

6           MR. HASAN:   Would you reread the question,

7    please.

8              (The record was read.)

9           MR. HANLE:   That's objection.   Calls for

10   speculation.                                             11:55:51

11          THE WITNESS:   Again, I could see, based on

12   this, that -- why they would do that.

13   BY MR. HASAN:

14          Q.   Is it inaccurate?

15          MR. HANLE:   Asked and answered.                  11:56:02

16          THE WITNESS:   It -- yeah, if that's your

17   terminology, then it would be accurate.

18   BY MR. HASAN:

19          Q.   That's PDP's terminology?

20          A.   Yes.                                         11:56:12

21          Q.   As in the user's manual, correct?

22          A.   Yes.

23          Q.   Okay.   Let's move on to the -- is it

24   true that as -- let me strike that.

25              Is it true that as new and different      11:56:32

                                                        Page 73

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Are those -- are those structures the | 11:57:49 |
| 2 | only way you could charge a controller? | |
| 3 | A.   What do you mean -- are you talking | |
| 4 | about the mini USB connector? | |
| 5 | Q.   I'm talking about the structure of the | 11:58:08 |
| 6 | plastic with the -- with the port in between it. | |
| 7 | A.   Do you -- do you mean the shape? | |
| 8 | Q.   Yes. | |
| 9 | A.   You could make the shape any shape you | |
| 10 | want, I think, as long as it fit around the | 11:58:26 |
| 11 | first-party controller. | |
| 12 | Q.   And you can -- you can make it fit in | |
| 13 | different ways; is that right? | |
| 14 | A.   Yeah.  You could make it bigger or | |
| 15 | smaller, thicker, you know. | 11:58:39 |
| 16 | Q.   And -- and the -- the port's there | |
| 17 | within the plastic structures? | |
| 18 | A.   What do you mean by "port"? | |
| 19 | Q.   Do you know what a port is? | |
| 20 | A.   I know what I think a port is, yes. | 11:58:55 |
| 21 | Q.   What do you think a port is? | |
| 22 | MR. HANLE:   Objection.  Vague and lacks | |
| 23 | foundation. | |
| 24 | BY MR. HASAN: | |
| 25 | Q.   Based on your 18 years of experience -- | 11:59:05 |

Page 75

Exhibit M
Page 198

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    let me strike that.                                   11:59:06

 2              Based on your 18 years of experience in

 3    designing and developing video game accessories,

 4    what do you believe a port is --

 5         MR. HANLE:  Objection.  Vague.                    11:59:15

 6    BY MR. HASAN:

 7         Q.   -- Mr. Roberts?

 8         MR. HANLE:  Objection.  Vague and lacks

 9    foundation.

10         THE WITNESS:  A port is something that            11:59:21

11    accepts something else.

12    BY MR. HASAN:

13         Q.   What do you mean by "accept"?

14         A.   Fits to.

15         Q.   Fits into?                                   11:59:30

16         A.   Fits to.  I mean, that's -- that's my

17    question for you, what you meant.  Do you mean the

18    USB?  Sometimes that's referred to as a "port."  Or

19    do you mean the plastic?

20         Q.   I was just asking you about what you         11:59:47

21    believe a port is.

22         A.   Oh, okay.  So, I've answered.

23         Q.   It's your -- it's your understanding

24    that a port is something that something else fits

25    to?                                                   11:59:59
```

                                                            Page 76

                    Veritext National Deposition & Litigation Services
                              866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1          MR. HANLE:   Objection.   Vague and lacks      11:59:59

2    foundation, misstates his testimony.

3          THE WITNESS:   Yeah, that would be part of the

4    definition.

5    BY MR. HASAN:                                        12:00:05

6          Q.   What else is part of it?

7          MR. HANLE:   Same objections.

8          THE WITNESS:   It depends on the context.

9    BY MR. HASAN:

10         Q.   How about in the context of a charger     12:00:11

11   for a video game controller?

12         A.   It would be how you connect.

13         Q.   How you connect what?

14         A.   The item that you're trying to charge.

15         Q.   How do you connect it to what?            12:00:27

16         A.   To the USB.

17         Q.   Is this USB one example of a port?

18         A.   It could be if that's your choice of

19   term.

20         Q.   No.   I'm asking -- sir, you on keep      12:00:43

21   talking about my choice of term --

22         A.   I'm just trying to understand your --

23         MR. HANLE:   Just wait.   Let him ask a

24   question, and answer the question.

25   / / /

                                              Page 77

```
 1    BY MR. HASAN:                                    12:00:53

 2         Q.   I'm asking you to explain, based on your

 3    understanding.  Okay?  And if you don't have an

 4    understanding, you can let me know.  I just want the

 5    record to be clear.                               12:00:59

 6         A.   Uh-huh.

 7         MR. HASAN:  Do you have an objection?

 8         MR. HANLE:  There's no question.  So, I

 9    was -- I was waiting for a question.

10         MR. HASAN:  Right.  Okay.                    12:01:08

11    BY MR. HASAN:

12         Q.   Is this USB port on the accused device a

13    port?

14         A.   You call it a port.  I -- I -- for me,

15    it would be probably the -- the female part of that,   12:01:22

16    for the USB connector.

17         Q.   Your understanding of a port is

18    something that connects to something else; is that

19    right?

20         A.   Yeah.                                   12:01:36

21         Q.   Does this mini USB connect into the

22    controller?

23         A.   Yes.

24         Q.   And because it connects into the

25    controller, this is a port on the accused device   12:01:49
```

Page 78

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    under your understanding; is that right?              12:01:53

2            MR. HANLE:  Objection.  Asked and answered.

3            THE WITNESS:  Again, you could refer to it

4    that way, yes.

5    BY MR. HASAN:                                         12:02:03

6            Q.   Would it be incorrect, based on your

7    18 years of experience, to refer to it that way?

8            MR. HANLE:  Objection.  Lacks foundation.

9            THE WITNESS:  It would not be incorrect.

10   BY MR. HASAN:                                         12:02:11

11           Q.   Okay.  This port, to charge a

12   controller, can be on a wire or cable; is that

13   right?

14           A.   It could be.

15           Q.   As a matter of fact --                   12:02:39

16           A.   But I wouldn't call it a port in that

17   case.  But it could be a wire.  You could charge the

18   controller with a wire.

19           Q.   Okay.  But the -- the wire would not be

20   a port -- the end of the wire would not be a port?   12:02:49

21           MR. HANLE:  Objection.  Vague, lacks

22   foundation.

23   BY MR. HASAN:

24           Q.   In your understanding, sir, would -- let

25   me strike that.                                       12:02:56

Page 79

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  I would be speculating on how      02:58:42

 2     it operates, and I don't know how the Nyko piece

 3     operates.

 4     BY MR. HASAN:

 5            Q.   If it -- if it has a -- a male port that    02:58:49

 6     mates with the female port on the controller in the

 7     Nyko charge base, based on your experience, would

 8     that be the same as the concept design of the

 9     accused product?

10            MR. HANLE:  Objection.  Incomplete              02:59:12

11     hypothetical, lacks foundation, calls for

12     speculation, vague.

13            THE WITNESS:  If it does have that, that part

14     of it would be similar to the -- the product in

15     question.                                              02:59:27

16     BY MR. HASAN:

17            Q.   The accused product, right?

18            A.   (The witness nods head.)

19            Q.   Yes?

20            A.   Yeah.                                       02:59:32

21            Q.   Okay.  And in this Nyko charge base, you

22     can see here this has docking bays, doesn't it?

23            MR. HANLE:  Objection.  Calls for

24     speculation, lacks foundation, vague.

25            THE WITNESS:  We'll have to go back to the       02:59:51
```

