1  **ART HASAN, CA Bar No. 167323**
   art.hasan@cph.com
2  **G. WARREN BLEEKER, CA Bar No. 210834**
   warren.Bleeker@cph.com
3  **KATHERINE L. QUIGLEY, CA Bar No. 258212**
   katherine.quigley@cph.com
4  **CHRISTIE, PARKER & HALE, LLP**
   **655 North Central Avenue, Suite 2300**
5  **Glendale, California 91203-1445**
   **Telephone: (626) 795-9900**
6  **Facsimile:  (626) 577-8800**

7  Attorneys for Plaintiff and Counterdefendant,
   NYKO Technologies, Inc.

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  NYKO TECHNOLOGIES, INC., a         Case No. CV12-03001 GAF (VBKx)
    California corporation,
13
              Plaintiff,
14                                      **NYKO TECHNOLOGIES, INC.'S**
       vs.                              **RESPONSE TO DEFENDANTS'**
15                                      **OBJECTIONS TO EXPERT**
    ENERGIZER HOLDINGS, INC., a         **DECLARATIONS OF GARRY**
16  Missouri corporation, EVEREADY      **KITCHEN**
    BATTERY COMPANY, INC., a
17  Delaware corporation, and
    PERFORMANCE DESIGNED
18  PRODUCTS LLC, a California limited
    liability company,
19                                      Hon. Gary Allen Feess
              Defendants.
20

21  AND RELATED COUNTERCLAIM.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION....................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND.................................... 2

III.    DEFENDANTS' UNTIMELINESS ARGUMENT IS MERITLESS............ 4

IV.     MR. KITCHEN IS HIGHLY QUALIFIED TO OFFER EXPERT
        OPINIONS IN THIS CASE......................................................................... 5

V.      MR. KITCHEN'S TESTIMONY REGARDING THE TERM
        "BASE" PROPERLY RELIES UPON THE INTRINSIC
        EVIDENCE TO ENCOMPASS ALL OF THE EXEMPLARY
        FEATURES AND FUNCTIONS OF THE BASE ........................................ 6

VI.     MR. KITCHEN'S OPINIONS ON THE CLAIM LANGUAGE
        "COUPLE TO" IS PROPER....................................................................... 11

        A.      Mr. Kitchen's Construction of "Couple to" is the Plain and
                Ordinary Meaning to a Person of Ordinary Skill in the Art .............. 11

        B.      Mr. Kitchen's Testimony Regarding the Term "Couple To" Is
                Consistent With the Intrinsic Evidence and the Applicable
                Law......................................................................................... 13

VII.    MR. KITCHEN'S OPINIONS OF THE TERMS "AT LEAST ONE"
        AND "STRUCTURE" ARE RELIABLE...................................................... 16

VIII.   CONCLUSION ........................................................................................ 20

CHRISTIE, PARKER & HALE, LLP

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alloc, Inc. v. ITC*,
  342 F.3d 1361 (Fed. Cir. 2003) .......................................................... 14

*Amgen Inc. v. F. Hoffmann-La Roche, Ltd.*,
  580 F.3d 1340 (Fed. Cir. 2009) .......................................................... 19

*ArcelorMittal France v. AK Steel Corp.*,
  700 F.3d 1314 (Fed. Cir. 2012) .......................................................... 10

*Biosig Instruments Inc. v. Nautilus*, *Inc.*,
  2012-1289 at p. 21 (Fed. Cir. Apr. 23, 2013) .................................... 20

*Exxon Research & Eng'g Co. v. United States*,
  265 F.3d 1371 (Fed. Cir. 2001) .......................................................... 19

*Halliburton Energy Servs. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) .......................................................... 19

*Hologic, Inc. v. SenoRx, Inc.*,
  639 F.3d 1329 (Fed. Cir. 2011), *reh'g denied*, 2011 U.S. App. LEXIS
  11017 (Fed. Cir. Apr. 26, 2011) ......................................................... 14

*In re Abbott Diabetes Care, Inc.*,
  696 F.3d 1142 (Fed. Cir. 2012) .......................................................... 12

*Johnson Worldwide Assocs. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999) ............................................................ 12

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ................................................... passim

*Sandisk Corp. v. Memorex Prods.*,
  415 F.3d 1278 (Fed. Cir. 2005) .......................................................... 16

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) .......................................................... 20

*Superguide Corp. v. DirecTV Enters.*,
  358 F.3d 870 (Fed. Cir. 2004) ............................................................ 16

CHRISTIE, PARKER & HALE, LLP

*Texas Instruments Inc. v. ITC,*
    988 F.2d 1165 (Fed. Cir. 1993) ............................................................................. 15

STATUTES

35 U.S.C. § 103 ............................................................................................................ 2

OTHER AUTHORITIES

L.R. 7-4, 7-12, 7-13 ...................................................................................................... 1

Local Rule 7-3 ............................................................................................................... 1

Local Rule 7-4 ............................................................................................................... 1

CHRISTIE, PARKER & HALE, LLP

## I.   **INTRODUCTION**

Apparently not content with the first two briefs they filed, Defendants, without leave of Court and without permission from Nyko, filed an unauthorized **second** responsive brief.   [*See* Dkt. No. 114.]   Despite mischaracterizing their third overall brief as merely "objections," Defendants' second responsive brief goes well beyond stating evidentiary objections to Mr. Kitchen's opinions, and should be struck as an improper surreply unauthorized by the Court and improper under the Local Rules.[1]

As to the substance of the brief, Defendants' "objections" are nothing more than attorney argument that misstates the facts and is contrary to established legal precedent.   Defendants continue their "throw everything at the wall and see what sticks" approach to claim construction to confuse the issues and deflect from a proper analysis.

