1   **ART HASAN, CA Bar No. 167323**
art.hasan@cph.com
2   **G. WARREN BLEEKER, CA Bar No. 210834**
warren.bleeker@cph.com
3   **KATHERINE L. QUIGLEY, CA Bar No. 258212**
katherine.quigley@cph.com
4   **CHRISTIE, PARKER & HALE, LLP**
**655 North Central Avenue, Suite 2300**
5   **Glendale, California 91203-1445**
**Telephone: (626) 795-9900**
6   **Facsimile:   (626) 577-8800**

7   Attorneys for Plaintiff and Counterdefendant,
NYKO Technologies, Inc.
8

9              UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11

| 12  NYKO TECHNOLOGIES, INC., a California corporation, | Case No. CV12-03001 GAF (VBKx) |
|---|---|
| 13               Plaintiff, | **DECLARATION OF KATHERINE L. QUIGLEY IN SUPPORT OF NYKO TECHNOLOGIES, INC.'S RESPONSE TO DEFENDANTS' OBJECTIONS TO EXPERT DECLARATIONS OF GARRY KITCHEN** |
| 14          vs. | |
| 15  ENERGIZER HOLDINGS, INC., a Missouri corporation, EVEREADY BATTERY COMPANY, INC., a Delaware corporation, and PERFORMANCE DESIGNED PRODUCTS LLC, a California limited liability company, | |
| 16 | |
| 17 | **Hon. Gary Allen Feess** |
| 18 | |
| 19               Defendants. | |
| 20 | |
| 21  AND RELATED COUNTERCLAIM. | |

22

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP

I, Katherine L. Quigley, declare as follows:

1.     I am an associate with Christie, Parker & Hale, LLP, counsel for Plaintiff and Counterdefendant NYKO Technologies, Inc. ("NYKO").  I make this declaration based on personal knowledge and if called as a witness, could competently testify to each of the following facts.

2.     Pursuant to agreement of the parties, Mr. Kitchen was made available for deposition on April 11, 2013.   Prior to his deposition, Nyko provided a detailed summary in two separate e-mail communications of all the topics on which he was expected to opine. Attached as Exhibit A are the e-mail communications I sent to counsel for the Defendants.

3.     Attached as Exhibit B are true and correct copies of excerpts from the deposition of Garry Kitchen which I attended on April 11, 2013, with relevant sections highlighted.

4.     On April 15, 2013, in connection with Nyko's responsive claim construction brief, Nyko served and filed a supplemental report from Mr. Kitchen in which he responds to and properly supplements his prior opinions in response to the new positions and arguments first advanced by Defendants in their April 3 opening brief.  The rebuttal report followed the summary that Nyko had provided to Defendants prior to Mr. Kitchen's deposition.

5.     Attached as Exhibit C is a true and correct copy of Section 2111.03 from the Manual of Patent Examining Procedure found on the U.S. Patent Office's website, with relevant sections highlighted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 30, 2013 in Glendale, California.

*/s/ Katherine L. Quigley*
Katherine L. Quigley

CHRISTIE, PARKER & HALE, LLP

-2-

# EXHIBIT A

**Katherine L. Quigley**

| | |
|---|---|
| **From:** | Katherine L. Quigley |
| **Sent:** | Friday, March 29, 2013 5:47 PM |
| **To:** | 'Gray Buccigross'; 'LegalTm-PDP-Nyko' |
| **Cc:** | Warren Bleeker; Art Hasan |
| **Subject:** | Nyko v. PDP - Summary of Expert Testimony |
| **Attachments:** | GarryKitchenCV_2013.pdf |

Gray,

Nyko has retained Mr. Garry Kitchen to offer opinions and expert testimony in this matter.  His CV is attached.  Further
to the agreement between the parties dated March 26, Nyko discloses that it intends to rely upon opinions by Mr.
Kitchen in connection with claim construction as follows:

1. As to the terms "to couple to" and "electrically coupled to," Mr. Kitchen will offer opinions that the meaning of the
terms depends on their context.  Within the context of the '848 Patent, Mr. Kitchen will confirm that the term "to couple
to" relates to the mechanical linkage between the DC port and the input port of the video game controller, and that the
appropriate definition of the term means to join, link or connect the aforementioned structures together without the
use of external wires or cables.  In contrast, the term "electrically coupled to" is an electrical term of art that allows for a
direct or indirect connection between components so long as the components electrically interact, for example, via
intermediate circuit elements.   Mr. Kitchen is expected to cite to examples in the intrinsic evidence and to rely upon his
experience and extrinsic evidence in the mechanical and electrical arts to support his opinions.

2. As to the term "at least one," within the context of the plain mathematical meaning of the term, the intrisic evidence
and extrinsic evidence, Mr. Kitchen will offer an opinion that the proper meaning of this term is "one or more."  Mr.
Kitchen will also opine that the definition offered by Defendants is at odds with the intrinsic evidence and is out of
context.  For example, Defendants construction that a single structure must define a plurality of docking bays is
inaccurate and unsupported, as is their construction each docking structure must have two or more pairs of opposite
surfaces.

3. Mr. Kitchen will also offer opinions in opposition to Defendants' indefiniteness claims either in the opening briefing or
rebuttal or both.  Mr. Kitchen will opine that sufficient structure is disclosed in the claims themselves, including with
respect to the opposite surfaces, the docking bays and the DC ports, and that the same are described in the written
description in a manner in which one skilled in the art would be able to discern what is being claimed.

4. Mr. Kitchen will offer an opinion that Nyko's proposed definition of the term "base," meaning the foundation or
support upon which structures including the controllers themselves rest, is proper given the intrinsic evidence.  Mr.
Kitchen will cite to portions of the written description where it is shown and/or described that the base is a body or
housing that holds, for example, circuitry and other elements.  Mr. Kitchen will opine that Defendants proposed
construction of the base being the bottom part of the charging system that provides physical support for the system
against an external adjacent surface (e.g., a table or wall) is an out of context definition that improperly removes the
preferred embodiment from claim coverage.

5.  Mr. Kitchen will respond to any additional specific arguments raised by Defendants in a rebuttal declaration filed with
the rebuttal briefs.

Regards,

Katherine Quigley

1



**Katherine L. Quigley, Esq.**
Christie, Parker & Hale, LLP
655 North Central Avenue, Suite 2300
Glendale, CA 91203-1445
PH: (626) 795-9900 | FAX: (626) 577-8800

--------------------------------------------------------------------

The information in this communication and any attached documents contain information from the law firm of Christie, Parker and Hale, LLP that may be confidential and/or privileged.  If you are not the intended recipient, or an agent responsible for delivering it to the intended recipient,  you may not read, copy, distribute or use this information.  If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete all electronic copies and destroy any hard copies.

**Katherine L. Quigley**

| | |
|---|---|
| **From:** | Katherine L. Quigley |
| **Sent:** | Wednesday, April 10, 2013 6:40 PM |
| **To:** | 'Gray Buccigross'; 'LegalTm-PDP-Nyko' |
| **Cc:** | Art Hasan; Warren Bleeker |
| **Subject:** | FW: Nyko v. PDP - Summary of Expert Testimony |

Hi Gray,

Just to clarify, when we referred to the subjects below in our prior email regarding the summary of Mr. Kitchen's testimony, we were referring to the attached email below.

