1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2       Including Professional Corporations

3   DANIEL N. YANNUZZI, Cal. Bar No. 196612
    dyannuzzi@sheppardmullin.com
4   GRAHAM (GRAY) M. BUCCIGROSS, Cal. Bar No. 234558
    gbuccigross@sheppardmullin.com
5   MATTHEW M. MUELLER. Cal. Bar No. 268486
    mmueller@sheppardmullin.com
6   12275 El Camino Real, Suite 200
    San Diego, California  92130-2006
7   Telephone:  858.720.8900
    Facsimile:   858.509.3691
8
    STEVEN M. HANLE, Cal. Bar No. 168876
9   shanle@sheppardmullin.com
    650 Town Center Drive, 4th Fl.
10  Costa Mesa, CA  92626
    Telephone:  714.513.5100
11  Facsimile:   714.513.5130

12  Attorneys for Performance Designed Products
    LLC, Energizer Holdings, Inc., and Eveready
13  Battery Co., Inc.

14              UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16

17  NYKO TECHNOLOGIES, INC. a          Case No. CV12-03001-GAF-VBK
    California Corporation,
18                                     **MEMORANDUM OF POINTS AND**
                  Plaintiff,           **AUTHORITIES IN SUPPORT OF**
19                                     **DEFENDANTS' MOTION FOR**
            v.                         **SUMMARY JUDGMENT OF**
20                                     **PATENT INVALIDITY**

    ENERGIZER HOLDINGS, INC. a
21  Missouri Corporation, EVEREADY     Date:  September 23, 2013
    BATTERY CO., INC, a Delaware       Time: 9:30 a.m.
22  Corporation, and PERFORMANCE
    DESIGNED PRODUCTS LLC, a           Complaint Filed:  April 5, 2012
23  California Limited Liability Company,   Discovery Cutoff:   Oct. 14, 2013
                                       Pretrial Conf.:  Dec. 30, 2013
24                Defendants.          Trial Date: Jan. 28, 2014

25

26

27

28
                                                   Case No. CV12-03001
    SMRH:409958749.1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................. 3

III.  UNDISPUTED MATERIAL FACTS ................................................. 3

      A.   Public Use ................................................................................ 3

      B.   On-Sale Bar .............................................................................. 4

      C.   Charge Base 2 .......................................................................... 6

      D.   The Navid Provisional ............................................................. 6

      E.   The '295 Application ................................................................ 9

      F.   '848 Patent ............................................................................. 10

IV.   LEGAL AUTHORITY AND ANALYSIS ....................................... 11

      A.   Section 102(b) ........................................................................ 11

           1.   The Charge Base Was In Public Use Before the Critical
                Date ............................................................................... 11

           2.   The Charge Base Was On Sale Before the Critical Date .......... 13

      B.   The Asserted Claims Are Not Entitled to the Priority Date of the
           Navid Provisional .................................................................. 15

      C.   Claims 10 and 15 Invalid Based on Nyko's Public Use and the
           On-Sale Bar ............................................................................ 21

V.    CONCLUSION ................................................................................ 23

SMRH:409958749.1

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adenta GMBH v. Orthoarm, Inc.*
  501 F.3d 1364 (Fed. Cir. 2007) ............................................................ 12

*Anascape, Ltd. v. Nintendo of Am., Inc.*
  601 F.3d 1333 (Fed. Cir. 2010) ......................................................... 19, 20

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*
  516 F. 3d 1361 (Fed. Cir. 2008) ........................................................ 13, 14

*Avia Group International, Inc. v. L.A. Gear California, Inc.*
  853 F.2d 1557 (Fed. Cir. 1988) ............................................................ 11

*Beachcombers v. WildeWood Creative Products, Inc.*
  31 F. 3d 1154 (Fed. Cir. 1994) ............................................................ 12

*Bone Care Intern., LLC v. Pentech Pharms.*
  741 F. Supp. 2d 865 (N.D. Ill. 2010) .................................................... 15

*In re Caveney*
  761 F.2d 671 (Fed. Cir. 1985) ........................................................... 13, 14

*Clock Spring, L.P. v. Wrapmaster, Inc.*
  560 F.3d 1317 (Fed. Cir. 2009) ............................................................ 22

*Dippin' Dots, Inc. v. Mosey*
  476 F.3d 1337 (Fed. Cir. 2007) ............................................................ 22

*Group One, Ltd. v. Hallmark Cards, Inc.*
  254 F.3d 1041 (Fed. Cir. 2001) ............................................................ 14

*Invitrogen Corp. v. Biocrest Mfg., L.P.*
  424 F.3d 1374 (Fed. Cir. 2005) ......................................................... 11, 12

*KSR Intern. Co. v. Teleflex Inc.*
  550 U.S. 398 (2007) ......................................................................... 22

*Lockwood v. Am. Airlines, Inc.*
  107 F.3d 1565 (Fed. Cir. 1997) ......................................................... 17, 20

*Martin v. Mayer*
   823 F.2d 500 (Fed.Cir.1987) ....................................................................... 16, 17

*Netscape Commens. Corp. v. Konrad*
   295 F.3d 1315 (Fed.Cir. 2002) ..................................................................... 11, 22

*New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co.*
   298 F.3d 1290 (Fed. Cir. 2002) ........................................................... 3, 15, 16, 20

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*
   587 F.3d 1324 (Fed. Cir. 2009) ........................................................................ 21

*Petrolite Corp. v. Baker Hughes Inc.*
   96 F.3d 1423 (Fed. Cir. 1996) .......................................................................... 11

*Pfaff v. Wells Electronics, Inc.*
   525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998) ................................... 13, 22

*PowerOasis, Inc. v. T-Mobile USA, Inc.*
   522 F.3d 1299 (Fed. Cir. 2008) ........................................................................ 15

*STX, LLC v. Brine, Inc.*
   211 F.3d 588 (Fed. Cir. 2000) ................................................................ 2, 13, 14

*Tronzo v. Biomet, Inc.*
   156 F.3d 1154 (Fed. Cir. 1998) ........................................................................ 20

