1   **ART HASAN, CA Bar No. 167323**
    art.hasan@cph.com
2   **G. WARREN BLEEKER, CA Bar No. 210834**
    warren.bleeker@cph.com
3   **KATHERINE L. QUIGLEY, CA Bar No. 258212**
    katherine.quigley@cph.com
4   **CHRISTIE, PARKER & HALE, LLP**
    **655 North Central Avenue, Suite 2300**
5   **Glendale, California 91203-1445**
    **Telephone: (626) 795-9900**
6   **Facsimile: (626) 577-8800**

7   Attorneys for Plaintiff and Counterdefendant,
    NYKO Technologies, Inc.
8

9               UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11

12  NYKO TECHNOLOGIES, INC., a          Case No. CV12-03001 GAF (VBKx)
    California corporation,
13                                      **MEMORANDUM OF POINTS**
                  Plaintiff,            **AND AUTHORITIES OPPOSING**
14                                      **DEFENDANTS' MOTION FOR**
            vs.                         **SUMMARY JUDGMENT OF**
15                                      **INVALIDITY**
    ENERGIZER HOLDINGS, INC., a
16  Missouri corporation, EVEREADY      Date:  September 23, 2013
    BATTERY COMPANY, INC., a            Time: 9:30 a.m.
17  Delaware corporation, and
    PERFORMANCE DESIGNED
18  PRODUCTS LLC, a California limited
    liability company,                  Hon. Gary Allen Feess
19
                  Defendants.
20

21  AND RELATED COUNTERCLAIM.

22

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................... 1

II. STATEMENT OF FACTS ..................................................................... 3

III. ARGUMENT ......................................................................................... 7

    A. Defendants' Motion Undisputedly Fails if the Asserted Claims Have the Priority of the Provisional Application. ................................ 7

    B. There Are Genuine Factual Issues About the Priority of the Asserted Claims. ................................................................................ 8

        1. Claim 13 Is Supported by the Provisional Application. ........... 11

            a) The Provisional Application Disclosed Male Mini-USB Connectors Supported by the Base. ............. 11

            b) Defendants' Motion Contradicts the Court's Claim Construction. ................................................. 13

            c) The Provisional Application Disclosed Mini-Male USB Ports Electrically Coupled to Power Inputs. ................................................................... 14

        2. Claim 1 as Properly Construed Is Also Disclosed in the Provisional Application. ........................................................ 14

            a) The Claim Term "On the Base" Was Not Designated or Briefed for Construction. ...................... 14

            b) The Term "On the Base" Does Not Exclude a Removable Adapter. .......................................... 15

        3. The Provisional Application Did Not Exclude Embodiments with Permanently Affixed Connectors. ............. 18

    C. Defendants Fail to Prove that the Prototype Shown at CES was a Working Version. ...................................................................... 21

    D. Triable Issues of Material Fact Preclude Summary Judgment as to Defendants' Public Use Defense. ............................................ 23

    E. Triable Issues of Material Facts Require Denial of Summary Judgment as to the On-Sale Bar. ..................................................... 24

IV. CONCLUSION ..................................................................................... 25

CHRISTIE, PARKER & HALE, LLP

# TABLE OF AUTHORITIES

Page(s)

CASES

*Am. Seating Co. v. USSC Group, Inc.,*
514 F.3d 1262 (Fed. Cir. 2008)........................................................................24

*Anascape, Ltd. v. Nintendo of Am., Inc.,*
601 F.3d 1333 (Fed. Cir. 20I0).................................................................10, 11

*Bernhardt, L.L.C. v. Collezione Europa USA, Inc.,*
386 F.3d 1371 (Fed. Cir. 2004)........................................................................23

*Browning Mfg. Co. v. Bros, Inc.,*
134 U.S.P.Q. 231 (D. Minn. 1962), *affd,* 317 F.2d 413 (8th Cir. 1963)..............22

*Clintec Nutrition Co. v. Baxa Corp.,*
988 F. Supp. 1109 (N.D. Ill. 1997) ...................................................................17

*Cordis Corp. v. Medtronic AVE, Inc.,*
339 F. 3d 1352 (Fed. Cir. 2003)...................................................................9, 20

*Crown Packaging Tech. v. Ball Metal Beverage,*
635 F.3d 1373 (Fed. Cir. 2011)........................................................................20

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
438 F. 3d 1374 (Fed. Cir. 2006)........................................................................17

*Dream Games of Ariz., Inc. v. PC Onsite,*
561 F.3d 983 (9th Cir. 2009) ..............................................................................8

*Eiselstein v. Frank,*
52 F.3d 1035 (Fed. Cir. 1995) ...........................................................................12

*Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.,*
3:11-CV-345, 2012 WL 6562220 (E.D. Va. Aug. 13, 2012) *aff'd,* 2012-
1581, 2013 WL 4081872 (Fed. Cir. Aug. 14, 2013)................................................22

*Hormone Research Found. v. Genentech, Inc.,*
904 F.2d 1558 (Fed.Cir.1990) ...........................................................................17

*Hunt v. Cromartie,*
526 U.S. 541 (1999).............................................................................................8

-ii-

CHRISTIE, PARKER & HALE, LLP

*Impax Labs., Inc. v. Aventis Pharms. Inc.*,
    545 F.3d 1312 (Fed. Cir. 2008)..................................................................8

*Indep. Towers of Wash. v. Washington*,
    350 F.3d 925 (9th Cir. 2003) ....................................................................9

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
    424 F.3d 1374 (Fed. Cir. 2005)................................................................23

*Johnson Worldwide Assoc., Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999).................................................................20

*Juicy Whip v. Orange Bang*,
    292 F.3d 728 (Fed. Cir. 2002)..................................................................21

*Lampi Corp. v. American Power Products, Inc.*,
    228 F. 3d 1365 (Fed. Cir. 2000).........................................................19, 20

*Laryngeal Mask Co. Ltd. v. Ambu A/S*,
    618 F. 3d 1367 (Fed. Cir. 2010)...............................................................20

*Linear Tech. Corp. v. Micrel, Inc.*,
    275 F.3d 1040 (Fed. Cir. 2001)................................................................24

*Lisle Corp. v. A. J. Mfg. Co.*,
    398 F.3d 1306 (Fed. Cir. 2005)................................................................21

*Lockwood v. Am. Airlines. Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997).........................................................10, 12

*Martin v. Mayer*,
    823 F. 2d 500 (Fed. Cir. 1987).................................................................10

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007)................................................................16

