**ART HASAN, CA Bar No. 167323**
art.hasan@cph.com
**G. WARREN BLEEKER, CA Bar No. 210834**
warren.bleeker@cph.com
**KATHERINE L. QUIGLEY, CA Bar No. 258212**
katherine.quigley@cph.com
**CHRISTIE, PARKER & HALE, LLP**
**655 North Central Avenue, Suite 2300**
**Glendale, California 91203-1445**
**Telephone:  (626) 795-9900**
**Facsimile:   (626) 577-8800**

Attorneys for Plaintiff and Counterdefendant,
NYKO Technologies, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NYKO TECHNOLOGIES, INC., a California corporation,<br><br>           Plaintiff,<br><br>      vs.<br><br>ENERGIZER HOLDINGS, INC., a Missouri corporation, EVEREADY BATTERY COMPANY, INC., a Delaware corporation, and PERFORMANCE DESIGNED PRODUCTS LLC, a California limited liability company,<br><br>           Defendants.<br><br>AND RELATED COUNTERCLAIM. | Case No. CV12-03001 GAF (VBKx)<br><br>**DECLARATION OF GARRY KITCHEN IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**<br><br>**DATE:     September 23, 2013**<br>**TIME:     9:30 a.m.**<br>**CTRM:    740**<br><br>**Hon. Gary Allen Fees** |

1

## **TABLE OF CONTENTS**

A.    Scope of Declaration ........................................................................ 2

B.    Background and Qualifications ........................................................ 2

C.    Materials Considered ....................................................................... 5

II.    SUMMARY OF OPINIONS ....................................................................... 5

III.   LEGAL PRINCIPLES ................................................................................ 6

IV.    THE PATENT IN SUIT ............................................................................. 7

A.    The Asserted Patent ......................................................................... 7

B.    The Asserted Claims ........................................................................ 7

C.    The Level of Ordinary Skill in the Art ........................................... 9

V.    CLAIM CONSTRUCTIONS ................................................................... 10

A.    "base" ............................................................................................. 10

B.    "to couple to" ................................................................................ 10

C.    "electrically coupled to" ............................................................... 10

D.    "at least one" ................................................................................. 10

E.    "structure" ..................................................................................... 10

F.    "docking structure" ....................................................................... 10

G.    "supported by the base" ................................................................ 10

VI.    DETAILED ANALYSIS ........................................................................... 10

A.    The Term "on" Is Not a Term of Art and Requires No Special Meaning ............. 10

B.    The Navid Provisional Discloses  "a plurality of DC ports on the base"
As Set Forth in Claim 1 ................................................................ 15

C.    The Navid Provisional Discloses "a plurality of male mini-USB
connectors supported by the base" As Set Forth in Claim 13. ..... 21

D.    The Navid Provisional Does Not Teach Away From the Asserted Claims ......... 24

E.    The Embodiment Disclosed in the '848 Patent with DC Ports On the
Base is the Same Invention as the One Disclosed in the Navid
Provisional .................................................................................... 32

VII.   CONCLUSION ......................................................................................... 40

CHRISTIE, PARKER & HALE, LLP

I.       **INTRODUCTION**

        **A.**       ***Scope of Declaration***

        1.       I, Garry Kitchen, have been retained by Christie, Parker & Hale, LLP on behalf of Plaintiff NYKO Technologies, Inc. (the "Plaintiff").  I have been asked by counsel to provide my independent expert opinion regarding the disclosure of features claimed in U.S. Patent No. 8,143,848 ("the '848 patent") to a person of ordinary skill in the art by U.S. Provisional Patent Application No. 60/982364 (the "Navid Provisional").

        **B.**       ***Background and Qualifications***

        2.       I am an engineer, video game designer and consultant.  I received a Bachelor of Science in Electrical Engineering in 1980 from Fairleigh Dickinson University, where I was a member of the Eta Kappa Nu Honor Society.  As an EE student, I was twice chosen to receive the Engineering Merit Scholarship from Panasonic / Matsushita Corporation of Japan, one of the largest consumer electronics companies in the world.  A copy of my CV is attached as Exhibit 1 to this declaration.

        3.       My career in the electronic entertainment/video game industry includes over 30 years of experience running game development companies, with significant hands-on technical and creative experience in all game genres, including console, PC retail and download, online, mobile, and dedicated electronic.  I have been directly involved in the design of hundreds of commercially-released video game products, across a breadth of hardware platforms, from the earliest Atari machine to the present day platforms.  I have personally developed video game software products that have generated career sales in excess of $350 million.

        4.       I invented and developed the handheld electronic game *Bank Shot* for Parker Brothers, named one of the "10 Best Games of 1980" by OMNI Magazine, and also recognized as one of the year's top games by Games Magazine.  Bank Shot utilized a customized version of the American Microsystems (AMI) S-2000 4-bit microprocessor, a state-

of-the-art (at the time) single chip microcomputer.  As lead engineer on the project, I was involved in all aspects of the development, including hardware, software and game play.  I was awarded U.S. Patent No. 4,346,892 ("Electronic Pool Game") for the invention of Bank Shot.

5.       In 1980, I reverse engineered the hardware and software of the Atari 2600 game platform, developing one of the first third-party compatible games for the Atari 2600 system (*Space Jockey*).

6.       In 1982, I designed and programmed the Atari 2600 adaptation of the hit arcade game *Donkey Kong*, which achieved revenues in excess of $100 million on 4 million units sold.

7.       From June 1982 to March 1986, I was a Senior Designer for Activision, Inc., during which time I designed and developed the hit title *Keystone Kapers*, which earned a Video Game of the Year – Certificate of Merit from Electronic Games Magazine in 1983.

8.       From 1984–1985, I developed *Garry Kitchen's GameMaker*, a suite of 5 professional quality design tools connected to an easy-to-use programming language that allowed novice game makers to create commercial quality video games.  I was named Video Game Designer of the Year in 1985 by Computer Entertainer Magazine for my work on *Garry Kitchen's GameMaker*.

9.       In 1986, I co-founded Absolute Entertainment, Inc. and served as Chairman, President & CEO until November 1995.  Absolute Entertainment, Inc. was a console game publisher licensed by Nintendo, Sega, Sony, 3DO and Atari and was a video game developer of over 100 marketed titles from 1986 to 1995.

10.       In 1995, I co-founded Skyworks Technologies, Inc., an early, pioneering online game company that has become a leading publisher of games on the Apple iPhone

CHRISTIE, PARKER & HALE, LLP

platform.  I served as Chairman, President & CEO from 1995 to December 2007.  I then served as Chief Operating Officer from January 2008 to September 2009.

11.     Most recently I served as the Vice President of Game Publishing for Viacom Media Networks, a division of Viacom Inc., a $15 billion media conglomerate whose holdings include BET Networks, MTV, VH1, CMT, Nickelodeon, Spike TV, Comedy Central and Paramount Pictures.

12.     Having worked in the video game industry for over 30 years, I am very familiar with the video game accessory market, including game controllers.  I have direct experience working with hundreds of video game controllers, including the Atari 2600 8-direction joystick and analog game paddles, Atari 5200 analog joystick, Atari 7800 joystick controller, Commodore 64 8-direction joystick, Apple II analog joysticks and game paddles, Nintendo game controllers for the Famicom, NES, and Super NES, Nintendo Wii Wiimote motion controller and nunchuk controller, Microsoft Xbox 360 controllers (both wired and wireless), Sony Playstation (PSOne, PS2, PS3) game controllers, (both wired and wireless), Mac and PC single button and multi button mouse controllers, accelerometer controls as implemented in the Apple iPhone/iPad and iPod products, and numerous rhythm action music game controllers, including guitars, electronic drum pads, dance pads, and microphones.

13.     In addition to the working knowledge of game controllers and video game accessories I have gained from over 30 years of experience in creating home video games, I have also served as an technical expert in numerous cases involving video game accessories and video game controller hardware and software.

14.     For example, I served as a technical expert for Nintendo of Japan in a copyright suit involving the Game Genie video game accessory.

15.     I have served numerous times as a technical expert in cases regarding patent and copyright issues for rhythm action video games played with custom game

4

controllers.  The custom game controllers in these matters have included simulated drums, guitars, dance pads and microphones.

16.     I have also served as a technical expert for Sony Computer Entertainment of America (SCEA) in a patent infringement suit involving Sony's tactile feedback technology as implemented in their line of video game controllers.

17.     I recently served as a technical expert for Nintendo of America in a patent dispute involving the Wii Fit and Wii Fit plus custom game controllers.

18.     I am currently serving as a technical expert for Nintendo of America in two separate patent disputes involving the Wiimote motion game controller.

19.     I have been recognized numerous times for my contributions to video games.  For example, in 1992 I received a Lifetime Achievement Award in Video Games from The Doctor Fad Show, a syndicated educational television program.  In 2003, I was honored with the Lifetime Achievement Award in Video Games from Classic Gaming Expo.  In addition to these personal honors, individual games that I have developed have also received awards.

### C.     *Materials Considered*

20.     In connection with my work on this matter, in addition to my own background and experience, I have considered the '848 Patent and its prosecution history, the Navid Provisional, the Court's Order re Claim Construction dated June 12, 2013 (Court Doc. 122), the Defendants' Motion for Summary Judgment of Patent Invalidity dated August 19, 2013 and associated papers including the Declaration of Stephen D. Bristow, the Deposition Transcript of Stephen D. Bristow dated August 29, 2013, dictionary definitions for the terms "on" and "physically," and my prior expert reports and declarations exchanged and filed in this matter.

