# EXHIBIT H



# Cambridge Dictionaries Online
*The most popular online dictionary and thesaurus for learners of English*

American E...  ▼  **Search!**   **Spanish**   **Learn**   **Share**   **Develop**   **About**   **Help**

## on
*preposition, adverb* [not gradable] **(SUPPORTED BY)** US ◄)
/ɔn, ɑn/

### Definition

› **supported by or resting at the top of another thing:**
  *There is snow on the ground.*
  *You put pudding in the pie crust and then put whipped cream on.*

(Definition of on preposition, adverb (SUPPORTED BY) from the
Cambridge Academic Content Dictionary © Cambridge University
Press)
Focus on the pronunciation of on

AdChoices ▷

### "on" in other dictionaries

**in Spanish** | **in Turkish**
**British English** | **Learner's**

### More results for "on"

**All**   **Phrasal Verbs**   **Idioms**

**on** *preposition, adjective, adverb*
(ATTACHED TO)

**on** *preposition, adjective, adverb*
(COVERING)

**on** *preposition, adjective, adverb*
(BROADCAST)

**on** *preposition, adjective, adverb*
(TRAVEL BY)

**on** *preposition* (AT)

**on** *preposition* (STORED AS)

See all results »

### Word of the Day

**inculcate**
to fix beliefs or ideas in someone's mind,
especially by repeating them often.
**Word of the Day** ▶

### Blog

Read our blog about how the English
language behaves.
**Learn More** ▶

### New Words

🔍 **Add the Cambridge Dictionaries to your browser**
➕ **Add the Cambridge dictionaries to your website**

**Free! Learn English words with Cambridge**
👤 20.7k people learning this
Powered by Memrise.com

**Become a fan on Facebook**
**Follow us on Twitter!**

EXHIBIT H
Page 106

9/2/2013 10:22 PM

# EXHIBIT I

AUTHORITATIVE • TRUSTWORTHY • CURRENT • COMPREHENSIVE

*The*

# AMERICAN HERITAGE®



*dic·tion·ar·y*

*of*

## THE ENGLISH LANGUAGE





AMERICA'S FAVORITE
**NEW**
UPDATED
EDITION
DICTIONARY

*Richly Illustrated in Full Color*



*fourth edition*

EXHIBIT I
Page 107

**om·ni·sex·u·al** (ŏm′nĭ-sĕk′shōō-əl) *adj.* Pansexual. ❖ *n.* A pansexual person. —**om′ni·sex′u·al′i·ty** *n.*

**om·ni·um-gath·er·um** (ŏm′nē-əm-găth′ər-əm) *n.* A miscellaneous collection; a hodgepodge. [Latin *omnium*, genitive pl. of *omnis*, all; see **op-** in Appendix I + *gatherum* (mock-Latinate alteration of GATHER).]

**om·ni·vore** (ŏm′nə-vôr′, -vōr′) *n.* 1. An omnivorous person or animal. 2. One that takes in everything available, as with the mind. [From New Latin *Omnivora*, omnivores, from neuter pl. of Latin *omnivorus*, omnivorous. See OMNIVOROUS.]

**om·niv·o·rous** (ŏm-nĭv′ər-əs) *adj.* 1. Eating both animal and vegetable foods. 2. Taking in everything available, as with the mind: *an omnivorous reader.* [From Latin *omnivorus* : *omni-*, omni- + *-vorus*, -vorous.] —**om·niv′o·rous·ly** *adv.* —**om·niv′o·rous·ness** *n.*

**O·mo·lon** (ō′mə-lôn′) A river, about 965 km (600 mi) long, of northeast Russia flowing northward to the Kolyma River.

**O·mot·ic** (ō-mŏt′ĭk) *n.* A branch of the Afro-Asiatic language family, spoken in Ethiopia. [After the *Omo River* in western Ethiopia.]

**om·pha·los** (ŏm′fə-lŏs′, -ləs) *n., pl.* **-li** (-lī) 1. The navel. 2. A central part; a focal point. [Greek. See **nobh-** in Appendix I.]

**Omsk** (ŏmsk) A city of south-central Russia at the confluence of the Irtysh and Om rivers. On the Trans-Siberian Railroad, it is a major river port and transportation hub. The city was founded in 1716. Population: 1,163,885.

**on** (ŏn, ôn) *prep.* **1a.** Used to indicate position above and supported by or in contact with: *The vase is on the table. We rested on our hands and knees.* **b.** Used to indicate contact with or extent over a surface regardless of position: *a picture on the wall; a rash on my back.* **c.** Used to indicate location at or along: *the pasture on the south side of the river; a house on the highway.* **d.** Used to indicate proximity: *a town on the border.* **e.** Used to indicate attachment to or suspension from: *beads on a string.* **f.** Used to indicate figurative or abstract position: *on the young side, but experienced; on her third beer; stopped on chapter two.* **2a.** Used to indicate actual motion toward, against, or onto: *jumped on the table; the march on Washington.* **b.** Used to indicate figurative or abstract motion toward, against, or onto: *going on six o'clock; came on the answer by accident.* **3a.** Used to indicate occurrence at a given time: *on July third; every hour on the hour.* **b.** Used to indicate the particular occasion or circumstance: *On entering the room, she saw him.* **4a.** Used to indicate the object affected by actual, perceptible action: *The spotlight fell on the actress. He knocked on the door.* **b.** Used to indicate the object affected by a figurative action: *Have pity on them.* **c.** Used to indicate the object of an action directed, tending, or moving against it: *an attack on the fortress.* **d.** Used to indicate the object of perception or thought: *gazed on the vista; meditated on his actions.* **5.** Used to indicate the agent or agency of a specified action: *cut his foot on the broken glass; talked on the telephone.* **6a.** Used to indicate a medicine or other corrective taken or undertaken routinely: *went on a strict diet.* **b.** Used to indicate a substance that is the cause of an addiction, a habit, or an altered state of consciousness: *high on dope.* **7a.** Used to indicate a source or basis: *"We will reach our judgments not on intentions or on promises but on deeds and on results"* (Margaret Thatcher). **b.** Used to indicate a source of power or energy: *The car runs on methane.* **8a.** Used to indicate the state or process of: *on leave; on fire; on the way.* **b.** Used to indicate the purpose of: *travel on business.* **c.** Used to indicate a means of conveyance: *ride on a train.* **d.** Used to indicate availability by means of: *beer on tap; a physician on call.* **9.** Used to indicate belonging to: *a nurse on the hospital staff.* **10.** Used to indicate addition or repetition: *heaped error on error.* **11a.** Concerning; about: *a book on astronomy.* **b.** Concerning and to the disadvantage of: *We have some evidence on him.* **12.** *Informal* In one's possession; with: *I haven't a cent on me.* **13.** At the expense of; compliments of: *drinks on the house.* ❖ *adv.* **1.** In or into a position or condition of being supported by or in contact with something: *Put the coffee on.* **2.** In or into a position of being attached to or covering something: *Put your clothes on.* **3.** In the direction of something: *He looked on while the thigh docked.* **4a.** Toward or at a point lying ahead in space or time; forward: *The play moved on to the next city.* **b.** At or to a more distant point in time or space: *I'll do it later on.* **5.** In a continuous course: *He worked on quietly.* **6a.** In or into performance or operation: *Turn on the radio.* **b.** In progress or action; in a state of activity: *The show must go on.* **7.** In or at the present condition or position: *stay on; hang on.* **8.** In a condition of being scheduled for or decided upon: *There is a party on tonight.* ❖ *adj.* **1.** Being in operation: *The television is on.* **2a.** Engaged in a given function or activity, such as a vocal or dramatic role: *You're on in five minutes!* **b.** Under or behaving as if under observation: *A minister is always on.* **3.** *Informal* Functioning or performing at a high degree of competence or energy: *The goalie is really on.* **4a.** Planned; intended: *We have nothing much on for this weekend.* **b.** Happening; taking place: *The parade is on.* **5.** Baseball Having reached base safely; on base: *Two runners are on.* —**Idioms: be on to** *Slang* To be aware of or have information about: *You'll never deceive us again; we're on to you.* **on and off** Intermittently. **on on** Without stopping; continuously. [Middle English, from Old English *an, on.* See **an-** in Appendix I.]

**Usage Note** To indicate motion toward a position, both *on* and *onto* can be used: *The cat jumped on the table. The cat jumped onto the table. Onto* is more specific, however, in indicating that the motion was initiated from an outside point. *He wandered onto the battlefield* means that he began his wandering at some point off the battlefield. *He wandered on the battlefield* may mean that his wandering began on the battlefield. ❖ In constructions where *on* is an adverb attached to a verb, it should not be joined with *to* to form the single word *onto: move on to (not onto) new subjects; hold on to (not onto) our gains.* ❖ In their uses to indicate spatial relations, *on* and *upon* are often interchangeable: *It was resting on (or up-*

*on) two supports. We saw a finch light on (or upon) a bough.* To indicate a relation between two things, however, instead of between an action and an end point, *upon* cannot always be used: *Hand me the book on* (not *upon*) *the table. It was the only town on* (not *upon*) *the main line.* Similarly, *upon* cannot always be used in place of *on* when the relation is not spatial: *He wrote a book on* (not *upon*) *alchemy. She will be here on* (not *upon*) *Tuesday.*

**ON** *abbr.* 1. Old Norse 2. Ontario

**-on¹** *suff.* **1a.** Subatomic particle: *baryon.* **b.** Unit; quantum: *photon.* **2.** Basic hereditary unit: *codon.* [From ION.]

**-on²** *suff.* Inert gas: *radon.* [New Latin, from (ARG)ON.]

**-on³** *suff.* A chemical compound that is not a ketone or a compound that contains oxygen in a carbonyl group: *parathion.* [Alteration of -ONE.]

**on·a·gain, off·a·gain** (ŏn′ə-gĕn′ ôf′ə-gĕn′, ôf-, ŏn′-) *adj. Informal* Existing or continuing sporadically; intermittent or occasional: *an on-again, off-again correspondence.*

**on·a·ger** (ŏn′ə-jər) *n.* **1.** A fast-running wild ass (*Equus hemionus* subsp. *onager*) of central Asia, having an erect mane and a broad black stripe along its back. **2.** An ancient and medieval stone-propelling siege engine. [Middle English, from Late Latin, from Latin, wild ass, from Greek *onagros* : *onos*, ass + *agrios*, wild; see **agro-** in Appendix I.]

**on-air** (ŏn′âr′, ŏn′-) *adj.* Spoken, occurring, or used during broadcasting: *an on-air gaffe; changed his on-air name.*

**o·nan·ism** (ō′nə-nĭz′əm) *n.* **1.** Masturbation. **2.** Coitus interruptus. [After *Onan*, son of Judah (Genesis 38:9).] —**o′nan·ist** *n.* —**o′nan·is′tic** *adj.*

**O·nas·sis** (ō-năs′ĭs, ō-nä′sĭs), Aristotle 1906?–1975. Turkish-born Greek financier and shipping magnate who pioneered the use of oil supertankers.

**Onassis, Jacqueline Lee Bouvier Kennedy** See Jacqueline Lee Bouvier **Kennedy.**

**O·ña·te** (ō-nyä′tĕ), **Juan de** 1550?–1630? Spanish explorer and conquistador. He claimed New Mexico for Spain in 1598 and served as its governor until 1607.

**on·board** or **on-board** (ŏn-bôrd′, -bōrd′, ŏn-) *adj.* Carried or used aboard a vehicle or vessel: *onboard radar systems.* —**on·board′** *adv.*

**once** (wŭns) *adv.* **1.** One time only: *once a day.* **2.** At one time in the past; formerly. **3.** At any time; ever: *Once known, his face is never forgotten.* **4.** By one degree of relationship: *my first cousin once removed.* ❖ *n.* A single occurrence; one time: *Once will have to do. You can go just this once.* ❖ *conj.* As soon as; if ever: *when Once he goes, we can clean up.* ❖ *adj.* Having been formerly; former: *the once capital of the nation.* —**Idiom: at once 1.** All at one time; simultaneously: *Everything happened at once. The view of the skyline is at once awesome, grand, and disappointing.* **2.** Immediately; instantly: *Leave the room at once.* [Middle English *ones*, from *on*, one, from Old English *ān.* See **oi-no-** in Appendix I.]

**once-o·ver** (wŭns′ō′vər) *n. Informal* A quick but comprehensive survey or performance: *Let's give this memorandum the once-over.*

**on·cet** (ŏngkt′) *adv. Southern & South Midland U.S.* Once. [Variant of ONCE.]

**on·cho·cer·ci·a·sis** (ŏng′kō-sər-kī′ə-sĭs) *n.* A disease caused by infestation with filarial worms of the genus *Onchocerca*, especially a disease of humans caused by *O. volvulus* and characterized by nodular swellings on the skin and lesions of the eyes. Transmitted by black flies, the disease occurs in tropical regions of Africa and Central America. Also called *river blindness.* [New Latin : *Onchocerca*, genus name (Greek *onkos*, barb + Greek *kerkos*, tail) + -IASIS.]

**on·ci·di·um** (ŏn-sĭd′ē-əm, ŏng-kĭd′-) *n.* Any of numerous epiphytic tropical American orchids of the genus *Oncidium*, having clusters of showy flowers. [New Latin *Oncidium*, genus name : Greek *onkos*, barb, hook (from the shape of its labellum) + New Latin *-idium*, diminutive suff. (from Greek *-idion*).]

**on·co·gene** (ŏn′kə-jēn, ŏng′-) *n.* A gene that causes the transformation of normal cells into cancerous cells, especially a viral gene that transforms a host cell into a tumor cell. [Greek *onkos*, mass, tumor; see ONCOLOGY + GENE.]

**on·co·gen·e·sis** (ŏn′kō-jĕn′ĭ-sĭs, ŏng′-) *n.* The formation and development of tumors. [Greek *onkos*, mass, tumor; see **nek-²** in Appendix I + -GENESIS.]

**on·co·gen·ic** (ŏn′kō-jĕn′ĭk, ŏng′-) *adj.* Tending to cause or give rise to tumors: *an oncogenic virus.* [Greek *onkos*, mass, tumor; see ONCOLOGY + -GENIC.] —**on′co·ge·nic′i·ty** (-jə-nĭs′ĭ-tē) *n.*

**on·col·o·gy** (ŏn-kŏl′ə-jē, ŏng-) *n.* The branch of medicine that deals with tumors, including study of their development, diagnosis, treatment, and prevention. [Greek *onkos*, mass, tumor; see **nek-²** in Appendix I + -LOGY.] —**on′co·log′i·cal** (-kə-lŏj′ĭ-kəl), **on′co·log′ic** (-lŏj′ĭk) *adj.* —**on·col′o·gist** *n.*

**on·com·ing** (ŏn′kŭm′ĭng, ŏn′-) *adj.* Coming nearer; approaching: *an oncoming storm.* ❖ *n.* An approach; an advance.

**on·cor·na·vi·rus** (ŏn-kôr′nə-vī′rəs, ŏng-) *n.* Any of a group of viruses that contain single-stranded RNA and produce tumors in birds and mammals. [Greek *onkos*, mass, tumor; see ONCOLOGY + RNA + VIRUS.]

