**LINK: 126**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Stephen Montes Kerr | Pam Batalo | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Katherine L. Quigley | Steven M. Hanle |
| Syed A. Hasan | |

**Proceedings:**

### ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff NYKO Technologies, Inc. ("NYKO" or "Plaintiff") holds the patent on a video game controller charging system that contains multiple docking bays allowing for several game controllers to be charged at the same time. The charging system is described in United States Patent No. 8,143,848 (the "'848 Patent" or the "Patent"), entitled "Video Game Controller Charging System Having a Docking Structure." (Docket No. 135-3 [Ex. B ("'848 Patent")].) In the present lawsuit, NYKO contends that Energizer Holdings, Inc. ("Energizer"), Eveready Battery Co., Inc. ("Eveready"), and Performance Designed Products, LLC ("PDP") (collectively "Defendants"), have infringed the '848 Patent through the sale of a competing video game controller charging system having a docking structure. (Docket No. 85 [First Am. Compl. ("FAC")] ¶ 10.) Defendants now move for summary judgment on the ground that the '848 Patent is invalid. (Docket No. 133-1 [Mot. for Summ. Judgment ("Mem.")].)

In this motion, Defendants argue that the '848 Patent is invalid because "the device claimed . . . was in public use and on sale more than a year before the patent's filing date" in violation of 35 U.S.C. § 102(b).[1] (Mem. at 1.) They contend that the device was demonstrated to the public at the January 2007 Consumer Electronics Show in Las Vegas and that orders for

---

[1] Congress recently changed the language and structure of 35 U.S.C. § 102. See Leahy-Smith America Invents Act, Pub. L. No. 112-29. Because this case was filed before the effective date of the change, the Court refers to the old version of § 102(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | | Date | October 22, 2013 |
|---|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | | |

the sale of the charger were taken at that time. Because the application for the '848 Patent was not filed until March 7, 2008, Defendants argue that this public use and sale of the device undeniably invalidates the Patent. ('848 Patent at 1.)

Plaintiff contends that, even if the conduct in January 2007 constitutes a public use or sale, the one year ban does not invalidate the '848 Patent because the invention is allegedly described in a provisional patent application filed on October 24, 2007 -- Application No. 60/982,364 (the "'364 Provisional" or the "Provisional"). Plaintiff therefore contends that the '848 Patent is not invalid because it is entitled to the Provisional's earlier priority date. (See Docket No. 135, [Opp. to Mot. for Summ. Judgment. ("Opp.")] at 8–21; Docket No. 135-3 [Ex. A ("'364 Provisional")].)

The undisputed facts, and those that are without substantial controversy, establish that: (1) the invention described in the '848 Patent was in public use and offered for sale in January 2007; and (2) the invention was not described in the the '364 Provisional and therefore not entitled to the earlier priority date.[2] For these reasons, which are discussed in detail below, the '848 Patent is invalid and the motion for summary judgment is **GRANTED**.

## II. BACKGROUND

### A. PROCEDURAL HISTORY

Plaintiff initiated this action on April 5, 2012, asserting one patent infringement claim based on Defendants Energizer's and PDP's alleged sale of competing "video game controller charging systems having a docking structure." (Docket No. 1, [Compl.] ¶ 8.) On December 14, 2012, Plaintiff filed a First Amended Complaint pursuant to a stipulation between the Parties. (FAC.) The FAC asserts one patent infringement claim, expands on the factual allegations, and adds Defendant Eveready. (Id.) Defendants answered on December 28, 2012, also asserting a counterclaim seeking declaratory judgment as to noninfringement, invalidity, and unenforceability. (Docket No. 88 [Answer]; Docket No. 93 [Counterclaim].) Plaintiff answered the Counterclaim on January 16, 2013. (Docket No. 96 [Counterclaim Answer].)

---

[2] Throughout this Order, the Court refers exclusively to the claims at issue; several claims of the '848 Patent are not the subject of this litigation, and this Order does not purport to determine the validity of those claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

Before the Court now is Defendants' motion for summary judgment. In this motion, Defendants primarily argue that 35 U.S.C. § 102(b) invalidates the contested elements of the '848 Patent because the described device was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." (Mem. at 1) (quoting 35 U.S.C. § 102(b).) Plaintiff responds that the device was not in public use or on sale prior to the March 7, 2007, critical date. (Opp. at 23–25.) And even if it were, Plaintiff charges that the filing of the '364 Provisional on October 24, 2007, means that the actual critical date should be October 24, 2006, at which time no public use or sale had taken place. (Id. at 1–3.)

## B. OVERVIEW OF THE '848 PATENT

The '848 Patent describes a device (the "Charger" or "Charging System") for charging video game controllers. ('848 Patent at 1:16–19, 1:66–2:1.)[3] Plaintiff's '848 Patent is a charging station capable of charging multiple video game controllers simultaneously. (Id. at 1:66–2:1, 15:30–31, 16:28–29.)

Though there are multiple variations of the Charging System, the relevant embodiments of the '848 Patent are described in the 15 claims at issue.[4] The Charging System consists of a number of components. There is a base, on top of which sits at least one support structure, which comprises a plurality of docking bays configured to receive controllers and which physically supports the controllers. (Id. at 15:34–38; 16:31, 35–40.) The Charging System also includes an AC-to-DC converter, which may be either internal or external to the base. (Id. at 16:13–20; 16:50–56.) This converter, whether internal or external to the base, converts the externally supplied AC power into DC power, which is then ultimately provided to the power input port of the video game controllers. (Id. at 16:13–16; 16:57–59.) DC ports on the base -- which may be mini-USB connectors[5] -- are configured to couple to and provide DC power to the input ports of the controllers. (Id. at 15:33–35, 39–42; 16:32–34.) The video game controller

---

[3] While the specification notes that the '848 Patent is not limited to charging video game controllers, i.e. it is capable of charging other handheld electronics devices, ('848 Patent at 15:12–20), any other potential uses are not at issue here.

