SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
DANIEL N. YANNUZZI, Cal. Bar No. 196612
dyannuzzi@sheppardmullin.com
GRAHAM M. BUCCIGROSS, Cal. Bar No. 234558
gbuccigross@sheppardmullin.com
MATTHEW M. MUELLER, Cal. Bar No. 268486
mmueller@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California  92130-2006
Telephone:  858.720.8900
Facsimile:   858.509.3691

STEVEN M. HANLE, Cal. Bar No. 168876
shanle@sheppardmullin.com
650 Town Center Drive, 4th Floor
Costa Mesa, California  92626
Telephone:  714.513.5100
Facsimile:   714.513.5130

Attorneys for Performance Designed Products
LLC, Energizer Holdings, Inc., and Eveready
Battery Co., Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NYKO TECHNOLOGIES, INC. a California Corporation, | Case No. CV12-03001 |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR ATTORNEY FEES; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| ENERGIZER HOLDINGS, INC. a Missouri Corporation, EVEREADY BATTERY CO., INC., a Delaware Corporation, and PERFORMANCE DESIGNED PRODUCTS LLC, a California Limited Liability Company, | Date:   December 16, 2013
Time:  9:30 a.m.

The Hon. Gary A. Feess |
| Defendants. | [Complaint Filed:  April 5, 2012] |

Please take notice that on December 16, 2013, in the Courtroom of Hon. Gary A. Feess, Defendants Energizer Holdings, Inc., Eveready Battery Co., Inc., and Performance Designed Products, LLC (collectively "Defendants") will move the Court for an award of attorney fees, expert fees and non-taxable costs against Plaintiff Nyko Technologies, Inc.  This motion is made pursuant to 35 U.S.C. § 285, Federal Rule of Civil Procedure 11, and other applicable law, on the grounds that this case is exceptional; it was based on an invalid patent, procured through inequitable conduct, and should never have been filed.  Once filed, it was litigated in bad faith, in a calculated effort to increase expense, to obstruct an inevitable finding of invalidity and to mislead the Court.

Defendants bring this motion following conferences of counsel, which took place on November 11 and 13, 2013.

The motion is based on this notice of motion and motion, the supporting memoranda and evidence, the docket and documents on file herein, applicable law and such other information as may be deemed appropriate by the Court.

Dated:  November 18, 2013           SHEPPARD, MULLIN, RICHTER & HAMPTON

By      /s/ Steven M. Hanle

Attorney for Energizer Holdings, Inc., Eveready Battery Company, Inc., and Performance Designed Products LLC

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.    RELEVANT FACTS ................................................................................. 3

    A.    Nyko's Public Use and Offers for Sale ...................................... 3

    B.    Charge Base 2 and the Provisional Application ........................ 4

    C.    The '295 Application and Failure to Disclose the Highly
        Material Public Use and Sales ..................................................... 5

    D.    The Filing of the Lawsuit and the TRO ...................................... 6

    E.    Nyko's Attempts to Misrepresent and Conceal Public Use and
        On-Sale Bar .................................................................................. 8

        1.    Nyko's Evasive and Misleading Interrogatory Responses ........... 8

        2.    Nyko's Deficient Document Productions..................................... 9

        3.    Nyko's Stonewalling of Depositions ......................................... 10

    F.    Nyko's Bad Faith Pursuit of Litigation Against Energizer and
        Eveready........................................................................................ 12

    G.    Nyko's Attempts to Coerce a Settlement Based on Litigation
        Expense ......................................................................................... 13

    H.    Nyko's Bad Faith Positions in Opposition to Summary Judgment ...... 14

III.    ARGUMENT ......................................................................................... 16

    A.    Navid's Inequitable Conduct Justifies Declaring This Case
        Exceptional................................................................................... 16

    B.    Nyko's Filing and Maintenance of this Unjustified Litigation
        Justifies An Award of Attorney Fees......................................... 20

    C.    Nyko's Litigation Misconduct Justifies Declaring This Case
        Exceptional................................................................................... 21

    D.    The Combination of Inequitable Conduct, Unjustified Litigation
        and Litigation Misconduct Renders This Case Exceptional ............... 23

IV.    DEFENDANTS' ATTORNEY FEES AND COSTS WERE
        REASONABLE..................................................................................... 23

V.    CONCLUSION ..................................................................................... 24

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Agfa Corp. v. Creo Prods. Inc.*
    451 F.3d 1366 (Fed. Cir. 2006) .................................................................. 20

*American Calcar, Inc. v. American Honda Motor Co., Inc.*
    651 F.3d 1318 (Fed. Cir. 2011) ................................................................. 17

*Apotex, Inc. v. Cephalon, Inc.*
    Case No. 2:06-cv-2768, U.S. Dist. LEXIS 125859 (E.D. Pa. Nov. 7, 2011),
    *aff'd per curiam*, 500 Fed. Appx. 959 (Fed. Cir. 2013) ..................................... 18

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*
    516 F.3d 1361 (Fed. Cir. 2008) ................................................................. 17

*Badalamenti v. Dunham's Inc.*
    896 F.2d 1359 (Fed. Cir. 1990) .................................................................... 2

*Beckman Instruments, Inc. v. LKB Produkter AB*
    892 F.2d 1547 (Fed. Cir. 1989) ................................................................. 20

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*
    267 F.3d 1370 (Fed. Cir. 2001) .................................................... 16, 20, 21

*Brooks Furniture Mfg., Inc., v. Dutailier Int'l, Inc.*
    393 F.3d 1378 (Fed. Cir. 2005) ............................................................ 1, 20

*Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*
    394 F.3d 1348 (Fed. Cir. 2005) ................................................................. 20

*Central Soya Co. v. Geo. A. Hormel & Co.*
    723 F.2d 1573 (Fed. Cir. 1983) ................................................................. 24

*Digeo, Inc. v. Audible, Inc.*
    505 F.3d 1362 (Fed. Cir. 2007) ................................................................. 20

*Dippin' Dots, Inc. v. Mosey*
    476 F.3d 1337 (Fed. Cir. 2007) ................................................................. 19

*Eon-Net LP v. Flagstar Bancorp.*
    653 F.3d 1314 (Fed. Cir. 2011) ................................................................. 21

*Evident Corp. v. Church & Dwight Co.*
399 F.3d 1310 (Fed. Cir. 2005) ...................................................... 20

*Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*
No. 2012-1581, 2013 U.S. App. LEXIS 16797 (Fed. Cir. Aug. 14, 2013).......... 3

*Hughes v. Novi Am. Inc.*
724 F.2d 122 (Fed. Cir. 1984) ................................................. 20, 21

*Interpart Corp. v. Italia*
777 F.2d 678 (Fed. Cir. 1985) .......................................................... 20

*Mathis v. Spears*
857 F.2d 749 (Fed. Cir. 1988) .......................................................... 24

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*
726 F.3d 1359 (Fed. Cir. 2013) ........................................ 16, 21, 23

