Page 1

```
 1            UNITED STATES DISTRICT COURT
 2           WESTERN DISTRICT OF WASHINGTON
 3                       - - -
 4
 5  NINTENDO OF AMERICA, INC., a  )
    Washington corporation,       )
 6                                )
            Plaintiff,             )
 7                                )
         vs.             ) Case No. CV
 8                       ) 08-0907 RSL
    NYKO TECHNOLOGIES, INC., a    )
 9  foreign corporation,           )
                                  )
10          Defendant.              )
                                  )
11
12
13
14     CONFIDENTIAL - ATTORNEYS' EYES ONLY
15         DEPOSITION OF AMIR NAVID
16          Santa Monica, California
17         Wednesday, October 23, 2008
18               VOLUME I
19
20
21  Atkinson-Baker, Inc.
    Court Reporters
22  (800)288-3376
    www.depo.com
23
24  REPORTED BY:  Sharon Campbell, CSR NO. 8643, RPR
25  FILE NO.:  A2093D3
```

Page 2

```
 1            UNITED STATES DISTRICT COURT
 2           WESTERN DISTRICT OF WASHINGTON
 3                       - - -
 4
 5  NINTENDO OF AMERICA, INC., a  )
    Washington corporation,       )
 6                                )
            Plaintiff,             )
 7                                )
         vs.             ) Case No. CV
 8                       ) 08-0907 RSL
    NYKO TECHNOLOGIES, INC., a    )
 9  foreign corporation,           )
                                  )
10          Defendant.              )
                                  )
11
12
13       DEPOSITION OF AMIR NAVID, a witness
14  herein, taken on behalf of the plaintiff at
15  1620 26th Street, Santa Monica, California,
16  commencing at 9:52 A.M., Thursday,
17  October 23, 2008, before Sharon Campbell,
18  CSR No. 8643, RPR.
19
20
21
22
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3  For the Plaintiff:
 4  PERKINS COIE LLP
    BY:  SUSAN FAHRINGER
 5       HARRY SCHNEIDER
    1201 Third Avenue
 6  Suite 4800
    Seattle, Washington 98101-3099
 7  (206) 359-8687
 8
    For the Defendant:
 9
    CHRISTIE, PARKER & HALE
10  BY:  ART HASAN
    350 West Colorado Boulevard
11  Suite 500
    Pasadena, California  91105-1836
12  (626) 795-9900
13
14  ALSO PRESENT:   Matt Egan, Videographer
15
```

Page 4

```
 1              I N D E X
 2  WITNESS:  AMIR NAVID
 3  EXAMINATION                      PAGE
 4     By Ms. Fahringer                7
 5
 6  EXHIBITS:
             PLAINTIFF'S
 7  NO.      DESCRIPTION            PAGE
 8  643   Email from Amir Navid to KS Ho,   149
          dated July 16, 2008, Subject:
 9        New Kama Design, and attaching
          Kama version two.pdf
10
    644   Email chain, top one from Amir    156
11        Navid to KS Ho, dated January 17,
          2008, Subject Nunchuk sample
12        with earlier program
13  645   Color copy of Wireless Kama in    186
          package, front and back
14
    646   Color copy of Wireless Kama in    192
15        package
    647   Email from Ado Ceric to Amir      202
16        Navid, dated October 8, 2008,
          Subject Kama Sample, and
17        attachments
18
    648   Email chain, top one from Amir    204
19        Navid to KS Ho, dated August 5,
          2008, Subject:  Wing, Kama &
20        Buttons
21  649   Email chain, top one from KS Ho   210
          to Chris Lueck, dated October 9,
22        2008, Subject:  Kama New
          Packaging sample
23
    650   Email from Ado Ceric to KS Ho,    211
24        dated October 9, 2008 Subject:
          Kama New Packaging sample, attached
25        Kama Feedback.pdf
```

Navid, Amir Vol 1 AEO (No linked Ex or Video)                                                         Pages 1 - 4
CONFIDENTIAL - ATTORNEYS' EYES ONLY / COMPETITIVE DECISION MAKING                          NT071894