                                                    Page 158

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1   docking bay exchange, but that's where -- it appears   02:59:52

 2   from the drawing here, the picture here, that that's

 3   meant to accept the controller.  So, if -- if you

 4   want to refer to it as a docking bay, I will accept

 5   that.                                                   03:00:14

 6   BY MR. HASAN:

 7          Q.   In the same vein, the accused product

 8   has the docking bays that accept the controller to

 9   charge it.

10          MR. HANLE:  Is there a question?                03:00:30

11   BY MR. HASAN:

12          Q.   Is that right?

13          MR. HANLE:  Objection.  Vague, lacks

14   foundation, calls for speculation, asked and

15   answered multiple times.                               03:00:34

16          THE WITNESS:  It accepts the controller and,

17   in particular, where the connection needs to be made

18   to charge the controller, that's true.

19   BY MR. HASAN:

20          Q.   Okay.  And let me ask you about the --     03:00:45

21   take a look at Exhibit 72, sir, the accused product

22   here.

23          A.   Oh.

24          Q.   Okay.  Is that a video game controller

25   charging system?                                       03:01:21
```

Page 159

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 03:01:23 |
| 2 | Q.   How many wireless video game controllers | |
| 3 | can it charge at the same time? | |
| 4 | A.   Two.  Actually, let me correct that.  It | |
| 5 | can charge three, using the USB socket on the side | 03:01:35 |
| 6 | if you have a cable. | |
| 7 | Q.   And show the camera where the other two | |
| 8 | are. | |
| 9 | A.   Well, on this one, there's only one. | |
| 10 | Q.   You said it can charge up to three | 03:01:55 |
| 11 | controllers. | |
| 12 | A.   If you have a cable that can plug into | |
| 13 | this USB socket. | |
| 14 | Q.   Okay.  Where do the first two | |
| 15 | controllers get charged in the accused product? | 03:02:05 |
| 16 | A.   Up here, up here (indicating). | |
| 17 | Q.   Are you pointing to the plastic sections | |
| 18 | there with the USB port protruding from? | |
| 19 | A.   I am. | |
| 20 | Q.   Okay.  And on this one here, is there at | 03:02:16 |
| 21 | least one structure providing physical support to | |
| 22 | the plurality of video game controllers while | |
| 23 | they're -- while they're being charged? | |
| 24 | MR. HANLE:  Objection.  Vague, calls for a | |
| 25 | legal conclusion, lacks foundation. | 03:02:30 |

Page 160

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1          THE WITNESS:  The -- the support for the        03:02:37

 2     charging holder is actually supported by the base.

 3     So, standing alone, it can't support them.  But as

 4     a -- as a completed product, it supports two

 5     controllers that are mounted for charging.           03:02:54

 6     BY MR. HASAN:

 7          Q.   Please show the camera what provides the

 8     support for the two controllers.

 9          MR. HANLE:  Objection.  Vague.

10          THE WITNESS:  Again, there's multiple           03:03:06

11     components here.

12     BY MR. HASAN:

13          Q.   Which are they?

14          A.   We have the base.  We have what -- what

15     I would call the spine.  The controllers go into the  03:03:12

16     spine.  The base supports the spine.

17          Q.   And the spine supports the controllers

18     too?

19          A.   The spine is used to mount and accept

20     the controllers, yes.                                03:03:29

21          Q.   And the plastic see-through portions

22     over there, those support the controllers when

23     they're mounted?

24          A.   Yes, they do.

25          Q.   Okay.  Now, there are a -- where --        03:03:40

                                           Page 161
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1     there are DC ports on this accused device?          03:03:47

 2          MR. HANLE:  Objection.  Vague, lacks

 3     foundation.

 4          THE WITNESS:  There -- yeah.  There are

 5     contact points that are used to charge.             03:04:00

 6     BY MR. HASAN:

 7          Q.   Where are the DC ports on the accused

 8     device?

 9          MR. HANLE:  Objection.  Assumes facts not in

10     evidence.                                           03:04:07

11          THE WITNESS:  There's one in the back.

12     BY MR. HASAN:

13          Q.   Okay.  That one is the plug that goes to

14     the wall?

15          A.   That's correct.                           03:04:13

16          Q.   Where else --

17          A.   It accepts DC power.

18          Q.   Okay.  Where else is there a DC port, if

19     anywhere, too?

20          A.   This USB socket.                          03:04:20

21          Q.   Okay.  In addition to the socket on the

22     side and the one on the back, are there any other DC

23     ports on the accused product?

24          A.   The mini USB connectors are used to plug

25     the controllers into.                               03:04:39
```

                                                 Page 162

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1              Q.   Those are DC ports, correct?              03:04:41

 2         MR. HANLE:  Objection.  Lacks foundation,

 3    calls for a legal conclusion.

 4         THE WITNESS:  They provide DC power that,

 5    when connected to the controller --                     03:04:50

 6    BY MR. HASAN:

 7              Q.   Based on your 18 years --

 8              A.   -- can be charged.

 9         MR. HANLE:  You're interrupting him.  Let him

10    finish his answer, please.                              03:04:57

11         MR. HASAN:  I apologize.

12    BY MR. HASAN:

13              Q.   Based on your 18 years of experience,

14    are those USB ports male DC ports?

15         MR. HANLE:  Objection.  Calls for a legal          03:05:07

16    conclusion, lacks foundation.

17         THE WITNESS:  They can provide DC power.

18    They can.

19    BY MR. HASAN:

20              Q.   Are those DC ports, in your              03:05:18

21    understanding, based on your experience in the video

22    game segment of the consumer electronics, art?