Defendants make a number of arguments inconsistent with the facts and controlling legal principles.   By way of one example (there are several), Defendants argue that the expert opinion of Garry Kitchen should be excluded because Mr. Kitchen does "little more than selectively cite the intrinsic evidence." [Dkt. No. 114 at 1:9-10.]   The glaring flaw with Defendants' critique is that intrinsic evidence **must** be viewed according to the understanding of one of ordinary skill in the art, which is exactly what Mr. Kitchen does and should be doing as an expert skilled in the art.   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1315 (Fed. Cir. 2005).   Defendants, on the other hand, fail to offer any expert testimony from one skilled in the art.

---

[1] Even if the "objections" are deemed a new motion to exclude the opinions of Mr. Kitchen, Defendants separately failed to meet and confer in violation of Local Rule 7-3, failed to file a notice of motion in violation of Local Rule 7-4, and failed to properly set the motion on calendar for hearing consistent with the Local Rules, all of which are grounds to deny the relief sought by Defendants. *See* L.R. 7-4, 7-12, 7-13.

CHRISTIE, PARKER & HALE, LLP

The breadth of Defendants' inconsistencies is surprising.  By way of example, Defendants now argue without hesitation that Erickson, U.S. Patent publication US 2009/0072784 is *not* prior art, and cannot be relied upon for claim construction.   [Dkt. No. 114 at 12:4-7 ("the Erickson application was first published in 2009, well after the date of invention of the '848 patent") (internal citation omitted).]  Erickson is the same reference Defendants vigorously argued *was prior art* when Defendants asked this Court to deny preliminary injunctive relief based on invalidity.  [Dkt. No. 19 at 18:27-20:15 ("Claim 1 is unpatentable under 35 U.S.C. § 103 as being obvious over *Erickson*.").] This Court, relying on Defendants' position that Erickson was prior art, cited Erickson among the primary references in denying Nyko's motion for a temporary restraining order. [Dkt. No. 51.]   Such gamesmanship undercuts the credibility of Defendants' arguments.

Defendants' objections to Mr. Kitchen's opinions in an unauthorized second response brief lack merit and should be overruled.   The Court may properly consider Mr. Kitchen's opinions as evidence of what one skilled in the art would understand to be the proper claim construction.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2012, the parties simultaneously exchanged their respective proposed claim constructions and jointly filed them with the Court. [Dkt. No. 86.]  The parties subsequently agreed on a briefing schedule (opening briefs for both parties due April 3 and responsive briefs for both parties due April 15) and agreed to disclose any expert opinions regarding the previously proposed claim constructions by March 29, 2013.   The deadline for initial expert disclosures set forth in the Court's Scheduling Order is July 26, 2013. [Dkt. No. 69.]

On the evening of March 27, 2013, effectively one business day before the agreed upon date for expert disclosures regarding claim construction, counsel for

-2-

Defendants for the first time raised the issue of disclosing modified proposed claim constructions.  [Declaration of G. Warren Bleeker in Support of Nyko Technologies Inc.'s Response to Defendants' Objections to Expert Declarations of Garry Kitchen filed concurrently herewith ("Bleeker Decl."), ¶ 2, Exh. A.]  Nyko responded that it would be inappropriate for Defendants to fundamentally change their proposed claim constructions at that late date given that "changing positions may impact the subjects of expert testimony" and may impact many other issues as well.  [*Id.* ¶ 3, Exh. A.]

On April 3, Nyko filed its opening claim construction brief.  [Dkt. No. 98.]  Nyko served Mr. Kitchen's initial expert report on April 3, 2013 in connection with its opening claim construction brief.  [Dkt. No. 99.]  In Nyko's opening brief, it presented argument and expert opinions from Mr. Kitchen in support of Nyko's proposed claim constructions and in opposition to Defendants' proposed claim constructions as stated on December 17, 2012.

In Defendants' simultaneously-filed opening brief, however, Defendants substantially modified their proposed construction of "at least one" to mean essentially "exactly one" without any notice to Nyko [*See e.g.,* Dkt. No. 107 at pp. 14-15; *compare to* Joint Claim Construction Statement, Dkt. No. 86 at pp. 2-4.]  Mr. Kitchen's opening report dealt with Defendants' original construction, not the changed one for which Nyko was given no notice.  In addition, Defendants for the first time set forth their argument as to Defendants' claim of indefiniteness, and for the first time provided argument in support of their other proposed claim constructions.   Therefore, Mr. Kitchen's original report did not and could not comment on these new arguments.

Pursuant to agreement of the parties, Mr. Kitchen was made available for deposition on April 11, 2013.  Prior to his deposition, Nyko provided a detailed summary in two separate e-mail communications of all the topics on which he was expected to opine.  [Declaration of Katherine L. Quigley in Support of Nyko

-3-

Technologies Inc.'s Response to Defendants' Objections to Expert Declarations of Garry Kitchen filed concurrently herewith ("Quigley Decl."), ¶ 2, Exh. A.]  On April 8, Defendants served a document subpoena directly on Mr. Kitchen demanding that he produce responsive documents within 24 hours.  [Bleeker Decl., ¶ 4, Exh. B.]  Counsel for Nyko served objections to the subpoena of April 9, 2013 and produced responsive documents on April 10, 2013.  [Bleeker Decl., ¶ 5].  Mr. Kitchen was deposed on April 11.  [Id.]