Kat

---

**From:** Katherine L. Quigley
**Sent:** Friday, March 29, 2013 5:47 PM
**To:** 'Gray Buccigross'; 'LegalTm-PDP-Nyko'
**Cc:** Warren Bleeker; Art Hasan
**Subject:** Nyko v. PDP - Summary of Expert Testimony

Gray,

Nyko has retained Mr. Garry Kitchen to offer opinions and expert testimony in this matter.  His CV is attached.  Further to the agreement between the parties dated March 26, Nyko discloses that it intends to rely upon opinions by Mr. Kitchen in connection with claim construction as follows:

1. As to the terms "to couple to" and "electrically coupled to," Mr. Kitchen will offer opinions that the meaning of the terms depends on their context.  Within the context of the '848 Patent, Mr. Kitchen will confirm that the term "to couple to" relates to the mechanical linkage between the DC port and the input port of the video game controller, and that the appropriate definition of the term means to join, link or connect the aforementioned structures together without the use of external wires or cables.  In contrast, the term "electrically coupled to" is an electrical term of art that allows for a direct or indirect connection between components so long as the components electrically interact, for example, via intermediate circuit elements.   Mr. Kitchen is expected to cite to examples in the intrinsic evidence and to rely upon his experience and extrinsic evidence in the mechanical and electrical arts to support his opinions.

2. As to the term "at least one," within the context of the plain mathematical meaning of the term, the intrisic evidence and extrinsic evidence, Mr. Kitchen will offer an opinion that the proper meaning of this term is "one or more."  Mr. Kitchen will also opine that the definition offered by Defendants is at odds with the intrinsic evidence and is out of context.  For example, Defendants construction that a single structure must define a plurality of docking bays is inaccurate and unsupported, as is their construction each docking structure must have two or more pairs of opposite surfaces.

3. Mr. Kitchen will also offer opinions in opposition to Defendants' indefiniteness claims either in the opening briefing or rebuttal or both.  Mr. Kitchen will opine that sufficient structure is disclosed in the claims themselves, including with respect to the opposite surfaces, the docking bays and the DC ports, and that the same are described in the written description in a manner in which one skilled in the art would be able to discern what is being claimed.

4. Mr. Kitchen will offer an opinion that Nyko's proposed definition of the term "base," meaning the foundation or support upon which structures including the controllers themselves rest, is proper given the intrinsic evidence.  Mr. Kitchen will cite to portions of the written description where it is shown and/or described that the base is a body or housing that holds, for example, circuitry and other elements.  Mr. Kitchen will opine that Defendants proposed construction of the base being the bottom part of the charging system that provides physical support for the system against an external adjacent surface (e.g., a table or wall) is an out of context definition that improperly removes the preferred embodiment from claim coverage.

5.  Mr. Kitchen will respond to any additional specific arguments raised by Defendants in a rebuttal declaration filed with the rebuttal briefs.

Regards,

Katherine Quigley



**Katherine L. Quigley, Esq.**
Christie, Parker & Hale, LLP
655 North Central Avenue, Suite 2300
Glendale, CA 91203-1445
PH: (626) 795-9900 | FAX: (626) 577-8800

-----------------------------------------------------------------

The information in this communication and any attached documents contain information from the law firm of Christie, Parker and Hale, LLP that may be confidential and/or privileged.  If you are not the intended recipient, or an agent responsible for delivering it to the intended recipient,  you may not read, copy, distribute or use this information.  If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete all electronic copies and destroy any hard copies.

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4     ----------------------------
       NYKO TECHNOLOGIES, INC., a  )
 5     California corporation,     )
                                   )
 6          Plaintiff,             ) Case No.
                                   ) CV 12-3001 GAF (VBKx)
 7        vs.                      )
                                   )
 8     ENERGIZER HOLDINGS, INC., a )
       Missouri corporation,      ) VOLUME I
 9     EVEREADY BATTERY CO., INC., )
       a Delaware Corporation, and )
10     PERFORMANCE DESIGNED        )
       PRODUCTS LLC, a California   )
11     Limited Liability Company,  )
                                   )
12          Defendants.            )
       ----------------------------
13                                 )
       AND RELATED COUNTERCLAIM    )
14                                 )
       ----------------------------
15
16
17            DEPOSITION OF GARRY KITCHEN
18               GLENDALE, CALIFORNIA
19             THURSDAY, APRIL 11, 2013
20
21
22     Job No. 1647583
23     Reported by: RICKI Q. MELTON, CSR No. 9400
24
25     PAGES 1 - 264

                                        Page 1
```

| | | |
|---|---|---|
| 1 | report of Garry Kitchen re claim construction. | 01:16:01 |
| 2 | (Exhibit 103 was marked for | 01:16:01 |
| 3 | identification by the reporter | 01:16:01 |
| 4 | and is attached hereto.) | 01:16:01 |
| 5 | BY MR. HANLE: | 01:16:01 |
| 6 | Q    Do you have that before you? | 01:16:05 |
| 7 | A    I do. | 01:16:06 |
| 8 | Q    And in that, you outline some of your work | 01:16:06 |
| 9 | experience in the opening paragraphs, and then you | 01:16:11 |
| 10 | also attach a CV or resume; is that correct? | 01:16:13 |
| 11 | A    Yes, I do. | 01:16:18 |
| 12 | Q    Is that -- is the attached resume up to | 01:16:18 |
| 13 | date? | 01:16:24 |
| 14 | A    Yes, it is. | 01:16:24 |
| 15 | Q    Would you agree that most of your work | 01:16:25 |
| 16 | experience with respect to video games is software | 01:16:31 |
| 17 | experience? | 01:16:34 |
| 18 | A    Intrinsically, in the video game work I | 01:16:34 |
| 19 | have done, given the amount of time I have done it, | 01:16:51 |
| 20 | it's encompassed a combination of hardware and | 01:16:53 |
| 21 | software. | 01:16:57 |
| 22 | Q    Have you ever designed a hardware product | 01:16:57 |
| 23 | either relating to a video game console or | 01:17:10 |
| 24 | accessories? | 01:17:16 |
| 25 | A    I designed a number of hand-held | 01:17:17 |

Page 13

| | | |
|---|---|---|
| 1 | electronic games that were stand-alone video game | 01:17:22 |
| 2 | items that you held in your hand. | 01:17:30 |
| 3 | Q    Okay.  And what were those? | 01:17:32 |
| 4 | A    A product called Bank Shot marketed by | 01:17:33 |
| 5 | Parker Brothers.  Product called Wildfire marketed | 01:17:37 |
| 6 | by Parker Brothers.  I developed a prototype for a | 01:17:40 |
| 7 | product which became the Ohio Etch A Sketch | 01:17:46 |
| 8 | electronic drawing tool. | 01:17:49 |
| 9 | So I have done a significant amount of | 01:17:50 |
| 10 | work, earlier in my career, in hardware. | 01:17:53 |
| 11 | Q    And when -- when was the last time you | 01:17:57 |
| 12 | worked on a hardware product as you just described? | 01:17:58 |
| 13 | A    Well, as a designer of hardware would have | 01:18:02 |
| 14 | been, I would say, around 1987, but in writing code | 01:18:08 |
| 15 | and developing games, until very recently with the | 01:18:21 |
| 16 | latest round of consoles, you've always needed to | 01:18:27 |
| 17 | have a very intimate knowledge of how the hardware | 01:18:31 |
| 18 | works, and I've worked on a number of cases that | 01:18:35 |
| 19 | have involved hardware. | 01:18:37 |
| 20 | Q    Did you ever design any accessories for | 01:18:39 |
| 21 | PlayStation or Xbox video games? | 01:18:43 |
| 22 | A    I have not designed them, but I have | 01:18:47 |
| 23 | opined on them.  I have worked on cases where I | 01:18:51 |
| 24 | have had to look at the hardware for them.  I have | 01:18:56 |
| 25 | had to look at code and write code that interfaces | 01:18:58 |

Page 14

| | | |
|---|---|---|
| 1 | A No. | 01:31:48 |
| 2 | Q So one of the claim terms that you construe | 01:32:03 |
| 3 | is the term "to couple to"; is that correct? | 01:32:27 |
| 4 | A Yes. | 01:32:31 |
| 5 | Q So before reading the patent, would you | 01:32:33 |
| 6 | agree that the plain and ordinary meaning of "to | 01:32:39 |
| 7 | couple to" includes connecting directly and | 01:32:42 |
| 8 | indirectly? | 01:32:44 |
| 9 | A No, that's not how I would give the | 01:32:45 |
| 10 | definition. | 01:32:55 |
| 11 | Q Okay. Before reading the patent, what | 01:32:57 |
| 12 | would -- what was your understanding of the plain | 01:33:01 |
| 13 | and ordinary meaning of the term "to couple to"? | 01:33:04 |
| 14 | A To directly connect two things together | 01:33:09 |
| 15 | mechanically but obviously "couple" means a lot of | 01:33:13 |
| 16 | things, but as an engineer, I would initially think | 01:33:17 |
| 17 | of couple in a mechanical sense, and it would be to | 01:33:20 |
| 18 | connect two things together mechanically and | 01:33:23 |
| 19 | directly. | 01:33:27 |
| 20 | Q And what's the -- what's the basis of that | 01:33:46 |
| 21 | understanding? | 01:33:48 |
| 22 | A Just my experience and education. | 01:33:49 |
| 23 | MR. HANLE: Okay. I'll mark as the next | 01:33:57 |
| 24 | exhibit, 106, a document with Bates Nos. GK112 | 01:33:59 |
| 25 | through 116. | 01:34:02 |

Page 25