*Wyers v. Master Lock Co.*
   616 F.3d 1231 (Fed. Cir. 2010) ........................................................................ 22

Statutes

35 U.S.C. § 102(b) ............................................................. 1, 3, 11, 12, 15, 21, 22

35 U.S.C. § 103 .................................................................................... 2, 3, 22

35 U.S.C. § 103(a) ............................................................................................ 21

35 U.S.C. § 112 .......................................................................................... 15, 18

35 U.S.C. § 119(e)(1) ........................................................................................ 15

UCC § 2-204 ..................................................................................................... 14

UCC § 2-207 ..................................................................................................... 14

SMRH:409958749.1

## I.    INTRODUCTION

A person is not entitled to a patent if the invention was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. §102(b).  The patent law thus provides patentees with a one year grace period to file a patent after engaging in commercial activity. The purpose of this grace period is to encourage inventors to file patents in a timely fashion and to prevent them from improperly extending their monopoly.  Here, the device claimed in the asserted claims of the '848 Patent, Nyko's "Charge Base," was in public use and on sale more than a year before the patent's filing date of March 7, 2008.  Those claims are therefore invalid under Section 102(b).

The evidence of public use and sales before the critical date (March 7, 2007) is beyond dispute.  The public uses and sales were not experimental or confidential. For example, below is a screen shot of a video of a very public demonstration of the Charge Base during the 2007 Consumer Electronics Show between January 8 and 11, 2007, and posted on YouTube on January 13, 2007.  (Ex. 17.)[1]



---
[1]    See ¶ 2 of the accompanying Statement of Undisputed Facts ("UMF ¶ 2") and Ex. 17.  "Ex. __ " refers to exhibits to the accompanying declaration of Graham Buccigross.

Nyko has admitted that "[t]he product Nyko introduced in January 2007 includes each and every feature of the claimed invention." (Dkt. No. 44 ¶ 17.) Specifically, Nyko admits that this Charge Base included all the elements of at least 12 of the 14 asserted claims.[2]

At the same time it was publicly demonstrated, the Charge Base was offered for sale and, within days, Nyko had actually accepted and confirmed several purchase orders for the product. In sum, Nyko accepted at least 19 separate orders for a total of at least 4,665 Charge Base units between January 8, 2007 and March 2, 2007. These purchase orders and related documents establish undisputed offers for sale and sales before the March 7, 2007 critical date. Nyko has argued that these stransactions were not offers for sale or sales because the products were not delivered until after the critical date. This argument fails as a matter of law. *See STX, LLC v. Brine, Inc.*, 211 F.3d 588, 590 (Fed. Cir. 2000) ("The fact that delivery was set for dates after the critical date is irrelevant to the finding of a commercial offer to sell.")

Nyko alternatively argues that that Asserted Claims are entitled to the priority of a provisional patent application filed October 24, 2007. Again, Nyko is incorrect as a matter of law. As addressed below, that provisional application described and claimed an entirely different invention from the one that is the subject of the Asserted Claims. Specifically, unlike the Asserted Claims, the provisional application did not disclose "DC ports on the base" of the charging device, and required a separate adapter with a DC port on the adapter to establish the connection between the base of the charging device and a wireless controller. Nyko may argue that the provisional application renders obvious the Asserted Claims. This

---

[2]    Nyko asserts claims 1-5, 7, 8, 10-13, and 15-17 (the "Asserted Claims"). Nyko apparently asserts that the Charge Base did not include the <u>external</u> AC-to-DC converter of claims 10 and 15, however, external AC-to-DC converters were extremely well known in the art and those claims are invalid as obvious under 35 U.S.C. §103. *See* Section IV(C) below.

1  argument, however, has been repeatedly rejected by the Federal Circuit, as

2  established in Section IV(B), below.  Under that precedent, claims are not entitled to

3  priority of an earlier application unless the earlier application "necessarily discloses"

4  the claimed device.  *See, e.g.*, *New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co.*, 298

5  F.3d 1290, 1294 (Fed. Cir. 2002).   That is not the case here.

6       Because Nyko is <u>not</u> entitled to priority based on the provisional, and Nyko

7  did not file the application that resulted in the '848 Patent until March 7, 2008 –

8  more than one year after it publicly used and placed the invention on sale -- the

9  Asserted Claims are invalid under Sections 102(b) and 103.

10  **II.    BACKGROUND**

11       In the weeks leading up to the Consumer Electronics Show in Las Vegas

12  starting on January 8, 2007 (CES 2007), Nyko pushed its manufacturer to complete

13  a "sales demonstration sample" of the invention.  (Ex. 27.)  Nyko also assigned a

14  part number for the product (83017), which it called "Charge Base PS3," and started

15  including the product on its Dealer Price Sheet.  (Ex. 28.)  The sample was

16  completed, and the alleged invention was reduced to practice, on December 26,

17  2006 (the "Demonstration Charge Base").  (Ex. 3, p. 3-4 to 3-5.)  On December 29,

18  2006, Nyko ordered 36,000 units of the Charge Base from its Hong Kong

19  manufacturer.  (Ex. 25.)

20  **III.   UNDISPUTED MATERIAL FACTS**

21       **A.    <u>Public Use</u>**

22       On January 8, 2007, Nyko publicly announced the launch of its Charge Base

23  product.  Nyko's press release confirmed that the Charge Base "will debut at this

24  year's Consumer Electronics Show in Las Vegas, Nevada."  (Defendants' Statement

25  of Undisputed Material Facts ("UMF") ¶ 1.)  The press release also announced that

26  "the Charge Base for PS3 has a suggested retail price of $39.99," and that "Nyko

27  will offer hands-on demos of all of its PlayStation 3 products at this year's

28  Consumer Electronics Show in Las Vegas, Nevada."  (*Id.*)  Nyko then publicly

-3-

SMRH:409958749.1

demonstrated the Charge Base between January 8 and 11, 2007 during Consumer Electronics Show in a Las Vegas Hilton Hotel suite open to members of the press and to retailers of video game accessories. (UMF 2.) The members of the press and retailers who viewed the Charge Base on or after January 8, 2007 were allowed to videotape and photograph it, and were under no limitation, restriction, or obligation of confidentiality. (UMF ¶ 3.) The Charge Base included all the elements of claims 1-5, 7, 8, 11-13, and 16-17. (UMF ¶ 4.)