*Motionless Keyboard Co. v. Microsoft Corp.*,
    486 F.3d 1376 (Fed. Cir. 2007).........................................................21, 22

*New Railhead Mfg., LLC v. Vermeer Mfg. Co.*,
    298 F. 3d 1290 (Fed. Cir. 2002).........................................................8, 9, 10

*Revolution Eyewear v. Aspex Eyewear, Inc.*,
    563 F.3d 1358 (Fed. Cir. 2009)................................................................21

-iii-

CHRISTIE, PARKER & HALE, LLP

*Rexnord v. Laitram,*
  274 F.3d 1336 (Fed. Cir. 2001) .......................................................................21

*Scaltech Inc. v. Retec/Tetra, L.L.C.,*
  178 F.3d 1378, 51 USPQ2d 1055 (Fed.Cir.1999) ........................................21

*Spine Solutions v. Medtronic Sofamor Danek USA,*
  620 F. 3d 1305 (2010) ............................................................................19, 21

*Tandon Corp. v. United States Int'l Trade Comm'n,*
  831 F.2d 1017 (Fed. Cir. 1987) .......................................................................17

*Thermal Techs., Inc., et al. v. Dade Serv. Corp.,*
  No. 6:03-cv-1414-Orl-31JGG, 2004 U.S. Dist. LEXIS 27885 (M.D.
  Fla., Jun. 14, 2004) ..........................................................................................18

*Vas-Cath Inc. v. Mahurkar,*
  935 F. 2d 1555 (Fed. Cir. 1991) ............................................................9, 12, 21

*Vectra Fitness, Inc. v. ICON Health & Fitness, Inc.,*
  246 F.Supp.2d 1111 (W.D. Wash. 2003) ........................................................15

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) .........................................................................16

**STATUTES**

35 U.S.C. section 102(b) ...............................................................................1, 7

35 U.S.C. § 111(b) .........................................................................................3, 8

35 U.S.C. § 119(e)(1) ....................................................................................4, 8

35 U.S.C. § 282 ...................................................................................................8

Leahy-Smith America Invents Act of 2011, Pub. L. No. 112-29, 125 Stat. 284 § 3
  (2011) .................................................................................................................7

**OTHER AUTHORITIES**

Fed.R.Civ. P. 56(a) .............................................................................................8

-iv-

CHRISTIE, PARKER & HALE, LLP

## I.    __INTRODUCTION__

The Court should deny Defendants' motion for summary judgment of invalidity.  At the very least, there are genuine issues of material fact, which preclude summary judgment.[1]

Defendants' invalidity defenses fail because they depend on using Nyko's own product demonstrations, offers, and sales as supposed "prior art" against Nyko's patent.  But to qualify as prior art on the asserted basis – 35 U.S.C. section 102(b) – these alleged actions have to predate Nyko's application patent by at least a year.  That requirement is not met, because Nyko's patent claims priority of a provisional application filed in October 2007.  The earliest of the Nyko's alleged actions did not occur until January 2007 – less than a year before the provisional and therefore too late to qualify under section 102(b).

Defendants attack Nyko's priority claim, asserting that the "provisional application described and claimed an entirely different invention from the one that is the subject of the Asserted Claims."  That is nonsense.  The issued '848 Patent-in-suit includes the same drawings as the provisional (among others) and the claims of the '848 Patent cover (but are not limited to) the embodiments described and depicted in the provisional application.

A provisional application provides a sufficient "written description" to support priority of a later patent claim if, from the point of view of a person of ordinary skill in the relevant field, the provisional disclosed the features in that claim.  Nyko's provisional does support priority of the claims asserted in this case, because the provisional disclosed all of the features recited in those claims. This is shown by the expert declaration of Garry Kitchen (to be filed concurrently with this memorandum) and indeed is clear on the face of the application itself.

---

[1] *See* Nyko's Separate Statement of Genuine Disputed Facts, filed concurrently herewith [referenced paragraphs listed in brackets hereinafter].

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nyko's detailed showing that the claimed features were disclosed in provisional raises genuine issues of material fact that defeat Defendants' motion.

In fact, there are only two features in the asserted claims that Defendants contend were not disclosed in the provisional application.  With regard to Claim 1 (and its dependent claims), Defendants assert that the provisional did not disclose "DC ports on the base" of the charging system.  With regard to Claim 13 (and its dependent claims), Defendants assert that the provisional did not disclose "male mini-USB connectors supported by the base."  Defendants are wrong on each point.  Both features were disclosed in the provisional.

This point is particularly clear with respect to Claim 13 and its dependent Claims 15-17.  The provisional application plainly illustrates and describes connectors "supported by the base" under the Court's construction of that phrase as meaning "physically supported by but not necessarily directly on the base." (Claim Construction Order at 25 (Doc. 122).)  Figure 3 of the provisional shows male mini-USB connectors physically supported by the base:



**Connectors 42**
(Can be "male mini-USB … connector[s].")

**Base 24**
Supports the connectors.

There is no question that the base supports the male mini-USB connectors under the Court's claim construction, the ordinary meaning of the word "support," and the ordinary meaning of the word "physical" – and as a matter of common sense.  Anyone of ordinary skill in the art would understand that the

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

base is holding up the male mini-USB connectors in Figure 3.  If the base were suddenly removed, the male mini-USB connectors would fall down.   [65] Revealingly, Defendants do not provide any reason why this does not constitute "support."  This is not surprising because, as the expert's deposition showed, the only way Defendants can deny the presence of "support" is by contradicting the construction in the Court's order of June 12 and by taking nonsensical positions at odds with common sense and the laws of physics.

Claim 1 is also entitled to priority of the provisional application, under a correct construction of the claim's limitation requiring "DC ports on the base." While the Court remarked about "on" in the claim construction order, neither side had designated that term for construction, so Nyko has not had the opportunity until now to brief its construction or provide supporting evidence.  As we will explain below, "on" should not be construed to require direct contact between the ports and the base.  Such contact is not required by most definitions of "on," nor by its ordinary meaning.  [95-101.]  Both sides' experts agree that "on" is not used as a term of art in the '848 Patent [102], so its ordinary meaning should prevail.  Other courts have construed "on" accordingly, and so should this Court.

Even though the issues are moot given Nyko's entitlement to priority of the provisional, there are additional fact issues regarding Defendants' assertions of a public use and on-sale bar.

At a minimum, the evidence put forward by Nyko raises genuine factual issues.  As a result, Defendants' summary judgment motion should be denied.