### II.     SUMMARY OF OPINIONS

CHRISTIE, PARKER & HALE, LLP

21.     My opinions and the basis for them are set forth in this declaration.  In this section, I summarize my opinions based on my study.

22.     It is my opinion that the term "on" as used in the claims of the '848 patent (e.g. "on the base") should be read by a person of ordinary skill in the art using its plain and ordinary meaning of "[u]sed to indicate position above and supported by **or** in contact with," (emphasis added).  This definition accurately reflects the dual nature of the word "on," covering both "direct contact with" and "above and supported by," but not necessarily in direct contact with.

23.     It is my opinion that the Navid Provisional discloses "a plurality of DC ports on the base" as required by claim 1 of the '848 Patent.

24.     It is my opinion that the Navid Provisional discloses "a plurality of male mini-USB connectors supported by the base" as required by the claim 13 of the '848 Patent.

25.     It is my opinion that a person skilled in the art would recognize that the embodiment disclosed in the '848 Patent with DC ports on the base is the same invention as the one disclosed in the Navid Provisional.

26.     Based on the foregoing, it is my opinion that the Navid Provisional clearly discloses to a person of ordinary skill in the art each and every feature of the Asserted Claims of the '848 patent.

### III.     LEGAL PRINCIPLES

27.     I am informed that to comply with the written description requirement, the description must reasonably allow persons of ordinary skill in the art to recognize that the applicant invented what is claimed.  The test for sufficiency of support in an earlier application is whether the disclosure of the earlier application reasonably conveys to the skilled artisan that the inventor had possession at that time of the later claimed subject matter.   The disclosure may be express or inherent, and may be found in the text or drawings of the prior application, or in a combination of the two.  There is no requirement that that actual words in the earlier application be the same as those in the claims, and there is no requirement to explicitly describe in the specification every conceivable and possible future embodiment of the invention.  When

6

CHRISTIE, PARKER & HALE, LLP

a patent includes two inventive components, particular claims may be directed to one of those inventive components and not to the other.

## IV.     THE PATENT IN SUIT

### A.     *The Asserted Patent*

28.     The '848 patent issued on March 27, 2012 and is titled "Video Game Controller Charging System Having a Docking Structure." The '848 Patent describes a charging system capable of charging a plurality of video game controllers simultaneously.

### B.     *The Asserted Claims*

29.     The Plaintiff asserts Independent Claim 1 and Dependent Claims 2, 3, 4, 5, 7, 8, 10, 11, 12 and Independent Claim 13 and Dependent Claims 15, 16, and 17. (collectively "the Asserted Claims").

**Independent Claim 1**

*1. A video game controller charging system for charging a plurality of video game controllers using externally supplied power, the video game controller system comprising:*
*   a base;*
*   at least one structure on the base for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged; and*
*   a plurality of DC ports on the base, each of the DC ports configured to couple to and provide DC power to a power input port of a respective one of the plurality of video game controllers,*
*   wherein the at least one structure on the base comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction, and*
*   wherein the at least one structure on the base further comprises a plurality of pairs of opposite surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays each of the DC ports being on the base between a respective one of the pairs of surfaces.*

**Dependent Claim 2**

*2. The video game controller charging system of claim 1, wherein the plurality of DC ports comprises a plurality of male mini-USB connectors.*

**Dependent Claim 3**

*3. The video game controller charging system of claim 1, further comprising: a current detector electrically coupled to the plurality of DC ports; and an indicator*

CHRISTIE, PARKER & HALE, LLP

*electrically coupled to the current detector, the indicator configured to indicate a
charging status of the video game controller charging system.*

**Dependent Claim 4**

*4. The video game controller charging system of claim 3, wherein the indicator
comprises at least one LED.*

**Dependent Claim 5**

*5. The video game controller charging system of claim 1, wherein the pairs of
opposite surfaces are configured to align respective ones of the plurality of video
game controllers such that the power input ports of the respective ones of the
plurality of video game controllers couple to respective ones of the plurality of DC
ports.*

**Dependent Claim 7**

*7. The video game controller charging system of claim 1, wherein the plurality of
DC ports is configured to concurrently couple to and provide the DC power to the
plurality of video game controllers.*

**Dependent Claim 8**

*8. The video game controller charging system of claim 1, further comprising an AC-
to-DC converter adapted to convert the externally supplied power to the DC power
provided to the power input ports of the respective video game controllers.*

**Dependent Claim 10**

*10. The video game controller charging system of claim 8, wherein the AC-to-DC
converter is external to the base.*

**Dependent Claim 11**

*11. The video game controller charging system of claim 8, wherein the AC-to-DC
converter is adapted to convert an AC voltage in the range of 100 V to 240 V
corresponding to the externally supplied power into a DC voltage corresponding to
the DC power.*

**Dependent Claim 12**

*12. The video game controller charging system of claim 11, wherein the DC voltage
is DC 5 V.*

**Independent Claim 13**

13. *A charging system for charging a plurality of video game controllers, each having a power input port, the charging system comprising:*
 *a base;*
 *a plurality of male mini-USB connectors supported by the base and each adapted to provide DC power to a respective one of the plurality of video game controllers;*
 *at least one docking structure defining a plurality of docking bays open in a first direction and configured to receive from the first direction and align respective ones of the plurality of video game controllers to couple to respective ones of the plurality of male mini-USB connectors; and*
 *a power input for connecting to a power supply, the power input electrically coupled to the plurality of male mini-USB connectors,*
 *wherein the at least one docking structure comprises a plurality of pairs of substantially parallel opposite planar surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays, each of the docking bays being open on opposite sides between the respective pair of surfaces.*

**Dependent Claim 15**

15. *The charging system of claim 13, wherein the charging system further comprises an AC-to-DC converter external to the base and electrically coupled to the power input.*

**Dependent Claim 16**

16. *The charging system of claim 13, further comprising: a current detector electrically coupled to the plurality of male mini-USB connectors; and an indicator electrically coupled to the current detector, the indicator configured to indicate a charging status of the charging system.*

**Dependent Claim 17**

17. *The charging system of claim 16, wherein the indicator comprises at least one LED.*

C. *The Level of Ordinary Skill in the Art*

  30.  Based on my technical and educational background and my in-depth experience in the field of video game hardware, video game accessories, and video game controllers, and having read and analyzed the '848 Patent, I believe one of ordinary skill in the art at the time the application that issued as the '848 patent was filed (October 2006) would have a bachelor's degree in engineering or equivalent degree with approximately two years of relevant experience working in the area of video games and/or video game accessories, or have enough work experience in the relevant fields to be of a level of skill equivalent to the degreed engineer

9

above.

## V.     CLAIM CONSTRUCTIONS

31.     The Court has set forth the following Claim Constructions:

*A.*     *"base"*

32.     The body of the Charging System.

*B.*     *"to couple to"*

33.     To connect directly without the use of wires or cables.

*C.*     *"electrically coupled to"*

34.     Directly or indirectly connected to permit the flow of electrical current.

*D.*     *"at least one"*

35.     One or more than one.

*E.*     *"structure"*

36.     One or more physical components for receiving controllers.

*F.*      *"docking structure"*

37.     One or more physical components for receiving and aligning controllers.

*G.*      *"supported by the base"*

38.     Physically supported by but not necessarily directly on the base.

## VI.    DETAILED ANALYSIS

39.          The Navid Provisional discloses each and every feature of the Asserted Claims, as shown in the attached claim charts set forth in Exhibit 2.  I additionally opine as to the terms "a plurality of DC ports on the base" in Claim 1 and "plurality of male mini-USB connectors supported by the base" in claim 13 in more detail below, as the Defendants have focused on these terms in their Motion for Summary Judgment of Patent Invalidity.

*A.*     *The Term "on" Is Not a Term of Art and Requires No Special Meaning*

40.     In the Court's Claim Construction Order, even though "on the base" was not a term that the parties sought to be construed, the Court states that " 'on' connotes direct contact,

and therefore all components 'on the base' are 'supported by it,' but not all components 'supported by the base' are 'on the base.' " [Claim Construction Order, p. 24].  I respectfully disagree with this assertion and believe that this interpretation of the term "on" is incorrect and reads unnecessary limitations into the claims of the '848 patent.

41.     For example, Cambridge Dictionaries Online, supported by the Cambridge Academic Content Dictionary, presents the default (first) definition of "on"[1] as:

> **on**
> preposition, adverb [not gradable] (SUPPORTED BY)    /ɔn, an/
>
> **Definition**
> › supported by or resting at the top of another thing:
> There is snow on the ground.
> You put pudding in the pie crust and then put whipped cream on.

Note that the Cambridge Dictionary definition does not require that "on" include "direct contact with."

42.     Random House Webster's unabridged dictionary (2001) (first) definition of "on"[2] is as follows:

> **on** [on, awn]
> preposition
> *1.* so as to be or remain supported by or suspended from: Put your package down on the table; Hang your coat on the hook.
> *2.* so as to be attached to or unified with: Hang the picture on the wall. Paste the label on the package.

Once again, note that the first Dictionary.com definition does not require that "on" include "direct contact with."  The secondary definition defines a more specific meaning for the term "on" in which an object must be "attached or unified with" another object, but this requirement is not included in the first definition.

43.     American Heritage Dictionary (2006). defines "on"[3] as follows:

---

[1]   http://dictionary.cambridge.org/us/dictionary/american-english/on_1?q=on  (Exhibit  H  to  Quigley Declaration, filed concurrently herewith.)