**one** (wŭn) *adj.* **1.** Being a single entity, unit, object, or living being. **2.** Characterized by unity; undivided: *They spoke with one voice.* **3a.** Of the same kind or quality: *two animals of one species.* **b.** Forming a single entity of two or more components: *these chemicals combining into one solution.* **4.** Being a single member or element of a class, group, or kind: *I'm just one player on the team.* **5.** Being a single thing in contrast*



**onager**
*Equus hemionus* subsp. *onager*

EXHIBIT
Page 108

# EXHIBIT J



# RANDOM HOUSE
# WEBSTER'S
*unabridged*
*dictionary*

**SECOND EDITION**

ON

OVER 315,000 ENTRIES

SPECIAL NEW-WORDS SECTION PLUS AN ESSAY
ON THE GROWTH OF ENGLISH

2,400 ILLUSTRATIONS AND SPOT MAPS

EXHIBIT J
Page 109

**omnidirectional**

**om·ni·di·rec·tion·al** (om′nē di rek′shə nl), *adj.* Electronics. sending or receiving signals in all directions: *an omnidirectional microphone.* [1925–30; OMNI- + DIRECTIONAL]

**om·ni·dis·tance** (om′ni dis′təns), *n. Navig.* the distance between an omnirange station and a receiver. [OMNI- + DISTANCE]

**om·ni·far·i·ous** (om′nə fâr′ē əs), *adj.* of all forms, varieties, or kinds. [1645–55; < LL *omnifārius* (derive. of L *omnifāriam* on all sides), equiv. to L *omni-* OMNI- + -*fārius*; see BIFARIOUS] —**om′ni·far′i·ous·ly,** *adv.* —**om′ni·far′i·ous·ness,** *n.*

**om·ni·fi·cent** (om nif′ə sənt), *adj.* creating all things; having unlimited powers of creation. Also, **om·nif·ic** (om nif′ik). [1670–80; OMNI- + -*ficent,* as in *beneficent*] —**om·nif′i·cence,** *n.*

**om·ni·graph** (om′ni graf′, -gräf′), *n.* a device for converting Morse Code signals that are punched on a tape into audio signals, used in the training of telegraph operators. [1860–65; OMNI- + -GRAPH]

**om·nip·o·tence** (om nip′ə təns), *n.* 1. the quality or state of being omnipotent. 2. (*cap.*) God. [1560–70; < LL *omnipotentia,* equiv. to L *omnipotent-* OMNIPOTENT + -*ia;* see -ENCE]

**om·nip·o·tent** (om nip′ə tənt), *adj.* 1. almighty or infinite in power, as God. 2. having very great or unlimited authority or power. —*n.* 3. an omnipotent being. 4. the **Omnipotent,** God. [1275–1325; ME < L *omnipotent-* (s. of *omnipotēns*), equiv. to *omni-* OMNI- + *potent-* (see POTENT)] —**om·nip′o·tent·ly,** *adv.* —**Syn.** 2. powerful, mighty, supreme. —**Ant.** 2. impotent, powerless, helpless.

**om·ni·pres·ent** (om′nə prez′ənt), *adj.* present everywhere at the same time: *the omnipresent God.* [1600–10; < ML *omnipraesent-* (s. of *omnipraesēns*), equiv. to L *omni-* OMNI- + *praesent-* PRESENT] —**om′ni·pres′ence,** *n.* —**Syn.** OMNIPRESENT, UBIQUITOUS refer to the quality of being everywhere. OMNIPRESENT emphasizes in a lofty or dignified way the power, usually divine, of being present everywhere at the same time, as though all-enveloping: *Divine law is omnipresent.* Ubiquitous is applied to that which seems to appear in many and all sorts of places, or in an undignified or humorous way is "all over the place," often when unwanted: *A bore seems to be ubiquitous.*

**om·ni·range** (om′nə rānj′), *n.* a radio navigational aid in which stations emit distinctive signals on each of 360 degrees, giving the bearing of each degree with reference to magnetic north. Also called **VOR.** [1945–50; OMNI- + RANGE]

**om·nis·cience** (om nish′əns), *n.* 1. the quality or state of being omniscient. 2. infinite knowledge. 3. (*cap.*) God. [1605–15; < ML *omniscientia,* equiv. to L *omni-* OMNI- + *scientia* knowledge; see SCIENCE]

**om·nis·cient** (om nish′ənt), *adj.* 1. having complete or unlimited knowledge, awareness, or understanding; perceiving all things. —*n.* 2. an omniscient being. 3. the **Omniscient,** God. [1595–1605; < NL *omniscient-,* s. of *omnisciēns,* equiv. to L *omni-* OMNI- + *scient-* knowing; see SCIENCE] —**om·nis′cient·ly,** *adv.*

**om·ni·um-gath·er·um** (om′nē əm gath′ər əm), *n., pl. -ums.* a miscellaneous collection. [1520–30; < L, *omnium* of all (gen. pl. of *omnis*) + pseudo-L *gatherum* a gathering]

**om·niv·o·rous** (om niv′ər əs), *adj.* 1. someone or something that is omnivorous. 2. an omnivorous animal. [1885–90; < F, on the model of CARNIVORE, etc.]

**om·niv·o·rous** (om niv′ər əs), *adj.* 1. eating both animal and plant foods. 2. eating all kinds of foods indiscriminately. 3. taking in everything, as with the mind: *an omnivorous reader.* [1650–60; < L *omnivorus.* equiv. to *omni-* OMNI- + *-vorous* -VOROUS] —**om·niv′o·rous·ly,** *adv.* —**om·niv′o·rous·ness,** *n.*

**omn. man.,** (in prescriptions) every morning. Also, **omn man** [< L *omnī māne*]

**omn. noct.,** (in prescriptions) every night. Also, **omn noct** [< L *omnī nocte*]

**omn. quadr. hor.,** (in prescriptions) every quarter of an hour. Also, **omn quadr hor** [< L *omnī quadrante hōrae*]

**O·mo·la·ra** (ō mō′lä rä′), *n.* a male given name: from a West African word meaning "child born at the right time."

**O·moo** (ō mōō′), *n.* a novel (1847) by Herman Melville.

**om·o·pha·gia** (ō′mə fā′jə, -jē ə), *n.* the eating of raw food, esp. raw meat. [1700–10; < NL < Gk *ōmophagía,* equiv. to *ōmó(s)* raw + *-phagia* -PHAGY] —**om·o·phag·ic** (ō mə fāj′ik), **om·oph·a·gous** (ō mof′ə gəs), *adj.* —**om·oph·a·gist** (ō mof′ə jist), *n.*

**o·mo·pho·ri·on** (ō′mə fôr′ē ən, -fōr′-, -mə-), *n., pl. -pho·ri·a** (-fôr′ē ə, -fōr′-). Eastern Ch. a liturgical stole, resembling a pallium, worn by bishops. [1865–70; < LGk *ōmophórion,* equiv. to Gk *ōmo-* (deriv. of *ōmos* shoulder) + LGk *-phorion,* deriv. of Gk *phérein* to bear]

**O·mot·ic** (ō mot′ik), *n.* a proposed branch of the Afro-asiatic family comprising a group of languages spoken in Ethiopia and often included within the Cushitic branch.

**om·pha·cite** (om′fə sīt′), *n. Mineral.* a pale-green variety of pyroxene similar to olivine, found in eclogite. [1820–30; < G *Omphacit* < Gk *omphakītēs* green stone, equiv. to *omphak-* (s. of *ómphax*) unripe grape + -ITE¹]

**om·pha·los** (om′fə ləs, -lōs′), *n.* 1. the navel; umbilicus. 2. the central point. 3. *Gk. Antiq.* a stone in the temple of Apollo at Delphi, thought to mark the center of the earth. [1840–50; < Gk *omphalós;* akin to NAVEL]

**om·pha·lo·skep·sis** (om′fə lō skep′sis), *n.* contemplation of one's navel as part of a mystical exercise. [< Gk *omphal(ós)* OMPHALOS + -o- -O- + *sképsis* act of looking]

**Om·ri** (om′rī), *n.* a king of Israel and the father of Ahab. I Kings 16:16–28.

**Omsk** (ōmsk), *n.* a city in the SW Russian Federation in Asia on the Irtysh River. 1,148,000.

**O·mu·ta** (ō′mŏŏ tä′), *n.* a seaport on W Kyushu, in SW Japan. 169,485. Also, **O·mu·ta** (ō′mŏŏ dä′).

**on** (on, ôn), *prep.* 1. so as to be or remain supported by or suspended from: *Put your package down on the table; Hang your coat on the hook.* 2. so as to be attached to or unified with: *Hang the picture on the wall. Paste the label on the package.* 3. so as to be a covering or wrapping for: *Put the blanket on the baby. Put aluminum foil on the lamb chops before freezing them.* 4. in connection, association, or cooperation with; as a part or element of: *to serve on a jury.* 5. so as to be a supporting part, base, backing, etc., of a painting on canvas, mounted on cardboard; legs on a chair. 6. (used to indicate place, location, situation, etc.): *a scar on the face; the book on the table; a house on 19th Street.* 7. (used to indicate immediate proximity): *a house on fire; to border on absurdity.* 8. in the direction of; on the left; to sail on a southerly course. 9. (used to indicate a means of conveyance or a means of supporting or supplying movement): *on the wing; This car runs on electricity. Can you walk on your hands? I'll be there on the noon plane.* 10. by the agency or means of: *drunk on wine; talking on the phone; I saw it on television.* 11. in addition to; television on Shakespeare. 12. with respect or regard to (used to indicate the object of an action directed against or toward): *Let's play a joke on him. Write a critical essay on Shakespeare.* 13. in a state or condition of; in the process of; on strike: *The house is on fire!* 14. subject to: *a doctor on call.* 15. engaged in or involved with: *He's on the second chapter now.* 16. (used to indicate a source or a person or thing that serves as a source or agent): *a duty on imported goods; She depends on her friends for encouragement.* 17. (used to indicate a basis or ground): *on my word of honor; The movie is based on the book.* 18. (used to indicate risk or liability): *on pain of death.* 19. (used to indicate progress toward or completion of an objective): *We completed the project on budget.* 20. assigned to or occupied with; operating: *Who's on the switchboard this afternoon?* 21. *Informal.* so as to disturb or affect adversely: *My hair dryer broke on me.* 22. *Informal.* paid for by, esp. as a treat or gift: *Dinner is on me.* 23. taking or using as a prescribed measure, cure, or the like: *The doctor had her on a low-salt diet.* 24. regularly taking or addicted to: *He was on drugs for two years.* 25. *Informal.* with; carried by: *I have no money on me.* 26. (used to indicate time or occasion): *on Sunday; We demand cash on delivery.* 27. (used to indicate the object or end of motion): *to march on the capital.* 28. (used to indicate the object or end of action, though, desire, etc.): *to gaze on a scene.* 29. (used to indicate subject, reference, or respect): *views on public matters.* 30. (used to indicate an encounter): *The pickpocket crept up on a victim.* 31. **on the bow,** *Naut. bow³* (def. 7). —*adv.* 32. in, into, or onto a position of being supported or attached: *Sew the button on.* 33. in, into, or onto a position of covering or wrapping: *Put your raincoat on.* 34. fast to a thing, as for support: *Hold on!* 35. toward a place, point, activity, or object: *to look on while others work.* 36. forward, onward, or along, as in any course or process: *further on.* 37. with continuous activity: *to work on.* 38. into or in active operation or performance: *Turn the gas on.* 39. on and off, off (def. 22a). 40. on and on, at great length, so as to become tiresome: *They rambled on and on about their grandchildren.* —*adj.* 41. operating or in use: *The television set was on. Is your brake on?* 42. taking place; occurring: *Don't you know there's a war on?* 43. performing or broadcasting: *The radio announcer told us war was on.* 44. *Informal.* a. behaving in a theatrical, lively, or ingratiating way: *Around close friends, one doesn't have to be on every minute.* b. functioning or performing at one's best: *When she's on, no other tennis player is half as good.* 45. scheduled or planned: *Anything on after supper?* 46. *Baseball.* positioned on a base or bases: *They had two men on when he hit the home run.* 47. Cricket. noting that side of the wicket, or of the field, on which the batsman stands. 48. on to, aware of the true nature, motive, or meaning of: *I'm on to your little game.* —*n.* 49. Cricket. the on side. [bef. 900; ME *on,* an, OE: *on,* an, to c. D *aan, G an,* ON *ā,* Goth *ana;* akin to Gk *aná* up, upon (see ANA-)]

**On** (on), *n. Biblical* name of **Heliopolis.**

**ON,** Old Norse. Also, **ON., O.N.**

**-on¹,** a suffix used in the names of subatomic particles (*gluon; meson; neutron*), quanta (*graviton*), and other minimal entities or components (*cistron; codon; magneton; photon*). [prob. extracted from ION; cf. PROTON]

**-on²,** a suffix used in the naming of inert gaseous elements: *neon.* [< < Gk -*on,* neut. of -*os* adj. ending]

**O·na** (ō′nə), *n., pl.* **O·nas,** (esp. collectively) **O·na** for def. 1. 1. a member of a people of Tierra del Fuego. 2. a female given name.

**on·a·gain, off·a·gain** (on′ə gen′ ôf′ə gen′, ôf′-, ôn′-), being in force or inoperative by turns, esp. spasmodically and unpredictably: *an on-again, off-again romance.* Also, **on′-a·gain′-off′-a·gain′.** [1945–50]

**on·a·ger** (on′ə jər), *n., pl.* **-gri** (-grī′), **-gers.** 1. a wild ass, *Equus hemionus,* of southwestern Asia. 2. an ancient and medieval military catapult for throwing stones. [1300–50; ME < LL: machine for throwing projectiles, L *onager, onagrus* wild ass < Gk *ónagros* (in both senses), alter. of *ónos agrios* ass of the fields, wild ass (see ACRE)]



onager,
*Equus hemionus,*
4¾ ft. (1.4 m)
high at shoulder

**on·a·gra·ceous** (on′ə grā′shəs), *adj.* belonging to the Onagraceae, the evening primrose family of plants. [1835–45; < NL *Onagrace(ae)* (*Onagr(a)* the type genus (< Gk *ónagros* (ē)) + -ACEAE) + -OUS]

**on·air** (on′âr′, ôn′-), *adj.* broadcasting; on-air: *within five years of on-air experience.* [1970–75]

**o·nan·ism** (ō′nə niz′əm), *n.* 1. withdrawal of the penis in sexual intercourse so that ejaculation takes place outside the vagina; coitus interruptus. 2. masturbation. [1720–30; after *Onan,* son of Judah (Gen. 38:9) + -ISM] —**o′nan·ist,** *n.* —**o′nan·is′tic,** *adj.*

**O·nas·sis** (ō nas′is, ō näs′-), *n.* 1. **Aristotle Socrates,** 1906–75, Greek businessman, born in Turkey. 2. **Jacqueline (Lee Bouv·ier Kennedy)** (″*Jackie*″), 1929–94, wife of John F. Kennedy (1963–63) and Aristotle Onassis (1968–75).

**O·ña·te** (ō nyä′te), *n.* **Juan de** (hwän de), 1550?–1624?, Spanish explorer who colonized New Mexico.

**on·board** (on′bôrd′, -bōrd′, ôn′-), *adj.* 1. provided, occurring, etc., on a vehicle: *among the ship's many onboard services.* 2. installed and functional within a vehicle: *on-board computers for aircraft.* Also, *on′board′.* [1965–70; adj. use of adv. phrase *on board*]

**on·cam·er·a** (on′kam′ər ə, -kam′rə, ôn′-), *adj., adv.* within the range of a motion-picture or television camera; while being filmed or televised: *on-camera blunders; The assassination happened on-camera.* [1960–65]

**once** (wuns), *adv.* 1. at one time in the past; formerly: *I was a farmer once; a once powerful nation.* 2. a single time: *We ate there just once. We go to a movie once a week.* 3. even a single time; at any time; ever: *if the facts once become known, it will be just too bad.* 4. by a single step, degree, or grade: *a cousin once removed.* 5. **once and again,** repeatedly: *He has been told once and again not to slam the door.* 6. **once and for all,** decisively; finally: *Let's settle this problem once and for all.* Also, **once for all.** 7. **once in a while,** at intervals; occasionally: *She stops in to see us once in a while.* 8. **once or twice,** a very few times; infrequently: *I've seen her in the elevator once or twice.* 9. **once upon a time,** at some unspecified past time, esp. a long time ago: *Once upon a time, in a faraway land, there lived a prince and princess.* —*conj.* 10. former; having at one time been the one past and future king. —*conj.* 11. if or when at any time; if ever: *Once you're finished, you can leave.* —*n.* 13. a single occasion: *one time only: Once is enough.* 14. **all at once,** a. simultaneously: *The children were running, screaming, and throwing things all at once.* b. suddenly: *All at once the rain came down.* 15. **at once,** a. at the same time; simultaneously: *Don't all speak at once.* b. immediately; promptly: *Tell him to come at once!* [bef. 1150; ME *ones,* OE *ānes,* orig. gen. of *ān* ONE or *āne* ONE; see ONE, r. ME *ene,* OE *æne* once, equiv. to *æ(ne)* (orig. instrumental of *ān*) + -*es* adv. suffix; see -s¹]

**once-o·ver** (wuns′ō′vər), *n. Informal.* 1. a quick look, examination, or appraisal. 2. a quick, superficial job: *He gave the car just a once-over with a rag.* [1910–15; Amer.]