[4] The claims at issue are Independent Claims 1 and 13, and Dependent Claims 2–5, 7, 8, 10–12, and 14–17. While the claims at issue specify further elements of the '848 Patent, the Court will discuss only those details necessary to the determination of this motion.

[5] A mini-USB connector is a type of DC port.

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

rests directly on the base or support structure. The '848 Patent provides a useful functional diagram of the system:



(Id., Figure 15.) The '848 Patent also provides a helpful visual rendering that illustrates the relationship between the DC ports and the rest of the device:



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

(Id., Figure 11.) Item No. 408 in Figure 11 is a mini-USB DC port incorporated into the base, and the video game controllers are placed directly onto each of those ports, as shown in Figure 14:

*FIG.14*



(Id., Figure 14.) That is, a video game controller (Item No. 420 in Figure 14) fits between each of the partitions (Item No. 406 in Figure 11) and onto each of the DC ports (Item No. 408 in Figure 11), which in this case are mini-USB connectors.

## C. OVERVIEW OF THE '364 PROVISIONAL

The '364 Provisional also describes a charging system (the "Provisional System"). ('364 Provisional at 1:6–8.)[6] Plaintiff's Provisional System is a charging station capable of charging one or more hand-held controllers for a video game console. (Id. at 2:8–9.)

Though the '364 Provisional describes multiple embodiments of the Provisional System, the claims indicate one relevant manifestation. Like the Charging System, the Provisional

---

[6] As with the '848 Patent, the '364 Provisional is not limited to charging video game controllers, i.e. is capable of charging other handheld electronics devices ('364 Provisional at 3:15–17). However, any other potential uses are not at issue here.

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

System consists of a number of inter-working parts. There is a base, which has recesses with electrical contacts dimensioned to receive external adapters.[7, 8] (Id. at 10:5–7, 10–11.) The base also has a power input for connection to a power supply. (Id. at 10:5–6.) The Provisional System includes an AC-to-DC converter, which is coupled between the power input and electrical contacts in the recesses. (Id. at 10:5, 11:3–6.) The electrical contacts in the recesses contact electrical leads on the external adapters. (Id. at 10:10–11.) The external adapters fit into the recesses on the base, and include a "connector configured to couple to the power input port" of the video game controllers. (Id. at 10:8–9.) The connector may be a male mini-USB connector. (Id. at 10:26–27.) The video game controller rests on the external adapters, which in turn fit into the recesses and rest on the base. Like the '848 Patent, the '364 Provisional provides a useful functional diagram of the system:

**FIG. 7**



(Id., Figure 7.) This diagram clearly shows an adapter that links the base to the device being charged as a critical element. (Id.) The '364 Provisional also provides a helpful visual rendering that illustrates the relationship between the external adapters and the rest of the device:

---

[7] Though the '364 Provisional only describes these recesses and adapters in the singular, it is clear from the attached figures and prior descriptions that it was intended to cover a plurality of both recesses and adapters.

[8] The Court notes that these adapters are simply structural adapters, not electrical converters.

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |



FIG.2

(Id., Figure 2.)  Item No. 16 in Figure 2 is the external adapter.  Item No. 42 is a mini-USB DC port attached to that adapter and Item No. 30 is the recess into which the adapter fits.  The video game controllers would be connected to the external adapters, which would then fit into the recesses on the base, as shown in Figure 5:



FIG.5

(Id., Figure 5.)  That is, a video game controller (Item No. 26 in Figure 5) fits onto an external adapter (Item No. 16 in Figure 2) by connecting to the adapter's DC ports (Item No. 42 in Figure 2), and the adapter then connects to the base by fitting into its recesses (Item No. 30 in Figure 2).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

## D. PUBLIC USE OF THE CHARGER

### 1. THE PUBLIC NATURE OF THE DISCLOSURE

On January 8, 2007, Plaintiff demonstrated a model of what became the '848 Charging System (the "Model") at the Consumer Electronics Show 2007 ("CES") in Nevada. (Docket No. 136, [Statement of Disputed Facts ("SDF")] ¶ 2.)[9] The Model was displayed in a suite rented by NYKO for the occasion. (Id. ¶ 131.) While on display, members of the press were invited to photograph and videotape their interactions with it, and they were under no obligation of confidentiality. (Id. ¶ 3.) These disclosures led to widespread discussion and online dissemination of pictures of the Model in the following weeks and throughout January. (Id. ¶ 5.) Thus, while the suite may not have been open to anyone who wished to walk in, no one who entered was barred from reporting their observations, and the conduct of NYKO unambiguously indicates that it sought widespread publicity for its device. Indeed, as discussed below, these disclosures resulted in NYKO receiving a number of orders for the Charger from resalers like Amazon.

### 2. THE MODEL WAS FUNCTIONING

Because only a Model which had been reduced to practice would trigger the public use bar, NYKO seeks refuge in its recent contention that the Model shown at CES was not a functioning version of the Charger. (Id. ¶¶ 129, 130, 135.)[10] But the record will not support such a contention. Plaintiff has admitted that the Model "included all the elements" of the claims at issue, and therefore it must have been functional. (Id. ¶ 4.) In addition, Defendants presented evidence that Plaintiff ordered thousands of parts for making Charging Systems as early as December 2006. (Docket No. 133-26, [Hip Hing Order] at 1.) Those orders followed an email conversation with NYKO's supplier in which the Charger's inventor, Amir Navid,

---

[9] For the sake of narrative coherence, the Court cites to the Statement of Disputed Facts when providing background information. The Court does not necessarily adopt these facts, and it addresses the different stories told by Plaintiff and Defendants, when necessary, below.