*Nilssen v. Osram Sylvania, Inc.*
528 F.3d 1352 (Fed. Cir. 2008) ................................................... 17

*Novitas, Inc. v. Genlyte Group, Inc.*
No. CV 91-3857 MRP, 1995 U.S. Dist. LEXIS 21089 (C.D. Cal. Mar. 9,
1995) ................................................................................. 22, 23

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*
984 F.2d 1182 (Fed. Cir. 1993) .................................................. 16, 19

*Stephens v. Tech Int'l, Inc.*
393 F.3d 1269 (Fed. Cir. 2004) ................................................ 2, 20

*Taltech Ltd. v. Esquel Enters. Ltd.*
604 F.3d 1324 (Fed. Cir. 2010) ................................................ 19, 21

*Therasense, Inc. v. Becton, Dickinson & Co.*
649 F.3d 1276 (Fed. Cir. 2011) ................................................... 17

<u>Statutes</u>

35 U.S.C. § 102(b) ................................................................. 2, 3, 10

35 U.S.C. § 285 ...................................................... 1, 2, 3, 21, 24, 25

37 CFR § 1.56 ......................................................................... 5, 17

<u>Rules</u>

Fed. R. Civ. P. 11 ................................................................................................ 1, 20

Fed. R. Civ. P. 30(b)(6) ........................................................................................ 13

## I.   INTRODUCTION

Defendants seek a determination that this case is exceptional and an award of attorney fees under 35 U.S.C. § 285.  "A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as … inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions."  *Brooks Furniture Mfg., Inc., v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005).  Here, there are several interrelated grounds for finding this case exceptional.

First, the asserted patent, U.S. Patent No. 8,143,848 ("the '848 patent"), was procured by inequitable conduct based on the applicant's intentional failure to disclose during prosecution highly material information that was certain to invalidate the patent.  Despite acknowledging its duty of candor, Nyko offers the same feeble explanations for its failure to disclose that it argued to this Court in contesting the public use and on-sale bars – that an aggressively public and commercial use was neither public nor commercial, that actual sales were merely pre-orders, and, with respect to its bogus priority argument, that an adapter is not an adapter, it is merely part of the base.

In addition, despite knowledge of the patent's invalidity, Nyko filed and waged an unjustified litigation against Defendants in an effort to get Defendants to pull their products from the shelves and/or to coerce them into paying a settlement.  Simply put, the '848 patent was invalid, and Nyko knew or should have known it was invalid before filing this case because the invalidating activity was its own.  Indeed, within days of being served with an application for temporary restraining order, Defendants had (a) located public information regarding Nyko's public use and sales activity more than one year before the filing date of the '848 patent; and (b) determined that the asserted claims of the '848 patent are not entitled to the priority date of a provisional application relating to a different embodiment.  At a

minimum, Nyko should have dismissed the case when Defendants brought this information to light in opposing the TRO. *See Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1273–74 (Fed. Cir. 2004) (case may also be deemed exceptional when a patentee maintains its claims after realizing, or on reasonable investigation should know, that its claims are baseless).

But, rather than immediately dismissing the case, Nyko spent the next 16 months stonewalling discovery and obfuscating the facts regarding these defenses and running up Defendants' litigation costs in an effort to coerce a settlement through attrition when it knew it could not possibly win on the merits. This is precisely the situation warranting an award of attorneys' fees. Numerous times, Defendants proposed that Nyko provide the necessary discovery so Defendants could present the Section 102(b) invalidity issues to the Court for an early resolution to limit unnecessary expense. Nyko consistently refused. Indeed, to this day, Nyko has failed to produce complete documentation of the majority of the pre-critical date sales. When Defendants were finally left with no alternative but to file their summary judgment motion based on the limited information available, Nyko twisted, or outright misrepresented, the evidence to the Court.

In sum, through inequitable and wrongful conduct, Nyko obtained a patent that never should have issued, filed a case it should never have filed, and aggressively litigated a case it should never have litigated. Under these exceptional circumstances, 35 U.S.C. § 285 authorizes, and the case law fully supports, an award of attorney fees to prevailing defendants. "The purpose of §285 is to provide discretion [to award fees] where it would be grossly unjust that the winner be left to bear the burden of his own counsel" fees. *Badalamenti v. Dunham's Inc.*, 896 F.2d 1359, 1364 (Fed. Cir. 1990). That is the case here, where there are multiple independent grounds for finding this case exceptional. Nyko engaged in inequitable conduct in procuring the patent, filed an unjustified case based on an invalid patent, maintained its claims after invalidity was certain, and dramatically drove up

1  litigation costs by misrepresenting and obfuscating the evidence that clearly

2  demonstrated invalidity.

3       Accordingly, Defendants seek a finding that the case is exceptional under

4  § 285 and an award of $1,819,548.50 in attorney fees, $131,014.42 in expert witness

5  fees, and $44,607.31 in non-taxable costs.  As set forth below, these amounts are

6  reasonable in light of the amount of work necessitated by Nyko's prosecution of the

7  case, the hourly rates of Defendants' attorneys, which are well within the relevant

8  norms, and the average fees expended in comparable cases, as established by the

9  widely-cited American Intellectual Property Law Association Economic Survey.

10 **II.    RELEVANT FACTS**

11      **A.    Nyko's Public Use and Offers for Sale**

12      In the weeks leading up to the Consumer Electronics Show in Las Vegas in

13 January 2007 ("CES 2007"), Amir Navid, the named inventor of the '848 patent and

14 Nyko's VP of product development, had Nyko's manufacturer make a "sales

15 demonstration sample" of the invention of the asserted claims, which it called the

16 Charge Base.  (Doc. 133-28; Doc. 205, p. 17.)[1]  On December 29, 2006, Nyko

17 ordered 36,000 units of the Charge Base from its Hong Kong manufacturer; Navid

18 was aware of this order.  (Doc. 133-26; Doc. 205, p. 19.)[2]  On January 8, 2007,

19 Nyko publicly announced the launch of its Charge Base product, including the price

20 and part number.  (Doc. 133-2, ¶ 1; Doc. 205, p. 21.)  Nyko then publicly

21 demonstrated the Charge Base in a hotel suite at CES 2007 to members of the press

22

23 ────────────────

[1]      "Doc. __" refers to the docket number of the document in the Court's file in

24 this case.  The exhibits referenced herein are preceded by the name of the declarant
   to whose declaration they are attached, e.g., Hanle Ex. __, Mueller Ex. __, etc.

25 [2]      In the Court's order granting summary judgment, the Court apparently
   believed that this was an order of parts.  (Doc. 205 pp. 8. 19.)  In fact, these were

26 orders of the Charge Base itself.  (Doc. 133-26; Buccigross Ex. A, pp. 328–29.)  The
   manufacturer's offer to supply the products in response to Nyko's request is itself an

27 invalidating sale under 35 U.S.C. § 102(b).  *Hamilton Beach Brands, Inc. v.*
   *Sunbeam Prods., Inc.*, No. 2012-1581, 2013 U.S. App. LEXIS 16797, at *15–16

28 (Fed. Cir. Aug. 14, 2013).