Exhibit C
Page C-1

Page 17

1    Q    If you will, please let me finish the
2   question.
3    A    Okay.
4    Q    What's the budgeted amount for development
5   of product 87027?
    10:03
6    A    I don't know that offhand.
7         What I want to clarify is that if you're
8   going to use just the item number for this piece --
9   and I think it's really important that we clarify
10  this early on in this deposition.
    10:04
11        Since we are taking and you're aware of it
12  that we are introducing a new model that uses a
13  similar skew number, I want to be clear, if you're
14  asking me a question whether you're referring to
15  version one or version two.
    10:04
16        So I would prefer that you don't use the
17  item number and refer to the product as Kama version
18  one or Kama version two or Wireless Kama version one
19  or Kama Wireless version two.
20   Q    You're welcome to use those terms to refer
    10:04
21  to them.  I will not, but you're welcome to.
22   A    Okay.
23   Q    When you say the skew number is a similar
24  skew number --
25   A    It's the same skew number.
    10:04

Page 18

1    Q    Okay.
2    A    And that's a step that we're taking for
3   the sake of our customers because, you know, we're
4   going through this bogus case; so I wanted to just
5   be clear about that.
    10:05
6         As far as the budget, I wouldn't have the
7   accurate figure.  There was some tooling costs
8   involved.  Most of the development was done by
9   myself.
10        So it was not quite as extravagant as some
    10:05
11  of the other ones, but it certainly was substantial.
12   Q    So same skew number 87027; correct?
13   A    Uh-huh.
14   Q    And for the court reporter's benefit,
15  you'll have to --
    10:05
16   A    Yes.
17   Q    -- articulate your answers.
18   A    Okay.
19   Q    And you'll also have to wait until I
20  finish my question.  It makes it very difficult on
    10:05
21  the court reporter when we talk over each other.
22        So why do you consider this a bogus case?
23   A    Because there's prior art, very prominent
24  prior art.  There is no uniqueness to the product in
25  question.
    10:05

Page 19

1         There's very well-known -- I mean, what
2   really frustrates me is the fact that anyone,
3   especially a company like Nintendo based in Japan,
4   should be aware of several products that either
5   closely resemble or their design was heavily
    10:06
6   influenced by.
7         But there is a product called the ASCII
8   Grip 2.  Especially version two, that was available
9   about nearly ten years ago that is the same
10  functionality, same shape, down to the strain relief
    10:06
11  and the cord that comes out of it.
12        So yes, there's certainly prior art.  So I
13  think it's a very bogus case.  In addition, you
14  know, we're talking about -- especially in the
15  actual case, when I read the paper of the complaint,
    10:06
16  you know, there's this reference to us knowingly
17  infringing on a product which we absolutely did not
18  do.  There was no proper marking on this product.
19        When you have a patent, you're supposed to
20  mark that product.  You're supposed to label the
    10:07
21  product packaging.  You're supposed to label the
22  product, which was not done, and to this day it's
23  not done.
24        So I do believe that there was a mistake
25  made on the part of the Patent Office issuing this
    10:07

Page 20

1   patent to Nintendo, which I do believe is invalid.
2         And I think, you know, there must have
3   been some mistake or some sort of deception on the
4   side of whoever filed this report because there is
5   prior art, very obvious prior art.
    10:07
6         So I think anyone who is involved in the
7   gaming industry can look at this prior art, look at
8   the Nintendo piece, and they would understand how
9   closely it resembles it and the functionality.  What
10  it does, how it works, the fit, the look, the
    10:08
11  functionality -- it's very obvious.
12   Q    So you feel that the patents asserted in
13  this case are invalid?
14   A    Uh-huh.  Absolutely.
15   Q    And you feel that you shouldn't have been
    10:08
16  accused of infringement because the patents were
17  invalid?
18   A    First of all, I want to clarify that we
19  were not aware of any such patents.  You know, we're
20  all actually fans of Nintendo.  Everyone in this
    10:08
21  company -- we're in the gaming industry.  We all
22  love this business.
23        So we have nothing against Nintendo.  If
24  it was clearly marked, I'm sure, even though there
25  is prior art, we would be willing to do it
    10:08

Navid, Amir Vol 1 AEO (No linked Ex or Video)                                    Pages 17 - 20
**CONFIDENTIAL - ATTORNEYS' EYES ONLY / COMPETITIVE DECISION MAKING**           NT071898