23         MR. HANLE:  Same objections.

24         THE WITNESS:  Not -- not only DC.

25    /  /  /
```

                                                  Page 163

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    BY MR. HASAN:                                         03:05:30

2         Q.    Do they provide the function of being a

3    DC port?

4         A.    Yes, they do.

5         Q.    Okay.  Each one of them does, correct?    03:05:34

6         A.    Correct.

7         Q.    Okay.  Now, let me ask you this:  How

8    many docking bays are there on the accused product?

9         MR. HANLE:  Objection.  Assumes facts not in

10   evidence, vague, lacks foundation, calls for a legal  03:05:52

11   conclusion.

12        THE WITNESS:  Your term for "docking bay"?

13        MR. HASAN:  PDP's use of the term in the --

14   in the manual, the user manual we saw, for example.

15        MR. HANLE:  Misstates the record.  It didn't    03:06:09

16   say "docking bays."

17   BY MR. HASAN:

18        Q.    Based on your understanding, is it

19   incorrect for one to refer to each of the

20   see-through plastic portions surrounding the USB      03:06:19

21   port as docking bays?

22        MR. HANLE:  Objection.  Asked and answered

23   multiple times.

24   BY MR. HASAN:

25        Q.    Is that incorrect?                         03:06:29

                                              Page 164

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1           A.    You could refer to those as docking      03:06:30

 2     bays.

 3           Q.    Okay.   Let me -- is each of those

 4     docking bays able to accept the video game

 5     controllers?                                          03:06:42

 6           A.    Yes.   The Sony video game controller.

 7           Q.    And each of those plastic portions of

 8     the docking bays has a pair of opposite surfaces?

 9           MR. HANLE:   Objection.   Vague.

10           THE WITNESS:   I am not sure what you mean.     03:07:09

11     BY MR. HASAN:

12           Q.    Let me point to it.   This top part of

13     the docking bay --

14           A.    Uh-huh.

15           Q.    -- this is an opposite surface to the     03:07:16

16     bottom part of the docking bay, it --

17           MR. HANLE:   Objection.

18     BY MR. HASAN:

19           Q.    -- is that right?

20           MR. HANLE:   Objection.   Calls for a legal     03:07:23

21     conclusion, lacks foundation, vague.

22           THE WITNESS:   They're parallel surfaces.

23     BY MR. HASAN:

24           Q.    They're opposite one another too,

25     correct?                                              03:07:32
```

Page 165

Exhibit M
Page 210

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1          MR. HANLE:  Objection.  Vague.          03:07:33

2          THE WITNESS:  They are opposite -- again,

3    depending on the meaning, that they are opposite.

4    They're on another side -- either side of the

5    controller when it's mounted.          03:07:42

6    BY MR. HASAN:

7          Q.   And each of the docking bays has that --

8          A.   Yes.

9          Q.   -- that feature?  Okay.

10          Let me ask you this:  Do each of those          03:07:51

11    pairs of surfaces defines the docking bay in that

12    plastic see-through portion --

13          MR. HANLE:  Objection.  Vague.

14    BY MR. HASAN:

15          Q.   -- on the accused device?          03:08:16

16          MR. HANLE:  Objection.  Vague, lacks

17    foundation, calls for speculation, assumes facts not

18    in evidence.

19          THE WITNESS:  Could you repeat the question?

20          (The record was read.)          03:08:28

21          THE WITNESS:  They could contribute to the

22    definition, but they're not the only feature that

23    would allow and accept the controller.

24    BY MR. HASAN:

25          Q.   They contribute to the -- to the feature          03:08:50

Page 166

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    of the docking bay, correct?                        03:08:52

2              MR. HANLE:   Objection.   Vague, lacks

3    foundation.

4              THE WITNESS:   They do hold the controllers.

5    BY MR. HASAN:                                        03:08:58

6         Q.   Okay.   And the DC ports are disposed

7    between those --

8         A.   Disposed?

9         Q.   -- parallel surfaces.   Do you know what

10   "disposed" means?                                    03:09:14

11        A.   Yes.

12        Q.   Like a disposition.   You've heard of

13   that, right?   It's an engineering term?

14        A.   I think it's a legal term.   But --

15        Q.   Okay.   All right.   Let me -- let me back  03:09:23

16   it up 'cause I don't want to give you any -- I don't

17   want to -- the -- DC ports are located between these

18   parallel surfaces, right?

19        A.   That is correct.   The mini USB connector

20   is between the two surfaces you're pointing.          03:09:41

21        Q.   Okay.   Each of those docking bays are

22   supported by the base?

23        MR. HANLE:   Objection.   Lacks foundation,

24   calls for a legal conclusion.

25        THE WITNESS:   I would say they're supported    03:09:59

                                                    Page 167

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    portion --                                       03:10:50

 2         MR. HANLE:  Objection.

 3    BY MR. HASAN:

 4         Q.   -- of a charger?

 5         MR. BUCCIGROSS:  Objection.  Lacks           03:10:52

 6    foundation, vague, incomplete hypothetical.

 7    BY MR. HASAN:

 8         Q.   Is that your understanding?

 9         A.   I'd be speculating.  I don't believe the

10    video game industry would define "base" one way or   03:10:59

11    the other.

12         Q.   Let's assume, as we saw in the website,

13    for example, that the charger base is referring to

14    the entire accused product.  Remember we talked

15    about that?                                      03:11:17

16         A.   I remember.

17         Q.   Okay.  So, assuming that definition of

18    what a base is, then the docking bays are on the

19    base --

20         MR. HANLE:  Objection.                      03:11:28

21    BY MR. HASAN:

22         Q.   -- is that right?

23         MR. HANLE:  Objection.  Incomplete

24    hypothetical, calls for speculation.

25         THE WITNESS:  I think you're -- yeah, you're    03:11:37
```

Page 169

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    marketing may view it one way.  I don't view it that    03:12:24

 2    way.

 3    BY MR. HASAN:

 4        Q.   That's not my question.  In the view

 5    that is on the -- sorry.  Excuse me.              03:12:29

 6           In the definition that I gave you --

 7    forget about who gave it, okay?  It happens to be

 8    marketing.  But put that aside for a second, please,

 9    will you?

10        A.   Yes.                                     03:12:42

11        Q.   Okay.  If the base is meant to refer to

12    the entirety of the accused product, then the

13    docking bays are on the base, aren't they?

14           MR. HANLE:   Objection.  Misstates the record,

15    incomplete hypothetical, it's -- lacks foundation,   03:12:55

16    calls for a legal conclusion.

17    BY MR. HASAN:

18        Q.   Mr. Roberts?

19           MR. HANLE:   Asked and answered.

20           THE WITNESS:   If I accept your definition    03:13:04

21    that it all is the base, then yes, the mounts are on

22    the base.

23    BY MR. HASAN:

24        Q.   Thank you, sir.  Okay.

25           Let's move to the next area over here.    03:13:12
```

Page 171

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1          MR. HASAN:   The accused product.                03:14:08

2          THE WITNESS:  Who is in charge is -- I would

3     say the product manager.

4          MR. HASAN:  Okay.  Please take a look at this

5     document marked next in line, sir, as Exhibit 82.        03:14:44

6               (Deposition Exhibit 82 marked for

7     identification.)

8     BY MR. HASAN:

9          Q.   This document was produced by your

10    counsel here.  Is this -- what is this document?          03:14:54

11         A.   It's a technical description of the

12    charge system for the PlayStation 3 first-party

13    controller.