On April 15, 2013 in connection with Nyko's responsive claim construction brief, Nyko served and filed a supplemental report from Mr. Kitchen in which he responds to and properly supplements his prior opinions in response to the new positions and arguments first advanced by Defendants in their April 3 opening brief.  [Dkt. No. 110.]  The rebuttal report followed the summary that Nyko had provided to Defendants prior to Mr. Kitchen's deposition. [Quigley Decl., ¶ 2, 4, Exh. A.]

Given that Nyko and Defendants filed simultaneous opening briefs on April 3, neither Nyko nor Mr. Kitchen could have possibly analyzed or responded to Defendants' new arguments at that time.  Moreover, Nyko certainly could not have disclosed an initial expert opinion on March 29 as to positions and arguments advanced for the first time by Defendants five days later on April 3.

III.   <u>DEFENDANTS' UNTIMELINESS ARGUMENT IS MERITLESS</u>

The deadline for initial expert disclosures set forth in the Court's Scheduling Order is July 26, 2013. [Dkt. No. 69.]  The expert discovery cut-off is November 11, 2013. [Id.] On March 29, 2013, Nyko disclosed Mr. Kitchen's initial opinions regarding the December 17, 2012 proposed claim constructions. [Quigley Decl., Exh. A.]  On April 3, 2013, Nyko served Mr. Kitchen's initial expert report, and on April 15, 2013, Nyko served Mr. Kitchen's supplemental expert report.  Each of these disclosures occurred many months before the deadline for disclosing initial expert opinions, which is July 26.  Moreover, Mr.

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6

Kitchen's supplemental report addressed arguments and positions taken for the first time by Defendants on April 3, 2013, and it was not possible for Mr. Kitchen or Nyko to address those arguments and positions *before* Defendants articulated them.  In addition, Defendants cannot claim they were prejudiced in any way.  Thus, Mr. Kitchen's supplemental report is timely and should be considered by the Court.[2]

7
8

## IV. <u>MR. KITCHEN IS HIGHLY QUALIFIED TO OFFER EXPERT OPINIONS IN THIS CASE</u>

9
10
11
12
13
14
15
16
17
18
19
20

Mr. Kitchen is a highly qualified expert in the video game industry, with over 30 years of experience. [Decl. of Garry Kitchen in Support of Plaintiff Nyko Technologies, Inc.'s Opening Claim Construction Brief, Exh. A, Dkt. No. 99, ("Kitchen Report") at ¶3.]  After receiving his Bachelor of Science degree in Electrical Engineering, Mr. Kitchen began a career in the electronic entertainment/video game industry where he has been directly involved in the design of hundreds of commercially-released video game products, across a breadth of hardware platforms, from the earliest Atari machine to the present day Apple iPhone. [Dkt. No. 99, Kitchen Report at ¶¶2-3.]  He has hands-on technical and creative experience in all game genres, including dedicated electronics, console, PC retail, online and mobile. [Dkt. No. 99, Kitchen Report at ¶3.]  He has personally developed video game products that have generated career sales in

21

22
23
24
25
26
27
28

---

[2] Defendants note that because they chose not to submit any opinion from one skilled in the art, Mr. Kitchen had nothing to rebut, and Mr. Kitchen was not entitled to serve a "rebuttal" report.  Even though Mr. Kitchen's supplemental report was titled a "rebuttal" report as it responded to new arguments raised by the Defendants for the first time after Mr. Kitchen's original report, it should have been more accurately titled a "supplemental" report.  Regardless of the title, it is clear upon reading Mr. Kitchen's supplemental report that in it, he responds to and supplements his initial opinions in response to the positions and arguments advanced for the first time by Defendants in their April 3 opening claim construction brief.

CHRISTIE, PARKER & HALE, LLP

1   excess of $350 million. *Id.*   He has testified as an expert in a number of patent

2   cases. [Dkt. No. 99, Kitchen Report at ¶ 15-18 and attached CV at pp. 6-9.]

3       Contrary to Defendants' assertion, Mr. Kitchen's experience is not related

4   only to software development, but has encompassed a combination of both

5   software and hardware, as Mr. Kitchen informed Defendants' counsel at his

6   deposition. [Quigley Decl., Exh. B, Kitchen Depo. at 13:15-21.] In fact, several

7   products designed by Mr. Kitchen were handheld electronic games that were

8   stand-alone video gaming devices. [Quigley Decl., Exh. B, Kitchen Depo. at

9   13:22-14:2.] As also noted by Mr. Kitchen, when he was developing games, he

10  needed to have a very intimate knowledge of how the hardware worked. [Quigley

11  Decl., Exh. B, Kitchen Depo. at 14:11-19.]

12      Having worked in the video game industry for over 30 years, Mr. Kitchen

13  has direct experience working with hundreds of video game controllers, including

14  the Sony PlayStation 3 wireless controllers, the Microsoft Xbox360 wireless

15  controllers, the Nintendo Wii Wiimote motion controller and Nunchuk controller,

16  the prior wired Microsoft Xbox 360 controllers, the prior wired Sony PlayStation

17  game controllers (for PSOne and PS2), in addition to a multitude of others. [Dkt.