```
1           MR. HASAN:  That's a good one.            03:35:16

2           MR. HANLE:  Yeah.                         03:35:18

3           MR. HASAN:  Let's do it.  That's good.    03:35:18

4    BY MR. HANLE:                                    03:35:18

5       Q    So --                                    03:35:18

6           MR. HASAN:  Thank you.                    03:35:18

7    BY MR. HANLE:                                    03:35:18

8       Q    So before reading the patent, the '848  03:35:21

9    patent, would you agree that the plain and ordinary  03:35:24

10   meaning of the word "base" is the bottom support of  03:35:26

11   anything on which the thing stands or rests?     03:35:28

12      A    Not in the context of what I do for a    03:35:33

13   living.                                          03:35:35

14      Q    Okay.  Is -- so -- so in the context of  03:35:38

15   what you do for a living, is "base" -- does "base"  03:35:44

16   mean something different than the bottom of an   03:35:49

17   object on which it rests?                        03:35:50

18      A    "Base" can mean a million things.  I mean  03:35:52

19   it can mean all sorts of things.  There's a lot of  03:35:55

20   things that "base" can mean, and we can go to the  03:35:59

21   dictionary and look up a dozen of them, I'm sure.  03:36:01

22           In the context of this subject matter,   03:36:04

23   video game controllers, outside of the patent but  03:36:07

24   video game controllers and chargers, what the base  03:36:10

25   means is this unit.                              03:36:12
```

Page 119

| | | |
|---|---|---|
| 1 | If I had one of these in my house and my | 03:36:15 |
| 2 | kids were playing with the Xbox controllers that | 03:36:18 |
| 3 | are wireless, I would tell them to make sure to put | 03:36:20 |
| 4 | the controllers back in the base so that they | 03:36:23 |
| 5 | charge. | 03:36:25 |
| 6 | This is a common term.  "Base" is a common | 03:36:26 |
| 7 | term for this sort of a controller holder charger. | 03:36:28 |
| 8 | MR. HASAN:  For the record, the witness | 03:36:32 |
| 9 | picked up the entire device 58. | 03:36:33 |
| 10 | THE WITNESS:  Sorry. | 03:36:36 |
| 11 | BY MR. HANLE: | 03:36:37 |
| 12 | Q    Yeah.  I understand that's your new | 03:36:37 |
| 13 | opinion.  So let's -- but let's focus on the old | 03:36:38 |
| 14 | one. | 03:36:41 |
| 15 | Hold that cup in your hand.  Okay.  Put it | 03:36:42 |
| 16 | down on the table. | 03:36:46 |
| 17 | A    (Complies.) | 03:36:46 |
| 18 | Q    Where is the base of the cup? | 03:36:47 |
| 19 | MR. HASAN:  Objection. | 03:36:49 |
| 20 | THE WITNESS:  You are talking about cups | 03:36:50 |
| 21 | now? | 03:36:52 |
| 22 | BY MR. HANLE: | 03:36:52 |
| 23 | Q    Yes. | 03:36:53 |
| 24 | Where is the base -- | 03:36:53 |
| 25 | MR. HASAN:  Objection. | 03:36:53 |

Page 120

```
 1   BY MR. HANLE:                                       03:36:53

 2        Q      -- of the cup?                          03:36:53

 3        A      The base of the cup is the bottom.      03:36:53

 4        Q      Okay.  Where is the base of the chair you   03:36:55

 5   are sitting on?                                     03:36:58

 6        A      I don't know.  Is it on the bottom of the   03:36:58

 7   wheels?  I don't know.                              03:37:01

 8        Q      Okay.  But you think it's the bottom,   03:37:03

 9   somewhere in the bottom?                            03:37:04

10        A      Sure.                                   03:37:05

11        Q      Okay.  So would you agree that, in      03:37:06

12   general, the plain and ordinary meaning of the base   03:37:08

13   of an object is the bottom of the object that       03:37:13

14   supports the object?                                03:37:15

15             MR. HASAN:  Objection to the term         03:37:16

16   "general."                                          03:37:18

17             THE WITNESS:  In my report, I state       03:37:18

18   unequivocally (sic) that the plain and ordinary     03:37:20

19   meaning of the word "base" is irrelevant to this    03:37:23

20   discussion, and that's my opinion.                  03:37:25

21   BY MR. HANLE:                                       03:37:26

22        Q     Boy, I wonder if I should just stop there.   03:37:32

23   That's pretty good.                                 03:37:34

24             So let's -- let's -- let's talk about some   03:37:36

25   dictionary definitions for a minute, and we will go   03:37:49
```

| | | |
|---|---|---|
| 1 | back to the ones that you were provided, and this | 03:37:51 |
| 2 | is -- starting with Exhibit 106 is the first one, | 03:38:00 |
| 3 | which is the Webster's one. | 03:38:02 |
| 4 | A    Are they all in here? | 03:38:05 |
| 5 | Q    No. | 03:38:07 |
| 6 | So you've got Exhibit 108.  Keep that | 03:38:07 |
| 7 | because we will be back to that in a second, but | 03:38:11 |
| 8 | there's another one in your stack that's | 03:38:12 |
| 9 | Exhibit 106.  There it is. | 03:38:14 |
| 10 | And you recall this is the one -- one of | 03:38:21 |
| 11 | the ones you were provided and -- and looking at -- | 03:38:23 |
| 12 | this is the Webster's unabridged dictionary -- I | 03:38:33 |
| 13 | guess let me back up a half step. | 03:38:37 |
| 14 | Do you contend that "base" has a specific | 03:38:39 |
| 15 | meaning in the context of engineering in general? | 03:38:41 |
| 16 | A    No.  I contend that "base" has a specific | 03:38:45 |
| 17 | meaning in the context of these type of video game | 03:38:48 |
| 18 | controller chargers. | 03:38:53 |
| 19 | Q    Okay.  So looking at the dictionary | 03:38:54 |
| 20 | definition, 106, of "base," the first definition | 03:38:57 |
| 21 | there says -- this is on page GK114. | 03:39:00 |
| 22 | It says: | 03:39:06 |
| 23 | "The bottom support of anything | 03:39:06 |
| 24 | that on which the thing stands or | 03:39:08 |
| 25 | rests." | 03:39:10 |

Page 122