In the week following the press release and the hotel suite demonstration, numerous publications further disclosed the Charge Base, including a video published on an industry review website and on YouTube, photographs of the Charge Base, written descriptions of the Charge Base, and its retail price. (UMF ¶ 5.)

### B.   On-Sale Bar

By January 8, 2007, the same day Nyko issued its press release, it placed the Charge Base on sale by communicating at least its price, part number, product name and product description to its customer Amazon so that Amazon could order Charge Base products. (UMF ¶ 6.) On the same day, Amazon emailed to Nyko four separate purchase orders for four different Amazon locations for a total of 460 Charge Base units at $22 per unit (a 45% discount off the $39.99 retail price). (UMF ¶ 7.) On the next day, January 9, 2007, Nyko accepted the orders by generating and sending to Amazon "Sales Orders" for each of the Amazon purchase orders. (UMF ¶ 8.) Each of the Sales Orders includes Amazon's corresponding purchase order number, as well as the quantity, part number, product description and discounted pricing of the Charge Base units ordered. (*Id.*) Nyko's documents show that it shipped products pursuant these Amazon purchase orders and Nyko's confirming Sales Order documents (numbered 97145 to 97148) on July 11, 2007. (UMF ¶ 9.)

Altogether, Nyko offered for sale and accepted the following orders for the Charge Base before the on-sale bar date of March 7, 2007:

| Order Date | Customer | Units ordered | Price | Exhibit Nos. |
|---|---|---|---|---|
| 1/8/2007 | Amazon.com.DEDC, Inc. (DE) | 160 | $22.00 | |
| 1/8/2007 | Amazon.com.KYDC, Inc. (KY) | 60 | $22.00 | |
| 1/8/2007 | Amazon.com.KYDC, Inc. (KY) | 100 | $22.00 | |
| 1/8/2007 | Amazon.com (NV) | 140 | $22.00 | |
| 1/24/2007 | Visco Entertainment | 100 | $17.00 | |
| 2/1/2007 | Hollywood Ent./Game Crazy (OR) | 400 | $22.00 | |
| 2/1/2007 | Hollywood Entertainment (TN) | 600 | $22.00 | |
| 2/5/2007 | Vast Electronics | 20 | $17.00 | |
| 2/5/2007 | Baker & Taylor Entertainment (NJ) | 100 | $17.00 | |
| 2/6/2007 | Baker & Taylor Entertainment (TX) | 300 | $22.00 | |
| 2/6/2007 | Baker & Taylor Entertainment (NJ) | 600 | $22.00 | |
| 2/6/2007 | Baker & Taylor Entertainment (NV) | 300 | $22.00 | |
| 2/6/2007 | Baker & Taylor Entertainment (IL) | 600 | $22.00 | |
| 2/8/2007 | Viastara | 600 | $19.80 | |
| 2/20/2007 | Corporate PC | 100 | $20.00 | |
| 2/20/2007 | Solution 2 Go, Inc. | 200 | $22.00 | |
| 2/22/2007 | Eurpac Warehouse Sales | 200 | $19.80 | |
| 2/23/2007 | Micro Electronics | 5 | $17.00 | |
| 3/2/2007 | Fillpoint | 80 | $20.57 | |
| | **Total Units Ordered** | **4,665** | | |

In sum, Nyko accepted at least 19 separate orders for a total of at least 4,665 Charge Base units between January 8, 2007 and March 2, 2007.  (UMF ¶ 10.) While Nyko has not produced complete information on when all of these orders were filled, Nyko's documents indicate that (in addition to the Amazon orders) the following Charge Base units were shipped by Nyko on July 11, 2007 pursuant to orders accepted and confirmed before the March 7, 2007 on-sale bar date:  100 of the 300 Charge Base units ordered by Baker & Taylor Entertainment (NV) on February 6, 2007; 100 of the 600 units ordered by Baker & Taylor Entertainment

(IL) on February 6, 2007; the 200 Charge Base units ordered by Eurpac on February 22, 2007.  (UMF ¶ 11).

Thus, Nyko both offered for sale the invention claimed in claims 1-5, 7, 8, 11-13 and 16-17 more than one year before applying for the '848 Patent, and sold the invention by entering into binding sales contracts through the exchange of purchase orders and Nyko's confirming Sales Orders.  (*See* Section IV(A)(2).)

### C.  <u>Charge Base 2</u>

Within a few months after it started shipping its Charge Base product in June 2007, Nyko decided to change its design to include two docking bays rather than four, and to attach adapters to the controllers to facilitate the connection to the body of the charger.  Nyko refers to this product as Charge Base 2.  (Exs. 29, 30.)  In early October 2007, Nyko requested that its Chinese manufacturer provide a circuit diagram for the Charge Base 2 in connection with the filing of a patent application.  (Ex. 30.)  As described in Nyko's press release, the Charge Base 2 employed "a totally new contact point dongle system" consisting of "two light weight Mini USB charge adaptors that attach to the controller and allow for easy drop and charge functionality through the Charge Base 2's specialized charging ports."  (UMF ¶ 13.)

Nyko employee Amir Navid filed a provisional patent application on the Charge Base 2 product on October 24, 2007 ("Navid Provisional").  Navid had not previously filed for patent protection on the any charge stand for wireless controllers.  (UMF ¶ 12.)  As addressed below, the Navid Provisional is directed solely to the Charge Base 2 invention, and does not disclose the Charge Base that Nyko had been selling for months, with DC ports on the base rather than on a separate external adapter.