## II.    STATEMENT OF FACTS

The '848 Patent in suit claims priority of Provisional Application No. 60/982,364.  [87.]  The provisional application was filed on October 24, 2007 – less than a year after the events asserted by Defendants as prior art.  [88.]  The provisional application fulfilled the statutory requirements of 35 U.S.C. § 111(b),

such as a specification and at least one drawing.  [89.]  The application for the '848 Patent was filed on March 7, 2008 – less than a year after the filing of the provisional application.  [90.]  The application for the '848 Patent fulfilled the statutory requirements for claiming priority of the provisional application under 35 U.S.C. § 119(e)(1), such as having at least one common inventor (in this case, the same single inventor) and containing a specific reference to the provisional application.  [91.]

Nyko has submitted a detailed expert declaration by Garry Kitchen, an engineer with in-depth experience in the field of video game hardware, video game accessories, and video game controllers.  [92.]  Mr. Kitchen not only opines that the provisional application discloses every feature in the asserted claims; he demonstrates that disclosure element-by-element, providing supporting evidence from the provisional to support the disclosure of each claim element.  [30-55.]

Mr. Kitchen goes into even greater detail with regard to the two claim elements that Defendants contend are missing from the provisional application: "DC ports on the base," as recited in Claim 1, and "male mini-USB connectors supported by the base," as recited 13.  Mr. Kitchen explains how and why the provisional application *did* disclose these features to a person of ordinary skill in the art.  [33, 49.]  For example, he explains how Figure 3 of the provisional disclosed these features.  (*See id*.)

Mr. Kitchen applies the Court's construction of "supported by the base" as "Physically supported by but not necessarily directly on the base."  [93.]  Mr. Kitchen explains why one of ordinary skill in the art would understand that the connectors in Figure 3 of the provisional application (labeled as Items 42) are physically supported by the base.  [49.]  He also points out that the provisional application expressly states that the connectors 42 can be "male mini-USB . . . connector[s]."  (*Id*.)

Mr. Kitchen explains why it is not true that, as Defendants' expert Stephen

CHRISTIE, PARKER & HALE, LLP

Bristow opines, "The physical support for the male mini-USB connectors is provided entirely by the structure of the adapters themselves . . . ."  On the contrary, the base (Item 24) of the charging system depicted in Figure 3 of the provisional application underlies and fits around the adapters (Items 16) and thereby physically supports both them and the connectors.  [94.]  "If the body of the charging system were not under the mini-USB connectors, the connectors would fall down onto whatever surface is below."  [65.]

Mr. Kitchen recognizes that the disclosure of "DC ports on the base" may depend on how the word "on" is interpreted.  But he explains that "on" has no specialized technical meaning in the context of the '848 Patent and that a person of ordinary skill in the art would understand it according to its plain English meaning.  (This is a point on which Defendants' expert agrees.)  [102.]  The ordinary usage of "on" includes situations where an object is "on" something that it is not directly touching but that is under the object and therefore provides support for it.  Mr. Kitchen gives examples of dictionary definitions and everyday English usage, which apply equally to the context of the '848 Patent.  [95-101.]  For example, "on" is defined as "supported by or resting at the top of another thing."  [95.]  A statement that "the food is on the table" would be considered accurate even if the food was on a plate, which in turn was on a placemat or tablecloth, rather than directly touching the table.  [99.]



*"The food is on the table."*

CHRISTIE, PARKER & HALE, LLP

1   Under the plain and ordinary meaning of the word "on," Figure 3 shows "DC

2   ports on the base."  [103.]

3        Mr. Kitchen also addresses – and refutes – Defendants' contention that the

4   provisional application somehow excludes the possibility of having male mini-

5   USB connectors or other DC ports that are permanently affixed to the charging

6   station base instead of being part of a detachable adapter.  [57-86.]  To begin

7   with, Mr. Kitchen points out that the provisional application does not contain any

8   statement that a detachable adapter is mandatory or that permanently affixed ports

9   are prohibited.   [85.]   He explains that one of ordinary skill would have

10  understood the use of an external adapter as one way of practicing the invention

11  of the provisional application (a preferred embodiment) but not the only way of

12  doing so.  [66-67.]  While the preferred embodiment used an external adapter, a

13  person of ordinary skill would have understood that the invention of the

14  provisional application could be practiced and could serve its intended purpose

15  without an external adapter.  [69.]

16       For example, Figure 3 of the provisional application shows a configuration

17  in which the DC ports (male mini-USB connectors) are connected to the base and

18  are not connected to controllers.   [68.]   One of ordinary skill would have

19  understood that, in this configuration, the operation of the charging station of the

20  invention would be exactly the same whether the DC ports (male mini-USB

21  connectors) on the base were detachable from the base or were permanently

22  attached to it.  [84.]

23       While the provisional application explains the advantages of the

24  embodiment in which an adapter remains attached to the controller and drops into

25  a recess in the base, one of ordinary skill in the art would recognize other

26  advantageous aspects of the invention in the provisional application.   For

27  example, the provisional application describes "docking bays . . . dimensioned to

28  accept a handheld controller."  [66.]  These bays may include recesses to receive

CHRISTIE, PARKER & HALE, LLP

an adapter, but they also include, other structures, like their partitions and their sidewalls, that help align the controllers and accomplish the purposes of the inventions.  [59, 67 69.]  One of ordinary skill would have understood that the configuration of the charging station as shown in Figure 3 of the provisional application would have facilitated connection of the controller and accomplished the purposes of the invention, even without an adapter being connected to the controller.   [69.]   Thus, the invention of the provisional application was not limited to the particular embodiment with an external adapter.

III.   **ARGUMENT**

    A.    **Defendants' Motion Undisputedly Fails if the Asserted Claims Have the Priority of the Provisional Application.**

Defendants' invalidity arguments depend on asserted "prior art" that does not actually qualify as prior art under the applicable statute.   Defendants' invalidity case is premised upon according prior-art status to Nyko's own demonstration, offering, and sale of a certain charge base starting in January 2007.  But it is undisputed that Nyko filed its provisional patent application on October 24, 2007 – less than a year after the events put forward by Defendants as constituting prior art.  [88.]

The sole basis on which Defendants assert that Nyko's disclosures, offers, and sales qualify as prior art is 35 U.S.C. § 102(b), which provides, "A person shall be entitled to a patent unless ... the invention was ... in public use or on sale in this country, ***more than one year prior*** to the date of the application for patent in the United States." (*See* Defts.' Summ. J. Mem. at 1:2-4 (quoting § 102(b))(emphasis added).)[2]  But a patent claim falls within the one-year grace period of § 102(b) – and cannot be invalidated – if it is entitled to priority of a

---

[2] Nyko's patent is not affected by the amendment of § 102 that applies to patent applications filed starting March 16, 2013.  *See* Leahy-Smith America Invents Act of 2011, Pub. L. No. 112-29, 125 Stat. 284 § 3 (2011).