[2]  Random House Webster's unabridged dictionary (2001). (Exhibit J to Quigley Declaration.)

CHRISTIE, PARKER & HALE, LLP

11

*on*  (ŏn, ôn)
*prep.*
*1.*
*a*. Used to indicate position above and supported by or in contact with: *The vase is on the table.  We rested on our hands and knees.*
*b*. Used to indicate contact with or extent over (a surface) regardless of position: *a picture on the wall; a rash on my back.*

Once again, the default/first definition of "on" is absent of any requirement for "direct contact with," recognizing direct contact as an optional component of the meaning.

44.     The above definitions confirm what is the plain and ordinary meaning of the term "on" as used in day-to-day conversation; "used to indicate position above and supported by **or** in contact with."

45.     For example:

*"The food is on the table."*



---

[3] American Heritage Dictionary (2006). (Exhibit I to Quigley Declaration.)

12

The fact that the food is actually sitting on the plate, which is on the placemat, which is then physically in contact with the table, does not change the meaning of the word "on" in this context; i.e. "used to indicate position above and supported by **or** in contact with."

*"The boy is on the sidewalk" (as opposed, say, to on the grass).*



The fact the boy is standing on his skateboard, which is between him and the sidewalk, does not change the meaning of the word "on" in this context; i.e. "used to indicate position above and supported by **or** in contact with."

CHRISTIE, PARKER & HALE, LLP

*"The couple is sitting on the beach."*



The couple, pictured in the image above, is clearly sitting on the beach. The fact they are sitting on a blanket, which is between them and the sand, does not change the meaning of the word "on" in this context; i.e. "used to indicate position above and supported by or in contact with."

46.     Finally, consider Figures 20 and 21 from the '848 patent, shown below. Figure 20 shows a single game controller sitting <u>on</u> the base. Figure 21 shows two game controllers sitting <u>on</u> the charging station, or base. The fact that there may be adapters between the game controllers and the base does not change the plain and ordinary understanding that the controllers are <u>on</u> the base.




**Figures 20, 21 from the '848 Patent**

14

47.    Based on the above, it is my opinion that the term "on" as used in the claims of the '848 patent (e.g. "on the base") should be read by a person of ordinary skill in the art using its plain and ordinary meaning of "[u]sed to indicate position above and supported by **or** in contact with," (emphasis added).  This definition accurately reflects the dual nature of the word "on," covering both "direct contact with" and "above and supported by," but not necessarily in direct contact with.  My analysis below is based on the above plain and ordinary meaning of the term "on."

### B.    The Navid Provisional Discloses  "a plurality of DC ports on the base" As Set Forth in Claim 1

48.    Defendant's Memo of Points and Authorities (page 11, par. 1) states:

> Each of the Asserted Claims of the '848 patent requires "**a plurality of DC ports on the base**" of the charging system configured to provide power to a power input port of a wireless controller (claims 1-5, 7, 8, and 10-12) or, more specifically, "a plurality of male mini-USB connectors supported by the base" (claims 13, 15- 17). (UMF ¶ 27.) Because a device with DC ports on the base was not disclosed in the Navid Provisional from which Nyko attempts to claim priority, the effective filing date of the Asserted Claims is March 7, 2008, and the public uses and offers for sale of the claimed invention before March 7, 2007 invalidate the asserted claims under 35 U.S.C. § 102(b). (Emphasis added)

49.    I disagree with the statement above that "a device with DC ports on the base was not disclosed in the Navid Provisional."

50.    Using the plain and ordinary meaning of the term "on" as discussed above (i.e. "used to indicate position above and supported by or in contact with"), a person of ordinary skill in the art would recognize that the Navid Provisional discloses "a plurality of DC ports on the base," as shown in Figure 3 below:

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Navid Provisional – Figure 3 (arrows and associated text added)*

51.     Defendants state in their Statement of Uncontroverted Fact 18: "The external adapters 16 including the DC ports (connectors 42) are separate from the charger base." This statement is inaccurate as the adapters can either be part of the base (as shown above in Figure 3), or separate from the base.  Furthermore, the Navid Provisional discloses at least one embodiment in which the adapter(s) are fastened to the base, using a "push-fit, press-fit, or snap-fit, rather than a simple drop-fit." [Navid Provisional, ¶ 23].  I agree with Defendants' Expert, Mr. Bristow, that the push-fit, press-fit and snap-fit indicate successively greater degrees of attachment.  A base with the adapter(s) and their DC ports attached through one of the above fastening methods would fall under the Court's interpretation of "on the base" as "a direct connection between the object and the base."  A component that is push-fitted, press-

16

fitted or snap-fitted to become a unitary structure with the base is directly connected to the base under any interpretation and would not be considered "separate from" the charger base.

52.     The Navid Provisional discloses adapters that are placed in corresponding recesses in the base and are press-fit, push-fit or snap-fit into a corresponding recess in the base.  The purpose of this recess is clearly to allow the adapters with the DC ports to sit within the base and act as a unit that allows the connection to the controller power input port to be made without interference with the purpose of the docking bays, which is to align and receive the controllers.

53.     In addition, Figure 3 of the Navid Provisional shows the adapters fastened to the base (as discussed above) by a press-fit, push-fit or snap-fit, or sitting in the recesses of the docking bays by a drop fit.  One skilled in the art would understand that the provisional patent describes both configurations, in which the DC ports are attached or removable.

54.     Similarly, Figure 6 of the Navid Provisional (shown below) shows two controllers charging in the disclosed invention without specifying the presence or absence of the adapters – "FIG. 6 is a perspective view of a charging station with two video game controllers according to an exemplary embodiment of the invention;" [Navid Provisional, ¶13]. Without this specificity, one skilled in the art would understand that the provisional patent claims both configurations; docked and charging with an adapter or without an adapter (i.e. with a DC port directly connected to the base).

55.     Although I understand that the claims of the earlier application are not of primary significance, as the entire specification must be viewed, I further note that one of the claims of the Navid Provisional reads:  "11.  Apparatus as shown and described herein."  As FIGs. 3 and 6 show the docking bays configured to receive and align the controllers, with opposite parallel sidewalls and DC ports attached to the base, it is clear that the inventor found this to be part of his invention.

CHRISTIE, PARKER & HALE, LLP

*FIG.6*

***Navid Provisional – Figure 6***

56.     The Defendants claim that the Navid Provisional does not disclose DC ports on the base because (according to the Defendants) the provisional patent teaches that the adapters are always attached to the game controller.  For example, the Defendants' Memorandum in Support of the Summary Judgment states that the "external adapter… is separate from the base…. and remains connected to the controller" [7:23-8:1].  This characterization of the Navid Provisional's disclosure is not accurate.  While the Defendants' language portrays this usage of the adapter as a requirement of the invention, the Navid Provisional makes it clear through its wording that the adapter can remain on the base or <u>optionally</u> be attached to the game controller (note the use of the word "can," meaning "has the ability to," rather than "must," as in a requirement):

> The adapter 16 <u>can</u> remain with the hand-held controller 26 at all times, even when the controller 26 is not being charged in the charging station 10.  When the hand-held controller 26 is in use during operation of a

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

video game, when the controller 26 is stored, and when it is charging, the adapter 16 <u>can</u> remain connected to (and physically mounted on) the controller 26." [NP, ¶22], (Emphasis added)

57.    Note that Figure 3 (shown below), is described in the Navid Provisional as "a perspective view of a charging station with two adapters according to an exemplary embodiment of the invention." [Navid Provisional, ¶8].  As Figure 3 shows no controllers and shows the adapters on the base, it is clear that an embodiment is disclosed as pictured, in which the adapters can remain on the base.

58.    I understand that Mr. Bristow may have taken the position that not showing the controllers is a drawing convenience, but the controllers could have been drawn in phantom (with dotted lines), which is a convention that indicates presence without obstruction of the view of the features of the drawing that would otherwise be blocked by the controllers.

59.    In any event, whether the adapters remain with the controllers in the optional case is irrelevant.  Even in the optional case where the adapters remain with the controllers, the controllers with the DC ports must end up on the base in order for the system to charge the controllers.



*A plurality of DC ports on the base*

FIG.3

***Navid Provisional – Figure 3 (arrows and associated text added)***

60.     In summary, the Navid Provisional includes disclosures in which the adapters are on the base, either sitting in the recess of the docking bay or attached directly to the base through the disclosed fastening methods.  In all cases the DC ports must be on the base for the device to function as intended, because the DC ports must be on the base to receive the DC voltage necessary to charge the game controllers.  In fact, there is no scenario in which the invention shown in Figure 3 functions as intended without the DC ports being positioned as shown above; i.e. positioned on the docking bays of the base with the DC ports part of the electrical circuit of the charger.

61.     Defendants state in their Statement of Uncontroverted Fact 20: "Contrary to the Asserted Claims, the Navid Provisional does not disclose a charging device with DC ports on

the base or supported by the base and is expressly directed to a device that places DC ports on and supported by an external adapter that remains attached to the controller."

62.     Based on the analysis above, I disagree with this purported statement of fact.  As explained above, the Navid Provisional does disclose a charging device with DC ports on the base.  The Navid Provisional does disclose a charging device with DC ports supported by the base.  Furthermore, the Navid Provisional is not limited to a device that places DC ports on an external adapter nor is it limited to a device that has DC ports supported by an external adapter.  Finally, the provisional is not limited to a device with an external adapter that remains attached to the controller.  (See Figure 3.)

63.     Therefore, it is my opinion that the Navid Provisional discloses "a plurality of DC ports on the base" as set forth in Claim 1.