**once-o·ver-light·ly** (wuns′ō′vər lit′lē), *n. Informal.* a hasty or superficial treatment, look, examination, etc.: *once-over; The maid gave the room the once-over-lightly.* [1940–45]

**on·cho·cer·ci·a·sis** (ong′kō sər kī′ə sis), *n. Pathol.* an infestation with filarial worms of the genus *Onchocerca,* common in tropical America and Africa, transmitted by black flies, and characterized by nodules under the skin, an itchy rash, eye lesions, and in severe cases, elephantiasis. Also, **on·cho·cer·co·sis** (ong′kō sər kō′sis). Also called **river blindness.** [1910–15; < NL *Onchocerc(a)* a genus of filarioid worms (*Oncho-,* incorrectly *onco-* < Gk *ónk(os)* barb + -*o-* -O- + *cerc(us)* < *-cercus* -tailed < Gk, adj. deriv. of *kérkos* tail) + -IASIS]

**on·cid·i·um** (on sid′ē əm), *n., pl.* of numerous tropical American orchids of the genus *Oncidium,* having clusters of flowers showing great variety in size, form, and color. Also called **dancing lady orchid.** [1800, equiv. to Gk *onk(o)-* (comb. form of *ónkos* barb and arrow) + NL *-idium* -IDIUM; so called from the crest on the labellum]

**onco-** a combining form meaning "tumor," as used in the formation of compound words: *oncogenic.* [comb. form of Gk *ónkos* mass, bulk]

**on·co·gene** (ong′kə jēn′), *n. Genetics.* any gene that is a causative factor in the initiation of cancerous growth. [1965–70; ONCO- + GENE]

**on·co·gen·e·sis** (ong′kə jen′ə sis), *n.* the generation of tumors. [1930–35; ONCO- + -GENESIS]

**on·co·gen·ic** (ong′kə jə nis′i tē), *n.* the capability of inducing tumor formation. [1940–45; ONCOGENIC + -ITY]

**on·col·o·gy** (ong kol′ə jē), *n.* 1. the branch of medical science dealing with tumors, including the origin, development, diagnosis, and treatment of malignant neoplasms. 2. the study of cancer. [1855–60; ONCO-

**CONCISE ETYMOLOGY KEY:** <, descended or borrowed from; >, whence; b., blend of, blended; c., cognate with; cf., compare; deriv., derivative; equiv., equivalent; imit., imitative; obl., oblique; r., replacing; s., stem; sp., spelling, spelled; resp., respelling, respelled; trans., translation; ?, origin unknown; ×, unattested; ‡, probably earlier than. See the full key inside the front cover.

**oncology**

# EXHIBIT K

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3     _____
 4     NYKO TECHNOLOGIES, INC., a    )
       California corporation,       )
 5                                   )
                 Plaintiff,          )
 6                                   )No. No. CV 12-3001 GAF
          vs.                        )         (VBKx)
 7                                   )
       ENERGIZER HOLDINGS, INC., a   )
 8     Missouri corporation,         )
       EVEREADY BATTERY COMPANY,     )
 9     INC., a Delaware Corporation,)
       and PERFORMANCE DESIGNED      )
10     PRODUCTS LLC, a California    )
       limited liability company,   )
11                                   )
                 Defendants.         )
12     _____)
13
14          CONFIDENTIAL - ATTORNEYS' EYES ONLY
15
16     VIDEOTAPED DEPOSITION OF CHRISTOPHER S. ARBOGAST
17                 Glendale, California
18                Tuesday, March 5, 2013
19                     Volume I
20
21
       Reported by:
22     Melissa M. Villagran, RPR, CLR
       CSR No. 12543
23     Job No. 1621678
24
25     PAGES 1 - 357

                                           Page 1
```

EXHIBIT K
Page 111

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A   Yes.

 2        Q   And so is it true that the Nyko Charge Base

 3   was disclosed and presented at the hotel suite

 4   during the Consumer Electronics Show in

 5   January 2007?                                        10:20

 6        A   Yes.

 7        Q   And was -- was it -- strike that.

 8            Was that a public disclosure and

 9   presentation of the Charge Base product?

10            MR. HASAN:   Objection as to form.          10:20

11            THE DEPONENT:   It was a private hotel

12   suite.   We did not have a public show floor booth.

13   Our meetings were by appointment.

14   BY MR. HANLE:

15        Q   Members of the public could get into the    10:20

16   suite; correct?

17            MR. HASAN:   Objection as to form.

18            THE DEPONENT:   No.   Only if you -- there

19   were signs at the show that says where we were

20   exhibiting because we were an actual exhibitor for   10:20

21   CES.   So you could go find Nyko's suite if you went

22   and looked in the directory.

23            If you came to the suite, we would stop you

24   at the door, ask you if you had an appointment.   If

25   you did, you were let in.   If not, we would ask what 10:21
```

Page 40

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the nature of your business were.  If you were a

2   drop-by press or retailer, then you would be

3   potentially allowed admittance.

4          If you were just someone with a general

5   attendee badge, which I believe CES is an industry          10:21

6   show.  So I don't know if you can just walk in off

7   the street if you are a regular, everyday

8   non-industry consumer.

9   BY MR. HANLE:

10      Q   You have to know someone; right?                    10:21

11      A   Right.  You have to -- yeah, I believe you

12   have to be in the industry or be a professional or

13   one of the companies or buyers or something like

14   that to get into the show.  I could be mistaken.

15      Q   So I would like you to read the next               10:21

16   paragraph for the record that starts, "After a

17   reasonable search."

18      A   (As read):

19              "After a reasonable search,

20          Nyko has not yet identified the                    10:21

21          first public use, presentation, or

22          demonstration of an actual working

23          version of this product.  Nyko does

24          not recall any nonpublic disclosure

25          of this product, which PDP has                     10:21

                                                    Page 41

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    January 2007 were not under any confidentiality

 2    obligation regarding the Charge Base after

 3    January 8th, 2007?

 4        A    Yes.

 5        Q    Okay.  Let's now take -- you mentioned          10:29

 6    others who viewed the Charge Base product at the

 7    hotel suite in January 2007, and specifically, you

 8    mentioned retailers, representatives of retailers;

 9    correct?

10        A    That's correct.  Usually buyers from           10:30

11    retailers, sometimes executives -- but, yes,

12    representatives from retail, various positions

13    sometimes.

14        Q    And were those representatives of retailers

15    who saw the Charge Base in the hotel suite in          10:30

16    January 2007 under any confidentiality obligation

17    with respect to the product?

18        A    I mean, general confidentiality with

19    regards to Nyko products, yes, if it's undisclosed.

20    If they came to the suite prior or after the press     10:31

21    release went live, after the embargo was lifted,

22    they would no longer be held under the

23    confidentiality agreement regarding the original

24    Charge Base because it's public knowledge once we

25    showed it.                                             10:31
```

Page 49

EXHIBIT K
Page 114

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        I would assume they would still be under

2    their confidentiality regarding any

3    nonpublicly-disclosed products that we may have

4    disclosed or talked about at the show in a retailer

5    case-by-case basis.                                    10:31

6        Q   Okay.  So, again, answer "Yes" or "No," if

7    you can.

8            Would you agree that retailers who saw the

9    Charge Base in the hotel suite were not under a

10   confidentiality obligation with respect to the        10:31

11   Charge Base after January 8, 2007?

12       A   The original Charge Base, yes.

13       Q   Do you recall how many retailers,

14   representatives of retailers saw the Charge Base in

15   the hotel suite in Las Vegas in January 2007?         10:32

16       A   I cannot.  Not specifically.  We had --

17   those shows are typically busy.  So you have a lot

18   of times some back-to-back meetings and double books

19   and things.

20           So it was a fairly busy meeting schedule,     10:32

21   but I can't recall as I was not -- still attending

22   those sales meetings.  I did the press meetings.

23           So I don't know specifically how many

24   retailers saw it.

25       Q   Would you give -- provide your best          10:32

                                                         Page 50

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q    I understand.

2            Now, at the same time as the sales team was

3    doing meetings with retailers, were you doing

4    meetings with members of the press?

5        A    Yes.                                          10:35

6        Q    Can you provide your best estimate of the

7    number of press representatives who saw the Charge

8    Base demonstrated at the January 2007 hotel suite at

9    the Consumer Electronics Show?

10       A    Yes, typically, we'd take one every half an   10:35

11   hour, and we'd try to double book those meetings, if

12   possible, occasional triple book.  So that is --

13   someone else can do the math, but from a -- from

14   9:00 to 6:00 -- nine times two is 18.

15           Roughly, is that two per -- I would say       10:35

16   about maybe 18 or so -- 16 to 18 members of the

17   press or outlets, I should say, because occasionally

18   they would bring one or two people or a film crew or

19   something like that.

20           So anywhere from -- depending on the show      10:36

21   date, 12 to 18 per day as far as meetings with the

22   press.

23       Q    Okay.

24       A    That would be a good estimate.

25       Q    When you demonstrated the Charge Base to      10:36
```

                                              Page 53

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   members of the press in that hotel suite, would they

2   be allowed to pick it up and handle it?

3           MR. HASAN:  Objection as to form.

4           THE DEPONENT:  It depends.  I don't recall

5   exactly the -- I know it was an early prototype.  I          10:36

6   don't know -- I can't recall if it was -- the

7   condition it was in, as far as if it was working or

8   not working, if we had it plugged in or not.

9           Sometimes we have charging samples that are

10  not plugged in, sometimes not, depending upon the            10:36

11  stage the prototypes was in.

12          And we definitely let them photograph and

13  take pictures of it.  I don't know if we --

14  typically we demo it, and if it's not too fragile or

15  not too early of a prototype, we'll let them handle          10:37

16  it.

17          I don't recall specifically because it was

18  a long time ago, you know, if we had -- if we let

19  them handle it or not.

20  BY MR. HANLE:                                                10:37

21      Q   Okay.  Do you recall handling it and

22  demonstrating it for members of the press during

23  January 2007?

24          MR. HASAN:  Objection as to form.

25          THE DEPONENT:  Yes, I would have been --           10:37

Page 54

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    myself or one of my team would have been one to set

2    it up.  And would have showed it and kind of

3    demonstrated it at the suite.

4    BY MR. HANLE:

5        Q   Do you recall whether the Charge Base was          10:37

6    plugged in during the -- in the hotel suite?

7        A   I don't specifically recall if it was

8    plugged in and working at the time.

9        Q   Okay.  Would there be any reason to plug it

10   in if it wasn't electrically working?                       10:37

11           MR. HASAN:  Objection as to form.

12           THE DEPONENT:  I don't know.  Like if --

13   and sometimes if it is working, we may not plug it

14   in, if we can't route the cord to a nearby outlet

15   and still have it displayed in a                            10:38

16   aesthetically-pleasing manner.

17   BY MR. HANLE:

18       Q   I guess I kind of want to go the other way.

19           If it was plugged in, it was probably

20   working; right?                                             10:38

21           MR. HASAN:  Objection as to form.

22           THE DEPONENT:  Again, I don't know for

23   sure, but theoretically, we wouldn't necessarily

24   plug in a non-working sample, but I'm not sure.

25           MR. HANLE:  Let's take a short break.             10:38

Page 55

CONFIDENTIAL — ATTORNEYS' ONLY

1    Q    Does Nyko contend that showing the

2    prototype to these individuals at the hotel suite

3    was not a private disclosure of the claimed

4    invention?

5         MR. HASAN:  Objection to form.                11:09

6         THE DEPONENT:  Okay.  Probably depends

7    on -- excuse me.  Let me reread the last sentence

8    again.  (Sotto voce.)

9         Okay.  Yeah, I would say, obviously, it's a

10   public disclosure of a product concept.  I think the    11:09

11   verbiage here "claimed invention," though, would

12   be -- we never claimed -- I think that would

13   differentiate -- obviously, we disclosed a product

14   concept when we showed it off to journalists and

15   press, and they wrote about it.                    11:09

16        But I don't remember myself making any sort

17   of claim that it was an invention.

18   BY MR. HANLE:

19   Q    Okay.  You demonstrate a product, not just

20   a product concept; correct?                        11:09

21   A    Both.  Or -- well, it -- again, it depends

22   on the state of which the product were -- the

23   prototype or the visual representing is in at the

24   time of the show, which would range sometimes to

25   just images all the way up to a full working,      11:10

Page  70

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    finished product sample.

 2         Q   I'm asking you about the Charge Base that

 3    was shown at the show.

 4             Okay.  That was an actual product; correct?

 5             MR. HASAN:  Objection as to form.          11:10

 6             THE DEPONENT:  Well, it was a prototype.

 7    BY MR. HANLE:

 8         Q   Okay.  And were there differences between

 9    the prototype and the final product that you're

10    aware of?                                            11:10

11         A   I believe the form, function, design -- I

12    remember from the photos that there's some

13    hand-painted parts.  Some of the aesthetics and

14    stuff may change a bit.  It happens quite often.

15             So I remember that -- I -- because on the   11:10

16    final version aren't the -- the docking bay is like

17    chrome, and I think they were hand painted --

18    because it was a hand made, essentially, sample.

19             So, yes, there would be differences

20    between the -- at least aesthetically, from what I   11:10

21    can see.  I can't testify as to the innards, the

22    working edition and that kind of thing because I'm

23    not from product development.  That would be more of

24    a question for Amir Navid.