[10] One would have thought that NYKO could readily establish that the Model was merely a non-functioning replica simulating the Charger's appearance. However all of the evidence suggests the contrary. Accordingly, NYKO has offered the convoluted argument that the Model must not have been working because all four lights on the Model's LED display lit up during the demonstration, whereas if it had been functioning only two would have been illuminated. (Id. ¶¶ 129, 130.) NYKO therefore asks the Court to ignore contrary evidence and draw the inference that it must have been only a mockup of the anticipated Charger.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

sought "a working [model]" for use "as our main sales demonstration sample." (Docket No. 133-28 [Hip Hing Description] at 1.) Bizarrely, Plaintiff's own exhibits in opposition to the motion provide further clear evidence that the Model was operational. Plaintiff attaches a transcript of the Navid's deposition in support of its Opposition. In describing the Model's manufacturing, Navid stated that such constructions might "initially work, [then] they may not work later." (Docket No. 135-4, [Navid Dep.] at 127:8–9.) He then goes on to add that the very reason for making the Model would have been "to test how everything fits together *and how it will work*." (Id. at 127:19–20) (emphasis added.)

The Parties likewise dispute whether Plaintiff's CES suite was public for the purposes of § 102(b) "public use" analysis. (SDF ¶ 131.) Defendants claim that because the suite was open to members of the press and retailers of video game accessories, who were under no obligation of confidentiality, it was public. (Id. ¶ 2.) Plaintiff responds that, while retailers and members of the press had access to the suite, the suite was nevertheless not public because that access was restricted to invited guests with appointments. (Id. ¶ 131.)

**E.  CLAIMED SALE OF THE CHARGER**

Defendants also argue that, in addition to making public use of the Charger, Plaintiff began offering the Charger for sale on January 8, 2007, two months before the March 7, 2007, critical date. (Id. ¶ 6.) It released a price, part number, product name, and product description to customers on January 8, 2007, and customers almost immediately began placing orders for the Charger. (Id. ¶ 7.) Plaintiff accepted those orders as early as January 9, 2007, and further orders were received over the following months prior to the March 7, 2007, critical date. (Id. ¶¶ 8, 9.) Plaintiff eventually fulfilled the orders beginning July 11, 2007. (Id. ¶¶ 10, 11.)

Plaintiff's version of the story indicates that none of these "orders" constituted an actual sale. It contends that the design and price of the product had not been finalized when the orders were made, and that Plaintiff had not even determined whether it would be able to manufacture the product in a cost-effective manner. (Id. ¶¶ 137, 138, 140.) Plaintiff claims that the initial orders were in fact only requests made by vendors, conditioned on the premise that the product would actually be released, and that no binding contract was formed prior to the March 7, 2007, critical date. (Id. ¶¶ 140, 142.) Accordingly, Plaintiff argues, no sale took place within the meaning of § 102(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

### III. DISCUSSION

#### A. LEGAL RULES

##### 1. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(a). Thus, when addressing a motion for summary judgment, the Court must decide whether
there exist "any genuine factual issues that properly can be resolved only by a finder of fact
because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 250 (1986).

The moving party has the burden of demonstrating the absence of a genuine issue of fact
for trial, which it can meet by presenting evidence establishing the absence of a genuine issue or
by "pointing out to the district court . . . that there is an absence of evidence" supporting a fact
for which the non-moving party bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S.
317, 325 (1986). To defeat summary judgment, the non-moving party must put forth
"affirmative evidence" that shows "that there is a genuine issue for trial." Anderson, 477 U.S. at
256–57. This evidence must be admissible. See Fed. R. Civ. P. 56(c), (e). The non-moving
party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the
material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586
(1986). Rather, the non-moving party must show that evidence in the record could lead a
rational trier of fact to find in its favor. Id. at 587. In reviewing the record, the Court must
believe the non-moving party's evidence, and must draw all justifiable inferences in its favor.
Anderson, 477 U.S. at 255.

##### 2. PROVISIONAL PATENT PRIORITY

Inventors may file a "provisional patent application that . . . will establish a priority filing
date for a later complete Section 111(a) application . . . filed not more than 12 months later." 4
Chisum on Patents § 11.02[1][g] at 11–118 (citing 35 U.S.C. § 119(e) (1)). "Such a provisional
application need only include a specification conforming to the requirements of 35 U.S.C. § 112
and at least one drawing filed under § 113; no claims are required." New Railhead Mfg., L.L.C.
v. Vermeer Mfg. Co., 298 F.3d 1290, 1294 (Fed. Cir. 2002) (citing 35 U.S.C. §§ 111(b) (1), (2)).
But that is only the beginning of the applicant's obligation if he seeks priority based on the
provisional application's filing date. "[T]he specification of the provisional must contain a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms to enable an ordinarily skilled artisan to practice the invention claimed in the non-provisional application." Id. (internal quotations, citations omitted). The purpose of this description "is broader than to merely explain how to 'make and use'" the invention. Id. "[T]he applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." Id., citing Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991). In other words, "the disclosure must show he had invented each feature that is included as a claim limitation." Id. at 1295.[11]

### 3. SECTION 102(B) INVALIDITY

"A person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Courts have treated this language as providing two methods for invalidating a patent: the public use bar, and the on-sale bar.