1  and retailers, who were allowed to videotape and photograph it, and were under no
2  limitation, restriction, or obligation of confidentiality.  (Doc. 133-2, ¶ 3; Doc. 205,
3  p. 20.)  Navid was admittedly aware of this commercial activity.  (*See, e.g.,* Doc. 44,
4  ¶ 15.)

5      Before CES 2007 was over, Nyko had placed the Charge Base on sale and
6  accepted four separate orders from Amazon.  (Doc. 133-2, ¶ 6–8; Doc. 205, pp. 21–
7  22.)  Nyko went on to accept at least 19 separate orders for a total of at least 4,665
8  Charge Base units between January 8, 2007 and March 2, 2007.  (Doc. 133-2, ¶ 10;
9  Doc. 205, p. 22.)  Nyko subsequently delivered the units under these orders.  Thus,
10 both Nyko and its manufacturer offered for sale, and Nyko sold, the invention later
11 claimed in the '848 patent more than one year before filing the patent application on
12 March 7, 2008.  (Doc. 205, p. 23.)

13      **B.      Charge Base 2 and the Provisional Application**

14      Later in 2007, Nyko changed its design to include adapters attached to the
15 controllers to facilitate connection to the body of the charger.  Nyko referred to this
16 product as the Charge Base 2.  (Docs. 133-30, 133-31.)  The Charge Base 2
17 employed "a totally new contact point dongle system" consisting of "two light
18 weight Mini USB charge adaptors that attach to the controller and allow for easy
19 drop and charge functionality through the Charge Base 2's specialized charging
20 ports."  (Doc. 133-2, ¶ 13.)  Navid filed a provisional patent application on the
21 Charge Base 2 product on October 24, 2007 (the "Provisional").  Navid had not
22 previously filed for patent protection on any charge stand for wireless controllers.
23 (*Id.*, ¶ 12.)  The Provisional is directed solely to the Charge Base 2 invention
24 requiring adapters, and does not describe the Charge Base that Nyko had been
25 selling for months, with DC ports on the base rather than on a separate external
26 adapter.  (Doc. 205, pp. 13–16.)  In fact, the Provisional teaches away from a direct
27 attachment between the controller and the base.  (Doc. 133-2, ¶¶ 15–20; Doc. 205,
28 pp. 13, 15.)  In light of Nyko's own press release and conduct in filing of a patent

application on the Charge Base 2, there can be no doubt that Navid knew that the Provisional was directed to a different invention than the first Charge Base and the asserted claims.

### C.     The '295 Application and Failure to Disclose the Highly Material Public Use and Sales

In late 2007, PDP launched its "Pelican" branded charging system for PS3 wireless controllers, utilizing its own design that did not resemble the Charge Base. (Doc. 20, ¶ 7.)  The design of PDP's chargers did not use an adapter, so there was no possibility that patent claims based on the Provisional would cover PDP's charger.  On March 7, 2008, well after PDP's product was on the market, five months after the filing of the Provisional, and over a year after Nyko publicly used and sold the Charge Base, Navid filed U.S. Patent Application No. 12/044,295 ("the '295 application") that resulted in the '848 patent.  (Doc. 133-2, ¶ 21.)  The '295 application describes and claims, for the first time in any Navid patent application, a charging system with "DC ports on the base," and not requiring a separate external adapter with a DC port to facilitate the connection between the controllers and the charge base.  (Id., ¶ 22.)  Accordingly, there was no basis to assert priority based on the Provisional for claims directed to this embodiment.

At the time he filed the '295 application, Navid signed a sworn declaration acknowledging his "duty to disclose information which is material to patentability as defined in 37 CFR § 1.56."  (Buccigross Ex. B.)  Navid understood that this included the duty to disclose sales of the claimed invention more than a year before the filing of the patent application, and that such sales would invalidate the claims. (Buccigross Ex. A, p. 297.)  Nevertheless, Navid failed to disclose any of Nyko's extensive commercial activity more than a year before he filed the '295 application.

Navid's attempted justification for his failure to disclose lacks corroboration, consistency and credibility:

- He claims that he was not aware of the sales activity in January 2007, despite his admitted awareness of the product release, the CES demonstration, and Nyko's order of 36,000 Charge Base units from its manufacturer.  (*Id.*, p. 298; Doc. 44, ¶ 15; Doc. 133-26)

- He claims that the demonstration of the Charge Base at CES 2007 "to great fanfare" was not public because the hotel suite in which it was shown was "private" and "only people who are invited are allowed in there." (*Id.*, p. 116; Doc. 44, ¶ 15.)

- Navid assumed that the '295 application was effectively filed within a year of the public use and sale of the Charge Base because of the Provisional, despite the fact that the Provisional was limited to the adapter embodiment.  Navid's testimony on this issue is a travesty, repeatedly denying that the adapter was a separate component in an effort to support priority for the asserted claims, which encompass products without an adapter.  (*See* Buccigross Ex. A, pp. 138–157.)

### D.     The Filing of the Lawsuit and the TRO

Based on the PTO's ignorance of the invalidating public use and sales Navid and Nyko concealed, the '848 patent issued on March 27, 2012.  Within days, without ever having notified Defendants of its purported patent rights, Nyko filed this lawsuit, naming not only PDP, but its trademark licensor Energizer, who has absolutely no role in the manufacture, use, sale, or offer for sale of the accused devices.  (Doc. 1.)[3]

---

[3]     Navid had harshly criticized Nintendo in an earlier deposition in another case for filing suit against Nyko without any advance notice.  (Buccigross Ex. C, pp. 21, 36–37.)  He then tried to retreat from this position at his deposition in this case when confronted with the fact that Nyko did the same thing to Defendants.  (Buccigross Ex. A, pp. 34–36.)  Again, Navid's testimony is grounded in self-interest rather than truth.

A month later on May 10, 2012, again without any notice, Nyko filed a 21-page *ex parte* application for a temporary restraining order ("TRO") supported by four detailed declarations.  (Docs. 9–15.)  Nyko had been aware of PDP's accused device for years, yet sought to ambush Defendants with a TRO, rather than filing a motion for preliminary injunction that would have been heard at the same time if Nyko had pursued it promptly upon filing the case.  Needless to say, the burden on Defendants in responding to the TRO within days was enormous.  Nevertheless, within the five days they had to respond to the TRO (including a Saturday and Sunday), Defendants located invalidating prior art and determined that Nyko's assertion of priority based on the Provisional was groundless.  (Doc. 19, p. 6 n.4, et al.)  Disregarding the Court's rules and any semblance of fairness to Defendants, Nyko then filed a 14-page reply brief supported by three additional declarations.  (Docs. 25–30.)  By the time of the hearing on the TRO, Defendants had also determined, from public sources, that the claimed invention had been publicly demonstrated and offered for sale more than a year before the filing of the '295 application.  (Docs. 41-1, 41-2.)