Exhibit C
Page C-2

Page 21

1 differently.
2       I think the prior -- probably the most
3 disappointing aspect of this is that, you know,
4 people -- it's come to my attention that people were
5 aware that this might be infringing on something on
   10:08
6 Nintendo's side and they sat back and didn't inform
7 us.
8       They wanted us to make this product.  They
9 wanted us to bring the product to this stage just so
10 this can happen.  That's disappointing to me, and I
   10:09
11 hope that's not on the part Nintendo Japan.
12       Maybe this was something that was
13 contrived by Nintendo of America because I would
14 think -- I think highly of Nintendo.
15       And that would be disappointing to me as a
   10:09
16 gamer, as a designer because it's just ludicrous.
17       MR. HASAN:  Can we take a five-minute break
18 when you have a chance, please?
19       Q   BY MS. FAHRINGER:  Let me finish this line
20 of questioning, and I'll just be two more minutes.
   10:09
21       So because you feel the patent was
22 invalid, do you feel that you were entitled to copy
23 the shape of the Nunchuk controller?
24       MR. HASAN:  Objection.
25       Lack of foundation as to copying.
   10:09

Page 22

1       THE WITNESS:  Uh-huh.  There was no copying.
2       Again, we don't believe that our product
3 is the same product.  There's some very obvious
4 advantages to our product.  As far as any
5 similarities that would be found in the product,
   10:10
6 it's strictly functional.
7       Again, this is not a shape that -- this is
8 the first rendition of it that we've ever seen in
9 the Nintendo piece.
10       This was available previously.  Parts of
   10:10
11 it are available in nearly ever popular gaming
12 accessory on the market, whether it's the Xbox
13 system -- if you look at the timeline of the
14 development of this controller and this particular
15 piece, there's not even a step between ASCII Grip 2
   10:10
16 and this piece.
17       If anything, it's a step back.  There's
18 less functionality in the Nintendo piece than there
19 is in the ASCII Grip 2.
20       Q   BY MR. FAHRINGER:  What you've called
   10:10
21 version two?
22       A   Uh-huh.  There's the version two of ASCII
23 Grip.  There's two versions.
24       Q   I'm sorry.  I wasn't finished with the
25 question.
   10:10

Page 23

1       A   Uh-huh.
2       Q   What I was referring to was not the
3 version two of the ASCII Grip.  I was referring to
4 what you referred to earlier.
5       A   Uh-huh.
   10:11
6       Q   In these depositions we referred to them
7 as the modified version of product 87027 versus the
8 original version.
9       A   I'm referring to -- are you finished?  I'm
10 sorry.
   10:11
11       Q   I'm sorry.  I'm not.  The modified version
12 of product 87027.
13       A   Uh-huh.
14       Q   Do you feel that is an improvement in
15 function over the original version of product 87027?
   10:11
16       A   Realistically, from the testing we've
17 done, from the feedback we've gotten, from the
18 overall cost and the additional hardship that we've
19 endured, I would say no.
20       Q   I'm sorry.  My question did not go to your
   10:11
21 hardship, your cost.  My question was --
22       A   No, I responded to the --
23       Q   I'm sorry.
24       A   I responded to the functionality as well.
25       Q   I'm sorry.  I'm not finished with the
   10:11

Page 24

1 question.
2       A   Uh-huh.
3       Q   The question is, rather, do you believe
4 just the shape, the functionality of version two of
5 product 87027 -- do you feel that that is an
   10:11
6 improvement over the original version of 87027?
7       MR. HASAN:  Objection.
8       Asked and answered.
9       THE WITNESS:  Do you need me to answer it
10 again?
   10:12
11       Q   BY MS. FAHRINGER:  I do.
12       A   Okay.
13       I would say no.  I would say it's not an
14 improvement.  I would say because of the changes
15 we've made, it's not as functional.
   10:12
16       There's some changes that we made where
17 the product is even bigger.  So for smaller hands,
18 it is more difficult to access some of the buttons.
19       It's more difficult to move your primary
20 fingers than you would use in gaming, which would be
   10:12
21 your index finger and middle finger.
22       It's more difficult to swing those around
23 and access the buttons on the top.
24       Q   Uh-huh.
25       A   And you know, these are changes that we
   10:12

Navid, Amir Vol 1 AEO (No linked Ex or Video)     Pages 21 - 24
CONFIDENTIAL - ATTORNEYS' EYES ONLY / COMPETITIVE DECISION MAKING     NT071899