14         Q.   In this technical description, is this a

15    marketing document?                                       03:15:21

16         A.   It is not -- it is not a marketing

17    document, although marketing could pull some

18    information from it.

19         Q.   Marketing could pull information from

20    it?                                                       03:15:33

21         A.   Sure.

22         Q.   Okay.  And marketing also contributes to

23    the engineering aspects of this?

24         MR. HANLE:  Objection.  Vague.

25    /  /  /

Page 173

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1      BY MR. HASAN:                                              03:15:48

2            Q.    That's marketing's job, in your mind?

3            A.    No.

4            Q.    Okay.

5            A.    They -- they may contribute to certain        03:15:52

6      ways to implement features.

7            Q.    Okay.   They don't write this document,

8      do they?

9            A.    No.

10           Q.    This is -- this is -- this document was       03:16:00

11     approved by you?

12           A.    Yes.

13           Q.    You signed it?   You approved it?

14           A.    I didn't sign it, but my name is there.

15           Q.    Did you approve it, sir?   Your name is       03:16:15

16     on page 2?

17           A.    Yeah, I -- I -- I'm -- I approved it.   I

18     must have approved it, yeah.

19           Q.    Nobody -- nobody put your name on there

20     without your consent, did they?                           03:16:27

21           A.    No, no.

22           Q.    You, you approved this specification,

23     right?

24           MR. HANLE:   Asked and answered.   He said he

25     approved it.                                              03:16:38

Page 174

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1          THE WITNESS:   Yeah.                          03:16:39

2          MR. HASAN:   Okay, okay.

3     BY MR. HASAN:

4          Q.    And when you approve documents, you read

5     them carefully?                                    03:16:45

6          A.    I read them.

7          Q.    Okay.   And you, you want to make sure

8     that they're correct before you approve them?

9          A.    Fundamentally, I want to make sure

10    they're correct.                                   03:16:55

11         Q.    Okay.   All right.   Well, let's take a

12    look at the product description there on page 4.

13         A.    Okay.

14         Q.    And that's showing a picture of the

15    accused product, correct?                          03:17:10

16         A.    Yes.

17         Q.    Okay.   And above that picture, it talks

18    of product description?

19         A.    Yes.

20         Q.    Read the second sentence, please, under  03:17:17

21    "Product Description."

22         A.    "The charge base offers a sleek and

23    unique design that is impressive and functional."

24         Q.    Is that a mistake?

25         MR. HANLE:   Objection.   Vague.              03:17:29

                                          Page 175

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  No -- oh, sorry.              03:17:30

 2            MR. HANLE:  Go ahead.

 3            THE WITNESS:  No.

 4       BY MR. HASAN:

 5            Q.   This is referring to the charge base as   03:17:35

 6       the entire product?

 7            A.   Probably.

 8            Q.   Is that right, sir?

 9            A.   Probably.

10            Q.   And you approved this, right --        03:17:43

11            A.   Yes.

12            Q.   -- the document?

13            A.   Yes, yes.

14            MR. HASAN:  All right.  Let's move on.

15                 What exhibit number was that?         03:17:56

16            THE WITNESS:  82.

17            MR. HASAN:  Okay.  Let me show you another

18       document here that we'll have marked as Exhibit 83.

19                 (Deposition Exhibit 83 marked for

20       identification.)                                03:18:36

21       BY MR. HASAN:

22            Q.   This is electrical specifications this

23       time for the Xbox 360 version of the accused

24       product, correct?

25            A.   Correct.                              03:18:46
```

Page 176

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1        Q.    And there's a depiction of the accused          03:18:46

2   product on that second page --

3        A.    Yes.

4        Q.    -- of the document?

5        A.    Yes.                                             03:18:54

6        Q.    Let me borrow that for a second,

7   Mr. Roberts.   Thank you, sir.

8              And on September 27th, 2011, you

9   approved this document, this specification?

10       A.    Yes.                                             03:19:15

11       Q.    You made sure it was accurate when you

12  approved it?

13       A.    Fundamentally, yes.

14       Q.    Well, you --

15       A.    I'm not the author, and I don't rewrite         03:19:24

16  things.   But fundamentally I approved the content,

17  yes.

18       Q.    And if there's something that was wrong

19  with it, you would have corrected that in this

20  specification?                                             03:19:33

21       A.    Yes.

22       Q.    Okay.   So, let me turn your attention to

23  the product description over here under Section 2.

24  It's the general product description.   Do you see

25  that?                                                      03:19:48

Page 177

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1      A.    Uh-huh.                                          03:19:48

2      Q.    What's the last line say of that first

3  paragraph there that is describing the general

4  product description, sir?

5      A.    "The charge base offers a sleek and        03:19:57

6  unique design that is impressive and functional."

7      Q.    Is that -- is that a mistake?

8      A.    No.

9      Q.    Okay.  Is that referring again to the

10 entirety of the accused device, sir?                03:20:10

11     A.    I think that's one way you can interpret

12 that.

13     Q.    Okay.  And you approved this document,

14 right?

15     A.    Yes.                                       03:20:22

16     Q.    Okay.  Thank you, sir.

17           And in Exhibit 34, okay, it appears in

18 this document that Nyko is referring to the charge

19 base as the entire device, correct?

20           MR. HANLE:  Objection.  Calls for          03:20:52

21 speculation, lacks foundation.

22           THE WITNESS:  They use the word "base" in the

23 title of the product, yes.

24 BY MR. HASAN:

25     Q.    From the title of the product, it's your  03:21:01

Page 178

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1    understanding, looking at this, that this is          03:21:04

2    referring to the entire product?

3         MR. HANLE:   Objection.   Lacks foundation,

4    calls for speculation.

5    BY MR. HASAN:                                          03:21:13

6         Q.   Right?

7         A.   Looking at the picture of the product,

8    it looks like the product is the base, yes.

9         Q.   Okay.  Let's go back to Exhibit 80, sir.

10        A.   I have it.                                    03:22:09

11        Q.   Okay.  That's the one where Chiu

12   provided the concept for the accused device in

13   May 2007; is that right?

14        MR. HANLE:  Objection.  Misstates his

15   testimony.                                             03:22:23

16        THE WITNESS:  It's a record of the

17   communication between Chris and Chiu and me and

18   Chris.

19   BY MR. HASAN:

20        Q.   That was the document where, if you          03:22:36

21   turned to the next page, Chiu prevents -- presents a

22   depiction to Chris Richards, which then Chris

23   Richards forwards to you and all the product

24   managers that shows essentially the same depiction

25   of the accused device, correct?                        03:22:56

                                                    Page 179

Exhibit M
Page 221

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    BY MR. HASAN:                                    04:45:17

 2         Q.   Okay.   Is that current detecter

 3    electrically coupled to the DC ports?

 4         A.   It would all be part of the same

 5    circuit.                                         04:45:25

 6         Q.   So, is that a yes, that it's

 7    electrically coupled to the DC ports if it's part of

 8    the same circuit?

 9         A.   Well, "coupled" implies two parts.  The

10    circuit has more than two components, so I don't    04:45:45

11    know if it's exact use of the term "coupling."

12         Q.   What -- based on your understanding,

13    what does the -- what does the term "coupled to"

14    mean?

15         MR. HANLE:  Objection.  Lacks foundation,     04:45:57

16    calls for a legal conclusion.

17         THE WITNESS:  When two parts go together.

18    BY MR. HASAN:

19         Q.   And let me ask you this question now:

20    Does the accused device have an indicator that is    04:46:13

21    coupled to the current detecter to indicate the

22    charge status of the video game controller?

23         MR. HANLE:  Objection.  Lacks foundation,

24    calls for a legal conclusion, also vague.

25         THE WITNESS:  I believe it does.            04:46:34
```

Page 243

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1        A.   I think so.                              06:05:13

 2        Q.   Why?

 3        A.   'Cause you don't have to leave the

 4   console on.