18  No. 99, Kitchen Report at ¶12.] Additional support for his expertise can be found

19  in his Expert Report, in particular paragraphs 2-19, and his CV attached to his

20  Expert Report. [*See* Dkt. No. 99, Kitchen Decl. at Exh. A.]

21      Mr. Kitchen is unquestionably qualified to offer testimony regarding what

22  one of ordinary skill in the art would understand to be the proper claim

23  construction in this case.

24  **V.    MR. KITCHEN'S TESTIMONY REGARDING THE TERM "BASE"**

25  **PROPERLY RELIES UPON THE INTRINSIC EVIDENCE TO**

26  **ENCOMPASS ALL OF THE EXEMPLARY FEATURES AND**

27  **FUNCTIONS OF THE BASE**

28  Mr. Kitchen offered a clarification of Nyko's construction of the term

CHRISTIE, PARKER & HALE, LLP

"base" that is helpful to the fact finder.  With respect to Nyko's initially proposed construction, namely "the foundation or support upon which structures rest," Nyko consistently argued that the charger body is the foundation or support and the controllers are the structures that rest on the charger body.  [Plaintiff Nyko Technologies, Inc.'s Opening Claim Construction Brief ("Nyko's Op. Brief"), Dkt. No. 98, at 8:1-9:25.]  Mr. Kitchen suggested that the reference to the charger body and video game controllers be incorporated into the proposed construction itself to aid the fact-finder.  [*See* Quigley Decl., Exh. B, Kitchen Depo., 130:15-131:19, Declaration of Garry Kitchen in Support of Plaintiff Nyko Technologies, Inc.'s Rebuttal Claim Construction Brief, Exh. B ("Kitchen Rebuttal Report"), Dkt. No. 110, at pgs. 14-15.]

Defendants argue that Mr. Kitchen does nothing more than rely on intrinsic evidence, and also that Mr. Kitchen ignores the intrinsic evidence.  [*See* Dkt. No. 114, Def. Obj., p. 6].  Mr. Kitchen reads the intrinsic evidence from the standpoint of one skilled in the art, as he must.  *Phillips*, 415 F.3d at 1313 (Fed. Cir. 2005) ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").  Defendants argue that Mr. Kitchen ignores an arrow that points to a "bottom portion" of the charging system.  But it is Defendants who have ignored the intrinsic evidence, in that the dependent claims, specification and prior art all show, in addition to this arrow, that the base is a body that not only includes a bottom portion but also includes top surfaces for supporting the controllers and LED indicators as well as housing components such as the AC-DC converter and other components.  Nyko's proposed construction of the base as the "entire body of the charger" captures not only that the "base" may include a bottom portion but also the other features and capabilities of the "base" as required by the specification and dependent claims.  Defendants' construction

-7-

omits exemplary features and functionality of the base, while Nyko's does not.

Defendants argue that "[a] *base* clearly refers to a component of the entire charging system. If *base* referred to the entire charging system, then there would be no need to claim it as a separate component, nor to claim a "structure on the base" or "DC ports on the base."  [Dkt. No. 114, Def. Obj. at p. 9, lines 11-15.] This argument is flawed, as the term "video game controller charging system" in the preamble of the claim is followed by the term "comprising" which is a patent term of art that means "including but not limited to."  [Quigley Decl., Exh. C, Manual of Patent Examining Procedure § 2111.03.]  The base refers to the "body of the charger," but not necessarily to the cord that plugs into the wall outlet, for example.  Therefore, applying this fundamental patent definition of "comprising", the entire charging system includes, but is not limited to, the body of the charger.

Further, there is nothing inconsistent about elements being on the base and part of the base.  By way of example, the side view mirrors of a car are *on* the car and are ***part*** of the car.   There is nothing inconsistent about any of this. Defendants' argument appears to be an attempt to confuse the Court.

Defendants argue that Mr. Kitchen "admittedly disregarded the plain and ordinary meaning of base … [and] testified that "the plain and ordinary meaning of the word base is irrelevant." [Dkt. No. 114, Def. Obj. at p. 7.]  Defendants also show a still frame of Mr. Kitchen holding up a microphone and stating that the bottom part is the base.  *Id*. at p. 8.  Defendants misstate Mr. Kitchen's testimony and take it out of context.  [*See* Quigley Decl., Exh. B, Kitchen Depo. at 128:2-129:2.]  Mr. Kitchen acknowledged that one *lay* meaning of many definitions of the term base, as referencing a cup for example, may refer to a bottom portion, but also testified that such a restrictive definition is not applicable to the patent-in-suit because of the intrinsic evidence and the meaning of the term in the art. [*See* Quigley Decl., Exh. B, Kitchen Depo. at 119:14-122:18 and 123:3-20.]