```
 1            Do you see that?                    03:39:11
 2      A    Yes.                                 03:39:11
 3      Q    And is that consistent with your    03:39:12
 4   understanding of the plain and ordinary meaning of  03:39:14
 5   the term "base" outside of the context of the '848  03:39:17
 6   patent?                                      03:39:19
 7            MR. HASAN:  Objection as to "plain and  03:39:20
 8   ordinary."                                   03:39:21
 9            THE WITNESS:  I don't understand why I  03:39:26
10   would care what the plain and ordinary meaning of  03:39:28
11   the term is when there's a term of art specific to  03:39:30
12   the scope of this invention that anyone who is in  03:39:32
13   the field knows for the term "base."         03:39:36
14            There are many, many definitions for the  03:39:39
15   term "base."  I don't care that a base is something  03:39:41
16   that my son stands on when he gets a single because  03:39:44
17   that has nothing to do with the scope of this  03:39:47
18   patent.                                      03:39:49
19            So I'm not debating what this dictionary  03:39:49
20   says, but it's not relevant.                 03:39:53
21   BY MR. HANLE:                                03:39:55
22      Q    Okay.  So I mean, you understand that  03:39:55
23   people litigate things that they disagree on; right?  03:39:58
24      A    I've heard that.                     03:40:00
25      Q    Okay.  And so you have had experts on the  03:40:01
```

Page 123

| | | |
|---|---|---|
| 1 | Can I have another water?  Thanks. | 03:43:32 |
| 2 | BY MR. HANLE: | 03:43:35 |
| 3 | Q    I'm going to move this back.  Let me ask | 03:43:41 |
| 4 | you a question. | 03:43:45 |
| 5 | There's a microphone here on the table | 03:43:45 |
| 6 | that the videographer has for Ms. Quigley down at | 03:43:47 |
| 7 | the end of the table since she is not mic'd up. | 03:43:51 |
| 8 | What would you consider the base of that | 03:43:54 |
| 9 | microphone? | 03:43:55 |
| 10 | A    This entire bottom piece. | 03:43:59 |
| 11 | Q    Okay.  Can you hold it up. | 03:44:01 |
| 12 | A    (Complies.) | 03:44:02 |
| 13 | Q    And point to the base. | 03:44:03 |
| 14 | A    This entire piece here. | 03:44:04 |
| 15 | Q    Okay.  Thank you. | 03:44:05 |
| 16 | And it wouldn't include -- I'm sorry.  One | 03:44:16 |
| 17 | more time. | 03:44:16 |
| 18 | It wouldn't include this shaft that | 03:44:17 |
| 19 | extends upwardly from this bottom part; correct? | 03:44:19 |
| 20 | MR. HASAN:  Objection. | 03:44:20 |
| 21 | BY MR. HANLE: | 03:44:21 |
| 22 | Q    That wouldn't be the base, in your mind? | 03:44:21 |
| 23 | A    We're talking out of context completely | 03:44:23 |
| 24 | from the patent and the video game controller | 03:44:27 |
| 25 | charger world.  Completely out of context of that, | 03:44:30 |

Page 128

| | | |
|---|---|---|
| 1 | I consider the base on this device to be this | 03:44:33 |
| 2 | bottom piece. | 03:44:37 |
| 3 | Q   Okay. | 03:44:40 |
| 4 | MR. HASAN:  Can we take a real short break | 03:44:58 |
| 5 | when you have a chance, Steve? | 03:45:00 |
| 6 | MR. HANLE:  Yeah, just give me just a | 03:45:02 |
| 7 | moment. | 03:45:03 |
| 8 | MR. HASAN:  Sure. | 03:45:04 |
| 9 | MR. HANLE:  I just have one question | 03:45:21 |
| 10 | before we break. | 03:45:22 |
| 11 | MR. HASAN:  Oh, no.  Please.  Go ahead. | 03:45:23 |
| 12 | BY MR. HANLE: | 03:45:23 |
| 13 | Q   And so in your -- | 03:45:24 |
| 14 | MR. HASAN:  Go ahead.  Sorry. | 03:45:26 |
| 15 | BY MR. HANLE: | 03:45:26 |
| 16 | Q   -- report, which is Exhibit 103, go to | 03:45:26 |
| 17 | page 9. | 03:45:35 |
| 18 | A   Okay.  Why can't I find my report? | 03:45:37 |
| 19 | Because you have it. | 03:45:44 |
| 20 | THE REPORTER:  No. | 03:45:45 |
| 21 | THE WITNESS:  No? | 03:45:46 |
| 22 | MR. HASAN:  It's right there. | 03:45:46 |
| 23 | THE WITNESS:  Oh, here it is.  The last | 03:45:46 |
| 24 | one. | 03:45:47 |
| 25 | Page 9? | 03:45:48 |

Page 129

| | | |
|---|---|---|
| 1 | BY MR. HANLE: | 03:45:48 |
| 2 | Q    Yes. | 03:45:49 |
| 3 | A    Okay. | 03:45:49 |
| 4 | Q    And here you say the correct meaning of | 03:45:54 |
| 5 | the term "base" -- this is on page 9, paragraph -- | 03:45:56 |
| 6 | it's 26D, and you say there the correct meaning of | 03:46:00 |
| 7 | the term "base" is the foundation or support upon | 03:46:04 |
| 8 | which structures rest. | 03:46:08 |
| 9 | Do you see that? | 03:46:09 |
| 10 | A    Yes. | 03:46:10 |
| 11 | Q    In that definition, the word "structures," | 03:46:11 |
| 12 | you recall that's a -- that's a term that's used in | 03:46:17 |
| 13 | the claims of the patent; correct? | 03:46:19 |
| 14 | A    Yes. | 03:46:19 |
| 15 | Q    Okay.  And so is the word "structures" in | 03:46:21 |
| 16 | your proposed construction here -- is that word | 03:46:26 |
| 17 | used the same way as the word "structures" is used | 03:46:29 |
| 18 | in the patent? | 03:46:32 |
| 19 | A    I believe we're modifying the correct | 03:46:36 |
| 20 | meaning of the term "base" to clarify that because | 03:46:40 |
| 21 | I gave the opinion that that was not the way would | 03:46:44 |
| 22 | I like to describe "base." | 03:46:52 |
| 23 | So there is a new definition for the term | 03:46:54 |
| 24 | "base" which we are proposing which came after I | 03:46:57 |
| 25 | wrote this report. | 03:46:59 |

Page 130

| | | |
|---|---|---|
| 1 | Q    Okay.  So when you proposed this, what did | 03:47:00 |
| 2 | you have in mind for the meaning of the word | 03:47:03 |
| 3 | "structures" in that proposed definition? | 03:47:06 |
| 4 | A    Well, in that definition, it could mean | 03:47:08 |
| 5 | either the actual structures as used in the patent | 03:47:13 |
| 6 | that make up the base that support the controllers, | 03:47:17 |
| 7 | or you could read that to mean it actually includes | 03:47:21 |
| 8 | devices that sit on the base like the controllers | 03:47:24 |
| 9 | themselves, and I didn't want there to be ambiguity | 03:47:27 |
| 10 | in the term "structures" to have people misinterpret | 03:47:30 |
| 11 | it. | 03:47:33 |
| 12 | So we decided not, I believe, in the new | 03:47:34 |
| 13 | definition to use "structures" because of that | 03:47:37 |
| 14 | ambiguity, and understand I was not involved in the | 03:47:40 |
| 15 | initial synthesis of the foundation or support upon | 03:47:44 |
| 16 | which structures rest, and my immediate comment to | 03:47:49 |
| 17 | it was why are we using the term "structures"?  It | 03:47:52 |
| 18 | may confuse the issue because that's a term that we | 03:47:56 |
| 19 | are discussing in other places. | 03:47:58 |
| 20 | MR. HANLE:  Okay.  Now is a good time. | 03:48:00 |
| 21 | MR. HASAN:  All right.  Thanks. | 03:48:01 |
| 22 | VIDEO OPERATOR:  Going off the record at | 03:48:02 |
| 23 | 3:48 P.M. | 03:48:03 |
| 24 | (Off the record.) | 03:48:05 |
| 25 | VIDEO OPERATOR:  Going back on the record | 03:57:48 |

Page 131