### D.  <u>The Navid Provisional</u>

Nyko now argues that the Asserted Claims are entitled to the priority date of the Navid Provisional Application.  However, unlike the Asserted Claims of the '848 Patent, the Navid Provisional does not disclose DC ports or USB ports of any

kind on the base, and <u>only</u> discloses embodiments requiring a separate external adapter.  (UMF ¶ 14.)  Indeed, the Navid Provisional expressly teaches away from required elements of the Asserted Claims (DC ports on the base of the charging system) because the DC ports can be easily bent or broken when repeatedly plugging and unplugging the controller to and from the charging system.  (UMF ¶¶ 15-20.)  In describing the prior art, the Navid Provisional states:

> [0003] Frequent replacement of batteries can be expensive, and as a result many accessory devices utilize rechargeable batteries. The accessory device is connected to a charging station periodically to recharge the batteries. The charging station and the accessory device have matching plugs or ports that fit together to make a connection. If the plug on the charging station or the accessory device is broken or damaged, the accessory device can no longer be connected to the charging station. These plugs can be small and/or fragile, as the accessory device itself is often a small, compact device. These small plugs can be easily bent or broken, rendering the charging station inoperable. The user has to be careful to connect the plugs slowly, gently, and completely, in order to make a proper connection without damaging the parts.

(UMF ¶ 15.)

The Navid Provisional describes that the object of the invention is to overcome this problem as follows:

> [0004] Thus, it is desirable to provide an improved charging station that allows for fast, easy, and reliable connection between the accessory device and the charging station.

(UMF ¶ 16).  To achieve this object, the DC port that plugs into the controller in the invention of the Navid Provisional is placed on an external adapter, separate from the base of the charging system.  This DC port is supported by the adapter, not by the base.  This adapter is plugged into the wireless controller and remains connected to the controller when it is in use (not connected to the charging station), and when the controller/adapter is placed into a docking bay on the base of the charging

system (the "Adapter Invention").  (UMF ¶ 19.)  This separate external adapter is described as item 16 in the Navid Provisional:

[0022] In use, the connector 42 on the adapter 16 is connected to the power input port of the accessory device to be charged, such as the hand-held controller 26 shown in FIGs. 5 and 6. The adapter 16 is a small and light-weight piece that connects snugly to the power input port of the hand-held controller 26. The adapter 16 can remain with the hand-held controller 26 at all times, even when the controller 26 is not being charged in the charging station 10. When the hand-held controller 26 is in use during operation of a video game, when the controller 26 is stored, and when it is charging, the adapter 16 can remain connected to (and physically mounted on) the controller 26. The adapter 16 is small and light weight, so that it does not interfere with operation of the controller 26. When the controller needs to be recharged, connecting it to the charging station 10 is as easy as dropping it into the docking bay 12, 14. The adapter 16 slides easily into the recess 30, and the electrical leads 22 on the bottom of the adapter 16 make an electrical connection with the electrical contacts 20 in the recess 30. The charging station 10 is connected to a power supply through its own power input. The charging station 10 then provides power to the controller 26 to recharge the controller's batteries. This recharging process is fast and easy, as the adapter 16 allows the controller to be simply dropped into place, rather than carefully connected to a fragile port or connector.





(UMF ¶ 17.)

SMRH:409958749.1

Case No. CV12-03001

MEMO OF Ps & As ISO MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY

1    As shown in both figures, above the external adapters 16 including the DC

2  ports 42 are separate from the charger base. (UMF ¶ 18.)  Thus, contrary to the

3  Asserted Claims, the Navid Provisional does not disclose a charging device with DC

4  ports on the base or supported by the base and is expressly directed to a device that

5  places DC ports on and supported by an external adapter that remains attached to the

6  controller. (UMF ¶ 20.)

7    **E.    The '295 Application**

8    On March 7, 2008, five months after the filing of the Navid Provisional, and

9  well over a year after Nyko publicly used and sold the Charge Base, Navid filed

10  Application No. 12/044,295 (the '295 Application), which is the application that

11  resulted in the '848 Patent.  (UMF ¶ 21.)  The '295 Application describes, <u>for the</u>

12  <u>first time in any Navid patent application</u>, a charging system with "DC ports on the

13  base," and not requiring a separate external adapter with a DC port to facilitate the

14  connection between the controllers and the charge base. (UMF ¶ 22.)  The DC ports

15  408 on the base depicted in Figs. 11-13 of the '295 application are "male mini-USB

16  connectors."  (UMF ¶ 23.)



SMRH:409958749.1

These figures clearly show the differences between the Adapter Invention – DC ports on separate adapters – and the invention of the Asserted Claims – DC ports on the charger base.  In addition to the new embodiment with the DC ports on the base, the '295 application includes the Adapter Invention described and depicted in the Navid Provisional as an entirely separate embodiment.  Specifically, the '295 application discloses "another exemplary embodiment of the invention, shown in FIGS. 16-23" with electrical contacts 520 on the base instead of DC ports.  (UMF ¶ 24.)  As in the Navid Provisional, the DC ports 542 that connect to the controllers are located on external adapters 516, which are separate from the base as clearly shown in FIGS. 17 and 22.  (*Id.*)



On the opposite surface of the adapters from the DC ports are electrical leads 522 that make contact with the electrical contacts 520 on the base to provide an electrical connection to provide power to the controllers.  (UMF ¶ 24.)  Confirming that the new embodiment of the charging system with the DC ports on the base was a different invention than the Adapter Invention of the Navid Provisional, it was claimed separately from the Adapter Invention in both the original claims of the '295 application and in the claims of the '848 patent as issued.  (UMF ¶ 25.)

**F.    '848 Patent**

-10-

1   Each of the Asserted Claims of the '848 patent requires "a plurality of DC
2   ports on the base" of the charging system configured to provide power to a power
3   input port of a wireless controller (claims 1-5, 7, 8, and 10-12) or, more specifically,
4   "a plurality of male mini-USB connectors supported by the base" (claims 13, 15-
5   17). (UMF ¶ 27.) Because a device with DC ports on the base was <u>not disclosed</u> in
6   the Navid Provisional from which Nyko attempts to claim priority, the effective
7   filing date of the Asserted Claims is March 7, 2008, and the public uses and offers
8   for sale of the claimed invention before March 7, 2007 invalidate the asserted claims
9   under 35 U.S.C. § 102(b).