CHRISTIE, PARKER & HALE, LLP

provisional application that was filed within a year after the asserted prior art came into existence.  *See New Railhead Mfg., LLC v. Vermeer Mfg. Co.,* 298 F. 3d 1290, 1294 (Fed. Cir. 2002). "[F]or the non-provisional utility application to be afforded the priority date of the provisional application, the two applications must share at least one common inventor and the written description of the provisional must adequately support the claims of the non-provisional application . . . ." *Id.*

Nyko's provisional application did fulfill the requirements of 35 U.S.C. § 111(b), such as a specification and at least one drawing. [89.] Nyko filed its non-provisional utility application – which resulted in the '848 Patent – within one year of the provisional. [90.]  The application for the '848 Patent fulfilled the statutory requirements for claiming priority of the provisional application under 35 U.S.C. § 119(e)(1), such as having at least one common inventor (in this case, the same single inventor) and containing a specific reference to the provisional application. [91.]

    **B.**    **<u>There Are Genuine Factual Issues About the Priority of the Asserted Claims.</u>**

Summary judgment is not permitted if there is any genuine dispute regarding any material fact in the case.  *See* Fed.R.Civ. P. 56(a).  With respect to invalidity, the movant's burden is even more exacting, because an issued patent is presumed to be valid.  35 U.S.C. § 282.  Thus, to prevail on their motion, Defendants must show by clear, convincing, and unrebutted evidence that they have established every single element of their invalidity defenses, even after all reasonable inferences are drawn in favor of Nyko.  *See, e.g., Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008); *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).  Further, Defendants must have satisfied this burden in their opening brief.  Arguments that are "not specifically and distinctly argued in [the] opening brief" are waived.  *Dream Games of Ariz., Inc. v. PC Onsite*, 561

CHRISTIE, PARKER & HALE, LLP

1    F.3d 983, 995 (9th Cir. 2009) (internal citations omitted); *see also Indep. Towers*

2    *of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) (noting that a court

3    will only review issues that are specifically and distinctly argued in a party's

4    opening brief).

5    "[C]ompliance with the "written description" requirement of § 112 is a

6    question of fact . . . ." *Vas-Cath Inc. v. Mahurkar*, 935 F. 2d 1555, 156 (Fed. Cir.

7    1991); *accord, Cordis Corp. v. Medtronic AVE, Inc.*, 339 F. 3d 1352, 1364 (Fed.

8    Cir. 2003).  Summary judgment for Defendants would be highly inappropriate on

9    the facts of this case.  There are at least genuine issues of fact concerning the

10   priority of Nyko's asserted patent claims.  The application for the '848 Patent

11   claimed the priority of the October 2007 provisional application, and there is

12   substantial evidence – indeed, compelling evidence – supporting that claim.  ([87,

13   90-91.]   For example, Garry Kitchen's expert declaration has provided an

14   element-by-element showing that the provisional application disclosed every

15   element in the asserted claims of the '848 Patent.  [30-55.]  He has squarely

16   disputed Defendants' contentions that two elements are missing, providing a well-

17   reasoned and factually supported analysis concluding that they were in fact

18   disclosed by the provisional application.  (*See id*.)

19   In view of the disclosures of the provisional application and the competent

20   evidence put forward by Nyko, this case is completely unlike the precedents cited

21   by Defendants, such as *New Railhead Mfg., LLC,* 298 F. 3d at 1290, *cited in*

22   Defts.' Summ. J. Mem. at 15-16.   *New Railhead* involved a patent claim that

23   expressly required a drill bit with a "body . . . angled with respect to the sonde

24   housing." *New Railhead Mfg.,* 298 F. 3d at 1292.  The provisional application did

25   not mention such a structure, and the patentees' own personnel admitted that such

26   a structure could not be discerned from the drawings.  *Id*. at 1293, 1295.  New

27   Railhead's claim to priority of the provisional application failed because an

28   element recited in the claims was missing from the provisional application.  *See*

CHRISTIE, PARKER & HALE, LLP

1   *id.* at 1297.  In contrast, there is no such missing claim element in this case, so

2   Nyko's priority claim is valid and should be upheld.

3       The same is true of the other decisions cited by Defendants in which a

4   priority claim was unsuccessful.  In every one of those decisions, the court

5   identified an expressly-recited claim element that was clearly missing from the

6   application to which the patentee was claiming priority.  Thus, in *Martin v.*

7   *Mayer*, 823 F. 2d 500, 502-05 (Fed. Cir. 1987), *cited in* Defts.' Summ. J. Mem. at

8   16-17, the court approved priority for a claim that recited "high frequency

9   attenuation cable," but it denied priority for a claim that required a "harness

10  comprising a plurality of high frequency attenuation cables," because the

11  application to which priority was claimed had contained "no reference" to such a

12  harness.  In *Lockwood v. Am. Airlines. Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997),

13  *cited in* Defts.' Summ. J. Mem. at 17-18, the earlier applications to which priority

14  was claimed had failed to describe multiple features required by the claims.  For

15  example, while the claims required "a computer system connected to multiple

16  vendors," one of the earlier applications only "discusse[d] the use of a television

17  set and a keypad at a consumer's home."  *Id.*  And, similarly, in *Anascape, Ltd. v.*

18  *Nintendo of Am., Inc.*, 601 F.3d 1333, 1335-36 (Fed. Cir. 20I0), *cited in* Defts.'

19  Summ. J. Mem. at 19, the claims lacked priority because they required "multiple

20  input members that together operate in six degrees of freedom," whereas the

21  earlier application to which priority was claimed had disclosed only "a ***single***

22  input member that operates in six degrees of freedom." (*Id.*, emphasis added.)  In

23  its later application, the patentee changed all the earlier references to a "hand

24  operable single input member" to instead say "hand operable input member(s),"

25  but this was too late to establish priority.  *Id.* at 1338.

26      The reason why the expert testimony in *Anascape* did not create a triable

27  factual issue was that the expert's conclusion was "not supported by any evidence

28  at all."  *Id.* at 1339.  He was unable to point to anything in the earlier application

-10-

that disclosed the required claim element. *Id.* That is completely unlike the expert declaration of Garry Kitchen in this case. Mr. Kitchen points to specific disclosures in the provisional application – such as Figure 3 – and he explains in detail why they included "male mini-USB connectors supported by the base" and "DC ports on the base" from the perspective of a person of ordinary skill in the art. [33, 49.]