**C.     The Navid Provisional Discloses "a plurality of male mini-USB connectors supported by the base" As Set Forth in Claim 13.**

64.     Defendant's Memo of Points and Authorities (page 11, par. 1) states:

> Each of the Asserted Claims of the '848 patent requires "a plurality of DC ports on the base" of the charging system configured to provide power to a power input port of a wireless controller (claims 1-5, 7, 8, and 10-12) or, more specifically, "**a plurality of male mini-USB connectors supported by the base**" (claims 13, 15- 17). (UMF ¶ 27.) Because a device with DC ports on the base was not disclosed in the Navid Provisional from which Nyko attempts to claim priority, the effective filing date of the Asserted Claims is March 7, 2008, and the public uses and offers for sale of the claimed invention before March 7, 2007 invalidate the asserted claims under 35 U.S.C. § 102(b). (emphasis added)

65.     In determining if the Navid Provisional discloses "a plurality of male mini-USB connectors supported by the base," it is necessary to review the Court's Claim Construction order.  The Court construes the term "supported by the base" to mean "physically supported by but not necessarily directly on the base."  In addition, the Court construes "base" as "the body of the Charging System."  Under these constructions, it is clear that a person of ordinary skill in

CHRISTIE, PARKER & HALE, LLP

the art would recognize that the Navid Provisional discloses "a plurality of male mini-USB connectors supported by the base," as shown in Figure 3 below:



*Navid Provisional – Figure 3 (arrows and associated text added)*

66.     There can be no doubt that the above image discloses "a plurality of male mini-USB connectors."  The connectors 42 are clearly mini-USB connectors and are called out as such in the patent application:

> In one embodiment, the connector 42 is a male mini-USB (universal serial bus) connector adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the Playstation3®. Navid Provisional, page 5, lines 11-13.

67.     As there are two connectors 42 shown, the image discloses a plurality (more than one) of male mini-USB connectors.

CHRISTIE, PARKER & HALE, LLP

68.     Regarding the requirement that the male mini-USB connectors be supported by the base, in the Declaration of Stephen D. Bristow, Mr. Bristow opines that:

> The Court construed "supported by the base" as "physically supported by but not necessarily directly on the base."  The male mini-USB connectors on the adapters, as disclosed in the Navid Provisional, **are not "physically supported by the base," as that phrase would be understood by a person of skill in the art.**  The physical support for the male mini-USB connectors is provided entirely by the structure of the adapters themselves; connecting the controller/adapter assembly to the base does not provide any further "physical support" for the male mini-USB connectors as that term would be reasonably understood. [Bristow Declaration, 4: 3-10.] (Emphasis added)

69.     I disagree with Mr. Bristow's opinion above as his analysis fails to take into account the full meaning of "supported by the base" as construed by the Court; i.e. "physically supported by but not necessarily directly on the base."  It's informative to note that Mr. Bristow omits the second half of the phrase, "but not necessarily directly on the base," in his sentence opining on what a person of skill in the art would understand.  In fact, a person of skill in the art would understand, with the addition of the key modifier "but not necessarily directly on the base," that the mini-USB connectors can be, and are, supported by the base even though they are not directly on the base.  Mr. Bristow's reasoning appears to be that only the object that the connectors are directly in contact with (i.e. the adapter) can supply physical support; in fact, he states definitively "the physical support for the male mini-USB connectors is provided entirely by the structure of the adapters themselves" (emphasis added).  If that reasoning was true, which it is not, then the Court's construction would be nonsensical because, by Mr. Bristow's logic, anything that isn't "directly on the base" is entirely supported by whatever structure it is directly on.  The phrase "but not necessarily directly on the base" specifically applies to the case in which one or more object(s), such as the mini-USB connectors, are physically supported by the base but sitting on something else (the adapter), rather than directly on the base.

23

70. In Figure 3 above, the mini-USB connectors are clearly supported physically by the base, or body of the charging system, even though they are not directly on the base. If the body of the charging system were not under the mini-USB connectors, the connectors would fall down onto whatever surface is below.

71. Defendants state in their Statement of Uncontroverted Fact 14: "Unlike the Asserted claims of the '848 Patent, the Navid Provisional does not disclose DC ports or USB ports of any kind on the base, and only disclosed embodiments requiring a separate external adapter." I disagree with this purported statement of fact. As explained above, the Navid Provisional does disclose USB ports on the base. One of ordinary skill in the art would understand that the embodiments with external adapters merely disclose particular ways of practicing the invention and that the invention could be practiced without external adapters. The Navid Provisional does not require a separate external adapter.

72. Therefore, for the reasons stated above, it is my opinion that a person skilled in the art would recognize that the Navid Provisional discloses "a plurality of male mini-USB connectors supported by the base."

**D.    *The Navid Provisional Does Not Teach Away From the Asserted Claims***

73. The Background section of the Navid Provisional discusses certain problems that can be encountered in using charging stations:

> Frequent replacement of batteries can be expensive, and as a result many accessory devices utilize rechargeable batteries. The accessory device is connected to a charging station periodically to recharge the batteries. The charging station and the accessory device have matching plugs or ports that fit together to make a connection. If the plug on the charging station or the accessory device is broken or damaged, the accessory device can no longer be connected to the charging station. These plugs can be small and/or fragile, as the accessory device itself is often a small, compact device. These small plugs can be easily bent or broken, rendering the charging station inoperable. The user has to be careful to connect the plugs slowly, gently, and completely, in order to make a proper connection without damaging the parts. [Navid Provisional, 1:18-26]

74. The Navid Provisional goes on to state:

24

1

2      Thus, it is desirable to provide an improved charging station that allows
3      for fast, easy, and reliable connection between the accessory device and
       the charging station. [Navid Provisional, 2:3-4]

4

5      75.     Referring to this section of the Navid Provisional, Defendant's Motion for

6   Summary Judgment Memorandum states the conclusion that this discussion expressly teaches

7   away from required elements of the Asserted Claims:

8      Indeed, the Navid Provisional expressly teaches away from required
       elements of the Asserted Claims (DC ports on the base of the charging
9      system) because the DC ports can be easily bent or broken when
       repeatedly plugging and unplugging the controller to and from the
10     charging system. [Motion for Summary Judgment Memorandum, 7:2-5]

11     The Defendants go on to state:

12     To achieve this object, the DC port that plugs into the controller in the
       invention of the Navid Provisional is placed on an external adapter,
13     separate from the base of the charging system. This DC port is supported
       by the adapter, not by the base. This adapter is plugged into the wireless
14     controller and remains connected to the controller when it is in use (not
       connected to the charging station), and when the controller/adapter is
15     placed into a docking bay on the base of the charging system (the
       "Adapter Invention"). [Motion for Summary Judgment Memorandum,
16     7:23-8:1]

17

18     76.     The above conclusion is fraught with inaccuracies.  First of all, the external

19  adapter is not the only feature of the invention disclosed to "achieve the object" of providing an

20  improved charging station that allows for fast, easy, and reliable connection.  In fact, it is the

21  whole of the invention that solves the problems discussed in the Background section of the

22  Navid Provisional to achieve "an improved charging station."  For example, the external

23  adapter would be useless and ineffective without the disclosed docking bays, which align and

24  support the game controller to achieve a reliable connection between the accessory device and

25  the charging station.

26

27     As shown in FIG. 1, the charging station 10 includes a base 24 with two
       docking bays 12, 14.  The docking bays 12, 14 are each dimensioned to
28

1    accept a hand-held controller 26 (see FIGs. 5, 6). [Navid Provisional,
2    ¶17]

3        77.      A person of ordinary skill would have understood from the Navid Provisional

4    that the invention could be practiced and could serve its intended purpose without an external

5    adapter, using, for example, the configuration of the docking bays as depicted in the Navid

6    Provisional.  For example, as discussed above, Figure 3 of the Navid Provisional shows a

7    configuration in which the DC ports (male mini-USB connectors) are connected to the base and

8    are not connected to controllers.  A person of ordinary skill would have understood from Figure

9    3 that, even without the assistance of external adapters attached to the controller, the docking

10   bay configuration would have helped align the controllers, would facilitate connection of the

11   controller to the charging station, and would thereby accomplish the purposes of the invention.

12       78.      The '848 patent describes at greater length what a person of ordinary skill in the

13   art would have recognized from the drawings and description in the Navid Provisional – the

14   critical role of the docking bays in providing a "fast, easy and reliable connection":

15

16       In use, the DC ports 408 are connected to power input ports of the video
17   game controllers 420 to be charged, as shown in FIG. 14. When one or
     more video game controllers 420 need to be recharged, **connecting the**
18   **video game controllers 420 to the charging system 400 is as easy as**
     **inserting each of the video game controllers 420 into one of the**
19   **docking bays 404**. As described above, **the locators 410 aid in aligning**
     **the video game controller 420 into the docking bay 404** such that the
20   power input port of the video game controller 420 **slides down onto and**
     **connects to the DC port 408**. ['848 patent, 9:65-10:7] (Emphasis
21   added).