25         Q   Are you aware of any structural differences 11:11
```

Page 71

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   between the prototype that was shown in the hotel

2   suite in January 2007 and the final product that was

3   sold?

4           MR. HASAN:  Objection as to form, asked and

5   answered.                                         11:11

6           THE DEPONENT:  I can't recall specific --

7   like the width or dimension, like if we changed,

8   like, the width of it, the overall size or height,

9   the length.

10          It could have been sometimes the --        11:11

11  generally the handmade prototypes do differ in, as

12  far as the final shape, a bit.  Like the dimensions

13  and stuff will be off, like, millimeters, the weight

14  will be different because it's different materials,

15  typically.                                         11:11

16          But, again, I'm not an expert in that.

17  BY MR. HANLE:

18      Q   Okay.  I think you're trying to be helpful,

19  but I want to focus on, not -- not in general

20  products.  I want to focus on the Charge Base for    11:11

21  now, and if I want to ask sort of generally what

22  happened, I'll ask about that.

23          So with respect to the Charge Base itself,

24  do you remember any structural differences between

25  the Charge Base prototype that was shown in the      11:12

                                           Page  72

CONFIDENTIAL - ATTORNEYS' ONLY

1    hotel suite and the final product that was sold in

2    the marketplace?

3          MR. HASAN:  Objection as to form.

4          THE DEPONENT:  I can't recall the exact --

5    all the changes, if there were any, between the          11:12

6    prototype and the final product because we -- I

7    remember on that one we went through a couple

8    different design revisions of the prototype.

9          So I don't know -- I don't recall which

10   exact prototype we showed at the show and how much   11:12

11   that differed from the final product.  I can't

12   recall those specifics.

13   BY MR. HANLE:

14       Q  So "Yes" or "No," you don't recall any

15   structural differences between the prototype and the  11:12

16   product that was sold at retail?

17         MR. HASAN:  Objection as to form, asked and

18   answered.

19         THE DEPONENT:  Yeah, I remember it being

20   different.  I can't recall specifics.              11:12

21         I remember it looking slightly different is

22   what I'm saying.  Like, I believe, the top part was

23   different.

24   BY MR. HANLE:

25       Q  I want you to focus very specifically on    11:12

Page  73

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the question.  You're talking about aesthetics.  I

2   want to talk about structure.

3           "Yes" or "No," do you remember any

4   structural differences between the prototype and the

5   product that was sold finally?                    11:13

6           MR. HASAN:  Objection as to form, asked and

7   answered.

8           THE DEPONENT:  I cannot recall any major

9   structural differences.

10  BY MR. HANLE:                                     11:13

11      Q   Again, you've qualified my answer.

12          "Yes" or "No," do you recall any structural

13  differences whatsoever between the prototype and the

14  final product that was sold?

15          MR. HASAN:  Objection as to form, asked and   11:13

16  answered.

17          THE DEPONENT:  Let me think.  I'm trying to

18  remember, the top portion was different, if I

19  remember correctly.  As far as the -- the --

20          So, yes, the lighting structure top portion   11:13

21  of different, if I remember correctly.

22  BY MR. HANLE:

23      Q   And you said, "the lighting structure."

24      A   The LED charge indicator light portion.  I

25  remember that being somewhat different because the   11:13

Page 74

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    final product has full-on LED indicator lights,

2    diagram description up top, and I believe it was

3    embossed or embezzled or -- and went down a bit.  I

4    think that one was kind of smooth because it was a

5    handmade sample.                                    11:14

6          So I think that would technically qualify

7    as structural differences if we changed that top

8    piece.

9          So, yes, I believe there was some

10   structural differences.                             11:14

11      Q   Was there an LED indicator on both the

12   prototype and on the final version that was sold?

13      A   Yes.

14      Q   Okay.  Other than the difference in the LED

15   indicator portion, do you recall any other          11:14

16   structural differences between the prototype and the

17   product that was sold at retail?

18          MR. HASAN:  Objection as to form.

19          THE DEPONENT:  Not that I recall, no.

20          Sorry to get specific.  I just want to make  11:14

21   sure I didn't misspeak or --

22   BY MR. HANLE:

23      Q   No, I appreciate it.

24          MR. HASAN:  Steve, this was located

25   yesterday.                                           11:15

                                               Page 75

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the best way to display the LEDs.

 2           This was some technology, I think, we were

 3    experimenting with, in a product that ultimately

 4    didn't come to market in this one, in which the LED

 5    is underneath kind of a translucent black plastic,          11:16

 6    that when it turns on, you see it, versus having an

 7    open LED that you can see, which I believe that's

 8    the LED indicators that's on the Charge Base product

 9    to be released.

10       Q   Okay.  Do you believe this version that           11:16

11    you're holding up now was a prototype that was --

12    that was made prior to the final commercial version?

13       A   Prior to the final commercial version?

14    Yes.

15       Q   Okay.  And -- but you don't recall whether        11:16

16    this was the -- an example of the one that was shown

17    in the hotel suite in Las Vegas?

18       A   I don't believe this one is.

19           One, the LED indicator is different; and

20    two, there's a date on the bottom, which is dated         11:17

21    after?

22       Q   And what is the date of that one?

23       A   It is 1/18/2007.  So this is probably one

24    that didn't make it in time for the show, an

25    alternate one we were looking at producing.               11:17
```

Page 77

EXHIBIT K
Page 125

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      it on the bottom, Counsel?

 2              MR. HANLE:  Yes, that's fine.

 3              MR. HASAN:  It's not covering anything?

 4              THE DEPOSITION OFFICER:  No.

 5              (Exhibit 58 was marked for              11:35

 6              identification by the deposition

 7              officer and is attached hereto.)

 8      BY MR. HANLE:

 9          Q    Look at the Exhibit 58 prototype.  I'd like

10      you to plug that into the outlet in front of you.    11:36

11          A    Sure.

12          Q    What happens when you plug it in?

13          A    Four LED -- recessed LED indicator lights,

14      under the plastic light up, green.

15          Q    So would you agree this is a working        11:36

16      prototype?

17              MR. HASAN:  Objection as to form.

18              THE VIDEOGRAPHER:  Can you turn that

19      because it's getting a reflection.

20              MR. HASAN:  Objection as to form.           11:36

21              THE DEPONENT:  The lights light up.  As far

22      as whether or not it's fully working as far as the

23      little charge controller, that, I don't know.

24              Sometimes, if it's an early prototype,

25      we'll make it work so the lights will light up, but  11:36
```

Page 80

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1    it won't necessarily charge or won't distribute the

2    adequate charge.

3         These may not be real ports, that kind of

4    thing.   It all depends on the -- you know, the type

5    of prototype or the product that we have for the                11:36

6    show.

7         So sometimes it will manufacture something

8    or make something that looks like a working --

9    fully-working sample to debut and demo and show how

10   it would work, but it's not fully working.              11:36

11   BY MR. HANLE:

12        Q   So it may be working, you just don't know

13   one way or the other; correct?

14        A   Exactly, if we had a controller, we could

15   dock it in and see if the lights change, but you      11:37

16   wouldn't know if the charge is being held unless you

17   tested it, and I haven't fully tested this product

18   myself to know.

19        I haven't let it charge for like two to

20   four hours, and then tested the controller and      11:37

21   making sure.

22        Personally, I wouldn't be comfortable

23   saying this is a fully-working prototype.   The

24   lights do work.   There is electrocurrent running

25   through.                                              11:37

Page 81

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    So the answer is you don't know whether

2    it's a working prototype.  It may be; it may not be?

3    A    Exactly.

4    Q    So I'd like you to -- you can put that down

5    for a moment.                                    11:37

6         And I'd like to show you what has

7    previously been marked as Exhibit 15.  And

8    Exhibit 15 is a document with Bates Nos. NT941 to

9    943, and then there's a blowup of the photograph as

10   the fourth page of the exhibit.                  11:38

11        And so.  First of all, this -- you'll note

12   that this document -- the "NT" means that it was

13   produced by Nyko to PDP in the litigation?

14   A    Okay.

15   Q    So are you aware that this is one of the --     11:38

16   one of the press coverages of the -- of the CES 2007

17   demonstration of the Charge Base that was provided

18   by your marketing firm?

19        MR. HASAN:  Objection as to form, because

20   this -- this last page appears to be a blowup         11:38

21   that --

22        MR. HANLE:  You don't need to -- just say

23   "Objection to form."  That's fine.

24        MR. HASAN:  Objection to the exhibit, lack

25   of foundation.                                       11:38

Page 82

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. HANLE:  Okay.

 2    BY MR. HANLE:

 3        Q    My question is:   Is this press coverage

 4    that's the first three pages -- is this press

 5    coverage that was generated as a result of Chris      11:38

 6    Kohler's attendance at in at CES in January 2007 in

 7    Las Vegas?

 8            MR. HASAN:   Objection as to form.

 9            THE DEPONENT:   I believe so.   Now, with

10    that caveat because, again, sometimes you'll have     11:39

11    one editor that is actually attending the show and

12    another that's back at the home office that, when we

13    send the press release out, we'll write an initial

14    story.

15            So I assume that this is -- because there's    11:39

16    a photo of it, actually, at the -- yeah, actually at

17    the booth or at the suite that this person was in

18    attendance, but it could have been -- they could

19    have -- the guy taking the notes, taking the photos

20    may not be the same guy writing the article.          11:39

21            So I don't have a personal recollection of

22    Chris Kohler, or who he is or whether he was there,

23    but it appears that he was the one who attended, but

24    I can't say for certain.

25            ///
```

Page 83

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     BY MR. HANLE:

2         Q    Okay.   But your understanding is that

3     someone on behalf of Wired.Com attended the booth --

4     or excuse me -- attended the suite in January 2007

5     and took a picture of this Charge Base; correct?                11:40

6         A    I would assume so, yes, because they don't

7     source anybody -- any other -- because, like, at

8     sometimes, there's articles that are written based

9     upon somebody else going.   Like --

10          If -- a lot of sites are in the same                     11:40

11    network.   So say, like, Joystick will write a story.

12    Engadget will pick it up because Joystick wrote it;

13    and so they are writing with somebody else.

14          But they don't -- I don't believe -- give

15    me a second to look through here -- usually, they               11:40

16    will source that other article, if they didn't

17    personally receive it or somebody else attended.

18          Yeah, they didn't source anybody else; so I

19    assume somebody from Wired was in the booth, and

20    they saw it, took a photo, and relayed information.             11:40

21        Q    And you said -- you may have misspoke.   You

22    said, "I assume somebody from Wired was in the

23    booth."

24          Did you mean someone from Wired was in the

25    suite?                                                          11:40

Page 84

EXHIBIT K
Page 130

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A    Sorry.  Suite.  Sorry.  I call all exhibits

2    areas "booth."

3      Q    That's fine.  I just wanted the record to

4    be clear.

5          So this photo is not a photo that Nyko        11:40

6    provided as part of the press kit; correct?

7      A    No.

8      Q    And if you look at the last page of the

9    exhibit, you'll see there's a blowup of a photo of

10   the Charge Base.                                     11:41

11         Do you see that?

12     A    Uh-huh.  Yes.

13     Q    And does that appear to be the blowup of

14   the same photo that appears on the first page of the

15   exhibit?                                             11:41

16     A    Yes, it appears to be the same photo.

17     Q    Okay.  Now, focusing on the photograph on

18   the last page of the exhibit, other than the LED

19   lights, are there any structural differences between

20   the prototype shown in the picture in Exhibit 15 and  11:41

21   the second prototype, Exhibit 58, which is in front

22   of you?

23         MR. HASAN:  Objection as to form.

24         THE DEPONENT:  Again, it's only one photo.

25   It's from a weird angle.  So I couldn't be certain,   11:41

                                                Page 85

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    updating document of.

 2           They probably do a combination of the two

 3    when they blast this out over the wire.

 4        Q   When you say the "official press list from

 5    CES 2007," are you referring to a list that was          11:51

 6    generated after the event or before the event?

 7        A   No.   It's generated prior to the event.

 8    So, typically, the way it works is every journalist

 9    who signs up to go to CES and applies -- gets a

10    badge for the show, if it is designated as a press       11:51

11    badge, they will keep a running list of that.

12           And then that is distributed to the

13    exhibitors of the show; so they can follow up and

14    book meetings ahead of time.

15           So we will acquire from the CES Web site or       11:51

16    from show management, we'll send that to our PR

17    firm, and they'll use that to book meetings and --

18    on our behalf at the show.   Prior to the show,

19    they'll book the meetings.

20        Q   Okay.  And when you said this press release      11:51

21    went out to the official press list from CES and

22    Conkeys internal press list --

23        A   Well, I'm assuming it's a combination.  I

24    don't know the final aggregate list, if it was a

25    combo, or if they just used CES.  I don't know that      11:52
```

Page 93

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    in that process of the business, once the order

 2    comes in and is being fulfilled.

 3         Q    Are you aware of the existence of a

 4    document called a "Sales Order"?

 5         A    Yeah.                                    02:43

 6         Q    What is that?

 7         A    Sales Order is, typically, when someone is

 8    placing a request for goods from Nyko.  It comes

 9    from outside Nyko in, in traditional sense.

10         Q    But does Nyko generate a document called a   02:43

11    "Sales Order"?

12         A    I don't know if we generate them or if it

13    comes from the account or if it's dialed into our

14    system in some way.  That's more of the minutia of

15    accounting that I'm not involved in that detail of   02:43

16    reports.

17              Again, my involvement with sales is more

18    pitching product, meeting with retail accounts, not

19    once orders are placed within Nyko.

20         Q    What's your understanding of how Nyko       02:44

21    acknowledges a customer's order?

22         A    I know we have several people in the

23    accounting department that, once it comes in, they

24    process it, verify it, make sure we have goods in

25    the warehouse, et cetera.                            02:44
```

Page 174

EXHIBIT K
Page 133

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    CC Swiney does more of that logistics and

 2   operations.

 3        Q    Do you have an understanding of what

 4   documents are sent to the customer once an order is

 5   received?                                              02:49

 6        A    No.

 7        Q    Do you know that customers receive

 8   invoices?

 9        A    I assume they receive invoices from our

10   accounts payable department for goods.                 02:49

11        Q    I want to show you what has been previously

12   marked as Exhibit 17.

13             Do you recognize the first page of this

14   document as a Nyko invoice?

15        A    Yes.                                          02:50

16        Q    And this is an invoice --

17             What was the order date for the items

18   ordered for this invoice?

19             MR. HASAN:   Objection -- objection as to

20   form.                                                  02:50

21             THE DEPONENT:   It appears it is 1/10/2007

22   in the upper left-hand.