#### a. The Public Use Bar

"Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor *who is under no limitation, restriction or obligation of secrecy to the inventor*." Minn. Mining & Mfg. v. Chemque, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002) (emphasis added). "The statutory phrase 'public use' does not necessarily mean open and visible in the ordinary sense; it includes any use of the claimed invention by a person other than the

---

[11] Plaintiff argues that this standard is unduly restrictive and that it is entitled to priority if the '364 Provisional rendered the claims in the '848 Patent obvious to one skilled in the art. (Docket No. 203, [Hearing Tr.] at 40:4–7.) In support of this argument, it refers the Court to Utter v. Hiraga, 845 F.2d 993 (Fed. Cir. 1988), a review of a decision of the Board of Patent Appeals and Interferences. Hiraga, which pre-dates both Vas-Cath and New Railhead, involved a priority dispute between foreign and domestic patent applicants and addressed the significance of prior art citations in determining priority. Hiraga determined that, while the preferred embodiment of the invention contemplated an internal pivot and made no mention of an external pivot, disclosure of at least two prior art references utilizing external pivots revealed both that the inventor was in possession of the invention and expressly disclosed to one skilled in the art the potential for the use of the external pivot in that invention. Indeed, the Federal Circuit concluded that the Board did not err in concluding that he "had possession at [the time of his application] of the later claimed ['068 interference count] subject matter." Hiraga, 845 F.2d at 999. Thus, when carefully considered, Hiraga is consistent with the analysis in New Railhead. See also Anascape, Ltd. v. Nintendo of Am., Inc., 601 F.3d 1333, 1339 (Fed. Cir. 2010) (applicant must "recount his invention in such detail that his future claims can be determined to be encompassed within his original creation.")

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." New Railhead, 298 F.3d at 1297 (citing Lough v. Brunswick Corp., 86 F.3d 1113, 1119 (Fed. Cir. 1996)). In contrast, "[t]he use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use." Petrolite Corp. v. Baker Hughes, Inc., 96 F.3d 1423, 1426 (Fed. Cir. 1996) (quoting City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 134 (1877)).

Although these principles suggest a clear line of demarcation, no such bright line exits. An apparently "public use" of an invention, *prior to its reduction to practice*, may qualify as "experimental use." Under Federal Circuit jurisprudence, such "experimental use" does not constitute an invalidating public use. See Baxter Int'l, Inc. v. Cobe Labs., Inc., 88 F.3d 1054, 1059 (Fed. Cir. 1996) ("Experimental use negates public use; when proved, it may show that particular acts, even if apparently public in a colloquial sense, do not constitute a public use within the meaning of section 102."). Accordingly, the public use bar can only apply "where the inventions were used for their intended purpose." Motionless Keyboard Co. v. Microsoft Corp., 486 F.3d 1376, 1385 (Fed. Cir. 2007). But the experimental use exception "does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention. The purpose of such activities is commercial exploitation and not experimentation," and therefore not entitled to the protection of the "experimental use" doctrine. In re Smith, 714 F.2d 1127, 1135 (Fed. Cir. 1983).

### b. The On-Sale Bar

Under the on-sale bar, "an inventor may not patent an invention that has been 'on sale' more than one year before the patent application is filed." Link Treasure Ltd. v. Baby Trend, Inc., 809 F. Supp. 2d 1191, 1197 (C.D. Cal. 2011) (citing 35 U.S.C. § 102(b)). "A party challenging the validity of a patent on the basis of the on-sale bar 'must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell' before the critical date." Id. (quoting Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045–46 (Fed. Cir. 2001)). In applying the on-sale bar, the Court utilizes the test set forth in Pfaff v. Wells Electronics, Inc., which requires that "(1) the invention be the subject of a commercial sale or offer for sale and (2) the invention be 'ready for patenting' at the time of the offer or sale." 525 U.S. 55, 67 (1998).

To satisfy the first criteria of the on-sale bar, the product must be part of an actual sale or offer for sale. In re Kollar, 286 F.3d 1326, 1330 (Fed. Cir. 2002). For instance, "merely

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

granting a license to an invention, without more, does not trigger the on-sale bar of § 102(b).
In re Kollar, 286 F.3d at 1330–1331 (citing Mas-Hamilton Group v. LaGard, Inc., 156 F.3d
1206, 1217 (Fed. Cir. 1998)). "Only an offer which rises to the level of a commercial offer for
sale, one which the other party could make into a binding contract by simple acceptance
(assuming consideration), constitutes an offer for sale under § 102(b)." Lacks Indus. v.
McKechnie Vehicle Components USA, Inc., 300 Fed. Appx. 904, 906–907 (Fed. Cir. 2008).

The second element of the on-sale bar asks whether "the inventor thought he had a
product which could be . . . offered to customers, not whether he could prevail under the
technicalities of reduction to practice . . . ." Paragon Podiatry Labs., Inc. v. KLM Labs., Inc., 984
F.2d 1182, 1187 n.5, (Fed. Cir. 1993). However, whether an invention is "ready for patenting"
is an objective determination. Petrolite Corp., 96 F.3d at 1427 (citing U.S. Envtl. Prods., Inc. v.
Westall, 911 F.2d 713, 717 (Fed. Cir. 1990)).

**B. APPLICATION**

### 1. THE '364 PROVISIONAL DOES NOT DISCLOSE THE '848 PATENT

Plaintiff acknowledges that the '848 Patent may only be afforded the priority date of the
'364 Provisional if the two applications "share at least one common inventor and the written
description of the provisional . . . adequately support[s] the claims of the non-provisional
application." (Opp. at 8) (citing New Railhead, 298 F.3d at 1294.) The Parties agree that the
two applications "share at least one common inventor," so the only question at issue is whether
the '364 Provisional adequately supports the claims of the '848 Patent.

The undisputed facts demonstrate that the claims at issue are not adequately disclosed by
the '364 Provisional. First, the '364 Provisional "discloses only a charging system with an
external adapter, where the DC ports are on the adapter, and not on the base or supported by the
base" as required by the '848 Patent. (Mem. at 19.) Second, the '364 Provisional requires the
controller to attach "directly to the external adapter, rather than directly to the base." (Id. at 19.)
And third, the '364 Provisional actually teaches away from the claims at issue in the '848 Patent
by discussing the failings of a system without an external adapter. (Id. at 20.)