Undeterred by this information, the Court's comments at the hearing, the Local Rules and basic fairness, Nyko filed a surreply and <u>three more declarations</u> after the hearing.  (Docs. 44–49.)  In Navid's <u>third</u> declaration, he acknowledged that "Nyko introduced the Charge Base product at the Consumer Electronics Show in Las Vegas to great fanfare in January 2007" (Doc. 44, ¶ 15), in an effort to concoct a spurious allegation that PDP copied Nyko's product.  Faced with the implications of this admission, Nyko spent the next 16 months of the case trying to retreat from it, and to distort and conceal the evidence that would prove the full extent of Nyko's invalidating commercialization of the Charge Base.

Two days after Nyko filed the third Navid declaration, the Court denied the TRO, finding, among other things:

the field of invention is extremely crowded and reflects numerous solutions to the need to charge batteries used to operate electronic components and devices. PDP has raised substantial questions regarding the patent's validity due to obviousness, and Nyko has not shown that the defense lacks substantial merit. Therefore, Nyko has not shown a likelihood of success on the merits.

(Doc. 51.)

Despite the Court's denial of its TRO, Nyko's admissions regarding commercialization before the filing date, and its clear lack of entitlement to the priority date of the Provisional, Nyko did not dismiss, did not negotiate in good faith, and did not cooperate in seeking an early adjudication of these issues.  In fact, it did just the opposite.

**E.     Nyko's Attempts to Misrepresent and Conceal Public Use and On-Sale Bar**

1.     Nyko's Evasive and Misleading Interrogatory Responses

PDP served its First Set of Interrogatories on July 16, 2012.  (Buccigross ¶ 6.) Interrogatory No. 2 sought information regarding Nyko's first sale and offer for sale of its patented products.  Interrogatory No. 3 sought information regarding Nyko's first public use and demonstration of its patented products.  Despite its exclusive knowledge, its TRO, its obligations under the Federal Rules, and the courtesy extension granted until September 7, 2012, Nyko's first responses contained only objections, and not a single fact.  (Buccigross Ex. D.)  Nyko refused to promptly supplement its responses and PDP was forced to file a motion to compel.  (Doc. 70.) Knowing it could delay no further, Nyko set out to cover its tracks and served supplemental responses contending that its first sale and offer for sale occurred "no earlier" than June 2007.  (Buccigross Ex. E, p. 6.)  As the Court knows, this was false.  As to public use, Nyko contended that the CES demonstration in January 2007 was private, and that it had been unable to identify the first public use.

1    PDP requested further supplementation to provide the factual basis for these

2    contentions.  (*Id*. Ex. F.)  Nyko refused, arguing that Defendants must serve another

3    interrogatory, and threatening to seek sanctions if Defendants moved to compel.

4    (*Id*.)  When Defendants persisted, Nyko again supplemented its response to

5    Interrogatory No. 3 on December 20, 2012, this time contending (1) it could not

6    identify any individuals who saw the Charge Base at CES 2007, (2) it could not

7    locate the sample shown at CES or determine whether it was a working sample, and

8    (3) that showing the Charge Base "privately to select individuals at a private hotel

9    suite [does not] constitute a public disclosure of the claimed invention."  (*Id*. Ex. G.)

10   These contentions were preposterous given Nyko's admissions about the

11   demonstrations in the hotel suite, as well as the publicly available videos and press

12   coverage of the Charge Base at CES.  But Nyko did not want to divulge the facts.

13   Given the documentary evidence of January 2007 sales that had come to light

14   and Nyko's refusal to explain its contentions, Defendant Eveready Battery Co.

15   propounded follow-up interrogatories, but Nyko continued to stonewall.  (*Id*. ¶ 11.)

16   Interrogatory No. 9 sought the bases for Nyko's contentions that it did not sell or

17   offer to sell any Charge Base products prior to March 7, 2007.  Nyko's March 8,

18   2013 response stated without explanation that "Nyko contends there was no firm

19   sale or offer for sale of the accused product prior to June 2007."  (*Id*. Ex. H, p. 10.)

20   Interrogatory No. 10 sought the bases for Nyko's contentions that the Charge Base

21   was not in public use prior to March 7, 2007.  Nyko's response admitted that the

22   Charge Base shown at CES "included each and every feature of the claimed

23   invention," but again espoused the bad faith position that "access to the Nyko suite

24   was not 'public'" and "the disclosures did not amount to 'public use.'"  (*Id*., pp. 13–

25   14.)

26       2.    <u>Nyko's Deficient Document Productions</u>

27   Nyko also delayed producing, and in fact never did produce, all documents

28   relating to its sales prior to the critical date.  PDP propounded its comprehensive

First Set of Requests for Production on July 16, 2012.  (*Id*. Ex. I.)  A number of those requests sought documents relating to use and sales prior to the critical date.  (*Id*. ¶ 14.)  As of November 6, 2012, over seven months after it filed the case, Nyko had only produced 129 documents, and had not produced the vital records of pre-critical date sales.  When Nyko finally produced a sales *summary* (Doc. 133-20), Defendants discovered that Nyko had not produced any of the underlying documents, including purchase orders, sale orders (Nyko's confirmation documents), and invoices, regarding extensive sales activity from January through March 2007.  In November 2012, Defendants notified Nyko that its failure to produce these documents was interfering with their ability to take critical depositions and pursue a case-dispositive motion for summary judgment on their Section 102(b) defenses.  (Buccigross Ex. X.)  On December 5, 2012, PDP wrote Nyko demanding these documents by December 10, 2012.  (Buccigross Ex. J.)  On December 7, 2012, the parties conducted a formal meet and confer on Defendants' planned summary judgment motion and Defendants again demanded production of the sales documents.  (*Id*. ¶ 16.)

Still not having received the documents, on December 20, 2012, PDP served its portion of a motion to compel.  (*Id*. ¶ 17.)  On December 26, 2012, PDP agreed to withdraw the joint stipulation in reliance on Nyko's agreement to produce all documents by January 9, 2013.  (*Id*. Ex. K.)  On January 9, 2013, Nyko wrote PDP claiming it was unable to produce all documents that day.  (*Id*. ¶ 19.)  Nyko did not produce additional sales documents until January 30, 2013, at the long-delayed deposition of Amir Navid.  (*Id*. ¶ 20.)  Even then, Nyko still did not produce all the sales documents; indeed, Nyko did not produce a single purchase order or sales order pertaining to the pre-critical date sales to customers other than Amazon.  (*Id*.)

### 3.    Nyko's Stonewalling of Depositions

Nyko's evasion of critical depositions was egregious and, by itself, justifies an award of sanctions.  Defendants first noticed the deposition of Amir Navid on

October 12, 2012 to take place on November 8. (*Id*. ¶ 22.) The deposition of Mr. Navid was critical to the issues of prior use and prior sale. Because Nyko stonewalled its document production leading up to the deposition, Defendants were forced to re-notice the deposition for December 5, 2012. (*Id*. Ex. L.) After being asked to confirm that Mr. Navid would appear, Nyko stated that he would not, that Nyko would still not be finished with its document production, and proposed that the deposition be scheduled for mid-January 2013. (*Id*. Ex. M.) Defendants responded that this delay was unacceptable in light of their intention to move for summary judgment, but proposed to delay the deposition if Nyko would agree to provide complete responses to the outstanding interrogatories regarding public use and sales. (*Id*. Ex. N.) Nyko refused, yet failed to appear for the deposition as noticed. (*Id*. ¶ 25.)