Exhibit C
Page C-3

```
                                                               Page 25
 1   made in order to appease our retailers.  I want to
 2   be clear about that.  Because this is not -- you
 3   know, I find no foundation in this suit.
 4         I don't believe -- but because of the
 5   power that Nintendo has, and the fear that they can
10:13
 6   put in our retailers as far as allocations of goods,
 7   we have a lot of customers that are nervous about
 8   taking the product as it was.
 9         So we made these adjustments; so they
10   could feel more comfortable taking our product.
10:13
11   Q    BY MS. FAHRINGER:  How do you know that?
12   A    We've been told.
13         Of course, I'm not sure if any of our
14   customers would be willing to testify to that fact.
15   But we're well aware of the fact that we're missing
10:13
16   out on sales because of this suit because it was
17   publicized by Nintendo, and we firmly believe
18   there's no merit to that.
19   MS. FAHRINGER:  I'm finished with this line of
20   questioning.
10:13
21   MR. HASAN:  Okay.  Just a few minutes.
22   THE VIDEOGRAPHER:  The DVD is being stopped.
23   We're going off the record at 10:13 A.M.
24         (An off-the-record discussion was held
25         between the witness and his counsel.)
10:23
```

```
                                                               Page 26
 1   THE VIDEOGRAPHER:  The DVD has been restarted.
 2   We're back on the record at 10:23.
 3   Q    BY MR. FAHRINGER:  Mr. Navid, if you
 4   would, directing your attention to Exhibit 639,
 5   which is in the top of the stack of exhibits before
10:23
 6   you.
 7   A    Thank you.
 8   Q    Do you recognize this as some promotional
 9   material literature about Nyko?
10   A    This looks like marketing material.  It
10:23
11   has the Nyko logo on it.  I would imagine it's
12   accurate, although I've never seen this particular
13   document before.
14   Q    Fair enough.
15         Directing your attention to the first page
10:23
16   of the exhibit --
17   A    Uh-huh.
18   Q    -- is it true -- and the first bullet
19   point where it states that Nyko Technologies has
20   been in business since 1995.
10:23
21         Is that accurate?
22   A    I believe so, yes.
23   Q    And the second bullet point reads that
24   Nyko developed innovative products of the highest
25   quality.  They either have a patented concept, is
10:24
```

```
                                                               Page 27
 1   licensed, or both.
 2         Are you there?
 3   A    Yes.
 4   Q    Is that true to your knowledge?
 5   A    On cases, yes, it is.
10:24
 6   Q    And in general, Nyko tries --
 7   A    Yes, definitely, we have innovative
 8   products -- I'm sorry  to interrupt.
 9   Q    That's fine.
10         In general, is it fair to say that Nyko
10:24
11   owns or licenses or tries to own or license the
12   intellectual property that is at issue in its
13   product?
14   MR. HASAN:  Objection.
15         Vague and ambiguous as to at issue.
10:24
16   THE WITNESS:  It's not.
17   Q    BY MS. FAHRINGER:  Okay.
18   A    Again, I don't think this is what this
19   statement is implying.
20   Q    Fair enough.  Put the exhibit down.
10:24
21   A    Uh-huh.
22         (Witness complies.)
23   Q    Then the question is:  Is it fair to say
24   that Nyko either owns or tries to license the
25   intellectual property that is at issue in its
10:24
```

```
                                                               Page 28
 1   products?
 2   MR. HASAN:  Objection.
 3         Lack of foundation.  Vague and ambiguous
 4   as to at issue.
 5   Q    BY MS. FAHRINGER:  I'll withdraw the
10:25
 6   question.
 7   A    Okay.
 8   Q    And ask a better one.
 9   A    Okay.
10   Q    You understand intellectual property, do
10:25
11   you not?
12   A    Absolutely.
13   Q    And you're an inventor; correct?
14   A    Uh-huh, yes, I am.
15   Q    A named inventor on patents?
10:25
16   A    I am.
17   Q    Along with Mr. Naghi?
18   A    Uh-huh.  Yes.
19   Q    Who in some cases is a co-inventor with
20   you; correct?
10:25
21   A    Yes.  Correct.
22   Q    And you're also generally familiar with
23   trademark law?
24   MR. HASAN:  Objection.
25   Q    BY MS. FAHRINGER:  Just answer -- if the
10:25
```

```
                                                           Page 29
 1  answer is "no," that's fine.