 5        Q.   Why did PDP end up making the accused    06:05:20

 6   device with clear plastic on the docking bays?

 7        A.   As I recall, it -- it transmitted the

 8   LED indicators nicely.

 9        Q.   It also allows the user to see through

10   those transparent plastic portions and see the    06:05:50

11   controller suspended there in the charger; is that

12   right?

13        A.   You mean by looking through the clear?

14   Yeah, it's clear, so it would transmit whatever is

15   behind it.                                         06:06:09

16        Q.   And in the normal use, that would be the

17   controller inside of it?

18        A.   Right.

19        Q.   So, one of the -- one of the features is

20   that you could see the controller suspended on the 06:06:16

21   charger?

22        A.   Yeah.  But those don't need to be clear

23   to see the controllers connected.

24        Q.   Even if they -- if they weren't clear,

25   you could see the controllers connected?          06:06:31
```

Page 276

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1          A.   You could see that they are mounted,      06:06:35

 2     yeah.

 3          Q.   Is it a desirable feature, do you think,

 4     for the video game arch to be able to have a design

 5     that allows the wireless controllers to be mounted   06:06:47

 6     on the charger while they're being charged?

 7          A.   I think, from a beauty standpoint, but

 8     that's all opinion and conjecture.  I think it looks

 9     nice.

10          Q.   What is nice about it?                      06:07:12

11          A.   The lines, the shape.

12          Q.   What is nice about having the video game

13     controllers mounted on the base?

14          MR. HANLE:  Objection.  Vague as to the term

15     "base."                                              06:07:27

16          THE WITNESS:  It's a very subjective thing,

17     beauty.  I happen to think that this looks very

18     appealing when the controllers are attached or

19     otherwise.

20     BY MR. HASAN:                                         06:07:44

21          Q.   Okay.  When the controllers are

22     attached, the fact that the controllers protrude

23     outwardly from the forward sections and are mounted

24     on the charger, do you find that to be appealing --

25          MR. HANLE:  Objection.  Compound.                06:07:59

                                              Page 277
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
 1    BY MR. HASAN:                                      06:07:59

 2         Q.   -- based on your experience?

 3         MR. HANLE:  Objection.  Compound.

 4         THE WITNESS:  It would not be based on my

 5    experience.  It would be just my sense of beauty.  06:08:09

 6    BY MR. HASAN:

 7         Q.   And based on your sense of beauty, that

 8    would be a yes or a no?

 9         A.   I think it looks nice.

10         Q.   And it looks nice with the controller    06:08:22

11    suspended within the docking bays?

12         MR. HANLE:  Objection.  Vague, lacks

13    foundation.

14         THE WITNESS:  In my opinion.

15    BY MR. HASAN:                                      06:08:33

16         Q.   Okay.  One of the features of this is

17    that when the controllers are suspended within the

18    docking bays, the handle portions of the controller

19    extend outwardly from the docking bay; is that

20    right?                                             06:08:51

21         A.   Yeah.  By nature of the configuration of

22    the controller, they look like the picture that

23    you're showing me.

24         Q.   Okay.  And that picture is the one from

25    the PDP website that we marked as an exhibit?      06:09:09
```