Defendants' selective citation to the controlling *Phillips* case that the

-8-

"words of a claim are generally given their ordinary customary meaning" is incomplete because that meaning must be ascribed according to one skilled in the art in view of the intrinsic evidence. *Phillips,* 415 F.3d at 1312-13 (Fed. Cir. 2005) ("We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.' We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.") (internal citations omitted). That is exactly what Mr. Kitchen has done here. He has reviewed the intrinsic evidence and applied a construction to the term "base" that one skilled in the art would understand in view of the claims and the specification. [*See* Dkt. No. 99, Kitchen Report at pp. 20-24; Dkt. No. 110, Kitchen Rebuttal Report at pp. 14-30.] He has discounted a lay meaning, as he should, when the lay meaning is out of context with the intrinsic evidence and the understanding of those skilled in the art:

> Q.     And is that consistent with your understanding of the plain and ordinary meaning of the term "base" outside of the context of the '848 patent?
>
> MR. HASAN: Objection as to "plain and ordinary."
>
> THE WITNESS: I don't understand why I would care what the plain and ordinary meaning of the term is when there's a term of art specific to the scope of this invention that anyone who is in the field knows for the term "base."
>
> There are many, many definitions for the term "base." I don't care that a base is something that my son stands on when he gets a single because that has nothing to do with the scope of this patent.

-9-

1   [*See* Quigley Decl., Exh. B, Kitchen Depo. at 123:3-18.]

2           He has also relied on extrinsic evidence, such as other patents in the field

3   of art at the time of the invention, consistent with the understanding of one skilled

4   in the art.   [Dkt. No. 110, Kitchen Rebuttal Report at pp. 15-20.]; see

5   *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1322 (Fed. Cir. 2012)

6   ("[W]hen an inventor's understanding of a claim term is expressed in the prior art,

7   it can be evidence of how those skilled in the art would have understood that term

8   at the time of the invention.")

9           Defendants fault Mr. Kitchen for not being able to recite from memory

10   during his deposition examples in the field of the art that show the base referring

11   to the entire body of the charging system.  A deposition should not be a memory

12   test.  Mr. Kitchen has reviewed the Cole (U.S. Pat. 7,942,747) and Erickson (U.S.

13   Patent Pub. 2009/0072784) references relied upon by the Defendants' in their

14   Opposition to Nyko's Motion for a Temporary Restraining Order and provided his

15   opinion in his Rebuttal Report. [Dkt. No. 110, Kitchen Rebuttal Report at pp. 15-

16   20.]

17           Both the Cole and Erickson references refer to the body of the charger, i.e.

18   the entire support structure, as the base.  Erickson, refers to the entire body of the

19   charger as a "**base unit** 14," and refers to the "**charger base**" using the *same*

20   reference numeral 14. [*Id.*, Kitchen Rebuttal Report at ¶¶30-35.]  Cole refers to

21   the body of the charger as "vertical member or **game controller base** 15" and the

22   "vertical member or **base** 15b." [*Id.*, Kitchen Rebuttal Report at ¶¶36-41.]  Both

23   of these references show the use of the term "base" in the field of art at the time

24   of the invention to describe the "base" as being a foundation/support that is the

25   entire body of the charger upon which controllers rest.

26           Mr. Kitchen's testimony as to the proper construction of "base" is

27   consistent with the intrinsic evidence and provides the necessary perspective of a

28   person of ordinary skill in the art.  It is also in accordance with the laws of claim

CHRISTIE, PARKER & HALE, LLP

construction and should be considered.

## VI.   MR. KITCHEN'S OPINIONS ON THE CLAIM LANGUAGE "COUPLE TO" IS PROPER

### A.   Mr. Kitchen's Construction of "Couple to" is the Plain and Ordinary Meaning to a Person of Ordinary Skill in the Art

Mr. Kitchen has provided a construction of "couple to" based on his extensive background and experience in the field of art. [*See* Dkt. No. 99, Kitchen Report at ¶26 (stating that his opinions in his report are, among other things, based on his technical and educational background and in-depth experience in the field of art).]  Contrary to Defendants' assertions, Mr. Kitchen has opined that the term "couple to" should be given its plain and ordinary meaning.  Defendants misleadingly argue that Mr. Kitchen's opinion is contrary to the plain meaning, claiming that the plain and ordinary meaning is as found in extrinsic lay dictionaries, as opposed to the perspective of one of ordinary skill in the art at the time of the invention, as required. *Phillips*, 415 F.3d at 1312-13 ("We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . .").  Mr. Kitchen's understanding of the plain and ordinary meaning is from the perspective of one of ordinary skill in the art at the time of the invention.

In addition, Defendants misstate Mr. Kitchen's testimony.  Mr. Kitchen acknowledged that the *lay* dictionary definition provided by Defendants did not necessarily require a direct connection, but that such a definition is not the plain and ordinary meaning of the term "couple to" to one of ordinary skill in the art at the time of the invention.  When Mr. Kitchen was asked for the plain and ordinary meaning of the term "to couple to," he responded that "to couple to" was "[t]o directly connect two things together mechanically but obviously "couple" means a lot of things, but as an engineer, I would initially think of couple in a

-11-

mechanical sense, and it would be to connect two things together mechanically and directly." [Quigley Decl., Exh. B, Kitchen Depo. at 25:11-19.]   To Mr. Kitchen as an engineer, i.e. to one of ordinary skill in the art, "couple to" means a direct mechanical connection.[3]   Mr. Kitchen's opinion is supported by the specification, as he discusses in his reports. [Dkt. No. 99, Kitchen Report at ¶¶28-33; Dkt. No. 110, Kitchen Rebuttal Report at ¶¶8-16.]; *see also Phillips v. AWH Corp.*, 415 F.3d at 1313 (holding that a person of skill in the art must read the claim term in the context of the entire patent to aide in understanding the plain and ordinary meaning.)   The fact that lay dictionaries provide multiple, sometimes disparate definitions, outside the field of art and outside the context of the patent, is not relevant.