```
 1    structure?                                      05:20:32

 2           MR. HASAN:  Objection.  Asked and answered. 05:20:33

 3    BY MR. HANLE:                                   05:20:35

 4       Q    "Yes" or "no"?                          05:20:35

 5           MR. HASAN:  Asked and answered.          05:20:36

 6           THE WITNESS:  Each partition is a separate 05:20:38

 7    structure, but it takes more than one structure to 05:20:47

 8    satisfy the claims as they are here.            05:20:53

 9           It takes structures that create a docking 05:20:56

10    bay, structures that create a set of parallel   05:21:00

11    surfaces, opposite surfaces, and it takes a DC port. 05:21:07

12           So they are structures, yes, but a single 05:21:10

13    structure by itself is not going to practice the 05:21:13

14    claims of the patent.                           05:21:15

15    BY MR. HANLE:                                   05:21:17

16       Q    Okay.  Turn to page 12 of the -- NYKO's 05:21:24

17    brief, Exhibit 114.                             05:21:42

18           Okay.  So would you agree -- so I'll --  05:21:54

19    there's a sentence on page 12.  It starts at line 05:21:56

20    18, and it reads as follows:                    05:21:59

21           "The phrase 'at least one                05:22:01

22           structure' is repeatedly used in         05:22:02

23           claim 1 as a term to emphasize           05:22:06

24           that the structure can be either         05:22:08

25           one structure or more than one           05:22:10
```

Page 198

```
1            MR. HASAN:  Objection.                    06:02:14

2            THE WITNESS:  They may supply -- each side  06:02:55

3    of a partition may supply physical support --     06:02:57

4    partial physical support.                         06:03:02

5            Certainly, if I had one partition and I    06:03:04

6    tried to put down a controller with one partition, 06:03:05

7    it wouldn't support it because it would fall over, 06:03:09

8    but they play a role.                              06:03:13

9            The sides play a role in providing physical 06:03:14

10   support, but one partition in and of itself does   06:03:18

11   not create a docking bay, and one partition in and 06:03:22

12   of itself does not create pairs of opposite        06:03:25

13   surfaces.                                          06:03:28

14           MR. HASAN:  Can we -- that's three or four  06:03:30

15   questions.  Now can we take a break so he can      06:03:31

16   change his flight?                                 06:03:33

17           MR. HANLE:  Yeah.                           06:03:35

18           MR. HASAN:  Okay.                           06:03:36

19           VIDEO OPERATOR:  Going off the record at    06:03:37

20   6:03 P.M.                                          06:03:38

21           (Off the record.)                          06:03:40

22           VIDEO OPERATOR:  Going back on the record   06:23:56

23   at 6:24 P.M.                                       06:23:59

24   BY MR. HANLE:                                      06:23:59

25      Q    Okay.  Would you agree, Mr. Kitchen, that  06:24:03
```

Page 220

```
 1   when -- according to claim 1, when the at least one        06:24:06

 2   structure on the base is -- is a single structure,        06:24:09

 3   that that single structure must comprise a                06:24:13

 4   plurality of docking bays?                                06:24:17

 5           MR. HASAN:  Objection as to form.                 06:24:19

 6   BY MR. HANLE:                                             06:24:23

 7      Q   I'm looking at the -- it's the fourth             06:24:23

 8   element now.                                              06:24:26

 9           THE WITNESS:  I'm sorry.  Could you read         06:24:28

10   it back.                                                 06:25:10

11           (The following record was                        06:25:10

12           read by the reporter:                            06:25:10

13           "QUESTION:  Would you agree,                      06:24:03

14           Mr. Kitchen, that when --                        06:24:04

15           according to claim 1, when the at                06:24:07

16           least one structure on the base                  06:24:08

17           is a single structure, that that                 06:24:11

18           single structure must comprise a                 06:24:15

19           plurality of docking bays?")                     06:24:17

20           Yes, I'll agree to that.                         06:25:48

21   BY MR. HANLE:                                            06:25:50

22      Q   Okay.  And would you agree that, when the         06:25:55

23   at least one structure on the base is a single           06:25:57

24   structure, that that single structure must provide       06:26:00

25   physical support to two or more video game               06:26:03
```

                                                    Page 221

| | | |
|---|---|---|
| 1 | change is. | 06:35:57 |
| 2 | Q    Okay.  And so by changing the "at least | 06:35:57 |
| 3 | one video game controller" to the "plurality of | 06:36:01 |
| 4 | video game controllers," the amendment required | 06:36:05 |
| 5 | that the at least one structure provide physical | 06:36:08 |
| 6 | support to two or more video game controllers; | 06:36:11 |
| 7 | correct? | 06:36:11 |
| 8 | A    It excluded the case of the invention | 06:36:24 |
| 9 | holding a single video game controller. | 06:36:28 |
| 10 | Q    And so as a result, the least one | 06:36:30 |
| 11 | structure needed to provide physical support to two | 06:36:33 |
| 12 | or more video game controllers? | 06:36:37 |
| 13 | MR. HASAN:  Objection.  Asked and answered. | 06:36:38 |
| 14 | THE WITNESS:  Using my understanding of | 06:36:43 |
| 15 | "at least one structure," it requires that one or | 06:36:46 |
| 16 | more structures provide physical support to the | 06:36:50 |
| 17 | plurality of video game controllers. | 06:36:55 |
| 18 | BY MR. HANLE: | 06:36:57 |
| 19 | Q    And is it your understanding that -- that | 06:36:57 |
| 20 | that amendment was made in order to overcome the | 06:36:59 |
| 21 | rejection based on Chang? | 06:37:02 |
| 22 | A    I understand this change was made to | 06:37:06 |
| 23 | address a rejection based on Chang, yes. | 06:37:08 |
| 24 | Q    Okay.  Your Exhibit 112, which is the | 06:37:11 |
| 25 | e-mail with your -- with your new opinions, turn to | 06:37:42 |

Page 230