10  **IV.   LEGAL AUTHORITY AND ANALYSIS**

11  The Court is well familiar with the summary judgment standard. Summary
12  judgment is as appropriate in patent cases as in other cases. *Avia Group*
13  *International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir.
14  1988).

15  **A.   <u>Section 102(b)</u>**

16  Under Section 102(b), a person is not entitled to a patent if the invention was
17  "in public use or on sale in this country, more than one year prior to the date of the
18  application for patent in the United States."

19  **1.   The Charge Base Was In Public Use Before the Critical Date**

20  Whether a patent is invalid for public use is a question of law based on
21  underlying facts. *Netscape*, 295 F.3d at 1320. An invention is in public use if it is
22  shown to or used by an individual other than the inventor under no limitation,
23  restriction, or obligation of confidentiality. *Petrolite Corp. v. Baker Hughes Inc.*, 96
24  F.3d 1423, 1425 (Fed. Cir. 1996) (affirming summary judgment of invalidity based
25  on public use) (citing *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983)). The test
26  for whether an invention is ineligible for a patent due to the section 102(b) public
27  use bar "is whether the purported use: (1) was accessible to the public; or (2) was
28  commercially exploited." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374,

-11-

1   1380 (Fed. Cir. 2005).  Indeed, "commercial exploitation is a clear indication of

2   public use …"  (*Id.*)[3]

3          In *Adenta GMBH v. Orthoarm, Inc.*, 501 F.3d 1364, 1371-72 (Fed. Cir. 2007),

4   the Federal Circuit affirmed a district court's ruling that the mere display of an

5   orthodontic brace at a trade show before the critical date was a public use and

6   invalidated the asserted patent under Section 102(b).  In *Beachcombers v.*

7   *WildeWood Creative Products, Inc.*, 31 F. 3d 1154, 1160 (Fed. Cir. 1994), the

8   Federal Circuit affirmed a district court's ruling that the display of a kaleidoscope

9   invention to the guests at a private party was an invalidating public use.

10          Here, the undisputed evidence established that the Charge Base was in public

11  use as of January 8, 2007.  (UMF ¶¶ 1-3.)  On that date, Nyko issued a press release

12  announcing that the Charge Base "will debut at this year's Consumer Electronics

13  Show in Las Vegas, Nevada."   (UMF ¶ 2.)  Over the next three days, it was shown

14  to and used by numerous individuals other than the inventor at Nyko's CES hotel

15  suite who were under no limitation, restriction, or obligation of confidentiality.

16  (UMF ¶¶ 2-3.)   The demonstration of the Charge Base was recorded on video by

17  the press, and the recording was made publicly available on You Tube, where it

18  remains publicly available to this day.  (UMF ¶ 3.)  Within the week after CES,

19  there were numerous press reports about the commercial launch of the Charge Base.

20  (UMF ¶ 5.)   The public demonstration was clearly for commercial purposes.

21  Concurrently with the demonstration, Nyko issued a press release announcing the

22  launch of the Charge Base and included the MSRP.  (UMF ¶ 1.)  At the same time,

23  it offered the Charge Base for sale, and actually accepted orders for its sale.  (UMF

24

25  _____

[3]   "Thus, the test for the public use prong includes the consideration of evidence
26  relevant to experimentation, as well as, inter alia, the nature of the activity that
    occurred in public; public access to the use; confidentiality obligations imposed on
27  members of the public who observed the use; and commercial exploitation."  *Id.*,
    citing *Allied Colloids, Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir.
28  1995).

-12-

1   ¶¶ 6-10.)  This is far more than the mere display of the invention that the Federal

2   Circuit has recognized as an invalidating public use.

3        Claims 1-5, 7, 8, 11-13, and 16-17 are invalid as a matter of law based on

4   Nyko's extensive public use of the Charge Base more than one year before the

5   effective filing date of the '848 Patent.

6              2.    **The Charge Base Was On Sale Before the Critical Date**

7        The present standard for the on-sale bar was established by the Supreme

8   Court in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142

9   L.Ed.2d 261 (1998).  Under *Pfaff*, the on-sale bar applies when the invention is the

10  subject of a commercial offer for sale, and is ready for patenting before the critical

11  date. A recent Federal Circuit case addressed the development of the *Pfaff* standard:

> The overriding concern of the on sale bar is an inventor's attempt to
> commercialize his invention beyond the statutory term. *Netscape*
> *Commens. Corp. v. Konrad*, 295 F.3d 1315, 1323 (Fed.Cir. 2002).
> When the asserted basis of invalidity is an on-sale bar, the court should
> determine whether the subject of the barring activity met each of the
> limitations of the claim, and thus was an embodiment of the claimed
> invention. *Id.* (quotations removed). … To meet the first, commercial
> offer, prong, the offer must be sufficiently definite that another party
> could make a binding contract by simple acceptance, assuming
> consideration. *Netscape,* 295 F.3d at 1323. In determining such
> definiteness, we review the language of the proposal in accordance with
> the principles of general contract law. *Id.*

20

21  *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F. 3d 1361, 1365-66 (Fed. Cir.

22  2008); see *In re Caveney*, 761 F.2d 671, 676 (Fed. Cir. 1985) ("It is well settled that

23  a sale is a contract between parties to give and to pass rights of property for

24  consideration which the buyer pays or promises to pay the seller for the thing bought

25  or sold. 77 C.J.S. Sales § 1 (1952).")  Thus, a sale occurs when there is an offer to

26  purchase and an acceptance of that offer, and the shipment of the product at a later

27  date is irrelevant to the date of the sale. *STX*, 211 F.3d at 590 ("The fact that

28

-13-

SMRH:409958749.1

1  delivery was set for dates after the critical date is irrelevant to the finding of a

2  commercial offer to sell.")

3      The Federal Circuit has also looked to the UCC to determine whether there

4  has been a commercial offer for sale. *Group One, Ltd. v. Hallmark Cards, Inc.*, 254

5  F.3d 1041 (Fed. Cir. 2001).  Under UCC § 2-204, "a contract for sale of goods may

6  be made in any manner sufficient to show agreement, including conduct by both

7  parties which recognizes the existence of such a contract."  This includes formation

8  of a contract by the exchange of purchase orders and invoices.  UCC § 2-207 ("A

9  definite and seasonable expression of acceptance or a written confirmation which is

10  sent within a reasonable time operates as an acceptance … .").