If anything, the situation in this case is the opposite of the one in *Anascape*, with Nyko providing specific reasons and supporting evidence that the claim element was disclosed, while Defendants' unsupported denials are insufficient to even raise a triable issue in their favor, let alone to preclude Nyko from claiming priority. Certainly, Nyko has raised at least a genuine, triable issue of fact concerning its right to priority of the provisional application.

### 1.  Claim 13 Is Supported by the Provisional Application.

The provisional application disclosed every feature in Claim 13 of the '848 Patent. This is shown by the expert declaration of Garry Kitchen, an engineer with in-depth experience in the field of video game hardware, video game accessories, and video game controllers. [92.] Mr. Kitchen provides an element-by-element analysis identifying every claim element in the disclosures of the provisional application. [47-52.]

### a)  The Provisional Application Disclosed Male Mini-USB Connectors Supported by the Base.

The Kitchen declaration establishes that the provisional application did disclose the element of Claim 13 that Defendants assert was missing from the provisional application: "male mini-USB connectors supported by the base." Such connectors are illustrated, for example, in Figure 3 of the provisional application. [49.]

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11



**Connectors 42**
Can be "male mini-USB ... connector[s]."

**Base 24**
Supports the connectors.

12    To provide a "written description," a prior application need not describe the

13 claimed subject matter in exactly the same terms as used in the claims. . . ."

14 *Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995).  Indeed, "drawings

15 alone may provide a 'written description' of an invention as required by § 112."

16 *Vas-Cath*, 935 F. 2d at 1565; *see Lockwood*, 107 F.3d at 1572 (The written

17 description requirement can be satisfied by "words, structures, figures, diagrams,

18 formulas, etc."). *Id.* The provisional application refers verbatim to the "male

19 mini-USB . . . connector[s]" recited in Claim 13.  [49.]  While the provisional

20 application does not say in so many words that the connectors are supported by

21 the base, Figure 3 shows such support, which is enough to satisfy the written

22 description requirement.  (*Id*.)

23    This Court has already construed the phrase "supported by the base,"

24 determining that it means, "Physically supported by but not necessarily directly

25 on the base."  (Claim Construction Order at 25.)  The plain meaning of "support"

26 is to "hold up."  [104-05.] ("to hold up or serve as a foundation or prop for"),

27 SS106 ("to bear or hold up . . ."), [107] ("to hold the weight of someone or of

28 something such as a building or structure so that they do not move or fall").)

CHRISTIE, PARKER & HALE, LLP

Meanwhile "physical" means "having material existence **:** perceptible esp[ecially] through the senses and subject to the laws of nature" or "characterized or produced by the forces and operations of physics." [108.]

The base of the charging station in Figure 3 of the provisional application plainly supports the USB connectors under the Court's construction and under the ordinary meaning of the words "physical" and "support." The base (Item 24) underlies and fits around the adapters (Items 16) and thereby physically supports both them and the connectors. [94.] "If the body of the charging system were not under the mini-USB connectors, the connectors would fall down onto whatever surface is below." [65.]

### b)   <u>Defendants' Motion Contradicts the Court's Claim Construction.</u>

Defendants' only basis for questioning that Figure 3 of the provisional application disclosed "male mini-USB connectors supported by the base" is to try to narrowly redefine "supported by the base" in a manner contrary to the Court's construction. While Defendants use various verbal formulations, the essence of their position is that, because the connectors are on adapters, they cannot be "supported by the base." This fundamentally contradicts the Court's determination that connectors "supported by the base" need ***not*** be "directly on the base." (Claim Construction Order at 25.)

The deposition of Defendants' expert, Stephen Bristow, revealed that this contradiction of the Court's construction was his sole basis for denying that the connectors in Figure 3 were "supported by the base." Although Mr. Bristow claimed that he had used the Court's construction [109], his testimony showed otherwise. [110.] He agreed that, "in [his] definition . . . of physically supported, ***there must be an immediate connection*** between the two items . . . . [W]hat's holding it is ***the immediate thing it's attached to***." [111.] In other words, contrary to the Court's construction, Mr. Bristow insists that connectors

-13-

1  "supported by the base" must be directly on the base.

2      Mr. Bristow's implausible construction of "supported by" not only

3  contradicts the Court but forces him into contradictory and absurd positions.  For

4  example, he at first admitted that he was "physically supported" by his chair and

5  then claimed that, "to be precise, the chair is supporting the slacks which is

6  supporting my thighs, to be precise."  [112.]  He admitted that in Figure 3 the

7  base is physically supporting the adapter [113], and he admitted that the

8  connectors are "part of the adapter" [114], but he nonsensically denied that the

9  base is supporting the male mini-USB connector that is part of the adapter.  [115.]

10  This defies logic as well as mauling the English language.

11     At one point, Mr. Bristow even said that, if the base were removed from

12  Figure 3 "the adapter would be floating in air . . . ."  [116.]  But later, he admitted

13  the adapter and DC port "would fall to whatever surface was below where the

14  disappeared charging base was . . . ."  [117.]  In other words, Mr. Bristow

15  admitted that the base holds up (physically supports) the male mini-USB

16  connectors in Figure 3.

17          c)     **The Provisional Application Disclosed Mini-Male**

18                 **USB Ports Electrically Coupled to Power Inputs.**

19     In a footnote – and without explanation – Defendants assert that, in the

20  provisional application, "the male mini-USB ports are not electrically connected

21  to the power input." (Defts.' Summ. J. Mem. at 19 n. 5.)  The Court is entitled to

22  disregard this obscure and unsupported assertion.  But in any case the assertion is

23  wrong.  [51.]

24      2.     **Claim 1 as Properly Construed Is Also Disclosed in the**

25             **Provisional Application.**

26          a)     **The Claim Term "On the Base" Was Not Designated**

27                 **or Briefed for Construction.**

28     Neither side designated the phrase "on the base" for construction by the

-14-

Court.   As a result, Nyko has not previously had an opportunity to brief its construction or provide supporting evidence.   Defendants' attorney agrees that "[t]he court didn't construe the word "on."  [120.]  Although the Court made some comments about the word "on," it should fully consider the parties' evidence and arguments before making a decision.

### b)   **The Term "On the Base" Does Not Exclude a Removable Adapter.**

Defendants and their expert merely assume that the term "on the base" excludes any intermediate structures, without providing any evidence or explanation.  They never say how they would define "on."  [108.]