22       79.      Secondly, the above excerpt from the Motion for Summary Judgment

23   Memorandum conclusively states that the "external adapter… is separate from the base…. and

24   remains connected to the controller."  Once again, this is a distortion of the Navid Provisional's

25   disclosure.  While the Defendants' language characterizes this usage of the adapter as a

26   requirement of the invention, the Navid Provisional makes it clear through its wording and

27   drawings that the adapter can either remain on the base or <u>optionally</u> attached to the game

28

CHRISTIE, PARKER & HALE, LLP

controller (note the use of the word "can," meaning "has the ability to," rather than "must," as in a requirement):

> The adapter 16 <u>can</u> remain with the hand-held controller 26 at all times, even when the controller 26 is not being charged in the charging station 10.  When the hand-held controller 26 is in use during operation of a video game, when the controller 26 is stored, and when it is charging, the adapter 16 <u>can</u> remain connected to (and physically mounted on) the controller 26." [Navid Provisional, ¶22] (Emphasis added).

80.    The Navid Provisional also discloses at least one embodiment in which the adapter(s) are fastened to the base, using a "push-fit, press-fit, or snap-fit, rather than a simple drop-fit." [Navid Provisional, ¶ 23].  Consequently, a person of skill in the art would recognize the use of an external adapter that remains with the controller as one way of practicing the invention of the Navid Provisional (a preferred embodiment), but not the only way of doing so.

81.    Further, the Navid Provisional repeatedly uses the terms "exemplary embodiment" and "one embodiment," which states to one of ordinary skill in the art that each of the described embodiments is but an example of the invention, and that the invention is not restricted to a particular embodiment.  FIG. 7 of the Navid Provisional includes arrows both above and below the Adapter 16, indicating that the adapter can be attached either to the Accessory Device 26 or the Charger Base 10; in other words, the adapter may remain with the controller or remain with the base.

82.    In fact, not only does the Navid Provisional not teach away from the Asserted Claims of the '848 patent, Figure 3 of the Navid Provisional shows the adapters mounted on the base of the charging system, practicing the requirement of Claim 1 of the '848 patent of having "DC ports on the base.":

CHRISTIE, PARKER & HALE, LLP



*Navid Provisional – Figure 3 (arrows and associated text added)*

83.     The Defendants cite to the Background section of the provisional application and characterize it as an admission of prior art.  This is improper.  First, the background never states that it is a description of prior art, and Defendants supply no evidence that it is.  The Background simply states that there is a problem with charging stations with fragile DC ports in that the DC port may become damaged when the connection is made between it and the controller.  It does not describe the configuration of any particular charging stations.

84.     The Defendants read what is disclosed in the Background to cover the exact embodiment of a charging station without adapters that was later added in the '848 patent, but again there is no support for this, as other charging solutions existed at or about the time of

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

filing of the provisional application.  The Cole patent (which is not prior art), for example, discloses a rack in which the controllers sit on finger like posts that are arranged in rows along the base, and use external cables and wires to protect the fragile power input ports on the controller.  The space between the adjacent posts in Cole cannot be considered to define docking bays as described in the Navid Provisional and recited in the Asserted Claims, as it is clear from Cole that the controller on the rack is sitting on top of the uppermost row of posts without any opposite surface for aligning the controller.  See Figure 4 below from the Cole patent:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Cole US 7,942,747 – Figure 4

85.     Another example of a charging station that does not include docking bays is pictured in document PDP0076069 (shown below), disclosing an alternate design considered by Defendant PDP for a game controller charging system.  It is my understanding in reviewing the document that the power input ports of the game controllers would mate with DC ports

30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

extending horizontally from the center divider of the system.  As this design does not include docking bays to align and support the game controllers when charging, a person skilled in the art would understand that this design would be plagued by the same problems discussed in the Navid Provisional Background section, as quoted above.



    86.    The provisional application expressly and inherently discloses multiple solutions to this problem of fragile ports on the base.  One potential solution is the use of a DC port integrally disposed in an adapter that can remain with the controller.  Another potential solution is the interplay of the base with structures on the base that define docking bays including parallel opposite surfaces for receiving and aligning the controllers while they are being charged.

87.     In understand that there is no requirement that a patentee claim each and every disclosed feature in each and every claim.  The fact that the provisional discloses multiple features and may emphasize some over others does not mean that there is a failure of written description to support claims reciting combinations of some but not all of the disclosed features.

88.     Therefore, based on the above analysis, it is my opinion that the Navid Provisional does not teach away from the Asserted Claims of the '848 patent.

**E.      The Embodiment Disclosed in the '848 Patent with DC Ports On the Base is the Same Invention as the One Disclosed in the Navid Provisional**

89.     The Defendants claim in their Motion for Summary Judgment Memorandum that the embodiment disclosed in the '848 patent with DC ports on the base is a "different invention than the Adapter Invention of the Navid Provisional." [Motion for Summary Judgment Memorandum, 10:23-24].  I disagree with this conclusion.

90.     In comparing the Navid Provisional's disclosed invention to the '848 patent embodiment with DC ports directly and non-removably attached to the base, it is important to first understand what the invention is that is disclosed in the Navid Provisional.  Referring to ¶22 of the Navid Provisional, Defendants state in their Statement of Unsupported Fact 17: "The invention of the Navid Provisional includes an external adapter 16 with a male USB port to connect to the controller:" See ¶22 below:

> In use, the connector 42 on the adapter 16 is connected to the power input port of the accessory device to be charged, such as the hand-held controller 26 shown in FIGs. 5 and 6.  The adapter 16 is a small and light-weight piece that connects snugly to the power input port of the hand-held controller 26.  The adapter 16 can remain with the hand-held controller 26 at all times, even when the controller 26 is not being charged in the charging station 10.  When the hand-held controller 26 is in use during operation of a video game, when the controller 26 is stored, and when it is charging, the adapter 16 can remain connected to (and physically mounted on) the controller 26.  The adapter 16 is small and light weight, so that it does not interfere with operation of the controller 26.  When the controller needs to be recharged, connecting it to the charging station 10 is as easy as dropping it into the docking bay 12, 14.  The adapter 16 slides easily into the recess 30, and the electrical leads 22 on the bottom of the adapter 16 make an electrical connection with the

electrical contacts 20 in the recess 30.  The charging station 10 is
connected to a power supply through its own power input.  The charging
station 10 then provides power to the controller 26 to recharge the
controller's batteries.  This recharging process is fast and easy, as the
adapter 16 allows the controller to be simply dropped into place, rather
than carefully connected to a fragile port or connector." [Navid
Provisional, ¶22]

91.     I disagree with Defendants' narrow characterization above of the "invention of

the Navid Provisional," as the referenced ¶22 is describing only one embodiment of the

invention (see ¶20, "As shown in FIG. 3, in one embodiment…").

92.     Defendants state in their Statement of Unsupported Fact 19: "Thus, to achieve

the object of the invention of the Navid Provisional, the DC port that plugs into the controller in

the invention of Navid Provisional is placed on an external adapter, separate from the base of

the charging system.  This DC port is supported by the adapter, not by the base.  This adapter is

plugged into the wireless and remains connected to the controller when it is in use (not

connected to the charging station), and when the controller/ adapter is placed into a docking

bay on the base of the charging system (the 'Adapter Invention')."

93.     I disagree with the above purported statement of fact for a number of reasons.

As discussed elsewhere in this declaration, an external adapter is not necessary to achieve the

object of the invention; it is only one embodiment.  The adapter is not necessarily separate from

the base, as evidenced in Figure 3 and my analysis elsewhere in this document.  In fact, they

have to be together for the charging station to operate.  It is not a requirement of the Navid

Provisional that the adapter remain connected to the controller.  Similarly, the controller need

not be connected to the adapter when the adapter is in the docking bay on the base.

94.     Defendants state in their Statement of Unsupported Fact 22: "The '295

application describes, for the first time in any Navid patent application, a charging system with

'at least one DC port on the base,' and not requiring a separate external adapter with a DC port

to facilitate the connection between the controllers and the charge base."

95.     Once again, I disagree with this characterization of the Navid Provisional.  As

discussed elsewhere in this document, the Navid Provisional had previously disclosed a

33

charging system with "at least one DC port on the base."  And, as discussed elsewhere in this declaration, an external adapter is not necessary to achieve the object of the invention; it is only one embodiment.

96.     A person of skill in the art would recognize that the invention disclosed in Figure 11 of the '848 patent and the one disclosed in Figure 3 from the Navid Provisional, both shown below, are the same invention:



*'848 Patent – Figure 11*

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Navid Provisional - Figure 3*

97.      With the adapters on the base (as shown in Figure 3), the inventions in Figure 3 of the Navid Provisional and Figure 11 of the '848 patent are substantially the same.  The adapters must be positioned as shown in Figure 3 (i.e. in exactly the same position as the DC ports pictured in Figure 11), for the invention to function as specified.  There is no scenario in which the invention performs the Asserted Claims of the '848 patent with the adapters removed from the base.  In these embodiments, the adapter and base operate as a unitary piece, practicing the disclosed claims of the patent.  When the adapter is on the base as pictured in Figure 3 above, whether sitting in the recess on the base or attached to the base as disclosed previously, a person skilled in the art would recognize that the adapter and base functioning as a unitary piece is equivalent to having a DC port mounted on the base.

CHRISTIE, PARKER & HALE, LLP

98.     Similarly, a person skilled in the art would perceive no substantive difference in inventions between the devices shown in Figure 6 of the Navid Provisional and Figure 14 of the '848 patent (both shown below).  Figure 6 is described as "a perspective view of a charging station with two video game controllers according to an exemplary embodiment of the invention;" [Navid Provisional, ¶13].  The Navid Provisional gives no specifics as to whether or not Figure 6 depicts the usage of external adapters.  Figure 14 of the '848 patent is described as "a perspective view of the video game controller charging system of FIG. 11 having video game controllers connected for charging," ['848 patent, 5:33-35].  The charging system of FIG. 11 depicts an embodiment with male mini-USB ports mounted on the base.  Even to one skilled in the art, the inventions look and appear to function identically.