23   BY MR. HANLE:

24        Q    Okay.  That looks like -- there is a date

25   of the invoice, and there's also an order date?        02:50
```

Page 179

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1       A    I'm sorry.  Yes.  January 9th, 2007.

2       Q    Okay.  And you see that was the day after

3    the press release for the Charge Base?

4       A    That's correct.

5       Q    And so is this acknowledging an order by          02:51

6    Amazon of -- looking down, fourth from the bottom --

7    140 Charge Base units?

8           MR. HASAN:  Objection as to form.

9           THE DEPONENT:  No, because -- well,

10   essentially, that's kind of a request of              02:51

11   allocation -- more of like a forecast almost.  Like

12   vacancy, based upon the press release that their

13   initial need is going to be around 140 pieces.

14          Because, if you look over to the right,

15   there is no amount here; so not actually paying or    02:51

16   ordering for anything.

17          Now, Amazon, in particular, and some other

18   online retailers will submit requests for goods and

19   get it set up well in advance in order to preorder

20   them.                                                 02:51

21          So it's common practice in video games to

22   preorder products well in advance.

23          So sometimes, if you look, not on this

24   release, we'll even partner with, like, Amazon to

25   announce -- we'll announce a product for the very     02:52

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   first time in a press release, and then include "Now

2   available for preorder at Amazon and LinkedIn," but

3   we haven't sold them any goods or no money has

4   exchanged hands.

5          It's just a way for -- we see people,                02:52

6   they'll rate the product, and they'll go ahead

7   and --

8          Say we get a thousand of preorders of an

9   item and only a couple dozen on another, we'll know

10  Product A is viable; Product B is not.                      02:52

11         So it's a way for us to kind of, again,

12  further gauge interest above and beyond just looking

13  at what journalists will say about it and what

14  people will post in the comments.

15         This is foreseeable proof, when Amazon sets          02:52

16  something up for preorder, that people definitely

17  want it because they are putting it down they,

18  essentially, want to put money down for it.

19  BY MR. HANLE:

20      Q   Does the word "preorder" appear anywhere on         02:52

21  this invoice?

22      A   No, not internally.  That's more of a

23  external consumer term.

24      Q   Does this invoice -- was this sent back to

25  Amazon?                                                     02:53

                                                   Page 181

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    addressed to orders.

 2            Do you see that?

 3            That e-mail that we're looking at from

 4    Kathy D. sent Monday, January 8 --

 5        A    Yes, I'm sorry.  I was looking at the wrong     03:28

 6    place.

 7        Q    -- to orders.

 8            Is orders an internal Nyko e-mail address?

 9        A    I do not know if it's internal Nyko e-mail

10    address or if it's a -- like a blanket e-mail that     03:28

11    goes out or it's an address book.  I don't know.  I

12    don't receive those e-mails.

13        Q    All right.  And so this e-mail references a

14    Nyko purchase order number of L347035.

15            Do you see that?                              03:29

16        A    Yes.

17        Q    And that matches the purchase order number

18    on the first page of the exhibit, which is the Nyko

19    invoice; correct?

20        A    (Sotto voce.)  Yes.                          03:29

21        Q    So Amazon placed this order to either Peake

22    Marketing or Nyko, and Nyko acknowledged the order

23    by preparing an invoice; correct?

24            MR. HASAN:  Objection as to form.

25            THE DEPONENT:  Invoice -- it looks like        03:29
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1    they prepared invoice -- or invoice for some of the

2    products, but not all of them.  Most of these

3    aren't -- let's see, what they are here.

4            Yeah, it looks like all the new products,

5    like PS3 that are not out at this time, were also on          03:30

6    here.

7            It's a -- more of that setting up, kind of

8    preorder for Amazon, because it has to be set up in

9    their system, obviously; and we don't have a

10   separate distinction for preorder product and                 03:30

11   existing product.

12   BY MR. HANLE:

13        Q    So in Nyko's system, there's no distinction

14   between preorder product and order product; is that

15   correct?                                                       03:30

16           MR. HASAN:  Objection to form.

17           THE DEPONENT:  Like, I don't know for

18   certain but that is my understanding.  I don't know

19   if any preorder -- I assume it would be on here if

20   we had a thing for preorder.                                   03:30

21           The only indication here says, "Request."

22           Like, they are requesting these units as

23   far as an indication -- kind of like a miniature

24   forecast.

25           But as you can see, not everything that is            03:30

Page  198

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  requested is shipped, if you look for the shipping

2  quantity next to the request.

3  BY MR. HANLE:

4      Q   So request -- that -- request doesn't mean

5  mini forecast, does it?                                  03:31

6          MR. HASAN:  Objection as to form.

7  BY MR. HANLE:

8      Q   It means how many they are ordering; right?

9          MR. HASAN:  Objection as to form,

10  argumentative.                                          03:31

11          THE DEPONENT:  No, I mean -- well, the

12  reason we have a "Request" in a "Shipped" column is

13  because, when you request an item --

14          Well, there's two cases:

15          If it's already an item and it's out, we        03:31

16  may be backordered or out of stock on the item; or

17  we may not have -- say, they requested, like, in

18  this case, 520 units of something, we ship zero --

19  say, we have 100, and we agree to partially ship

20  them the order, then that's what would and in that      03:31

21  second column.

22          So a request is not a guaranteed order

23  because:

24          One, if the product is not out yet, we

25  can't ship it;                                          03:31

Page 199

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        And two, if it is out, and we are out of

2    stock, we can't ship it.

3        That's why it's requested, not an actual

4    order.

5        It's not like when you walk up to a fast        03:31

6    food joint, and they have food sitting there and you

7    can take it away.  They are requesting what they

8    want.  And we can only ship and provide what we

9    have.

10       So, in this case, if we are out of stock on       03:32

11   Wii stuff, and we can't ship it; or in the case of

12   PS3, these are concept products that aren't out yet,

13   but they are putting in --

14       We ask accounts to let us know ahead of

15   time what products they are interested in and in      03:32

16   what quantities so we can use that as a base to

17   order later.

18   BY MR. HANLE:

19       Q    Okay.  But you're not aware of any Nyko

20   documentation that distinguishes between a preorder   03:32

21   and an order; correct?

22       MR. HASAN:  Objection as to form.

23       THE DEPONENT:  Not that I'm aware of, no.

24       Again, I'm not deeply involved in the

25   accounting and order-keeping process at Nyko.         03:32

Page 200

EXHIBIT K
Page 140

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. HANLE:

2        Q.   Okay.   So in this case, you -- for example,

3    there's a request for 60 of Power Combo 360s.

4            Do you see that?

5        A.   Let me see.   Yes.                                    03:32

6        Q.   And pursuant to that request 60 shipped;

7    correct?

8        A.   Yes.

9        Q.   Okay.   Now, in the same column under

10   "Request," there's a request for 140 Charge Base --        03:33

11   PS3 Charge Bases.

12           Do you see that?

13       A.   Yes.

14       Q.   And there's no way to tell the difference

15   from this invoice as between the request for 60           03:33

16   Power Combos that shipped, and the 140 Charge Bases

17   that didn't ship; correct?

18           MR. HASAN:   Objection as to form.

19           THE DEPONENT:   From my -- I mean, I'm

20   looking at the same document you are.                     03:33

21           From my recollection, no, I can't tell the

22   difference between --

23   BY MR. HANLE:

24       Q.   Okay.   And you'll see that under "Charge

25   Base," it says, "140 requested" and "140 on              03:33

Page 201

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    backorder."

2           Do you see that?

3      A    Yes.

4      Q    So isn't it true that Nyko could fulfill

5    this order once the product is off of backorder and          03:33

6    available for shipment?

7           MR. HASAN:  Objection as to form.

8           THE DEPONENT:  No.  Can't backorder a

9    product that isn't out yet.

10   BY MR. HANLE:                                                  03:33

11     Q    Well, this says, "backorder."  It says,

12   "140 backorder," doesn't it?

13          MR. HASAN:  Objection as to form,

14   argumentative.

15          THE DEPONENT:  It is listed 140 in the               03:34

16   backorder column, but it doesn't mean we have an

17   active order from the factory for this item.

18   BY MR. HANLE:

19     Q    Is there anywhere that says it's not an

20   active order?                                                 03:34

21     A    No.

22     Q    Okay.  Then why do you say it's not an

23   active order?

24          What is the basis for that testimony?

25          MR. HASAN:  Objection as to form,                    03:34

CONFIDENTIAL -- ATTORNEYS' EYES ONLY

```
 1    argumentative.
 2           THE DEPONENT:  Because we didn't ship this
 3    product for another six months.
 4    BY MR. HANLE:
 5        Q    No, you accepted an order for it, and then      03:34
 6    you shipped it six months later; isn't that right?
 7           MR. HASAN:  Objection; argumentative.
 8           THE DEPONENT:  Again, it's not a concrete
 9    order without a concrete price and actual ship date
10    from us.                                                 03:34
11           This is a request.  We have to -- in order
12    to get something on Amazon, we have to set it up in
13    their system, they place a request for it.
14           We can't --
15    BY MR. HANLE:                                            03:34
16        Q    They ordered?
17           MR. HASAN:  All right.  Let him finish.
18    Let him finish.  You cut him off.
19           THE DEPONENT:  They -- again, the way
20    preorders work, is it is set up in their system         03:34
21    sometimes months and months before product is ever
22    shipped.
23           And sometimes a product never even comes
24    out that we set up for preorder because we are
25    gauging interest.                                        03:35
```

Page 203

EXHIBIT K
Page 143

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              Especially on a brand new console platform,

2     which in January of 2007, PlayStation 3 was brand

3     new; so the market was untested as far as what

4     products were going to be viable or not.

5              So we announced a whole sloth of brand new          03:35

6     products that we think potentially could be viable.

7     We get out to press, consumers, retailers give

8     feedback, set some up for preorder, as well as, you

9     know, kind of gauge interest of everyone.

10             And the ones that make sense, we get              03:35

11    requests from -- like, sizeable requests.  We don't

12    just look at Amazon, we look at all our retailers.

13             If we have sizeable requests of units from

14    all those, then we can actually place an order with

15    the factory, go into production, produce the units,          03:35

16    and then ship months later.

17             MR. HASAN:  Let him finish.  He wasn't

18    finished.

19             MR. HANLE:  I didn't ask the question that

20    he's answering.                                              03:35

21             I don't know what he's talking about.

22             MR. HASAN:  You can't cut him off.  You

23    can't cut him off.  You can't cut him off.

24             Wait a second.

25             Mr. Hanle, you can't cut him off.                   03:35

                                                    Page 204

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. HANLE:  He was just talking.

 2              MR. HASAN:  You can't cut him off.

 3              MR. HANLE:  I'm not cutting him off.

 4              MR. HASAN:  You did.  Yes, you are.

 5              MR. HANLE:  What was my question?        03:35

 6          (Speaking simultaneously.)

 7    BY MR. HANLE:

 8       Q   Do you remember what my question was?

 9       A   Yes.

10              MR. HASAN:  You can't cut him off.       03:36

11    BY MR. HANLE:

12       Q   Okay.  I'm going to ask a new question.

13          So is there any document that you can

14    identify among the 83,000 documents that Nyko has

15    produced in this case that says that this was a      03:36

16    preorder as opposed to an order?

17       A   Not that I'm aware of, that's different

18    from this document.

19       Q   Okay.  But in this document, it doesn't

20    say, "preorder," does it?                            03:36

21              MR. HASAN:  Objection as to form.

22              THE DEPONENT:  It says, "Request, Shipped,

23    and BO."

24    BY MR. HANLE:

25       Q   And, in fact, looking at the fifth page,     03:36
```

                                        Page 205

EXHIBIT K
Page 145

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    which is the e-mail from Amazon, KathyD@Amazon, that

 2    says it's a purchase order, doesn't it?

 3         A   I'm sorry.  Which page?

 4         Q   Fifth Page.  It says, "81238," at the

 5    bottom right.                                          03:36

 6         A   Okay.

 7         Q   It's the e-mail that we looked at from

 8    KathyD@Amazon.com, and the subject is "Amazon.com

 9    PO L3470035," and then beneath that it says,

10    "Purchase Order No. L3470035."                         03:37

11             So that's a purchase order from Amazon;

12    correct?

13             MR. HASAN:  Objection.

14             THE DEPONENT:  It's a purchase order as it

15    pertains to the products that are current Nyko         03:37

16    products that we have in stock, yes.

17             But, again, to my knowledge, we don't

18    distinguish between preorders.  We don't issue like

19    a preorder PO and a regular PO.

20             Their system isn't set up, to my knowledge,   03:37

21    to handle that, nor is ours.

22             Again, I'm not as well-versed in our

23    internal order system and theirs, but everything

24    gets set up in the same system.

25             So -- and this is the same system that        03:37
```

Page 206

EXHIBIT K
Page 146

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    handles accessories.  It handles video games and

2    movies and music and what have you, which they do

3    preorders across all those platforms and categories.

4    BY MR. HANLE:

5       Q   There's nothing on this document that says        03:37

6    "preorder" is there?

7            MR. HASAN:  Objection as to form.

8            THE DEPONENT:  Nothing that I can see that

9    distinguishes from a preorder.

10   BY MR. HANLE:                                             03:37

11      Q   And there is nothing on here that it says

12   this is a forecast or request rather than a purchase

13   order, is there?

14           MR. HASAN:  Objection to form.

15           THE DEPONENT:  It definitely does say           03:37

16   "Request."

17   BY MR. HANLE:

18      Q   Where does it say that?

19      A   Here on the first column.

20      Q   I'm talking about the purchase order --          03:38

21      A   You're talking about the e-mail.  I'm

22   sorry.

23      Q   -- from Amazon.

24      A   Nope, I don't see anything -- I don't see a

25   request on the e-mail.                                   03:38

Page 207

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q    Okay.  And -- and this e-mail on the second

2   page includes the order for 140 PlayStation 3 Charge

3   Base; correct?

4           Looking -- I'm looking at the second page

5   of the e-mail.                                    03:39

6      A    Oh, e-mail.  Sorry.  Okay.  NT 081239?

7      Q    That's correct.  It's No. 9.

8      A    Well, again, it's a request for -- or

9   putting in like a preorder for their product for

10  that amount, which I don't know even know if that   03:39

11  was of the final price or not, because --

12          Again, in January, six months before a

13  product ships, price fluctuates.  You can't

14  necessarily bill someone for something we don't

15  have, is what I'm saying.                          03:40

16     Q    Is there anything on here that says it's

17  anything other than a purchase order for 22 --

18  excuse me -- for 140 PS3 Charge Bases for a total of

19  $3,080?

20          MR. HASAN:  Objection as to form.          03:40

21          THE DEPONENT:  No, nothing else states

22  anything otherwise than that.  Although, it's

23  understood, if a product isn't out yet, they will

24  place the order in advance, you know, on the --

25  essentially, some of the guys that we want to get a   03:40

Page 208

EXHIBIT K
Page 148

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    commitment from them, an actual commitment that they

2    want the units and how many.

3            And then once we identify the overall need

4    and if it's viable for the product, then we'll start

5    producing it.                                          03:40

6    BY MR. HANLE:

7        Q    So is this a commitment to purchase 140

8    Charge Base units --

9            MR. HASAN:  Objection as to form.

10   BY MR. HANLE:                                          03:40

11       Q    -- at that price?

12       A    No, well, again -- price on -- I believe I

13   don't remember the exhibit number, but the previous

14   one said, "subject to change."

15           So we will not invoice or ship a product     03:40

16   unless we have it in the warehouse, to my knowledge,

17   as far as we will not bill a company for something

18   we do not have.

19           So this is more of a -- it's a commitment

20   from them that they would like these products, but I  03:41

21   don't believe it's binding.

22           Again, I'm not in accounting.  Binding as

23   far as we can't go ahead and bill them for all these

24   products, if we don't ship them, and we don't verify

25   the price as I believe changed from this price.       03:41

                                               Page 209

EXHIBIT K
Page 149

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        I don't recall from the previous exhibit or

2    if it was the final Price Sheet.

3        Q    Yeah.  You -- you referred to in your

4    answer you said a document -- "earlier document"

5    that you looked at had a statement that "Price is          03:41

6    subject to change."

7             You were referring to the Price Sheet;

8    correct?

9        A    Yes.

10       Q    And so there's nothing in these documents,          03:41

11   Exhibit 65 or 17, that that -- that says that "Price

12   is subject to change," is there?

13            MR. HASAN:  Objection as to form.

14            THE DEPONENT:  Not that I can see on the

15   page, no.                                                    03:41

16   BY MR. HANLE:

17       Q    Okay.  And at the top of the page you're

18   looking at, it says, "This purchase order

19   incorporates the Amazon.com standard terms."

20            Do you see that?                                    03:42

21       A    Yes.

22       Q    Okay.  So is there anything in this e-mail

23   or in the invoice that says that this is anything

24   other than a commitment to purchase 140 units of --

25   of PS3 Charge Base?                                          03:42

Sarnoff, A VERITEXT COMPANY
877-955-3855

EXHIBIT K
Page 150

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. HASAN:  Objection as to form, asked and

2     answered.

3          THE DEPONENT:  Not that I can see.  But,

4     again, without going over Amazon's terms, which

5     terms differ on account basis based upon their          03:42

6     program, they may have some sort of out clause or

7     preorder status, I have no idea.

8          (Deposition officer clarification.)

9          THE DEPONENT:  Out clause if they place an

10    invoice on product that isn't really available yet      03:42

11    or was under a preorder basis.

12          I don't know what Amazon's program is or

13    was in 2007 or their terms, but I don't see anything

14    here that states any of that, obviously.

15    BY MR. HANLE:                                            03:42

16    Q    Okay.  Flip one page back.

17          I apologize.  I should have asked this when

18    we were on this page:

19          But about a third of the way -- well,

20    actually, halfway down the page, there's a reference     03:42

21    to "Backorder," and then there's a "Y" next to the

22    backorder.

23          Do you see that?

24    A    Yes.

25    Q    Do you have an understanding what was that         03:43

                                                        Page 211

CONFIDENTIAL – ATTORNEYS' EYES ONLY

```
 1    first entry under Amazon.com?

 2         A    97145.

 3         Q    Okay.  Turn to the third page of

 4    Exhibit 65, which is the previous exhibit -- the

 5    previous exhibit.                                      03:48

 6         A    Oh, sorry.  Okay.

 7         Q    And that's a Nyko Sales Order No. 97145;

 8    correct?

 9         A    Yes.

10         Q    So this entry in Exhibit 66 corresponds to    03:49

11    the Nyko Sales Order that's included in Exhibit 65;

12    correct?

13         A    Yes.

14         Q    Okay.  So -- and that order is for

15    140 units of PS3 Charge Base; correct?                 03:49

16              MR. HASAN:  Objection as to form, asked and

17    answered.

18              THE DEPONENT:  Again, this is request for

19    140 units of a product that isn't out yet, and it

20    says a corresponding sales report that says we sold    03:49

21    zero of a part that isn't out yet.

22    BY MR. HANLE:

23         Q    I have a different question.

24              My question is --

25              MR. HASAN:  Don't cut him off.               03:49
```

Page 217

EXHIBIT K
Page 152

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          Okay?

 2          MR. HANLE:  Are you done talking now?

 3          MR. HASAN:  Please don't cut him off.

 4          MR. HANLE:  Are you done talking now, Art?

 5          MR. HASAN:  Please don't cut him off.        03:50

 6          MR. HANLE:  Okay.

 7          MR. HASAN:  Thank you, Mr. Hanle.

 8          MR. HANLE:  Okay.  I didn't, for the

 9  record.

10  BY MR. HANLE:                                        03:50

11      Q   Okay.  So I have a different question than

12  the one you just answered.

13          The question is:  Look at the Sales Order

14  that Nyko generated January of 2007.

15          Do you see that?                             03:50

16      A   Yes.

17      Q   And does that reflect an order for

18  140 units of Charge Base for PS3?

19          MR. HASAN:  Objection as to form, asked and

20  answered.                                            03:50

21          THE DEPONENT:  Again, I'm not in

22  accounting.  I don't deal with these documents on a

23  regular basis, but looking at it for the first time,

24  this appears to be a request for units that aren't

25  available, not an actual exchange of monies for      03:50
```

Page 219

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    goods yet.