In response Plaintiff relies substantially on the expert declaration of Gary Kitchen to
demonstrate that the '364 Provisional disclosed every element of the claims at issue in the '848
Patent. (Opp. at 9, 11–16.) This argument attempts to demonstrate the likeness of a system *with*
an external adapter (the '364 Provisional) to a system *without* an external adapter (the '848

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

Patent). Plaintiff does this in two ways. First, it argues that the language of the '848 Patent incorporates removable adapters. (Id. at 11–18.) Second, it argues that the '364 Provisional's external adapter could be "permanently affixed" to the base, in effect making it part of the base. (Id. at 18.)

Plaintiff's first argument relies on a close reading of Independent Claims 1 and 13 of the '848 Patent, which use two different phrases to describe the relationship of the DC ports to the base. Claim 1 describes them as being "on the base," while Claim 13 describes them as "supported by the base." ('848 Patent 15:35, 16:32–33.) The Court's Claim Construction Order determined that the phrase "supported by the base" meant "physically supported by but not necessarily directly on the base." (Docket No. 122, [June Order] at 25.) The phrase "on the base" was not designated for construction by either Party.[12] Because the DC ports in the '364 Provisional rest on an adapter, which in turn rests in a recess, which in turn is set into the base, Plaintiff argues that the DC ports are "supported by the base" as disclosed in the '848 Patent. (Opp. at 13.) Arguing that "on the base" encompasses a similar meaning, Plaintiff suggests that the DC ports in the '364 Provisional are also "on the base" as disclosed in the '848 Patent. (Id. at 15.)

However, focusing solely on the construction of the phrases "on the base" and "supported by the base" misses the point. The '364 Provisional must "adequately support the claims" of the '848 Patent. New Railhead, 298 F.3d at 1294. And the fact remains that the '364 Provisional *requires* an external adapter while the '848 Patent makes no mention of it.[13] One skilled in the

---

[12] However, it is plain from the Court's June Order that the phrase "on the base" means something other than "supported by the base." At the time, the Court described the phrases as having a "rectangle-square relationship." (June Order at 24.) That is, something "on the base" would be "supported by the base," but the reverse is not necessarily true. (Id.) The subsequent language of the Court's definition of "supported by the base" -- "physically supported by but *not necessarily directly on the base*" -- implies that the word "on" requires direct contact while the words "supported by" do not. (Id. at 25.)

Plaintiff now suggests a meaning of "on the base" that flies in the face of this rectangle-square relationship. It argues that "on" can include either "above and supported by" or "in contact with." (Opp. at 15.) Perhaps recognizing the distinction the Court drew previously, Plaintiff acknowledges that phrases "may not have identical scope," and suggests that "their meanings at least overlap." (Id. at 17.) But Plaintiff's overlap goes in the wrong direction by professing that "supported" is a subset of "on," rather than the other way around.

[13] Plaintiff appears to play fast and loose with this distinction on at least one occasion by referring to Figures in the '848 Patent that incorporate an external adapter. (Docket No. 135-1, [Kitchen Declaration] at 14.) However, upon review of the '848 Patent, these Figures correspond solely to claims that are not at issue in this

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

art may have been able to conceive of a different invention by studying the '364 application, but
that invention, one that did not require an external adapter, plainly was not disclosed in the '364
Provisional.

Plaintiff's second argument, that the '364 Provisional does not exclude a permanently
affixed adapter, is an argument foreclosed in the case law. The question is not whether the
provisional excludes a particular claim or claims, but whether it affirmatively discloses the
pertinent claims of the later filed patent application. Here the '364 Provisional must
affirmatively disclose the claims of the '848 Patent; the '848 Patent is not entitled to priority
merely because the '364 Provisional fails to exclude its claims. New Railhead, 298 F.3d at
1294–1295; Anascape, 601 F.3d at 1339 (patentee is not presumed to claim variants that are not
described). Moreover, Plaintiff's suggestion, that because the '364 Provisional permits
permanently affixed external adapters it discloses a System without external adapters, is
illogical. The argument implicitly relies on the '364 Provisional's disclosure of a so-called
press-fit adapter, which forms a "really tight" connection between the external adapter and the
base. (Opp. at 16.) Plaintiff suggests that a press-fit adapter is equivalent to disclosing an
adapter-less Charger because it would be difficult to remove such an adapter. (Id.) Put simply, a
"really tight" connection between adapter and base is not the same thing as eliminating the
adapter altogether. Whether a user would have chosen to leave the adapter in the recess or not,
the described invention contemplates adapters that could be removed, while the '848 Patent
contemplates no adapters whatsoever. (See '848 Patent, Figure 15; '364 Provisional, Figure 7.)

The prior point supports Defendants argument that the '364 Provisional teaches away
from the claims at issue. The '364 Provisional declares that placing a DC port directly on a
charging station, as the '848 Patent does, risks having the DC port damaged, "rendering the
charging station inoperable." ('364 Provisional 1:24–25.) "Thus, it is desirable to provide an
improved charging station," presumably without the weakness included in the '848 Patent's
claims. (Id. at 2:3–4.) In other words, the system described in the '364 Provisions is touted as
desirable precisely because it does not describe or encompass the system described in the claims
that are at issue in this litigation.

Because the '364 Provisional requires adapters while the pertinent claims of the '848
Patent excludes them, there can be no genuine dispute that the '364 Provisional fails to "convey
to one of ordinary skill that [Plaintiff] was in possession of the . . . limitation of the invention
claimed in the [Patent]." New Railhead, 298 F.3d at 1297. Accordingly, the '848 Patent is not

suit.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

entitled to the priority date of the '364 Provisional. The Court therefore evaluates the '848 Patent for invalidity under Section 102(b) using the March 7, 2007, critical date.

### 2. SECTION 102(B) RENDERS THE '848 PATENT INVALID

"A person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The Charger was both publicly used and on sale in this country more than one year prior to the March 7, 2007, critical date.