Nyko agreed to complete its document production regarding public use and offers for sale by January 9, 2013 (which would allow the Navid and Arbogast depositions to go forward on January 15 and 16, 2013), in exchange for Defendants' agreement to withdraw their motion to compel. (*Id*. ¶ 28.) Nyko breached this agreement and, as a result, Defendants were not able to complete Navid's deposition until January 30, 2013, and even then, without a complete document production.[4] (*Id*. ¶ 29.) This was one of several times that Nyko forestalled a motion to compel by making promises it did not keep.

Nyko's evasion of the Arbogast deposition was just as egregious. On December 14, 2012, Defendants noticed the deposition of Chris Arbogast, whom Nyko had identified as its most knowledgeable witness regarding the public use and offers for sale of the Charge Base, to take place on January 16, 2013. (*Id*. ¶ 27.)

---

[4] Notably, while refusing to produce Navid until mid-January 2013, Nyko noticed three depositions of Defendants' employees for December 21 and 27, 2012 and January 9, 2013. (Buccigross ¶ 26.)

Nyko waited three weeks after the notice before telling Defendants that Arbogast was purportedly unavailable on January 16, 2013. (*Id*. ¶ 30.)

Defendants stated that they would change the date of the deposition only if Nyko provided an alternative date between January 10 and 24, 2013, even offering to take the deposition on a weekend. (*Id*. Ex. O.) Nyko ignored this offer and simply failed to appear for the properly noticed deposition. (*Id*. ¶ 31.) Having received no alternative dates, Defendants re-noticed the deposition for January 29, 2013, and again Arbogast simply failed to appear for the properly noticed deposition. (*Id*. ¶¶ 32–33.) On the same day, Nyko finally provided proposed dates for the deposition, but not until March 2013, three months after Defendants noticed his deposition. (*Id*. ¶ 34.)

Throughout Defendants' attempts to get Nyko to produce Arbogast for his deposition, Defendants reminded Nyko that Nyko had identified Mr. Arbogast as its most knowledgeable witness as to its public use and sales of the Charge Base, and that his deposition was necessary to allow Defendants to file their motion for summary judgment. (*Id*. ¶ 35.) Defendants also offered, on several occasions, to stay other aspects of the litigation to allow the Court to resolve the priority and Section 102 issues without unnecessary expense. (*Id*. ¶ 35, Ex. P.) Nyko consistently refused. (*Id*. ¶ 35.) Adding insult to injury, when Nyko finally produced Mr. Arbogast for his deposition, Defendants learned that he was not, in fact, knowledgeable about Nyko's early 2007 sales activity, and lacked any familiarity with the documents regarding these sales. (*Id*. ¶ 36.) Nyko's delays, misinformation and obstruction had already delayed Defendants' pursuit of the truth for many months, and Nyko had delayed it yet again.

## F.   Nyko's Bad Faith Pursuit of Litigation Against Energizer and Eveready

In a plain effort to exert pressure on PDP and run up costs, Nyko also sued Energizer Holdings, Inc., which merely licenses its trademarks to PDP and posts

some information about the accused products on its website.  On October 12, 2012, counsel for Energizer wrote Nyko confirming these facts and requesting that the case against Energizer be dismissed.  Counsel also explained that Energizer employees had, at most, purchased 50 units of the accused products, and that any damages would be due from PDP and not Energizer.  (*Id*. Ex. Q.)  Nyko not only refused to dismiss Energizer, but subsequently sued a related entity, Eveready Battery Company, as well.  (Doc. 85.)  Nyko proceeded to run up litigation costs by propounding two sets of requests for production on Energizer and three sets of requests for production on Eveready, requiring extensive document collection, review, and production.  (Buccigross Exs. R–V.)  Nyko also issued interrogatories to Energizer.  (*Id*. Ex. W.)  Further, Nyko deposed an Eveready employee (Danielle Kyriakos), and noticed up the Rule 30(b)(6) depositions of Energizer and Eveready, as well as the deposition of an additional Eveready employee.  (*Id*. ¶ 44.)

### G.      Nyko's Attempts to Coerce a Settlement Based on Litigation Expense

In order to avoid further litigation expenses, including expenses associated with expert reports and expert discovery, Defendants engaged Nyko in renewed settlement discussions.  In June 2013, Defendants offered Nyko a cash settlement and also offered to not file their motion for summary judgment of invalidity in exchange for Nyko dropping its enforcement action and granting Defendants a fully-paid, perpetual license to the '848 and related patents.  The parties engaged in settlement discussions through August of 2013, and even reached agreement in principle on a settlement amount and other key terms.  However, discussions broke down in August when Nyko reneged on its counsel's promise to deliver a perpetual license and instead only offered a limited license that would not cover new charge stations for next-generation consoles.  These consoles were released just last week. (Yannuzzi ¶ 3.)

Throughout settlement discussions, Nyko repeatedly threatened continued, expensive litigation, including an appeal of summary judgment, if they lost the motion.  Nyko has followed through with its threat.  Defendants delayed preparing expert reports as long as possible while the parties continued settlement discussions.  Indeed, Defendants even sought and obtained agreement from Nyko to extend the deadline for opening and rebuttal expert reports in an attempt to save costs and fees in anticipation of a settlement.  Throughout this time, through August 2013, Defendants delayed finalizing and filing their motion for summary judgment to give the parties a chance to settle the matter.  (Yannuzzi ¶ 4.)

### H.    Nyko's Bad Faith Positions in Opposition to Summary Judgment

When it finally became apparent that a settlement with Nyko was impossible, Defendants filed their motion for summary judgment of invalidity based on the public use, sales, and offers for sale of the claimed invention more than one year before the effective filing date of the asserted claims.  As noted by the Court at the hearing and in its order granting the motion, many of Nyko's arguments in response to the motion were incredible, and simply disregarded the documentary evidence:

- The undisputed facts, and those that are without substantial controversy, establish that:  (1) the invention described in the '848 Patent was in public use and offered for sale in January 2007; (2) the invention was not described in the '364 Provisional and therefore not entitled to the earlier priority date.  (Doc. 205, p. 2.)

- NYKO has offered the convoluted argument that the Model must not have been working because all four lights on the Model's LED display lit up during the demonstration, whereas if it had been functioning only two would have been illuminated.  NYKO therefore asks the Court to ignore contrary evidence and draw the inference that it must have been only a mockup of the anticipated Charger.  (*Id.*, p. 8 n.10.)