 2      A   I would say lightly -- slightly so.
 3      Q   Okay.
 4      A   To some degree.  You know, things to that
 5  effect, we leave for our legal and also for our
    10:25
 6  marketing.
 7      Q   Do you have an internal legal team at
 8  Nyko?
 9      A   We have a legal teams that we use.
10  Internal, no.
    10:25
11      Q   So you don't have in-house counsel;
12  correct?
13      A   No, we do not.
14      Q   You rely on outside counsel for legal
15  advice?
    10:26
16      A   Yes, that we have on retainer or we
17  consult.
18      MR. HASAN:  Answer generally, not --
19      THE WITNESS:  Yes, absolutely.
20      Q   BY MR. FAHRINGER:  There was nothing wrong
    10:26
21  with your answer, Mr. Navid.  That was a perfectly
22  fine answer.
23          In general, I think your counsel might
24  have gotten energetic because he was concerned that
25  you might share with me some attorney-client
    10:26
```

```
                                                           Page 30
 1  communication and we don't want that today.
 2      MR. HASAN:  Thank you.  That was why I
 3  inserted.
 4      Q   BY MS. FAHRINGER:  So does Nyko own any
 5  trademarks to your knowledge?
    10:26
 6      A   Yes, I believe we do.
 7      Q   Can you recall any of the trademarks that
 8  Nyko owns?
 9      A   Wormlite.
10      Q   W-o-r-m-l-i-t-e?
    10:26
11      A   L-i-t-e; correct.
12      Q   Do you recall -- continue.
13      A   I believe typically, we try to -- we pick
14  some unique names; so I would imagine there's a slew
15  of them.  There's several that we've had over time,
    10:26
16  and I believe we have Intercooler as well.
17          So I don't know exactly how many, but yes
18  we do have trademarks.
19      Q   Who at Nyko is responsible for pursuing
20  trademark rights on behalf of the company?  Arrange
    10:27
21  with outside counsel to register the trademarks and
22  so forth?
23      MR. HASAN:  Lack of foundation.
24      THE WITNESS:  I would -- I would say it could
25  be different people depending on the project, but
    10:27
```

```
                                                           Page 31
 1  typically, it would be something through marketing.
 2      Q   BY MS. FAHRINGER:  Marketing?
 3      A   (No audible response.)
 4      Q   Have you ever been responsible for
 5  pursuing or advising that perhaps you should -- Nyko
    10:27
 6  should obtain a trademark on some term, you
 7  personally?
 8      A   I'm sure there's particular names that I
 9  felt were strong names that defined the product well
10  that are unique and catchy that I felt, you know,
    10:27
11  that I would say I voted for as far as us pursuing a
12  trademark on.
13      Q   Okay.
14          You testified before that you were an
15  inventor on patents.
    10:28
16      A   Uh-huh.
17      Q   And in some instances, co-inventor with
18  the CEO of Nyko, Mr. Herschel Naghi; correct?
19      A   Correct.
20      Q   And are those patents -- well, without
    10:28
21  going into too much detail -- we can if you want.  I
22  have the patents here.
23          But generally speaking, are they assigned
24  to Nyko or any of the patents assigned to Nyko?
25      A   Are the patents themselves?  So have we
    10:28
```

```
                                                           Page 32
 1  assigned the patents?  Yes, they're assigned to Nyko
 2  to my knowledge, yes.
 3      Q   Why would a company seek patent
 4  protection?
 5      MR. HASAN:  Objection.
    10:28
 6          Calls for speculation.
 7      Q   BY MS. FAHRINGER:  Let me withdraw that
 8  question and ask a more direct one of your personal
 9  experience.
10          When you seek patent protection as an
    10:28
11  inventor, why do you do that?
12      A   You know, it's not typically myself that
13  decides, okay, let's patent this particular idea.
14          I would say the obvious reason why, you
15  know, patents exist is in order to protect
    10:29
16  intellectual property, unique designs, innovation.
17          So that would be my general answer to it.
18      Q   And to prevent others from copying that
19  design without a license?
20      A   Uh-huh.  If it's a unique thing, yes
    10:29
21  absolutely.
22      Q   If it's a patented thing?
23      A   If it's a unique product, yes.
24      Q   Would the products being unique be the
25  thing that stops others from copying the product or
    10:29
```