Page 278

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

```
1          A.   No.                                    06:22:52

2          Q.   What did you mean by squashing Nyko like

3   a bug?

4          A.   Beat the competition.

5          Q.   And you knew that Nyko was the          06:22:58

6   competition with respect to the charge base product?

7          A.   They were a competitor.

8          Q.   Who else was a competitor in connection

9   with these products for concurrently charging two

10  wireless controllers at the same time in June 2007?   06:23:13

11         A.   I don't clearly recall, but I would

12  think that any number of the competitors would have

13  had a similar product.

14         Q.   In June 2007?

15         A.   Yeah.                                   06:23:33

16         Q.   And why, then, did you focus, if other

17  competitors, in your mind, had the product, on Nyko?

18         A.   Recollection isn't clear, but probably

19  because they were the most promoted.

20         Q.   What do you mean by that, "the most      06:23:51

21  promoted"?

22         A.   They probably had it on their website

23  before selling it and that kind of thing so that the

24  information was available.

25         Q.   So, you wanted to squash Nyko like a bug  06:24:11
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. HANLE:  Lacks foundation, calls for | 06:56:33 |
| 2 | speculation, asked and answered. | |
| 3 | THE WITNESS:  That's a different question. | |
| 4 | Yes, they had to approve it. | |
| 5 | BY MR. HASAN: | 06:56:39 |
| 6 | Q.   Okay.  And it's your understanding that | |
| 7 | Energizer approved the sale of the product, the | |
| 8 | accused product, with its name on it by PDP? | |
| 9 | MR. HANLE:  Objection.  Vague, lacks | |
| 10 | foundation, calls for speculation. | 06:56:49 |
| 11 | THE WITNESS:  Yes. | |
| 12 | BY MR. HASAN: | |
| 13 | Q.   Okay.  And you understand that Energizer | |
| 14 | displays the accused product on its own website; do | |
| 15 | you know that? | 06:57:02 |
| 16 | A.   I don't know that. | |
| 17 | Q.   What other things did you have to do to | |
| 18 | gain Energizer's approval to sell the product, if | |
| 19 | anything, besides sending them samples? | |
| 20 | MR. HANLE:  Calls for speculation. | 06:57:18 |
| 21 | THE WITNESS:  We, as a matter of course, | |
| 22 | would send a description of the operation, how it | |
| 23 | works, its features, that sort of thing. | |
| 24 | BY MR. HASAN: | |
| 25 | Q.   Was that requested of you by Energizer? | 06:57:31 |

Page 308

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ATTORNEYS' EYES ONLY

1        A.    I'm sure it was.                              06:57:34

2        Q.    Yeah.    And do you have an understanding

3   as to why they would want that?

4        MR. HANLE:    Objection.    Calls for

5   speculation.                                             06:57:40

6        THE WITNESS:    I will assume because their

7   name is going on the box so they want to be aware of

8   what's going in the box.

9   BY MR. HASAN:

10       Q.    And PDP could not sell the accused           06:57:55

11  products without Energizer's approval, correct?

12       MR. HANLE:    Objection.    Lacks foundation,

13  calls for speculation.

14       THE WITNESS:    With the Energizer brand, no.

15  BY MR. HASAN:                                            06:58:23

16       Q.    Does PDP intend to discontinue the sale

17  of the accused product?

18       MR. HANLE:    Objection.    Calls for

19  speculation, lacks foundation, vague.

20       THE WITNESS:    I don't think they intend to       06:58:39

21  discontinue the sale of it.

22  BY MR. HASAN:

23       Q.    Why not?

24       A.    Because it's selling.

25       Q.    Is it selling well, to your                  06:58:52

                                                    Page 309

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT N

PS3→ Energizer® Power & Play for PS3 Charging System.

Home     PS3   → Energizer® Power & Play for PS3 Charging System.



### Energizer® Power & Play for PS3 Charging System.
PL6328

**Product Description**

In just 2.5 hours, the Energizer Power & Play Charging System for PS3 charges up to 2 controllers and your headset simultaneously . The charge base offers a sleek and unique design that is impressive and functional. The station let's you know when it's charging via the connection by appearing in red light (charging) and green (fully charged). It is powered the by the included UL-approved AC power cord. Keep those controllers charged and get back in the game with fully licensed Energizer Power & Play Charging System for the PS3 by PDP.

🔲 SHARE   ◾🔽✉_

# $29.99

Quantity: 1

Tell A Friend

## Related Products

Customers who purchased this product also liked the following products.



AFTERGLOW® AP.1 for PlayStation 3



Energizer® Power & Play for PS3
Charge Cable

Support  Press  Contact  Careers  Privacy Policy  Shipping & Returns  DDR Adapter



© Performance Designed Products LLC 2011. All Rights Reserved


**Exhibit 73**
Roberts
3/26/13
Kae Gernandt, CSR #5342

Exhibit N
Page 229

# EXHIBIT O





PERFORMANCE
DESIGNED PRODUCTS

# ELECTRICAL SPECIFICATIONS

For Xbox Charger Station PL-3628



**Exhibit 83**
Roberts
3/26/13
Kae Gernandt, CSR #5342

Page 1 of 11          Exhibit O          9/27/2011
~~Page 229~~ Page 230

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING          PDP0022201


PERFORMANCE
DESIGNED PRODUCTS

**PL-3628 Xbox Charger Station Spec Ver1.0**



1.1 **REDACTED**

1.2 **Publication History**

| Rev. | ECO if needed | Date | Description |
|------|------|------|------|
| X1.0 | N/A | 09/23/11 | Draft Version |
| V1.0 | N/A | 09/27/11 | Release Version |

Exhibit O
Page 230  Page 231
9/27/2011

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022202



**PL-3628 Xbox Charger Station Spec Ver1.0**

## 1.3        Document Approval

Prepared By:   <u>Angel Monzalvo</u>                      <u>September 27, 2011</u>
                              Editor                                                      Date

Approved By:   <u>Angel Monzalvo</u>                      <u>September 27, 2011</u>
                              Engineering                                              Date

Approved By:   <u>Tom Roberts</u>                            <u>September 27, 2011</u>
                              Engineering Senior VP                          Date

# REDACTED

1.4

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING                          PDP0022203

 PERFORMANCE DESIGNED PRODUCTS

**PL-3628 Xbox Charger Station Spec Ver1.0**

# REDACTED

## 2   General Product Description

The PL-3628 Energizer Power & Play for 360 Charging System is an accessory for the Xbox 360 controllers. The system provides a solution to charge two Xbox 360 controllers and the Xbox wireless headset simultaneously. It is fully compatible with Microsoft Xbox 360 rechargeable battery packs. The charge base offers a sleek and unique design that is impressive and functional.

The Power & Play Charging System developed by PDP is going to use the brand name of Energizer and it includes the following items:

- 1 conductive charge station with 2 channels
- 1 power pass through connector for Xbox wireless headset
- 1 UL-approved AC adaptor

## REDACTED

The station features LED charge indicators on each channel to tell the end user the charging status of the Xbox controller. A solid red light indicates that the unit is on charging process and a solid green light indicates that unit is fully charged. There is also a variation on the red LED where a fast blinking indicates an error condition.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING                    PDP0022204



**PL-3628 Xbox Charger Station Spec Ver1.0**

# REDACTED

Exhibit O
~~Page 233~~  Page 234

9/27/2011

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022205

 PERFORMANCE DESIGNED PRODUCTS

**PL-3628 Xbox Charger Station Spec Ver1.0**

# REDACTED

3.3   Charge Station: LED indicators

The charge station has two LEDs on each channel to indicate the charging states at that time:

- Solid Red color indicates that the charge station is in the process of charging the battery.