The Federal Circuit has recognized that "couple to" is a term of art with respect to mechanical devices.   In *In re Abbott Diabetes Care*, the Court found that the claim language suggested connectivity without cables or wires because the claims recite that the sensor's contact pads are "coupl[ed] to" conductive contacts.   *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012).  In *Johnson Worldwide*, the Court stated that a mechanical coupling denotes a connection without wires, again showing an understanding that "couple to" is a term of art in the field of mechanical arts. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (discussing the term "coupled" and comparing connecting via wires "rather than mechanically.")

Defendants argue that Mr. Kitchen and Nyko are reading "direct" into the language "couple to."   The technical dictionaries include a definition that "couple to" means to connect via "a mechanical fastening that connects shafts together for power transmission," which in the context of the patent refers to a mating

---

[3] As Mr. Kitchen opines in his initial report, a person of ordinary skill in the art would have a degree in engineering or equivalent degree or equivalent work experience. [Dkt. No. 99, Kitchen Report at ¶25.]

-12-

CHRISTIE, PARKER & HALE, LLP

connection between the male DC port and female receptacle on the controller. [Declaration of Katherine L. Quigley in Support of Nyko Technologies, Inc.'s Opening Claim Construction Brief ("Opening Quigley Decl."), Exh. F, Dkt. No. 105-2.]  Further, Defendants provide a construction of "electrically coupled to" that permits either a direct or an indirect connection, when the claims themselves do not recite that the connection can be indirect. [Joint Claim Construction Statement, Dkt. No. 86 at p. 4.]  It is only when reading the claim language in the context of the patent from the perspective of one of ordinary skill in the art that the meaning of both "couple to" and "electrically coupled to" can be determined. *Phillips*, 415 F.3d at 1313.

### B.   Mr. Kitchen's Testimony Regarding the Term "Couple To" Is Consistent With the Intrinsic Evidence and the Applicable Law

Defendants repeatedly argue that Mr. Kitchen's support is simply to argue the intrinsic evidence, without offering any technical knowledge.  [Dkt. No. 114, Def. Obj. at p. 13.]  Defendants' argument lacks merit.  Mr. Kitchen read and understood the patent from the perspective of one of ordinary skill in the art.  His understanding of those terms and his constructions based on those terms take into account his education and his years of experience in the industry - they are a reflection of his technical knowledge.  This is in exact accordance with the law of claim construction.  The Federal Circuit in *Phillips*, citing *Multiform Desiccants, Inc. v. Medzam, Ltd.,* stated it best:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.

*Phillips*, 415 F.3d 1313 (*citing Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed.Cir.1998)).

The fact that Mr. Kitchen used his technical knowledge and background in

-13-

testifying about the proper constructions is clearly laid out in his expert report. [Dkt. No. 99, Kitchen Report at ¶26 (stating that his opinions in his report are "[b]ased on my technical and educational background and my in-depth experience in the field of video game hardware, video game accessories, and video game controllers, and having read and analyzed the '848 Patent and other pertinent materials.").]

In his expert reports, Mr. Kitchen started with the intrinsic evidence and pointed out how the term "couple to" is used in every instance of the specification only to refer to a direct connection. [Dkt. No. 99, Kitchen Report at ¶32.]  Mr. Kitchen also pointed out that all embodiments of the patent show a direct connection between the DC ports and the controllers. [Dkt. No. 99, Kitchen Report at ¶31.]  Understanding a claim term to have a particular meaning based on consistent and exclusive usage in the specifications has been supported by the Federal Circuit. *See Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1334-38 (Fed. Cir. 2011), *reh'g denied*, 2011 U.S. App. LEXIS 11017 (Fed. Cir. Apr. 26, 2011) (limiting a claim term because the specification, including the figures, consistently and exclusively showed the claim term with that meaning); *see also Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.")

In his analysis of the term "couple to," Mr. Kitchen makes reference to claims 1 and 13, which refer to docking bays that receive the video game controllers from a first direction.  In addition, Mr. Kitchen describes a purpose of the invention, namely for the docking bays to support and align the controllers. [Dkt. No. 110, Kitchen Rebuttal Report at ¶¶8-16.]  There would be no need to have docking bays that support and align the video game controllers from a first direction if the coupling of the DC ports to the video game controllers was

-14-

1   indirect.  If the connection was indirect through a wire or cable, the video game

2   controllers would not be docked in the docking bays to couple to the DC ports;

3   there would be a cable in the way, therefore there would be no need for docking

4   bays that align the video game controllers. *See id.*

5       In every embodiment of the patent, the docking bays are shown and

6   described as including opposite surfaces for receiving and aligning the video

7   game controllers. *Id.*  If there was an intervening wire or cable between the DC

8   port and the video game controllers, the docking bays, whose function, according

9   to claim 1, is to receive the video game controllers, would now have no function

10  because the cable would impede the placement of the video game controllers into

11  the docking bays. [*See* Dkt. No. 105-1, Opening Quigley Decl., Exh. A, '848

12  Patent at Figs. 11 & 18.]  Thus, allowing "couple to" to include an indirect

13  connection would effectively and improperly read the function of the docking

14  bays out of the claims.  *Texas Instruments Inc. v. ITC*, 988 F.2d 1165, 1171 (Fed.