```
 1    Engineering.                                    07:15:49

 2            Is this what you are referring to?      07:15:49

 3       Q    We can take this in order here.         07:16:09

 4            On page 79 of Exhibit C, let's take a look  07:16:13

 5    at that one first.  Well -- yeah, page 79 of   07:16:20

 6    Exhibit C.                                      07:16:24

 7       A    Okay.                                   07:16:25

 8       Q    And do you see there, under "verb       07:16:26

 9    transitive," it says "1.  To link together,    07:16:29

10    connect"?                                       07:16:31

11       A    Yes.                                    07:16:33

12       Q    Is that consistent with your understanding  07:16:34

13    of what the patent shows of a -- of a direct   07:16:39

14    connection?                                     07:16:43

15       A    Yes, to link together, connect.         07:16:43

16            MR. HANLE:  Objection.  Leading and vague.  07:16:45

17            THE WITNESS:  "To link together, connect"  07:16:50

18    describes a direct connection.                  07:16:54

19    BY MR. HASAN:                                   07:16:56

20       Q    Okay.  And then look on page 85, and this  07:16:58

21    is a Dictionary of Mechanical Engineering.     07:17:01

22            What is the term "coupling" there, the  07:17:08

23    first one?                                      07:17:11

24       A    "A device for connecting together       07:17:13

25            two or more parts of a mechanism."      07:17:15
```

Page 256

| | | |
|---|---|---|
| 1 | Q      Okay.   And is that -- does the -- does | 07:17:18 |
| 2 | the DC port described in the patent in connection | 07:17:20 |
| 3 | with the female port -- is that consistent with | 07:17:24 |
| 4 | this? | 07:17:28 |
| 5 |             MR. HANLE:   Objection.   Vague. | 07:17:28 |
| 6 |             THE WITNESS:   You could say that the mating | 07:17:40 |
| 7 | of the two connectors are a device for connecting | 07:17:42 |
| 8 | together two or more parts, one -- | 07:17:50 |
| 9 | BY MR. HASAN: | 07:17:52 |
| 10 | Q      Yeah. | 07:17:52 |
| 11 | A      -- being the controller and one being the | 07:17:52 |
| 12 | base. | 07:17:55 |
| 13 | Q      Okay.   And let me take you to -- see if | 07:17:55 |
| 14 | there's something else here. | 07:18:00 |
| 15 |             On page 90 -- this is another dictionary. | 07:18:07 |
| 16 | Let me see which one this is.   Dictionary of | 07:18:11 |
| 17 | Scientific and Technical Terms. | 07:18:16 |
| 18 |             Do you see that on page 90, sir -- | 07:18:20 |
| 19 | A      Yes. | 07:18:20 |
| 20 | Q      -- of Exhibit 108? | 07:18:23 |
| 21 | A      Yeah. | 07:18:24 |
| 22 | Q      Okay.   It talks about a mechanical | 07:18:25 |
| 23 | fastening -- | 07:18:27 |
| 24 | A      Where are you?   What line? | 07:18:28 |
| 25 | Q      I'm sorry. | 07:18:29 |

Page 257

| | | |
|---|---|---|
| 1 | A | I'm sorry.  What column? | 07:18:30 |
| 2 | Q | On the right -- | 07:18:31 |
| 3 | A | Okay. | 07:18:33 |
| 4 | Q | -- where it says the mechanical | 07:18:34 |
| 5 | | engineering -- | 07:18:36 |
| 6 | | "The mechanical fastening that | 07:18:36 |
| 7 | | connects shafts together for | 07:18:38 |
| 8 | | power transmission." | 07:18:40 |
| 9 | | Do you see that? | 07:18:42 |
| 10 | A | Yes. | 07:18:43 |
| 11 | Q | Is that consistent with the -- what is | 07:18:43 |
| 12 | | described in the patent in the relation between the | 07:18:47 |
| 13 | | DC port, the male and the female? | 07:18:51 |
| 14 | A | If my understanding of the word "shaft" | 07:18:55 |
| 15 | | is correct, I guess you could refer to these as | 07:19:05 |
| 16 | | shafts. | 07:19:10 |
| 17 | | "Mechanical fastening that | 07:19:14 |
| 18 | | connects shafts together for | 07:19:16 |
| 19 | | power transmission." | 07:19:18 |
| 20 | | Yeah, I can consider these shafts.  So | 07:19:23 |
| 21 | | this is a mechanical fastening that connects shafts | 07:19:25 |
| 22 | | together. | 07:19:29 |
| 23 | | MR. HASAN:  Okay.  I have no further | 07:19:30 |
| 24 | | questions. | 07:19:35 |
| 25 | | You can follow up. | 07:19:37 |

Page 258

# EXHIBIT C

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

Original Eighth Edition August 2001

Latest Revision August 2012

U.S. DEPARTMENT OF COMMERCE

United States Patent and Trademark Office



Rev. 9, August   2012

Exhibit C
Page 27

The U.S. Patent and Trademark Office does not handle the sale of the Manual, distribution of notices and revisions, or change of address of those on the subscription list. Correspondence relating to existing subscriptions should be sent to the Superintendent of Documents at the following address:

> Superintendent of Documents      Telephone: 202-512-2267
> Mail List Section, Washington, DC 20402

Inquiries relating to purchasing the Manual should be directed to:

> Superintendent of Documents      Telephone: 202-512-1800
> United States Government Printing Office
> Washington, DC 20402,

Orders for reproduced copies of individual replacement pages or of previous revisions of the Manual should be sent to the following address:

> Mail Stop Document Services      Telephone: 1-800-972-6382
> Director of the U.S. Patent and Trademark Office      or 571-272-3150
> P.O. Box 1450
> Alexandria, VA 22313-1450,

Previous editions and revisions of the Manual are available on microfilm in the Patent Search Room.
The Manual is available on CD-ROM from:

> U.S. Patent and Trademark Office      Telephone: 571-272-5600
> Office of Electronic Information Products
> MDW 4C18, P.O. Box 1450
> Alexandria, VA 22313-1450

Pursuant to the Patent and Trademark Office Efficiency Act (PTOEA) (Pub. L. 106-113, 113 Stat. 1501A-572), the head of the United States Patent and Trademark Office (USPTO) is the "Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office." The Director is assisted by the "Deputy Under Secretary of Commerce for Intellectual Property and Deputy Director of the United States Patent and Trademark Office." The patent operations of the USPTO are now headed by the "Commissioner for Patents." The trademark operations of the USPTO are now headed by the "Commissioner for Trademarks." Under section 4741(b) of the PTOEA, any reference to the Commissioner of Patents and Trademarks, the Assistant Commissioner for Patents, or the Assistant Commissioner for Trademarks is deemed to refer to the Director, the Commissioner for Patents, or the Commissioner for Trademarks, respectively. See "Reestablishment of the Patent and Trademark Office as the United States Patent and Trademark Office" published in the *Federal Register* at 65 FR 17858 (Apr. 5, 2000), and in the *Official Gazette of the United States Patent and Trademark Office* at 1234 O.G. 41 (May 9, 2000).

Additions to the text of the Manual are indicated by arrows (><) inserted in the text. Deletions are indicated by a single asterisk (*) where a single word was deleted and by two asterisks (**) where more than one word was deleted. The use of three or five asterisks in the body of the laws, rules, treaties, and administrative instructions indicates a portion of the law, rule, treaty, or administrative instruction which was not reproduced.

> First Edition,  November 1949
> Second Edition,  November 1953
> Third Edition,  November 1961
> Fourth Edition,  June 1979
> Fifth Edition,  August 1983
> Sixth Edition,  January 1995
> Seventh Edition,  July 1998
> Eighth Edition,  August 2001
> > Revision 1, February 2003
> > Revision 2, May 2004
> > Revision 3, August 2005
> > Revision 4, October 2005
> > Revision 5, August 2006
> > Revision 6, September 2007
> > Revision 7, July 2008
> > Revision 8, July 2010
> > Revision 9, August 2012