11      Here again, the evidence of Nyko's commercial offers for sale, and actual

12  sales, of the Charge Base before March 8, 2007 is extensive and undisputed.  By

13  January 8, 2007, the same day Nyko issued its press release, it placed the Charge

14  Base on sale by communicating at least its price, part number, product name and

15  product description to its customer Amazon so that Amazon could order Charge

16  Base products.  (UMF ¶ 6.)   On the same day, Amazon emailed to Nyko four

17  separate purchase orders for four different Amazon locations for a total of 460

18  Charge Base units.  (UMF ¶ 7.)  The next day, January 9, 2007, Nyko accepted the

19  orders by generating and sending to Amazon a "Sales Order" for each of the

20  Amazon purchase orders, and thus created binding sales contracts and <u>actual sales</u>.

21  (UMF ¶ 8); *see Atlanta Attachment,* 516 F. 3d at 1366, *In re Caveney*, 761 F.2d at

22  676; *Group One*, 254 F.3d at 1047-48.  Nyko's documents show that it shipped

23  products pursuant to these sales on July 11, 2007.  (UMF ¶ 9.)[4]  In total, Nyko

24

25

26  [4]    As set forth above, because the sales took place before the critical date, the
27  "fact that delivery was set for dates after the critical date is irrelevant to the finding of a commercial offer to sell." *STX, LLC v. Brine, Inc.*, 211 F.3d 588, 590 (Fed. Cir. 2000).

28

offered for sale and accepted 19 orders for approximately 4,665 Charge Base before March 7, 2007.  (UMF ¶¶ 10.)

Thus, Nyko offered for sale and actually sold the invention of the Asserted Claims more than one year before applying for the '848 Patent, and those claims are invalid as a matter of law.

**B.     The Asserted Claims Are Not Entitled to the Priority Date of the Navid Provisional**

The '295 application for the '848 Patent was filed March 7, 2008.  (UMF ¶ 21.)  Thus, the "critical date" under Section 102(b), which is one year before the date of the '295 application, is March 7, 2007.  35 U.S.C. § 102(b).  In an effort to avoid the invalidating effects of its public use and sales activity before March 2007, Nyko has argued that the asserted claims of the '848 Patent are entitled to the priority date of a provisional application filed October 24, 2007.  (Dkt No. 25 at 3; Dkt. No. 44 at 4.)   Nyko is incorrect as a matter of law.

For a non-provisional utility application to be afforded the priority date of the provisional application, the written description of the provisional must adequately support the claims of the non-provisional application.  35 U.S.C. § 119(e)(1); *New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002).  "In other words, the specification of the *provisional* must 'contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms,' 35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the invention *claimed* in the *non-provisional* application."  *Id.*  Where, as here, there has been no priority determination at the Patent Office, no presumption of validity attaches to priority claims and the burden is on the patentee to come forward with evidence to prove entitlement to claim priority.  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305-06 (Fed. Cir. 2008); *Bone Care Intern., LLC v. Pentech Pharms.*, 741 F. Supp. 2d 865, 873 (N.D. Ill. 2010).

Case No. CV12-03001
MEMO OF Ps & As ISO MOTION FOR SUMMARY
JUDGMENT OF PATENT INVALIDITY

1    In *New Railhead*, the Federal Circuit upheld a <u>summary judgment</u> ruling of

2 invalidity based on a determination that the claims of a non-provisional application

3 were <u>not</u> entitled to the priority date of a provisional application.  The claims at

4 issue in the non-provisional application claimed a drill bit apparatus where the drill

5 bit was "angled with respect to the sonde housing." *New Railhead*, 298 F.3d at 1292.

6 The plaintiff argued that, although the provisional application did not explicitly

7 disclose this feature, one of ordinary skill could actually construct the later claimed

8 device from the drawings in the provisional.   *Id.* at 1295.  The district court and the

9 Federal Circuit rejected this argument:

> The purpose of the written description requirement is broader than to
> merely explain how to "make and use"; the applicant must also convey
> with reasonable clarity to those skilled in the art that, as of the filing
> date sought, he or she **was in possession of the invention.**" *Vas-Cath
> Inc. v. Mahurkar,* 935 F.2d 1555, 1563-64 (Fed.Cir.1991). That is, **the
> disclosure must show he had invented each feature that is included
> as a claim limitation**. The adequacy of the written description (*i.e.,* the
> disclosure) is measured from the face of the application; the
> requirement is not satisfied if one of ordinary skill in the art must first
> make the patented invention before he can ascertain the claimed
> features of that invention. *Cf. Martin v. Mayer,* 823 F.2d 500, 505
> (Fed.Cir.1987) ("It is not a question of whether one skilled in the art
> might be able to construct the patentee's device from the teachings of
> the disclosure [but] whether the application necessarily discloses that
> particular device. (quoting *Jepson v. Coleman,* 314 F.2d 533, 536
> (CCPA 1963)).

*New Railhead*, 298 F.3d at 1295 (Fed. Cir. 2002).

    Similarly, in *Martin v. Mayer*, 823 F. 2d 500, 502-03 (Fed. Cir. 1987), the

earlier application was deemed to disclose a "high frequency attenuation cable," and

the applicant was awarded priority for claims including this feature.  However, the

applicant also claimed priority for a claim covering a "harness comprising a

plurality of high frequency attenuation cables." The Board of Patent Appeals and

Interferences awarded priority for this claim as well based on the determination that

-16-

SMRH:409958749.1

a harness of electrical cables is "conventional" to persons of skill in the art.  The

Federal Circuit <u>reversed</u>, reiterating that "[t]he issue is not whether one skilled in the

art would have been able to make a harness using knowledge of the art, but rather

did Mayer's application sufficiently describe a harness of cables with conductive

outer jackets."  Applying that burden of proof, the Federal Circuit "discern[ed] no

disclosure in the Mayer specification of a plurality of cables and no reference to a

harness of cables wherein each cable has a conductive shield...."  *Id.* at 504-05.