Properly construed, the phrase "on the base" does ***not*** require direct contact between the DC ports and the base and does not exclude DC ports that are part of adapters that fit into the base, like the ones in the provisional application.  While there are many possible definitions of "on," most definitions permit an object to be "on" an underlying object even if there are other objects between the two.  For example, no direct contact is required by the definition of "on" as "supported by or resting at the top of another thing."  [95.]  No direct contact is required by the definition of "on" as "so as to be or remain supported by or suspended from." [96.]  And no direct contact is required by the definition of "on" as "Used to indicate position above and supported by ***or*** in contact with," because being supported is an alternative to any contact, whether direct or indirect.  [97]

That is also normal, everyday English usage, as illustrated by the phrase, "The food is on the table" and other examples provides by Garry Kitchen.  [98-101.] ("The boy [riding a skateboard] is on the sidewalk," "The couple [on a towel] is sitting on the beach").)  Courts have also recognized that the word "on" does not ordinarily require direct contact.  *See, e.g., Vectra Fitness, Inc. v. ICON Health & Fitness, Inc.*, 246 F.Supp.2d 1111, 1118 (W.D. Wash. 2003) (holding that claim limitation calling for "stops on said three cables" covered "stops [that]

-15-

do not come into ***direct*** contact with the cable" (emphasis in original)).

The preferred embodiments in the specification of the '848 Patent include the same designs with external adapters that were included in the provisional application.  [119.]  Adopting a narrow interpretation of "on" that requires direct contact would exclude such preferred embodiments from the scope of the claims, which "is rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007); *see Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that constructions are "rarely, if ever, correct and would require highly persuasive evidentiary support").

The word "on" has no special meaning to those of skill in the art, so it should be interpreted according to its ordinary English meaning.   [102.] Defendants' expert, Stephen Bristow, appears to agree with this (*id.*), yet he failed to consult any dictionary definitions of "on" [121.]  Mr. Bristow convoluted the English language and contradicted himself trying to avoid the conclusion that Figure 3 of the provisional application shows DC ports "on the base."

Even Mr. Bristow had to admit that he was sitting "[o]n a chair" at his deposition, even though he was wearing slacks between his body and the chair. [122.]  Under this same admitted "common understanding" (*id.*), the DC ports in Figure 3 of the provisional application are "on the body" of the charging station.

Trying to avoid this compelling conclusion, Mr. Bristow shifted gears when he realized the implications of his testimony, and denied that a can of Coke is "on" a table if there is a napkin between the can and the table.  [123.]  This abuse of the language merely highlights the absurdity of Defendants' misinterpretation of the word "on."

The provisional application disclosed adapters being joined to the base in multiple ways, including "snap-fits," "push-fits," and "press-fits."  [34.]  Mr. Bristow testified that "[a] press-fit is typically a much firmer version of a push-fit. [I]t's really tight . . . ."  [124.]  It would be particularly inappropriate to conclude

-16-

that the DC ports cannot be "on" the base even when the adapter is tightly held within the base in this manner.  In that position, the adapter is functionally part of the base, and the DC ports, being part of the adapter, are "on" the base in any practical sense of the word.

There is nothing about the use of "supported by" in Claim 13 that compels adoption of a particularly narrow construction of "on" in Claim 1.  The terms "on" and "supported by" may not have identical scope, but their meanings at least overlap – and so too do the scopes of Claims 1 and 13.  There is nothing about the use of alternative claim terms that compels construction of the alternative terms as opposites or mutually exclusive.  On the contrary, alternative claim terms usually reflect an attempt by the drafter to write claims that cover the same preferred embodiment.  Alternative claim terms may differ in the breadth of other designs that they cover.  Or, alternative claim terms may provide an insurance policy against an unfavorable future construction of one of the terms.  "[C]laim drafters can . . . use different terms to define the exact same subject matter. Indeed this court has acknowledged that two claims with different terminology can define the exact same subject matter." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F. 3d 1374, 1380 (Fed. Cir. 2006). "[P]ractice has long recognized that claims may be multiplied . . . to define the metes and bounds of the invention in a variety of different ways. . . .  Thus two claims which read differently can cover the same subject matter." *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) (internal citations omitted).  "It is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved." *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n. 15 (Fed.Cir.1990), quoted in *Curtis-Wright*, 438 F. 3d at 1380-81; *Clintec Nutrition Co. v. Baxa Corp.*, 988 F. Supp. 1109, 1119 (N.D. Ill. 1997) ("sorting"

-17-

and "selecting" are "synonymous").  In *Thermal Techs., Inc., et al. v. Dade Serv. Corp.*, No. 6:03-cv-1414-Orl-31JGG, 2004 U.S. Dist. LEXIS 27885 at *5 (M.D. Fla., Jun. 14, 2004), the court equated "on" and "supported by."  But at a minimum, those terms should be viewed as overlapping even if their scopes are not exactly the same.  As noted, dictionary definitions identify being "supported by" a structure as one of the ways to be "on" a structure.  (*See supra* § III B 2 b 1.)  In Figure 3 of the provisional application, the DC ports are both "supported by" the base and "on" the base as the word "on" is conventionally and properly understood.

> **3.      The   Provisional   Application   Did   Not   Exclude Embodiments with Permanently Affixed Connectors.**

Despite Defendants' attempts to argue otherwise, there is nothing in the provisional application that excludes permanently affixed connectors.  There is at least a genuine, triable issue of fact on the subject, in view of Nyko's evidence showing that one of ordinary skill would not find the provisional application to be limited in that manner.  [67, 69, 85.]

Defendants say that the provisional application "teaches away" from having DC ports on the base.  That is not true.  [73.] The "teaching away" argument by Defendants' expert rests on a series of highly debatable assumptions, which cannot preclude a triable issue of fact regarding the scope of the written description.  First, he assumes that the "Background" section of the provisional application solely describes prior art, although it does not say so and describes features that are clearly part of the invention.  [125-26.]  Then, he falsely assumes that the external adapter is the only feature in the provisional application that differentiates the ensuing description of the invention from the "Background."  But in reality, one of ordinary skill in the art would understand that the provisional application describes a variety of beneficial features, including not only the external adapter but also docking bay configurations that would be

-18-

beneficial even without such an adapter.  [66-71.]