*Navid Provisional – Figure 6*

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*'848 Patent – Figure 14*

99.     Consequently, one of ordinary skill would have understood that, in any of the above configurations, the operation of the charging station would be exactly the same whether the DC ports (male mini-USB connectors) on the base were detachable from the base or were permanently attached to it.  There is nothing in the Navid Provisional that requires the use of an external adapter.  One of ordinary skill in the art would recognize that the removable adapter is a further convenience of the disclosed invention, and certainly not a separate and distinct invention.   In other words, the provisional application discloses all of the features set forth in the Asserted Claims plus the added feature that the DC ports may be removable.  The added

37

feature is optional and is not implicated by the words "on" and "supported by" in Asserted Claims 1 and 13 respectively.

100.   Defendants state in their Statement of Unsupported Fact 26: "Confirming that the new embodiment of the charging system with the DC ports on the base was a different invention than the Adapter Invention of the Navid Provisional, it was claimed separately from the Adapter Invention in both the original claims of the '295 application and in the claims as issued." I disagree with this purported statement of fact.  The fact that other claims in the '848 Patent not asserted in this action expressly claim the feature of the removable external adapter that remains with the controller does not mean that the coverage of Claims 1 and 13 excludes embodiments that do not include the removable adapter.  The terms "on" and "supported by" cover both embodiments.  It is my understanding that a patent can disclose separate embodiments of the same invention and the fact that one embodiment is claimed separately from another does not imply that they are separate inventions.  It is further my understanding that if they were separate inventions, the Patent Office would have required that they be broken into separate applications.  Furthermore, the Claims in the Navid Provisional and as issued cover both embodiments.

101.   Defendants also state in their Statement of Unsupported Fact 24:  "In addition to the new embodiment with the DC ports on the base, the '295 application includes the Adapter Invention described and depicted in the earlier Navid Provisional as an entirely separate embodiment.  Specifically, the '295 application disclosed 'another exemplary embodiment of the invention, shown in FIGS. 16-23' with electrical contacts 520 on the base instead of DC ports." Additionally, Defendants state in their Statement of Unsupported Fact 25: "As in the Navid Provisional, the DC ports (connectors 542) that connect to the controllers are located on external adapters 516, which are separate from the base as clearly shown in FIGS. 17, 19 and 22.  On the opposite surface of the adapters from the DC ports are electrical leads 522 that make contact with the electrical contacts 520 on the base to provide an electrical connection to provide power to the controllers." I disagree with these assertions for a number of reasons.  As

38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

discussed earlier in my declaration, the Navid Provisional discloses embodiments with DC

ports on the base.  Furthermore, the '848 patent embodiment referred to in FIGS. 16-23 is not

the same as the invention of the Navid Provisional.  The Navid Provisional was not limited to

any one embodiment.

    102.    Therefore, based on the above analysis, it is my opinion that a person skilled in

the art would recognize that the embodiment disclosed in the '848 Patent with DC ports on the

base is the same invention as the one disclosed in the Navid Provisional.

CHRISTIE, PARKER & HALE, LLP

## VII.   CONCLUSION

103.   I have determined that the Navid Provisional clearly discloses to a person of
ordinary skill in the art each and every feature of the Asserted Claims of the '848 patent.

I declare under penalty of perjury under the laws of the United States of America that
the foregoing is true and correct.

Executed September 2, 2013, at Danville, California.

Garry Kitchen

40

CHRISTIE, PARKER & HALE, LLP

# EXHIBIT 1

# Garry E. Kitchen
## http://www.garrykitchen.com

contact info available
by request

gk@garrykitchen.com

**EDUCATION**

**Bachelor of Science, Electrical Engineering,** 1980
Fairleigh Dickinson University, Teaneck, New Jersey
Eta Kappa Nu Honor Society, 1979-1980
Engineering Merit Scholarship - Matsushita Corp, 1978-1979

**AFFILIATIONS**

AIAS - Academy of Interactive Arts and Sciences
IGDA - International Game Developers Association
IEEE - Institute of Electrical & Electronics Engineers
BOSSLEVEL - The World's Top 100 Game Developers (by invitation only)
*Elite Expert* for IMS Expert Services, Pensacola, Florida
Eta Kappa Nu Honor Society
Gerson Lehrman Group Councils
Guidepoint Global (FNA Vista Research - Society of Industrial Leaders)
Coleman Research Group

**RECENT ACCOMPLISHMENTS**

**2008** - In response to a dramatic shift in the investment environment, as a senior member of management (COO), I participated in the repositioning a $0 revenue investment-backed venture into a successful digital publishing business in the span of 7 months. My contributions to this effort included participation in the rethinking of the business strategy, initial technical R&D, proof-of-concept product development, and product line strategy.

**EXPERIENCE**

• 30 years of technical management experience running game development companies, with an unmatched 14 years of management experience in Internet gaming.

• Strategic business planning - a history of anticipating and influencing industry trends with pioneering initiatives:
**1980** Back-engineered the Atari 2600 in anticipation of the video game revolution
**1986** Established the 1st North American-based Nintendo development studio
**1996** Pioneered *Advergaming* with development of LifeSavers' Candystand.com
**2005** Applied dynamic in-game advertising technology to casual games - CGN
**2008** Partnered in the launch of a leading iPhone publisher

• Hands-on technical and creative experience in all genres of game development, including console, PC retail and download, online, mobile and dedicated electronic.

EXHIBIT 1
Page 41

**Garry E. Kitchen**
page 2

**EXPERIENCE**
(cont'd)

- Expertise in developing comprehensive business plans, with application toward raising investment capital, either through IPO or private equity investment.

- Recognized as an industry expert in online gaming by numerous trade conferences, including Digital Hollywood, iMedia Breakthrough, GDC, CES, Gamer Technology Conference, Casual Game Conference, Advertising in Games conference, DMEXPO, VNU Digital Marketing conference, National Cable Show.

- Experience in dealing with broadcast and print media, including CNBC, ABC Eyewitness News, CNN, Good Morning Atlanta, The Today Show and various consumer and trade publications.

- Personally developed video game software products generating career retail sales in excess of $350 million.

- Co-founded Skyworks Technologies, Inc., an industry pioneer in *Advergames* - sponsorship-supported video games used as advertising vehicles.  Skyworks was named a Top 50 Interactive Agency by Advertising Age for the years 2003 and 2004.  Skyworks' client list included Nabisco/Kraft Foods, BMW, Toyota, Ford, PepsiCo, Campbell's, Fox Sports, CBS, Mattel, Weather Channel, Microsoft Network, Yahoo!, Miller Brewing Company, GlaxoSmithKline and MTV.

- Developed strategy and business plan for the Casual Games Network (CGN), Skyworks' initiative applying dynamic in-game advertising to online casual games, partnering with Massive Incorporated.

- Co-founded Absolute Entertainment, Inc., console game publisher licensed by Nintendo, Sega, Sony, 3DO and Atari and video game developer of over 100 marketed titles from 1986 to 1995, generating product retail sales of over $300 million.  Successfully lead Absolute through oversold IPO, raising $12 million.

- Consulted for RCA David Sarnoff Research Labs (1986-1987) on entertainment applications of Digital Video Interactive (DVI), the first technology to store digital full-motion video on a CDROM.

- Designed & programmed Atari 2600 adaptation of hit arcade game <u>Donkey Kong</u>, 1982 wholesale revenues in excess of $100 million on 4 million units.

- Conceived, designed and developed <u>Bank Shot</u>, an innovative electronic pool game marketed by Parker Brothers, named "10 Best Games of 1980", *Omni Magazine*.

- Back-engineered Atari 2600 game system in 1980, creating one of the first third party 2600-compatible game cartridges - <u>Space Jockey</u>.

- Performed as Legal Expert Witness in numerous cases involving patents, intellectual property, video games and software development for clients including Konami Entertainment, Nintendo of America, NCR, Taito and Activision.

EXHIBIT 1
Page 42

**Garry E. Kitchen**
page 3

## EMPLOYMENT HISTORY

**Vice President, Game Publishing**
Viacom MTV Networks
December 2010 - Present

**President/CEO**
AppStar Games Inc., Paramus, New Jersey
February 2010 - November 2010

**President/CEO**
SGK Service Inc., Franklin Lakes, New Jersey
March 2007 - November 2010

**Chief Operating Officer**
Skyworks Interactive, Inc., Hackensack, New Jersey
December 2007 - September 2009

**Chairman, President & CEO**
Skyworks Technologies, Inc., Hackensack, New Jersey
November 1995 - December 2007

**Chairman, President & CEO**
Absolute Entertainment, Inc., Upper Saddle River, New Jersey
March 1986 - November 1995

**Senior Designer**
Activision, Inc., Mountainview, California
June 1982 - March 1986

**President**
Imaginative Systems Software, New Milford, New Jersey
November 1981 - May 1982

**Engineer/Designer**
James Wickstead Design Associates, Cedar Knolls, New Jersey
April 1976 - October 1981

## HONORS AND AWARDS

• Nomination as an *Elite Expert* by IMS Expert Services
*IMS Expert Services (www.ims-expertservices.com) - 2009*

• Nomination to the Advisory Committee: "Reinventing Advertising: VOD, PVR, Broadband, Games, PODs & Mobile Consortium"
*Digital Hollywood* - 2005, 2006