2    BY MR. HANLE:

3          Q    I know you want to talk about --

4               MR. HASAN:   You're putting up your hands,

5    cutting him off.                                          03:50

6    BY MR. HANLE:

7          Q    -- exchange of goods, what have you.

8               I just want to know what the documents say.

9    Okay?

10              That Sales Order says there's an order for    03:51

11   140 units at $22.00 a unit for $3,080; is that

12   correct?

13              MR. HASAN:   Objection as to form, asked and

14   answered.

15              THE DEPONENT:   This -- it says there was a    03:51

16   request for 140 units.

17              MR. HASAN:   Argumentative.

18   BY MR. HANLE:

19         Q    Where does the word "request" appear on

20   this document?                                           03:51

21         A    Right here on the right-hand column,

22   "Request 140 units."

23         Q    And that's a Sales Order; correct?

24         A    Sales Order 97145.

25         Q    So it's a request or an order for --          03:51

Page 220

Sarnoff, A VERITEXT COMPANY
877-955-3855

EXHIBIT K
Page 154

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              MR. HASAN:   Objection as to form.

2              MR. HANLE:   I wasn't done with my question,

3     Counsel.

4     BY MR. HANLE:

5         Q    -- for 140 units of Charge Base, $22.00 a          03:51

6     unit for $3,080, and that's what's reflected on the

7     document; correct?

8              MR. HASAN:   Objection as to form, asked and

9     answered.

10             THE DEPONENT:   Yes, it reflects, I should          03:51

11    say, a request for those units at that price.   Does

12    not mean that is actually being sold.

13             As I said, before, I don't believe we can

14    distinguish a preorder request and an actual order

15    in our system.                                               03:51

16             So we have to set up everything this way,

17    and at this time, we didn't have any sort of

18    internal forecasting software or forecasting tools.

19             So I'm guessing, again, somebody in

20    accounting, CC Swiney could verify, but this is how,        03:52

21    essentially, we keep track of retailer interest in

22    new upcoming unreleased products.

23    BY MR. HANLE:

24        Q    And -- and -- what -- how is the

25    information from a Sales Order somehow used to gauge         03:52

                                            Page 221

EXHIBIT K
Page 155

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    customer interest?

 2            Who uses that?

 3            Is there a database called "Customer

 4    Interest"?

 5            Is somebody in charge of customer interest      03:52

 6    at Nyko that keeps track of these things on an

 7    order?

 8            MR. HASAN:  Objection as to form.

 9            THE DEPONENT:  They are in charge of

10    forecasting.  They do keep track of all the initial     03:52

11    orders that are coming in for a product, and then

12    based upon internal forecasts, which is operations

13    and logistics and sales get together and determine

14    whether or not a product is viable to bring in it,

15    and then once it is, how much to order based upon       03:52

16    these requests from retailers.

17            We don't -- the only way know how much to

18    order from a factory is based upon how much requests

19    we get in from a retailer.

20            So not just Amazon, every retailer submits      03:53

21    the request.  We see, "Oh, it's going to be 400

22    units.  It's not enough for us to make.  It's going

23    to be 20,000 units, it's enough for us to make.

24    Let's go forward with the product."

25            That's -- without a sort of complex             03:53
```

Page 222

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    forecasting software, which we don't have, this is

2    how we do it.  At least, that's what appears to me

3    on these documents.

4          Again, I'm not --

5    BY MR. HANLE:                                    03:53

6       Q    Well, in this case, didn't Nyko already

7    order 6,000 units of product --

8          MR. HASAN:  Objection as to form.

9    BY MR. HANLE:

10      Q    -- without any -- without any showing of   03:53

11   requests or forecasting from customers?

12      A    That, I don't know.  I don't place orders

13   from factories.

14      Q    Okay.  But you saw the document that showed

15   that we ordered -- that Nyko ordered 6,000 units of  03:53

16   the Charge Base product at the end of December of

17   2006; correct?

18      A    Right.

19          Sometimes we will place initial orders from

20   factories, a small order because, typically,       03:53

21   anywhere from five to ten pieces, like a smaller

22   order to -- in order to source components.

23          The -- and Amir can attest to this more

24   than I can, but from my general knowledge of how we

25   do things, we can't source components until you     03:54

                                           Page  223

EXHIBIT K
Page 157

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    place a form PO with the factory.

2            In order to that, you place a PO with them,

3    and then they source components, and then they get

4    you a finalized cost in those components, then you

5    can quote a final a price back to the retail.          03:54

6            So there is some risk involved in having to

7    place initial order before there's firm commitments,

8    and then we will reorder based upon these requests.

9            So we will place initial small orders, just

10   to get the information from the factory on what        03:54

11   components will cost, and then they can quote a

12   final price later, in June or whatever that was, for

13   the product based upon the requests, then we can

14   reorder in time for holiday.

15           That's my general analysis of how the          03:54

16   process works.  Again, CC and Amir can elaborate

17   more.

18       Q   When you said, "an initial small order,"

19   what is "an initial small order"?

20       A   Rather than ordering, you know, hundreds or     03:54

21   thousands or millions of pieces, most factories,

22   from what I can gauge, is they need a minimum order

23   quantity to produce anything.  Usually, it's in the

24   single digit thousands of units.

25           It depends on the factory and the item and     03:55

Page  224

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the cost of that item.

2         Amir would be able to elaborate exactly

3    what the our minimum costs are per, at least,

4    category.  I'm sure batteries are different

5    controllers, et cetera.                          03:55

6         Q   Okay.  So go to the second page of

7    Exhibit 66, which is the one in your left hand.

8         Okay.  And I'd like you to go -- it's about

9    a third of the way up from the bottom, and there's

10   an invoice date of 7/11/07, and it's the -- maybe   03:55

11   the best way to get there is the "Quantity Shipped"

12   is 140 units; so it's at the top of the group at

13   bottom with the "Quantity Shipped."

14        Do you see that?

15        A   Yes.                                      03:55

16        Q   So go down to the column that says,

17   "Quantity Shipped" until you hit 140.

18        And we may be on different pages.

19        Are you looking at Page NT 1124?

20        A   No.  1125.  Sorry.                        03:56

21        MR. HASAN:  We don't have a 124 here.

22        THE DEPONENT:  Yeah, 123 and 125.

23   BY MR. HANLE:

24        Q   Well, that sucks.

25        A   I thought I was crazy.  I couldn't find it.  03:56

                                          Page 225

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    Okay.  But your understanding is that that

2    was -- that with respect to both the members of the

3    press and the retail -- the representatives of

4    retailers, they were invited for specific

5    appointments as opposed to just drop in?                04:13

6    A    Yeah, we try to book specific appointments.

7    Usually, on the retail side, it's almost always

8    appointments.

9         On the press side, sometimes, if they are

10   too busy, have too many meetings, they will,           04:13

11   essentially, say we don't have to set appointment,

12   but we will drop by.

13        But we try to lock them down for an actual

14   meeting time.

15   Q    With respect to individuals that showed up        04:13

16   other than at an appointed time, was there was there

17   some type of control on entering the suite?

18   A    Yes, as I said before, they'll come to the

19   door, typically, knock or walk in the entranceway.

20        And then they'll be approached by either a        04:13

21   Nyko employee or one of the members of our PR firm

22   and, essentially, will ask -- if we don't recognize

23   them, "Do you have an appointment?"

24        "Yes, I'm here to see so-and-so."  And then

25   we'll escort them to a person they need to have a      04:14

Page 232

CONFIDENTIAL - ATTORNEYS' ONLY

1   meeting with.

2        If they are not there for an appointment,

3   we'll ask who they are, if they have a card.  And if

4   it's relevant, if it's a member of the press or

5   retailer that slips through the cracks that we                04:14

6   didn't have a meeting with, then we'll usually

7   invite them in or reschedule a meeting.

8        If it's somebody who's outside of that,

9   we'll hand them a card or whatever and kind of send

10  them on their way, if it's just like a regular                04:14

11  consumer or someone else.

12       Q   Do you recall, with respect to the specific

13  show in January 2007 and the hotel suite in

14  January 2007, whether any uninvited guests showed up

15  at the suite?                                                  04:14

16       A   I can't recall that specifically, no.

17       Q   Did Nyko ask people to sign in when they

18  visited the hotel suite?

19       A   No.

20       Q   You mentioned earlier that the members of   04:15

21  the press who came to the hotel suite in

22  January 2007, were given an electronic press kit.

23       Can you describe how that was -- how that

24  was done.

25       A   Sure.                                        04:15

                                                  Page 233

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    video?

 2         A    Yes.

 3         Q    Okay.  And is that -- is that video taken

 4    in the hotel suite in Las Vegas during the time

 5    frame of the CES 2007 show in January of 2007?          04:24

 6         A    Yes.

 7         Q    Okay.  And is that -- the Charge Base

 8    product that is referred to in that video, is that

 9    the prototype of the Charge Base that was available

10    for viewing in the -- in the hotel suite in          04:25

11    Las Vegas in January 2007?

12         A    Yes, it was the same one.

13         Q    Okay.  And -- and in the video, you

14    demonstrated how to place a controller into the

15    docking bay of the Charge Base; correct?              04:25

16         A    Yes.

17         Q    Okay.  And does that refresh your

18    recollection as to whether the Charge Base that was

19    in the suite in Las Vegas in January 2007 actually

20    charged controllers or not?                           04:25

21              MR. HASAN:   Objection; asked and answered.

22              THE DEPONENT:   Like I said, I don't recall

23    if it was a fully-working charge controllers or if

24    the lights just lit up.  I wouldn't know.  That's --

25              If Amir has record of that, he could let    04:25
```

Page 239

Sarnoff, A VERITEXT COMPANY
877-955-3855

EXHIBIT K
Page 162

CONFIDENTIAL — ATTORNEYS' EYES ONLY

1    you know if it was a fully-working sample or not.

2            I honestly can't remember if it fully

3    charged controllers over a two- to four-hour period

4    and then fully recharged the batteries, or if we --

5    it was just an early prototype where the LEDs lit up        04:26

6    when you plugged it in.

7    BY MR. HANLE:

8        Q   Did -- did Nyko approve the taking of that

9    video?

10       A   Yes.                                               04:26

11       Q   And did -- Nyko approve the dissemination

12   of that video to the public?

13       A   Well, we don't --

14           MR. HASAN:  Objection.

15           THE DEPONENT:  We don't distribute that          04:26

16   video.  They post the video.

17           So we don't give an okay like, "You can run

18   it on this site for this many impressions during

19   this time period."

20           We just say, "You can take a video," and          04:26

21   they distribute it however they like.

22   BY MR. HANLE:

23       Q   Let's put it another way:

24           Did Nyko restrict the ability of the

25   company that took the video from -- from publicizing      04:26

                                            Page 240

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              Do you see that?

 2      A    Yes.

 3      Q    And the next sentence it says (as read):

 4                   "We can't help but wonder

 5           what cost there was in manufacturing          04:40

 6           or hidden costs in licensing that

 7           made this glorified wall outlet

 8           $10.00 more than the Wii station,

 9           which does the same thing, but gives

10           you two rechargeable and nickel             04:40

11           metal hydride rubberized battery

12           packs."

13           Do you see that sentence?

14      A    Yes.

15      Q    Do you recall whether Nyko considered        04:40

16  changing the price of the Charge Base after CES

17  2007?

18      A    I believe the price for that item

19  fluctuated several times.

20      Q    Do you recall whether it fluctuated between  04:41

21  January 2007, the press release --

22      A    Uh-huh.

23      Q    -- and the time that it was actually

24  shipped to customers in May or June of 2007?

25      A    I wasn't involved in pricing, but I believe  04:41
```

Page 253

Sarnoff, A VERITEXT COMPANY
877-955-3855

EXHIBIT K
Page 164

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       so, yes.

2               There are several Price Sheets that are

3       subject to change, and I think the price changes a

4       bit.

5               At this time we wouldn't have had a final          04:41

6       Bill of Materials.

7               So price was speculation.  So I assume it

8       definitely -- not definitely, because I'm

9       assuming -- but I'm guessing, yes, it did fluctuate.

10      Again, I --                                                04:41

11          Q   Can you assume definitely, I don't know?

12          A   Wait a second.  That doesn't make sense.

13          Q   So -- all right.

14              Do you remember specific comments that,

15      after CES 2007, that the -- that the suggested price       04:41

16      for Charge Base of 39.99 was too high?

17              MR. HASAN:  Objection as to form.

18              THE DEPONENT:  I remember there was some

19      talk internal, discussion, like, whether or not --

20      you know, is it viable at 39.00 -- or -- because I         04:42

21      think the original target was --

22              We have on that original Price Sheet 34.00.

23      So I remember we discussed it internally.  I don't

24      remember who -- I don't make the final pricing calls

25      of what we decided upon.                                   04:42

Page 254

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              for sale?")

 2              MR. HASAN:  Objection.  The document speaks

 3      for itself.

 4              THE DEPONENT:  Yeah, June 20, 2007.

 5      BY MR. HANLE:                                    05:33

 6         Q    So it was offered for sale on June 20,

 7      2007, and the sale occurred on June 20, 2007?

 8         A    Yes, essentially, that's -- assuming per

 9      that report information, that that's when the

10      product became available to offer for sale, based   05:33

11      upon it's off-tool, and we can ship and hit the

12      certain date.

13              Word from our factory, then we can,

14      essentially, let our sales reps know they can let

15      the accounts know, and anyone waiting and kind of   05:34

16      who had already expressed interests or preorder for

17      sale, can then say, "Yes, we can pull the trigger,

18      and you can order those products."

19              MR. HANLE:  Okay.  Let's take a break.

20              THE VIDEOGRAPHER:  This concludes Tape        05:34

21      No. 3.  We are going off the record at 5:33.

22              (Recess.)

23              THE VIDEOGRAPHER:  This is Tape No. 4.

24      We're back on the record at 5:43.

25              ///
```

Page 294

# EXHIBIT L

You'll Get a "Charge" Out of These PS3 Products! | Game|Life | Wired.com

**WIRED** GEAR SCIENCE ENTERTAINMENT BUSINESS SECURITY DESIGN VIDEO INSIDER MAGAZINE SUBSCRIBE 🔍



GAME|LIFE — hardware

FOLLOW GAME|LIFE

## You'll Get a "Charge" Out of These PS3 Products!

BY CHRIS KOHLER ☑ 01.09.07 3:24 PM

Follow @kobunheat



Tweet 0

+1 0

in



I am so, *so* sorry for that headline.

Anyway, everybody knows charging PlayStation 3 controllers is easier than charging Xbox 360 controllers — it just requires a standard USB cable — but this is probably the most elegant solution for charging four controllers at once, without having to plug them into your PS3. The Charge Base, which ships in Q1 for $40, serves the dual purpose of keeping your PS3 controllers up and off the floor while charging them.

One more item of interest after the jump.

### WIRED
*game|life*

**EDITOR**
Chris Kohler

**CONTRIBUTORS**
Ryan Rigney
John Mix Meyer
Daniel Feit

**WIRED MAG**
Chris Baker
Peter Rubin

Send us a tip

**GAME|LIFE VIDEO**

Exhibit 15
A. Navid
1-30-13
S. Clifford. CSR 10154

**NT000941**

EXHIBIT L
Page 167

You'll Get a "Charge" Out of These PS3 Products! | Game|Life | Wired.com



In case the Charge Base is a bit too large for your tastes — or in case you want something more universal — there's the Dual Charger AC. Apparently Nyko holds a patent on this technology (the conversion of AC power into two or more USB ports), so they're the only accessory maker who will release something like this. As you might imagine, this is more general-use than the PlayStation 3 branding might suggest. You'll be able to get one this month for $25.