#### a. *The CES Display Constituted a Public Use*

Defendants essentially make four claims in support of their argument that Plaintiff's demonstration at CES qualifies as a public use. First, the Charger was displayed at CES. (Mem. at 12.) Second, it was shown to retailers and members of the press, who were not under the control of Plaintiff and were under no obligation of confidentiality. (Id. at 4, 12.) Third, those retailers and members of the press used the Charger, recorded that use, and made that use publicly available on the internet. (Id. at 12.) And finally, Plaintiff used that public demonstration for commercial purposes. (Id.)

The record before the Court establishes these facts beyond any reasonable dispute. Nevertheless, Plaintiff resists the "public use" claim on the principal ground that the Model on display at CES was not a Charger but was in fact nothing more than a stereolithograph ("SLA"), or plastic mockup, a dummy device made to look like the Charger.[14] (Opp. at 22–23.) Because, according to Plaintiff, the dummy device could not properly charge video game controllers, it was not used for the '848 Patent's intended purpose at CES, did not disclose or embody the claim elements at issue, and therefore had not been reduced to practice. (Id. at 22.) For that reason, Plaintiff argues that its display qualifies as an experimental use, and does not trigger the public use bar. See 35 U.S.C. § 102(b): Baxter Int'l, 88 F.3d at 1059; Hamilton Beach Brands, 2012 WL 6562220, aff'd, 2013 WL 4081872.

---

[14] Stereolithography is a method of three-dimensional printing, in which the entire object is "printed," typically as a single plastic construction. (Docket No. 135-4, [Ex. N, ("Navid Tr.")] at 126:21–25, 127:1–2.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

### i. The Charger Was Operable

In support of its argument that the Model was an inoperable dummy, NYKO has ignored the undisputed and incontrovertible facts now before the Court. When those facts, which come from NYKO's files and its own witnesses are considered, it is clear that Plaintiff has not created a genuine issue of fact for trial on the public use issue.

NYKO's suggestion that the Model was an inoperable dummy contradicts the inventor's earlier sworn declaration, the documentary record, and Plaintiff's interrogatory answers. In early December 2006, the inventor, Amir Navid, wrote in an email to one of his suppliers:

> The design looks good, please proceed.
>
> I need a ***working SLA*** made right away, and please make sure that the outlook is attractive, as ~~we will use this as our main sales demonstration sample~~.

(Hip Hing Description at 1) (emphasis added.)  NYKO's interrogatory answers recognized that it was a working device, where NYKO acknowledged that Navid received a "prototype referred to as a stereolithographic apparatus ('SLA') which was completed on or about December 26, 2007. Mr. Navid then performed testing and made necessary modifications . . .." (Docket No. 133-6, [Interrogatory Response] at 3–4.)[15]  Plainly, one cannot conduct tests and make necessary modifications on a non-operable dummy.

This evidence supports Navid's earlier admissions regarding the Model's functionality, made in an attempt to obtain interim injunctive relief during the pendency of this lawsuit. In a sworn declaration, Navid stated, "The product Nyko introduced in January 2007 includes each and every feature of the claimed invention." (Docket No. 44 [Decl. of Amir Navid ("Navid Decl.")] ¶ 17); (see Interrogatory Response at 5) (indicating that "the claimed invention was reduced to practice in asserted claims 1–5, 7, 8, and 10–13, and 15–17 on or after December 26,

---

[15] Navid and Christopher Arbogast, a marketing executive, suggested during their depositions that NYKO sometimes used dummy devices for display while designs were still being altered. (Id. at 54:4–11; Docket No. 135-4, [Ex. N ("Navid Tr.")] at 127:6–20.) Such statements do not create an issue of fact for trial even if they are absolutely true. What may occur on some occasions is one thing; evidence of what happened in the circumstances under discussion is another. The evidence here demonstrates that NYKO had a working model in use at the CES.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

2006.").) Moreover, in that same declaration, Navid acknowledged that "NYKO introduced the Charge Base product at the Consumer Electronics Show in Las Vegas to great fanfare in January 2007 (see Exhibit A attached hereto)." (Navid Decl. ¶ 15.) The referenced "Exhibit A" shows a January 10, 2007, report touting the advantages of the NYKO charge base with its suggested retail pricing. (Id. at 10.) In short, the record conclusively establishes that Navid: (1) ordered a working SLA a month before the CES; (2) ordered it to use as a sales model; (3) used it at CES to publicize the product and promote sales of the device; and (4) acknowledged that the device demonstrated at the show included each and every feature of the claimed invention. There can be no dispute that it had been reduced to practice.

Plaintiff has not shown any evidence that would establish any conceivable ground for the Court to ignore the admissions of NYKO and the inventor. Rather, grasping at straws, Plaintiff argues that the Model was non-operational based on video and photographs of the device's LED display taken during CES. (Opp. at 23.) The Model included four LEDs, each of which would have been connected to a docking port in a genuine Charger. (Id.) Because only two docking ports were occupied by video game controllers during the CES demonstrations, Plaintiff contends that only two lights should have been illuminated on a genuine Charger, and yet the photographs and video show that all four LEDs were illuminated. (Docket No. 135-4, (Ex. L [Wired Article] at 1); Docket No. 135-4 (Ex. M [Charger Picture].) Moreover, Plaintiff sometimes illuminated all LEDs for display purposes when making nonfunctioning models of their devices. (Docket No. 135-4, [Ex. K ("Arbogast Tr.")] at 80:24–25, 81:1–2.)