- Because only a Model which had been reduced to practice would trigger the public use bar, NYKO seeks refuge in its recent contention that the Model shown at CES was not a functioning version of the Charger.  But the record will not support such a contention. … Bizarrely, Plaintiffs own

exhibits in opposition to the motion provide further clear evidence that the Model was operational.  (*Id.*, pp. 8–9.)

- In support of its argument that the Model was an inoperable dummy, NYKO has ignored the undisputed and incontrovertible facts now before the Court.  When those facts, which come from NYKO's files and its own witnesses are considered, it is clear that Plaintiff has not created a genuine issue of fact for trial on the public use issue.  NYKO's suggestion that the Model was an inoperable dummy contradicts the inventor's earlier sworn declaration, the documentary record, and Plaintiff's interrogatory answers. (*Id.*, p. 17.)

- Plaintiff has not shown any evidence that would establish any conceivable ground for the Court to ignore the admissions of NYKO and the inventor. Rather, grasping at straws, Plaintiff argues that the Model was non-operational based on video and photographs of the device's LED display taken during CES.  (*Id.*, p. 18.)

- Plaintiff contends that the CES display was not a public use for statutory purposes because the event was held in a private suite, and only people with invitations were allowed to attend. … At the very least, Plaintiff "demonstrated [the Model] at the suite" for members of the press. And, as indicated by its press release and ensuing online publicization of the Charger, Plaintiff appears to have wanted the press to be as non-confidential in their discussion of the Charger as possible.  No understanding of confidentiality could possibly be implied in this situation. Indeed, Navid's declaration testimony, cited above, indicates that the device was introduced at CES to "great fanfare," which was the obvious purpose of the demonstration. There was one reason and one reason only for inviting the press to view the device -- to generate publicity as widespread as possible for a device that NYKO immediately put on sale. (*Id.*, pp. 19–20.)

- To the extent that NYKO has suggested that the use was an "experimental use," the Court considers the argument totally meritless.  The entire purpose of the demonstration was to gauge and generate market interest in the product, neither of which constitutes "experimentation" within the meaning of Federal Circuit jurisprudence.  (*Id.*, p. 20 n.17.)

- Plaintiff explains that NYKO's ordinary custom upon the release of a new product, which it followed in this case, was to gauge interest with pre-orders prior to forming binding contracts. … Moreover, Plaintiff asks the

Court to interpret the initial orders as not setting a price.  This argument
fails upon examination of the undisputed documentary evidence.  (*Id.*,
p. 21.)

- Every single piece of evidence points to the conclusion that the Purchase
and Sales Orders reflect commercial sales within the meaning of Section
102(b ).  (*Id.*, p. 22.)

In filing this case, refusing to dismiss it, hiding the truth, litigating
aggressively and in bad faith, and misrepresenting the facts to Defendants and the
Court, Nyko simply delayed what was inevitable from the beginning, a
determination that the asserted claims were invalid based on Nyko's own public use
and sales activity.  Nyko's conduct was inexcusable and renders this case
exceptional.

## III.   ARGUMENT

Exceptional cases normally involve inequitable conduct, bad faith litigation,
and/or litigation misconduct.  *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
726 F.3d 1359, 1366 (Fed. Cir. 2013).  Here, there is all three.

### A.   Navid's Inequitable Conduct Justifies Declaring This Case Exceptional

A judgment on different case dispositive issue does not prevent a court from
awarding attorneys' fees based on inequitable conduct.  The Federal Circuit has
noted that an inequitable conduct determination could be made solely to determine
whether attorneys' fees are warranted.  *Paragon Podiatry Lab., Inc. v. KLM Labs.,
Inc.*, 984 F.2d 1182, 1188 n.6 (Fed. Cir. 1993).  Likewise, the Federal Circuit has
reviewed an inequitable conduct determination as part of an attorneys' fees award
after a summary judgment determination of patent invalidity due to the on-sale bar.
*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1375, 1379 (Fed.
Cir. 2001).  Accordingly, this Court may consider Navid's inequitable conduct in
obtaining the '848 patent as one basis for awarding attorneys' fees.  Inequitable
conduct by itself is a basis for declaring a case exceptional without any other

misconduct.  *Nilssen v. Osram Sylvania, Inc.*, 528 F.3d 1352, 1358 (Fed. Cir. 2008).

Inequitable conduct may be found when a patent applicant:  (1) misrepresented or omitted certain information in applying for the patent; (2) that information was material, i.e., but for its omission or misrepresentation the PTO would not have issued the patent; and (3) the misrepresentation or omission was made with the specific intent to deceive the PTO.  *American Calcar, Inc. v. American Honda Motor Co., Inc*., 651 F.3d 1318, 1334 (Fed. Cir. 2011); *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011).  In evaluating whether conduct was inequitable, it must be noted that the PTO imposes a duty of candor on all individuals associated with the filing of a patent.  This includes an obligation to disclose information on possible prior public uses, sales, and offers to sell.  37 C.F.R. § 1.56; *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1368 (Fed. Cir. 2008).

Here, the materiality of the information withheld by Nyko has been established as a matter of law based on the Court's invalidity determination.  "[I]f a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO."  *Therasense*, 649 F.3d at 1292.  With respect to intent,

> As patent applicants rarely admit intentionally misleading the patent office, intent to deceive can be inferred from the facts and circumstances surrounding the conduct at issue. *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989); *Cargill*, 476 F.3d at 1364. Where intent is inferred from indirect and circumstantial evidence, the clear and convincing standard is met only when the intent to deceive is "the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290 (quoting *Star*, 537 F.3d at 1366).

*Apotex, Inc. v. Cephalon, Inc.*, Case No. 2:06-cv-2768, U.S. Dist. LEXIS 125859, at *80–81 (E.D. Pa. Nov. 7, 2011), *aff'd per curiam*, 500 Fed. Appx. 959 (Fed. Cir. 2013).  In *Apotex*, the district court found that intent to deceive was the single most reasonable inference because of, among other things, the applicant's "complete concealment" of a highly material pre-critical date supply agreement that included an agreement to purchase and sell the claimed patented pharmaceutical, as well as the patentee's lack of good faith explanation for the concealment. *Id.* at *81–85.

Here as well, the single most reasonable inference is that Navid specifically intended to mislead the PTO by completely concealing Nyko's own invalidating public use and sales activity.  Navid was admittedly aware of his obligation to disclose public use and sales of his claimed invention more than one year before the filing of his application.  (Buccigross Ex. A, pp. 295–97.)  Nevertheless, despite his admission that "Nyko introduced the Charge Base product at the Consumer Electronics Show in Las Vegas to great fanfare in January 2007," Navid neglected to disclose this material information to the PTO.  To add insult to injury, he later contended to the Court that this demonstration was not public.  He alternately testified that he assumed the '295 application was effectively filed within a year of the public use and sale of the Charge Base based on the Provisional, despite his knowledge that the Provisional was limited to the adapter embodiment.  When confronted with this fact, Navid repeatedly denied that the adapter was a separate component in an effort to support priority for the asserted claims.  (*See* Buccigross Ex. A, pp. 138–157.)  As mentioned above, his testimony on this point is offensive in its lack of candor.