Navid, Amir Vol 1 AEO (No linked Ex or Video)                                    Pages 29 - 32
**CONFIDENTIAL - ATTORNEYS' EYES ONLY / COMPETITIVE DECISION MAKING**           NT071901

Exhibit C
Page C-5

Page 33

1  the fact the product is patented?
2      MR. HASAN: Objection.
3          Calls for speculation.
4      THE WITNESS: I don't --
5      MR. HASAN: Calls for a legal conclusion.
   10:29
6   Q   BY MS. FAHRINGER: You can answer now.
7   A   I believe -- can you repeat the question
8  to me? Because -- sorry -- I just kind of got
9  thrown off. If you would, please.
10  Q   Right. I'll ask a different question.
   10:30
11  A   Okay.
12  Q   When you said that it would -- when we
13 were discussing that patent protection would prevent
14 copying -- do you recall that testimony --
15     Well, let me ask a different question.
   10:30
16 What I'm trying to do is shorten this line of
17 questioning so we don't have to spend too much time
18 with this.
19     But we can go step-by-step?
20  A   Okay.
   10:30
21  Q   When you seek patent protection --
22  A   Uh-huh.
23  Q   -- tell me the reasons why you do that,
24 typically.
25     MR. HASAN: Objection.
   10:30

Page 34

1          Asked and answered.
2      THE WITNESS: Apparently, I've answered the
3  question; so if you would like me to re-answer the
4  question.
5   Q   BY MS. FAHRINGER: That's right.
   10:30
6   A   We seek patents on a general reason that I
7  provided before in order to protect unique ideas and
8  concepts and technologies.
9   Q   And how do patents protect those
10 technologies?
   10:31
11     MR. HASAN: Objection.
12         Calls for legal conclusion.
13  Q   BY MS. FAHRINGER: Just your
14 understanding.
15  A   Well, I would imagine it allows people to
   10:31
16 go through similar circumstances that we're going
17 through right now. Of course, in the case of the
18 patents that we have, they're legitimate unique
19 items.
20     So I would say it's supposed to serve as a
   10:31
21 way of protecting people's unique designs and ideas.
22 However, there's certainly some drawbacks because,
23 you know, like anything, sometimes patents get
24 issued that shouldn't get issued.
25     And, you know, because you rely on the
   10:31

Page 35

1  person who is -- or the party that's submitting the
2  application to the patent office, and you know,
3  there's a lot of information as far as how busy the
4  patent offices are and how much due diligence there
5  is as far as researching prior art.
   10:32
6      So unfortunately, a lot of times you have
7  patents that are issued with no merit. So that
8  causes, you know, a lot of problems, and it actually
9  stifles technology and growth in different
10 industries, not just our own.
   10:32
11     But you know, if a product is unique, a
12 concept is unique, I think the basis of the reason
13 there is a patent system is sound.
14     But unfortunately, you know, there's some
15 drawbacks because sometimes things get through that
   10:32
16 really shouldn't.
17  Q   Has Nyko sued others to enforce its
18 patents?
19  A   I'm not really aware of that. I would be
20 speculating whether or not that's happened. You
   10:32
21 know, we're in an industry where we're frequently
22 copied.
23     And you know -- I don't think anyone
24 really wants to spend tremendous amounts of funds
25 and energy in legal battles. You know, we're there
   10:33

Page 36

1  to make toys. You know, this is what we do.
2      So we're not -- although we have a lot of
3  patents and, you know, we respect other people's
4  intellectual property, and we always try to make
5  unique products, and we're known for that in the
   10:33
6  industry.
7      It's kind of unfortunate, you know because
8  I think the patent laws are abused sometimes.
9   Q   Would it surprise you to know that Nyko
10 has, on multiple occasions, sued to enforce its
   10:33
11 patent rights?
12     MR. HASAN: Objection.
13         Lack of foundation.
14     THE WITNESS: Again, would it surprise me? No
15 I'm sure, like any company, if it was a product that
   10:34
16 was unique and we felt that someone chose to, you
17 know, infringe on our product knowingly, then I see
18 merit in why we would have done that.
19     Again, I don't think it's a general
20 practice for us to go. I know of a recent situation
   10:34
21 that I wouldn't go into that we chose not to go
22 through a legal basis.
23     So I think there should be some fairness
24 in things. I think people should be informed. They
25 should be warned.
   10:34