- Solid Green color indicates that the charge station has fully charged the battery.
- Flashing Red color indicates an error condition in the system.

When remote is placed on the charge base, the Energizer's Power & Play Charging System shall intelligently determine the charge state of the controller's battery.

If charging is required the charger system should dispense current and red light indicator (1-per supported controller) shall turn on.

When controller battery reaches capacity, the charger system shall intelligently enter trickle-charging mode so as not to overload or overheat battery pack and LED indicator shall shift to solid green.

When no controller is situated in the charger base, the charger indicator LEDs should be off.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022206

 PERFORMANCE DESIGNED PRODUCTS

**PL-3628 Xbox Charger Station Spec Ver1.0**

# REDACTED

Exhibit O

Page 235 Page 236

9/27/2011

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022207

 PERFORMANCE DESIGNED PRODUCTS

**PL-3628 Xbox Charger Station Spec Ver1.0**

# REDACTED

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022208



PL-3628 Xbox Charger Station Spec Ver1.0

# REDACTED

Exhibit O
Page 237 Page 238

9/27/2011

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022209

 PERFORMANCE DESIGNED PRODUCTS

**PL-3628 Xbox Charger Station Spec Ver1.0**

# REDACTED

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING      PDP0022210



# REDACTED

Exhibit O
Page 239 Page 240

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022211



**PL-3628 Xbox Charger Station Spec Ver1.0**

# REDACTED

Exhibit O
~~Page 240~~ Page 241

9/27/2011

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

PDP0022212

# EXHIBIT P



PS3

# ChargeBase™



## Charging Dock for up to 4 Controllers
### for PlayStation®3



### 83017 Charge Base

- **Rapidly charges 4 PS3 controllers simultaneously**
- **Store and charge all your controllers in one place**
- **Mount directly to any wall outlet or place conveniently in an entertainment center**
- **Powered by a standard wall plug; no USB port required**
- **Compact design**
- **Keep your controllers fully charged, organized and ready for use**

83017 Charge Base

| | QUANTITY | WIDTH | HEIGHT | DEPTH | CUBE (ft³) | WEIGHT | UPC NUMBER |
|---|---|---|---|---|---|---|---|
| SINGLE | 1 | 5.5" | 14.5" | 4.25" | 0.20 | 1.7 lbs | 7-43840-83017-7 |
| INNER | 5 | 19.8" | 6.2" | 15" | 1.0 | 9.8 lbs | 1 07-43840-83017-4 |
| MASTER | 20 | 30.7" | 13.3" | 20.3 " | 4.8 | 43 lbs | 2 07-43840-83017-1 |

1990 Westwood Blvd.   3rd Floor   Los Angeles, CA  90025   USA
Main: 310.446.6602   •   Toll Free: 888.444.NYKO   •   Fax: 310.446.6617   •   www.NYKO.com

Exhibit P
Page 242

CONFIDENTIAL - ATTORNEYS' EYES ONLY

NT037010



PS3

# CHARGE BASE 2™



**Charging Dock for 2 Controllers**
**for PlayStation®3**


### 83053 Charge Base 2

- Rapidly charges 2 PS3 controllers simultaneously
- Store and charge your controllers in one place
- Includes 2 USB charge adaptors for quick and convenient use
- Plug into any wall outlet or place conveniently in an entertainment center
- Powered by a standard wall plug; no USB port required
- Compact design
- Keep your controllers fully charged, organized and ready for use



83053 Charge Base 2

|  | QUANTITY | WIDTH | HEIGHT | DEPTH | CUBE (ft²) | WEIGHT | UPC NUMBER |
|---|---|---|---|---|---|---|---|
| SINGLE | 1 | 6" | 11" | 4.75" | 0.18 | 1 lbs | 7-43840-83053-5 |
| INNER | 5 | 24.4" | 12" | 6.5" | 1.1 | 7.5 lbs | 1 07-43840-83053-2 |
| MASTER | 20 | 25" | 25.4" | 13.8" | 5.0 | 31 lbs | 2 07-43840-83053-9 |

06-24-09

1990 Westwood Blvd.   3rd Floor   Los Angeles, CA  90025   USA
Main: 310.446.6602   •   Toll Free: 888.444.NYKO   •   Fax: 310.446.6617

Exhibit P
Page 243

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

NT037013



# PLAYSTATION®3

**ITEM : 83100**

# CHARGE BASE 3™
## Dual Port Magnetic Charger

Version 2.1s • 08-18-2011

7 43840 83100



NT037016

## Features :

- Easily charge and store two PS3 controllers
- Patented mini USB dongles magnetically connect the controller to the charging dock
- Powered via included AC adapter for a much faster charge than USB
- Charge indicator lights illustrate the level of charge
- Collapsible dock is easy to store and ultra portable



| | QUANTITY | WIDTH | HEIGHT | DEPTH | CUBE (ft3) | WEIGHT | UPC NUMBER | |
|---|---|---|---|---|---|---|---|---|
| SINGLE | 1 | 5.6" | 9.2" | 2.8" | 0.08 | 1.1 lbs | 7-43840-83100 | 6 |
| INNER | 3 | 23.6" | 6.1" | 3.1" | 0.25 | 3.5 lbs | 1 07-43840-83100 | 3 |
| MASTER | 12 | 24.0" | 13.0" | 6.9" | 1.25 | 15.2 lbs | 2 07-43840-83100 | 0 |

1990 Westwood Blvd.   3rd Floor   Los Angeles, CA  90025   USA
Main: 310.446.6602 • Toll Free: 888.444.NYKO • Fax: 310.446.6617

Exhibit P
Page 244

www.NYKO.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT Q

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations

3   DANIEL N. YANNUZZI, Cal. Bar No. 196612
    dyannuzzi@sheppardmullin.com
4   GRAHAM (GRAY) M. BUCCIGROSS, Cal. Bar No. 234558
    gbuccigross@sheppardmullin.com
5   MATTHEW M. MUELLER. Cal. Bar No. 268486
    mmueller@sheppardmullin.com
6   12275 El Camino Real, Suite 200
    San Diego, California  92130-2006
7   Telephone:    858.720.8900
    Facsimile:    858.509.3691
8
    STEVEN M. HANLE, Cal. Bar No. 168876
9   shanle@sheppardmullin.com
    650 Town Center Drive, 4th Fl.
10  Costa Mesa, CA  92626
    Telephone:    714.513.5100
11  Facsimile:    714.513.5130

12  Attorneys for Performance Designed Products LLC
    and Energizer Holdings, Inc.

13

14                  UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
15

16  NYKO TECHNOLOGIES, INC. a California          Case No. CV12-03001
    Corporation,
17                                                PERFORMANCE DESIGNED PRODUCTS
18                        Plaintiff,              LLC'S RESPONSE TO NYKO
                                                  TECHNOLOGIES, INC.'S FIRST SET OF
19          v.                                    INTERROGATORIES

20  ENERGIZER HOLDINGS, INC. a Missouri           The Hon. Gary A. Feess
    Corporation, and PERFORMANCE
21  DESIGNED PRODUCTS LLC, a California
    Limited Liability Company,                    [Complaint Filed:  April 5, 2012]
22
                          Defendants.
23

24  **DEFENDANT PERFORMANCE DESIGNED PRODUCTS LLC'S RESPONSES AND
    OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

25  **CONTAINS CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

26
    PROPOUNDING PARTY:          NYKO TECHNOLOGIES, INC.
27  RESPONDING PARTY:           PERFORMANCE DESIGNED PRODUCTS LLC
28  SET NO.:                    ONE

SMRH:406601941.4                      PDP'S RESPONSE TO NYKO'S FIRST SET OF INTERROGATORIES

items specifically identified by Nyko, that have been made in, imported into, used, sold, or offered

for sale in the United States since the '848 patent was issued.  Furthermore, PDP objects that the

phrase "identical and similar to" is overly broad, unduly burdensome, vague and ambiguous, and

unintelligible.  PDP hereby incorporates this objection into its response to each and every Nyko

Interrogatory that uses this term.

3.      PDP objects to Nyko's Instruction Nos. 2–4 as overly broad and unduly

burdensome, harassing, oppressive, and seeking information beyond that required by the Federal

Rules of Civil Procedure, Local Rules, and the Court's orders and default orders.

4.      PDP objects to the terms "RELATING" and "CONCERNING," and their variants

as vague and ambiguous, overly broad, unduly burdensome, and unintelligible.  PDP hereby

incorporates this objection into its response to each and every Nyko Interrogatory that uses these

terms.

5.      PDP objects to Nyko's definition of "IDENTIFY" as overly broad and unduly

burdensome, and seeking information beyond that required by the Federal Rules of Civil

Procedure, Local Rules, and the Court's orders, seeking information that is protected by privacy

laws or otherwise subject to third-party confidentiality, unduly broad, overly burdensome,

harassing, oppressive, vague, and ambiguous.  PDP hereby incorporates this objection into its

response to each and every Nyko Interrogatory that uses this term.

6.      PDP objects to the definition of "ENERGIZER" as vague and ambiguous, overly