15  Cir. 1993) ("To construe the claims in the manner suggested by TI would read an

16  express limitation out of the claims.")

17      Defendants also argue that Mr. Kitchen's testimony should be stricken

18  because he has opined that "electrically coupled to," which Defendants say is a

19  subset of "couple to," can be a direct or indirect connection which is broader than

20  "couple to," which requires a direct connection.  In addition to being legally

21  irrelevant, this argument also takes Mr. Kitchen's testimony out of context.  Mr.

22  Kitchen is opining that "couple to" is used in a mechanical context in the patent,

23  and as such it means a direct connection, whereas "electrically coupled to" is used

24  in the electrical context and in that context means it can be a direct or indirect

25  transfer as long as it is for energy transfer, which is the plain and ordinary

26  meaning of the term in the electrical context and as used in the specification. [*See*

27  Dkt. No. 99, Kitchen Report at ¶¶28-38.]

28      In light of the above, it is clear that Mr. Kitchen's opinion is proper in light

-15-

of the intrinsic evidence.  Defendants attack Mr. Kitchen's understanding in the field of art, yet they do not offer any competing testimony of a person in the field of art to rebut such an understanding.  Whether Mr. Kitchen's opinion differs from the lay definitions provided by Defendants is irrelevant to the plain and ordinary meaning of the claim term "couple to" as viewed by one of ordinary skill in the art at the time of the invention.[4] *Phillips*, 415 F.3d 1313.

## VII.   MR. KITCHEN'S OPINIONS OF THE TERMS "AT LEAST ONE" AND "STRUCTURE" ARE RELIABLE

Defendants' criticism that Mr. Kitchen repeatedly cites to the patent specification lacks merit.  *See Phillips*, 415 F.3d at 1313.  Mr. Kitchen's construction of "at least one," like all of his opinions, is properly based on his perspective as one of ordinary skill in the art using his background knowledge in the field of art. [*See* Dkt. No. 99, Kitchen Report at ¶26.]

Defendants also claim that Mr. Kitchen's opinion is unreliable because he did not address the prosecution history in his initial report.  Mr. Kitchen acknowledges the relevance of the prosecution history to the process of claim construction in general.  However, Mr. Kitchen did not find that the amendments to the claims during the prosecution of the application affected the meaning of the term "at least one." [*See* Quigley Decl., Exh. B, Kitchen Depo. at 230:10-17.] The prosecution history is only relevant if the applicant clearly and unmistakably disavowed a meaning of a claim term in overcoming the prior art. *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005); *see also Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("[T]he prosecution

---

[4]   Contrary to the assertions of Defendants, the engineering definition of mechanical coupling supports a direct connection.  The engineering definition requires the direct connection via a mechanical fastening, which, as Mr. Kitchen explained, is the connectors on the video game controller and the base.  There is no separate intervening part. [Quigley Decl., Exh. B, Kitchen Depo. at 256:20-258:22.]

CHRISTIE, PARKER & HALE, LLP

1   history may not be used to infer the intentional narrowing of a claim absent the

2   applicant's clear disavowal of claim coverage.").

3         Nevertheless, after Defendants raised an argument about the prosecution

4   history for the first time in their opening brief, Mr. Kitchen reviewed and

5   responded to it.  As Mr. Kitchen said, the amendment changing "at least one

6   video game controller" to "a plurality of video game controllers" merely

7   "excluded the case of the invention holding a single video game controller."

8   [Quigley Decl., Exh. B, Kitchen Depo. at 230:10-17.]  In addition, Mr. Kitchen

9   stated that "[u]sing my understanding of 'at least one structure,' [the amended

10  claim] requires that one more structures provide physical support to the plurality

11  of video game controllers." [*Id.*, Kitchen Depo. at 230:14-17.]   Hence, Mr.

12  Kitchen opined that the prosecution history, which did not change the "at least

13  one structure" claim language, but which did affect the claim language relating to

14  the number of controllers, is therefore irrelevant to the meaning of "at least one

15  structure."  This opinion is entirely consistent with the prosecution history, and

16  highlights that the prosecution history did not clearly and unmistakably change

17  the meaning of this term. [*See* Dkt. No. 107, Nyko's Rebuttal Claim Construction

18  Brief at pp. 18-19.]

19        Defendants initially attack Mr. Kitchen for not addressing "structure" in his

20  first report.  But Mr. Kitchen could not have done so, given that Defendants never

21  articulated their indefiniteness argument prior to their opening brief.   Mr.

22  Kitchen's testimony on "structure" simply responds to Defendants' arguments,

23  and therefore could only be made in a responsive Rebuttal Report.

24        Defendants then proceed to take Mr. Kitchen's clear testimony and distort

25  it to create confusion where there is none.  First, Defendants misrepresent Mr.