**Exhibit C**
**Page 28**

no significance to the structure and process of making.); *In re Sinex*, 309 F.2d 488, 492, 135 USPQ 302, 305 (CCPA 1962) (statement of intended use in an apparatus claim did not distinguish over the prior art apparatus). If a prior art structure is capable of performing the intended use as recited in the preamble, then it meets the claim. See, e.g., *In re Schreiber*, 128 F.3d 1473, 1477, 44 USPQ2d 1429, 1431 (Fed. Cir. 1997) (anticipation rejection affirmed based on Board's factual finding that the reference dispenser (a spout disclosed as useful for purposes such as dispensing oil from an oil can) would be capable of dispensing popcorn in the manner set forth in appellant's claim 1 (a dispensing top for dispensing popcorn in a specified manner)) and cases cited therein. See also MPEP § **2112** - § **2112.02**.

>However, a "preamble may provide context for claim construction, particularly, where … that preamble's statement of intended use forms the basis for distinguishing the prior art in the patent's prosecution history." *Metabolite Labs., Inc. v. Corp. of Am. Holdings*, 370 F.3d 1354, 1358-62, 71 USPQ2d 1081, 1084-87 (Fed. Cir. 2004). The patent claim at issue was directed to a two-step method for detecting a deficiency of vitamin B$_{12}$ or folic acid, involving (i) assaying a body fluid for an "elevated level" of homocysteine, and (ii) "correlating" an "elevated" level with a vitamin deficiency. 370 F.3d at 1358-59, 71 USPQ2d at 1084. The court stated that the disputed claim term "correlating" can include comparing with either an unelevated level or elevated level, as opposed to only an elevated level because adding the "correlating" step in the claim during prosecution to overcome prior art tied the preamble directly to the "correlating" step. 370 F.3d at 1362, 71 USPQ2d at 1087. The recitation of the intended use of "detecting" a vitamin deficiency in the preamble rendered the claimed invention a method for "detecting," and, thus, was not limited to detecting "elevated" levels. *Id* .

See also *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d at 808-09, 62 USPQ2d at 1785 ("[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention.…Without such reliance, however, a preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." Consequently, "preamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant."). In *Poly-America LP v. GSE Lining Tech. Inc.*, 383 F.3d 1303, 1310, 72 USPQ2d 1685,

1689 (Fed. Cir. 2004), the court stated that "a '[r]eview of the entirety of the '047 patent reveals that the preamble language relating to 'blown-film' does not state a purpose or an intended use of the invention, but rather discloses a fundamental characteristic of the claimed invention that is properly construed as a limitation of the claim.…'" Compare *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1294-96, 70 USPQ2d 1780, 1783-84 (Fed. Cir. 2004) (holding that the preamble of a patent claim directed to a "hand-held punch pliers for simultaneously punching and connecting overlapping sheet metal" was not a limitation of the claim because (i) the body of the claim described a "structurally complete invention" without the preamble, and (ii) statements in prosecution history referring to "punching and connecting" function of invention did not constitute "clear reliance" on the preamble needed to make the preamble a limitation).<

## 2111.03 Transitional Phrases [R-9]

==The transitional phrases "comprising", "consisting essentially of" and "consisting of" define the scope of a claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim. > The determination of what is or is not excluded by a transitional phrase must be made on a case-by-case basis in light of the facts of each case. <==

==The transitional term "comprising", which is synonymous with "including", "containing," or "characterized by," is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.== See, e.g., *Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376, 71 USPQ2d 1837, 1843 (Fed. Cir. 2004) ("like the term 'comprising,' the terms 'containing' and 'mixture' are open-ended."). *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368, 66 USPQ2d 1631, 1634 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."); ==*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501, 42 USPQ2d 1608, 1613 (Fed. Cir. 1997) ("Comprising" is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.);== *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 229 USPQ 805 (Fed. Cir. 1986); *In re Baxter*, 656 F.2d 679, 686, 210 USPQ 795, 803 (CCPA 1981); *Ex parte Davis*, 80 USPQ 448, 450 (Bd. App. 1948) ("comprising" leaves "the claim open for the inclusion of unspecified ingredients even in major amounts"). In *Gillette Co. v. Energizer Holdings Inc.*, 405 F.3d 1367, 1371-73, 74 USPQ2d 1586, 1589-91 (Fed. Cir. 2005), the court held that a claim to "a safety razor blade unit comprising a guard, a cap, and a group of first, second, and third blades" encompasses razors with more than

Exhibit C
Page 29

MANUAL OF PATENT EXAMINING PROCEDURE

three blades because the transitional phrase "comprising" in the preamble and the phrase "group of" are presumptively open-ended. "The word 'comprising' transitioning from the preamble to the body signals that the entire claim is presumptively open-ended." *Id.* In contrast, the court noted the phrase "group consisting of" is a closed term, which is often used in claim drafting to signal a "Markush group" that is by its nature closed. *Id.* The court also emphasized that reference to "first," "second," and "third" blades in the claim was not used to show a serial or numerical limitation but instead was used to distinguish or identify the various members of the group. *Id.*

The transitional phrase "consisting of" excludes any element, step, or ingredient not specified in the claim. *In re Gray*, 53 F.2d 520, 11 USPQ 255 (CCPA 1931); *Ex parte Davis*, 80 USPQ 448, 450 (Bd. App. 1948) ("consisting of" defined as "closing the claim to the inclusion of materials other than those recited except for impurities ordinarily associated therewith."). But see *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32, 70 USPQ2d 1508, 1516 (Fed. Cir. 2004) (holding that a bone repair kit "consisting of" claimed chemicals was infringed by a bone repair kit including a spatula in addition to the claimed chemicals because the presence of the spatula was unrelated to the claimed invention). A claim which depends from a claim which "consists of" the recited elements or steps cannot add an element or step. When the phrase "consists of" appears in a clause of the body of a claim, rather than immediately following the preamble, it limits only the element set forth in that clause; other elements are not excluded from the claim as a whole. *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 230 USPQ 45 (Fed. Cir. 1986). See also *In re Crish*, 393 F.3d 1253, 73 USPQ2d 1364 (Fed. Cir. 2004) (The claims at issue "related to purified DNA molecules having promoter activity for the human involucrin gene (hINV)." *Id.*, 73 USPQ2d at 1365. In determining the scope of applicant's claims directed to "a purified oligonucleotide comprising at least a portion of the nucleotide sequence of SEQ ID NO:1 wherein said portion consists of the nucleotide sequence from … to 2473 of SEQ ID NO:1, and wherein said portion of the nucleotide sequence of SEQ ID NO:1 has promoter activity," the court stated that the use of "consists" in the body of the claims did not limit the open-ended "comprising" language in the claims (emphases added). *Id.* at 1257, 73 USPQ2d at 1367. The court held that the claimed promoter sequence designated as SEQ ID NO:1 was obtained by sequencing the same prior art plasmid and was therefore anticipated by the prior art plasmid which necessarily possessed the same DNA sequence as the claimed oligonucleotides . *Id.* at 1256 and 1259, 73 USPQ2d at 1366 and 1369.The court

affirmed the Board's interpretation that the transition phrase "consists" did not limit the claims to only the recited numbered nucleotide sequences of SEQ ID NO:1 and that "the transition language 'comprising' allowed the claims to cover the entire involucrin gene plus other portions of the plasmid, as long as the gene contained the specific portions of SEQ ID NO:1 recited by the claim[s]" *Id.* at 1256, 73 USPQ2d at 1366.