In *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997), the

Federal Circuit upheld the grant of summary judgment of invalidity because later

claims were not entitled to filing date of prior application:

> Entitlement to a filing date does not extend to subject matter which is
> not disclosed, but would be obvious over what is expressly disclosed. It
> extends only to that which is disclosed. While the meaning of terms,
> phrases, or diagrams in a disclosure is to be explained or interpreted
> from the vantage point of one skilled in the art, all the limitations must
> appear in the specification. **The question is not whether a claimed**
> **invention is an obvious variant of that which is disclosed in the**
> **specification. Rather, a prior application itself must describe an**
> **invention, and do so in sufficient detail that one skilled in the art**
> **can clearly conclude that the inventor invented the claimed**
> **invention as of the filing date sought**. See *Martin v. Mayer*, 823 F.2d
> 500, 504, 3 USPQ2d 1333, 1337 (Fed.Cir. 1987) (stating that it is "not a
> question of whether one skilled in the art might be able to construct the
> patentee's device from the teachings of the disclosure.... Rather, it is a
> question whether the application necessarily discloses that particular
> device.") (quoting *Jepson v. Coleman*, 50 C.C.P.A. 1051, 314 F.2d 533,
> 536, 136 USPQ 647, 649-50 (1963)).

> The claim for which Lockwood sought priority claimed:

> A system for automatically dispensing information, goods or
> services for a plurality of institutions in a particular industry,
> comprising:

> a central data processing center including means for storing
> service, price rate information or sales information for each
> institution;

-17-

at least one merchandising apparatus ...

...

said merchandising apparatus including:

a means for composing and displaying individualized sales presentations according to determinants entered into said apparatus and based on a customer's profile and requests ...

storage means holding a plurality of randomly accessible segments of data;

...

means for selectively combining said determinants to address and retrieve at least one of said segments....

The earlier applications failed to disclose:

a computer system connected to multiple vendors and another, while disclosing a central computer with a video disk player, failed to disclose individual merchandising apparatus that contained video disk players or other equivalent storage means. Lockwood's expert averred that the disclosed terminal in the former application "can be connected" to multiple vendors and that, although the latter application only "discusses the use of a television set and a keypad at a consumer's home," it would have been apparent to one skilled in the art that "Lockwood also envisioned the use of a terminal" containing a video disk player.

The Federal Circuit held:

That does not solve Lockwood's problem. Lockwood claimed a distinct invention from that disclosed in the specification. It is not sufficient for purposes of the written description requirement of § 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose. Each application in the chain must describe the claimed features. It is undisputed that one of the intervening applications does not describe an individual terminal containing a video disk player. Therefore, the declaration by Lockwood's expert does not raise a genuine issue of material fact. The district court correctly held that the '355 patent was invalid as anticipated by the '359 patent.

-18-

SMRH:409958749.1

1    Finally, in *Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1340

2  (Fed. Cir. 2010), the Federal Circuit reversed a jury verdict that the patent in suit

3  was not invalid.  The Federal Circuit held as a matter of law that later claims

4  covering video controllers having "multiple input members" that together operate in

5  six degrees of freedom were <u>not</u> entitled to the priority of an earlier application that

6  repeatedly and solely described a "single input member" operable in six degrees of

7  freedom and expressed the advantages of such an embodiment.  The Federal Circuit

8  also relied on the fact that the specification for the later-filed application contained

9  substantial changes and additions supporting embodiments with more than a single

10  input member.  *Id.* at 1338.  The Federal Circuit reversed despite expert testimony

11  that the earlier application adequately disclosed embodiments with more than a

12  single input member, finding that such testimony "cannot override the objective

13  content" of the applications at issue.  *Id.* at 1339.

14    Here too, the Asserted Claims are not entitled to the priority date of the Navid

15  Provisional.  The Navid Provisional clearly and unambiguously discloses only a

16  charging system including an external adapter, where the DC ports are on the

17  adapter, and not on the base or supported by the base.  (UMF ¶¶ 14-20.)[5]  In

18  contrast, the Asserted Claims require the DC ports to be on the charger base or

19  supported by the base, and do not mention or allow for an adapter.  Further, in the

20  invention of the Navid Provisional, the controller attaches directly to the external

21  adapter, rather than directly to the base, as required by the Asserted Claims.  (UMF

22  ¶¶ 17-19.)

23    Under the extensive authority above, any contention that the invention of the

24  asserted claims could be *derived* from the Navid Provisional is irrelevant.  "The

25  question is not whether a claimed invention is an obvious variant of that which is

26

27  ───────────────

[5]    Further, in Adapter Invention, the male mini-USB ports are not electrically coupled to the power input, as required by asserted claims 13 and 15-17.  (Ex. 1.)

28

1   disclosed in the specification. Rather, a prior application itself must describe an

2   invention, and do so in sufficient detail that one skilled in the art can clearly

3   conclude that the inventor invented the claimed invention as of the filing date

4   sought." *Lockwood,* 107 F.3d at 1572.  The disclosure of the earlier application

5   must itself show that the inventor invented each feature that is included as a

6   limitation of the asserted claims. *New Railhead*, 298 F.3d at 1294.

7          Here, the Navid Provisional does not show that the inventor invented a

8   charging system DC ports on the base.  Indeed, the Navid Provisional describes a

9   device with DC ports on the base (where the "charging station and the accessory

10   device have matching plugs or ports that fit together to make a connection") as prior

11   art in need of improvement because the plugs can become damaged during repeated

12   connections.  (UMF ¶¶ 15-16.)[6]  The Adapter Invention of the Navid Provisional

13   purports to improve on that prior art by including an external adapter that connects

14   to the controller and remains there, allowing  the controller and charging station to

15   connect through contact between electrical leads on the adapter and electrical

16   contacts on the base, which are not so easily damaged.   (UMF ¶¶ 17-19.)  Thus, the

17   Navid Provisional actually <u>teaches away</u> from the invention of the asserted claims.

18   *See Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1337 (Fed. Cir. 2010)

19   (noting that the patent to which priority was claimed "stresses the advantages of

20   using a single input member operable in six degrees of freedom, and describes the

21   use of multiple input members as having 'significant disadvantages'"); *Tronzo v.*

22   *Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) ("Moreover, the only reference

23

24   ---

[6]          From the undisputed sequence of events, it appears that Navid did not
    consider the Charge Base to be patentable, and first filed for patent protection in

25   October 2007 only on the Adapter Invention embodied in the Charge Base 2.  (See
    Exs. 2, 29, 30.)  For unexplained reasons, Navid did not seek patent protection on

26   the first version of the Charge Base – which was acknowledged as prior art in the
    Navid Provisional -- until almost five months later in March 2008.  (UMF ¶¶ 21-22.)