In any event, "teaching away" is not the real issue here. Even criticism of a particular design would not exclude that design from the scope of the disclosure. *See Spine Solutions v. Medtronic Sofamor Danek USA*, 620 F. 3d 1305, 1315 (2010).  In *Spine Solutions*, the specification of the earlier patent "disparage[d]" the two-piece design in the later patent, saying that such a design would make it "particularly difficult" to achieve minimum implant height.  The court held that "this does not rise to the level of an express disclaimer sufficient to limit the scope of the claims; '[d]isavowal requires expressions of ***manifest exclusion or restriction***, representing ***a clear disavowal of claim scope***.'"  *Id.* (quoting *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009).  (emphasis added).  Despite the earlier patent's criticism of the later two-piece design, the court affirmed the denial of summary judgment of invalidity for failure to comply with the written description requirement.  *Id.* at 1320.  The result should be the same here, absent "expressions of manifest exclusion or restriction" or "clear disavowal of claim scope" in the provisional application.   The provisional application does not contain any statement that a detachable adapter is mandatory or that permanently affixed ports are prohibited.

While the provisional application does explain advantages of an external adapter, this falls far short of anything that could be deemed to limit the scope of the disclosure.  For example, in *Lampi Corp. v. American Power Products, Inc*., 228 F. 3d 1365, 1378-79 (Fed. Cir. 2000), the Federal Circuit held that the asserted patent was entitled to the priority of an earlier-filed patent, rejecting a written description argument similar to the one made by Defendants in this case.  The evidence supporting their argument was, if anything, stronger than in this case.  The earlier application showed only identical half-shells, and it emphasized the advantages of identical half-shells to "enable particularly easy and cost-effective manufacture of these two half-shells and to ensure especially easy

-19-

assembly . . . ."  *Id.* at 1378.  But the Federal Circuit held that this was still consistent with interpreting identical half-shells as "only a preferred embodiment of the invention."  *Id.* at 1378; *see also Laryngeal Mask Co. Ltd. v. Ambu A/S*, 618 F. 3d 1367, 1375 (Fed. Cir. 2010) (no requirement for connecting cuff reinforcement to breastplate, even though "Summary of the Invention" said it was a "preferred aspect" of the invention).

While not required to do so, the provisional application illustrates, in Figure 3, the use of the invention in a way that does not take advantage of the preferred external adapters.  Figure 3 shows the adapters in place in the base and not connected to controllers.  [66.] One of ordinary skill would have understood that, in this configuration, the operation of the charging station of the invention would be exactly the same whether the DC ports (male mini-USB connectors) on the base were detachable from the base or were permanently attached to it.  [84.]

Trying to avoid the teaching of Figure 3, Defendants' expert is driven to question whether it is part of the invention.  He says that what it shows is "a bad idea," that "[i]t's not a recommendation," that "it looks similar in concept to the prior art," and that "the patent teaches that's not what you want to do."  [127.] Mr. Bristow's efforts to read Figure 3 out of the provisional application are ridiculous.  The provisional application expressly identifies Figure 3 as showing "a charging station . . . according to an exemplary embodiment of the invention." [128.]  Defendants' inability to reconcile their position with Figure 3 shows that their position is fallacious.  Certainly, their dubious interpretation of the provisional application is not sufficient to support summary judgment. The Federal Circuit case law clearly discloses that summary judgment is inappropriate under the circumstances.  *See, e.g., Cordis Corp. v. Medtronic*, 339 F.3d 1352 (Fed. Cir. 2003); *Crown Packaging Tech. v. Ball Metal Beverage*, 635 F.3d 1373 (Fed. Cir. 2011); *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999); *Laryngeal Mask Co., Ltd. v. Ambu*, 618 F.3d 1367 (Fed. Cir.

-20-

2010); *Revolution Eyewear v. Aspex Eyewear, Inc.*, 563 F.3d 1358 (Fed. Cir. 2009); *Rexnord v. Laitram,* 274 F.3d 1336 (Fed. Cir. 2001); *Spine Solutions v. Medtronic Sofamor Danek USA*, 620 F.3d 1305 (Fed. Cir. 2010); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991).

## C. Defendants Fail to Prove that the Prototype Shown at CES was a Working Version.

A "party challenging a patent's validity has the burden of proving by clear and convincing evidence that the patent is invalid, and that . . . burden does not shift at any time to the patent owner." *Lisle Corp. v. A. J. Mfg. Co.*, 398 F.3d 1306, 1316 (Fed. Cir. 2005).  When the asserted basis of invalidity is prior public use, the moving party must prove by clear and convincing evidence that "the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention."  *Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383, 51 USPQ2d 1055, 1058 (Fed.Cir.1999). A failure to present an "element-by-element comparison" between the subject of the claimed barring activity and the asserted claims requires denial of a motion for summary judgment. *Juicy Whip v. Orange Bang*, 292 F.3d 728, 738 (Fed. Cir. 2002).

The Federal Circuit requires undisputed, clear and convincing admissible evidence that the specific article that is claimed to have been in public use was used in public for its intended purpose.  *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007).  In *Motionless Keyboard*, the Federal Circuit held that a disclosure of an ergonomic keyboard which provided a *visual view* of the new keyboard design without any disclosure of an ability to translate finger movements into actuation of keys to transmit data is not a public use.  The district court improperly relied on an admission by the patent owner that the "Cherry Model 5" keyboard embodied the claims of the asserted patents and granted summary judgment for the defendant based on the public use defense.  *Id.* at 1383.  The Federal Circuit reversed and held that the patent owner's admission

-21-

1    was an insufficient basis for summary judgment.  A visual display of a product is

2    not a public use because it does not disclose or embody each of the claim

3    elements.  If the product is not used for its intended purpose, it cannot form a

4    basis for the public use defense.  *Id.* at 1385.

5        Other courts have similarly held that a public display of non-functioning

6    products does not constitute an invalidating public use.  *Hamilton Beach Brands,*

7    *Inc. v. Sunbeam Products, Inc.,* 3:11-CV-345, 2012 WL 6562220 (E.D. Va. Aug.

8    13, 2012) (moving party failed to meet burden to establish prior use defense the

9    product in public, a slow cooker, had no power cord and was nonfunctioning)

10   *aff'd,* 2012-1581, 2013 WL 4081872 (Fed. Cir. Aug. 14, 2013); *Browning Mfg.*

11   *Co. v. Bros, Inc.,* 134 U.S.P.Q. 231 (D. Minn. 1962), *affd,* 317 F.2d 413 (8th Cir.

12   1963) (where a roller compactor for use in the building of roads was displayed

13   publicly but not actually operated the machine was not in public use.)