• Lifetime Achievement Award in Video Games
*Classic Gaming Expo* - 2003

EXHIBIT 1
Page 43

**Garry E. Kitchen**
page 4

**HONORS AND AWARDS**
(cont'd)

> • New Jersey Entrepreneur of the Year - Finalist
> *Inc. Magazine*, *Merrill Lynch* and *Ernst & Young* - 1993

> • Best Simulation Game
> <u>Super Battletank</u>
> *Game Informer Magazine* - 1992

> • Lifetime Achievement Award in Video Games
> *The Doctor Fad Show*
> Syndicated educational television program - 1990

> • Video Game Designer of the Year
> *Computer Entertainer Magazine* - 1985

> • Best Creativity Product - Nominee
> <u>Garry Kitchen's GameMaker</u>
> *SPA Excellence in Software* - 1985

> • Video Game of the Year - Certificate of Merit
> <u>Keystone Kapers</u>
> *Electronic Games Magazine* - 1983

> • U.S. Patent #4,346,892
> <u>Bank Shot</u>
> Electronic Pool Game marketed by
> Parker Brothers - 1981

> • Ten Best Games of 1980
> <u>Bank Shot</u>
> *OMNI Magazine* - 1980

> • The Games 100 - The Top 100 Games of 1980
> <u>Bank Shot</u>
> *Games Magazine* - 1980

> • Engineering Merit Scholarship
> Panasonic / Matsushita Corporation of Japan
> Fairleigh Dickinson University - 1978, 1979

EXHIBIT 1
Page 44

# EXHIBIT 2

## EXHIBIT 2

### NAVID PROVISIONAL APPLICATION'S DISCLOSURE OF SUBJECT MATTER OF ASSERTED CLAIMS OF '848 PATENT

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| **CLAIM 1**<br>A video game controller charging system for charging a plurality of video game controllers using externally supplied power, the video game controller charging system comprising: | The Navid Provisional discloses a video game controller charging system for charging a plurality of video game controllers using externally supplied power according to Claim 1. [*See e.g.* Navid Provisional ¶ 0001, lines 6-8, ¶ 0005, lines 7-14, ¶ 0016, lines 15-25, ¶ 0017, lines 26-27, ¶ 0021, lines 9-11, ¶ 0022, lines 14-27, ¶ 0024, lines 16-25, ¶ 0028, lines 3-8, Claim 1 and Figs. 1-8].  "The present invention relates … to a charging station for one or more hand-held controllers for a video game console." [Navid Provisional ¶ 0001.] |
| a base; | The video game controller charging system includes a base [*See e.g.* Navid Provisional ¶ 0005, lines 7-12, ¶ 0017, line 26-27, ¶ 0024, line 21, ¶ 0025, line 26, Abstract, lines 6-9, Claim 1 and Figs. 1, 2, 3, 5, & 7] |
| at least one structure on the base for providing physical support to the plurality of video game controllers while the plurality of video | The video game controller charging system includes at least one structure on the base for providing physical support to the plurality of video game controllers, while the plurality of video game controllers are being charged. [*See e.g.* Navid |

EXHIBIT 2
Page 45

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| game controllers are being charged; and | Provisional docking bays 12, 14 at ¶ 0016, lines 18-25, ¶ 0017, lines 26-4, ¶ 0018, lines 8-10, ¶ 0019, lines 18-24, Figs. 1-3; adapters 16 at ¶ 0005, lines 12-15, ¶ 0016, lines 20-25, ¶ 0018, lines 8-15, ¶ 0019, lines 18-24, ¶ 0020, lines 25-7, ¶ 0021, lines 8-13, ¶ 0022, lines 14-25, ¶ 0023, lines 5-15, ¶ 0025, lines 26-3, ¶ 0028, lines 4-8 and Figs. 2-4C; and partition 28 at ¶ 0017, line 3 and Fig. 1 & 3]. "[T]he charging station 10 includes a base 24 with two docking bays 12, 14.  The docking bays 12, 14 are each dimensioned to accept a hand-held controller 26 (see Figs. 5, 6)." [Navid Provisional at ¶0017.]<br><br><br>FIG.3 |
| a plurality of DC ports on the base, each of the DC ports configured to couple | *See the fuller explanation of this disclosure in the main body of my Declaration dated September 2, 2013.* |

2

EXHIBIT 2
Page 46

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| to and provide DC power to a power input port of a respective one of the plurality of video game controllers, | The Navid Provisional discloses a plurality of male DC ports on the base, each of which is configured to couple to and provide DC power to a power input port of a respective one of the plurality of video game controllers. [*See e.g.* Navid Provisional ¶ 0003, lines 20-26, ¶ 0005, lines 9-14, ¶ 0016, lines 22-25, ¶ 0021, lines 9-13, ¶ 0022, lines 14-17, ¶ 0024, lines 18-25, ¶ 0028, lines 4-6, ¶ 0029, lines 10-13, Abstract 6-12, Claim 1 and Figs. 2, 3, 5 & 6]. <br><br> For example, the application discloses a base with a recess [*See e.g.* Navid Provisional ¶ 0005, line 10 and Abstract, line 7] into which a male DC port bearing structure called an "adapter" is fitted or attached [*See e.g.* Navid Provisional ¶ 0018, line 10-15].  The adapter may be placed into the docking bay by a push-fit, press-fit, snap-fit or attachment with prongs. [*See e.g.* Navid Provisional ¶ 0023, lines 9-15].  As the DC port is integrally disposed within the adapter [*See e.g.* Navid Provisional ¶ 0022, line 14], the DC port is on the base when the adapter is placed within the recess. [*See e.g.* Navid Provisional Fig. 3].  This is clearly shown in Figure 3, which displays the DC |

3

EXHIBIT 2
Page 47

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| | ports and the base as a unitary structure, with the DC ports clearly located on the base:<br><br><br><br>[Navid Provisional at Fig. 3 (blue text and arrows added)].<br><br>"The top side 40 of the body 36 includes a connector 42 that is configured to connect to the power input port of the accessory device to be charged, such as the hand-held controller 26 shown in FIGs. 5 and 6.  In one embodiment, the connector 42 is a male mini-USB (universal serial bus) connector adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the PlayStation3®." [Navid Provisional at ¶ 0021.] |

4

EXHIBIT 2
Page 48

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| wherein the at least one structure on the base comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction, and | The Navid Provisional discloses at least one structure on the base which includes a plurality of docking bays open in a first direction and each configured to receive a respective one of the plurality of video game controllers from the first direction. [*See e.g.* Navid Provisional ¶ 0016, lines 18-25, ¶ 0017, lines 26-4, ¶ 0018, lines 8-10, ¶ 0019, lines 18-24, ¶ 0023, lines 7-10 and Figs. 1-3, 5 & 6].<br><br>"[T]he charging station 10 includes a base 24 with two docking bays 12, 14.  The docking bays 12, 14 are each dimensioned to accept a hand-held controller 26 (see FIGs. 5, 6)." [Navid Provisional at ¶ 0017.]<br><br> |
| Wherein the at least one structure on the base further comprises a plurality of pairs of opposite surfaces, | The base includes at least one structure which comprises a plurality of pairs of opposite surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays. [*See e.g.* |

5

EXHIBIT 2
Page 49

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| each pair of surfaces defining a respective docking bay of the plurality of docking [bays] each of the DC ports being on the base between a respective one of the pairs of surfaces. | Navid Provisional ¶ 0016, lines 18-25, ¶ 0017, lines 26-4, ¶ 0018, lines 8-10, ¶ 0019, lines 18-24, ¶ 0023, lines 7-10 and Figs. 1-3, 5, & 6]. When the adapter with the integral DC port is fitted or attached within the respective docking bay [*See e.g.* Navid Provisional ¶ 0023, lines 9-10], the male DC port integrally disposed in the adapter is on the base between a respective one of the pairs of surfaces of the docking bays. [*See e.g.* Navid Provisional ¶ 0016, lines 18-25, ¶ 0017, lines 26-4, ¶ 0018, lines 8-15, ¶ 0019, lines 18-24, ¶ 0022, line 14, ¶ 0023, lines 7-10 and Figs. 1-3, 5 & 6]. "[T]he charging station 10 includes a base 24 with two docking bays 12, 14. The docking bays 12, 14 are each dimensioned to accept a hand-held controller 26 (see FIGs. 5, 6). The two docking bays are separated by a partition 28 positioned between them." [Navid Provisional at ¶ 0017.] |

6

EXHIBIT 2
Page 50

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| |  |
| **CLAIM 2**<br><br>A video game controller charging system of claim 1, wherein the plurality of DC ports comprises a plurality of male mini-USB connectors. | The Navid Provisional discloses a plurality of DC ports that are a plurality of male mini-USB connectors. [*See e.g.* Navid Provisional ¶ 0021, lines 11-14, Claim 6 and Fig. 2, 3, & 4A]. |
| **CLAIM 3**<br><br>A video game controller charging system of claim 1, a current detector electrically coupled to the plurality of DC ports; and an indicator electrically | The Navid Provisional discloses a current detector that is electrically coupled to the plurality of DC ports and an indicator which is electrically coupled to the current detector and that is configured to indicate a charging status of the video game controller charging system. [*See e.g.* Navid Provisional ¶¶ 0026-27, lines 6-26, 00030-31, lines |