## GAME|LIFE AUDIO PODCAST

Listen in to Game|Life's weekly audio podcast where Wired editors Chris Kohler, Chris Baker, Marty Cortinas and Peter Rubin analyze the latest news and introduce interesting new games.

## RECENT POSTS

- Versatile 'GlassBox' Engine Powers New *SimCity*
- How Videogames Are Changing Disney
- *Know-It-All* App Lets You Learn Without Thinking
- Apple's Favorite Strategy Game Is a Financial Disaster
- Celebrity Nintendo Ads Offend the Gamer Granfalloon

## YOU MIGHT LIKE



**Google Throws Open Doors to Its Top-Secret Data Center**

**8,000 Miles, 96 Hours, 3 Dead Pirates: Inside a Navy SEAL Rescue**

***Kick-Ass* Writer Mark Millar on Why Superhero Genre Was Due for Overhaul**

**Versatile 'GlassBox' Engine Powers New *SimCity***

**How Videogames Are Changing Disney**

*Chris Kohler is the founder and editor of Game|Life and the author of "Power-Up: How Japanese Videogames Gave the World an Extra Life."*

*Read more by Chris Kohler*

*Follow @kobunheat and @GameLife on Twitter.*

Post Comment | 2 Comments | Permalink

Tweet  0    +1  0

## ADVERTISEMENT

**Constant Contact ®**
Easy. Effective. Affordable. Can They Match That? Free 60 Day Trial! - ConstantContact.com/60_Day_Trial

**Pasadena Xbox Repair**
We Fix All Xbox Issues! Locations Nationwide, 90 Day Warr. - www.ubreakifix.com

**We Have IT Covered**
From Design to Deployment. Contact Us Today 1-800-800-0014 - PCConnection.com

**Games on Google Play**
Games, Apps, Movies, Books, Music Play Together. Discover Games Now. - play.google.com

Ads by Google

NT000942

EXHIBIT L
Page 168

You'll Get a "Charge" Out of These PS3 Products! | Game|Life | Wired.com



**Comments for this page are closed.**

**Showing 2 comments**                              Sort by popular now

**Just me**

Actually, this was already possible with just a self powered usb hub. Since you plug these into the wall, they don't need to be connected to your computer or playstation to charge ANY of your usb devices, including controllers.

5 years ago                                                                      Like

**Alc**

Heh, there's no way Nyko own a patent on splitting USB power lines.

5 years ago                                                                      Like

M Subscribe by email  S RSS

## SUBSCRIBE TO WIRED MAGAZINE

subscribe to
**WIRED**
PRINT AND DIGITAL ACCESS

- Subscribe to WIRED
- Renew
- Give a gift
- International Orders



CORRECTIONS | SITEMAP | FAQ | CONTACT US | WIRED STAFF | ADVERTISING | PRESS CENTER | SUBSCRIPTION SERVICES | NEWSLETTER | RSS FEEDS

**Condé Nast Web Sites:** Webmonkey | Reddit | ArsTechnica | Details | Golf Digest | GQ | New Yorker

Subscribe to a magazine:        Condé Nast web sites:        International Sites:

Wired.com © 2012 Condé Nast. All rights reserved. Use of this Site constitutes acceptance of our User Agreement (effective 3/21/12) and Privacy Policy (effective 3/21/12). Your California Privacy Rights.

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast.

Ad Choices

**NT000943**

EXHIBIT L
Page 169



EXHIBIT L
Page 170

# EXHIBIT M



EXHIBIT M
Page 171

# EXHIBIT N

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NYKO TECHNOLOGIES, INC., a          )
California Corporation,             )
                                    )
            Plaintiff,              )
                                    )
       v.                           )   NO. CV12-03001-GAF-VBK
                                    )
ENERGIZER HOLDINGS, INC. a          )
Missouri Corporation, EVEREADY      )
BATTERY COMPANY, INC., a            )
Delaware Corporation, and           )
PERFORMANCE DESIGNED PRODUCTS       )
LLC, a California Limited           )
Liability Company,                  )
                                    )
            Defendants.             )
_____)


(THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL.)


DEPOSITION OF AMIR NAVID

January 30, 2013


Shana K. Clifford, CSR No. 10154

353104



(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco      (949) 955-0400 Irvine        (858) 455-5444 San Diego
(916) 922-5777 Sacramento       (408) 885-0550 San Jose           (760) 322-2240 Palm Springs  (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills   (212) 808-8500 New York City      (347) 821-4611 Brooklyn      (518) 490-1910 Albany
(516) 277-9494 Garden City      (914) 510-9110 White Plains       (312) 379-5566 Chicago       (702) 366-0500 Las Vegas
          +33 1 70 72 65 26 Paris        +971 4 8137744 Dubai        +852 3693 1522 Hong Kong

11:41 1   just referring to whether or not this design is a

2   natural evolution to that final design (indicating).

3   And I don't believe that's the case.

4        Q    Okay.  Yeah, I'm more focusing on

11:42 5   whether -- whether -- where this -- the knowledge

6   behind these statements came from, whether it was --

7   whether it was -- do you recall reviewing PDP's

8   written submissions in connection with TRO, for

9   example?

11:42 10       A    At this moment I don't.  I may have.  I

11   may have reviewed them.  But I don't recall right

12   now.

13       Q    But you didn't get this information from

14   anyone at PDP; correct?

11:42 15       A    From PDP?  No, absolutely not.  I have no

16   contacts at PDP.

17       Q    Okay.  So then the next sentence in

18   paragraph 15 states, "Nyko introduced the Charge

19   Base product at the Consumer Electronics Show in

11:42 20   Las Vegas to great fanfare in January 2007."

21            Do you see that?

22       A    Mm-hmm.

23       Q    Okay.  What are you referring to there?

24       A    We're referring to the prototype being

11:43 25   shown at Consumer Electronics Show in Las Vegas in

111

AMIR NAVID

EXHIBIT N
Page 173

11:43  1    January 2007.

2          Q    Okay.  And the -- let's flip back to

3     Exhibit A as part of this declaration --

4          A    Mm-hmm.

11:43  5          Q    -- which is the first -- first exhibit.

6          A    Okay.

7          Q    And -- and so you see there a -- what is

8     Exhibit A?

9          A    Exhibit A appears to be a page capture

11:43  10    from IGN, I would guess, referring to "CES 2007:

11    Nyko Charge Base PS3."

12          Q    And you see the author there is Gerry

13    Block?

14          A    Yes.

11:43  15          Q    Do you know Gerry Block?

16          A    Personally?  I've spoken with him maybe

17    once.  This was previous to him being at PDP, when

18    he was still working for the press.  So --

19          Q    Okay.  You've had -- you've had drinks

11:44  20    with him; correct?

21          A    I've had --

22          MR. HASAN:  Objection.

23          THE DEPONENT:  Have I had drinks with him?

24    I've been at a social gathering with him where he

11:44  25    was present, but to have drinks with him, I mean,

112

AMIR NAVID                           EXHIBIT N

BARKLEY
Court Reporters

Page 174

11:46  1    new technologies, new advancements.  But was I

2    present in there?  Yes.  Obviously, I've made -- I

3    have visited that suite while it was being --

4         Q    And who else do you recall seeing in the

11:47  5    suite, other than employees of Nyko?

6              MR. HASAN:  Objection as to form.

7              THE DEPONENT:  To be honest right now, to

8    think back at what point -- I mean, typically it

9    would be press, you know.  The press would come in

11:47  10    there.  To identify any members that I specifically

11    saw, you know, four or five years ago, I don't

12    recall.

13         Q    BY MR. HANLE:  But you certainly remember

14    that there were members of the press that were

11:47  15    present in that hotel suite during the Consumer

16    Electronics Show?

17              MR. HASAN:  Objection as to form.

18              THE DEPONENT:  Specifically I don't.  I'm

19    not sure if they were press or they were any other

11:47  20    entities.  I'm not in the business of knowing these

21    other people.  So I couldn't tell -- I'm not going

22    in looking at their badges to see what their role

23    is, or even if those badges would tell what their

24    role is.  But whether or not -- what -- what job

11:47  25    duties they hold I certainly wouldn't know.

115

AMIR NAVID

EXHIBIT N

BARKLEY
Court Reporters

Page 175

11:47 1           Obviously, it's a private suite where

2    people are invited to -- only people who are invited

3    are allowed in there.  So I mean, that's -- that's

4    as much as I really know about it.

11:48 5        Q    BY MR. HANLE:  Okay.  But you -- but you

6    saw non-Nyko employees in the suite where the charge

7    base was being demonstrated; correct?

8        A    Yes, I saw other people in the suite that

9    aren't part of Nyko.

11:48 10       Q    Okay.

11       A    But I don't know what their roles are.

12       Q    Do you remember the identity of any of

13   those individuals?

14       A    I do not.  I'm sorry.

11:48 15       Q    Approximately how many non-Nyko employees

16   did you see in the suite, to the best of your

17   recollection?

18       A    You know, I don't spend much time in the

19   actual suites, like I mentioned before.  I couldn't

11:48 20   give you an accurate number, you know, or

21   specifically say, "Okay, there was five people in

22   the room while I was in there."  I don't recall.

23       Q    Do you have an estimate of how many -- how

24   many non-Nyko employees you saw?

11:48 25       A    I don't.  I don't.

116

BARKLEY
Court Reporters

12:01  1    to my exact specifications.

2             Q     Okay.  And so is that the -- is that the

3    charge base unit that was shown at the -- in the

4    hotel suite at Consumer Electronics Show 2007 in

12:01  5    January in Las Vegas?

6             A     It -- this is a very poor picture.  It

7    would be quite difficult for me to identify it as

8    exactly that prototype.

9             Q     Do you know who Chris Kohler is?

12:01  10            A     No, I do not.

11            Q     Okay.  How do you know that this -- how do

12    you know that this -- strike that.

13                  Where did you get this picture that's

14    shown in Exhibit A?

12:02  15            A     I did not personally get this picture.

16            Q     Who got it, to the best of your

17    recollection?

18            A     I believe our legal team.

19            Q     You used the term "SLA" previously.  What

12:02  20    is that?

21            A     It's stereolithographic assembly.  It's

22    basically a one-off sample made to essentially test

23    a concept to put together -- it's basically a

24    one-off, so it's only one made typically.  It's --

12:03  25    or individually made.  It's not -- it's not coming

126

AMIR NAVID

EXHIBIT 1
Page 177

BARKLEY
Court Reporters

12:03 1    out of a mold and is basically almost -- typically

2    used as a proof of concept.

3         Q    In this case was the prototype -- could

4    you actually power it up?  Could you actually plug

12:03 5    it in?

6         A    I don't -- honestly, I would imagine that

7    it did, but I can't guarantee for sure that it did

8    power up.  SLAs have a tendency -- even if they

9    initially work, they may not work later.  They break

12:03 10    down very easily because everything is handmade.

11    There's usually loose cables and -- so I don't know

12    if it powered up at the actual show.  So I'm not

13    certain.  I can't vouch for the fact whether or not

14    it powered on or not at that point.

12:04 15         Yeah, I mean, typically you make that

16    because it takes such a long time for you to

17    actually tool and bring the product to market.  So

18    this is like a proof of concept.  You get a one-off

19    made in order to test how everything fits together

12:04 20    and how it will work.

21         Q    Okay.  So why don't we go back to

22    Exhibit 1 now, which is the patent.

23         A    Yes, sir.

24         Q    Okay.  On the cover page of the patent,

12:04 25    there is a figure.

127

AMIR NAVID                          EXHIBIT 1
Page 178

12:26 1      A    It's part of the entire product.

2      Q    Okay.  In use, was it your intention that

3  the adapters, as shown in figure 17 and other

4  figures, would remain attached to the controller or

12:27 5  remain attached to the base when the controller was

6  not attached to the base?

7            MR. HASAN:  Objection as to form.

8            THE DEPONENT:  That's really up to the end

9  user.  So you can do it either way.  You can leave

12:27 10  them on the base if you don't want to have that

11  adapter on your actual controller, because it is a

12  piece that's on the controller.  So some people

13  might want to keep it in their base.  It really

14  depends.  You're not forced to have it there.  It

12:27 15  can be on there.

16      Q    BY MR. HANLE:  Okay.  When did you -- when

17  did you come up with the idea for the charge base 2

18  embodiment?

19            MR. HASAN:  Objection as to form.

12:28 20            THE DEPONENT:  The specific design for

21  that one -- I mean, they're related.  So it's not,

22  per se, one design is completely a different

23  concept.  It's the same core invention.  So I would

24  say this is no different -- I would say the same

12:28 25  time.  You know, this is just a further convenience

144

BARKLEY
Court Reporters

12:28 1    of being able to have these adapters or pieces of

2    this charging base on the device or not on the

3    device.

4         Q    BY MR. HANLE:   When did you conceive of

12:28 5    the idea to have an adapter interposed between the

6    controller and the base?

7              MR. HASAN:   Objection as to form.

8              THE DEPONENT:   Again, I think this is the

9    same product -- same -- same concept of having a

12:28 10   controller that attaches directly to -- to a DC

11   port, which -- so I would say June of 2006, when I

12   was conceiving the original model.

13        Q    BY MR. HANLE:   So you conceived of an

14   adapter in June 2006?

12:29 15       A    Not an adapter.   What I'm talking about is

16   the underlying invention, which --

17        Q    And I'm not talking about that.   My

18   question was the adapter.   I want to know when you

19   conceived of the adapter interposed between the

12:29 20   controller and the base.

21             MR. HASAN:   Objection:   Asked and

22   answered.

23             THE DEPONENT:   Yeah.   I believe I've

24   answered that.   It's -- I don't see --

12:29 25       Q    BY MR. HANLE:   You haven't.

145

AMIR NAVID

BARKLEY
Court Reporters

05:23   1              MR. HASAN:  Ask the question.  Go ahead.

2              MR. HANLE:  Okay.

3          Q     So -- so did you disclose to the patent

4     office, in connection with your patent application,

05:23   5     which is Exhibit 21, that the charge base was

6     publicly shown at the Consumer Electronics Show in

7     January of 2007?

8              MR. HASAN:  Objection as to form.

9              THE DEPONENT:  I did not, but we did not

05:24  10     publicly show it, and it wasn't -- as far as when it

11     was offered for sale -- you know, when we're showing

12     an SLA, that's not a complete, finished, shippable

13     product.  I'm sure you realize that.  So my

14     understanding was that we filed our -- I'm sorry.

05:24  15     It's called a -- my brain is not working right now.

16     Not provincial, but the initial patent is called

17     a --

18              What's the initial patent called?  Not the

19     full application, but the partial?

05:24  20              MR. HASAN:  You can look at your exhibits

21     if you want.  I'm not -- I can't answer.  If it

22     refreshes -- you can ask Mr. Hanle to clarify.

23              THE DEPONENT:  The word is eluding me

24     because I'm quite tired.  But obviously, the partial

05:25  25     application that we filed was before that.  It

301

BARKLEY
Court Reporters

05:25  1    starts with a P.  My brain is --

2         Q    BY MR. HANLE:  Are you talking about the

3    provisional application --

4         A    Provisional.

05:25  5         Q    -- on the charge base 2 embodiment?  Is

6    that what you're referring to?

7              MR. HASAN:  Objection -- objection as to

8    form.

9              THE DEPONENT:  I'm sorry, can you repeat

05:25  10   that?

11        Q    BY MR. HANLE:  Are you -- you referred in

12   your last answer to the provisional application.

13        A    Yes.

14        Q    I want to see if you're talking about the

05:25  15   provisional application on the charge base 2

16   embodiment.

17             MR. HASAN:  Objection as to form.

18             THE DEPONENT:  So charge base 2 --

19        Q    BY MR. HANLE:  The one --

05:25  20             (Admonition by the deposition officer to

21             speak one at a time.)

22             THE DEPONENT:  So actually, we filed a

23   patent application.  It wasn't necessarily limited

24   to charge base 2.  So when -- I think you're trying

05:25  25   to maybe trick me or -- I'm not sure what it is, but

302

AMIR NAVID

EXHIBIT 1
Page 182

BARKLEY
Court Reporters

05:25   1   to come in there and say that it was just for charge

2   base 2, I think it's very clear that this is a

3   utility patent and applies to all versions of the

4   charge base line.