While the lights may not have worked as intended, that is hardly evidence that the Model was not functioning, particularly when the compelling evidence discussed above indicates otherwise. In reality, this evidence, even if viewed in isolation, tends to suggest that the Model was more than a plastic dummy. It clearly shows that it was wired and was drawing current, which undermines the testimony of Christopher Arbogast, a marketing executive, who stated that he did not "specifically recall if [the Model] was plugged in and working at [CES]." (Arbogast Tr. at 55:7–8.) And even Arbogast admits that he "wouldn't necessarily plug in a non-working sample." (Id. at 55:23–24.) As the pictures of Plaintiff's CES display show, the Model was in fact plugged in. (Wired Article at 1; Charger Picture.) And when pressed, Arbogast admitted that -- even in light of the LED evidence upon which NYKO relies -- he simply did not know whether the Model was functional. (Arbogast Tr. at 82:1–3.)

While the Arbogast testimony is at best neutral on the issue of the Model's functionality, Navid's deposition testimony is more damning. In his description of the Model's manufacture, Navid said that such constructions might "initially work, [then] they may not work later."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

(Navid Tr. at 127:8–9.) He goes on to add that the very reason for making the Model would
have been "to test how everything fits together *and how it will work*." (Id. at 127:19–20)
(emphasis added.) In other words, Plaintiff may not have commenced large scale manufacturing
of the Charger prior to CES or reached a final decision on the exact appearance of the device,
but Navid "would imagine that it [powered up]." (Id. at 127:6–7.)[16] Nothing in this testimony
contradicts Navid's earlier admission that the CES Model in fact encompassed the '848
invention and worked as intended.

Documentation that Plaintiff had begun ordering thousands of parts for the Charger in
December 2006 lends additional support to the proposition that a working model had been
developed prior to CES. (Hip Hing Order at 1.) The supplier confirmed via email that it had
received two purchase orders for Item 83017, which the record reflects is associated with the
Charger at issue in this case, one order for 6,000 pieces and one for 30,000 pieces. (Id.)
Although NYKO suggests that these orders are not significant because they were necessary
merely to establish a price-point for products, (Opp. at 24–25), the supplier does not seem to
view them that way. As to each, the supplier states that it will "confirm the delivery date of this
order asap." (Id.) Such orders indicate that some version of the Charger had been reduced to
practice prior to CES. To the extent that these orders are not considered large or substantial, that
reflects concern over the level of interest in the marketplace and any final modifications in
design elements rather than any indication that the invention had yet to be reduced to practice.
(Arbogast Tr. 223:23–25, 224:1–14.)

In short, the invention had been reduced to practice by January 2007 and NYKO
introduced a working version of the device at the January 2007 CES in Las Vegas.

### ii. The Use Was Public

Plaintiff offers a second argument in opposition to the motion -- that the use was not
public. This argument merits only brief discussion.

Plaintiff contends that the CES display was not a public use for statutory purposes
because the event was held in a private suite, and only people with invitations were allowed to
attend. (Opp. at 23–24.) But whether a use is "public" within the meaning of statutory language

---

[16] The temporary form of construction Navid describes also suggests a possible reason for the
discrepancy between the LED lights and the rest of the Model: nonessential elements such as lighting may not
have been working, even while other parts of the Model were.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

"does not necessarily mean open and visible in the ordinary sense." New Railhead, 298 F.3d at 1297 (citing Lough, 86 F.3d at 1119).

Even if the device had been shown only to one person in a back alley in the dead of night, it would constitute a public use under Section 102(b) so long as that person (1) used the claimed invention and (2) was under no requirement of confidentiality or secrecy. Minn. Mining, 303 F.3d at 1301. Plaintiff notes that a formal agreement is not necessary if "an understanding of confidentiality can be implied." (Opp. at 23–24) (citing Am. Seating Co. v. USSC Group, Inc., 514 F.3d 1262, 1268 (Fed. Cir. 2008).) But Plaintiff admits that the members of the press photographed the Model, and may have even handled it. (Arbogast Tr. at 54:12–16.) At the very least, Plaintiff "demonstrated [the Model] at the suite" for members of the press. (Id. at 55:2–3.) And, as indicated by its press release and ensuing online publicization of the Charger, Plaintiff appears to have wanted the press to be as non-confidential in their discussion of the Charger as possible. (See e.g., Docket No. 133-16, [Press Release] at 1–2; Docket No 133-8, [IGN Article, Nyko Charge Base PS3] at 1.) No "understanding of confidentiality" could possibly be implied in this situation. Indeed, Navid's declaration testimony, cited above, indicates that the device was introduced at CES to "great fanfare," which was the obvious purpose of the demonstration. There was one reason and one reason only for inviting the press to view the device -- to generate publicity as widespread as possible for a device that NYKO immediately put on sale.[17]

The Model was a functioning version of the Charger. It was shown to retailers and members of the press, who were not under the control of Plaintiff and were under no obligation of confidentiality. Those retailers and members of the press publicized the Charger on the internet. Taken together, these facts establish the "use of the claimed invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." New Railhead, 298 F.3d at 1297 (citing Lough, 86 F.3d at 1119). The CES display therefore constituted a public use more than one year before the '848 Patent was filed within the meaning of Section 102(b). Accordingly, the public use bar applies, and the '848 Patent must be deemed to be invalid.

---

[17] To the extent that NYKO has suggested that the use was an "experimental use," the Court considers the argument totally meritless. The entire purpose of the demonstration was to gauge and generate market interest in the product, neither of which constitutes "experimentation" within the meaning of Federal Circuit jurisprudence. Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1344 (Fed. Cir. 2007); In re Smith, 714 F.2d at 1135.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

### b. Defendants Have Demonstrated that the On-Sale Bar Applies

The '848 Patent is also invalid because the on-sale bar applies. The record of sales during and immediately after the CES belies NYKO's claim that its sales were mere market tests. Beginning on January 8, 2007, in response to interest from vendors in the Charger, NYKO communicated a price, part number, product name, and product description to customers. (Mem. at 4, 14.) Between January 8, 2007, and March 7, 2007, customers, including Amazon.com, Inc. ("Amazon"), sent purchase orders for the Charger to Plaintiff. (Id.) Plaintiff generated sales orders and invoices for each of those purchase orders. (Id.) Plaintiff eventually shipped Chargers in compliance with nineteen such orders, beginning July 11, 2007. (Id. at 5, 14.) And finally, the Charger involved in these sales embodied the claims at issue in the '848 Patent. (Id. at 6.)