In fact, Navid lacks any credibility as a witness.  In his earlier deposition in the Nintendo case, he testified that:

- There must have been deception by the applicant or a mistake by the PTO in issuing the Nintendo patent because there was obvious prior art. (Buccigross Ex. C, pp. 19–20.)

- Because he believed the Nintendo patent was invalid, he contended that Nintendo had filed a bogus case.  (*Id.*, p. 19.)

- Sometimes patents get issued that should not get issued.  (*Id.*, p. 34.)

- Because the PTO relies on the party that is submitting the application and the PTO is very busy trying to research the prior art, a lot of patents are issued with no merit, which stifles technology and growth.  (*Id.*, pp. 34–35.)

- A patent applicant or owner should promptly warn a potential infringer of its potential infringement.  (*Id.*, pp. 21, 36–37.)

When confronted with this testimony at his deposition in the case, he waffled, weaseled, and back-pedaled on each of these points because they contradict Nyko's arguments in this case.  (*See* Buccigross Ex. A, pp. 15–28, 34–35.)  The record before this Court shows that Navid will say whatever he believes will support his present argument, regardless of its truth and regardless of what he testified to previously.  Navid's dissembling explanations for his failure to disclose and his lack of candor and consistency in his sworn testimony strongly support an inference of intent to deceive the PTO.

The Federal Circuit strongly supports inequitable conduct determinations based on the failure to disclose an on-sale bar.  In *Paragon*, the court noted:

> Absent explanation, the evidence of a knowing failure to disclose sales that bear all the earmarks of commercialization reasonably supports an inference that the inventor's attorney intended to mislead the PTO.  **The concealment of sales information can be *particularly egregious*** because, unlike the applicant's failure to disclose, for example, a material patent reference, **the examiner has no way of securing the information on his own.**

*Paragon*, 984 F.2d at 1193 (emphasis added); *see also Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007) (quoting the same section from *Paragon*).  The Federal Circuit has repeatedly affirmed exceptional case findings in instances where the patentee merely withheld prior art.  *See e.g., Taltech Ltd. v. Esquel*

1   *Enters. Ltd.*, 604 F.3d 1324, 1329 (Fed. Cir. 2010); *Agfa Corp. v. Creo Prods. Inc.*,

2   451 F.3d 1366 (Fed. Cir. 2006); *Evident Corp. v. Church & Dwight Co.*, 399 F.3d

3   1310 (Fed. Cir. 2005); *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*,

4   394 F.3d 1348 (Fed. Cir. 2005); *Brasseler*, 267 F.3d 1370.

5   In *Agfa*, for example, the inventor failed to disclose known prior art

6   contradicting Agfa's positions during prosecution. *Agfa*, 451 F.3d at 1377. The

7   inventors, who were Agfa employees, knew of the prior art because Agfa displayed

8   and sold the prior art products. *Id.* at 1378. Accordingly, based on a finding of

9   inequitable conduct for failure to disclose the prior art, the court determined that the

10  case was exceptional and awarded fees. The same essential facts exist here, and

11  warrant the same result.

12  **B.    Nyko's Filing and Maintenance of this Unjustified Litigation**
       **Justifies An Award of Attorney Fees**

13

14  "A case may be deemed exceptional when there has been some material

15  inappropriate conduct related to the matter in litigation, such as … misconduct

16  during litigation, vexatious or unjustified litigation, conduct that violates Fed. R.

17  Civ. P. 11, or like infractions." *Brooks*, 393 F.3d at 1381; *see also Digeo, Inc. v.*

18  *Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007). A court may find a case

19  exceptional because the case is unjustified or frivolous. *See Stephens*, 393 F.3d at

20  1273–74; *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551

21  (Fed. Cir. 1989). "A frivolous infringement suit is one [that] the patentee knew or,

22  on reasonable investigation, should have known was baseless," such as bringing suit

23  on a patent despite knowledge of earlier sales that would invalidate it. *Stephens*,

24  393 F.3d at 1273–74; *Interpart Corp. v. Italia*, 777 F.2d 678, 686 (Fed. Cir. 1985).

25  Similarly, continuing with litigation after learning of invalidating sales can justify

26  attorney fees. *Hughes v. Novi Am. Inc.*, 724 F.2d 122, 125–26 (Fed. Cir. 1984).

27  Here, there can be no dispute that Nyko knew of the invalidating public use

28  and sales before it filed the lawsuit. As observed by the Court, the evidence of such

use and sales came from its own witnesses and documents.  (Doc. 205, p. 17.)
Moreover, Defendants exposed this public use and sales activity in opposing Nyko's
application for a TRO (Docs. 41–42), yet Nyko continued this litigation in bad faith.
*See Hughes*, 724 F.2d at 125.[5]  Nyko's filing and maintenance of this action despite
undisputed knowledge of its own invalidating public use and sales activity further
supports a finding that this is an exceptional case.

## C. Nyko's Litigation Misconduct Justifies Declaring This Case Exceptional

Putting aside Navid's inequitable conduct and bad faith pursuit of this
frivolous case, Nyko's misconduct during the course of this litigation forms a
separate basis for finding this case exceptional.  "[L]itigation misconduct alone may
suffice to make a case exceptional."  *Monolithic*, 726 F.3d at 1366; *see also Eon-Net
LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1323 (Fed. Cir. 2011) ("[L]itigation
misconduct and unprofessional behavior may suffice, by themselves, to make a case
exceptional under §285."); *Taltech*, 604 F.3d at 1329; *Brasseler*, 267 F.3d at 1380.
Litigation misconduct includes a wide range of actions, including discovery abuses
and submitting false and misleading documents.  *Eon-Net*, 653 F.3d at 1324–26
(e.g., destroying documents prior to litigation, lodging misleading evidence,
submitting contradictory declarations, and showing contempt for discovery each are
examples of litigation misconduct); *Brasseler*, 267 F.3d at 1380 (engaging in "high-
spun wordplay" to diminish the implications arising from one's conduct is litigation
misconduct).  Litigation misconduct does not even require bad faith.  *Monolithic*,
726 F.3d at 1367.

Nyko's litigation misconduct in this case included all of the above and more:

- Filing a massive emergency application for a TRO instead of an earlier

---

[5]     To the extent Nyko relies on any purported mistaken belief that the asserted
claims were entitled to the priority of the Provisional, that belief was also dispelled
in Defendants' opposition to the TRO.  (Doc. 19, p. 6 n.4.)

motion for preliminary injunction that would have provided Defendants a more fair opportunity to prepare an opposition.  Then filing detailed reply and surreply papers in violation of the Local Rules and with no opportunity for Defendants to respond.

- Refusing to dismiss the case after its pre-critical date public use and sales of the claimed invention were brought to light in Defendants' opposition to the TRO.