Navid, Amir Vol 1 AEO (No linked Ex or Video)                                    Pages 33 - 36
**CONFIDENTIAL - ATTORNEYS' EYES ONLY / COMPETITIVE DECISION MAKING**          NT071902

Exhibit C
Page C-6

Page 37

```
 1       If they're, you know, heading down a path
 2  or infringing on something instead of talking about,
 3  you know, involving all the legal aspects and tying
 4  up people, and you know, really putting hardship not
 5  only on the company itself, it's employees, but also
    10:34
 6  the retailers and ultimately the consumer.
 7       I think if there's a way to inform someone
 8  that, you know, they're in dangerous waters, that
 9  would be the ideal thing to do, that would be the
10  humane thing to do.
    10:35
11       So unfortunately, that doesn't always
12  happen.
13  Q    Who at Nyko, if anyone, is responsible
14  that a new product does not infringe other people's
15  rights, other company's rights?
    10:35
16       MR. HASAN:  Objection.
17       Lack of foundation.
18       THE WITNESS:  Again, I think it is a bit of a
19  vague question, as far as, like I said, we make
20  unique products.  Typically almost every single
    10:35
21  time -- I would say every time we try to make a
22  unique product.  That's the direction of the
23  company.
24       And you know, as the head of product
25  development, this is something that we really try to
    10:35
```

Page 38

```
 1  strive for.
 2  Q    BY MR. FAHRINGER:  Do you have any
 3  internal process by which Nyko ensures that a check
 4  is made --
 5  A    Uh-huh.
    10:35
 6  Q    -- a review is done to ensure a new
 7  product does not infringe other's IP?
 8  A    We do the basic due diligence.  If
 9  something is very common and has been on the market
10  for years and years and it's -- you know, we're not
    10:36
11  going to go and check on a cable, you know.  The
12  cable is a cable.
13       Of course, if there's some sort of
14  licensing involved in it, we would seek to get that.
15  But in general, we check to make sure that the
    10:36
16  product -- we have no interest in infringing on
17  anyone's designs.
18       We -- if there's any similarities with our
19  products and anybody else's products, it would be
20  strictly on a functional basis.
    10:36
21       And what we would do is build on that
22  foundation and give some advantages to the end
23  consumer by providing them features that are not
24  there.
25  Q    When you testified that we, meaning Nyko,
    10:36
```

Page 39

```
 1  does basic due diligence, what did you mean?
 2  A    We do a background check as far as -- we
 3  do a -- I know that marketing typically does this.
 4  I think they would have been the best people to
 5  check.
    10:37
 6       But we do inform.  We have internal
 7  meetings as far as introducing projects that we're
 8  working on.  And each party would take their
 9  responsibilities and handle it their own way.
10       So we make products.  I have -- previous
    10:37
11  to working at Nyko, I worked in the gaming industry
12  in retail.  So I have practically 13 years of
13  experience in the market.
14       I'm aware of a lot of products that have
15  come and gone.  A lot of consoles.  A lot of
    10:37
16  controllers, cables, memory cards.
17       And in addition to all the products that
18  came out, there's a slew that thousands if not
19  millions of products that actually never made it to
20  product that were pitched to us as far as products
    10:37
21  that we should consider to bring to market.
22       So personally, I have a very long-standing
23  understanding of the market, products that were
24  involved in the market, products that have been
25  introduced into the market, products that haven't
    10:38
```

Page 40

```
 1  been introduced into the market.
 2       So I think at some stage, there's that
 3  point where like I would check to see if this is a
 4  product that might infringe or if there's a prior
 5  art that I know of.
    10:38
 6       You know there's the basic checks that we
 7  do.  A product that is patented, if there's a
 8  trademark, that's registered, it should be a
 9  registered trademark.
10       I mean, that's the basics of my
    10:38
11  understanding of it because I'm in product
12  development, that trademarks should have the circle
13  R registration.
14       If a product is patented, since I'm a
15  patent holder, I know that you're required to label
    10:38
16  the product as a patented product with the patent
17  number and that the packaging is labeled such.
18  Q    What steps were taken to ensure that the
19  packaging of what we called the original version of
20  87027 did not infringe anyone else's intellectual
    10:39
21  property, if any?
22       MR. HASAN:  Objection.
23       Lack of foundation.
24       THE WITNESS:  The package is completely unique.
25  There is no -- nothing -- no package -- I would
    10:39
```