broad and unduly burdensome, and unintelligible.  PDP cannot know the extent to which entities

and individuals are or have been related to Energizer Holdings, Inc. ("Energizer"), a company

separate and distinct from PDP.  PDP hereby incorporates this objection into its response to each

and every Nyko Interrogatory that uses this term.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

State with specificity all bases and facts for YOUR contention that PDP and/or

ENERGIZER have never "infringed, either directly or indirectly, by inducement or contributorily,

1   any claim of the Patent-in-suit [the '848 PATENT], either literally or under the doctrine of

2   equivalents," including, but not limited to, in a claim chart format, identifying each limitation of

3   each claim of the '848 PATENT which YOU claim is not infringed by the ACCUSED PRODUCT

4   (either literally and under the doctrine of equivalents) and explain in full all reasons why.

5   **RESPONSE TO INTERROGATORY NO. 1:**

6        PDP hereby incorporates, by reference, its General and Specific Objections in

7   response to this Interrogatory.

8

9        PDP objects to this Interrogatory on the grounds that it is overly broad, unduly

10  burdensome, and oppressive to the extent it seeks information on any product that is not

11  specifically identified by Nyko.

12

13       PDP objects to this Interrogatory as premature to the extent that claims and terms

14  within the '848 patent require claim construction, which has yet to be briefed by the parties and

15  decided by the Court.

16

17       PDP objects to this Interrogatory on the grounds that it is overly broad, unduly

18  burdensome and oppressive, in that it seeks all bases and facts, rather than being limited to those

19  that PDP intends to rely on.

20

21       In addition, PDP objects to this Interrogatory to the extent that it purports to require

22  the production of information that is protected by the attorney-client privilege, the attorney work

23  product doctrine, the common interest privilege (also known as the joint defense privilege),

24  statutory and constitutional privacy rights, and other applicable doctrines or privileges.

25

26       PDP further objects to this Interrogatory to the extent it seeks information

27  regarding Energizer Holdings, Inc, as overly broad, unduly burdensome, and seeking information

28

1  that is not within PDP's possession, custody, or control, and seeking information that is neither

2  relevant nor reasonably calculated to lead to the discovery of admissible evidence.

3

4      PDP objects that this Interrogatory to the extent that it calls for information that is

5  confidential to third parties.  Unless and until those parties waive their confidentiality or the Court

6  orders production, PDP is obligated to maintain those confidences.

7

8      Subject to and without waiving the foregoing objections, PDP responds as follows:

9

10     PDP's PS3 and Xbox 360 charging systems do not have at least the following

11  elements of the asserted claims of the '848 patent: (1) a plurality of DC ports on the base; and (2)

12  docking bays comprised of opposite surfaces on the base.  Significantly, these structural

13  limitations were added to the asserted claims to distinguish over prior art and must be strictly

14  construed.  Instead, the DC ports in PDP's accused products are on plastic insertion guides.  Those

15  plastic insertion guides are on horizontal members extending from the arc-shaped support, which

16  is, in turn, attached to the base.

17

18     Nyko contends that the term "base" includes a horizontal component in contact

19  with a surface in addition to all other components attached to it, except docking bays.  However,

20  this is not consistent with the plain meaning of "base" or the written description of the '848 patent.

21  The term "base" as described in the specification of the '848 patent discloses a component of the

22  charging system which "includes a base [402]" and allows for "structures [to be] on the base."  In

23  addition, Figures 11, 12 and 18 of the '848 patent show a "base" that is in contact with a

24  supporting surface, such as a table or wall.  A general-purpose dictionary describes "base" as used

25  in this context as: "the bottom of something considered as its support."  (See

26  http://www.merriam-webster.com/dictionary/base.)  This definition is consistent with the plain

27  meaning and with the written description and figures.  Thus, the structures identified by Nyko on

28

1   PDP's products as DC ports and opposite surfaces forming docking bays are <u>not</u> "on the base" as

2   required by every asserted claim of the '848 patent, and PDP's products do not infringe.

3

4          Furthermore, PDP's PS3 and Xbox 360 charging systems do not have "at least one

5   structure on the base [that] comprises a plurality of docking bays."  Rather, each horizontal

6   member extending from the arc-shaped support only consists of one pair of plastic insertion

7   guides.

8

9          Moreover, PDP's PS3 charging systems do not contain "a plurality of male mini-

10  USB connectors supported by the <u>base</u>."  Instead, the mini-USB connectors are supported by

11  plastic insertion guides.  The plastic insertion guides are supported by horizontal members

12  extending from the arc-shaped support, which is, in turn, attached to the base.

13

14         Because PDP does not infringe any independent claims of the '848 patent, it cannot

15  infringe any dependent claims.

16

17  **INTERROGATORY NO. 2:**

18         State with specificity all bases and facts for YOUR contention that "[e]ach of the asserted

19  claims of the Patent-in-suit is invalid for failure to comply with the requirements of 35 U.S.C. §§

20  101, 102, 103 and/or 112," including, but not limited to identifying each legal ground for

21  contending the claim is invalid, all prior art on which YOU intend to rely, any instance of alleged

22  prior or pre-critical date public knowledge, use, sale or offer for sale upon which YOU intend to

23  rely, for any contention of anticipation or obviousness, identifying in a claim chart format where

24  each prior art reference on which YOU rely discloses each limitation of the relevant claim, and

25  identifying any facts upon which YOU intend to rely in asserting these defenses.

26  **RESPONSE TO INTERROGATORY NO. 2:**

27         PDP hereby incorporates, by reference, its General and Specific Objections in

28  response to this Interrogatory.

1   Dated:  October 29, 2012

2                                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4                        By   _____
                                          /s/ Daniel N. Yannuzzi
5                                           DANIEL N. YANNUZZI

6                                Attorneys for Performance Designed Products LLC
                                      and Energizer Holdings, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE</u>

<u>STATE OF CALIFORNIA, COUNTY OF SAN DIEGO</u>

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130-2006.

On October 29, 2012, I served true copies of the following document(s) described as

**PERFORMANCE DESIGNED PRODUCTS LLC'S RESPONSE TO NYKO TECHNOLOGIES, INC.'S FIRST SET OF INTERROGATORIES**

on the interested parties in this action as follows:

S. Art Hasan                                      G. Warren Bleeker
Christie Parker and Hale LLP                       Christie Parker and Hale LLP
655 North Central Avenue Suite 2300               655 North Central Avenue Suite 2300
Glendale CA 91203-1445                            Glendale CA 91203-1445
Art.hasan@cph.com                                 Warren.bleeker@cph.com

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mmueller@sheppardmullin.com to the persons at the e-mail addresses listed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 29, 2012, at San Diego, California.


                                    */s/ Matthew M. Mueller*
                                    Matthew M. Mueller

Exhibit Q
Page 251

SMRH:406601941.4                                  PDP'S RESPONSE TO NYKO'S FIRST SET OF INTERROGATORIES