26  Kitchen's testimony.  Defendants state that Mr. Kitchen testified that "to comply

27  with claim 1, because at least one structure must support a plurality of controllers,

28  it must form two or more docking bays," citing pages 220-225 of Mr. Kitchen's

-17-

testimony. [Dkt. No. 114, Def. Obj. at p. 15.]  Mr. Kitchen never made such a statement.   In addition, during Mr. Kitchen's deposition, directly prior to his testimony on this issue, Defendants' counsel set up the following hypothetical "Would you agree, Mr. Kitchen, that when -- according to claim 1, when the at least one structure on the base is -- is a single structure, that that single structure must comprise a plurality of docking bays?" [Quigley Decl., Exh. B, Kitchen Depo. at 220:25 - 221:4 (emphasis added).]   It is to this hypothetical that Mr. Kitchen is responding; the hypothetical situation where "the at least one structure on the base" is in fact only one structure.

Mr. Kitchen has been clear, as Defendants have themselves pointed out, that "at least one" means "one or more." [Dkt. No. 114, Def. Obj. at 15:5-7.] Thus, the claim limitations are met when one structure comprises a plurality of docking bays or more than one structure comprises a plurality of docking bays. For example, the structure may be a molded piece or separate pieces.  It doesn't matter.  Defendants are weaving in their arguments regarding the "at least one" claim language in order to create confusion as to the meaning of "structure."

Defendants also argue that Mr. Kitchen's testimony is inconsistent with the testimony of the inventor of the patent-in-suit, Amir Navid.  The transcripts of both Mr. Kitchen and Mr. Navid show that there is no dispute.  When asked to point to "at least one structure on the base for providing physical support," Mr. Navid pointed to the partitions 406 on Fig. 11 and said "those are support structures." [Dkt. No. 105-2, Opening Quigley Decl., Exh. K, Navid Depo. at 243:5-14.]  He also stated that each partition 406 was a separate structure. [*Id.*, Navid Depo. at 244:6-12.]  Mr. Kitchen agreed with this testimony.  [Quigley Decl., Exh. B, Kitchen Depo. at 198:6-14.]

As to defendants' claim of indefiniteness, as long as "the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, [the Federal Circuit has]

CHRISTIE, PARKER & HALE, LLP

1  held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."
2  *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir.
3  2001); *see Amgen Inc. v. F. Hoffmann-La Roche, Ltd.*, 580 F.3d 1340, 1371 (Fed.
4  Cir. 2009) (*citing Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d
5  1010, 1022 (Fed. Cir. 2009) (finding a claim not indefinite where the
6  specification provided several examples and the patentee submitted a declaration
7  explaining that the ordinarily skilled artisan would have understood the meaning
8  of the claim).  Further, to be indefinite, the moving party must show by clear and
9  convincing evidence that the term is insolubly ambiguous, i.e. not amenable to
10 construction. *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249-50
11 (Fed. Cir. 2008).

12         In regards to "structure," the plain meaning of the claim language suffices.
13 As Nyko explained in its responsive brief, the claims themselves recite that the
14 structures define docking bays, which have a plain meaning known in the art, and
15 that those structures include a pair of opposite surfaces. [*See* Dkt. No. 107,
16 Nyko's Rebuttal Claim Construction Brief at pp. 22-25.] The claims recite the
17 location of the opposite surfaces relative to the DC ports. *Id.*  The claims recite
18 the purpose of the docking bays to receive the video game controllers from a first
19 direction (claims 1, 5 and 13), and to align the video game controllers (claims 5
20 and 13). *Id.*  Defendants do not come close to meeting their high burden to prove
21 any asserted claim term is indefinite.[5]

22 _____

23 [5] Ironically, Defendants stated in a meet and confer on December 10, 2012,
24 regarding a purported summary judgment motion that they intended to file (but
   never did),  that claim construction was not necessary because Defendants were
25 relying on the "plain and ordinary meaning of the claims" to bring their motion.
26 [Bleeker Decl., ¶ 6.]  Defendants now take the exact opposition position.
   Defendants' prior contention that this Court could determine the plain and
27 ordinary meaning of claim terms for purposes of ruling on Defendants' summary
   judgment motion seriously undermines their brand new position as of April 3,
28 2013, that those same claim terms are indefinite as a matter of law.

-19-

Moreover, Nyko's reliance on Mr. Kitchen's expert opinion with respect to the Defendants' indefiniteness argument is undisputedly appropriate. *Biosig Instruments Inc. v. Nautilus*, *Inc.*, 2012-1289 at p. 21 (Fed. Cir. Apr. 23, 2013). Indefiniteness is determined based on whether the claims provide sufficient clarity to allow one of ordinary skill in the art to determine their meaning. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011).   In *Biosig*, the Federal Circuit considered testimony from experts that confirmed that the claims provided inherent parameters for a skilled artisan to understand the bounds of a "spaced relationship." *Biosig Instruments*, 2012-1289 at 16.  In the case at issue, Mr. Kitchen has similarly opined that one skilled in the art understands the bounds of the term "structure." [Dkt. No. 110, Kitchen Rebuttal Report at ¶¶59-68.]  Defendants failed to offer any evidence from one of ordinary skill in the art to the contrary.

## VIII.  CONCLUSION

For the foregoing reasons, the Court should not exclude the expert opinions of Mr. Kitchen.

DATED:  April 30, 2013                    Respectfully submitted,

CHRISTIE, PARKER & HALE, LLP


By   */s/ Katherine L. Quigley*
　　　Katherine L. Quigley

Attorneys for Plaintiff and
Counterdefendant,
Nyko Technologies, Inc.

CHRISTIE, PARKER & HALE, LLP