The transitional phrase "consisting essentially of" limits the scope of a claim to the specified materials or steps "and those that do not materially affect the basic and novel characteristic(s)" of the claimed invention. *In re Herz*, 537 F.2d 549, 551-52, 190 USPQ 461, 463 (CCPA 1976) (emphasis in original) (Prior art hydraulic fluid required a dispersant which appellants argued was excluded from claims limited to a functional fluid "consisting essentially of" certain components. In finding the claims did not exclude the prior art dispersant, the court noted that appellants' specification indicated the claimed composition can contain any well-known additive such as a dispersant, and there was no evidence that the presence of a dispersant would materially affect the basic and novel characteristic of the claimed invention. The prior art composition had the same basic and novel characteristic (increased oxidation resistance) as well as additional enhanced detergent and dispersant characteristics.). "A 'consisting essentially of' claim occupies a middle ground between closed claims that are written in a 'consisting of' format and fully open claims that are drafted in a 'comprising' format." *PPG Industries v. Guardian Industries*, 156 F.3d 1351, 1354, 48 USPQ2d 1351, 1353-54 (Fed. Cir. 1998). See also *Atlas Powder v. E.I. duPont de Nemours & Co.,* 750 F.2d 1569, 224 USPQ 409 (Fed. Cir. 1984); *In re Janakirama-Rao*, 317 F.2d 951, 137 USPQ 893 (CCPA 1963); *Water Technologies Corp. vs. Calco, Ltd.,* 850 F.2d 660, 7 USPQ2d 1097 (Fed. Cir. 1988). For the purposes of searching for and applying prior art under **35 U.S.C. 102** and **103**, absent a clear indication in the specification or claims of what the basic and novel characteristics actually are, "consisting essentially of" will be construed as equivalent to "comprising." See, e.g., *PPG*, 156 F.3d at 1355, 48 USPQ2d at 1355 ("PPG could have defined the scope of the phrase 'consisting essentially of' for purposes of its patent by making clear in its specification what it regarded as constituting a material change in the basic and novel characteristics of the invention."). See also *AK Steel Corp. v. Sollac,* 344 F.3d 1234, 1240-41, 68 USPQ2d 1280, 1283-84 (Fed. Cir. 2003) (Applicant's statement in the specification that "silicon contents in the coating metal should not exceed about 0.5% by weight" along with a discussion of the deleterious effects of silicon provided basis to conclude that silicon in excess of 0.5% by weight would materially alter the basic and

Exhibit C
Page 30

novel properties of the invention. Thus, "consisting essentially of" as recited in the preamble was interpreted to permit no more than 0.5% by weight of silicon in the aluminum coating.); *In re Janakirama-Rao*, 317 F.2d 951, 954, 137 USPQ 893, 895-96 (CCPA 1963). If an applicant contends that additional steps or materials in the prior art are excluded by the recitation of "consisting essentially of," applicant has the burden of showing that the introduction of additional steps or components would materially change the characteristics of applicant's invention. *In re De Lajarte*, 337 F.2d 870, 143 USPQ 256 (CCPA 1964). See also *Ex parte Hoffman*, 12 USPQ2d 1061, 1063-64 (Bd. Pat. App. & Inter. 1989) ("Although 'consisting essentially of' is typically used and defined in the context of compositions of matter, we find nothing intrinsically wrong with the use of such language as a modifier of method steps. . . [rendering] the claim open only for the inclusion of steps which do not materially affect the basic and novel characteristics of the claimed method. To determine the steps included versus excluded the claim must be read in light of the specification. . . . [I]t is an applicant's burden to establish that a step practiced in a prior art method is excluded from his claims by 'consisting essentially of' language.").

**OTHER TRANSITIONAL PHRASES**

Transitional phrases such as "having" must be interpreted in light of the specification to determine whether open or closed claim language is intended. See, e.g., *Lampi Corp. v. American Power Products Inc.*, 228 F.3d 1365, 1376, 56 USPQ2d 1445, 1453 (Fed. Cir. 2000) (The term "having" was interpreted as open terminology, allowing the inclusion of other components in addition to those recited); *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc.*, 246 F.3d 1336, 1348, 57 USPQ2d 1953, 1959 (Fed. Cir. 2001) (term "having" in transitional phrase "does not create a presumption that the body of the claim is open"); *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1573, 43 USPQ2d 1398, 1410 (Fed. Cir. 1997) (In the context of a cDNA having a sequence coding for human PI, the term "having" still permitted inclusion of other moieties.). The transitional phrase "composed of" has been interpreted in the same manner as either "consisting of" or "consisting essentially of," depending on the facts of the particular case. See *AFG Industries, Inc. v. Cardinal IG Company*, 239 F.3d 1239, 1245, 57 USPQ2d 1776, 1780-81 (Fed. Cir. 2001) (based on specification and other evidence, "composed of" interpreted in same manner as "consisting essentially of"); *In re Bertsch*, 132 F.2d 1014, 1019-20, 56 USPQ 379, 384 (CCPA 1942) ("Composed of" interpreted in same manner as "consisting of"; however, court further remarked that "the words 'composed of'

may under certain circumstances be given, in patent law, a broader meaning than 'consisting of.'").

**2111.04 "Adapted to," "Adapted for," "Wherein," and "Whereby" Clauses [R-9]**

Claim scope is not limited by claim language that suggests or makes optional but does not require steps to be performed, or by claim language that does not limit a claim to a particular structure. However, examples of claim language, although not exhaustive, that may raise a question as to the limiting effect of the language in a claim are:

    (A) "adapted to" or "adapted for" clauses;
    (B) "wherein" clauses; and
    (C) "whereby" clauses.

The determination of whether each of these clauses is a limitation in a claim depends on the specific facts of the case. >See, e.g., *Griffin v. Bertina*, 283 F.3d 1029, 1034, 62 USPQ2d 1431 (Fed. Cir. 2002)(finding that a "wherein" clause limited a process claim where the clause gave "meaning and purpose to the manipulative steps").< In *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329, 74 USPQ2d 1481, 1483 (Fed. Cir. 2005), the court held that when a "'whereby' clause states a condition that is material to patentability, it cannot be ignored in order to change the substance of the invention." *Id.* However, the court noted (quoting *Minton v. Nat'l Ass'n of Securities Dealers, Inc.*, 336 F.3d 1373, 1381, 67 USPQ2d 1614, 1620 (Fed. Cir. 2003)) that a "'whereby clause in a method claim is not given weight when it simply expresses the intended result of a process step positively recited.'" *Id.*

>

**2111.05 Functional and Nonfunctional Descriptive Material [R-9]**

USPTO personnel must consider all claim limitations when determining patentability of an invention over the prior art. *In re Gulack*, 703 F.2d 1381, 1385, 217 USPQ 401, 403-04 (Fed. Cir. 1983). Since a claim must be read as a whole, USPTO personnel may not disregard claim limitations comprised of printed matter. See *Gulack*, 703 F.2d at 1384, 217 USPQ at 403; see also *Diamond v. Diehr*, 450 U.S. 175, 191, 209 USPQ 1, 10 (1981). However, USPTO personnel need not give patentable weight to printed matter absent a new and unobvious functional relationship between the printed matter and the substrate. See *In re Lowry*, 32 F.3d 1579, 1583-84, 32 USPQ2d 1031, 1035 (Fed. Cir. 1994); *In re Ngai*, 367 F.3d 1336, 70 USPQ2d 1862 (Fed. Cir. 2004). The rationale behind the printed matter cases, in which, for

**Exhibit C**
**Page 31**