27   By that time, the Charge Base had been in public use and on sale for over a year,
    and the Charge Base, without adapters and with DC ports on the base, was no longer
    eligible for patent protection under Section 102.

28

in the '589 patent's specification to different shapes is a recitation of the prior art.
Instead of suggesting that the '589 patent encompasses additional shapes, the
specification specifically distinguishes the prior art as inferior and touts the
advantages of the conical shape of the '589 cup.  Such statements make clear that
the '589 patent discloses *only* conical shaped cups and nothing broader." (citations
omitted)).

 Because the Asserted Claims are not entitled to the priority date of the Navid
Provisional, their effective filing date is March 7, 2008, and the extensive offers to
sell, sales, and public uses before March 7, 2007 render them invalid as a matter of
law pursuant to Section 102(b).

### C. Claims 10 and 15 Invalid Based on Nyko's Public Use and the On-Sale Bar

 As stated above, Nyko admits that the Charge Base in public use and on sale
before March 7, 2007 met all the limitations of all Asserted Claims except claims 10
and 15.  (UMF ¶ 4.)  The only limitation of claims 10 and 15 not present in the
Charge Base were an <u>external</u> AC-to-DC converter, i.e., the converter is external to
the base of the charger and coupled to a power input on the base.  (UMF ¶ 28.)
However, Nyko's extensive public use and sales activity of the Charge Base also
render claims 10 and 15 invalid because the use of external converters was disclosed
and well known in the art, and it would have been obvious to make a Charge Base
with an external adapter.  (UMF ¶ 29.)

 A patent is invalid as obvious where "the differences between the subject
matter sought to be patented and the prior art are such that the subject matter as a
whole would have been obvious at the time the invention was made to a person
having ordinary skill in the art to which said subject matter pertains."  *See* 35 U.S.C.
§ 103(a).  Obviousness may be decided on summary judgment.  *See, e.g., Perfect
Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324 (Fed. Cir. 2009) (affirming
summary judgment of obviousness).  The Federal Circuit has repeatedly "held that

1  the public use bar applies to obvious variants of the demonstrated public use."

2  *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1326 (Fed. Cir. 2009)

3  (affirming summary judgment of invalidity due to prior public use of an invention

4  and its obvious variant); *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321

5  (Fed. Cir. 2002).  Likewise, "[t]he on-sale bar … also applies if "the subject matter

6  of the sale or offer to sell ... would have rendered the claimed invention obvious by

7  its addition to the prior art."  *Pfaff*, 124 F.3d at 1436; *see also Dippin' Dots, Inc. v.*

8  *Mosey*, 476 F.3d 1337, 1344 (Fed. Cir. 2007) ("Prior art under the § 102(b) on-sale

9  bar is also prior art for the purposes of obviousness under § 103.").  "KSR and our

10  later cases establish that the legal determination of obviousness may include

11  recourse to logic, judgment, and common sense, in lieu of expert testimony."  *Wyers*

12  *v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010).

13      Here, the only difference between claims 10 and 15 and the Charge Base on

14  sale in January 2007 is that the Charge Base contained an *internal* AC-to-DC

15  converter.  (UMF ¶ 28.)  Using an *external* AC-to-DC converter would have been

16  obvious, as it is the only alternative to using an internal AC-to-DC converter, and

17  many prior art chargers, including gaming controller chargers, used an external AC-

18  to-DC converter.  (UMF ¶ 29.)  For example, an article published on a popular video

19  game review on October 4, 2005 website disclosed a Nintendo Wii charger with an

20  external AC-to-DC adapter electrically coupled to the power input of the charger.

21  (Ex. 4.)  In addition, PDP sold a product at least as early as 2001, the Pelican Charge

22  N' Go, that included an external AC-to-DC adapter electrically coupled to the power

23  input of the charger.  (Exs. 38 to 40.)

24      "The combination of familiar elements according to known methods is likely

25  to be obvious when it does no more than yield predictable results."  *KSR Intern. Co.*

26  *v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).  Here, claims 10 and 15 simply add the

27  known element of using an external adapter -- which is the only alternative to using

28  an internal adapter -- yielding the same result as an internal adapter.  Common sense

-22-

reasons existed for modifying the Charge Base to include an external adapter, such as limiting the size and weight of the charger base and allowing replacement of a faulty converter, without requiring replacement of the entire base.  These modifications would have been obvious for a layperson, and all the more so for a person of ordinary skill in the art who would be well familiar with AC/DC converters in general and their use with charging devices in particular.  (UMF ¶ 29.)  Accordingly, claims 10 and 15 are invalid as obvious as a matter of law.

## V. __CONCLUSION__

The evidence of public use and sales of the Charge Base before March 7, 2007 is extensive and undisputed.  Nyko admits that the Charge Base includes all elements of the claims 1-5, 7, 8, 11-13, and 16-17, which are not entitled to a filing date earlier than March 7, 2008.  The remaining Asserted Claims, 10 and 15, are obvious.  Accordingly, Defendants are entitled to summary judgment that the Asserted Claims are invalid pursuant to Sections 102(b) and 103.

Dated:  August 19, 2013

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____/s/ Steven M. Hanle_____
DANIEL N. YANNUZZI
STEVEN M. HANLE
GRAHAM (GRAY) M. BUCCIGROSS

Attorneys for Performance Designed Products LLC and Energizer Holdings, Inc.