14       Defendants fail to offer any admissible evidence, let alone clear and

15   convincing evidence, that the stereolithography (SLA) mock-up prototype charger

16   displayed at CES in 2007 ("SLA mock-up") was functioning.  Defendants cite to

17   three sources to support this claim.   They rely on NYKO's interrogatory

18   responses in which NYKO states that a "prototype" of the product was visually

19   presented in January 2007 and that following a reasonable search, NYKO cannot

20   identify any public "use," "presentation" or "demonstration" of an actual working

21   version of this product.  Nothing in these interrogatory responses suggests that the

22   SLA mock-up was a working version.  The second source on which Defendants

23   rely is Mr. Navid's declaration submitted during the preliminary injunction

24   briefing which states that the Charge Base product meets the claim limitations of

25   the '848 Patent.  This fact has nothing to do with whether the SLA mock-up

26   shown at the January 2007 CES was a working model.  Reliance on this type of

27   "admission" has been rejected by the Federal Circuit as not being probative of

28   public use.  *Motionless Keyboard,* 486 F.3d at 1383.   The third source is

-22-

1   Defendants' expert, Mr. Bristow, who has no personal knowledge of these facts

2   and simply relies on the first two sources.  Defendants, therefore, fail to carry

3   their high burden of clear and convincing admissible evidence that the SLA

4   mock-up was functioning.

5       **D.      Triable Issues of Material Fact Preclude Summary Judgment as**

6              **to Defendants' Public Use Defense.**

7       Whether an invention was "in public use or on sale" is based on underlying

8   questions of fact.  *Invitrogen Corp. v. Biocrest Mfg., L.P.,* 424 F.3d 1374, 1379

9   (Fed. Cir. 2005).  Photographs of the SLA mock-up suggest it was not a working

10  version.  [129.] (all four LED lights are illuminated even though two of the four

11  charger bays are empty.)  If it were a working charger, the LED lights associated

12  with the empty bays would not be illuminated. NYKO's Chris Arbogast

13  confirmed at deposition that NYKO manufactures non-functional prototypes to

14  have the appearance of a fully-working sample.  NYKO illuminates LED lights

15  on prototypes for visual purposes only, even though the SLA mock-up is not

16  functioning.   The LED lights are not connected to anything that charges the

17  controllers.  [130.]

18      Separately, whether access to NYKO's private CES suite was "public" is a

19  triable issue of fact.  The Federal Circuit has identified factors which must be

20  considered and weighed by a trier of fact including "the nature of the activity that

21  occurred in public; the public access to and knowledge of the public use; [and]

22  whether there was any confidentiality obligation imposed on persons who

23  observed the use." *Bernhardt, L.L.C. v. Collezione Europa USA, Inc*., 386 F.3d

24  1371, 1379 (Fed. Cir. 2004) (internal quotations and citations omitted).  "[T]he

25  fact that the inventors revealed the prototype to a select group of individuals

26  without a written confidentiality agreement is not dispositive.  When access to an

27  invention is clearly limited and controlled by the inventor, depending upon the

28  relationships of the observers and the inventor, an understanding of

CHRISTIE, PARKER & HALE, LLP

1    confidentiality can be implied." *Am. Seating Co. v. USSC Group, Inc.,* 514 F.3d

2    1262, 1268 (Fed. Cir. 2008).

3         Here, the NYKO suite was not public; access to the suite was restricted to

4    invited guests with appointments. [131.]  Again, there is no evidence that NYKO

5    ever showed a working version of this new product, still in development, to

6    anyone during CES. [132-138.]  For each of these reasons, summary judgment as

7    to public use should be denied.

8         E.   **Triable Issues of Material Facts Require Denial of Summary**

9              **Judgment as to the On-Sale Bar.**

10        There was no offer for sale prior to March 2007.  In *Linear Tech. Corp. v.*

11   *Micrel*, *Inc.*, 275 F.3d 1040, 1047, 1050 (Fed. Cir. 2001), the Federal Circuit

12   reversed a finding of invalidity due to the on-sale bar, holding that LTC had not

13   made an offer for sale prior to the critical date.  LTC had provided customers with

14   preliminary data sheets regarding the patented product and had entered four pre-

15   critical date purchase orders from its international distributors.   The Federal

16   Circuit held that the communications of a sales representative to potential

17   customers in an effort to establish pricing for its product was not considered an

18   offer.  *Id.* at 1050.  The Federal Circuit held this is a factual question of intent

19   dependent on the facts and circumstances of each particular case.  *Id.*  No final

20   price had been set and the data sheets were simply part of preliminary

21   negotiations directed toward enabling the customers to submit offers to buy.  *Id.*

22   at 1051.

23        In this case, NYKO's Charge Base was a new product. [132.]  The SLA

24   mock-up of the Charge Base product was received by NYKO in or about the last

25   week of December 2006. [133.]  The SLA mock-up up was being tested through

26   January 2007 and into May of 2007. [134.]  There is no clear and convincing

27   evidence that the mock up itself was a working prototype that worked for its

28   intended purpose. [135.]  A further prototype was received by NYKO in or about

-24-

January 18, 2007, which was subject to further testing. [136.]  Additional changes were made to the product between January 18, 2007 and May 2007, when final consumer products were received. [137.]   The design was not finalized, the demand was not ascertained and the cost of the product was not fixed. [138.]  The price of the product was not fixed and was subject to change per the dealer price sheets. [139.]  As such, any requests made by vendors for the product were in the category of pre-orders that would only be fulfilled in the event NYKO deemed that the design could be finalized and the product could be manufactured in a cost effective manner. [140.]  This is supported by the fact that NYKO shipped no product for any of the initial requests prior to June 2007, and re-invoiced the requests under new invoices for payment and shipment in June 2007, only after NYKO had finalized the product in terms of pricing and commercial design. [141]  It is common in the industry for products to be announced.  In cases where the demand for the announced product is weak, or the cost to manufacture the product is too high to support a reasonable manufacturer's suggested retail price, the product is never released.  [142].

## IV.  CONCLUSION

At the very least, there are genuine, triable issues of fact material to whether the '848 is entitled to the priority of the provisional application, thus disqualifying the "prior art" put forward by Defendants.  Defendants' motion for summary judgment should be denied.

DATED:  September 2, 2013          Respectfully submitted,

                                   CHRISTIE, PARKER & HALE, LLP


                                   By /s/ Art Hasan
                                       Art Hasan

                                   Attorneys for Plaintiff NYKO Technologies, Inc.

CHRISTIE, PARKER & HALE, LLP