7

EXHIBIT 2
Page 51

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| coupled to the current detector, the indicator configured to indicate a charging status of the video game controller charging system. | 14-27, Claim 2 and Fig. 8]. |
| **CLAIM 4**<br>A video game controller charging system of claim 1, Wherein the indicator comprises at least one LED. | The Navid Provisional discloses an indicator that includes at least one LED. [*See e.g.* Navid Provisional ¶¶ 0026-27, lines 6-26, ¶¶ 00030-31, lines 14-27, Claim 3 and Fig. 8]. |
| **CLAIM 5**<br>A video game controller charging system of claim 1, wherein the pairs of opposite surfaces are configured to align respective ones of the plurality of video game controllers such that the power input ports of the respective ones of the | The Navid Provisional discloses pairs of opposite surfaces that are configured to align respective ones of the plurality of video game controllers such that the power input ports of the respective ones of the plurality of video game controllers couple to respective ones of the plurality of DC ports. [*See e.g.* Navid Provisional ¶ 0016, lines 18-25, ¶ 0017, lines 26-4, ¶ 0018, lines 8-15, ¶ 0019, lines 18-24, ¶ 0021, lines 9-11, ¶ 0022, line 14-17, ¶ 0023, lines 7-10 and Figs. 1-3, 5, & 6]. |

8

EXHIBIT 2
Page 52

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| plurality of video game controllers couple to respective ones of the plurality of DC ports. | |
| **CLAIM 7** A video game controller charging system of claim 1, wherein the plurality of DC ports is configured to concurrently couple to and provide the DC power to the plurality of video game controllers. | The Navid Provisional discloses a plurality of DC ports that are configured to concurrently couple to and provide DC power to the plurality of video game controllers. [*See e.g.* Navid Provisional ¶ 0024, lines 16-25 and Figs. 2, 3, 5 & 6]. |
| **CLAIM 8** A video game controller charging system of claim 1, further comprising an AC-to-DC converter adapted to convert the externally supplied power to the DC power provided to the power input ports of the | The Navid Provisional discloses an AC-to-DC converter that is adapted to convert the externally supplied power to DC power which is provided to the power input ports of the respective video game controllers. [*See e.g.* Navid Provisional ¶ 0005, lines 9-14, ¶ 0016, lines 19-25, ¶ 0022, lines 14-2, ¶ 0024, lines 17-25, ¶ 0029, lines 9-12, Abstract 7-12 and Fig. 7]. |

9

EXHIBIT 2
Page 53

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| respective video game controllers. | |
| **CLAIM 10** A video game controller charging system of claim 1, wherein the AC-to-DC converter is external to the base. | The Navid Provisional discloses an AC-to-DC converter that is external to the base. [*See e.g.* Navid Provisional ¶ 0024, lines 17-25, ¶ 0029, lines 9-12]. |
| **CLAIM 11** A video game controller charging system of claim 1, wherein the AC-to-DC converter is adapted to convert an AC voltage in the range of 100 V to 240 V corresponding to the externally supplied power into a DC voltage corresponding to the DC power. | The Navid Provisional discloses an AC-to-DC converter that is adapted to convert an AC voltage in the range of 100V to 240V corresponding to the externally supplied power into a DC voltage corresponding to the DC power. [*See e.g.* Navid Provisional ¶ 0028, lines 6-8 and Fig 7]. |
| **CLAIM 12** A video game controller | The Navid Provisional discloses a DC voltage of 5V. [*See e.g.* Navid Provisional Fig. 8]  Figure 8 |

10

EXHIBIT 2
Page 54

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| charging system of claim 1, wherein the DC voltage is :DC 5 V. | discloses an input voltage of 5.0V DC Power (VCC) being supplied to the USB ports USB1 and USB2.  [*See e.g.* Navid Provisional ¶ 0022, lines 9-13 and Figs. 2,3, & 4A]. |
| **CLAIM 13** A charging system for charging a plurality of video game controllers, each having a power input port, the charging system comprising: | The Navid Provisional discloses a charging system for charging a plurality of video game controllers, each having a power input port. [*See e.g.* Navid Provisional ¶ 0001, lines 6-8, ¶ 0005, lines 7-14, ¶ 0016, lines 15-25, ¶ 0017, lines 26-27, ¶ 0021, lines 9-11, ¶ 0022, lines 14-27, ¶ 0024, lines 16-25, ¶ 0028, lines 3-8 and Figs. 1-8].  "The present invention relates … to a charging station for one or more hand-held controllers for a video game console." [Navid Provisional at ¶0001.] |
| a base; | The charging system includes a base [See e.g. Navid Provisional ¶ 0005, lines 7-12, ¶ 0017, line 26-27, ¶ 0024, line 21, ¶ 0025, line 26, Abstract, lines 6-9 and Figs. 1, 2, 3, 5, & 7]. |
| a plurality of male mini-USB connectors supported by the base and each adapted to provide DC | ***See the fuller explanation of this disclosure in the main body of my Declaration dated September 2, 2013.*** |

11

EXHIBIT 2
Page 55

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| power to a respective one of the plurality of video game controllers; | The charging system includes a plurality of male mini-USB connectors supported by the base and each adapted to provide DC power to a respective one of the plurality of video game controllers. [*See e.g.* Navid Provisional ¶ 0005, lines 12-14, ¶ 0021, lines 9-14, ¶ 0022, 14-15, ¶ 0024, lines 17-25, ¶ 0029, lines 9-12, Abstract 9-11 and Fig. 2, 3, 4A, 5, 6 & 7]. Fig. 3 for example clearly disclosed male mimi-USB ports supported by the base: <br><br>  <br><br> [Navid Provisional at Fig. 3 (blue text and arrows added)]. <br><br> "The top side 40 of the body 36 includes a connector 42 that is configured to connect to the power input port of the accessory device to be charged, such as the hand-held controller 26 shown |

12

EXHIBIT 2
Page 56

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
|  | in FIGs. 5 and 6.  In one embodiment, the connector 42 is a male mini-USB (universal serial bus) connector adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the PlayStation3®." [Navid Provisional at ¶ 0021.] |
| at least one docking structure defining a plurality of docking bays open in a first direction and configured to receive from the first direction and align respective ones of the plurality of video game controllers to couple to respective ones of the plurality of male mini-USB connectors; and | The Navid Provisional discloses the charging system as including at least one docking structure defining a plurality of docking bays open in a first direction and configured to receive from the first direction and align respective ones of the plurality of video game controllers to couple to respective ones of the plurality of male mini-USB connectors. [*See e.g.* Navid Provisional ¶ 0016, lines 18-25, ¶ 0017, lines 26-4, ¶ 0018, lines 8-10, ¶ 0019, lines 18-24, ¶ 0021, lines 11-14, ¶ 0023, lines 7-10 and Figs. 1-3, 4A, 5 & 6]. <br><br> "[T]he charging station 10 includes a base 24 with two docking bays 12, 14.  The docking bays 12, 14 are each dimensioned to accept a hand-held controller 26 (see FIGs. 5, 6)." [Navid Provisional at ¶ 0017.] |

13

EXHIBIT 2
Page 57

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| |  |
| a power input for connecting to a power supply, the power input electrically coupled to the plurality of male mini-USB connectors, wherein the at least one docking structure comprises a plurality of pairs of substantially parallel opposite planar surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays, each of the docking bays being open on opposite sides between the respective pair of surfaces. | The charging system  includes a power input for connecting to a power supply in which the power input is electrically coupled to the plurality of male mini-USB connectors [*See e.g.* Navid Provisional ¶ 0021, lines 11-14, ¶  0022, lines 26-27, ¶ 0024, lines 17-25, ¶ 0029, lines 9-12 and Fig. 2, 3, 4A & 7] and at least one docking structure that includes a plurality of pairs of substantially parallel opposite planar surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays, each of the docking bays being open on opposite sides between the respective pairs of surfaces. [*See e.g.* Navid Provisional ¶ 0016, lines 18-25, ¶ 0017, lines 26-4, ¶ 0018, lines 8-10, ¶ 0019, lines 18-24, ¶ 0023, lines 7-10 and Figs. 1-3, 5, & 6]. |

14

EXHIBIT 2
Page 58

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| |   FIG.3 |
| **CLAIM 15**  The video game controller charging system of claim 13, wherein the charging system further comprises an AC-to-DC converter external to the base and electrically coupled to the power input. | The Navid Provisional discloses a charging system that includes an AC-to-DC converter external to the base and electrically coupled to the power input. [*See e.g.* Navid Provisional ¶ 0005, 10-12, ¶ 0022, lines 25-26, ¶ 0024, lines 17-25, ¶ 0029, lines 9-12, and Abstract, lines 7-9]. |
| **CLAIM 16**  The video game controller charging system of claim 13, further comprising: a current detector electrically coupled to the plurality of | The Navid Provisional discloses a current detector that is electrically coupled to the plurality of male mini-USB connectors; and an indicator that is electrically coupled to the current detector, the indicator configured to indicate a charging status of the charging system. [*See e.g.* Navid Provisional ¶¶ |

15

EXHIBIT 2
Page 59

| Asserted Claim | Exemplary Disclosures in Navid Provisional Application |
|---|---|
| male mini-USB connectors; and an indicator electrically coupled to the current detector, the indicator configured to indicate a charging status of the charging system. | 0026-27, lines 6-26, ¶¶ 0030-31, lines 14-27 and Fig. 8]. |
| **CLAIM 17** The video game controller charging system of claim 13, wherein the indicator comprises at least one LED. | The Navid Provisional discloses an indicator that includes at least one LED. [*See e.g.* Navid Provisional ¶¶ 0026-27, lines 6-26, ¶¶ 0030-31, lines 14-27 and Fig. 8]. |

16

EXHIBIT 2
Page 60