05:26   5        Q    BY MR. HANLE:  Well, I disagree, but

6   we'll --

7        A    That's your job.

8        Q    Having said that, we can -- we can ask

9   questions.

05:26  10        So -- so what is the -- okay.  So let me

11   go back to part of your -- part of your answer --

12   previous answer was that you don't believe that the

13   charge base that was shown in the hotel suite and

14   plastered all over the press --

05:26  15        A    Mm-hmm.

16        Q    -- was publicly shown; is that right?

17        MR. HASAN:  Objection as to form.

18        THE DEPONENT:  Publicly shown.  Sure, it

19   was shown to press, and it was shown to invited

05:26  20   people that came there.  But to offer for sale, you

21   know, I think that's up to interpretation.  What do

22   you mean, "offer for sale"?  "Offer for sale" is --

23        Q    BY MR. HANLE:  I'm sorry.  I didn't use

24   "offer for sale" in my question, so I wasn't talking

05:26  25   about offer for sale.  I'm not going to talk about

303

AMIR NAVID

EXHIBIT 1

**BARKLEY**
Court Reporters

Page 183

# EXHIBIT O

1   **ART HASAN, CA Bar No. 167323**
    art.hasan@cph.com
2   **G. WARREN BLEEKER, CA Bar No. 210834**
    warren.bleeker@cph.com
3   **KATHERINE L. QUIGLEY, CA Bar No. 258212**
    katherine.quigley@cph.com
4   **CHRISTIE, PARKER & HALE, LLP**
    **655 North Central Avenue, Suite 2300**
5   **Glendale, California 91203-1445**
    **Telephone: (626) 795-9900**
6   **Facsimile:   (626) 577-8800**

7   Attorneys for Plaintiff and Counterdefendant,
    NYKO Technologies, Inc.
8

9                 UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11

12   NYKO TECHNOLOGIES, INC., a        Case No. CV12-03001 GAF (VBKx)
     California corporation,
13                                     **NYKO TECHNOLOGIES, INC.'S**
                Plaintiff,             **RESPONSES TO EVEREADY**
14                                     **BATTERY CO., INC.'S FIRST**
           vs.                         **SET OF INTERROGATORIES**
15
     ENERGIZER HOLDINGS, INC., a
16   Missouri corporation, EVEREADY
     BATTERY COMPANY, INC., a
17   Delaware corporation, and
     PERFORMANCE DESIGNED
18   PRODUCTS LLC, a California limited
     liability company,                **Hon. Gary Allen Feess**
19
                Defendants.
20

21   AND RELATED COUNTERCLAIM.

22

23        NYKO TECHNOLOGIES, INC. ("NYKO") responds as follows to the

24   First Set of Interrogatories propounded to it by EVEREADY BATTERY CO.,

25   INC. ("EBC"):

26

27

28

CHRISTIE, PARKER & HALE, LLP

EXHIBIT O
Page 184

## **GENERAL OBJECTIONS**

1. NYKO objects to EBC's definitions, instructions and interrogatories to the extent that they are inconsistent with or purport to impose a duty of disclosure that is greater than or different from that required under the applicable Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Central District of California.

2. NYKO objects to EBC's definitions, instructions and interrogatories to the extent that they purport to require the disclosure of information that is protected by attorney-client privilege, work-product doctrine or other applicable privilege or protection from disclosure.

3. NYKO objects to EBC's definitions, instructions and interrogatories to the extent that they purport to require the disclosure of information that is not relevant to the claim or defense of any party, and to the extent they are not reasonably calculated to lead to the discovery of admissible evidence.

4. NYKO objects specifically to the definitions of "NYKO" as overly broad, harassing and oppressive, and as seeking to invade attorney-client privilege and attorney work product.  NYKO responds to each of the interrogatories for itself alone.

5. NYKO objects to EBC's definitions, instructions and interrogatories to the extent that they purport to require the disclosure of information that constitutes or contains trade secrets or other confidential research, development or commercial information.

6. NYKO objects to EBC's definitions, instructions and interrogatories to the extent that they purport to require the disclosure of information that does not exist or is not in NYKO's possession, custody or control.

7. NYKO objects to EBC's definitions, instructions and interrogatories to the extent that they purport to require the disclosure of information that has been lost, destroyed, deleted or otherwise transferred outside of NYKO's possession,

-2-

custody or control.

8. NYKO objects to EBC's definitions, instructions and interrogatories to the extent that they impose on NYKO an unreasonable burden or expense.

9. NYKO objects to that the interrogatories, including all non-discrete subparts, exceed the 25 written interrogatory limit in violation of Rule 33(a)(1) and are therefore invalid on their face and require no response.

10. NYKO reserves the right to assert and seek a Court order that one or more interrogatories need not be answered until designated discovery is complete, or until a pretrial conference or some other time.

Subject to and without waiving the foregoing objections, each of which is specifically incorporated into each individual response below, NYKO responds to EBC's First Set of Interrogatories as follows:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**:

State whether You contend that EBC had knowledge of the Patent-in-Suit or the applications therefore before you filed your Complaint in this Action, and if so, all bases, including when you contend EBC became aware of the Patent-in-Suit, all actions taken by You to notify EBC of the Patent-in-Suit or application therefore, identifying Persons with knowledge of your contention, and identifying all Documents and Things supporting your contention.

**RESPONSE TO INTERROGATORY NO. 1**:

NYKO incorporates its General Objections.

NYKO objects that this interrogatory is compound and should constitute at least three separate interrogatories.  NYKO objects that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  NYKO objects that the term "application therefore" is not defined and is vague and ambiguous.

Subject to, and without waiving any objection, NYKO responds as follows:

CHRISTIE, PARKER & HALE, LLP

EXHIBIT O
Page 186

about the truth to the allegations of paragraphs 250 and 271, pursuant to Rule 8(b)(5) of the Federal Rules of Civil Procedure.

NYKO reserves its right to supplement its response.

**INTERROGATORY NO. 8**:

Identify the date(s) that NYKO first anticipated litigation against each of PDP, Energizer Holdings, Inc., and EBC, and state all factual and legal bases for Your contention.

**RESPONSE TO INTERROGATORY NO. 8**:

NYKO incorporates its General Objections.

NYKO objects that this interrogatory is compound and should constitute at least three separate interrogatories.  NYKO objects that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  NYKO objects that that request impermissibly seeks the legal bases for NYKO's position.  NYKO objects that the phrase "first anticipated litigation" is vague and ambiguous.   NYKO objects that the request seeks disclosure of attorney work product and/or attorney client communications.

NYKO reserves its right to supplement its response.

**INTERROGATORY NO. 9**:

Describe in detail all factual and legal bases supporting your contention that NYKO did not sell or offer to sell any of its Charge Base products prior to March 7, 2007, including identifying the NYKO employee (whether current or former) most knowledgeable regarding the foregoing, and identifying all Documents and Things supporting or refuting the foregoing. This includes, but is not limited to addressing NYKO Sales Order Numbers 97145-97148, 97595, 97596, 98010, 98081, 98103, 98107, 98190-8193, 98233, 99007, 99014, 99117, 99161, 99499, NYKO Invoice Numbers 103430, 101146-101149, 101622, 101623, 102052-102055, 102057, 102086, 102087, 102102, 102535-102538, 102575-102580, 103172-103175, 103180, 103188, 103190, 103221, 103222,

-9-

103225, 103529, 103611, 113979, 113980, 113982, and Amazon Purchase Order Numbers L3470035, R9850313, R8351981, and N2198145, as well as communications regarding the foregoing and shipments of NYKO's Charge Base products regarding the foregoing.

**RESPONSE TO INTERROGATORY NO. 9**:

NYKO incorporates its General Objections.

NYKO objects that this interrogatory is compound and should constitute at least sixty-five separate interrogatories. NYKO objects that the request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. NYKO objects that that request impermissibly seeks the legal bases for NYKO's position.

Subject to, and without waiving any objection, NYKO responds as follows:

Subject to further investigation and analysis, NYKO contends that there was no firm sale or offer for sale of the accused product prior to June 2007, when the pricing for the Charge Base product was fixed, the requests for the products were invoiced, and the products were actually shipped to vendors.

The price for the Charge Base product was not fixed and was subject to change through May 2007. A mock up of the Charge Base product was received in or about the last week of December 2006. The mock up was being tested through January 2007 and into May of 2007. There is no clear and convincing evidence that the mock up itself was a working prototype that worked for its intended purpose. A further prototype was received by NYKO in or about January 18, 2007, which was subject to further testing. Additional changes were made to the product between January 18, 2007 and May 2007, when final consumer products were received. The final products were not shipped until June 2007.

It is common in the industry for products to be announced. There is no fixed price for the products. Depending on the cost to manufacture the product,

CHRISTIE, PARKER & HALE, LLP

EXHIBIT O
Page 188

1   which can only be ascertained after the final design is completed and the
2   materials and parts are confirmed and sourced, the final price is set.  In cases
3   where the demand for the announced product is weak, or the cost to manufacture
4   the product is too high to support a reasonable manufacturer's suggested retail
5   price, the product is never released.

6          Here, the Charge Base was a new product that was announced and an SLA
7   mock-up was displayed at the 2007 Consumer Electronics Show in Las Vegas.
8   The design was not finalized, the demand was not ascertained and the cost of the
9   product was not fixed.  The price of the product was not fixed and was subject to
10  change per the dealer price sheets.  As such, any requests made by vendors for the
11  product were in the category of pre-orders that would only be fulfilled in the
12  event NYKO deemed that the design could be finalized and the product could be
13  manufactured in a cost effective manner.   This is supported by the fact that
14  NYKO shipped no product for any of the initial requests prior to June 2007, and
15  re-invoiced the requests under new invoices for payment and shipment in June
16  2007, only after NYKO had finalized the product in terms of pricing and
17  commercial design.

18         Based on the foregoing, NYKO's announcement of the products and
19  acceptance of requests for products, which requests were conditioned upon the
20  product actually being finalized and manufactured in a cost effective manner and
21  released at a firm price point do not constitute a "sale" or "offer for sale" of the
22  patented product prior to June 2007.

23         Further, there was no offer for sale by NYKO prior to the critical date.  For
24  example, the foregoing documents do not represent offers for sale because NYKO
25  did not manifest any willingness to enter into a bargain so made as to justify
26  another person in understanding that assent to that bargain is invited and would
27  conclude it. *See Linear Technology Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050
28  (Fed. Cir. 2001).

-11-

EXHIBIT O
Page 189

1  As discovery is not yet complete, NYKO reserves its right to supplement

2  its response.  Further, NYKO's analysis of the documents is continuing and

3  NYKO has not yet determined all the documents which may relate to this

4  request.  Once that analysis is completed, NYKO will supplement its response.

5  The NYKO employees most knowledgeable regarding the foregoing is

6  Christopher Arbogast and C.C. Swiney.

7  Responsive documents include:  NT001074-79,  NT001098-1107,

8  NT001116-1124,  NT002053-2056,  NT002098-2102,  NT002698-2703,

9  NT002742-2743, NT077835-846, NT077855-901, NT077938-939, NT077973-4,

10  NT077983-89, and NT078005-8223.

11  **INTERROGATORY NO. 10**:

12  Describe in detail all factual and legal bases supporting your contention

13  that NYKO's Charge Base was not in public use prior to March 7, 2007, including

14  identifying the NYKO employee (whether current or former) most knowledgeable

15  regarding the foregoing, and identifying all Documents and Things supporting or

16  refuting the foregoing.  This includes, but is not limited to addressing why

17  NYKO's showing and demonstration of its Charge Base prototype at its hotel

18  suite during the 2007 Consumer Electronics Show did not constitute a public use.

19  **RESPONSE TO INTERROGATORY NO. 10**:

20  NYKO incorporates its General Objections.

21  NYKO objects that this interrogatory is compound and should constitute at

22  least four separate interrogatories.  NYKO objects that the request is overbroad,

23  unduly burdensome and not reasonably calculated to lead to the discovery of

24  admissible evidence.  NYKO objects that that request impermissibly seeks the

25  legal bases for NYKO's position. NYKO objects that the interrogatory is

26  duplicative.

27  Subject to, and without waiving any objection, NYKO responds as follows:

28  See NYKO's response to PDP Interrogatory Nos. 3 and 6.

-12-

EXHIBIT O
Page 190

1   Further, in order for there to be a "public use" under 35 U.S.C. Section

2   102(b), the product must have been operable for its intended purpose.  Here, an

3   SLA mock-up of the Charge Base product was displayed and shown at the 2007

4   Consumer Electronics Show in Las Vegas.  However, there is no clear and

5   convincing evidence that the product actually operated to charge wireless

6   controllers.  The mock-up had LED indicator lights, but absent testing, it was

7   unclear whether the mock up could actually charge wireless controllers.  Further,

8   a prototype was built and sent to NYKO on or about January 2007, after the show

9   had ended.

10   Under § 102(b), a "public use" means any use of the claimed invention by a

11   person other than the inventor who is under no limitations, restrictions or

12   obligation of secrecy to the inventor.  Because there is no clear and convincing

13   evidence the prototype actually charged a wireless controller, the disclosures did

14   not amount to "public use" because these disclosures only visually displayed the

15   charger design without putting it into use, *i.e.*, without disclosure of the

16   prototype's ability to actually charge wireless controllers. *See Motionless*

17   *Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376 (Fed. Cir. 2007); *See also*

18   *Browning Mfg. Co. v. Bros, Inc.,* 134 U.S.P.Q. 231 (D. Minn. 1962), *affd,* 317

19   F.2d 413 (8th Cir. 1963) (where a roller compactor for use in the building of

20   roads was displayed publicly but not actually operated the machine was not in

21   public use.)

22   Here, there is no clear and convincing evidence that the SLA mock-up

23   shown and displayed at the 2007 CES show actually worked for its intended

24   purpose.  Although the mock-up was called Charge Base and included each and

25   every feature of the claimed invention, there is no clear and convincing evidence

26   that the prototype was functional to charge wireless controllers, and therefore the

27   invention was not in public use under 35 U.S.C. Section 102(b).

28   Further, regardless of the use, the access to the NYKO suite was not

-13-

1  "public" in the sense that access to the suite was restricted to invited guests with

2  appointments.

3  NYKO reserves the right to supplement its response.

4  **INTERROGATORY NO. 11**:

5  Identify all "others" who "copied the concepts embodied in NYKO's

6  product and introduced products of their own to compete with NYKO" as alleged

7  in paragraph 9 of Your Amended Complaint [Docket No. 85], and identify and

8  describe in detail all communications with those "others" regarding the '848

9  Patent.

10  **RESPONSE TO INTERROGATORY NO. 11**:

11  NYKO incorporates its General Objections.

12  NYKO objects that this interrogatory is compound and should constitute at

13  least two separate interrogatories.  NYKO objects that the request is overbroad,

14  unduly burdensome and not reasonably calculated to lead to the discovery of

15  admissible evidence.

16  Subject to, and without waiving any objection, NYKO responds as follows:

17  Without limitation, PDP, Energizer, BD&A doing business as Power A and

18  Sony have copied or implemented the concepts embodied in NYKO's product

19  during at least one point in the past.  NYKO has contacted at least BD&A and

20  Sony with respect to the same.

21  NYKO reserves the right to supplement its response.

22

23  **INTERROGATORY NO. 12**:

24  Describe in detail all factual and legal bases for Your allegation that

25  "Energizer's infringement, EBC's infringement and PDP's infringement of the

26  '848 Patent are willful and NYKO is entitled to enhanced damages against

27  Energizer, EBC and PDP, and each of them" in paragraph 20 of Your Amended

28  Complaint [Docket No. 85], including identifying the current NYKO employee

-14-

# EXHIBIT P

EXHIBIT
44
BIOUK

CONFIDENTIAL – ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING

PDP0003271



CONFIDENTIAL – ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING



CONFIDENTIAL – ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING

PDP0003270



CONFIDENTIAL – ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING

EXHIBIT 5

PDP0003272

# EXHIBIT Q

# EXHIBIT
# FILED
# UNDER SEAL