Plaintiff's defense essentially consists of one argument: the purported sales were actually nothing more than pre-orders, or a way of signaling interest. (Opp. at 24–25.) No money or Chargers changed hands, no contract was formed, and neither Plaintiff nor the customers were obligated to act in any way based on the purported sales. (Id. at 25; Arbogast Tr. at 180:23–25, 181:1–4.) This is not clear from the face of either the purchase orders or the sales orders. (Docket No. 133-23 [First Order]; Docket No. 133-22 [Second Order]; Docket No. 133-21 [Third Order]; and Docket No. 133-19 [Fourth Order].) Indeed, both the purchase and sales orders quite clearly represent that they form contracts, with items and values set. And Plaintiff has specifically acknowledged that the order forms themselves do not indicate that they are non-binding. (Arbogast Tr. 200:19–23, 205:12–18.)

In spite of this, Plaintiff explains that NYKO's ordinary custom upon the release of a new product, which it followed in this case, was to gauge interest with pre-orders prior to forming binding contracts. (Opp. at 25; Arbogast Tr. at 180:5–13, 17–21.) The Court should infer that the orders made in January were not binding contracts, Plaintiff argues, because the orders were not fulfilled until July 2007, and when they were fulfilled, "re-invoices" for payment and shipment were issued. (Opp. at 25; Docket No. 135-4, Ex. O [Interrogatory Responses] at 11.) Moreover, Plaintiff asks the Court to interpret the initial orders as not setting a price. (Opp. at 25.) This argument fails upon examination of the undisputed documentary evidence. The Court will analyze one set of orders and invoices, both as illustrative of the order process and aware that even a single sale would be enough to impose the on-sale bar.

On January 8, 2007, Amazon submitted four purchase orders to Plaintiff. The fourth was Purchase Order #L3470035 (the "Purchase Order"). (Fourth Order at 5.) The Purchase Order

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

requested 140 Chargers at a price of $22. (Id. at 6.) The following day, Plaintiff issued Sales Order #97145 (the "Sales Order") in response. (Id. at 3.) The Sales Order refers to the Purchase Order by number, and confirms the request for 140 Chargers. (Id. at 3.) The next day, on January 10, 2007, Invoice #101146 (the "January Invoice") was prepared based on that Sales Order. (Id. at 1.) The January Invoice included 140 Chargers at $22 each, and included a total invoice amount to be billed. (Id. at 1–2.) At some point Amazon created a file (the "Vendor Central Readout") that reflected these orders. (Docket No. 133-24 [Readout].) The Vendor Central Readout again indicated, based on the Purchase Order, that 140 Chargers had been ordered. (Readout at 1) It also indicated that, while the Charger was on backorder, each of the items requested in the Purchase Order had been accepted. (Id.) It is unclear exactly when payment was delivered, but the Vendor Central Readout also reflects that payment did eventually occur based on that Purchase Order.[18] (Id.) The final document in the sale process appears to be missing from the record. This is the "re-invoice," which Plaintiff issued when it shipped the Chargers in July 2007. However, a sales report (the "Sales Report") referring to that re-invoice indicates its contents. (Docket No. 133-20, [Sales Report] at 2.) The Sales Report shows that the second invoice, like the Purchase Order, Sales Order, January Invoice, and Vendor Central Readout, was for 140 Chargers at $22 each. (Sales Report at 2.) So Plaintiff filled Amazon's original request, made in January 2007, for 140 Chargers at $22 each. Nowhere in any of this is there any support for Plaintiff's proposition that the Purchase Order was only a pre-order and therefore non-binding.

Plaintiff's response is therefore insufficient to raise a triable issue of fact as to whether a sale took place. For the on-sale bar to apply two things must be true. First, the invention must be the subject of a commercial sale or offer for sale. Pfaff, 525 U.S. at 67. And second, the invention must be 'ready for patenting' at the time of the offer or sale. Id. Given the Court's determination above that the device had been reduced to practice by the time it was displayed at CES, the second half of this test has already been met. (See supra 17–19.) The only remaining issue, then, is whether the invention was in fact the subject of a commercial sale or offer for sale. The foregoing discussion shows that every single piece of evidence points to the conclusion that the Purchase and Sales Orders reflect commercial sales within the meaning of Section 102(b). See Lacks Indus., 300 Fed. Appx. at 906–907. Amazon and Plaintiff behaved as though they had a contract: the price and quantity quoted in the Purchase Order remained consistent

---

[18] The Readout also apparently states that the Chargers were cancelled at some point. (Readout at 1.) However, it is unclear whether this cancellation refers to the initial shipping window, which expired before the Chargers were actually shipped, or whether it refers to something else. However, neither Plaintiff nor Defendants ever suggest that the order itself was cancelled.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|----------|------------------------|------|------------------|
| Title | NYKO Technologies, Inc. v. Energizer Holdings Inc., et al | | |

throughout the various Orders and Invoices, and the Orders were eventually fulfilled. The orders made prior to the March 7, 2007, critical date therefore constituted sales within the meaning of Section 102(b). Accordingly, the on-sale bar applies, and the '848 Patent must be deemed to be invalid.

### IV. CONCLUSION

The Charger was in public use and on sale more than one year before the '848 Patent was filed. Accordingly, the '848 Patent is invalid under Section 102(b), and Defendants' motion for summary judgment is **GRANTED**. Defendants are to prepare a judgment consistent with this order and to lodge the proposed judgment with the Court no later than the close of business on October 28, 2013.

**IT IS SO ORDERED.**