- Despite forcing Defendants to undertake a massive fire drill in opposing the TRO, Nyko stonewalled Defendants' efforts to defend themselves.  Nyko provided <u>no</u> substantive discovery responses for over three months.  When it did, it provided a series of incomplete, misleading, and just plain false interrogatory responses regarding public use and the pre-critical date sales.  And, when threatened with motions to compel, Nyko continued to stonewall by promising production to avoid the motion, reneging on that promise, then repeating the pattern.

- Nyko delayed producing vital documents for months and, to this day, has not produced dozens of documents regarding known pre-critical date sales.

- Nyko delayed two critical depositions for months and simply failed to appear for noticed depositions on at least three occasions without having arranged alternative dates.

- In his deposition, Navid was evasive, misleading, and dishonest in attempting to obscure Nyko's public use, offers for sale, and the facts relating to priority.

- Nyko sued two defendants that had nothing to do with its infringement allegations simply to harass PDP and run up litigation expenses.

- Nyko attempted to use litigation expense to extort a settlement, even when it was clear that Defendants would prevail on its invalidity defenses.

- In opposing Defendants' motion for summary judgment, Nyko offered misleading evidence and arguments that conflicted with or were not supported by the documentary evidence.

In *Novitas, Inc. v. Genlyte Group, Inc.*, No. CV 91-3857 MRP, 1995 U.S. Dist. LEXIS 21089, *60 (C.D. Cal. Mar. 9, 1995), Judge Pfaelzer held:  "The circumstances warranting a finding of an exceptional case include: … (b) With

knowledge of invalidity, [plaintiff] then chose to invoke judicial process to assert its
unlawfully procured patent against [defendant]. During the lawsuit, [defendant]
inquired repeatedly about the existence of any prior uses or sales. [Plaintiff] had
every opportunity to divulge the truth. Instead, [plaintiff] made false statements
calculated to mislead [defendant].  (c) When confronted with [defendant's] exposure
of its false statements, [plaintiff] refused to voluntarily discontinue the litigation."

Here, Nyko engaged in the precise misconduct that was found in *Novitas* to
justify an award of attorney fees.  Defendants inquired repeatedly about the
evidence of prior use and sales.  Nyko had every opportunity to divulge the truth
based on its own documents and the knowledge of its own witnesses.  Instead, Nyko
made evasive and false statements calculated to mislead Defendants and the Court.
When confronted with the indisputable evidence of its public use and sales, Nyko
refused to voluntarily discontinue the litigation.

### D.  The Combination of Inequitable Conduct, Unjustified Litigation and Litigation Misconduct Renders This Case Exceptional

This case involves three independent grounds that each individually justify
declaring the case exceptional and awarding Defendants their attorneys' fees, expert
witness fees, and non-taxable costs.  When combined, Navid's inequitable conduct,
Nyko's filing and pursuit of an unjustified case, and Nyko's litigation misconduct
make this case exceptional, fully justifying an award of attorney fees to Defendants.
*See Monolithic*, 726 F.3d at 1367 (citing *Yamanouchi Pharm. Co. v. Danbury
Pharmacal, Inc.*, 231 F.3d 1339, 1347 (Fed. Cir. 2000) (holding that courts must
take into account the "totality of the circumstances" when determining whether to
award attorneys' fees)).

## IV.  DEFENDANTS' ATTORNEY FEES AND COSTS WERE REASONABLE

Defendants seek $1,819,548.50 in attorney fees.  Although this sounds like a
large amount, these fees are reasonable in light of Nyko's aggressive and extended

pursuit of this litigation as addressed above.  These fees are also in line with the customary hourly rates for attorneys in Southern California for comparable litigation and the average fees for this type of litigation according to the AIPLA survey.  (*See* Hanle Decl. submitted herewith.)

Defendants also seek $131,014.42 in expert witness fees and $44,607.31 in non-taxable costs.  (*See* Mueller Declaration submitted herewith.)  Non-taxable costs may be awarded under § 285.  *Mathis v. Spears*, 857 F.2d 749, 758 (Fed. Cir. 1988); *Central Soya Co. v. Geo. A. Hormel & Co*., 723 F.2d 1573, 1578 (Fed. Cir. 1983).  The Court has inherent equitable power to determine the level of exceptionality rising out of the offender's conduct and to determine, in light of that conduct, the compensatory quantum of the award, including the amount of attorney fees and what expenses should be included.  *Mathis*, 857 F.2d at 757–58.  Those include the reasonable and necessary out-of-pocket expenses of providing a lawyer's services that are routinely paid by counsel and billed to the client, that are not taxable costs or prohibited by statute, and that are not expenses incurred for the mere convenience of counsel.  *Id*.

While expert witness fees are not covered by § 285, a district court may award expert witness fees pursuant to its inherent authority. *Takeda Chem. Indus. Ltd. v. Mylan Labs*. Inc., 549 F.3d 1381, 1391 (Fed. Cir. 2008).  Here, expert witness fees are justified based on Nyko's delays and the arguments made by Nyko and its experts.  (*See* Mueller and Yannuzzi Declarations submitted herewith.)

## V.    CONCLUSION

Amir Navid knew that the invention underlying the asserted patent was publicly used and on sale prior to the critical date, but committed inequitable conduct by failing to disclose the invalidating activities to the PTO.  Despite knowing of the patent's invalidity, Nyko filed this spurious litigation.  Further,

1    Defendants put Nyko on notice of the patent's invalidity at the outset of this

2    litigation when Nyko moved for a temporary restraining order.  Yet, Nyko continued

3    litigating, repeatedly twisted the facts, and stonewalled Defendants' legitimate

4    discovery efforts.  Defendants respectfully request that the Court determine this case

5    to be exceptional and award attorney fees and non-taxable costs pursuant to 35

6    U.S.C. § 285 and the Court's inherent power.

7

8

9

10   Dated:  November 18, 2013          SHEPPARD, MULLIN, RICHTER & HAMPTON

11                                      By     /s/ Steven M. Hanle

12

13                                      Attorney for Energizer Holdings, Inc.,
                                        Eveready Battery Company, Inc., and
14                                      Performance Designed Products LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

<u>STATE OF CALIFORNIA, COUNTY OF SAN DIEGO</u>

I am employed in the County of San Diego; I am over the age of eighteen years and not a party to the within entitled action; my business address is 12275 El Camino Real, Suite 200, San Diego, California 92130.

On November 18, 2013 I electronically filed the following document(s) described as

**NOTICE OF MOTION AND MOTION FOR ATTORNEY FEES; MEMORANDUM OF POINTS AND AUTHORITIES**

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the interested parties who have consented to electronic service via the CM/ECF system.

S. Art Hasan
G. Warren Bleeker
Katherine Quigley
Christie Parker and Hale LLP
655 North Central Avenue Suite 2300
Glendale, CA 91203-1445
Art.hasan@cph.com
Warren.bleeker@cph.com
Katherine.Quigley@cph.com

I declare that I am employed by a member of the bar of this Court, at whose direction this service was made.

Executed on November 18, 2013 at San Diego, California.


/s/ Sarah Lewis
Sarah Lewis

Case No. CV12-03001
CERTIFICATE OF SERVICE