# EXHIBIT L



**Exhibit L**
**Page 172**



**Exhibit L**
**Page 173**

# EXHIBIT M

Amazon.com: PDP Energizer 2X Charging Station for PS4 - PlayStatio...       http://www.amazon.com/PDP-Energizer-Charging-Station-PS4-Play...

Try Prime Your Amazon.com    Today's Deals    Gift Cards    Sell    Help

Shop by Department ▾    Search    Video Games ▾    [Go]    Hello. Sign in Your Account ▾    Try Prime ▾    0 Cart ▾    Wish List ▾

**Video Games**    Xbox One    Xbox 360    PS4    PS3    Wii U    Wii    3DS    PS Vita    Digital Games    Kindle Fire Games    Deals    Best Sellers    Pre-orders



Roll over image to zoom in

Share your own customer images

# PDP Energizer 2X Charging Station for PS4 - PlayStation 4

by PDP

Platform: PlayStation 4

(8 customer reviews)

Price: **$29.99** & **FREE Shipping** on orders over $35.
Details

**Temporarily out of stock.**
Order now and we'll deliver when available. We'll e-mail you with an estimated delivery date as soon as we have more information. Your account will only be charged when we ship the item.
Ships from and sold by **Amazon.com**. Gift-wrap available.

**Want it Monday, Nov. 25?** Order within **46 hrs 55 mins** and choose **One-Day Shipping** at checkout. Details

- Glowing LED light clearly indicates charge status
- Quick charging with an included AC Adapter
- Sleek and compact design
- Glossy, matte details match console design
- Easy controller installation in secure cradles

**Share**

Quantity: 1

☐ Yes, I want **FREE Two-Day Shipping** with **Amazon Prime**

or

Sign in to turn on 1-Click ordering.

**More Buying Choices**

Have one to sell?

## PlayStation 4 Essentials

PS4 — Dualshock 4    PS4 — Camera    PS4 — Games    PS4 — PlayStation Plus

## Frequently Bought Together



Price for all three: **$149.94**

Some of these items ship sooner than the others. Show details

☑ **This item:** PDP Energizer 2X Charging Station for PS4 - PlayStation 4 by PDP  PlayStation 4    **$29.99**
☑ PlayStation 4 Dualshock 4 Wireless Controller by Sony Computer Entertainment  PlayStation 4    **$59.99**
☑ PlayStation 4 Camera by Sony Computer Entertainment  PlayStation 4    **$59.96**

## Customers Who Bought This Item Also Bought

Page 1 of 15



PlayStation 4 Dualshock 4 Wireless Controller
Sony Computer Entertainme...
(226)

PlayStation 4 Camera
Sony Computer Entertainme...
(51)
PlayStation 4
**$59.96**

Microsoft licensed Energizer 2X Charging System for Xbox One
PDP
Xbox One
**$29.99**

Nyko Smart Clip - PlayStation 4
Nyko
PlayStation 4
**$9.99**

Need for Speed Rivals - PlayStation 4
Electronic Arts
(23)
PlayStation 4
**$59.96**

Assassin's Creed IV Black Flag ...
UBI Soft
(70)
PlayStation 4
**$59.27**

## Product Details

**Exhibit M**
**Page 174**

Amazon.com: PDP Energizer 2X Charging Station for PS4 - PlayStatio...        http://www.amazon.com/PDP-Energizer-Charging-Station-PS4-Play...

**Shipping:** This item is also available for shipping to select countries outside the U.S.

**ASIN:** B00EADTVL2

**Item Weight:** 2 pounds

**Media:** Accessory

**Release Date:** November 15, 2013

**Average Customer Review:**        (8 customer reviews)

**Amazon Best Sellers Rank:** #87 in Video Games (See Top 100 in Video Games)
   #3 in Video Games > PlayStation 4 > Accessories

Did we miss any relevant features for this product? **Tell us what we missed.**

Would you like to **update product info**, **give feedback on images**, or **tell us about a lower price**?

---

## Product Description

A 2X conductive charger for the PS4 with an AC Adapter Power Adapter for quick charging. Features blue and green LED indicators for charge status. Has matte and glossy black details. This sleek design matches the new console perfectly!

---

## What Other Items Do Customers Buy After Viewing This Item?

 PlayStation 4 Dualshock 4 Wireless Controller  by Sony Computer Entertainment  PlayStation 4
   (226)
$59.99

 PlayStation 4 Camera  by Sony Computer Entertainment  PlayStation 4
   (51)
$59.96

 POWER A DualShock 4 Controller Charging Station for PlayStation 4  by POWER A  PlayStation 4
   (10)
$24.99

 DreamGEAR Dual Charge Dock - PlayStation 4  by DreamGEAR  PlayStation 4
$19.99

› **Explore similar items**

---

## Customer Reviews

   (8)
3.9 out of 5 stars

| | |
|---|---|
| 5 star | 4 |
| 4 star | 1 |
| 3 star | 2 |
| 2 star | 0 |
| 1 star | 1 |

Share your thoughts with other customers

[ Write a customer review ]

See all 8 customer reviews

**Most Helpful Customer Reviews**

Advertisement

6 of 7 people found the following review helpful

   **Floating controllers for the PS4 - Star Wars style!!!**  November 15, 2013

By Heart Attack Hal

Love this charger!!!! It makes my PS4 controllers look like they are floating Star Wars style!!!! The LEDs also match the PS4 controllers (blue and orange) which is super cool!!

1 Comment | **Was this review helpful to you?**  Yes   No

2 of 2 people found the following review helpful

   **Looks great, functionality lacking**  November 20, 2013

By paday2

**Amazon Verified Purchase**

Showed up DOA - (lit up for a second but went black) I would have exchanged for another but the design is so horrible - you have to line the micro usb contacts on the charger just right to get it in the right position. it also felt very flimsy.

Comment | **Was this review helpful to you?**  Yes   No

**Most Recent Customer Reviews**

**Good Product**

It works as advertised, but considering the product is made by Energizer, I expected it to be able to fully charge the controllers a little more quickly than it does.

Published 15 hours ago by Steven

**Perfect...**

It's a bit smaller than expected, but it looks awesome in my game room.
I don't think that the LEDs are too bright.
They are good the way they are.

Published 2 days ago by GerUS

11/21/2013 1:04 PM

**Exhibit M**
**Page 175**

Amazon.com: PDP Energizer 2X Charging Station for PS4 - PlayStatio...        http://www.amazon.com/PDP-Energizer-Charging-Station-PS4-Play...

2 of 3 people found the following review helpful

**Convenient**  November 16, 2013

By C. Leonard

Amazon Verified Purchase

Easy to set up. Completely charged the controller in 2 hours. I can't vouch for this device in the long run. As there is a chance that it could give the batteries "memory" over time.

2 Comments  |  **Was this review helpful to you?**  Yes  No

**Does the job in a timely manner!**  November 18, 2013

By Anthony Delamora

Amazon Verified Purchase

Nice little charging station.
Looks cool and was not very expensive.
Not very big so it is very easy to store.

2 Comments  |  **Was this review helpful to you?**  Yes  No

› See all 8 customer reviews (newest first)

Write a customer review

**Bright as hell :-/**

I purchased this charger on release day these are my thoughts so far. It does what it is supposed to and charges the controllers perfectly, but the lights on there are obnoxiously... Read more

Published 2 days ago by Brian Huber

**Great build quality so far, only issue is bright LED lights.**

So far so good. My only complaint is the LED lights are very bright, it even bothers me when trying to watch TV on how much light this thing gives off. Read more

Published 2 days ago by Achoffm1

**Search Customer Reviews**

Go

☑ Only search this product's reviews

## Forums

4 customer discussions

## Look for Similar Items by Category

Video Games > PlayStation 4 > Accessories

## Feedback

› If you have a question or problem, visit our **Help pages**.

› Would you like to **update product info**, **give feedback on images**, or **tell us about a lower price**?

› If you are a seller for this product and want to change product data, click **here** (you may have to sign in with your seller id).

**Your Recently Viewed Items and Featured Recommendations**

Loading

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon.com Rewards Visa Card | Your Account |
| Investor Relations | Become an Affiliate | Amazon.com Store Card | Shipping Rates & Policies |
| Press Releases | Advertise Your Products | Shop with Points | Amazon Prime |
| Amazon and Our Planet | Independently Publish with Us | Credit Card Marketplace | Returns & Replacements |
| Amazon in the Community | › See all | Amazon Currency Converter | Manage Your Kindle |
| | | | Help |

amazon.com

Australia    Brazil    Canada    China    France    Germany    India    Italy    Japan    Mexico    Spain    United Kingdom

6pm        AbeBooks        AfterSchool.com        Alexa        AmazonFresh        Amazon Local        AmazonSupply        Ama

**Exhibit M**
**Page 176**

Amazon.com: PDP Energizer 2X Charging Station for PS4 - PlayStatio...          http://www.amazon.com/PDP-Energizer-Charging-Station-PS4-Play...

| Score deals on fashion brands | Rare Books & Textbooks | Kids' Sports, Outdoor & Dance Gear | Actionable Analytics for the Web | Groceries & More Right To Your Door | Great Local Deals in Your City | Business, Industrial & Scientific Supplies | Scala Com |
|---|---|---|---|---|---|---|---|
| Askville Community Answers | Audible Download Audio Books | BeautyBar.com Prestige Beauty Delivered | Book Depository Books With Free Delivery Worldwide | Bookworm.com Books For Children Of All Ages | Casa.com Kitchen, Storage & Everything Home | CreateSpace Indie Print Publishing Made Easy | Diap Ever But |
| DPReview Digital Photography | East Dane Designer Men's Fashion | Fabric Sewing, Quilting & Knitting | IMDb Movies, TV & Celebrities | Junglee.com Shop Online in India | Kindle Direct Publishing Indie Digital Publishing Made Easy | Look.com Kids' Clothing & Shoes | MYH Priva Desi |
| Shopbop Designer Fashion Brands | Soap.com Health, Beauty & Home Essentials | Vine.com Everything to Live Life Green | Wag.com Everything For Your Pet | Warehouse Deals Open-Box Discounts | Woot! Discounts and Shenanigans | Yoyo.com A Happy Place To Shop For Toys | Zapp Shoe Cloth |

Conditions of Use   Privacy Notice   Interest-Based Ads   © 1996-2013, Amazon.com, Inc. or its affiliates

11/21/2013 1:04 PM

**Exhibit M**
**Page 177**

# EXHIBIT N

GameStop POWER TO THE PLAYERS
Need Help? PowerUp Rewards Find a Store Gift Cards Weekly Ad
XBOX ONE MORE INFO
Sign In Your Account Your Cart
Xbox One | PS4 | Xbox 360 | PS3 | PC | Wii U | 3DS | PS Vita | More | Pre-Owned | Trade Offers | Deals | Phones & Media Players | Tablets & Laptops

**PICK MY HOME STORE**

Get access to great in-store deals and local pick-up

91801 Go

**EXCLUSIVE DEALS**

Sign up for our email deals newsletter!

Email Go

**PS4**

Action
DLC
Fighting
Music & Party
Shooter
Sports
Strategy
Strategy Guides

**PS4 ACCESSORIES**

Batteries & Chargers
Cables & Adaptors
Controllers
Game Systems
Gear & Apparel
Headsets & Mics
Memory
Mounts & Brackets
Networking
Storage & Cases

# Energizer X2 Charging System for PS4

## by PDP

PS4

Like Send 17 people like this. Sign Up to see what your friends like. Tweet 3 g+1 0

BUY NEW
$29.99

**Not Available**

Currently unavailable online

Add to Wish List *Want it in a hurry?* PICKUP@STORE Check Availability

**Jump to:**

- Product Details
- Videos & Screenshots
- Reviews

10

Read all 2 reviews

Performance: 10
Value: 10
Design: 10

| Platform: | Publisher: | Developer: | Category: |
|---|---|---|---|
| PlayStation 4 | PDP | PDP | Accessories, Batteries & Chargers |

## Customers Who Bought This Item Also Bought

Playstation 4 Dualshock ... PS4 **$29.99**

PS4 Dual Charge Dock PS4 **$19.99**

PS4 BluRay Remote PS4 **$19.99** Add to Cart

PS4 LED Charge Cable PS4 **$19.99**

PS4 Charge Base PS4 **$29.99** Add to Cart

PS4 Player Charge & Grip... PS4 **$19.99** Add to Cart

### Product Details:

A 2X conductive charger for the PS4 with an AC Power Adapter for quick charging.

- Features red and green LED indicators for charge status. Has matte and glossy black and chrome details.
- This sleek design matches the new console perfectly!
- Charges 2 PS4 Controllers

Exhibit N
Page 178

Energizer X2 Charging System for PS4 for PlayStation 4 | GameStop          http://www.gamestop.com/ps4/accessories/energizer-x2-charging...

**Recommended for You**



Prime
Wired
Gaming
Heads...
PS4



PS4
DualShock
4 Controll...
PS4
**$9.99**



Ear Force
P4c Chat
Commu...
PC
**$29.99**



Call of Duty:
Ghosts Har...
PS4
**$119.99**
Add to Cart

Call of Duty:
Ghosts
Lim...
PC
**$34.99**



NBA 2K14
PS4
**$59.99**
Add to Cart

---

SUMMARY OF CUSTOMER RATINGS & REVIEWS

 **10**

100% of customers would recommend this product to a friend.

Performance: ●●●●●●●●●● 10
Value: ●●●●●●●●●● 10
Design: ●●●●●●●●●● 10

**Filter Reviews by:**

| OVERALL RATING | PERFORMANCE | VALUE |
| DESIGN |

Click on the Filters above to refine results

Sort reviews by:   Helpfulness - High to Low

### I love how it looks!

**10**

Shmadam
Los Angeles, Ca
**Age:** 25-34

Posted on:
**11/13/13**

**Did you buy this product for yourself or someone else?** For me

This looks great next to my TV, and I'm sure it will look great next to my PS4 on Friday. I have two controllers from gamestop that I can't wait to use, and I've already charged them in the charging station. Great design and easy to use!

Performance: ●●●●●●●●●● 10
Value: ●●●●●●●●●● 10
Design: ●●●●●●●●●● 10

**3 of 4** found this review helpful.

**Was this helpful to you?**

(Report as inappropriate)

**Share this:**



| Post Comment |

### best deal

**10**

Boogie88
Los Angeles, CA
**Age:** 25-34

Posted on:
**11/15/13**

**Did you buy this product for yourself or someone else?** For me

Purchased the energizer charger for the PS4. Best investment. Its slick and compact, love the l.e.d. lights

Performance: ●●●●●●●●●● 10
Value: ●●●●●●●●●● 10
Design: ●●●●●●●●●● 10

**Was this helpful to you?**

11/21/2013 1:06 PM

**Exhibit N**
**Page 179**

(Report as inappropriate)

**Share this:**

Post Comment

Read all Energizer X2 Charging System for PS4 reviews

**Looking for ...?**

- Upcoming Video Games
- Sign Up for Deals
- RSS Feed
- Events
- Sweepstakes
- Site Map

**Need Help?**

- Help Center
- Gift Card Balance
- Order History
- Contact Us

**GameStop Network**

- PowerUp Rewards
- Game Informer
- Kongregate
- PC Downloads
- BuyMyTronics

RESPECT THE RATINGS
WHAT IS ESRB?

© 1999-2013 GameStop Affiliates | Corporate | Careers | Privacy Policy | Conditions of Use | CA Transparency McAfee SECURE TESTED DAILY 21-NOV

# EXHIBIT O

PDP Energizer 2X Charging System for PlayStation 4 PL0019 - Best Buy       http://www.bestbuy.com/site/pdp-energizer-2x-charging-system-fo...



Enlarge

**PDP - Energizer 2X Charging System for PlayStation 4**

**Model:** PL0019 │ **SKU:** 1611495 │ **Release Date:** 11/27/2013 │
**Customer Rating:**                            **5.0**  (2 customer reviews)

**$29.99**

FREE SHIPPING
on orders $25 and up

## Overview



### Product Availability

**Shipping:** Not Available

**Store Pickup:** Not Available
Check Stores
Learn more about store pickup

### Special Offers

See (2) Special Offers

### Cardholder Offer

Get 5% Back in Rewards

### Specifications

**Manufacturers Suggested Age:** 6 years and up

**UPC:** 708056000592

Every gamer has been there. You're totally engrossed in a game, you've been playing for hours, and with every checkpoint that you cross, you get more involved in the storyline. You can barely force yourself to pause for a bathroom break and a drink of water, because you just have to find out what happens to your character. You come back to your couch, pick up the controller and prepare yourself to dive back into the game. That's when you realize that while you were gone, your controller's battery died. Avoid the devastating frustration that every gamer experiences when they encounter a dead controller with the help of this **Energizer 2X Charging System**.

Keep your PlayStation 4 controllers juiced up and ready for use with this 2X conductive charger. When you forget to charge the controllers between games and the worst happens — it dies mid-action — rest assured knowing that the **charging system**'s AC power adapter makes quick work out of powering the controller back up, so that you can get back in the game as soon as possible. Instead of anxiously awaiting the controller to reach full power, a simple glance at the green and red LED indicators will let you know the status of the charge. To stay in line with the sleek look of your gaming setup, the **charging station** features a matte and glossy black and chrome appearance that coordinates with the PlayStation 4. Don't let a dead controller get in the way of your game.

### Product Features

Ensure your PlayStation 4 controllers are fully charged and ready for use with the 2X conductive charger, which features an AC power adapter to quickly charge the controllers

Stay informed on the charging status with the red and green LED indicators

Enhance the look of your gaming setup with the matte and glossy black and chrome details that match the appearance of your PlayStation 4

## Related Products

11/21/2013 12:54 PM

**Exhibit O**
**Page 181**

PDP Energizer 2X Charging System for PlayStation 4 PL0019 - Best Buy     http://www.bestbuy.com/site/pdp-energizer-2x-charging-system-fo...

     

PDP - Afterglow AX.1 Controller for Xbox 360
**$31.99**

PDP - Afterglow AP2 Wireless Controller for PlayStation 3
**$34.99**

PDP - Battlefield 4 Controller for PlayStation 3
**$49.99**

PDP - Battlefield 4 Controller for Xbox 360
**$49.99**

PDP - Afterglow Wireless Dolby 5.1 Surround Sound Tower
**$89.99**

PDP - Afterglow Universal Prismatic Wireless Headset - Black
**$99.99**

## Customers Who Viewed This Item Also Viewed

Page **1** of **3**

   

PowerA - DUALSHOCK 4 Charging Station for PlayStation 4 - Black
(2)
**$24.99**

Sony - PlayStation 4 (500GB)
(134)
**$399.99**

Sony - DUALSHOCK 4 Wireless Controller for PlayStation 4
(19)
**$59.99**

Sony - PlayStation 4 Camera
(2)
**$59.99**

Rocketfish™ Gaming - Gamer Pack for PlayStation 4
**$79.99**

## Ratings & Reviews

### Services

**Overall Customer Rating:**

## 5.0

(2 Reviews)

**100%** of customers would recommend this product to a friend (2 out of 2)

Write a Review

**Safeguard your product with a Geek Squad Protection Plan.**

*Product images, including color, may differ from actual product appearance.*

**Ads by Google**

**What's this?**

Try Energize: $2 Coupon - Best Selling Energy Supplement
www.tryenergize.com/discount-savings
Get All Day Energy Without Crash!

Battlefield 4 on PS4 - Battlefield.com
www.battlefield.com/BF4_**PlayStation_4**
"Battlefield 4 is the perfect game to usher in the new generation"

Next-Generation Analog - microchip.com
www.microchip.com/PIC12F752
And digital peripherals in the PIC12F752 ideal for gen purpose app

GameFly™ - **Playstation 4** - PS4 games available at launch
www.gamefly.com/
Start Your Free Month Trial Today!
★★★★★ 18,468 reviews for gamefly.com

2 of 2

11/21/2013 12:54 PM

# EXHIBIT P

1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4       THE HONORABLE GARY ALLEN FEESS, JUDGE, PRESIDING

5

6    NYKO TECHNOLOGIES, INC.,          )
                                       )
7                    Plaintiff,        )
                                       )
8                                      )
           vs.                         )   No. CV 12-3001-GAF-VBK
9                                      )
     ENERGIZER HOLDINGS, INC., et al., )
10                                     )
                     Defendants.       )
11   _____)

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17              Los Angeles, California

18         Monday, October 15, 2012, 3:24 P.M.

19          Rule 26(f) Scheduling Conference

20

21                          PAT CUNEO CSR 1600, CRR-CM
                            Official Reporter
22                          Royal Federal Building
                            Room 181-E
23                          255 East Temple Street
                            Los Angeles, California 90012
24                          213-894-1782
                            patcuneo1600@gmail.com
25                          www.patcuneo.com

2

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:     CHRISTIE PARKER HALE LLP
                           BY:  KATHERINE L. QUIGLEY, ATTORNEY AT LAW
 3                         AND  ART HASAN, ATTORNEY AT LAW
                           655 N. Central Avenue
 4                         Suite 2300
                           Glendale, California  91203-1445
 5                         626-795-9900
                           katherine.quigley@cph.com
 6                         art@cph.com

 7

     FOR THE DEFENDANTS:    SHEPPARD MULLIN RICHTER & HAMPTON LLP
 8                         BY:  STEVE HANLE, ATTORNEY AT LAW
                           650 Town Center Drive
 9                         4th Floor
                           Costa Mesa, California  92626-1993
10                         714-513-5100
                           shanle@sheppardmullin.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit P**
**Page 184**

3

 1    **LOS ANGELES, CALIF.; MONDAY, OCTOBER 15, 2012; 3:24 P.M.**

 2                              -oOo-

 3             THE CLERK:  Please remain seated and come to

 4    order.  This United States District Court is again in

 5    session.

 6             THE COURT:  All right.  Call the case, please.

 7             THE CLERK:  Case No. CV 12-3001-GAF, NYKO

 8    Technologies, Inc., vs. Energizer Holdings, Inc., et al.

 9             Counsel, state your appearances.

10             MR. HASAN:  Good afternoon, Your Honor.

11    Art Hasan, Christie, Parker & Hale, for plaintiff NYKO

12    Technologies, Inc., and with me is Katherine Quigley, an

13    associate at Christie, Parker & Hale.

14             THE COURT:  Good afternoon.

15             MR. HANLE:  Good afternoon, Your Honor.

16    Steve Hanle of Sheppard Mullin Richter & Hampton for the

17    defendants; and I apologize for my tardiness.

18             THE COURT:  We had other things we were able to

19    keep busy.  Now if we hadn't been, it would have been a

20    different story.

21             MR. HANLE:  I understand that.

22             THE COURT:  We kept ourselves busy in the

23    intervening period so no harm, no foul.

24             All right.  This is our Rule 26(f) conference in

25    this patent case.  It's a dispute over charging stations for

**Exhibit P**
**Page 185**

4

```
 1    wireless video game controllers used in the PlayStation 3
 2    and the Microsoft Xbox.
 3              We've already had law and motion practice in the
 4    case so I don't think there's a whole lot that needs to be
 5    discussed in terms of the respective positions of the
 6    parties.
 7              I think they've been pretty well set out in the
 8    prior application for a restraining order.  What I really
 9    was trying to figure out as I was reading through your
10    report -- and it really isn't in the report so I want to
11    talk to you about it and that is:  What is the scope of
12    damages at this point?
13              What are we -- I know that you can't pinpoint, you
14    can't give me a computation of an exact number; but what's
15    the viewpoint of the defendant or -- excuse me -- the
16    plaintiff in terms of what plaintiff believes its damages to
17    be in this case?  And how are you going to go about proving
18    it up?
19              MR. HASAN:  Yes, Your Honor.
20              Under the Patent Act, we're entitled to, if we can
21    prove our case of infringement, lost profits and no less
22    than a reasonable royalty.
23              We don't have figures yet on the sales that PDP
24    has made, the defendant has made.  We're expecting that by
25    the end of this month pursuant to a discovery request.
```

5

1          THE COURT:  Uh-huh.

2          MR. HASAN:  But based on our understanding, there

3   are millions of dollars of sales of these products, and that

4   based upon the profit that NYKO has made, that the damages

5   can be in the seven figures.

6          It's just hard to put an exact or a more precise

7   estimate around that because we don't have defendants' sales

8   at this time.

9          THE COURT:  All right.

10          So we'll have to figure that out in time; but your

11   view is that it's a seven-figure case if the numbers are

12   what you anticipate?

13          MR. HASAN:  Yes, Your Honor.

14          We understand that these products have been

15   selling extremely well since NYKO, the plaintiff, came up

16   with the concept and put them into stores throughout the

17   country including Wal-Mart, Target, Amazon, and others where

18   PDP, after the fact, came in and is selling in the same

19   places sometimes to the displacement of NYKO.

20          THE COURT:  Well, NYKO -- let's see.  As I recall

21   at the TRO stage, we were focused on Wal-Mart's acquisition;

22   right?

23          MR. HASAN:  That's correct.

24          THE COURT:  So I assume that NYKO is still

25   actively involved in the marketplace and selling to other

**Exhibit P**
**Page 187**

6

1    retail outlets.

2              MR. HASAN:  It's doing the best that it can, yes,

3    under these difficult circumstances; but, yes, it is.

4              The difficult circumstances are that NYKO believed

5    that it had exclusive rights in this; and then, of course,

6    as briefed -- and we won't go back over that again -- in

7    the TRO papers, then PDP, the defendant, was able to come in

8    and take the major accounts, the biggest of which was

9    Wal-Mart but even prior to that Target as well.

10             THE COURT:  All right.

11             And who at this point is NYKO's major retail

12   outlet?

13             MR. HASAN:  Well, to the best of my knowledge,

14   Your Honor, they're trying to get back with Wal-Mart.  I

15   don't know if that has occurred yet.  I don't know whether

16   it will occur.

17             I believe that NYKO may sell at Best Buy but, you

18   know, I'm speculating to an extent because I don't have the

19   information in my hand.

20             But they were selling at Wal-Mart, Target, Best

21   Buy, Amazon.com, Wal-Mart.com, and others; but the

22   non-retail establishments were a smaller fraction of the

23   overall sales in brick-and-mortar stores.

24             THE COURT:  Okay.  The parties indicate that there

25   might have been discussion regarding settlement at some

**Exhibit P**
**Page 188**

7

1  point in time; is that right?

2          Were there some discussions?

3          MR. HASAN:  Just some very preliminary

4  discussions, yes, Your Honor.  I think it took place over a

5  telephone call that maybe lasted fifteen minutes at the most

6  with Mr. Hanle and his cocounsel Mr. Daniel Yannuzzi.

7          THE COURT:  And what was the nature, without

8  telling me exactly who said what to whom, was this an

9  exploratory conversation which was initiated by the

10  plaintiff or by the defendant or did it just come up in the

11  context of some other matters?

12          MR. HASAN:  I believe it came up in the context of

13  other matters; but I believe it was initiated by the

14  defendant in terms of, you know, just initiated some talks.

15  But without giving away any positions, we were somewhat far

16  apart without going into any more detail on that.

17          Out in the hall --

18          THE COURT:  Why have the conversations stopped?

19          MR. HASAN:  Well, I was just going to say, Your

20  Honor, that out in the hall we offered, if it made sense to,

21  you know, get into some early mediation and even to the

22  point where we stated that NYKO may be willing to, if the

23  court approves it, you know, enter into a stay of

24  proceedings for a short time for a month or 60 days to see

25  if we can't resolve this without, you know, expenditure of

**Exhibit P**
**Page 189**

8

1  large amounts of attorneys fees which are many times the

2  case in patent lawsuits.

3          THE COURT:  I've heard that.  I heard some figures

4  on the Apple-Samsung litigation that caused me to be

5  unconscious for an extended period of time on an unreal

6  amount of money.

7          MR. HASAN:  And even if we were a small fraction

8  of that, Your Honor, it would still be relatively high.

9          THE COURT:  You could be a small fraction of that

10  and it would be a lot of money, yeah, that's true.

11          Mr. Hanle, what's your thought on that subject?

12          MR. HANLE:  Yes.

13          We did have a preliminary conversation and

14  continued out in the hall and I believe Mr. Hasan

15  characterized it accurately.

16          The challenge is that given what transpired at the

17  TRO and what we believe are the merits of the case that my

18  client is not prepared to offer a large amount of money to

19  settle the case.

20          I guess that's relative and they are aware of the

21  attorneys fees.  We've made them very aware.  They've got an

22  written budget so they know what the attorneys fees they're

23  facing are.

24          And so the discussion in the hallway right now --

25  if I might be blunt -- is that, if we could get some

9

1  understanding of the universe of money we're talking about

2  or the ballpark that we're talking about, that I would

3  recommend strongly to my client to mediate.

4         But absent that, the past discussions have been

5  such that I'm a little uncomfortable recommending mediation

6  at this time because I believe it might be counterproductive

7  because I'm not confident that it would settle and it might

8  make it longer and harder before the next mediation where

9  there's more water under the bridge and might be more fees

10 and more developed issues that would encourage settlement.

11         THE COURT:  Well, yeah.  I mean, there is always

12 that problem; but the reality, at least in my experience, is

13 this:  That the longer you litigate and the more you spend

14 before you talk, the harder it is to settle.

15         Because there has been a lot of money spent and

16 clients have a tendency to say at least -- I don't know.

17 Maybe yours don't say this to you but mine used to say to

18 me:  Well, why did we spend all of this money litigating if

19 now we're going to be talking about settlement?

20         And, you know, the usual answer was:  Because --

21 no.  The answer, the true answer was:  Because that's what

22 you told me to do despite what I recommended in the first

23 place.  But that is not often remembered later on in the

24 case.

25         I don't think I've ever had a case where an

10

1  attempt at early mediation made it harder to mediate later.

2  I mean, I may be wrong about that; but it seems to me that

3  there's not much downside to it.

4      I can see if people misbehave in the mediation

5  that there can be some difficulty.

6      MR. HANLE:  No.

7      The one observation I would have is that if we

8  take a shot at mediating now, I think there's likely to be a

9  time lag before we would want to go back at it again.

10     And that's the challenge is we might be better

11  off -- and I'm still open to discussion on this with

12  Mr. Hasan -- but we might be better off waiting two to three

13  months to mediate rather than doing it now and then likely

14  not doing it again for another six months.

15     THE COURT:  All right.  Well, I just raise it

16  because I do think you need to think about it.  It sounds

17  like you are.  I'd like you to talk about it and give it

18  some real reflection before you decide on a course of action

19  because I do tend to think that the case -- I did go back

20  and read my order and I think that there's a basis for

21  mediating.

22     I mean, I did make that in my order without

23  prejudice as you'll recall; and it was certainly in my mind

24  at the time that I issued the order that I didn't feel like

25  I did have an enough evidence to grant the motion but that

**Exhibit P**
**Page 192**

11

1  it didn't mean that there wasn't evidence out there that

2  might be developed over the course of the litigation.

3          So I don't know -- I mean, certainly, the

4  defendant is ahead at this point.  Let's put it in those

5  terms.  But we're probably only in the second inning and we

6  don't know if the plaintiff is going to be more like the

7  Yankees or the St. Louis Cardinals.  So it's hard to

8  predict.  In any event, I think we've said all there is to

9  say about that.

10         I don't really have a whole lot of other --

11 there's not a whole lot else in the file that I really want

12 to talk about at this point.  I do have a couple of things I

13 want to tell you.

14         One is to remind you about Rule 26(a).

15 Rule 26(a), as you may recall, played a big role in the

16 Samsung-Apple case and my view as the same view as Judge

17 Koh; and that is I don't care what the consequence is of

18 keeping evidence out at the time of trial.

19         If you don't comply with 26(a), anyone who wants

20 to do a John Quinn in this courtroom, you know, be my guest

21 and then you'll make a big fuss at the time of trial and it

22 won't matter because the evidence won't be presented to the

23 jury.

24         So make sure that you've looked at 26(a),

25 understand what your obligations are and fully comply with

**Exhibit P**
**Page 193**

12

1    your 26(a) obligations.

2           Now, with respect to the schedule, I like the

3    schedule that the parties have proposed; and I would just

4    make that and attach that to my schedule and case management

5    order.

6           What I would like you to do is to reprint it,

7    attach it to just a caption.  Give me a caption sheet with

8    the only thing behind it being the scheduling document with

9    the dates and then I will make it part of my scheduling and

10   case management order because I think those dates look good

11   to me.  So that's really all I've got.

12          Does the plaintiff have anything else that it

13   wanted to raise with the court today?

14          MR. HASAN:  No, Your Honor.

15          I just, you know, on the issue of the TRO, because

16   that was something that Mr. Hanle brought up, you know, we

17   really do feel like perhaps, because of the preliminary

18   nature of the proceeding, we couldn't explain some of the

19   arguments that we wanted to make; and as we develop --

20          THE COURT:  Well, I think you explained your

21   arguments just fine.  I think that the issue in my mind was:

22   What's the evidentiary record look like?

23          And I didn't think that there was sufficient

24   evidence to support all of the arguments that were made; and

25   I think -- I tried to be as clear and unambiguous as I could

Exhibit P
Page 194

13

1    in my written ruling on that.  So I'm not inviting the

2    parties to come back and reargue it or seek reconsideration.

3            The without prejudice is when you get into

4    discovery, if you develop further evidence that is

5    supportive of your theories, that's an entirely different

6    thing; and I wanted to be clear about that.

7            But I think I understand what you're arguments are

8    and what your arguments were at the time; and I just didn't

9    think that the elements of a TRO were satisfied and,

10   hopefully, I articulated it fairly, you know, clearly and

11   unambiguously.

12           MR. HASAN:  Yes, Your Honor, you did.

13           And the one argument where I was mentioning was

14   really that what they were focusing on as prior art is not

15   prior art; and that's a legal argument as well.  But we're

16   not asking for reconsideration.

17           We feel like we're more like the St. Louis

18   Cardinals, Your Honor, in that we have a good shot here but,

19   you know, we'll have to see what evidence develops as you

20   pointed out.

21           THE COURT:  All right.

22           Does the defense have anything else that it wants

23   to raise with the court at this time?

24           MR. HANLE:  No.  Other than if there's a

25   particular mediator that the court has used successfully in

Exhibit P
Page 195

```
 1    the past particularly in patent cases.

 2           I've had some decent experience here in the

 3    Central District, a lot of experience in the Northern

 4    District.  But if there is a -- I've had success with Judge

 5    Tevrizian in the past.  I haven't inquired as to his

 6    schedule recently but --

 7           THE COURT:  Well, Judge Tevrizian is one that I

 8    had in mind who, you know, is very experienced and very

 9    good.  Layn Phillips.  I don't know if you know former Judge

10    Phillips.

11           MR. HANLE:  Yes.  I do, Your Honor.

12           THE COURT:  He and I go way back.  We were

13    Assistant U.S. Attorneys together in the U.S. Attorney's

14    Office a long, long time ago so I know him.

15           I know Layn very, very well; and I think I have a

16    very high opinion of his skill as a mediator.

17           So those are at least two that I know of that I

18    would recommend in a complicated business transaction type

19    of case.

20           MR. HANLE:  Yes, Your Honor.

21           MR. HASAN:  Your Honor, one issue is that the

22    parties have exchanged discovery and we have discovery

23    requests coming in.

24           Defendants have noticed depositions; and this is a

25    deposition -- the first one I believe is scheduled for early
```

15

1    November.

2            Does it make any sense to perhaps stay the case

3    pending the mediation in order that we don't get to the

4    point where there's been a high expenditure of attorneys

5    fees to get to your judge's point of the expenditures kind

6    of putting a damper on settlement.

7            THE COURT:  Well, I'm not going to stay it today.

8    What I want the parties to do is to talk about what, if

9    anything, they can accomplish mediation-wise.

10           I'm not even persuaded that you're going to

11   attempt to mediate the case.  We're talking about that as a

12   possibility and we'll just have to see if the parties decide

13   that they want to take a shot at mediation and want a short

14   stay to do that.  Let me know and I would probably sign that

15   order.

16           But let's wait and see whether or not we get to

17   that point.  Okay?

18           MR. HASAN:  Thank you.

19           MR. HANLE:  Thank you.

20           THE COURT:  All right.  Thank you.

21           We'll be in recess.

22           (At 3:43 p.m. proceedings were concluded.)

23

24                        -oOo-

25

**Exhibit P**
**Page 197**

16

```
 1                          CERTIFICATE

 2

 3            I, PAT CUNEO, CSR 1600, hereby certify that

 4    pursuant to Section 753, Title 28, United States Code, the

 5    foregoing is a true and correct transcript of the

 6    stenographically reported proceedings held in the

 7    above-entitled matter and that the transcript page format is

 8    in conformance with the regulations of the Judicial

 9    Conference of the United States.

10

11    Date:  November 20, 2013

12

13

14

15

16                              /s/ PAT CUNEO
                                _____

17                              PAT CUNEO, OFFICIAL REPORTER
                                CSR NO. 1600
18

19

20

21

22

23

24

25
```

**Exhibit P**
**Page 198**

# EXHIBIT Q

1

1               **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3                 **WESTERN DIVISION**

4     **THE HONORABLE GARY ALLEN FEESS, JUDGE PRESIDING**

5

6   NYKO TECHNOLOGIES, INC.,      )
                           )

7              Plaintiff,    )
                           )

8                       )
           vs.              )  No. CV 12-3001-GAF-VBK

9                       )
   ENERGIZER HOLDINGS, INC., et al.,   )

10                      )
            Defendants.   )

11  _____)

12

13

14

15        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

16

17           Los Angeles, California

18       Thursday, May 9, 2013, 9:31 A.M.

19        Claims Construction Hearing

20

21                **PAT CUNEO CSR 1600, CRR-CM**
                     **Official Reporter**

22                  **Roybal Federal Building**
                     **Room 181-E**

23                  **255 East Temple Street**
                  **Los Angeles, California 90012**

24                  **213-290-1817**
                  **patcuneo1600@gmail.com**

25                  **www.patcuneo.com**

1  here, when you bring in a limitation from the spec, there

2  has to be a good reason to do it and there are good reasons

3  for other terms.

4         But for this term, you know, if you look at how

5  it's supported by, as used there, it's used in both of these

6  embodiments.  They both refer to supported, they both have a

7  DC port on the base, and they're both supported by the base.

8         And in one sense it's on.  Something can be next

9  to something and on it in a definition.  And something --

10  but that doesn't necessarily mean that it's supported by.

11         THE COURT:  Okay.  I mean, I'll think about it.

12  I hear your argument.  It just seems to me that you've got a

13  claim that deals with DC ports that are on the base and

14  you've got another claim that has them supported by the

15  base.

16         I understand what "supported" means; and it seems

17  to me certainly clear that they don't have to be, when you

18  use "supported by the base," they clearly don't have to be

19  directly on the base; right?  You'd agree with that part?

20         MR. HASAN:  I completely agree with that.

21         THE COURT:  Right.

22         MR. HASAN:  But if they are, they are still

23  supported.  That's the only distinction.

24         THE COURT:  Okay.  I get that point then.

25         All right.  Is there anything else you want to

**Exhibit Q**
**Page 200**

56

1   placard here being on a piece of paper.  But let's take it

2   further.

3        Let's put a, you know, let's put a table on the

4   roof of a building.  And then on top of the table is a book

5   and on top of the book is a cup.  Is the cup supported by

6   the base of the building?

7        I think that's pretty attenuated, Your Honor, and

8   so we think that there needs to be a construction that

9   removes that ambiguity.

10        THE COURT:  They're not asking that.  It's a

11   question of physics, I presume, because technically, yes.

12        MR. HANLE:  But here we've got plain language and

13   we've got lay jurors; and so I think that to say that

14   something is, you know, that is -- is this microphone

15   supported by the foundation of the building.

16        In the broadest sense, I suppose it is.  But I

17   don't think that that is the intent.  I don't think one

18   could get that from reading the patent.

19        THE COURT:  Well, if -- I guess here's the point.

20   If it's on, it's supported by but it could be supported by

21   without being directly on.

22        MR. HANLE:  Okay?  So I agree but here's the issue

23   is when you have a claim term that's so broad that you're

24   not really sure how far it goes.  For example, my, you know,

25   my cup-foundation-of-building example, you need to put some

```
 1    limitations on it and then you go to the spec.

 2           And when you go to the spec, every example -- and

 3    there's only three and there are a number of figures, every

 4    single time the DC port is on the base.

 5           THE COURT:  But if we -- I understand that.  But

 6    I'm concerned about reading something out of the claim in a

 7    way that would be inappropriate by reference to the

 8    specification as opposed to using specifications just to

 9    construe it.

10           But let me ask you this question.  Doesn't

11    plaintiff's counsel's proposal about using the word

12    "necessarily" then circumvent the concern that you have?

13           You said your construction now reads this

14    preferred embodiment out of the claim, out of Claim 13, and

15    you can't do that.  But doesn't the inclusion of the word

16    "necessarily" cure that problem?

17           MR. HANLE:  Well, so then the construction would

18    be physically supported but not --

19           THE COURT:  By but not necessarily directly on the

20    base.

21           MR. HANLE:  So I think you beg the question is --

22    I think that's correct as far as it goes but the issue we

23    have with that is physically supported.  It gets into this

24    attenuation issue is what -- if it's hanging.

25           If it's hanging from the base, if the DC port is
```

58

1    on a cable.   I mean, is that supported by the base?

2              THE COURT:   Well, the answer as a matter of

3    physics is no because that would be tension and not

4    compression forces.   Support by the base, I think implies a

5    compression force, not a tensioning force.

6              Well, I won't go into the specifics as to some

7    issues that I've been dealing with on our new building; but

8    I'm very familiar with the hanging versus support.   Support

9    from the bottom versus support from the top.

10             MR. HANLE:   Well, but I think Your Honor just said

11   it.   I think if the words are "compression" and

12   "tensioning," there's a distinction.   But support, I think,

13   is neutral.   Support can --

14             THE COURT:   I think it implies.   I think by

15   implication you're talking about compression forces and not

16   tensioning forces.

17             But, look, let's -- I don't think we have to argue

18   about that to figure out how to deal with this.

19             *(The slide was displayed on the screen.)*

20             MR. HANLE:   Well, let me ask another question.

21   This is the one I struggled with "supported by the base."

22             Would "supported by the base" include when you had

23   a male mini-USB port on the controller?   And you took the

24   male mini-USB port on the controller and you attach it to

25   the base, is that now supported by the base?

59

1          THE COURT:  Well, is it on -- I mean, the whole

2    controller is supported by the base once it's put on it,

3    right?  It's connected to it and it's supported by the base

4    at that point; right?

5          MR. HANLE:  I would submit that to say that -- to

6    say if the USB port, the male mini-USB is on the controller

7    and you can take it off and it's still on the controller and

8    now to have that claim cover that -- the DC port, the male

9    mini-USB port is supported by the base, I think that's a

10   stretch to say that.

11          (The slide was displayed on the screen.)

12          THE COURT:  Well, I mean, the difference between

13   the male USB mini-port being on the base or, you know, on

14   the controller.  In one case it's supported by the base and

15   in one case it's not until the controller is attached to the

16   base; right?

17          MR. HANLE:  Well, but -- and that's my point:  Is

18   the term supported by the base?  I don't know whether it

19   would include -- I don't think it fulfills a public notice

20   function to leave it that broad without defining it.

21          And so we did -- we did look for some additional

22   constructions that had been made and there are one court at

23   least we found that had done some additional construction

24   and support; and the construction was hold in position.

25          And so that is an alternate construction that we

75

1                           **CERTIFICATE**

2

3           I, PAT CUNEO, CSR 1600, hereby certify that

4   pursuant to Section 753, Title 28, United States Code, the

5   foregoing is a true and correct transcript of the

6   stenographically reported proceedings held in the

7   above-entitled matter and that the transcript page format is

8   in conformance with the regulations of the Judicial

9   Conference of the United States.

10

11  Date:  May 29\, 2013

12

13

14

15

16                              **/s/ PAT CUNEO**

17                              **PAT CUNEO, OFFICIAL REPORTER**
                                **CSR NO. 1600**
18

19

20

21

22

23

24

25

*Pat Cuneo, CSR 1600, Official Reporter*

**Exhibit Q**
**Page 205**

# EXHIBIT R

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                          ---

 4              THE HONORABLE GARY ALLEN FEESS

 5          UNITED STATES DISTRICT JUDGE PRESIDING

 6

 7   Nyko Technologies, Inc.,            )

 8                   Plaintiff,          )

 9                                       )

10   vs.                                 )   Case No.

11                                       )   CV 12-3001-GAF(VBKx)

12   Energizer Holdings, Inc.,           )

13   et al.,                             )

14                   Defendants.         )

15   _____     )

16

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                 Los Angeles, California

20               Monday, September 23, 2013

21

22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446
```

**Exhibit R**
**Page 206**

2

```
1    APPEARANCES:

2

3      FOR PLAINTIFF:          CHRISTIE PARKER HALE, LLP

4                              BY:  KATHERINE QUIGLEY

5                                  ART HASAN

6                              655 N. CENTRAL AVENUE

7                              SUITE 2300

8                              GLENDALE, CA 91203

9

10     FOR DEFENDANT:          SHEPPARD MULLIN

11                             BY:  STEVE HANLE

12                             650 TOWN CENTER DRIVE

13                             4TH FLOOR

14                             COSTA MESA, CA 92626

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit R**
**Page 207**

```
 1              Los Angeles, California, Monday, September 23, 2013

 2                             9:45 a.m.

 3                              -oOo-

 4              THE CLERK:  Calling Item No. 3, CV 12-3001-GAF(VBKx),

 5    Nyko Technologies, Inc., vs. Energizer Holdings, Inc., et al.

 6              Counsel, state your appearances, please.

 7              MR. HANLE:  Good morning, your Honor.  Steve Hanle

 8    again, for the defendants.

 9              THE COURT:  Good morning.

10              MR. HASAN:  Good morning, your Honor.  Art Hasan --

11    Christie, Parker & Hale -- for the plaintiff, and with me is

12    Katherine Quigley.

13              THE COURT:  There was some question regarding the

14    technical equipment.

15              MR. HANLE:  I think we're almost there, your Honor.

16    They were working on it during the hearing in the other --

17              THE COURT:  Well, I'm not exactly sure what you folks

18    think -- what kind of presentation you think you're going to

19    make.  I've got a number of questions that I want answered that

20    don't have anything to do with pictures or charts.

21              So are we ready to go?

22              MR. HANLE:  I think we are ready to go, your Honor.

23              THE COURT:  Okay.  Let me then just summarize very

24    briefly where I think we are.  This is a -- it's a patent

25    infringement case.  Nyko owns what the parties refer to as the
```

**Exhibit R**
**Page 208**

1    848 Patent, which describes a charging system for video game

2    controllers.  Nyko contends that defendant manufactures and

3    sells a product that infringes certain of these claims.  It's a

4    multi-claim patent.

5            Defendants now move for summary judgment claiming that

6    the patent is invalid because the device was in public use and

7    on sale more than a year before the patent application was

8    filed.

9            The motion is based primarily on conduct that occurred

10   at and shortly after the January 8, 2007, CES show, Consumer

11   Electronics Show, when the charging system was displayed to

12   numerous members of the public and in particular, members of the

13   media.

14           The plaintiff defends primarily on two grounds:  the

15   charger was not in use or on sale in January 2007 for a number

16   of reasons, including that it was not ready for patentability at

17   that point, and that even if the events of January 2007

18   constituted a first use and/or sale, the provisional application

19   was filed within a year of that event and contained all of the

20   elements of the pertinent claim and that the application relates

21   back to that date, which was within a year.

22           Let me start by asking, I've got a general question

23   for the defendants, who are moving, and a number of specific

24   questions for the plaintiff.

25           As to the defendant, let's assume, for purposes of

```
1   this discussion, that I've read all of these materials, because
2   I have, and let's assume for purposes of discussion that you've
3   shown a very strong invalidity defense to be presented at trial.
4             You still have the issue of the Rule 56 burden on a
5   motion for summary judgment, and you've got to show me that
6   there's no genuine issue of material fact for trial to prevail
7   in this proceeding.
8             And it seems to me that in your motion, you're asking
9   me to do a couple of things:  One, in certain respects, you're
10  asking me to make a credibility determination; and, further, to
11  make some factual findings where the plaintiff identifies
12  disputes.  For example, you say the product was offered for
13  sale, and you show documentation involving sales to amazon.com
14  that were fulfilled in July of 2007 but where there was a
15  January 2007 invoice.
16            And the plaintiff has presented evidence saying no,
17  this was our procedure for testing public interest and for
18  trying to assess whether or not there was sufficient interest in
19  the product to warrant going forward with development.
20            So in view of that, am I not stuck at this point, even
21  if I don't think that's a very credible argument -- am I not,
22  for purposes of summary judgment, in a position where I have to
23  deny it?
24            MR. HANLE:  Okay, your Honor.  I can certainly address
25  that point specifically, and then, if you'd like, I can sort of
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3    COUNTY OF LOS ANGELES )
                           )
 4    STATE OF CALIFORNIA   )

 5

 6

 7            I, Pamela A. Batalo, Federal Official Realtime Court

 8    Reporter, Registered Professional Reporter, in and for the

 9    United States District Court for the Central District of

10    California, do hereby certify that pursuant to Section 753,

11    Title 18, United States Code, that the foregoing is a true and

12    correct transcript of the stenographically reported proceedings

13    held in the above-entitled matter and that the transcript page

14    format is in conformance with the regulations of the Judicial

15    Conference of the United States.

16

17
      Date:  September 27, 2013
18

19

20
      /s/ Pamela A. Batalo
21    Pamela A. Batalo, CSR No. 3593, FCRR, RMR
      Federal Official Court Reporter
22

23

24

25
```

# EXHIBIT S

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   NYKO TECHNOLOGIES, INC., a      )
     California Corporation,         )
 5                                   )
                     Plaintiff,      )
 6                                   )
                     v.              ) NO. CV12-03001-GAF-VBK
 7                                   )
     ENERGIZER HOLDINGS, INC. a      )
 8   Missouri Corporation, EVEREADY  )
     BATTERY COMPANY, INC., a        )
 9   Delaware Corporation, and       )
     PERFORMANCE DESIGNED PRODUCTS   )
10   LLC, a California Limited       )
     Liability Company,              )
11                                   )
                     Defendants.     )
12   _____)

13

14

15      (THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL.)

16

17           Videotaped Deposition of AMIR NAVID, taken

18           on behalf of the defendants, at 655 North

19           Central Avenue, Suite 2300, Glendale,

20           California, commencing at 9:19 a.m.,

21           Wednesday, January 30, 2013, before Shana K.

22           Clifford, RPR, Certified Shorthand Reporter

23           No. 10154.

24

25
```

2

AMIR NAVID

**Exhibit S**

**Page 212**

BARKLEY
Court Reporters

Page 14

1  you're stating the date, so I -- it's not a date   09:24
2  that I'm giving.  So I'm not quite sure what the
3  exact date of it was, but I do recall being deposed.
4     Q    Okay.  Do you recall whether your duties
5  have changed since -- at Nyko have changed since   09:24
6  October of 2008?
7     A    I would say in general it's -- it's the
8  same duties.  Obviously, you know, I'm involved
9  with, you know, different aspects of the business as
10 far as it relates to the product and product   09:25
11 development and, you know, product from conception
12 to -- to bringing it to market, final product.  So I
13 would say in general, it's the same -- same function
14 at the company.
15    Q    Okay.  Has -- has your title or position   09:25
16 changed since October of 2008?
17    A    Since 2008, I don't believe so.  I think
18 if -- it would be similar, if anything.  It would
19 have been something product development manager to
20 VP of product development, if anything.  But I'm not   09:25
21 sure if, by 2008, I may have already been -- I may
22 have already had my new title.
23    Q    What is your official title at this time?
24    A    Vice president of product development.
25    Q    One of your declarations says vice   09:26

Page 15

1  president of research and development.  Is -- is   09:26
2  there a distinction between product development and
3  research and development?
4     A    No.  I would say it's the same.
5     Q    Do you have a business card with you?   09:26
6     A    I don't, actually.
7     Q    Okay.
8     A    We can provide one to you, though, sure.
9     Q    Thank you.
10    Do you recall testifying in that Nintendo   09:26
11 versus Nyko deposition that sometimes patent get
12 issued -- patents get issued that should not have
13 been issued?
14    MR. HASAN:  Objection as to form.
15    THE DEPONENT:  I -- I don't recall that.   09:26
16    Q    BY MR. HANLE:  Okay.  Is that -- is that a
17 belief that you hold, that sometimes patents get
18 issued that should not have been issued?
19    MR. HASAN:  Objection as to form.
20    THE DEPONENT:  I'm sure it's possible,   09:27
21 but, you know, obviously there's people who have
22 titles and are enabled to do particular jobs.  And
23 there's a reason why they're given that title and
24 that purpose.  So, you know, it's not for me to
25 judge.  And it would be a generalization to say,   09:27

Page 16

1  "Well, sometimes a patent is valid.  Sometimes it's   09:27
2  invalid or should have been issued or not issued."
3  That's not my job.  I make products.  It's not my
4  decision whether or not something is valid or not.
5  So obviously, there's people who do that for a   09:27
6  living, whose business it is to decide whether or
7  not something is valid and are appointed to do that
8  particular job.  So anything that I would think
9  would be just my own opinion and -- yeah.
10    Q    BY MR. HANLE:  Well, do you have an   09:27
11 opinion that sometimes patents are issued that
12 should not have been issued?
13    A    Depends on the particular case.  I mean,
14 is there a particular case that you think -- that
15 you would want me to give my opinion on or --   09:28
16    Q    I'm just asking you if you believe there
17 are some cases where patents are issued that should
18 not have been issued.
19    MR. HASAN:  Objection as to form.
20    THE DEPONENT:  Yeah.  I mean, truthfully,   09:28
21 I would make -- be making a general comment, so I --
22 I don't know.  I mean, I wouldn't want to suppose
23 that someone that's been given the job to issue
24 patents and to examine inventions -- whether or not,
25 you know, they're doing their job properly.  I mean,   09:28

Page 17

1  it's -- it's on a general basis.  I mean, if you   09:28
2  want to talk about a specific patent that you'd like
3  my opinion on, I can mention that.  But I don't want
4  to come out and openly criticize the entire patent
5  process based on a general comment.   09:28
6     Q    BY MR. HANLE:  Do you recall testifying in
7  the Nintendo versus Nyko case that the patent at
8  issue in that case, Nintendo's patent, should not
9  have been issued?
10    A    May have been.  There was definitely some   09:29
11 prior art that we were aware of that we showed
12 during that -- that case.  So in that particular
13 case I believe there was prior art.  There -- you
14 know, we had physical samples of this prior art that
15 we showed.  So in that particular case, you know,   09:29
16 that -- that was my belief because we had this prior
17 art physically, samples of it.  So yes, it's --
18 during that process I may have claimed that on that
19 particular --
20    Q    And so do you still believe that that   09:29
21 patent -- that Nintendo patent that was at issue in
22 that case should not have been issued?
23    MR. HASAN:  Objection as to form.  Asked
24 and answered.
25    THE DEPONENT:  You know --   09:29

Exhibit S
Page 213

Page 18

1  Q   BY MR. HANLE:  You can answer yes or no if  09:29
2  you can, please.
3  A   Yes or no, do I think it was -- I mean,
4  you know, we've settled that case.  And I'm not --
5  Q   My question --                      09:29
6  A   -- a lawyer or --
7  Q   My question -- and try and focus on the
8  question --
9  A   Okay.
10  Q   -- and answer the question.          09:29
11  MR. HASAN:  Objection:  Argumentative.
12  Q   BY MR. HANLE:  And so my question is do
13  you still believe that the patent that was issued in
14  that case should not have been issued?  Yes or no?
15  MR. HASAN:  Objection as to form.     09:30
16  THE DEPONENT:  You know, I don't really
17  have an opinion on it.  It's something that I put
18  behind me.  Whether or not, you know -- I'm not a
19  lawyer.  I'm not here to pretend to know whether or
20  not something was valid or not.  You know, we    09:30
21  presented our case in that particular case, and, you
22  know, we've moved on from that.  And whether or not,
23  you know, I believed it was a valid patent or not --
24  you know, based on some of the information we had, I
25  had some reluctance to believe that -- that it    09:30

Page 19

1  should have been issued, but, you know, I don't    09:30
2  really have a set opinion on it at this point.
3  Q   BY MR. HANLE:  And do you recall
4  testifying in that case, then, when a patent is
5  issued with no merit, it causes a lot of problems    09:30
6  and stifles technology and growth?
7  MR. HASAN:  Objection as to form.  And --
8  THE DEPONENT:  You know, do I specifically
9  remember saying that?  I don't recall.
10  Q   BY MR. HANLE:  Do you have that belief    09:31
11  today?  Yes or no?
12  MR. HASAN:  Objection as to form.
13  THE DEPONENT:  That patents can stifle
14  growth?  Well, I believe that patents have a
15  purpose, because if -- if there was no patents, then  09:31
16  we'd have a world of chaos; right?  So, you know, I
17  believe in the importance of innovation and concepts
18  and original thought and ideas.  And I believe that
19  those should be protected.  So I do believe in the
20  patent process, if that's what you're asking me.    09:31
21  Q   BY MR. HANLE:  That's not what I asked.  I
22  can repeat the question.
23  A   Sure.
24  Q   Do you still believe that when patents are
25  issued with no merit --                      09:31

Page 20

1  A   Mm-hmm.                      09:31
2  Q   -- that that causes problems and stifles
3  technology and growth?
4  MR. HASAN:  Objection as to form.  Asked
5  and answered.                      09:31
6  THE DEPONENT:  Do I -- can you repeat that
7  again for me, please?
8  MR. HANLE:  You can read it back, please.
9  (The record was read as follows:
10  "Q   Do you still believe that when    09:32
11  patents are issued with no merit -- "
12  ///
13  " -- that that causes problems and
14  stifles technology and growth?")
15  MR. HASAN:  Same objection.          09:32
16  THE DEPONENT:  A patent with no merit.
17  Well, I don't believe a patent that has no merit
18  should be issued.  I mean, that's obvious.  But as
19  far as stifling growth or innovation, you know, if a
20  patent goes through the process and is approved,    09:32
21  obviously someone who is skilled at that has
22  approved it and sees, you know, the novelty and the
23  uniqueness of that design.  And I believe that
24  should --
25  It's not for me to decide whether or not,  09:32

Page 21

1  you know -- what the patent office should do or    09:32
2  should not do, you know.  I'm not an expert in
3  issuing patents or approving patent applications.
4  So obviously, if a patent has no merit, it
5  shouldn't be issued.  But that's just my personal    09:33
6  opinion.
7  Q   BY MR. HANLE:  Yeah.  And the question is
8  when it's issued with no merit, do you believe it
9  stifles technology and growth?
10  MR. HASAN:  Objection:  Argumentative.    09:33
11  Asked and answered.
12  Q   BY MR. HANLE:  Yes or no?
13  MR. HASAN:  Same objection.
14  THE DEPONENT:  I don't -- for me --
15  Q   BY MR. HANLE:  It's a yes-or-no question,  09:33
16  just so you understand the question.
17  MR. HASAN:  Argumentative.  Let him answer
18  the question.
19  MR. HANLE:  Here's the --
20  MR. HASAN:  It's argumentative.          09:33
21  Q   BY MR. HANLE:  Here's the issue --
22  A   Mm-hmm.
23  Q   -- is -- is I've got a limited number of
24  hours --
25  A   Mm-hmm.                      09:33

Navid, Amir (CON)                                          Pages 18 - 21

**Exhibit S**
**Page 214**

Page 58

1   Q   And that is did -- did -- when Sony        10:13
2  announced the general shape in around June of 2006,
3  did it disclose the type of charging port that would
4  be on the controller?
5       MR. HASAN:  Objection as to form.          10:13
6       THE DEPONENT:  I don't recall exactly, but
7  they did --
8       (Request for clarification by the
9       deposition officer.)
10       THE DEPONENT:  They -- that's where they   10:13
11  showed it.  They were playable units that were shown
12  at E3 that year.  So I would have looked at that.
13       MR. HANLE:  Okay.  Let's go ahead and take
14  a break.  How long --
15       MR. HASAN:  Okay.                          10:13
16       MR. HANLE:  How long do you need?
17       THE VIDEOGRAPHER:  We're off the record at
18  10:13.
19       (Recess taken.)
20       VIDEOGRAPHER:  We're back on the record at 10:24
21  10:24.
22   Q   BY MR. HANLE:  Mr. Navid, do you know if
23  your emails have been checked between the date of
24  the announcement of the Sony PS3 wireless controller
25  in about June of 2006 and your conception of the    10:24

Page 59

1  invention at issue in this case?                  10:24
2       MR. HASAN:  Objection as to form.
3       THE DEPONENT:  Do I know whether or not my
4  emails have been checked from that period?  We tried
5  to disclose as many emails, so I would imagine that, 10:25
6  yes, they've been checked.
7   Q   BY MR. HANLE:  Okay.  And did you locate
8  any -- any communications between yourself and Hip
9  Hing --
10   A   Mm-hmm.                                     10:25
11   Q   -- regarding the conception of the product
12  at issue in this case prior to August 31, 2006?
13   A   Not that I'm -- I don't know specifically
14  if there was any emails during that period.
15   Q   Did you look for them?                      10:25
16   A   We tried to disclose everything, so I'm --
17  we basically handed over all our emails.  And the
18  legal team's gone through everything, so --
19   Q   Okay.  Did you personally look for emails
20  regarding communications with the factory at the    10:25
21  time -- at this time period, June to September of
22  2006?
23   A   I -- yes, I think I did, because our legal
24  team had asked us to go through and find information
25  about it.  So yes.                                10:26

Page 60

1   Q   So would it -- would it be fair to say      10:26
2  that if the first email that we have regarding that
3  conception is August 31, 2006, then there were no
4  previous communications between you and the factory
5  regarding this product?                           10:26
6       MR. HASAN:  Objection as to form.
7       THE DEPONENT:  No, because I actually
8  traveled to China.  And that particular project I
9  described to them directly.  And I handed over
10  drawings to them, and I discussed the project with  10:26
11  them directly.  So it might not be in email format,
12  but I did go and meet with them.
13   Q   BY MR. HANLE:  Okay.
14   A   So --
15   Q   So you mentioned drawings that you handed  10:26
16  over to them.
17   A   Mm-hmm.
18   Q   When do you believe you handed drawings
19  over to them?
20   A   When I was in China in August.  Should be   10:26
21  sometime in August when I was over there.
22   Q   And have -- have you located copies of
23  those drawings?
24   A   Copies of my original sketches?  No.  As
25  far as my 2D renderings that I've done, we found    10:27

Page 61

1  those, yes.                                       10:27
2   Q   The drawings that you said you handed over
3  to the -- to Hip Hing in August, were those -- those
4  hand sketches or something else?
5   A   They were hand sketches, and I would       10:27
6  imagine it may have even been the 2D rendering as
7  well at that time.
8   Q   Do you recall for sure whether you handed
9  over the 2D rendering in August of 2006?
10   A   For sure?  I mean, we had a full           10:27
11  discussion.  Afterwards they sent me, you know, 3D
12  renderings.  This is normal procedure for me.  I do
13  something in 2D, explain everything, send over the
14  detailed notes, and have them do it.  So I believe I
15  did, yeah.                                        10:27
16   Q   So you believe you did hand over the 2D
17  rendering in 2006?
18   A   Mm-hmm.
19   Q   In August of 2006?
20   A   Yes.                                        10:28
21   Q   And when you say a 2D rendering, that's
22  electronically done; correct?
23   A   Yes.
24   Q   On what program?
25   A   Illustrator.                               10:28

**Exhibit S**
**Page 215**

Page 110

1 opinion on that in my declaration.          11:40
2    Q   Okay.  Then the next sentence states:
3        "By way of example, PDP states that it
4        expended significant" -- "a significant
5        amount of research and development effort  11:40
6        to come up with numerous designs including
7        its initial multistep clamshell approach."
8    A   Mm-hmm.
9    Q   Are you talking about statements that PDP
10 made in connection -- in the court proceedings?   11:41
11    A   I -- I believe here I'm referring to
12 statements you made during the temporary restraining
13 order proceedings where you came in and you
14 specifically mentioned that.  I was present at that.
15 And you mentioned that, you know --          11:41
16    Q   Just -- I don't want to interrupt.  I just
17 want to help you out.
18        I don't want to confuse him.
19        This was submitted before that court
20 proceeding, so I just wanted to clarify that.   11:41
21    A   Okay.  Yeah, I -- you know, specifically
22 where it came from, I -- I would guess that's where
23 it is.  But if it's not the case, then -- you know,
24 I certainly don't have any contacts at PDP.  I don't
25 know.  But from what I see in this statement, it's   11:41

Page 111

1 just referring to whether or not this design is a   11:41
2 natural evolution to that final design (indicating).
3 And I don't believe that's the case.
4    Q   Okay.  Yeah, I'm more focusing on
5 whether -- whether -- where this -- the knowledge   11:42
6 behind these statements came from, whether it was --
7 whether it was -- do you recall reviewing PDP's
8 written submissions in connection with TRO, for
9 example?
10    A   At this moment I don't.  I may have.  I   11:42
11 may have reviewed them.  But I don't recall right
12 now.
13    Q   But you didn't get this information from
14 anyone at PDP; correct?
15    A   From PDP?  No, absolutely not.  I have no  11:42
16 contacts at PDP.
17    Q   Okay.  So then the next sentence in
18 paragraph 15 states, "Nyko introduced the Charge
19 Base product at the Consumer Electronics Show in
20 Las Vegas to great fanfare in January 2007."   11:42
21        Do you see that?
22    A   Mm-hmm.
23    Q   Okay.  What are you referring to there?
24    A   We're referring to the prototype being
25 shown at Consumer Electronics Show in Las Vegas in  11:43

Page 112

1 January 2007.                           11:43
2    Q   Okay.  And the -- let's flip back to
3 Exhibit A as part of this declaration --
4    A   Mm-hmm.
5    Q   -- which is the first -- first exhibit.   11:43
6    A   Okay.
7    Q   And -- and so you see there a -- what is
8 Exhibit A?
9    A   Exhibit A appears to be a page capture
10 from IGN, I would guess, referring to "CES 2007:   11:43
11 Nyko Charge Base PS3."
12    Q   And you see the author there is Gerry
13 Block?
14    A   Yes.
15    Q   Do you know Gerry Block?          11:43
16    A   Personally?  I've spoken with him maybe
17 once.  This was previous to him being at PDP, when
18 he was still working for the press.  So --
19    Q   Okay.  You've had -- you've had drinks
20 with him; correct?                     11:44
21    A   I've had --
22        MR. HASAN:  Objection.
23        THE DEPONENT:  Have I had drinks with him?
24 I've been at a social gathering with him where he
25 was present, but to have drinks with him, I mean,   11:44

Page 113

1 that -- that would -- I don't know if I had drinks   11:44
2 with him.
3    Q   BY MR. HANLE:  Okay.  It's --
4        MR. HASAN:  I think -- I think that's
5 fine.  I --                           11:44
6    Q   BY MR. HANLE:  So you've socialized with
7 him?
8    A   I think "socialize" means that, like --
9        MR. HASAN:  Objection as to form.
10        THE DEPONENT:  -- something that's --   11:44
11 that's more personal time, which was not the case.
12 You know, we were at -- the only time I've really
13 met him or spoken to him was at -- I believe it was
14 either an E3 or a CES.  And he knew some of the
15 other individuals in my company from the marketing  11:44
16 department.  And he was speaking with them, and I
17 was present during their conversation, but I really
18 had little to say to him himself.
19    Q   BY MR. HANLE:  When you say Gerry Block
20 was a member of the press, what's your understanding 11:45
21 of what his role was?
22    A   Again, I'm not a marketing guy.  My
23 understanding was that he worked for IGN and he did
24 reviews, you know.  So that's -- that's as much as I
25 know.                                11:45

1    Q    -- "but I am entitled to your best    11:49
2  estimate or your best recollection."
3    A    Mm-hmm.
4    Q    And so a lot of times that's done by
5  giving ranges.    11:49
6    A    Mm-hmm.
7    Q    And so -- and so what -- what I will --
8  what I will do is say, you know, "Can you say that
9  it was more than one?," "Can you say that it was
10  more than three?," "Can you say that it was more    11:50
11  than five?," "Can you say that it was more than
12  50?," and then we can narrow it down.
13    A    I --
14    Q    So what I'm asking you is if you -- is
15  there any range that we can sort of fix it in    11:50
16  between and say, "I don't know within that range,
17  but I know it wasn't more than 50, and I know it
18  wasn't less than two"?
19         MR. HASAN:  Objection as to form.
20         THE DEPONENT:  So, sir, again, from my    11:50
21  recollection, I don't remember a specific count of
22  people, whether it was less than five people or more
23  than five people or, you know, just a few people.
24  It's -- I can't give you an accurate answer because
25  the -- my timing -- you know, I would show up during 11:50

1  a beginning of the workday, where a lot of times    11:50
2  there's not people who -- even people who are
3  invited may not be there.
4         So I don't -- I really don't think I'm the
5  best person to answer how many people visited or    11:50
6  whether it was less than five people or more than
7  five people.  I really can't recall.
8    Q    BY MR. HANLE:  Who is -- who is the best
9  person at Nyko to be able to answer that question?
10    A    Well, marketing department.  That would be 11:51
11  Chris Arbogast.  He's -- he's the one in charge of
12  that department and also of who gets invited.
13    Q    Okay.  So that was my next question.  So
14  Chris Arbogast would be able to tell us who was
15  invited?    11:51
16         MR. HASAN:  Objection.
17         THE DEPONENT:  I would imagine.  I don't
18  want to -- I would imagine so.
19    Q    BY MR. HANLE:  Have you ever seen an
20  invite list for that hotel suite?    11:51
21    A    No, not that I recall, no.
22    Q    And do you know if Nyko keeps a record of
23  who's invited to these types of --
24    A    Potentially.  I would imagine if an
25  invitation was sent out, there should be some sort  11:51

1  of email to that effect or a list.  I don't know    11:51
2  specifically if there's a list or an email or how
3  they would go about it.  It's not my department.
4    Q    Do you recall how -- whether entering and
5  leaving the suite was somehow controlled at -- for   11:51
6  this particular Consumer Electronics Show in
7  Las Vegas?
8    A    Well, we don't have a security guard
9  per se at the door that, you know, throws you out.
10  But we have our employees that are in the suite, and 11:52
11  as you enter, you know, you would get approached and
12  asked who you have a meeting or who you're there to
13  see.  But as far as a security guard or anything to
14  that effect, it is an invite-only suite.  That's the
15  most I know about it.    11:52
16    Q    Okay.  This sentence in your declaration
17  says that the charge base was introduced to great
18  fanfare.  What do you mean by "to great fanfare"?
19    A    To great fanfare, it means that it was
20  embraced by the press for -- for its novelty and    11:52
21  what it allows to do.  So it basically means that --
22  you know, overall that it was a positive review of
23  the concept.
24    Q    And does "to great fanfare," meaning --
25  does it relate to anything other than the press'    11:53

1  reaction?    11:53
2    A    I -- I would think it's press' reaction, I
3  mean, because at that point the consumers don't get
4  an opportunity to buy this product.
5    Q    Okay.  What about other gaming companies? 11:53
6  Do you recall --
7    A    Other gaming companies as far as
8  competitors?
9    Q    Any -- any other gaming companies.  So let
10  me -- and we're starting to get a little    11:53
11  conversational, and so let's try and keep it
12  question, then answer.
13         So do you recall anyone other than press
14  who commented on or reacted to the introduction of
15  the charge base product at CES 2007?    11:53
16    A    I don't recall.  I think that's a
17  statement towards press.
18    Q    And other than Gerry Block, do you
19  remember any other members of the press who -- who
20  reacted to the introduction of the charge base    11:54
21  product at CES 2007?
22    A    Specifically?  No, I don't.
23    Q    Okay.  Go to page 8.
24    A    On which document, sir?
25    Q    Exhibit -- Exhibit 3.    11:54

**Exhibit S**
**Page 217**

Page 126

1  to my exact specifications.          12:01
2     Q   Okay.  And so is that the -- is that the
3  charge base unit that was shown at the -- in the
4  hotel suite at Consumer Electronics Show 2007 in
5  January in Las Vegas?                12:01
6     A   It -- this is a very poor picture.  It
7  would be quite difficult for me to identify it as
8  exactly that prototype.
9     Q   Do you know who Chris Kohler is?
10    A   No, I do not.                   12:01
11    Q   Okay.  How do you know that this -- how do
12  you know that this -- strike that.
13        Where did you get this picture that's
14  shown in Exhibit A?
15    A   I did not personally get this picture.    12:02
16    Q   Who got it, to the best of your
17  recollection?
18    A   I believe our legal team.
19    Q   You used the term "SLA" previously.  What
20  is that?                             12:02
21    A   It's stereolithographic assembly.  It's
22  basically a one-off sample made to essentially test
23  a concept to put together -- it's basically a
24  one-off, so it's only one made typically.  It's --
25  or individually made.  It's not -- it's not coming  12:03

Page 127

1  out of a mold and is basically almost -- typically  12:03
2  used as a proof of concept.
3     Q   In this case was the prototype -- could
4  you actually power it up?  Could you actually plug
5  it in?                               12:03
6     A   I don't -- honestly, I would imagine that
7  it did, but I can't guarantee for sure that it did
8  power up.  SLAs have a tendency -- even if they
9  initially work, they may not work later.  They break
10  down very easily because everything is handmade.    12:03
11  There's usually loose cables and -- so I don't know
12  if it powered up at the actual show.  So I'm not
13  certain.  I can't vouch for the fact whether or not
14  it powered on or not at that point.
15        Yeah, I mean, typically you make that    12:04
16  because it takes such a long time for you to
17  actually tool and bring the product to market.  So
18  this is like a proof of concept.  You get a one-off
19  made in order to test how everything fits together
20  and how it will work.                12:04
21    Q   Okay.  So why don't we go back to
22  Exhibit 1 now, which is the patent.
23    A   Yes, sir.
24    Q   Okay.  On the cover page of the patent,
25  there is a figure.                   12:04

Page 128

1     A   Mm-hmm.                         12:04
2     Q   And this is -- would you agree that this
3  is one of the -- one of the embodiments of your
4  invention that is described and claimed in the '848
5  patent?                              12:05
6     A   Yes.
7     Q   Okay.  And what do you call this
8  particular embodiment?  Do you have a name that you
9  use -- that you refer to it?
10    A   This product was the charge base.    12:05
11    Q   Okay.  And when did you conceive of the
12  charge base, this embodiment?
13    A   This would have been about -- somewhere in
14  June is when they announced the actual controller
15  for PS3.  So I would think, in this manner, because  12:05
16  they defined the shape of the controller, would have
17  been in the period between the June E3 show and --
18  and August when -- when I went to China and
19  discussed the project with the factory.
20    Q   Okay.  Turn to the third page of this    12:06
21  Exhibit 1.  And you see figure 1 there?  And there's
22  a series of figures, 1 through 10.  And I'd like you
23  just to flip through those and look at those just
24  quickly.
25    A   Mm-hmm.                         12:06

Page 129

1     Q   Would you agree that these figures 1     12:06
2  through 10 relate to a different embodiment of your
3  invention as described in the patent?
4     A   Yes, this -- this is a different embody.
5     Q   Okay.  And figures 1 through 10 are --   12:06
6  those are a power adapter as opposed to a charge
7  base; correct?
8     A   Yes, these -- well, some of them are
9  diagrams, but they appear to be the AC adapter style
10  where it still required a cable.        12:06
11    Q   And when did you come up with this
12  embodiment -- these embodiments, the power adapter
13  embodiment of your invention?
14        MR. HASAN:  Objection.
15        Go ahead.                       12:07
16        THE DEPONENT:  I would have to look back
17  and look in my notes.  It would have been sometime
18  back.  I -- I don't recall.
19    Q   BY MR. HANLE:  Let's see if we can -- what
20  notes are you referring to, by the way?    12:07
21    A   Well, emails, you know, correspondence
22  that I had with, you know, factory or internally
23  about this type of product.
24    Q   Do you keep any type of inventor's
25  notebook?                            12:07

**Exhibit S**
**Page 218**

Page 142

1 [sic] as to form.                          12:24
2     Q    BY MR. HANLE:  Can you answer that
3 question yes or no?
4     A    I think I've explained it.  It's a part of
5 the base.  It's just, you know -- it sits on the   12:24
6 base.  It's a part of the base.
7     Q    And can you answer my question?  Focus
8 on -- this question is different from the earlier
9 ones.  Can you answer my question yes or no?
10        MR. HASAN:  Objection as to form.  Asked   12:24
11 and answered.
12        THE DEPONENT:  So I've answered this
13 question, I believe, to the best of my ability,
14 which is this is a part of the base.  It's where the
15 DC jack is located, and it's -- it's a part of the   12:24
16 base.  It's designed to work only and specifically
17 with this base.
18     Q    BY MR. HANLE:  So take a look at
19 column 11.
20     A    On which document?                   12:25
21     Q    In the same document you're in.
22     A    Okay.
23     Q    Keep your figure there by that figure
24 because we're going to come back to it.
25     A    Okay.                               12:25

Page 143

1     Q    And take a look at column 11.         12:25
2     A    Sure.  I don't have column 11.  Oh, sorry.
3     Q    Okay.  And column 11, line 58 -- actually
4 starting at 57, says, "The docking bays 512, 514 are
5 dimensioned to accept adapters 516."           12:25
6        Do you see that?
7     A    Mm-hmm.
8     Q    So according to that, 5- -- element 516 in
9 the figures is an adapter; correct?
10     A    Mm-hmm.  Well --                      12:26
11     Q    Is that a yes?
12     A    Within the context of that sentence, yes.
13     Q    Okay.  And does that sentence say that the
14 adapter is part of the base?
15        MR. HASAN:  Objection as to form.      12:26
16        THE DEPONENT:  Does it say it's part of
17 the base?  It -- it is a part -- are dimensioned to
18 accept these.  Yes.  So I think, yes, it refers to
19 that.
20     Q    BY MR. HANLE:  It says they're -- it says   12:26
21 they're dimensioned -- the docking bays are
22 dimensioned to accept adapters; right?
23     A    The particular adapter that come with it,
24 yes.
25     Q    Okay.                               12:26

Page 144

1     A    It's part of the entire product.     12:26
2     Q    Okay.  In use, was it your intention that
3 the adapters, as shown in figure 17 and other
4 figures, would remain attached to the controller or
5 remain attached to the base when the controller was   12:27
6 not attached to the base?
7        MR. HASAN:  Objection as to form.
8        THE DEPONENT:  That's really up to the end
9 user.  So you can do it either way.  You can leave
10 them on the base if you don't want to have that   12:27
11 adapter on your actual controller, because it is a
12 piece that's on the controller.  So some people
13 might want to keep it in their base.  It really
14 depends.  You're not forced to have it there.  It
15 can be on there.                             12:27
16     Q    BY MR. HANLE:  Okay.  When did you -- when
17 did you come up with the idea for the charge base 2
18 embodiment?
19        MR. HASAN:  Objection as to form.
20        THE DEPONENT:  The specific design for   12:28
21 that one -- I mean, they're related.  So it's not,
22 per se, one design is completely a different
23 concept.  It's the same core invention.  So I would
24 say this is no different -- I would say the same
25 time.  You know, this is just a further convenience   12:28

Page 145

1 of being able to have these adapters or pieces of   12:28
2 this charging base on the device or not on the
3 device.
4     Q    BY MR. HANLE:  When did you conceive of
5 the idea to have an adapter interposed between the   12:28
6 controller and the base?
7        MR. HASAN:  Objection as to form.
8        THE DEPONENT:  Again, I think this is the
9 same product -- same -- same concept of having a
10 controller that attaches directly to -- to a DC   12:28
11 port, which -- so I would say June of 2006, when I
12 was conceiving the original model.
13     Q    BY MR. HANLE:  So you conceived of an
14 adapter in June 2006?
15     A    Not an adapter.  What I'm talking about is   12:29
16 the underlying invention, which --
17     Q    And I'm not talking about that.  My
18 question was the adapter.  I want to know when you
19 conceived of the adapter interposed between the
20 controller and the base.                     12:29
21        MR. HASAN:  Objection:  Asked and
22 answered.
23        THE DEPONENT:  Yeah.  I believe I've
24 answered that.  It's -- I don't see --
25     Q    BY MR. HANLE:  You haven't.          12:29

**Exhibit S**
**Page 219**

Page 146

1    A    -- a difference between charge base 1 and   12:29
2    charge base 2, other than the fact that it has two
3    ports versus four ports.  It's --
4    Q    Well, one has an adapter, and one doesn't;
5    right?                                12:29
6         MR. HASAN:  Objection.
7         THE DEPONENT:  An adapter -- are you
8    talking about an external AC adapter or something to
9    that effect?  Because this is a piece of the actual
10   invention.                           12:29
11   Q    BY MR. HANLE:  Okay.  Your counsel brought
12   with him a charge base 2.  Is this -- is this a
13   charge base 2?
14   A    That is a charge base, yeah.
15   Q    And what's that piece right there?   12:30
16   A    This is the part that -- part of this base
17   that connects directly to the controller.
18   Q    Okay.  And is that an adapter?
19        MR. HASAN:  Objection as to form.
20        THE DEPONENT:  An "adapter" is a loose   12:30
21   term.  It can mean a lot of things.  But is it an
22   adapter?  I believe it's -- it's the same underlying
23   idea of having a controller without a wire attaching
24   to a charge base.
25   Q    BY MR. HANLE:  Why don't you pick that up, 12:30

Page 147

1    that adapter.                        12:30
2    A    Sure.
3    Q    Pick it up.  And so my question is, is
4    that an adapter?  I don't want to know about the
5    underlying idea.  I want to know whether it's an   12:30
6    adapter or not.
7         MR. HASAN:  Objection as to form.
8         THE DEPONENT:  An adapter -- like I've
9    explained, an adapter can mean a lot of different
10   things.  So is it an adapter?  I mean, there's   12:30
11   different -- that's subjective.  It depends.  You
12   could describe a lot of things as an adapter.
13   Q    BY MR. HANLE:  Is it an adapter as used --
14   A    This is a piece of this charge base, yes.
15   Q    Is it an adapter as that term is used in   12:30
16   your '848 patent, referring to element 516 that we
17   just looked at?
18   A    Within the context of that paragraph, yes.
19   Q    So that's an adapter as that term is used
20   in your patent?                       12:31
21   A    Within the context of that paragraph,
22   yeah.
23   Q    And so when did you come up with the idea
24   of the adapter?
25   A    Specific date?  Again, I think it would   12:31

Page 148

1    have been the same time.  The same -- it's the same   12:31
2    design.  It's the same concept.  It's the same
3    underlying invention of a charging bay that mates
4    and couples directly with a controller.  And that's
5    what it does.                        12:31
6    Q    Yeah, I'm not looking for the overall
7    design.  I want to know about the adapter.
8         Pick up the adapter, and hold it in your
9    hand again, please.
10   A    Mm-hmm.                          12:31
11   Q    Thank you.
12   A    Mm-hmm.
13   Q    When did you come up --
14        Keep it there.  Don't -- don't keep
15   putting it back in the base.                12:31
16   A    Okay.
17   Q    Okay.  I want to know about that adapter,
18   and I want to know when you came up with the idea
19   for that thing that's in your hand, which you called
20   an adapter.                          12:32
21        MR. HASAN:  Objection as to form.  Asked
22   and answered.
23        THE DEPONENT:  Actually, you called it an
24   adapter.  But as far as when I came up with the idea
25   of having a part of the base be removable for added   12:32

Page 149

1    convenience, I don't know off the top of my head.   12:32
2    Q    BY MR. HANLE:  What's your best
3    recollection?  Give me a range, a date range, as
4    best you can.
5    A    I really don't know.  I'd have to look   12:32
6    into my notes.
7    Q    Okay.  Was it after -- was it after August
8    of 2006, when you handed over drawings to -- to Hip
9    Hing?
10        MR. HASAN:  Objection as to form.   12:32
11        THE DEPONENT:  Not necessarily.  I
12   don't -- I don't know that.  I can't answer that
13   question.
14   Q    BY MR. HANLE:  Okay.  Was it -- was it
15   before or after Consumer Electronics Show 2007?   12:32
16        MR. HASAN:  Objection as to form.
17        THE DEPONENT:  Again, I think the
18   underlying design, the same purpose and the utility
19   of the -- of this invention is the same.  So it
20   would have been June of 2007ish.          12:32
21   Q    BY MR. HANLE:  Again, you're going back to
22   the utility, the overall invention.  I just want to
23   talk about the piece in your hand.
24   A    I don't see a separation between the two.
25   We're talking about the same concept, the same   12:33

**Exhibit S**
**Page 220**

Page 170

1 adapter 516?                              02:10
2     A   I'm sorry.  Do you mind if I read it, or
3 can you read it back to me?  Because I was trying to
4 find that particular -- so, "As shown in" -- do you
5 mind if I read it?                        02:10
6     Q   Why don't you read it out loud, the first
7 sentence of that paragraph.
8     A   Okay.
9         "As shown in figures 19A through 19C,
10        the adapter 516 includes a body...with an  02:10
11        angled edge....  Electrical leads...are
12        located on the bottom side...of the body
13        and the top side...of the
14        body...includes" --
15    Q   Yeah, just -- I was only asking about the  02:10
16 first sentence.
17    A   Okay.
18    Q   So would you agree that figures 19A
19 through C depict an adapter 516?
20    A   So in the patent description, not -- not  02:10
21 in the claims, that appears correct.
22    Q   Okay.  And similar to what we did before,
23 I want to -- you to be able to flip back and forth
24 between columns 11 and 12 of Exhibit 1.
25    A   Okay.                              02:11

Page 171

1     Q   And then in Exhibit 8 I would like you to  02:11
2 go to the paragraph numbered 16.
3     A   You said column 11 and 12 and paragraph 16
4 in --
5     Q   Yeah, that's right.  That's where it  02:12
6 starts.
7     A   Okay.
8     Q   So looking at paragraph -- paragraph
9 starting at 11 -- column 11, line 49, it states,
10 "Another exemplary embodiment of the invention,  02:12
11 shown in figure 16 through 23, relates to a charging
12 station for a consumer electronics device (CED)...."
13 And then it goes on.
14        And then paragraph 16 in Exhibit 8 says,
15 "An exemplary embodiment of the present invention  02:12
16 relates to a charging station for a consumer
17 electronics device (CED)...."
18    Q   Do you see that?
19    A   Mm-hmm.
20    Q   Okay.  Now, look at the next paragraph at  02:12
21 the top of column 12, Exhibit 1.
22    A   Mm-hmm.
23    Q   And it says, "As shown in figure 16, the
24 charging station 510 includes a base 524 with two
25 docking bays 512, 514."                    02:12

Page 172

1        Do you see that?                    02:12
2     A   I do.
3     Q   And take a look now at Exhibit 8,
4 paragraph 17, and you've got "As shown in figure 1,
5 the charging station 10 includes a base...with two  02:12
6 docking bays 12 and 14."
7        You see that the same language is used in
8 the '848 patent as is used in this provisional
9 application, Exhibit 8, except for the change in the
10 numerals.  And in the patent there's a 5 added  02:13
11 before each of those numerals.
12    Q   Do you see that?
13        MR. HASAN:  Objection as to form.
14        You can -- you can answer.
15        THE DEPONENT:  Yes, it appears that way.  02:13
16    Q   BY MR. HANLE:  Okay.  And so let's do one
17 more on column 12.  And so the second paragraph in
18 column 12, starting at line 13, says, "The recesses
19 530 are dimensioned to receive an adapter 516 into
20 the recess 530."                          02:13
21    Q   Do you see that?
22    A   I do.
23    Q   Okay.  And if you'll compare that to
24 paragraph 18 of Exhibit 8, it says, "The recesses 30
25 are dimensioned to receive an adapter 16 into the  02:14

Page 173

1 recess."                                  02:14
2        Do you see that?
3     A   I do.
4     Q   Okay.  So would you agree that the
5 paragraphs in your provisional application,  02:14
6 Exhibit 8, have been carried over into the
7 specification -- the written description of your
8 '848 patent?
9        MR. HASAN:  Objection as to form.
10        You can answer.                     02:14
11        THE DEPONENT:  It appears that way.
12    Q   BY MR. HANLE:  Okay.
13    A   I -- I don't know.  I haven't read the
14 entire paragraph, but it appears that way --
15    Q   Okay.                              02:14
16    A   -- based on the parts that you've read.
17    Q   All right.  And so the question -- and you
18 remember we -- before lunch we looked at and
19 compared Exhibit 1 with your original patent
20 application relating to the -- to the converter  02:14
21 adapter.
22        Do you recall that?
23    A   To the converter?  You mean the AC
24 adapter.
25    Q   The AC adapter.  Excuse me.          02:15

**Exhibit S**
**Page 221**

Page 174

```
1    A   Okay.                        02:15
2    Q   Okay.  You recall that?
3    A   Yes.  You mean the first figures; right?
4    Q   The first figures, and then the
5  paragraph -- the language in the paragraphs was   02:15
6  carried over from the earlier one to your -- to your
7  patent.
8    A   I believe so.
9    Q   Okay.  So do you -- do figures 11 through
10 15 of the '848 application appear in any earlier   02:15
11 application?
12   A   So in one figures -- I'm sorry?
13   Q   So go to your '848 patent, which is
14 Exhibit 1.
15   A   Okay.                        02:15
16   Q   And figures 11 through 15.
17   A   Figures 11 -- okay.
18   Q   Do figures 11 through 15 appear in your
19 provisional  application, Exhibit 8?
20   A   Well, figure 6 is essentially the same.   02:16
21 It's showing two controllers docked in bays.  So are
22 you talking about exact drawing where it looks the
23 same or in concept?
24   Q   I'm talking about the figure -- the
25 specific figures 11 through 15 and whether those   02:16
```

Page 175

```
1  specific figures --                    02:16
2    A   They're different drawings, but the
3  premise, the concept of the product is the same.
4    Q   Okay.  Similar question but with respect
5  to the text.  And this may take a little bit of time 02:17
6  for you to -- to review it.  But if you look at
7  column 9 of the '848 patent, which is Exhibit 1.
8    A   Okay.  Yes, sir.
9    Q   And you'll see, starting in column 9, at
10 line 6 --                         02:17
11   A   Mm-hmm.
12   Q   -- there's a paragraph that starts,
13 "Figures 11, 12, and 13 are perspective, top, and
14 side views...."
15       Do you see that?                02:17
16   A   I do, yes.
17   Q   Okay.  And so then all the rest of
18 column 9 is discussing those figures.  At the bottom
19 of column -- of column 9, there's a reference to
20 figure 14.                        02:17
21       Do you see that at the very last line?
22   A   Okay.
23       MR. HASAN:  Objection as to form.
24   Q   BY MR. HANLE:  And in paragraph 11 there's
25 a reference to paragraph 15.              02:18
```

Page 176

```
1        MR. HASAN:  Objection as to form.   02:18
2        THE DEPONENT:  Paragraph 11 in which
3  document?
4    Q   BY MR. HANLE:  Excuse me.  Go to
5  column 11.                        02:18
6    A   Column 11, okay.
7    Q   And -- and you see in column 11, there's a
8  reference to figure 15.
9    A   Where?
10   Q   The second full paragraph.  Do you see   02:18
11 that?
12   A   "See figure 15"?  Is that what you mean?
13   Q   Yes.
14   A   Okay.
15   Q   So would you agree that figures 11 through 02:18
16 15 are described in columns 9, 10, and 11?
17       MR. HASAN:  Objection as to form.
18       THE DEPONENT:  I would have to read
19 through it --
20   Q   BY MR. HANLE:  Okay.  That's fair enough.   02:18
21   A   -- and really --
22   Q   So, different question.  You know what?
23 Strike that.  Have to work too hard for that one.
24       So I want you to now compare figure 15 of
25 your '848 patent, which is Exhibit 1 --       02:19
```

Page 177

```
1    A   Okay.                        02:19
2    Q   -- with figure 22.
3    A   In the same one right?
4    Q   In the same Exhibit 1.
5    A   Okay.  Okay.                    02:19
6    Q   Okay.  So in figure 15 what part of that
7  figure -- that -- what do you call this type of
8  figure, by the way?
9    A   It's a schematic drawing, just more like
10 a -- the term eludes me, but it's just a simple   02:20
11 diagram.  That's what I would call it.  I don't know
12 the exact terminology for it.  Schematic drawing
13 would be the one that's on figure 23, but --
14   Q   Have you -- have you heard or used the
15 term block diagram?                    02:20
16       (Mr. Buccigross exited the room.)
17       THE DEPONENT:  Not, but -- is that what
18 it's called?  It's called a block diagram?
19   Q   BY MR. HANLE:  I'm asking you if that's a
20 term --                          02:20
21   A   I've not heard that, but yeah.
22   Q   Okay.  So in this -- in this figure 15
23 which portion of the block diagram shows the base?
24   A   Which -- in 15 or in 22?
25   Q   15.                         02:20
```

**Exhibit S**
**Page 222**

Page 182

1   Q   BY MR. HANLE:  Can you point to a place in   02:26
2   the patent, as you sit here right now, where the
3   adapter is disclosed as part of the base?
4        MR. HASAN:  Are you going to go allow him
5   to read the patent?                            02:26
6        THE DEPONENT:  The adapter is a part of
7   the base, and it's designed specifically -- it won't
8   work with anything else.  It's part of the base.
9   It's included with the base.  Whether or not -- and
10  I believe the way that this is worded -- and I've   02:26
11  read through this patent -- that it's -- it's
12  accurate.  It's describing just one embodiment of
13  the design, and the core purpose and uniqueness of
14  the product is there, whether or not there's an
15  adapter or not.  The key is that there's no wire,   02:26
16  there's nothing hanging out of this, that it is
17  directly connecting to this charge base.
18  Q   BY MR. HANLE:  So --
19  A   And having a movable part, I don't think,
20  weakens that at all.                            02:26
21  Q   Okay.  So I can have a cell phone --
22  A   Mm-hmm.
23  Q   -- that connects to a -- that ships with
24  and connects to a charger for that cell phone, a
25  charge cable; right?                            02:27

Page 183

1        MR. HASAN:  Objection as to form.         02:27
2        THE DEPONENT:  I'm sorry.  Can you say
3   that to me again?
4   Q   BY MR. HANLE:  Yeah.
5   A   What's your point?  I mean, define it to   02:27
6   me because I'm not sure I understand it.
7   Q   Unfortunately, you don't get to ask
8   questions.  I get to ask the questions.
9   A   Okay.
10  Q   So -- so I'll just -- I'll ask a          02:27
11  question --
12  A   Okay.
13  Q   -- and you just answer the question.
14  A   So a cell phone is frequently shipped with
15  a charger that connects to the cell phone; correct?  02:27
16  A   Charger.  You mean a power adapter.
17  Q   Sure.  A plug that plugs into it, connects
18  to it.
19       MR. HASAN:  Objection as to form.
20       THE DEPONENT:  Well, a plug is a different  02:27
21  thing than a charging cable or AC adapter.  A plug
22  refers to something short that basically --
23  Q   BY MR. HANLE:  A power cord.
24  A   -- pairs, right, or couples or mates with
25  a female, right, where a cable is a whole cable     02:27

Page 184

1   assembly.  It's called a cable assembly that       02:27
2   typically has a plug at one end, another plug at the
3   other, and has a cable in the middle.  So they are
4   two different things.
5   Q   Have you seen a -- have you seen those --  02:28
6   those credit card readers that you can plug into an
7   iPhone?
8        MR. HASAN:  Objection as to form.
9        THE DEPONENT:  Have I seen -- you mean the
10  ones that you slide the card through and it plugs   02:28
11  into the top ports?  Okay.  Yes, I have.
12  Q   BY MR. HANLE:  And so is that card reader
13  part of the iPhone?
14       MR. HASAN:  Objection as to form.
15       THE DEPONENT:  Is that card reader --      02:28
16  Q   BY MR. HANLE:  Because it connects to it.
17  So is it part of it?
18       MR. HASAN:  Objection as to form.
19       THE DEPONENT:  Does it ship with it?  Does
20  it ship with the iPhone?  I don't know if they have  02:28
21  some bundling where they do.  If they don't -- if it
22  doesn't ship with it, it's not a part of the phone,
23  then I would say no.  If it's made by a different
24  manufacturer, then no.
25  Q   BY MR. HANLE:  Okay.  So to tell whether   02:28

Page 185

1   the adapter is part of the base, we need to know    02:28
2   whether it ships with it and whether it connects to
3   it; is that right?
4        MR. HASAN:  Objection as to form.
5   Objection as to form.                            02:28
6        THE DEPONENT:  There is no question that
7   the adapter -- what you're calling an adapter or a
8   part of this or a dongle is a part of this base.  It
9   ships with it.  It can't be used without of it --
10  without it.  It's a part of it.  It's not made by a  02:29
11  different manufacturer.  Apple makes the iPhone.
12  Whoever makes that particular adapter or accessory,
13  which -- and that's what that is; it's an
14  accessory -- is made by a different party.
15       So no, it doesn't ship with that; right?    02:29
16  So I would say it's a different thing altogether.
17  It's not a valid analogy.
18  Q   BY MR. HANLE:  Okay.  As -- as Nyko ships
19  the charge base 2 product -- does it still sell the
20  charge base 2 product?                            02:29
21  A   I'm not certain if it's still selling.  It
22  could -- I mean, you're talking about leftover
23  inventory or are we still producing it?  Is that
24  what you're asking me or --
25  Q   No, whether you're still selling it.       02:29

Navid, Amir (CON)                                Pages 182 - 185

1    A    It's possible that some retailers still    02:29
2  sell it.
3    Q    At the time it was shipped, was it -- was
4  the -- were the adapters in the package not
5  connected to the base?    02:30
6    A    Not connected to the base.
7    MR. HASAN:  Objection as to form.
8    THE DEPONENT:  We had different versions
9  of packaging, and I'm sure we've had it in different
10  configurations.  It always has shipped with it.    02:30
11  It's a part of the product.
12    Q    BY MR. HANLE:  My question is, is there
13  any example of when it shipped where it was actually
14  inserted, connected to the base, as opposed to being
15  separate in the packaging?    02:30
16    MR. HASAN:  Objection as to form.
17    THE DEPONENT:  You know, to be honest,
18  I'm -- was it in a separate packaging?  Never.
19  Obviously, it was always packaged together.  Whether
20  or not it was -- are you asking me whether or not it    02:30
21  was physically on the base?
22    Q    BY MR. HANLE:  Yeah.  As shipped.
23    A    When it shipped?  I don't know.
24    Q    Okay.  Take a look at column 6 in your
25  patent, which is Exhibit 1.    02:31

1    A    Column 6.  Okay.    02:31
2    Q    So at line 15 of column 6, there's a
3  sentence that starts, halfway across:
4        "The charging station also includes an
5        external adapter with a connector    02:31
6        configured to couple to a power input
7        port.
8    Do you see that?"
9    A    Mm-hmm.
10    Q    What's meant by the term "external    02:31
11  adapter"?
12    MR. HASAN:  Objection as to form.
13    THE DEPONENT:  "The charge station also
14        includes an external adapter with a
15        connector configured to couple to a power    02:31
16        input port of the accessory device...."
17    Q    BY MR. HANLE:  What is meant -- my
18  question is what is meant by "external adapter"?
19    MR. HASAN:  Objection as to form.
20    THE DEPONENT:  It means that there is    02:31
21  another adapter that's on -- it's not internal.
22  It's not inside the actual device.
23    Q    BY MR. HANLE:  So it's external to what?
24    MR. HASAN:  Objection as to form.
25    Q    BY MR. HANLE:  Is it external to the    02:32

1  charging station?    02:32
2    MR. HASAN:  Objection as to form.
3    THE DEPONENT:  So as I described, it means
4  that it's external.  So it's not contained within
5  the actual charge base.  It's on the charge base.    02:32
6    Q    BY MR. HANLE:  Okay.  Take a look at
7  Exhibit 8.
8    A    Exhibit 8?
9    MR. HASAN:  Exhibit 8?
10    MR. HANLE:  Yes.    02:32
11    THE DEPONENT:  Okay.
12    Q    BY MR. HANLE:  Which is your provisional
13  application.  And you'll see on the first page that
14  there's a filing date of October 24, 2007.
15    Do you see that?    02:32
16    A    Yes.
17    Q    What led to the filing of this provisional
18  patent application?
19    MR. HASAN:  Objection as to form.
20    THE DEPONENT:  What led to it?  Basically    02:33
21  the desire to protect our investment and our
22  intellectual property.
23    Q    BY MR. HANLE:  Why wasn't the patent
24  application filed earlier than this with regard to
25  the charge base product without the dongle?    02:33

1    MR. HASAN:  Objection as to form.    02:33
2    THE DEPONENT:  It's the same concept.
3  What we're talking about in the provisional compared
4  to what we're talking about in the full application,
5  they're -- in my eye, there's no difference.    02:33
6    Q    BY MR. HANLE:  So --
7    A    And --
8    Q    -- with respect to --
9    A    If I can finish the question, because you
10  are asking me -- see, now I forgot what the question    02:33
11  was.  What was the actual question you wanted
12  answered?
13    MR. HASAN:  Please don't cut him off.
14    Q    BY MR. HANLE:  So the -- so you said you
15  conceived of the charge base invention in between,    02:33
16  like, June and August of 2006.
17    Do you recall that testimony?
18    MR. HASAN:  Objection as to form.  And
19  objection to cutting off the witness in the last
20  answer.    02:34
21    Go ahead.
22    THE DEPONENT:  Yes, the concept, what were
23  patented, this -- the utility and the concept behind
24  our product was evident in the first version, which
25  is the charge base, and as evident through all the    02:34

Page 190

1  other charge bases that we've made and --      02:34
2         MR. HANLE:  I'm going -- I'm going to move
3  to strike his answer as nonresponsive.
4         MR. HASAN:  Don't --
5         MR. HANLE:  We're -- we're getting to the  02:34
6  point where he's just filibustering and stalling for
7  time.
8         MR. HASAN:  Listen --
9         MR. HANLE:  Every -- no.  I am entitled --
10         MR. HASAN:  Listen to me.  You're not    02:34
11  entitled --
12         MR. HANLE:  I'm not done.  You can --
13         MR. HASAN:  You're not entitled to cut him
14  off.
15         MR. HANLE:  I am entitled --         02:34
16    (Admonition by the deposition officer to
17        speak one at a time.)
18         MR. HASAN:  Let me get this straight.  You
19  can cut him off, but people have to wait for you to
20  talk.                          02:34
21         MR. HANLE:  I --
22         MR. HASAN:  Is that correct?
23         MR. HANLE:  -- am entitled to move to
24  strike a nonresponsive answer.
25         MR. HASAN:  Okay.  Then you let him finish 02:34

Page 191

1  his answer.                        02:34
2         MR. HANLE:  That's what I will do.
3         MR. HASAN:  Okay.
4         THE DEPONENT:  Sure.
5         MR. HANLE:  And -- and the deposition will 02:34
6  never finish --
7         MR. HASAN:  You --
8         MR. HANLE:  -- if the filibustering
9  continues.
10         THE DEPONENT:  Filibustering.      02:35
11         MR. HASAN:  You can -- you can do whatever
12  you want.  You can motion to strike.  You can
13  reserve your rights.  No one's saying that you can't
14  do that, Steve -- Mr. Hanle.  But don't cut the
15  witness off.                      02:35
16         MR. HANLE:  Steve is fine.
17         MR. HASAN:  Okay, Steve.  Thank you.  I'm
18  just trying to be formal.  I'll call you Steve.
19         But let me just say this:  You're entitled
20  to do that.  No one is saying that you can't do  02:35
21  that.  What you can't do and what's improper is to
22  cut off the witness.  You can make your motion to
23  strike afterward.  We dispute what you're saying.
24  The witness is trying to answer the question.  If
25  you don't like the answer, you cut him off.  That's 02:35

Page 192

1  not how it works.                   02:35
2         MR. HANLE:  Here's what I'll do.  I'll
3  clarify my question --
4         THE DEPONENT:  Sure.  I'm sorry if I
5  didn't answer you properly.            02:35
6         MR. HANLE:  -- so they're clearly
7  understandable; okay?
8     Q   So you came up with your concept between
9  June and August of 2006.
10     A   Okay.                      02:35
11     Q   Why didn't you file a patent application
12  until October of 2007?
13     A   So that could be a lot of different
14  things.  It's not like -- it was within the time
15  period for us to do it.  Doesn't mean, just because 02:36
16  we come up with a concept, that we're immediately
17  going to run over to the legal department and tell
18  them to patent something.  And we did it within the
19  allowed time that legally we're allowed to file a
20  claim.  So I don't understand -- why we didn't do it 02:36
21  sooner?  Because we didn't get around to doing it
22  sooner.
23     Q   Okay.
24         See, that last sentence, that was --
25         MR. HASAN:  Okay.               02:36

Page 193

1         MR. HANLE:  That was responsive.      02:36
2         THE DEPONENT:  Sorry.  I --
3         MR. HANLE:  The rest was --
4         MR. HASAN:  Argumentative.
5         MR. HANLE:  -- chitchatting.        02:36
6         MR. HASAN:  Argumentative.
7     Q   BY MR. HANLE:  So --
8         MR. HASAN:  Move to strike the
9  argumentative comment.
10         MR. HANLE:  Okay.               02:36
11         MR. HASAN:  Okay, Steve?  I'm chuckling.
12  You're chuckling.  I'm trying to make it
13  lighthearted here.
14     Q   BY MR. HANLE:  So -- okay.  Take a look
15  at -- in this provisional application, Exhibit 8,  02:36
16  and take a look at -- it's the first numbered
17  page 1 -- well, there's a couple of numbered
18  pages 1.  But go to the -- where -- there's a page
19  about five or six pages back that's entitled
20  "Charging Station."  And it's where the actual text 02:37
21  of the application starts.
22     A   Okay.
23     Q   And you see the paragraph numbered 3
24  there?
25     A   Mm-hmm.  I do.  I'm sorry.          02:37

**Exhibit S**
**Page 225**

Page 194

1    Q   Thank you.                02:37
2        Okay.  So there's a paragraph there
3  that's -- and this is in the section called
4  "Background."  And it's -- and I'm going to read it
5  for the record:                    02:37
6            "Frequent replacement of batteries can
7        be expensive, and as a result many
8        accessory devices utilize rechargeable
9        batteries.  The accessory device is
10       connected to a charging station          02:37
11       periodically to recharge the batteries.
12       The charging station and the accessory
13       device have matching plugs or ports that
14       fit together to make a connection."
15       Does that last sentence where it describes 02:37
16  "the charging station and accessory device have
17  matching plugs or ports that fit together to make a
18  connection" -- does that describe the original
19  charge base design, such as was displayed at CES --
20  at Consumer Electronics Show January 2007?     02:38
21    A   Yes.
22    Q   Okay.  And then paragraph 3 goes on:
23           "If the plug on the charging station
24       or accessory device is broken or damaged,
25       the accessory device can no longer be    02:38

Page 195

1       connected to the charging station.  These  02:38
2       plugs can be small or fragile, as the
3       accessory device itself is often a small,
4       compact device.  These small plugs can be
5       easily bent or broken, rendering the     02:38
6       charging station inoperable.  The user has
7       to be careful to connect the plugs slowly,
8       gently, and completely, in order to make a
9       proper connection without damaging the
10      parts."                    02:38
11      Would those sentences also describe the
12  charge base 1 such as was shown at Consumer
13  Electronics Show January 2007?
14    A   Yes, I believe so.
15    Q   Okay.  Then the next paragraph, 4, goes on 02:39
16  to say:
17           "Thus, it is desirable to provide an
18       improved charging station that allows for
19       fast, easy, reliable connection between
20       the accessory device and the charging     02:39
21       station."
22      Do you see that?
23    A   Mm-hmm.
24    Q   Okay.  And the way that -- so is it true
25  that this patent application is directed to a   02:39

Page 196

1  faster, easy, more reliable connection between the  02:39
2  accessory device and the charging station?
3        MR. HASAN:  Objection as to form.
4        THE DEPONENT:  Is it true --
5        I'm sorry.  Can you repeat that for me,   02:39
6  please?
7        (The record was read as follows:
8            "Q   So is it true that this patent
9        application is directed to a faster, easy,
10       more reliable connection between the       02:39
11       accessory device and the charging
12       station?")
13       THE DEPONENT:  So -- compared to what?
14    Q   BY MR. HANLE:  Well, in the previous
15  paragraph, you described a problem with the direct  02:39
16  connection because of the potential to damage the
17  plugs that can easily be bent, broken.
18    A   Mm-hmm.  Yes.
19    Q   And so my question is, is this invention
20  addressed to solving that problem?          02:40
21       MR. HASAN:  Objection as to form.
22       THE DEPONENT:  I would say that -- I think
23  the whole idea of a charge station is, you know,
24  with the structures that guide and actually hold the
25  controller in place are what improves that -- works 02:40

Page 197

1  against the twisting, because it's not just as    02:40
2  simple as, "Okay, I have something on there that" --
3  you know, if there's no supporting structures that
4  hold the controller, then you run the same risk.  So
5  I think if you -- if it's taken out of context, yes. 02:41
6  But -- yeah.
7        Does that answer?  I'm sorry if that
8  wasn't complete enough for you.
9    Q   BY MR. HANLE:  Well, so you have -- with
10  the first version of charge base, such as was shown  02:41
11  at Consumer Electronics Show 2007 in January --
12    A   Mm-hmm.
13    Q   -- you had this problem where -- where the
14  plugs could be damaged because you had to get a
15  direct connection between the female USB port and    02:41
16  the male USB port.
17        MR. HASAN:  Objection as to form.
18        THE DEPONENT:  Actually, I --
19  I'm sorry.  I didn't wait long enough.
20        I think you're making an assumption that   02:41
21  we had some particular weakness in the original one,
22  and you're making the assumption that we had broken
23  pins or anything of the like.  There's nothing to
24  that.  This is just saying this is a further
25  convenience, in my eyes.                02:41

Navid, Amir (CON)                                              Pages 194 - 197

**Exhibit S**
**Page 226**

Page 198

1        So does that answer your question?        02:42
2    Q    BY MR. HANLE:  So the further convenience
3    is to add the adapter that makes the connection
4    easier; correct?
5    A    That --                        02:42
6        MR. HASAN:  Objection as to form.
7        THE DEPONENT:  -- basically allows you not
8    to have to spend maybe as much time, but it's
9    essentially the same thing.  Not essentially.  It's
10   the same thing.  Let's be honest.  It's the same    02:42
11   thing.  You have guiding posts.  You have a plug in
12   the center.
13   Q    BY MR. HANLE:  Okay --
14       MR. HASAN:  Don't cut him off.
15       MR. HANLE:  Please, Counsel.  This is not    02:42
16   responsive to my question.
17       MR. HASAN:  Don't -- do not cut him off.
18       MR. HANLE:  I'm asking --
19       MR. HASAN:  Do not cut him off.
20       MR. HANLE:  He wants to argue that it's    02:42
21   the same thing.  The question had nothing whatsoever
22   to do with whether it's the same thing.
23       MR. HASAN:  Sure, it didn't.  Sure, it
24   didn't.  Sure, it didn't, Steve.  Sure, it didn't.
25   Okay?                        02:42

Page 199

1        MR. HANLE:  It didn't.  You're right.    02:42
2        MR. HASAN:  Sure, it didn't, sir.  Okay?
3    I'm trying to talk to you calmly, please.  Sure, it
4    didn't.  Okay?  Let him finish.  You can't cut him
5    off.                        02:42
6        MR. HANLE:  Okay.  Well --
7        MR. HASAN:  You like to cut him off when
8    you don't like what you hear.  It's not the way it
9    works.  You know that.
10       MR. HANLE:  I just -- I just don't -- I    02:42
11   have a limited number of hours to take the
12   deposition.  I want to finish it, not --
13       MR. HASAN:  He's giving you complete
14   answers.
15       MR. HANLE:  He can --            02:43
16       MR. HASAN:  Okay?  Let him --
17       MR. HANLE:  -- put in a declaration that
18   gets his points across --
19       MR. HASAN:  Sir --
20       MR. HANLE:  -- if he wants.  I just want    02:43
21   answers to my questions.
22       MR. HASAN:  I'm sure you've heard it in
23   court, right, where it's not going to always be
24   answered your way, you know?  I'm sure you have an
25   answer in your mind, but it's not going to be    02:43

Page 200

1    answered your way, Steve.  You know that.  Come on.  02:43
2    Come on.
3        MR. HANLE:  As long as it's an answer to
4    my question, he can answer it how he pleases and not
5    some other question.                    02:43
6        MR. HASAN:  Steve --
7    Q    BY MR. HANLE:  Okay.  So --
8        MR. HASAN:  -- please.
9    Q    BY MR. HANLE:  -- how did this patent
10   achieve a faster, easier, and more reliable    02:43
11   connection?
12       MR. HASAN:  Objection to form.
13       THE DEPONENT:  How did this patent achieve
14   an easier, faster than -- than what?  I think you're
15   assuming that there is some other design or another  02:43
16   concept that this -- this is the same concept.
17   Q    BY MR. HANLE:  Okay.
18   A    You're saying -- you're trying to
19   basically make it seem like, okay, this design is
20   somehow different because it made it faster or    02:43
21   easier.  The entire charge base line makes it easier
22   and faster for you to charge your controllers
23   without wires, in a small footprint, with its own
24   dedicated power supply.
25       There is no previous design.  This is a    02:44

Page 201

1    patent application that we filed to protect our    02:44
2    design, which we put into market first before anyone
3    else.  And --
4    Q    Okay.
5    A    -- there's --                    02:44
6    Q    Now I'm going to interrupt because you're
7    not answering my question.
8        Let's take a -- let's take a break to
9    change the tape.
10       MR. HASAN:  Cut that out.  Cut that out.  02:44
11       MR. HANLE:  No, I'm not going to cut it
12   out.
13       MR. HASAN:  Now you're yelling.  Now
14   you're yelling too.
15       MR. HANLE:  Let's go off.            02:44
16       MR. HASAN:  You're yelling at the witness
17   and doing that.  No, not yet.
18       MR. HANLE:  I'm not yelling at the
19   witness.
20       MR. HASAN:  You are yelling at the    02:44
21   witness.
22       MR. HANLE:  I'm yelling at you.
23       MR. HASAN:  You're yelling at me?
24       MR. HANLE:  Yes.
25       MR. HASAN:  Okay.  It's okay, then.    02:44

Navid, Amir (CON)                                    Pages 198 - 201

Page 222

1    couple to and provide DC power to a power   03:19
2    input port of a respective one of the
3    plurality of video game controllers."
4        You see that language?
5    A   I do.                                03:19
6    Q   And I want to focus on the language "to
7    couple to." And my question is did you -- when you
8    approved this patent application, did you intend a
9    special meaning of the phrase "to couple to"?
10       MR. HASAN: Objection as to form.     03:19
11       THE DEPONENT: Special meaning -- to me,
12   what "couple to" means -- and when I reviewed it,
13   where I felt this was sufficiently covering it --
14   coupling means that they mate. So a plug, a direct
15   connection, where, you know, it's mating. So   03:19
16   that's -- that's what I meant by it.
17   Q   BY MR. HANLE: Okay. And is that your --
18   is that your understanding of the term "to couple
19   to" outside of the context of this patent?
20       MR. HASAN: Objection as to form.     03:20
21       THE DEPONENT: Typically when I will come
22   across it, yes. It's -- it's where something is
23   directly contacting something.
24   Q   BY MR. HANLE: So -- so it's your belief
25   that the term "to couple to," regardless of the   03:20

Page 223

1    context used, means direct coupling without a --   03:20
2    without a cable in between?
3    A   Absolutely, yeah.
4    Q   Okay. And what about without an adapter
5    in between? Would "to couple to" include with an   03:20
6    adapter in between?
7        MR. HASAN: Objection as to form.
8        THE DEPONENT: No. So again, the main
9    thing is that it doesn't have a cable, which is an
10   elongated, messy wire. Coupling is something -- a   03:20
11   physical part going into the direct jack that's the
12   power jack and powering it.
13       So an adapter -- what you're calling an
14   adapter, which is a piece of it, which is the DC
15   jack, still is inserted directly into the actual   03:20
16   controller the device is charging. So I don't think
17   an adapter is the same thing as tethering it to a --
18   to a cable.
19   Q   BY MR. HANLE: So "to couple to" would
20   include having an adapter in between two components   03:21
21   but would exclude having a cable in between two
22   components; is that right?
23       MR. HASAN: Objection as to form.
24   Misstates the testimony.
25       THE DEPONENT: So again, what I believe   03:21

Page 224

1    coupling is, is when a part of the base is inserted   03:21
2    into -- directly into the jack of the device that it
3    is charging.
4    Q   BY MR. HANLE: Okay. And I want to focus
5    on adapter.                               03:21
6    A   Okay.
7    Q   And so -- and cables. You mentioned
8    connecting by cables, in your view, would not be
9    coupling; right?
10   A   The whole purpose of this invention is to   03:21
11   get rid of cables. I think that's very clear.
12   Q   I don't want to know about the purpose of
13   the invention. I want to know about covering.
14   A   Okay.
15   Q   Only coupling. For the next 10 minutes   03:21
16   we're going to talk about only coupling.
17       MR. HASAN: No, no.
18       THE DEPONENT: I'd love to answer all your
19   questions.
20       MR. HASAN: Objection as to form.     03:22
21       And you answer how you need to answer.
22       Don't say for the next 10 minutes we're
23   going to sit here with -- no.
24       You answer the question how you --
25       Please don't tell him these things. You   03:22

Page 225

1    know it's improper.                       03:22
2        MR. HANLE: To tell him that I'm talking
3    about coupling as opposed to something else?
4        MR. HASAN: For the next 10 minutes you're
5    going to do this? Come on.               03:22
6    Q   BY MR. HANLE: Okay. So I just want to
7    make sure it's clear that my questions are as to
8    coupling; okay? And I'm looking for what you meant
9    by "coupling" and how you use the term; okay?
10       And there's a -- and there's this concept   03:22
11   of plain and ordinary meaning in construing claim
12   terms.
13   A   Mm-hmm.
14   Q   And I want to know if we're using plain
15   and ordinary meaning or some sort of special   03:22
16   meaning. So I'm really going to focus on the
17   definition. And I apologize for that preface, but I
18   just -- that's the preface for my questions until
19   further notice.
20   A   Mm-hmm.                              03:22
21   Q   So the question now --
22   A   Mm-hmm.
23   Q   -- is -- is, based on your understanding
24   of the term "to couple to" --
25   A   Mm-hmm.                              03:22

**Exhibit S**
**Page 228**

Page 238

1    MR. HANLE:  Okay.                    03:35
2    MR. HASAN:  Ready or --
3    MR. HANLE:  Yeah.
4    MR. HASAN:  Okay.
5    MR. HANLE:  That's fine.             03:35
6    MR. HASAN:  Sure.
7    VIDEOGRAPHER:  We're off the record at
8  3:35.
9    (Recess taken.)
10    VIDEOGRAPHER:  We're back on the record at 03:49
11  3:49.
12    Q   BY MR. HANLE:  Okay.  So we were talking
13  about some of the terms that are used in the claims
14  of the '848 patent, which is Exhibit 1.  And the
15  first element of claim 1, in column 15, which is the 03:49
16  second-to-last page -- the first element after the
17  preamble is "a base."  And -- give you a minute
18  to --
19    A   There we go.
20    Q   -- get there.                   03:50
21    A   Okay, sir.
22    Q   Do you see that?
23    A   Where?
24    Q   So column 15, claim 1.
25    A   Okay.                           03:50

Page 239

1    Q   First element after the preamble, line 34, 03:50
2  "a base."
3    Do you see that?
4    A   Yes, sir.
5    Q   Okay.  So again, I want to get the plain   03:50
6  and ordinary -- your understanding of the plain and
7  ordinary meaning of the term "base" outside of the
8  context of this patent.  And then we can talk about
9  what it means in the context of the patent.
10    So -- so --                         03:50
11    MR. HASAN:  Objection as to form.
12    MR. HANLE:  I haven't asked anything yet.
13    Q   So question -- question is, is -- so let's
14  take, for example, this table.  What would you
15  consider the base of this table?               03:50
16    MR. HASAN:  Objection as to form.
17    THE DEPONENT:  I -- I'm sorry, but I don't
18  understand how that relates to the patent at hand
19  and what we're trying to do.  Table -- I'm not in
20  the business of making tables.  I'm not an expert in 03:50
21  tables.  What is considered a base or a top of it is
22  not my expertise.  I don't claim that it's my
23  expertise.
24    In the context of this patent, what a base
25  is, is the entire charging device.  It's the   03:51

Page 240

1  charging system.                           03:51
2    Q   BY MR. HANLE:  Okay.  I asked you a
3  different question, so please answer my question.
4  And if the answer is "I don't know," feel free to
5  say so.                                  03:51
6    A   I don't know.  I'm not a table specialist.
7  So I don't know, outside the context of this --
8    Q   Okay.  So --
9    A   -- what "a base" could mean.
10    Q   What about the chair you're sitting in?  03:51
11  What would you consider the base of that chair?
12    MR. HASAN:  Same objections.
13    THE DEPONENT:  I'm not a carpenter.  I
14  don't build chairs.  I have no idea what a base is
15  or if there is a base, per se, part on this chair.  03:51
16  I don't know.
17    Q   BY MR. HANLE:  Okay.  So as a person
18  skilled in the art, you have no understanding of the
19  term --
20    A   In the skill of the art, as far as      03:51
21  applying to this --
22    Q   Just let me finish the question.  You're
23  interrupting me, and the court reporter is going to
24  kill us all.
25    So -- so are you saying that outside of   03:51

Page 241

1  the context of this patent, you have no independent 03:51
2  understanding of the meaning of the term "base"?  Is
3  that -- is that what you're telling me?
4    MR. HASAN:  Argumentative.  Objection as
5  to form.                                 03:52
6    THE DEPONENT:  I'm telling you that --
7    MR. HASAN:  Misstates the testimony.
8    THE DEPONENT:  What I'm saying is that
9  outside the context of this patent, the word can
10  have different meanings.                    03:52
11    Q   BY MR. HANLE:  And with respect to the
12  chair you're sitting on, do you have an
13  understanding of what part of it would be the base?
14    MR. HASAN:  Objection as to form.
15    THE DEPONENT:  I don't.  I'm not a -- I'm  03:52
16  not a chair specialist.  I have no idea which part
17  would be considered a base of a chair or if any part
18  of a chair is considered a base.
19    Q   BY MR. HANLE:  So is the -- is the cord a
20  part of the base in your invention?  The power cord? 03:53
21    MR. HASAN:  Objection as to form.
22    THE DEPONENT:  Is the cord a part of the
23  base?
24    Q   BY MR. HANLE:  I think you -- the reason I
25  ask that, you said -- I understood you to say that  03:53

Exhibit S
Page 229

Page 246

1 or --                                    03:58
2        Does that answer your question?
3    Q    Is there any difference between "at least
4 one" and "a plurality"?
5        MR. HASAN:  Objection as to form.      03:58
6    Q    BY MR. HANLE:  Based on your
7 understanding.
8    A    No, in my understanding, it's the same.
9 It means more than one.
10   Q    And so claim 13, on the same page -- and  03:58
11 you can -- save -- we're going to come back to
12 figure 11 --
13   A    Okay, sir.
14   Q    -- but take a look at claim 13, which
15 is -- it's over here, the second-to-last page.   03:59
16 Right there.
17       So claim 13 uses, in the third element --
18 this is column 16, about line 35 -- instead of --
19 instead of saying "at least one structure," it says,
20 "at least one docking structure defining a plurality  03:59
21 of docking bays...."
22       Can you point to, in figure 11, what is
23 referred to by a "docking structure"?
24   A    It's -- it would be the same thing.  These
25 are docking structures.  It's what supports the   03:59

Page 247

1 controller.  So that's what I understand them to be.  03:59
2    Q    So items 406 are docking structures?
3    A    Well, it's -- I would need to read -- or let
4 me read it in the context of what we're --
5    Q    Sure.                                 03:59
6    A    -- what's being said.  "A plurality" --
7 I'm sorry what line was that?
8    Q    Oh, boy.  It was line 35.
9    A    Okay.  "A" --
10       So in the context of this, it appears it   04:00
11 is the structure, but it's basically -- a docking
12 bay is defined by more than one of them and the area
13 basically where it supports the controller in the
14 middle.
15   Q    Okay.  I want to differentiate between the  04:00
16 term "docking structure" and "docking bay."  So I
17 want to focus on, for now, the word "docking
18 structure."
19       And so I want to know, in figure 11, is it
20 your understanding that the docking structure is    04:01
21 406?
22       MR. HASAN:  Objection as to form.
23       THE DEPONENT:  So -- so as I tried to
24 explain in the context of what it's saying, it's
25 saying that those structures, what we refer to as   04:01

Page 248

1 "structures" -- and when we're saying "docking   04:01
2 structure," it's one or more of these -- I'm
3 sorry -- two or more of these that actually create a
4 docking bay.  That's my understanding --
5    Q    BY MR. HANLE:  Okay.  And --        04:01
6    A    -- in that context.
7    Q    So the two or more structures in figure 11
8 that form a docking bay could be, for example, two
9 of items 406?
10   A    Yes.  I mean, it's the area in between   04:01
11 those structures.
12   Q    Okay.  So the docking bay is the area in
13 between the two docking structures 406; is that
14 is that correct?
15   A    Yes, I -- from, you know, a quick reading,  04:02
16 that's what it appears to me.
17   Q    So that claim, claim 13 in column 16, also
18 uses the term -- and this is just a couple lines
19 above that.  It says, "a plurality of male mini-USB
20 connectors supported by the base...."        04:02
21       Do you see that?
22   A    Yes, sir.
23   Q    And would USB connectors supported by the
24 base include USB connectors actually on the base?
25       MR. HASAN:  Objection as to form.      04:02

Page 249

1        THE DEPONENT:  I don't even understand   04:02
2 that question.  Would you like to repeat it, and
3 I'll try to --
4        MR. HANLE:  You can read it back.
5        (The record was read as follows:       04:03
6        "Q    So that claim, claim 13 in
7        column 16, also uses the term -- and this
8        is just a couple lines above that.  It
9        says, 'a plurality of male mini-USB
10       connectors supported by the base....'    04:02
11       "Do you see that?
12       "A    Yes, sir.
13       "Q    And would USB connectors
14       supported by the base include USB
15       connectors actually on the base?")      04:02
16       THE DEPONENT:  Yes.
17       MR. HANLE:  Okay.
18       Okay.  I will mark as the next exhibit a
19 document dated -- the printout is dated 5/29/2012,
20 and it's a press release -- a Nyko press release   04:04
21 dated January 8th, 2007.  This is Exhibit 9.
22       (Exhibit 9 was marked for the record.)
23   Q    BY MR. HANLE:  Are you familiar with this
24 document?
25   A    No, I'm not.                          04:05

**Exhibit S**
**Page 230**

Page 250

1   Q   Have you ever seen it before?        04:05
2   A   Not that I recollect, no.
3   Q   Do you ever get involved in Nyko's press
4   releases?
5   A   No.  It -- if anything, you know, it would 04:05
6   be limited to just describing product and product
7   features perhaps.  But I don't deal with this.  This
8   is done by marketing department.
9   Q   Okay.  And do you -- do you recall that
10  Nyko issued a press release that described the      04:05
11  charge base for PS3 in January of 2007?
12  A   I don't.  I think you could talk to the
13  marketing people, and they'd be able to tell you
14  whether or not we did a press release for this.  I
15  don't request or, you know, put together any kind of 04:06
16  press releases.  It's not my duties.
17  Q   Okay.  Starting about eight lines down --
18  eight or nine lines down, it's the part that
19  describes the charge base 3.  And the sentence
20  starts sort of two-thirds from the left.  It says,   04:06
21  "Built specifically to keep extended PlayStation 3
22  gaming sessions going strong...."
23      Do you see that?
24  A   Okay.  It's further down.  "Built
25  specifically to keep extended PlayStation 3" --      04:06

Page 251

1   okay.                                    04:06
2   Q   Yeah.  So let me read that entire
3   sentence, and then I want to ask you a question
4   about it.
5   A   Yes, sir.                             04:06
6   Q   "Built specifically to keep extended
7       PlayStation 3 gaming sessions going
8       strong, Nyko's patent pending Charge Base
9       for PS3 allows up to four SIXAXIS wireless
10      controllers to be charged simultaneously 04:06
11      via one simple device."
12      Do you see that?
13  A   I do.
14  Q   Do you recall whether you had any part in
15  describing the charge base for PS3 in connection     04:07
16  with -- with publicizing it?
17  A   I don't.  I don't recollect.
18  Q   It -- that references a patent-pending
19  charge base 3.
20      Do you see that?                      04:07
21  A   Yes.
22  Q   And this document and a number of
23  documents that we've seen reference a patent
24  application regarding the charge base for PS3.  And
25  I'm talking about documents before January 2007.    04:07

Page 252

1       So my question is do you -- do you know   04:07
2   what patent application this is referring to?
3       MR. HASAN:  Objection as to form.
4       THE DEPONENT:  I don't.
5   Q   BY MR. HANLE:  Did you have a patent      04:07
6   application pending that applied to the charge base
7   for PS3 that was released in January of 2007?
8       MR. HASAN:  Objection as to form.
9       THE DEPONENT:  I'm -- I don't know.  I
10  don't know if we did.  I don't know if we did.  It  04:08
11  could be if they're, you know, saying that they were
12  privy to some information to that effect.  But
13  I'm -- I can't recall.
14  Q   BY MR. HANLE:  When's the first patent
15  application that you're aware of that applied to     04:08
16  charge base?
17  A   Charge base would be our provisional
18  patent that we filed.  That's, I guess, number 8.
19  Q   Exhibit 8?  And filed in October 2007?
20  A   I believe so.                          04:08
21  Q   Okay.  So do you have any explanation for
22  why this document and others refer to a pending
23  patent application for charge base as of
24  January 2007?
25      MR. HASAN:  Objection as to form.        04:08

Page 253

1       THE DEPONENT:  I honestly don't know why. 04:08
2   It could -- I'm not -- I honestly don't know.  I
3   don't know if it was put there as a deterrent.  I
4   really -- I don't compose this, so -- we do get
5   ripped off all the time.  It's -- you know, so it    04:09
6   could be the reason for it.
7   Q   BY MR. HANLE:  Okay.  And so is Chris
8   Arbogast the person that's most likely to have
9   information regarding the contents of this press
10  release?                                  04:09
11      MR. HASAN:  Objection as to form.
12      THE DEPONENT:  I -- I believe so, yes.
13  He's the head of the marketing department.
14  Q   BY MR. HANLE:  Do you have knowledge of
15  how Nyko press releases in this time frame, 2007,    04:09
16  were typically disseminated?
17  A   No, I don't.  I am not a marketer.
18  Q   Do you have an understanding that they
19  were posted on Nyko's website for the public?
20      MR. HASAN:  Objection as to form.        04:09
21      THE DEPONENT:  Do I -- did I know that?
22  No.  I -- to be honest, I'm too busy to get involved
23  with every aspect of the business.
24      MR. HANLE:  Okay.
25      Okay.  I'll mark as the next exhibit --  04:10

**Exhibit S**
**Page 231**

Page 254

1    What are we on?  Are we on 9 or 10?    04:10
2    MS. QUIGLEY:  10.
3    THE DEPONENT:  This will be 10.
4    MR. HANLE:  Thank you.
5    THE DEPONENT:  You're welcome.    04:10
6    MR. HANLE:  I'm going to mark as
7  Exhibit 10 a document bearing Bates Nos. NT925 to
8  926.
9    (Exhibit 10 was marked for the record.)
10    Q    BY MR. HANLE:  And this is a two-page    04:10
11  printout of the Gerry Block piece from IGN that was
12  attached to one of your declarations that we looked
13  at earlier.
14    Do you recall that?
15    A    One of the earlier ones?  Yes.    04:10
16    Q    Okay.  Do you recall -- do you recall
17  seeing -- now that you've seen a color version of
18  it, do you recall seeing this publication regarding
19  the Nyko charge base PS3 in or around January of
20  2007?    04:11
21    MR. HASAN:  Objection as to form.
22    THE DEPONENT:  I don't honestly recall if
23  I had seen it at that time or not.
24    Q    BY MR. HANLE:  When's the -- I'm sorry.
25  When's the first time you recall seeing it?    04:11

Page 255

1    A    It was -- first time, literally, right    04:11
2  now.  I mean, I've seen it -- this is -- the latest
3  that I've seen it was when it was part of one of the
4  exhibits that we did.  And if it was part of the
5  declaration, so I would figure I'd seen it as part    04:11
6  of the declaration when I signed off on that.
7    Q    Do you -- are there any gaming websites
8  that you will typically look at to see reactions to
9  Nyko products when they're launched?
10    A    You know, I'm not very big on that    04:11
11  personally myself.  There are other people in the
12  office that are more -- I like to kind of keep a --
13  kind of a darkroom of -- so I don't really get
14  influenced by other things.  So I try to keep to my
15  own projects, and I don't typically -- I'm not -- I    04:12
16  don't check all the blogs and the big sites on a
17  daily basis, like other people at the office do.
18    Q    It sounded like you were answering as to
19  general practice.  I want to now --
20    A    I'm sorry.    04:12
21    Q    And maybe my question was phrased that
22  way, but I want to focus on specifics.
23    Do you recall seeing any press coverage of
24  the Nyko charge base for PS3 in or around January of
25  2007?    04:12

Page 256

1    A    Vaguely.  I mean, you know, pretty much    04:12
2  right after these shows is when you look to see
3  if -- if, you know, a product is getting good
4  reviews or is getting dogged and, you know, people
5  are picking things apart on it or, you know, people's    04:13
6  flaws that -- you know, straightforward flaws that
7  they may call to.  And there's other people in the
8  office that come and will inform me too if there's
9  something to that effect and bring it to my
10  attention for me to look at these things.    04:13
11    So I'm sure, at the time, I've seen
12  some -- some reviews and writeups about the product.
13    Q    Okay.  So you believe you saw reviews and
14  writeups in January of 2007 regarding the charge
15  base 3 that was demonstrated at Consumer Electronics    04:13
16  Show in Las Vegas January 2007?
17    MR. HASAN:  Objection as to form.
18  Misstates the testimony.
19    You can --
20    THE DEPONENT:  Yeah, I don't --    04:13
21  specifically when I saw that, I can't give a
22  testimony saying, "Okay, I saw it on January 9th" or
23  "when this was posted."  I don't know when I've seen
24  it, but, you know, I would imagine I've seen it.  I
25  don't know exactly what date.    04:14

Page 257

1    Q    BY MR. HANLE:  Would you expect you would    04:14
2  have seen it in the two or three weeks after the
3  Consumer Electronics Show January 2007?
4    MR. HASAN:  Objection as to form.
5    THE DEPONENT:  I honestly don't know.    04:14
6    Q    BY MR. HANLE:  Okay.  We'll see if any of
7  these refresh your recollection.
8    I'll mark as Exhibit 11 a document with
9  Bates Nos. NT929 through 930.  And there's a blowup
10  of one of the pictures in there.    04:14
11    (Exhibit 11 was marked for the record.)
12    THE DEPONENT:  Thank you.
13    Q    BY MR. HANLE:  Okay.  Exhibit 11 is a
14  printout from an Internet side called Gizmodo.
15    Are you familiar with that website?    04:14
16    A    Yes, I've heard of Gizmodo.
17    Q    Okay.  And this -- the byline on this,
18  underneath the photograph there, is Gizloco?
19    Do you see that?
20    A    I --    04:15
21    MR. HASAN:  Giz what?
22    MR. HANLE:  Gizloco.
23    THE DEPONENT:  Oh, "By Gizloco"?
24    Q    BY MR. HANLE:  Yes.
25    A    Okay.    04:15

Navid, Amir (CON)                                    Pages 254 - 257

Page 262

1 Las Vegas at Consumer Electronics 2007?        04:19
2    A   I --
3        MR. HASAN:  Objection as to form.
4        THE DEPONENT:  I'm sorry, but I can't
5 really go on record to say that.  I don't know when  04:19
6 that picture was taken.  I'm sure if we contact
7 Gizmodo, maybe they can tell you exactly when that
8 picture was taken.  There's several dates here, and
9 I don't know if this date relates to when the story
10 was or when it was taken off the Internet.  I        04:19
11 just -- I'm not an expert in this, so I can't tell
12 you when this picture was taken.  I didn't take this
13 picture.
14       MR. HANLE:  Okay.  Let's mark as
15 Exhibit 12 a document with Bates Nos. NT931 through  04:19
16 934.
17       (Exhibit 12 was marked for the record.)
18       THE DEPONENT:  Thank you.
19    Q   BY MR. HANLE:  And this document is a
20 publication at a website called joystiq.com.        04:20
21       Have you heard of joystiq.com?
22    A   I've heard of Joystiq.
23    Q   Have you ever visited the site?
24    A   Maybe.  Not often.  I don't visit it
25 regularly.        04:20

Page 263

1    Q   Do you know, either personally or by        04:20
2 reputation, Alexander Sliwinski?
3    A   I do not.
4    Q   Okay.  And you see the date next to his
5 name, next to the byline, January 10, 2007.        04:20
6       Do you see that?
7    A   I do.
8    Q   Do you know whether Mr. Sliwinski attended
9 the hotel suite in Las Vegas January 2007?
10   A   I do not know.        04:20
11   Q   The picture on the left of the -- of
12 the -- underneath the byline there, is that a -- is
13 that the charge base 1 or 2?
14   A   That appears to be the charge base.
15   Q   Okay.  So the first one?        04:21
16   A   Yes, charge base.
17   Q   Do you know where the -- do you know where
18 the photograph came from?  Was it something that
19 was, like, part of a press kit, or do you have any
20 idea?        04:21
21   A   I don't, but if it was part of a press
22 kit, it's -- I would imagine that there may be some
23 record to that effect.  I don't know exactly where
24 that image came from.  Sometimes the -- they'll take
25 their own picture.  Sometimes they'll use a picture  04:21

Page 264

1 that's provided by us.  I don't know what -- which   04:21
2 of those this would be.
3    Q   Are you involved in providing pictures for
4 part of press kits when you launch products?
5    A   Am I personally?  That comes from the       04:22
6 graphics department.
7    Q   Okay.
8    A   As far as the pictures themselves, to
9 provide it to the press, I certainly don't do that
10 either.        04:22
11       MR. HANLE:  Okay.  I'll mark as next,
12 Exhibit 13, a document with Bates Nos. NT935 to 937.
13       (Exhibit 13 was marked for the record.)
14       THE DEPONENT:  Thank you.
15   Q   BY MR. HANLE:  Okay.  And this is from a    04:22
16 website that's -- it says, at the bottom,
17 cinemablend.  And at the top it says Gaming Blend.
18       Are you familiar with this website?
19   A   No, I'm not.
20   Q   There's -- the author of this is listed as 04:23
21 William Usher beneath the title.
22       Do you see that?
23   A   I -- I do.
24   Q   Have you -- do you know that person,
25 either personally or by reputation?        04:23

Page 265

1    A   I do not.        04:23
2    Q   And you see the publication date of
3 January 10, 2007?
4    A   I do.
5    Q   Do you have any idea whether Mr. Usher     04:23
6 came to the Nyko hotel suite in January 2007?
7        MR. HASAN:  Objection as to form.
8        THE DEPONENT:  I do not know that.
9    Q   BY MR. HANLE:  And here you see there's
10 another reference to -- when it describes the Nyko   04:23
11 charging station, the second sentence -- well, the
12 first sentence says, "...Nyko's patent pending
13 Charge Base for PS3...."
14       Do you have any understanding of what --
15 what's being referred to as "patent pending"?        04:23
16   A   I do not.
17   Q   Based on your understanding, is Chris
18 Arbogast the one who is going to be most
19 knowledgeable about these various publications
20 describing, in the press, the charge base for PS3?  04:24
21   A   I believe so.
22       MR. HASAN:  Objection as to form.
23       THE DEPONENT:  I believe so.
24       MR. HANLE:  I'll mark as Exhibit 14 a
25 document with Bates Nos. NT938 through 940.        04:24

Exhibit S
Page 233

Page 274

```
 1    ever."                          04:35
 2        And it goes on:
 3        "Each Charge Base 2 comes packaged
 4    with two light weight Mini USB charge
 5    adaptors that attach to the controller and 04:35
 6    allow easy drop and charge functionality
 7    through the Charge Base 2's specialized
 8    charging ports."
 9        Do you see that?
10    A    I do.                       04:35
11    Q    And so do you have an understanding of why
12  the totally new contact point dongle system makes
13  charging your controllers easier than ever?
14    A    They --
15        MR. HASAN:  Objection as to form.  04:35
16        You can answer if you know.
17        THE DEPONENT:  Why it makes it eas- --
18  well, it's -- why it makes it easier than ever.  I
19  think it's pretty straightforward.  It's an
20  additional feature that makes it easier for people  04:36
21  to use it.
22    Q    BY MR. HANLE:  Yeah.  And my question is
23  how does it make it easier than ever?
24        MR. HASAN:  Objection as to form.
25        THE DEPONENT:  Well, according to this,  04:36
```

Page 275

```
 1  it's got a smaller form factor.  It's --  04:36
 2    Q    BY MR. HANLE:  This has --
 3    A    -- easier to align because it's, you
 4  know -- it's got the contact point dongle system
 5  that's included with it, according to this.  So yes.  04:36
 6  So it's -- you know, makes it even easier to align
 7  it and put it in there, yes.
 8    Q    Okay.  So the adapter that attaches to the
 9  controller allows for easier drop and charge
10  functionality?                      04:36
11        MR. HASAN:  Objection as to form.
12        THE DEPONENT:  According to this, it
13  appears that, you know, that's what -- what's going
14  on, yes.
15    Q    BY MR. HANLE:  And this says "totally new  04:37
16  contact point dongle system" in December 2011.  Does
17  this refresh your recollection that the -- that the
18  embodiment of the charge base with the adapter
19  was -- was -- came up later than the original
20  concept for the -- for the charge base?    04:37
21        MR. HASAN:  Objection as to form.
22        THE DEPONENT:  So again, the -- we're
23  talking design.  So the underlying product and its
24  purpose and what it's doing is the same.  So yes, is
25  it a different design?  We all know it's got two  04:37
```

Page 276

```
 1  ports instead of four ports.  It has these movable  04:37
 2  pieces that can attach to your controller.  So yes,
 3  it's -- I don't think there is any denial that
 4  there's a redesign or that we take a product and
 5  continuously try to improve it.          04:38
 6    Q    BY MR. HANLE:  And my question was a
 7  "when" question, I think.  When --
 8    A    I'm sorry.
 9    Q    When did you come up with this improvement
10  of a totally new contact point dongle system?    04:38
11        MR. HASAN:  Objection as to form.
12        THE DEPONENT:  I -- totally new?  I
13  don't -- I mean, I think this is marketing spins on
14  things, to say it's totally new.  But obviously,
15  we -- it's serving the same purpose, which is making  04:38
16  charging easier.
17        As far as when I came up with the utility
18  of making a charger that holds a controller like
19  that, I would imagine it's the same period where we
20  started working on the charge base.          04:38
21        But as far as the design, I'm sure there's
22  records and documents that are document -- that have
23  been handed over to you where you can see where we
24  started to work on that.  I don't know the date
25  exactly off the top of my head, but we can get that  04:38
```

Page 277

```
 1  information to you.                  04:38
 2    Q    BY MR. HANLE:  Thank you.
 3    A    Yes, sir.
 4        MR. HANLE:  Okay.  I want to mark as the
 5  next exhibit, 17, a document with Bates Nos. NT46363  04:39
 6  through 46377.
 7        (Exhibit 17 was marked for the record.)
 8        MR. HANLE:  Help me find this, Gray.  Help
 9  me find that one.
10        MR. BUCCIGROSS:  Oh, there it is.    04:40
11    Q    BY MR. HANLE:  All right.  So Exhibit 17
12  is actually a collection of documents as produced by
13  your counsel.
14        And the first page is a Nyko invoice.  Do
15  you recognize this as a Nyko invoice?        04:41
16    A    It says "Nyko," and it says "invoice," but
17  I don't typically deal with these documents.  But it
18  appears to be a Nyko invoice.
19    Q    Okay.  And you've seen them in the past;
20  correct?                          04:41
21    A    Not really.  I don't -- I don't deal with
22  the sales side.  I don't deal with that.
23    Q    Is it your testimony that you've never
24  seen a Nyko invoice?
25        MR. HASAN:  Objection as to form.    04:42
```

Navid, Amir (CON)                                    Pages 274 - 277

**Exhibit S**
**Page 234**

Page 278

1     THE DEPONENT:  To be honest, I don't pay   04:42
2  attention to these.  It's -- you know, I'm sure I've
3  seen an invoice before, but this, I mean, looks --
4  it looks legit.  I don't know what to tell you.
5     BY MR. HANLE:  Okay.  Do you know -- so   04:42
6  this is an invoice going to amazon.com.
7     Do you see that?
8  A   Yes.
9  Q   And how long has amazon.com been a
10  customer of Nyko for gaming accessories?   04:42
11  A   I don't know.
12  Q   What's -- what's the first recollection of
13  amazon.com having been a customer of Nyko?
14  A   I -- I really don't know how long Amazon's
15  been doing business with us.  I don't deal with that   04:42
16  aspect of the business at all.  You know, as far as
17  who we've had, when we started working with them,
18  when we stopped working with them, I just really
19  don't deal with that.
20  Q   Do you believe it was before 2005?   04:43
21     MR. HASAN:  Objection as to form.
22     THE DEPONENT:  I don't know accurately,
23  honestly.  I don't know when we started working with
24  them.  I don't know, you know, if -- I don't know.
25  I don't know.   04:43

Page 279

1  Q   BY MR. HANLE:  Okay.  Do you -- I'm going   04:43
2  to ask you a few questions here, and if you don't
3  know, you don't know.  But --
4  A   Yes, sir.
5  Q   -- do you know who salesperson 04 is, as   04:43
6  designated in the -- sort of the center column of
7  this document?
8  A   Salesperson 04?  No, I do not.
9  Q   Do you see there's an order number 97145
10  to the right of the salesperson number?  It says   04:43
11  "Our Order Number, 97415."
12     Do you see that?
13  A   Okay.
14  Q   Do you know how that number order is
15  generated?   04:43
16  A   No, I don't.
17  Q   Do you know what territory 66 is, just
18  to -- just above that?
19  A   I do not.
20  Q   So the -- on the invoice there's a line   04:44
21  item for 140 PS3 charge base.
22     Do you see that?
23  A   I do.
24  Q   Okay.  And there's -- in the fourth column
25  there's a number associated with the PS3 charge   04:44

Page 280

1  base, and it's 83017.   04:44
2     Do you see that?
3  A   Yes, sir.
4  Q   Do you know how that number is generated?
5  A   Yes.  That's our item number.   04:44
6  Q   And --
7  A   So we generate that.
8  Q   And "we" meaning -- is that the product
9  development?
10  A   I generate that, yes.   04:44
11  Q   Okay.  And is that done -- is that done
12  sequentially, or are there a series, or can you
13  explain how that works?
14  A   Yes, it's sequential, and it's -- it
15  differs depending on console.  So if you look at --   04:44
16  like a Wii item starts with an 87, where a PS3
17  starts with an 83.
18  Q   Okay.  But other than those first two
19  digits, it's sequential?
20  A   For the most part.  Well, we'll try to   04:45
21  avoid numbers that can cause confusion.  So if
22  there's a number that's too similar or too close
23  where the digits can be rearranged and confuse us at
24  a later stage, we try to avoid it.  But for the most
25  part, yes, it's sequential.   04:45

Page 281

1     MR. HASAN:  Objection as to form.   04:45
2  Q   BY MR. HANLE:  The third column on this
3  has a heading "B.O."  Does that stand for
4  "backorder"?
5  A   I don't know.  It could.  I -- I'm not a   04:45
6  specialist in that.
7  Q   Okay.  Go to the third page of this
8  document.  And this appears to be a printout from
9  Amazon Vendor Central website.
10     Do you see that?   04:45
11  A   That's what it says in the upper corner.
12  It sayer "Vendor Central" and "Amazon Vendor
13  Central."
14  Q   Have you ever seen this -- this type of
15  form with a printout from Amazon Vendor Central?   04:46
16  A   I have not.
17  Q   Okay.  At the top, just to the right of
18  where it says "Amazon Vendor Central," it says,
19  "Hello, Nyko Technologies Inc," and then it has,
20  parentheses, ywilliams@nyko.com.   04:46
21     Do you see that?
22  A   Yes, I do.
23  Q   Who is Y. Williams?
24  A   Yolanda Williams.
25  Q   And what is her role at Nyko?   04:46

Page 290

```
 1  same entity, but I'm not certain.          04:57
 2       MR. HANLE:  Okay.  I'm going to mark as
 3  the next exhibit, 19, a document with Bates
 4  Nos. NT71870 through 71.
 5       (Exhibit 19 was marked for the record.)  04:58
 6       THE DEPONENT:  Thank you.
 7    Q   BY MR. HANLE:  And this is a Nyko "Dealer
 8  Price Sheet Effective November 1, 2006."
 9       Do you see that?
10    A   I do.                              04:59
11    Q   Okay.  Do you have any role in putting
12  together price sheets for Nyko products?
13    A   I don't personally put the price sheets
14  together.  As I mentioned, I do assign item numbers.
15  So I would have provided maybe UPC codes, but as far 04:59
16  as everything else and pricing, I'm not involved in
17  that.
18    Q   Do you have any idea of how Nyko
19  publicizes its UPC codes and prices to its
20  customers?                              04:59
21       MR. HASAN:  Objection as to form.
22       THE DEPONENT:  I'm sorry.  Can you repeat
23  that question for me?
24       MR. HANLE:  Go ahead.
25       (The record was read as follows:      05:00
```

Page 291

```
 1       "Q   Do you have any idea of how Nyko 05:00
 2       publicizes its UPC codes and prices to its
 3       customers?")
 4       THE DEPONENT:  I would imagine maybe a
 5  price sheet.  I don't know.  I'm not in sales.  I   05:00
 6  don't know.
 7       MR. HANLE:  Okay.  Let's go ahead and take
 8  a break and change tapes.  Maybe a five-minute
 9  break.
10       VIDEOGRAPHER:  We're off the record at    05:00
11  five o'clock.  This is the end of disk number 3.
12       (Recess taken.)
13       VIDEOGRAPHER:  We're back on the record at
14  5:11.  This is start of disk number 4.
15    Q   BY MR. HANLE:  So in looking at those    05:11
16  invoices and the price list -- let's take it one at
17  a time.  In looking at the invoices, there's various
18  order dates that are in January -- January and
19  February of 2007.
20       And my question is were you aware that    05:12
21  there was sales activity with respect to the charge
22  base product in January and February 2007?
23       MR. HASAN:  Objection as to form.
24       THE DEPONENT:  I did not know.  I'm not
25  involved with sales, so no.  I wasn't sure if it's  05:12
```

Page 292

```
 1  on sale or what kind of sales effort there is behind 05:12
 2  it.  I don't know.
 3    Q   BY MR. HANLE:  Well, I mean -- so, I mean,
 4  as a product-development guy, aren't you kind of
 5  excited to learn if your products are selling?    05:12
 6       MR. HASAN:  Objection as to form.
 7       THE DEPONENT:  If they're selling in a
 8  retailer, like selling through, or are we talking
 9  about selling to a retailer or -- so -- I make a lot
10  of products.  I tend to keep working.  So I don't   05:13
11  pay attention so much to who -- whether or not
12  someone else is doing their job.  I have plenty to
13  do myself.
14    Q   BY MR. HANLE:  So nobody ever comes to
15  you, say, after the launch of a new product --      05:13
16    A   Mm-hmm.
17    Q   -- at a show and says, "Hey, we got a
18  bunch of new orders for that new product"?
19    A   From time to time that will happen, you
20  know, if a big account comes and, you know, places a 05:13
21  large order.  But typically I don't get involved.  I
22  try to make the best possible product and -- and a
23  product that's unique and has special features that
24  differentiate our product from the competition's.
25  And the rest is up to really our sales and marketing 05:13
```

Page 293

```
 1  team to go further.                         05:13
 2       I'm not going to say that, you know, that
 3  never happens.  From time to time if it's a big
 4  enough customer or, you know, something unique or
 5  large order, you know, I may hear about it.  But    05:14
 6  it's not -- you know, it's not a part of my normal
 7  duties to check to see who is buying it and who took
 8  it, who didn't take it.  I hope that everyone takes
 9  it, but --
10    Q   When's the first time you became aware of 05:14
11  sales activity with respect to the charge base
12  product?
13    A   I --
14       MR. HASAN:  Objection as to form.
15       THE DEPONENT:  I don't know.  Honestly, I 05:14
16  don't know.
17    Q   BY MR. HANLE:  What's your best estimate?
18       MR. HASAN:  Same objection.
19       THE DEPONENT:  For sale.  I don't know.  I
20  honestly don't know.                        05:14
21    Q   BY MR. HANLE:  2007?  2008?
22    A   Well, I would imagine it would be within
23  the year that we're releasing it, but, you know, as
24  far as when specifically they started selling it or
25  shipping it out, those aren't things that I'm       05:14
```

Exhibit S
Page 236

Page 294

1 involved with.  Shipping it to the actual retailers  05:14
2 who place the orders.
3    Q   So -- we also looked at that -- that price
4 sheet, which is Exhibit 19 there.
5    A   Yes, sir.                    05:15
6    Q   And it -- and so it's effective
7 November 2006, and it -- over in the right-hand
8 column, it states that -- for the charge base for
9 PS3 says "Available November."
10       Do you see that?              05:15
11   A   Yes.
12   Q   And was the charge base for PS3 available
13 in November of 2006?
14   A   No.  2006?  No.
15   Q   Okay.  Was there -- do you recall there   05:15
16 being a goal that it be available in November 2006?
17       MR. HASAN:  Objection as to form.
18       THE DEPONENT:  Not that I recall, no.
19 Products take, you know, time.  There's always
20 things that pop up and things that go wrong and   05:16
21 things that we need to get right and correct.  So
22 it's tough to -- to make a unique, innovative item.
23       So again, I'm not an expert in this.  I
24 don't know when it was officially available.  But I
25 don't know of a particular goal to get it available   05:16

Page 295

1 at -- you know, obviously, my bosses would love for   05:16
2 it to be available as soon as possible.  That's just
3 not always the case.
4        MR. HANLE:  Okay.  I'll mark as the next
5 exhibit, 20, a "Declaration and Power of Attorney   05:16
6 for Patent Application" referencing docket number
7 61070/N220.
8        (Exhibit 20 was marked for the record.)
9        THE DEPONENT:  Thank you.
10       MR. HANLE:  And I'll mark as Exhibit 21 a   05:17
11 nonprovisional patent application with the same
12 docket number, 61070/N220.
13       (Exhibit 21 was marked for the record.)
14       THE DEPONENT:  Thank you.
15   Q   BY MR. HANLE:  Okay.  And the -- so the   05:17
16 first exhibit, 20, is a declaration and power of
17 attorney.  And on the second page it bears a
18 signature.
19       Is that your signature?
20   A   Yes, it is.                    05:17
21   Q   And did you sign this document around
22 March 5th, 2008?
23   A   It appears that way, yes.
24   Q   Okay.  And taking a look at the first page
25 again, there's a -- looks like the fifth paragraph   05:18

Page 296

1 or so, there's a paragraph that starts, "I   05:18
2 acknowledge the duty to disclose...."
3        Do you see that?
4    A   "I acknowledge the duty to disclose...."
5 Okay.                              05:18
6    Q   Okay.  Why don't you read that for the
7 record.
8    A   Okay.
9        "I acknowledge the duty to disclose
10 information which is material to the   05:18
11 patentability as defined in 37 CFR" -- I'm
12 not sure what that symbol is -- "1.56,
13 including for continuation-in-part
14 applications, material information which
15 become available between the filing date   05:18
16 of the prior application and the national
17 or PCT international filing date of the
18 continuation-in-part application."
19   Q   Okay.  So what's your understanding of
20 that paragraph?                    05:18
21   A   That I would disclose any information --
22 I -- I mean, there's parts of it I don't understand.
23 "As defined in 37 CFR," I'm not familiar with that.
24       "Including in continuation" -- "for
25 continuation-in-part applications, material   05:19

Page 297

1 information which become available between the   05:19
2 filing date of the prior application and national or
3 PCT international filing date."  That, I would -- my
4 take from it is that I would disclose any
5 information that I would come across during -- I   05:19
6 mean, that's what I take from it.
7    Q   And -- so do you have an understanding
8 that if a product is sold -- a product embodying a
9 patent is sold more than one year before the filing
10 of the application, that that could invalidate the   05:19
11 patent?
12   A   Am I aware of that?  Yes, I understand
13 that it takes -- you have to do it within a year.
14   Q   Okay.  And so you're aware that it is
15 material to patentability whether -- if a commercial   05:20
16 embodiment of a claimed invention was sold more than
17 one year prior to the filing of the application?
18       MR. HASAN:  Objection as to form.
19       THE DEPONENT:  I believe so, yes.
20   Q   BY MR. HANLE:  Okay.  Did you -- when you   05:20
21 submitted this declaration and power of attorney,
22 Exhibit 21, and your patent -- excuse me,
23 Exhibit 20 -- and your patent application,
24 Exhibit 21, did you make any inquiries about when
25 the "commercial embodiment" claim in your patent   05:20

Page 298

1  application was first offered for sale?        05:20
2      A    When we did it, I -- I was under the
3  understanding that it was within the period.  So did
4  I make any -- I mean, it was within the one-year
5  period, so -- that we filed the provisional patent,  05:20
6  so --
7      Q    So you did make an inquiry as to when the
8  first commercial offer for sale was?
9          MR. HASAN:  Objection as to form.
10         THE DEPONENT:  No, I didn't make any        05:21
11 inquiry.  My understanding was that when we applied
12 for our pro- -- for our patent, it was within the --
13 within the one-year mark.
14     Q    BY MR. HANLE:  Okay.  So --
15     A    I didn't make an inquiry on it.  I         05:21
16 understood it to be within that one year.
17     Q    Okay.  I think you testified earlier you
18 didn't know when the first sales activity was with
19 respect to the charge base that was shown in
20 Las Vegas in January 2007.                          05:21
21     A    I'm not claiming otherwise right now.  I'm
22 just saying my understanding of it is that it was
23 within a year that we applied for it.
24     Q    Okay.  Well --
25     A    That's all I'm claiming.                   05:21

Page 299

1      Q    So -- so this patent application was filed 05:21
2  in March of 2008.  Is that -- is that your
3  understanding?
4      A    Which patent application?
5      Q    The one that this -- the Exhibit 21, which 05:21
6  is the one that your declaration and power of
7  attorney relates to.
8      A    According to the filing date there, it's
9  3/7/2008.
10     Q    Okay.  And so -- so were you aware of      05:22
11 sales activity with respect to the charge base more
12 than a year prior to the filing of this application?
13         MR. HASAN:  Objection as to form.
14         THE DEPONENT:  No.
15     Q    BY MR. HANLE:  Did you ask whether there   05:22
16 was sales activity more than one year before the
17 filing of this application?
18         MR. HASAN:  Objection as to form.
19         THE DEPONENT:  No, because -- no, because
20 I was under the understanding that it was within the 05:22
21 year.
22     Q    BY MR. HANLE:  Well, so we know that the
23 charge base SLA prototype --
24     A    Mm-hmm.
25     Q    -- was shown -- publicly shown in         05:23

Page 300

1  January 2007 --                                     05:23
2      A    Mm-hmm.
3      Q    -- at --
4          Watch the hand, Counsel.
5          MR. HASAN:  I'm putting it up for -- I'm    05:23
6  going to object, but go ahead.
7          MR. HANLE:  Okay.  Let me finish.
8          MR. HASAN:  I'm not -- that's why I'm
9  putting it up.
10         MR. HANLE:  You can object with your        05:23
11 mouth.  You don't need to object with your hand.
12         MR. HASAN:  No, I don't want him to start
13 talking, so --
14         MR. HANLE:  So --
15         MR. HASAN:  Okay?  So I'm going to put my   05:23
16 hand up here.
17         MR. HANLE:  So let me start again.
18     Q    So --
19         Okay.  He knows you want to object, so you
20 can put your hand down.                             05:23
21         So --
22         MR. HASAN:  Mr. Hanle, please don't start
23 up again; okay?
24         MR. HANLE:  Counsel, let me just ask the
25 question, and keep your hand down.                  05:23

Page 301

1          MR. HASAN:  Ask the question.  Go ahead.   05:23
2          MR. HANLE:  Okay.
3      Q    So -- so did you disclose to the patent
4  office, in connection with your patent application,
5  which is Exhibit 21, that the charge base was        05:23
6  publicly shown at the Consumer Electronics Show in
7  January of 2007?
8          MR. HASAN:  Objection as to form.
9          THE DEPONENT:  I did not, but we did not
10 publicly show it, and it wasn't -- as far as when it 05:24
11 was offered for sale -- you know, when we're showing
12 an SLA, that's not a complete, finished, shippable
13 product.  I'm sure you realize that.  So my
14 understanding was that we filed our -- I'm sorry.
15 It's called a -- my brain is not working right now.  05:24
16 Not provincial, but the initial patent is called
17 a --
18         What's the initial patent called?  Not the
19 full application, but the partial?
20         MR. HASAN:  You can look at your exhibits   05:24
21 if you want.  I'm not -- I can't answer.  If it
22 refreshes -- you can ask Mr. Hanle to clarify.
23         THE DEPONENT:  The word is eluding me
24 because I'm quite tired.  But obviously, the partial
25 application that we filed was before that.  It       05:25

Page 302

1  starts with a P.  My brain is --          05:25
2      Q    BY MR. HANLE:  Are you talking about the
3  provisional application --
4      A    Provisional.
5      Q    -- on the charge base 2 embodiment?  Is    05:25
6  that what you're referring to?
7          MR. HASAN:  Objection -- objection as to
8  form.
9          THE DEPONENT:  I'm sorry, can you repeat
10  that?                                    05:25
11      Q    BY MR. HANLE:  Are you -- you referred in
12  your last answer to the provisional application.
13      A    Yes.
14      Q    I want to see if you're talking about the
15  provisional application on the charge base 2    05:25
16  embodiment.
17          MR. HASAN:  Objection as to form.
18          THE DEPONENT:  So charge base 2 --
19      Q    BY MR. HANLE:  The one --
20          (Admonition by the deposition officer to    05:25
21  speak one at a time.)
22          THE DEPONENT:  So actually, we filed a
23  patent application.  It wasn't necessarily limited
24  to charge base 2.  So when -- I think you're trying
25  to maybe trick me or -- I'm not sure what it is, but 05:25

Page 303

1  to come in there and say that it was just for charge 05:25
2  base 2, I think it's very clear that this is a
3  utility patent and applies to all versions of the
4  charge base line.
5      Q    BY MR. HANLE:  Well, I disagree, but    05:26
6  we'll --
7      A    That's your job.
8      Q    Having said that, we can -- we can ask
9  questions.
10          So -- so what is the -- okay.  So let me    05:26
11  go back to part of your -- part of your answer --
12  previous answer was that you don't believe that the
13  charge base that was shown in the hotel suite and
14  plastered all over the press --
15      A    Mm-hmm.                            05:26
16      Q    -- was publicly shown; is that right?
17          MR. HASAN:  Objection as to form.
18          THE DEPONENT:  Publicly shown.  Sure, it
19  was shown to press, and it was shown to invited
20  people that came there.  But to offer for sale, you    05:26
21  know, I think that's up to interpretation.  What do
22  you mean, "offer for sale"?  "Offer for sale" is --
23      Q    BY MR. HANLE:  I'm sorry.  I didn't use
24  "offer for sale" in my question, so I wasn't talking
25  about offer for sale.  I'm not going to talk about    05:26

Page 304

1  offer for sale in this next question either.    05:26
2          So what I'm asking about is publicly
3  shown; okay?
4      A    Okay.
5      Q    And my question is do you -- do you deny    05:26
6  that the charge base, which was open for members of
7  the press to look at --
8      A    Mm-hmm.
9      Q    -- touch --
10      A    Mm-hmm.                            05:27
11      Q    -- and publicize --
12      A    Mm-hmm.
13      Q    -- at the hotel suite in Las Vegas
14  January 2007 wasn't publicly shown?
15          MR. HASAN:  Objection as to form.    05:27
16          THE DEPONENT:  So the information that was
17  provided to those that were invited, obviously, has
18  gone public.  So yes, I guess by definition, from
19  what you're saying, then yes, it was made public.
20          But still, from January to when we filed    05:27
21  our provincial [sic] patent, that's not more than a
22  year still; right?  We're talking January, and when
23  was that filed?
24      Q    BY MR. HANLE:  Well -- so do you -- so did
25  somebody tell you that you shouldn't disclose the    05:27

Page 305

1  public demonstration of the charge base based on the 05:27
2  filing of the provisional application?  Did somebody
3  tell you that?
4          MR. HASAN:  Objection as to form.
5          THE DEPONENT:  No.                    05:27
6      Q    BY MR. HANLE:  You came to that conclusion
7  on your own?
8          MR. HASAN:  Objection as to form.
9          THE DEPONENT:  Came to the conclusion of
10  what exactly?                            05:28
11      Q    BY MR. HANLE:  Of not disclosing the
12  public disclosure of the charge base in
13  January 2007.
14          MR. HASAN:  Objection as to form.
15          THE DEPONENT:  No, there wasn't a decision 05:28
16  because, again, as I explained earlier, I was under
17  the understanding that it was within a year from the
18  time that we filed for it.  So there's no need to
19  disclose information about when it went public
20  because it's within the period allowed by law.    05:28
21      Q    BY MR. HANLE:  Have you, to this day, in
22  your -- there's continuing patent applications on --
23  regarding this charge base product; correct?
24      A    Mm-hmm.
25      Q    Have you, to this day, disclosed to the    05:28

**Exhibit S**
**Page 239**

Page 306

1 patent office that there was sales activity and a      05:28
2 public demonstration of the charge base before the
3 filing of the -- of this application, Exhibit 21?
4          MR. HASAN:  Objection as to form.
5          THE DEPONENT:  Like I've answered, I think 05:28
6 you're hopeful that you're talking about the full
7 application being filed versus the filing date of
8 the provincial.  So it's -- it's two different
9 things.  I don't understand.  We're not breaking any
10 rules by filing within the one-year period.  So why 05:29
11 would we disclose that?  I don't understand why you
12 would see, for me -- a reason for me to disclose
13 that, because the patent was filed before then.
14     Q    BY MR. HANLE:  My question is have you or
15 have you not disclosed to the patent office the      05:29
16 public demonstration of the charge base in
17 January 2007?
18          MR. HASAN:  Objection as to form.
19     Q    BY MR. HANLE:  Ever.
20          MR. HASAN:  Objection as to form.      05:29
21          THE DEPONENT:  I'm not aware of it.
22     Q    BY MR. HANLE:  Okay.  Have you disclosed
23 to the patent office, ever, sales activity between
24 January and March 2007 regarding the charge base
25 product?      05:29

Page 307

1          MR. HASAN:  Objection as to form.      05:29
2          THE DEPONENT:  I'm not aware of that.
3     Q    BY MR. HANLE:  Okay.
4     A    I'm not aware of even the sales activity.
5     Q    Well, now you are.      05:29
6          MR. HASAN:  Objection as to form.
7          THE DEPONENT:  Now that you've informed
8 me, yes.
9     Q    BY MR. HANLE:  Okay.  Do you plan on
10 advising the patent office of that?      05:30
11          MR. HASAN:  Objection as to form.
12          THE DEPONENT:  Again, I feel that we filed
13 our patent within the one-year period.  So as far as
14 when it was offered for sale, it isn't -- it's not
15 even a valid claim.  We can continue to talk about 05:30
16 this, but it's not going to change the fact that we
17 filed within the one-year period.
18     Q    BY MR. HANLE:  What's the basis for your
19 belief that your -- that your application number 21
20 is entitled to priority based on the provisional,      05:30
21 which is Exhibit 8?
22          MR. HASAN:  Objection as to form.  Asked
23 and answered.
24          You can answer again.
25          THE DEPONENT:  The product in its      05:30

Page 308

1 entirety, as far as the underlying purpose and      05:30
2 intent of the product, is within that application
3 that we filed at that period.  And even that novelty
4 embodiment of it that we maybe speak of more within
5 that is also included in the full application.      05:31
6          The whole purpose of a full application is
7 so you put together all your documents so it's
8 complete and you want to disclose as much; right?
9 And I'm not a patent lawyer, but to me it seems you
10 get a provincial; that's going to hold your date.      05:31
11 It allows you enough time to, in detail, put
12 together all the documents you need in order to
13 submit a full application.  And I think by law you
14 have one year.  To my knowledge, we did that within
15 one year.  And that's all there is to it.      05:31
16     Q    BY MR. HANLE:  Did anyone else ever advise
17 you that you didn't need to disclose to the patent
18 office sales activity or public demonstration of the
19 charge base between January 2007 and March 2007?
20     A    No.      05:32
21     Q    So you came to that conclusion on your
22 own; is that correct?
23          MR. HASAN:  Object -- objection as to
24 form.
25          THE DEPONENT:  Again, as I've responded,      05:32

Page 309

1 we filed our application within the year.      05:32
2     Q    BY MR. HANLE:  I'm asking whether you came
3 to that conclusion on your own or with the
4 assistance of somebody else.
5          MR. HASAN:  Objection as to form.      05:33
6     Q    BY MR. HANLE:  That's my only question.
7     A    There was no conclusion to come to.
8 Again, it wasn't something that I thought about
9 because we filed within a one-year period.
10     Q    Okay.  When you say "we," who is "we"?      05:33
11     A    The company, Nyko.
12     Q    Okay.  So did you consult with anyone else
13 at Nyko in deciding whether or not to disclose
14 public demonstration or sales?
15          MR. HASAN:  Objection as to form.      05:33
16          THE DEPONENT:  Again --
17          MR. HASAN:  Asked and answered.
18          THE DEPONENT:  -- that was not a topic
19 that ever came up, to my knowledge, as far as what
20 to not disclose.  We're not trying to hide anything. 05:33
21 We not only have a patent behind our device, we
22 brought this device to market.  We sold it in the
23 market.  And I'm sorry, your client ripped off that
24 concept.
25          So that's really all there is to it.  We   05:33

1 followed the rules.  We filed it when we should have 05:33
2 and disclosed all the information that we felt we
3 needed to disclose.  Any other information that was
4 required, we didn't hold back.  It's not like there
5 was a conscious decision from -- on the part of the 05:34
6 company to hold any information back.  We tried to
7 disclose everything that we were aware of.  And
8 that's my knowledge of it.
9      Q    BY MR. HANLE:  Do you recall the Erickson
10 reference coming up in the -- during the prosecution 05:34
11 of your '848 patent?
12      A    Do I recall it?  Not really.  My
13 understanding is that it's not prior art, so --
14      Q    And why is that?
15      A    Because it's not prior to our invention.  05:35
16      Q    And did -- do you recall whether you swore
17 behind -- do you know what the term "swear behind"
18 means?
19      A    Swear -- no, I don't know, actually.
20 Swear behind.                                      05:35
21      Q    Did you argue to the patent office that --
22 that you were a prior inventor and therefore
23 Erickson was not prior art?
24           MR. HASAN:  Objection as to form.
25           THE DEPONENT:  Did I personally?  No.  I 05:35

1 would imagine my legal would take care of that.   05:35
2      Q    BY MR. HANLE:  Okay.  Do you know if they
3 did so?
4      A    I don't know.  I don't know.  I would
5 imagine so.  My understanding is that it's not prior 05:35
6 art.  Doesn't precede when we filed our application.
7      Q    Different question.  It's focused on
8 whether your attorneys argued to the patent office
9 that Erickson wasn't prior art.  Do you know one way
10 or the other?                                     05:35
11           MR. HASAN:  Objection as to form.
12           THE DEPONENT:  I don't know, no.  Or I
13 don't recall.
14           MR. HANLE:  Okay.  Okay.  I'm going to
15 mark as the next exhibit, 22, a document with    05:36
16 NT1489.
17           And then I'll mark as Exhibit 23 a
18 document with NT1459 through 1461.
19           There is 22.
20           (Exhibit 22 was marked for the record.)  05:36
21           MR. HANLE:  Here is 23.
22           (Exhibit 23 was marked for the record.)
23      Q    BY MR. HANLE:  Okay.  Exhibit 22 is an
24 email chain October 6th, 2007.  And the subject is
25 "PS3 Charge Base 2 schematics."                   05:38

1           Do you see that?                      05:38
2      A    I do.
3      Q    And this is from Chris Lueck?  How do you
4 pronounce his name?
5      A    Chris Lueck.                           05:38
6      Q    Chris Lueck.
7           So this is from Chris Lueck to KS Ho.
8           Who is KS Ho?
9      A    KS Ho is an engineer over at Ever Sparkle.
10      Q    And this is a different factory than the  05:38
11 Hip Hing that did the charge base?
12      A    Yes, correct.
13      Q    And the email from Chris, which is copied
14 to you, says:
15           "Will you send us a block diagram and  05:38
16      circuit diagram for the Charge Base 2?  We
17      are filing a patent for this and our
18      lawyers are requesting this information."
19           Do you see that?
20      A    I do.                                  05:38
21      Q    And the response from KS is "OK.  We will
22 prepare the block diagram and circuit diagram for
23 Charge Base 2 for you to file a patent."
24           Do you see that?
25      A    Okay.                                  05:38

1      Q    So do you recall -- does this refresh your 05:38
2 recollection as to -- as to when the development
3 period for charge base 2 was?
4           MR. HASAN:  Objection as to form.
5           THE DEPONENT:  Not really.  Asking for a  05:39
6 block -- circuit diagram and when the actual start
7 of this project are two different things.  Asking
8 for a block diagram, it just seems like he's asking
9 for some information.
10      Q    BY MR. HANLE:  So -- and then the next   05:39
11 exhibit, 23 --
12      A    Yes, sir.
13      Q    -- is -- it's the same first email.  And
14 the -- but then the second email in the chain this
15 time is an email dated October 12, 2007.  And it    05:39
16 says, "Hi Chris.  Please find attached with the
17 block diagram and circuit diagram for your
18 reference."
19           Do you see that?
20      A    I do.                                   05:39
21      Q    Okay.  And then attached, you have a block
22 diagram of the charge base 2 --
23      A    Mm-hmm.
24      Q    -- and a circuit diagram for charge
25 base 2; correct?                                  05:40

**Exhibit S**
**Page 241**

Page 318

1    A   Could be, yes.              05:44
2    Q   Okay.  And so in the second email in the
3  chain, you say:
4        "Hello Eric.  The design looks good,
5        please proceed.            05:44
6        "I need a work willing SLA made right
7        away, and please make sure that the
8        outlook is attractive, as we will use this
9        as our main sales demonstration sample."
10   A   Mm-hmm.                    05:44
11   Q   So in -- and this is December 2006, the
12 month before the Consumer Electronics Show
13 January 2007, Las Vegas.
14   A   Mm-hmm.
15   Q   So is the reason that you asked for an SLA 05:45
16 sample to be a sales demonstration sample?
17       MR. HASAN:  Objection as to form.
18       THE DEPONENT:  As a demonstration sample,
19 yes.
20   Q   BY MR. HANLE:  Well, it says here a "main 05:45
21 sales demonstration sample"; is that correct?
22   A   Yeah.  A demonstration sample would be
23 used for sales.  It would be used for marketing.
24 Absolutely, you're right.
25   Q   And do you recall, at this time, whether  05:45

Page 319

1  you were thinking that this would be a sales  05:45
2  demonstration sample for use at CES 2007 in January?
3    A   I would imagine so, because of the
4  timeline, that we would use it for showing it for
5  that, yes.  Really with SLAs we try to get them as 05:45
6  soon as possible anyway.  As far as for this
7  purpose, it's quite a long time ago, but most likely
8  it's for that because of its closeness to that.
9    Q   And you're asking here as well for a --
10 for a working SLA.  And by "working," what did you  05:46
11 mean?
12   A   That it's functional.
13   Q   And do you recall that that's what you
14 received for -- for Consumer Electronics Show 2007?
15       Counsel --                 05:46
16       MR. HASAN:  Objection as to form.
17       I'm stopping him because he was about to
18 talk again, and I don't want to get crosswise with
19 the court reporter.
20       MR. HANLE:  Okay.          05:46
21   **Q   So do you recall that that's what you**
22 **received that was shown at Consumer Electronics Show**
23 **in the hotel suite, was a working SLA?**
24       **MR. HASAN:  Objection as to form.**
25       **THE DEPONENT:  I'm not certain whether or  05:46**

Page 320

1  **not what we eventually ended up with was a working  05:46**
2  **sample.  A lot of things with SLAs can go wrong too**
3  **while it's shipping.  You know, these jumper cables**
4  **and leads that are in there can come loose.**
5  **Sometimes they work.  Sometimes they don't work.  I  05:47**
6  **don't recall whether or not that was working or not,**
7  **but I am asking for a working SLA sample in this.**
8    Q   BY MR. HANLE:  And why do you want a
9  working SLA sample?
10   A   Because that way it demonstrates how it  05:47
11 works.
12       MR. HANLE:  Okay.  I'm going to mark as
13 a next exhibit, 25, a document with Bates
14 Nos. NT66255 to 258.
15       (Exhibit 25 was marked for the record.)  05:47
16       THE DEPONENT:  Thank you.
17       BY MR. HANLE:  Okay.  Do you recognize
18 this document?
19   A   Yes.  It looks like one of my early
20 drawings.                       05:48
21   Q   When you say one of your early drawings,
22 there's a lot of other information here, what
23 maybe -- might be metadata.
24       Do you see that?
25   A   You mean the general information up top  05:48

Page 321

1  here?                           05:48
2    Q   Yes.
3    Q   Okay.
4    Q   So there's -- there's not just a drawing.
5  I'm pointing out that there's other information      05:48
6  here.  And I guess my question is what is this?
7  What is this document?
8    A   So on a Mac computer what you can do is
9  "Get Info."  It's a feature.  You can get info on a
10 particular file or a folder.  And it lets you know  05:48
11 information regarding that particular file.  So
12 that's what this is.
13   Q   Okay.  And this -- so this particular file
14 is a -- it's a file with a rendering of a -- the
15 charge base; correct?            05:49
16   A   Yes.  A concept of it.
17   Q   And this is a wall-mounted concept;
18 correct?
19   A   Yeah, this -- this approach appears to
20 plug -- well, not wall-mounted.  This goes into --  05:49
21 directly into a power port.  If you can see, there's
22 the power prongs on the back of it.  So it goes
23 right into a power port.
24   Q   Or it could go into a plug in a wall;
25 correct?                        05:49

**Exhibit S**
**Page 242**

Page 318

1   A   Could be, yes.                        05:44
2   Q   Okay.  And so in the second email in the
3   chain, you say:
4        "Hello Eric.  The design looks good,
5        please proceed.                       05:44
6        "I need a work willing SLA made right
7        away, and please make sure that the
8        outlook is attractive, as we will use this
9        as our main sales demonstration sample."
10  A   Mm-hmm.                                05:44
11  Q   So in -- and this is December 2006, the
12  month before the Consumer Electronics Show
13  January 2007, Las Vegas.
14  A   Mm-hmm.
15  Q   So is the reason that you asked for an SLA 05:45
16  sample to be a sales demonstration sample?
17       MR. HASAN:  Objection as to form.
18       THE DEPONENT:  As a demonstration sample,
19  yes.
20  Q   BY MR. HANLE:  Well, it says here a "main 05:45
21  sales demonstration sample"; is that correct?
22  A   Yeah.  A demonstration sample would be
23  used for sales.  It would be used for marketing.
24  Absolutely, you're right.
25  Q   And do you recall, at this time, whether  05:45

Page 319

1   you were thinking that this would be a sales   05:45
2   demonstration sample for use at CES 2007 in January?
3   A   I would imagine so, because of the
4   timeline, that we would use it for showing it for
5   that, yes.  Really with SLAs we try to get them as 05:45
6   soon as possible anyway.  As far as for this
7   purpose, it's quite a long time ago, but most likely
8   it's for that because of its closeness to that.
9   Q   And you're asking here as well for a --
10  for a working SLA.  And by "working," what did you  05:46
11  mean?
12  A   That it's functional.
13  Q   And do you recall that that's what you
14  received for -- for Consumer Electronics Show 2007?
15       Counsel --                              05:46
16       MR. HASAN:  Objection as to form.
17       I'm stopping him because he was about to
18  talk again, and I don't want to get crosswise with
19  the court reporter.
20       MR. HANLE:  Okay.                       05:46
21       Q   So do you recall that that's what you
22   received that was shown at Consumer Electronics Show
23   in the hotel suite, was a working SLA?
24       MR. HASAN:  Objection as to form.
25       THE DEPONENT:  I'm not certain whether or  05:46

Page 320

1   not what we eventually ended up with was a working  05:46
2   sample.  A lot of things with SLAs can go wrong too
3   while it's shipping.  You know, these jumper cables
4   and leads that are in there can come loose.
5   Sometimes they work.  Sometimes they don't work.  I  05:47
6   don't recall whether or not that was working or not,
7   but I am asking for a working SLA sample in this.
8   Q   BY MR. HANLE:  And why do you want a
9   working SLA sample?
10  A   Because that way it demonstrates how it   05:47
11  works.
12       MR. HANLE:  Okay.  I'm going to mark as
13  the next exhibit, 25, a document with Bates
14  Nos. NT66255 to 258.
15       (Exhibit 25 was marked for the record.)   05:47
16       THE DEPONENT:  Thank you.
17       MR. HANLE:  Okay.  Do you recognize
18  this document?
19  A   Yes.  It looks like one of my early
20  drawings.                                    05:48
21  Q   When you say one of your early drawings,
22  there's a lot of other information here, what
23  maybe -- might be metadata.
24       Do you see that?
25  A   You mean the general information up top  05:48

Page 321

1   here?                                        05:48
2   Q   Yes.
3   Q   Okay.
4   Q   So there's -- there's not just a drawing.
5   I'm pointing out that there's other information   05:48
6   here.  And I guess my question is what is this?
7   What is this document?
8   A   So on a Mac computer what you can do is
9   "Get Info."  It's a feature.  You can get info on a
10  particular file or a folder.  And it lets you know   05:48
11  information regarding that particular file.  So
12  that's what this is.
13  Q   Okay.  And this -- so this particular file
14  is a -- it's a file with a rendering of a -- the
15  charge base; correct?                        05:49
16  A   Yes.  A concept of it.
17  Q   And this is a wall-mounted concept;
18  correct?
19  A   Yeah, this -- this approach appears to
20  plug -- well, not wall-mounted.  This goes into --  05:49
21  directly into a power port.  If you can see, there's
22  the power prongs on the back of it.  So it goes
23  right into a power port.
24  Q   Or it could go into a plug in a wall;
25  correct?                                     05:49

Exhibit S
Page 243

# EXHIBIT T

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3    _____

4    NYKO TECHNOLOGIES, INC., a    )
     California corporation,       )
5                                  )
                 Plaintiff,        )
6                                  )No. No. CV 12-3001 GAF
         vs.                       )          (VBKx)
7                                  )
     ENERGIZER HOLDINGS, INC., a   )
8    Missouri corporation,         )
     EVEREADY BATTERY COMPANY,     )
9    INC., a Delaware Corporation, )
     and PERFORMANCE DESIGNED      )
10   PRODUCTS LLC, a California    )
     limited liability company,    )
11                                 )
                 Defendants.       )
12   _____)

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16    VIDEOTAPED DEPOSITION OF CHRISTOPHER S. ARBOGAST

17               Glendale, California

18              Tuesday, March 5, 2013

19                    Volume I

20

21

     Reported by:
22   Melissa M. Villagran, RPR, CLR
     CSR No. 12543
23   Job No. 1621678

24

25   PAGES 1 - 357

**Exhibit T**
**Page 244**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

1    I would assume they would still be under
2  their confidentiality regarding any
3  nonpublicly-disclosed products that we may have
4  disclosed or talked about at the show in a retailer
5  case-by-case basis.                            10:31
6    Q  Okay.  So, again, answer "Yes" or "No," if
7  you can.
8        Would you agree that retailers who saw the
9  Charge Base in the hotel suite were not under a
10  confidentiality obligation with respect to the     10:31
11  Charge Base after January 8, 2007?
12    A  The original Charge Base, yes.
13    Q  Do you recall how many retailers,
14  representatives of retailers saw the Charge Base in
15  the hotel suite in Las Vegas in January 2007?      10:32
16    A  I cannot.  Not specifically.  We had --
17  those shows are typically busy.  So you have a lot
18  of times some back-to-back meetings and double books
19  and things.
20        So it was a fairly busy meeting schedule,    10:32
21  but I can't recall as I was not -- still attending
22  those sales meetings.  I did the press meetings.
23  So I don't know specifically how many
24  retailers saw it.
25    Q  Would you give -- provide your best         10:32

Page 51

1  estimate.
2    A  Best estimate.  Let's see, typically, they
3  would schedule from 9:00 to 6:00 a meeting.  Bigger
4  accounts got an hour; lesser accounts maybe a
5  half-an-hour meeting slot.                      10:33
6        So if you do the math -- and some breaks
7  for lunch, maybe six to eight a day, if they had a
8  full meeting schedule, like every half an hour to an
9  hour depending upon account size.
10    Q  Okay.  And was it a -- was the hotel suite   10:33
11  open for three days?
12    A  Yes, the show runs for four days.  We
13  exhibit in the suite for the first three and then
14  close down and leave the last day.
15    Q  Okay.  So your -- given your estimate of    10:33
16  six to eight per day, would you agree that a good
17  estimate of the number of retailers who saw the
18  Charge Base in the hotel suite in January 2007 was
19  20 to 30?
20    MR. HASAN:  Objection as to form.            10:33
21    THE DEPONENT:  That's just a guess, without
22  seeing the schedule.  Nowadays, we have it all on
23  Google Docs, and we can -- you know, we share the
24  schedule and go back and recount how many people we
25  met with existing shows.                        10:34

Page 52

1    Back in 2007, we didn't have a shared
2  Google Doc or a shared schedule.  So I didn't even
3  see the sales schedules; so I would be purely
4  guessing.  I wouldn't -- I wouldn't feel comfortable
5  saying 20 to 30.                               10:34
6  BY MR. HANLE:
7    Q  I'm not asking you to guess.  I'm asking
8  you to estimate.
9        Based on what you've said before, you
10  estimated six to eight per day, if they had a full   10:34
11  schedule.  And so --
12    A  Do you mind if we check -- so say we had
13  top five accounts get an hour; and the other ones
14  maybe a half an hour, but we did double book some
15  meetings.                                      10:34
16    I don't have a calculator.  I'd have to do
17  the math.  Say we scheduled from 9:00 to 5:00, it
18  goes till 6:00, and we then we stop exhibiting.
19        So if we did one per hour -- it's kind of
20  tough.  I guess we can go -- again, it's all        10:35
21  speculating.  But, yeah, I would say 20 to 30 is a
22  rough estimate at the time.  But I was not, you
23  know -- didn't oversee sales at the time.
24        So that's an estimate from a nonsalesperson
25  who was not in the meetings.                     10:35

Page 53

1    Q  I understand.
2        Now, at the same time as the sales team was
3  doing meetings with retailers, were you doing
4  meetings with members of the press?
5    A  Yes.                                      10:35
6    Q  Can you provide your best estimate of the
7  number of press representatives who saw the Charge
8  Base demonstrated at the January 2007 hotel suite at
9  the Consumer Electronics Show?
10    A  Yes, typically, we'd take one every half an   10:35
11  hour, and we'd try to double book those meetings, if
12  possible, occasional triple book.  So that is --
13  someone else can do the math, but from a -- from
14  9:00 to 6:00 -- nine times two is 18.
15        Roughly, is that two per -- I would say      10:35
16  about maybe 18 or so -- 16 to 18 members of the
17  press or outlets, I should say, because occasionally
18  they would bring one or two people or a film crew or
19  something like that.
20        So anywhere from -- depending on the show    10:36
21  date, 12 to 18 per day as far as meetings with the
22  press.
23    Q  Okay.
24    A  That would be a good estimate.
25    Q  When you demonstrated the Charge Base to    10:36

14 (Pages 50 to 53)

**Exhibit T**
**Page 245**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

1  members of the press in that hotel suite, would they
2  be allowed to pick it up and handle it?
3       MR. HASAN: Objection as to form.
4       THE DEPONENT: It depends. I don't recall
5  exactly the -- I know it was an early prototype. I      10:36
6  don't know -- I can't recall if it was -- the
7  condition it was in, as far as if it was working or
8  not working, if we had it plugged in or not.
9       Sometimes we have charging samples that are
10  not plugged in, sometimes not, depending upon the      10:36
11  stage the prototypes was in.
12      And we definitely let them photograph and
13  take pictures of it. I don't know if we --
14  typically we demo it, and if it's not too fragile or
15  not too early of a prototype, we'll let them handle      10:37
16  it.
17      I don't recall specifically because it was
18  a long time ago, you know, if we had -- if we let
19  them handle it or not.
20  BY MR. HANLE:      10:37
21      Q  Okay. Do you recall handling it and
22  demonstrating it for members of the press during
23  January 2007?
24      MR. HASAN: Objection as to form.
25      THE DEPONENT: Yes, I would have been --      10:37

Page 55

1  myself or one of my team would have been one to set
2  it up. And would have showed it and kind of
3  demonstrated it at the suite.
4  BY MR. HANLE:
5      Q  Do you recall whether the Charge Base was      10:37
6  plugged in during the -- in the hotel suite?
7      A  I don't specifically recall if it was
8  plugged in and working at the time.
9      Q  Okay. Would there be any reason to plug it
10  in if it wasn't electrically working?      10:37
11      MR. HASAN: Objection as to form.
12      THE DEPONENT: I don't know. Like if --
13  and sometimes if it is working, we may not plug it
14  in, if we can't route the cord to a nearby outlet
15  and still have it displayed in a      10:38
16  aesthetically-pleasing manner.
17  BY MR. HANLE:
18      Q  I guess I kind of want to go the other way.
19      If it was plugged in, it was probably
20  working; right?      10:38
21      MR. HASAN: Objection as to form.
22      THE DEPONENT: Again, I don't know for
23  sure, but theoretically, we wouldn't necessarily
24  plug in a non-working sample, but I'm not sure.
25      MR. HANLE: Let's take a short break.      10:38

Page 56

1      THE VIDEOGRAPHER: Going off the record at
2  10:37.
3      (Recess.)
4      THE VIDEOGRAPHER: We are back on the
5  record at 10:52.      10:53
6      (Exhibit 57 was marked for
7      identification by the deposition
8      officer and is attached hereto.)
9  BY MR. HANLE:
10      Q  Okay. We have marked as Exhibit 57 "Nyko      10:53
11  Technology, Inc.'s Second Supplemental Responses to
12  Certain of PDP's Interrogatories." And that's in
13  front of you now.
14      Do you recognize that document?
15      A  Yes.      10:54
16      Q  And looking again at Interrogatory No. 3 --
17  this is on Page 6, and there's a -- on that page,
18  there's -- the Interrogatory is reprinted that we
19  read earlier, Interrogatory No. 3, regarding the
20  first disclosures.      10:54
21      Do you see that?
22      A  Yes.
23      Q  And then there's a Second Supplemental
24  Response, and I'd like you to read the second
25  paragraph of the Second Supplemental Response,      10:54

Page 57

1  please.
2      A  (As read):
3          "As a further supplement to
4      this Interrogatory, Nyko is
5      conducting a reasonable and diligent      10:54
6      search and has not yet identified
7      individuals who were shown the
8      prototype which was shown privately
9      to select individuals at a private
10      hotel suite in Las Vegas during the      10:54
11      time frame that the Consumer
12      Electronics Show was taking place in
13      January 2007."
14      Q  Okay. What has Nyko done as far as
15  conducting a reasonable and diligent search for      10:55
16  individuals who were shown the prototype at the
17  hotel suite?
18      A  Well, I know that myself -- I can speak for
19  my department and my team. So we have -- I believe
20  we produced a series of press hits, and as far as      10:55
21  that were written during that time frame, so -- or
22  resulting to in a reasonable three to four months or
23  five months after the show.
24      As far as which press came, saw it, and
25  wrote about it, we produced those press hits.      10:55

15 (Pages 54 to 57)

Exhibit T
Page 246

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 78

1    Q   Okay.  And with respect to -- hold it a
2   little bit back in front of you rather than out
3   towards me.  The camera is more important than I am.
4        I notice that there are -- the -- that the
5   partitions, if you will, between the docking bays      11:17
6   are chrome.
7        Is that right?
8    A   Yes.
9    Q   And the one that was shown at the hotel
10  suite in Vegas, those were not chrome; is that        11:17
11  right?
12   A   Yeah, I believe those were hand-painted
13  like a silver color, if I remember from the photos.
14       MR. HANLE:  Let's go off the record just
15  for a moment so I can take a look at --               11:17
16       MR. HASAN:  Sure.
17       THE VIDEOGRAPHER:  Going off the record at
18  11:16.
19       (Recess.)
20       THE VIDEOGRAPHER:  We are back on the         11:34
21  record at 11:33.
22  BY MR. HANLE:
23   Q   Okay.  So looking at the -- the -- shall we
24  call this a second prototype?
25   A   It's -- additional prototype.  I don't know   11:34

Page 79

1   how many we had.  So to call it "second" may be over
2   presumptuous.
3    Q   For the record, we're going to call it the
4   "second prototype," but we're not going to take that
5   as you admitting this is only the second.             11:34
6    A   Okay.
7        MR. HASAN:  Do you want to make an exhibit
8   number out of it?  How should we -- we can put a
9   production number on.  I know you and Gray were
10  taking some photos of it.  How do you want to do it   11:34
11  for housekeeping?
12       MR. HANLE:  Let's call it Exhibit 58, and
13  then we'll have to put an agreement on the record
14  that the -- that you will maintain possession of
15  Exhibit 58 and provide it for inspection with         11:35
16  reasonable notice.
17       MR. HASAN:  Yes.
18       MR. HANLE:  Rather than the court reporter
19  having to maintain it or anything like that.
20       MR. HASAN:  Let's do that.                    11:35
21       THE DEPONENT:  Okay.
22       MR. HASAN:  Do you want to put a sticker?
23       MR. HANLE:  I would like the court reporter
24  to put a sticker on it that says, "Exhibit 58."
25       THE DEPOSITION OFFICER:  It's okay if I put   11:35

Page 80

1   it on the bottom, Counsel?
2        MR. HANLE:  Yes, that's fine.
3        MR. HASAN:  It's not covering anything?
4        THE DEPOSITION OFFICER:  No.
5        (Exhibit 58 was marked for                   11:35
6        identification by the deposition
7        officer and is attached hereto.)
8   BY MR. HANLE:
9    Q   Look at the Exhibit 58 prototype.  I'd like
10  you to plug that into the outlet in front of you.     11:36
11   A   Sure.
12   Q   What happens when you plug it in?
13   A   Four LED -- recessed LED indicator lights,
14  under the plastic light up, green.
15   Q   So would you agree this is a working         11:36
16  prototype?
17       MR. HASAN:  Objection as to form.
18       THE VIDEOGRAPHER:  Can you turn that
19  because it's getting a reflection.
20       MR. HASAN:  Objection as to form.            11:36
21       THE DEPONENT:  The lights light up.  As far
22  as whether or not it's fully working as far as the
23  little charge controller, that, I don't know.
24       Sometimes, if it's an early prototype,
25  we'll make it work so the lights will light up, but  11:36

Page 81

1   it won't necessarily charge or won't distribute the
2   adequate charge.
3        These may not be real ports, that kind of
4   thing.  It all depends on the -- you know, the type
5   of prototype or the product that we have for the      11:36
6   show.
7        So sometimes it will manufacture something
8   or make something that looks like a working --
9   fully-working sample to debut and demo and show how
10  it would work, but it's not fully working.            11:36
11  BY MR. HANLE:
12   Q   So it may be working, you just don't know
13  one way or the other; correct?
14   A   Exactly, if we had a controller, we could
15  dock it in and see if the lights change, but you      11:37
16  wouldn't know if the charge is being held unless you
17  tested it, and I haven't fully tested this product
18  myself to know.
19       I haven't let it charge for like two to
20  four hours, and then tested the controller and        11:37
21  making sure.
22       Personally, I wouldn't be comfortable
23  saying this is a fully-working prototype.  The
24  lights do work.  There is electrocurrent running
25  through.                                              11:37

21 (Pages 78 to 81)

**Exhibit T**
**Page 247**

# EXHIBIT U

1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4      THE HONORABLE GARY ALLEN FEESS, JUDGE, PRESIDING

5

6   NYKO TECHNOLOGIES, INC.,          )
                                      )
7                    Plaintiff,       )
                                      )
8                                     )
            vs.                       )   No. CV 12-3001-GAF-VBK
9                                     )
    ENERGIZER HOLDINGS, INC., et al., )
10                                    )
                     Defendants.      )
11   _____)

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17             Los Angeles, California

18       Monday, September 30, 2013, 2:25 P.M.

19             Scheduling Conference

20

21                         PAT CUNEO CSR 1600, CRR-CM
                           Official Reporter
22                         Roybal Federal Building
                           Room 181-E
23                         255 East Temple Street
                           Los Angeles, California 90012
24                         213-894-1782
                           patcuneo1600@gmail.com
25                         www.patcuneo.com

Exhibit U
Page 248

5

1   problem that existed in the prior art when the DC adapter or

2   the port was somewhere other than the base.

3        But maybe I'm wrong about it.  Mr. Hanle, what do

4   you have to say about that?

5        MR. HANLE:  Well, we would agree with Your Honor's

6   initial take; and although Mr. Hasan is correct that the

7   words "DC ports on the base" are not used in the claims, the

8   claims all call for the DC ports to be between opposing

9   surfaces of the docking bay.

10       So, effectively, you have the same thing since the

11  docking bay is on the base and the opposing surfaces form

12  the docking bay.  The fact that --

13       THE COURT:  The specification is almost the same.

14       MR. HANLE:  It is.  I think it's identical.

15  Because if it were not identical, you'd have to have a

16  continuation in part because you've added specific new

17  matter to that.

18       THE COURT:  Well, there are a couple of different

19  drawings; but, I mean, the words, I think, are essentially

20  the same but the drawings are -- there are a couple of

21  different drawings, are there not?

22       MR. HANLE:  I think there are; and there's a more

23  upright orientation of the charger system.  But as I said,

24  the critical point for us is that because the DC ports in

25  the claims are being disclosed as between the opposing

6

1    surfaces, effectively, you're back to the same place, DC

2    ports on the base.

3              And because those claims are broad enough to

4    encompass and be supported by new matter, we would be

5    contending they're invalid.

6              I should say we've had discussions that relate to

7    the stay that we've discussed last week --

8              THE COURT:  That is the issue.

9              MR. HANLE:  -- that might be helpful for Your

10   Honor to fill you in on it; and if Mr. Hasan doesn't mind,

11   I'll go ahead and fill you in on those discussions.

12             THE COURT:  Okay.  Go ahead.

13             MR. HANLE:  Okay.

14             So what we talked about is perhaps agreeing not to

15   move anything forward in this case until we have a ruling on

16   the summary judgment motion in the other case.

17             And once we get that ruling, we would meet and

18   confer.  If the court grants the motion for summary

19   judgment, we would meet and confer and attempt to agree on

20   an expedited targeted summary judgment motion to resolve the

21   issue that we've been discussing here; whether the claims

22   will be invalid for the very same reasons.

23             If the court were to deny the motion, then we

24   would talk about scheduling in this case as well as perhaps

25   motion practice in this case that might be dictated by the

Exhibit U
Page 250

12

**CERTIFICATE**

1

2

3       I, PAT CUNEO, CSR 1600, hereby certify that

4   pursuant to Section 753, Title 28, United States Code, the

5   foregoing is a true and correct transcript of the

6   stenographically reported proceedings held in the

7   above-entitled matter and that the transcript page format is

8   in conformance with the regulations of the Judicial

9   Conference of the United States.

10

11   Date:  October 5, 2013

12

13

14

15

16                              /s/ PAT CUNEO

17                              PAT CUNEO, OFFICIAL REPORTER
                                CSR NO. 1600

18

19

20

21

22

23

24

25

*Pat Cuneo CSR 1600, Official Reporter*

**Exhibit U**
**Page 251**

# EXHIBIT V

**CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NYKO TECHNOLOGIES, INC. a California Corporation,<br><br>         Plaintiff,<br><br>    v.<br><br>ENERGIZER HOLDINGS, INC. a Missouri Corporation, EVEREADY BATTERY COMPANY, INC., a Delaware Corporation, and PERFORMANCE DESIGNED PRODUCTS LLC, a California Limited Liability Company,<br><br>         Defendants. | Case No. CV12-03001-GAF-VBK<br><br><br><br><br><br>The Hon. Gary A. Feess<br><br><br>[Complaint Filed: April 5, 2012] |

**REBUTTAL EXPERT REPORT OF STEPHEN D. BRISTOW REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 8,143,848**

1

Exhibit V
Page 252

**CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING**

## I.      INTRODUCTION AND QUALIFICATIONS

1.   My name is Stephen D. Bristow.  I have prepared this report pursuant to my role as an expert witness on behalf of the Defendants[1] in connection with the above-referenced litigation.  I have been asked to evaluate certain issues in connection with Nyko Technologies Inc.'s  ("Nyko") lawsuit against Defendants over U.S. Patent No. 8,143,848 (the "'848 patent").  In this report, I have been asked to analyze and respond to the analyses and opinions set forth in the Expert Report of Garry Kitchen on Infringement of U.S. Patent No. 8,143,848 ("Kitchen Report").  I also provide analyses and opinions that may be relevant to the value of the '848 patent.

2.   This report includes a discussion of my background and qualifications.  My full curriculum vitae and legal engagement list are attached as Exhibit A to this report.

3.   This report includes a discussion of the background of the technology involved in this lawsuit, my opinions, and the underlying bases and reasons for those opinions.

### A.      Educational Background

4.   I graduated with highest honors from University of California, Berkeley with a Bachelors' Degree in  Electrical Engineering in 1973.  In 1984, I received a Master's Degree in Electrical Engineering from the University of Santa Clara.  I have also taken a number of courses in safe product design from the University of Wisconsin at Madison.

### B.      Career History

5.   I have over 39 years of experience in consumer game design and video game architecture and technology.  Currently, I am the CTO of Direct Nu Energy, which is an LED street lighting company.  I am also the CTO of Connexed, a video surveillance company.  Finally, I am the Director of Engineering of Medivocci, a medical company.

6.   Previously I was a Principal Systems Engineer at Plantronics, a leading provider of headsets throughout the world.  I was engaged in evaluating power requirements and selecting lithium-ion batteries.  I specified, approved, and managed the charging systems, which use mini-USB connectors, that these headsets used.

7.   From 2000-2004, I was the Director of Hardware Engineering at Televoke, Inc., where I was responsible for all hardware interfacing, RF communications protocols, and co-ordinating with business partners.

8.   Prior to my employment at Televoke, I was the Vice President of Research and Development at Radica Innovations.  Radica was a leading manufacturer of handheld consumer gaming equipment.  I was responsible for implementing RF communications, speech synthesis, LCD display systems, and IR one- and two-way communications to

---

[1] Performance Designed Products LLC ("PDP"), Energizer Holdings, Inc., and Eveready Battery Company, Inc.

**Exhibit V**
**Page 253**

**CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING**

Radica's product line.  At Radica, I was also responsible for all patent related matters, including patent filings and co-ordination with outside patent counsel.

9.   I was also a founding member of Atari and was the Vice President of Engineering of the Home Game, Telephone Division (AtariTel).  I participated in designing power components and structures in Atari's coin operated games, making them compatible to a number of power sources around the world.  I also took part in obtaining regulatory approvals from agencies such as Underwriters Laboratory (UL).

### C.    Other Relevant Qualifications

10. I am the named inventor of over 23 United States patents, including a patent related to video game controller design.  A number of my patents focus on video game circuit technology.

11. Since 1976 I have been a member of the IEEE Consumer Electronics Society, and in the early 1980's I was a member of the National Administrative Committee.

12. From approximately 1986 to 1990 I was a consultant to the Environmental Protection Agency ("EPA") during the development of the Green Energy Standards for wall adapters and power supplies.  I drafted the standards that apply to wall adapters used in various consumer electronics devices.

## II.    SKILL LEVEL OF ONE OF ORDINARY SKILL IN THE ART

13. The pertinent art is the mechanical and electrical requirements of charging consumer electronics products with rechargeable batteries.

14. A person of ordinary skill in the art would have an undergraduate degree in engineering or other technical training in electromechanical product design or equivalent work experience in product development of consumer electronic products with rechargeable batteries and their charging systems. Such a person would possess at least one year of experience in developing and/or evaluating chargers for consumer electronics products.

15. It is my opinion that Nyko's proposed skill level of one of skill in the art is too limiting.  Specifically, I disagree that the pertinent art should be limited to the video game accessory arts.  In the "Field of the Invention," the patent states that "[t]he present invention relates to charging systems for consumer electronics devices…."  The patent also describes embodiments that are not limited to a video game controller charger.  For instance: "Alternatively, the DC ports 408 may be any electrical connectors suitable for coupling to a video game controller for another video game console, or for any other consumer electronics device to be charged, such as an MP3 player or accessory device."  ('848 patent, 9:39-43.) Further, the patent application, as originally filed, contained a number of claims directed to a "[a] charging system for at least one accessory device having a power input port."  (Original claims 14-18, 21-27.)

3

**Exhibit V**
**Page 254**

CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING

## III.    SUMMARY OF THE '848 PATENT

16. The '848 patent, which is entitled "Video Game Controller Charging System Having Docking Structure," was filed on March 7, 2008 and issued on March 27, 2012.  The following paragraphs provide an overview of the '848 patent for purposes of this report.

17. The '848 patent discloses at least one structure on the base that provides physical support to multiple video game controllers while they are being charged.  Additionally, the '848 patent further discloses DC ports that are located on the base that provide power to charge the video game controllers.

18. Finally, the docking bays that support the video game controllers are defined by opposite surfaces that are on the base.  The aforementioned DC port is positioned between these opposite surfaces.

19. The '848 patent additionally discloses mini-USB connectors that are used to couple with the video game controllers, and the substantially parallel nature of the opposite surfaces that define the docking bay.

## IV.    THE ASSERTED CLAIMS

20. In the present action, I understand that Nyko is presently asserting that PDP's Energizer Power & Play Charging System for Xbox360 and Energizer Power & Play Charging System for PlayStation 3 (collectively "accused products") infringe claims 1-5, 7, 8, 10-12 of the '848 patent.  Nyko further asserts that Energizer Power & Play Charging System for PlayStation 3 ("accused PS3 charger") infringe claims 2, 13-17 of the '848 patent.

## V.    THE COURT'S CLAIM CONSTRUCTIONS

21. In its Memorandum Opinion and Order, the Court construed the terms of the claims as follows.  While I do not necessarily agree or disagree with these constructions, I have applied them herein.

|   | Term or Phrase from '848 Patent | Construction |
|---|---|---|
| 1 | base | the body of the Charging System |
| 2 | couple to | to connect directly without the use of wires or cables |
| 3 | electrically coupled to | directly or indirectly connected to permit the flow of electrical current |
| 4 | at least one | one or more than one |
| 5 | structure | one or more physical components for receiving controllers |
| 6 | docking structure | one or more physical components for receiving and aligning controllers |
| 7 | supported by the base | physically supported by but not necessarily directly on the base |

4

Exhibit V
Page 255

**CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION
MAKING**

## VI.    UNDERSTANDING OF THE LAW

22. My understanding of the law pertaining to patent infringement and non-infringement is derived from sources such as the National Jury Instruction Project Model Patent Jury Instructions, which I have reproduced in relevant part below and attached herewith as Exhibit B. I also have experience applying the legal standards pertaining to patent infringement and non-infringement from work I have previously done as an expert in connection with other patent matters.

### A.    Non-Infringement

23. It is my understanding that for literal infringement, the patentee must establish that it is more probable than not that each limitation of a claim is met by an accused device. If even a single claim limitation is not met by an accused device, that device does not literally infringe the claim.

24. I also understand that a dependent claim incorporates all elements of the independent claim and any other dependent claims from which it depends.  I understand for a dependent claim to be infringed, all of the limitations of the dependent claim and all of the limitations of the claims from which it depends must be present in the accused device.

25. As previously stated, my understanding of the law pertaining to literal infringement is derived from the Model Patent Jury Instructions and other instructions provided to me, which I have reproduced in part below:

> To prove literal infringement, [the patent holder] must prove that it is more probable than not that [the alleged infringer]'s product [method] includes every requirement [step] in [the patent holder]'s patent claim. If [the alleged infringer]'s product [method] omits any requirement [step] recited in [the patent holder]'s patent claim, [the alleged infringer] does not infringe that claim.  For literal infringement, [the patent holder] is not required to prove that [the alleged infringer] intended to infringe or knew of the patent.

Exh. B at 16.

### B.    Indirect Infringement

26. I understand that one contributes to infringement if one supplies a "nonstaple" component of a claimed invention to another entity who makes, uses or sells the entire invention.

27. I understand that a nonstaple component is a component or part of an invention that is not suitable for an substantial use other than in the patented invention.

5

**Exhibit V
Page 256**

**CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING**

28. I also understand that one induces infringement if one provides another with instructions and information about how to make or sue the accused device or carry out the accused process.

29. I understand that while proof of intent is necessary, direct evidence of the intent is not required.

## VII.  SUMMARY OF OPINIONS

30. In Mr. Kitchen's report, he uses the following figure to identify the swooping arc ("arc") as being the base.  He further cites to passages on Energizer's website that use the term "charge base."  Kitchen Report at 13.



**Energizer Charging System for PS3 Base**

*Id*.

31. I disagree with Mr. Kitchen's statements.  It is my opinion that the base of the accused product constitutes the platform as shown below.

6

**Exhibit V**
**Page 257**

CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION MAKING



32. Neither the arc, nor the platform are "body of the charging system" as disclosed in the '848 patent.  The arc is an independent component of the accused product that detaches from the base/platform.  Indeed, the platform supports the arc when the two parts are assembled.  Additionally, the Court construed "base" to mean "the body of the Charging System."  In its Claim Construction Order, "the Court did find convincing Defendants' presentation at oral argument that to expand upon the term 'base' by construing it to include the objects that rest upon it, as supported by it, or are included within it, would run contrary to Federal Circuit precedent cautioning against construing terms to render other claim language superfluous."  Accordingly, it is my opinion that the arc is not part of the body of the charging system.  In other words, the arc does not constitute the "base" as that term is used in the asserted claims of the '848 patent.

33. To the extent that Defendants referred to the product as a "charge base," my understanding is that was used simply as a marketing term to refer to the entire system, and not attempting to describe a part of the system, as the term is used in the '848 patent.

34. Having established that the arc is not part of the base, the "transparent plastic structures"  identified by Mr. Kitchen are not on the base.  Rather, these structures are on the arc.

35. Mr. Kitchen further states that the accused Charging Systems each  include two docking bays.  Mr. Kitchen further states that each docking bay includes a "DC port on the base."

36. I disagree with Mr. Kitchen's statement that the DC port is on the base.  As analyzed in further detail in Section IX.B. of this report, the DC port in the accused products is not on or supported by the base.  As a matter of fact, the DC ports are not even on the arc.  Rather, the DC ports are on and fully supported by the transparent plastic insertion guides, which are on and supported by the arc.

37.  Finally, I disagree that "each pair of surfaces defin[e] a respective docking bay" of the accused products.  The transparent plastic insertion guide is defined not by a pair of opposite surfaces, but multiple surfaces.

Exhibit V
Page 258

**CONFIDENTIAL — ATTORNEYS' EYES ONLY – COMPETITIVE DECISION
MAKING**

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge.


September 13, 2013

Steve Bristow                                                           Date

43

**Exhibit V
Page 259**

# EXHIBIT W

## Stacey R. Dawson

**From:** Steve Hanle <SHanle@sheppardmullin.com>
**Sent:** Thursday, April 04, 2013 12:09 PM
**To:** Warren Bleeker; Gray Buccigross
**Cc:** LegalTm-PDP-Nyko; Art Hasan; Katherine L. Quigley; Stacey R. Dawson; Suzanne E. Swezey; Stacy Goodwin
**Subject:** RE: NYKO v. PDP, et al ('630 Patent)

Warren,
This was an oversight and, yes, we will accept service. For the record, the defendants strongly believe the '630 patent is invalid, for reasons we have discussed at length, including without limitation that Nyko put into public use and offered for sale the claimed invention more than one year before the effective filing date. We further believe there are serious issues regarding infringement, particularly since the claims of the '848 patent (and the '630 patent) have not been construed. We believe that in light of the clear on-sale bar and public use issues, of which Nyko had full knowledge, Nyko's filing of a complaint on the '630 patent is completely without merit and brought in bad faith.

Regards,
Steven M. Hanle
714.424.8293 | direct
714.428.5923 | direct fax
SHanle@sheppardmullin.com | Bio

**Sheppard**Mullin
Sheppard Mullin Richter & Hampton LLP
650 Town Center Drive, 4th Floor
Costa Mesa, CA 92626
714.513.5100 | main
www.sheppardmullin.com

**From:** Warren Bleeker [mailto:warren.bleeker@cph.com]
**Sent:** Thursday, April 04, 2013 11:49 AM
**To:** Steve Hanle; Gray Buccigross
**Cc:** LegalTm-PDP-Nyko; Art Hasan; Katherine L. Quigley; Stacey R. Dawson; Suzanne E. Swezey; Stacy Goodwin
**Subject:** RE: NYKO v. PDP, et al ('630 Patent)

Steve--

On February 21, 2013, NYKO put your clients on notice of issuance of the '630 Patent and asked that they voluntarily cease their infringing acts. Your clients failed to respond and continue to willfully infringe.

On March 19, 2013, as a professional courtesy, I inquired whether you would agree to accept service of the Summons and Complaint in this infringement matter on behalf of your clients. You responded 11 minutes later to that email asking if we had filed a notice of related case, but failed to address my request that you accept service. On March 20, I forwarded you the documents we filed notifying the Court of the related case and I again inquired whether you would accept service, and again you failed to respond.

We have tried to get your clients to voluntarily cease their infringing acts, and we have tried to avoid using process servers to effectuate service, but you and your clients have simply ignored our repeated requests. Your gamesmanship in refusing to accept service, even though you are actively representing these clients, is disappointing. If you do not agree to accept service by noon tomorrow, we will formally serve your clients with the Summons and Complaint.

**Exhibit W**
**Page 260**

--Warren



**G. Warren Bleeker** | *Partner*
gwb@cph.com
Christie, Parker & Hale, LLP
655 North Central Avenue, Suite 2300, Glendale, CA 91203
PH: 626.683.4521 | FAX: 626.577.8800

--------------------------------------------------------------
The information in this communication and any attached documents contain information from the law firm of Christie, Parker and Hale, LLP that may be confidential and/or privileged. If you are not the intended recipient, or an agent responsible for delivering it to the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete all electronic copies and destroy any hard copies.

---

**From:** Warren Bleeker
**Sent:** Wednesday, March 20, 2013 2:57 PM
**To:** 'Steve Hanle'; Gray Buccigross
**Cc:** LegalTm-PDP-Nyko; Art Hasan; Katherine L. Quigley; Stacey R. Dawson; Suzanne E. Swezey; Stacy Goodwin
**Subject:** RE: NYKO v. PDP, et al ('630 Patent)

Steve--

Yes.  They are attached.

Please let me know if you will agree to accept service of the summons and complaint and other accompanying documents on behalf of the Defendants.  Also, please let me know if you agree to accept service by email in this matter.

Thanks,
Warren



**G. Warren Bleeker** | *Partner*
gwb@cph.com
Christie, Parker & Hale, LLP
655 North Central Avenue, Suite 2300, Glendale, CA 91203
PH: 626.683.4521 | FAX: 626.577.8800

--------------------------------------------------------------
The information in this communication and any attached documents contain information from the law firm of Christie, Parker and Hale, LLP that may be confidential and/or privileged. If you are not the intended recipient, or an agent responsible for delivering it to the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete all electronic copies and destroy any hard copies.

---

**From:** Steve Hanle [mailto:SHanle@sheppardmullin.com]
**Sent:** Tuesday, March 19, 2013 8:38 AM
**To:** Warren Bleeker; Gray Buccigross
**Cc:** LegalTm-PDP-Nyko; Art Hasan; Katherine L. Quigley; Stacey R. Dawson; Suzanne E. Swezey; Stacy Goodwin
**Subject:** RE: NYKO v. PDP, et al ('630 Patent)

Warren,
Has Nyko filed a notice of related cases?  Please provide.

Regards,
Steven M. Hanle
714.424.8293 | direct
714.428.5923 | direct fax
SHanle@sheppardmullin.com | Bio

2

**Exhibit W**
**Page 261**

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
650 Town Center Drive, 4th Floor
Costa Mesa, CA 92626
714.513.5100 | main
www.sheppardmullin.com

---

**From:** Warren Bleeker [mailto:warren.bleeker@cph.com]
**Sent:** Tuesday, March 19, 2013 8:27 AM
**To:** Steve Hanle; Gray Buccigross
**Cc:** LegalTm-PDP-Nyko; Art Hasan; Katherine L. Quigley; Stacey R. Dawson; Suzanne E. Swezey; Stacy Goodwin
**Subject:** NYKO v. PDP, et al ('630 Patent)

Counsel--

Attached is a courtesy copy of the Complaint NYKO filed yesterday and accompanying Summons.  Please let me know if you agree to accept service of these documents on behalf of PDP, Energizer Holdings, Inc. and Eveready Battery Company.

Regards,
Warren

 **G. Warren Bleeker** | *Partner*
gwb@cph.com
Christie, Parker & Hale, LLP
655 North Central Avenue, Suite 2300, Glendale, CA 91203
PH: 626.683.4521 | FAX: 626.577.8800

----------------------------------------------------------------
The information in this communication and any attached documents contain information from the law firm of Christie, Parker and Hale, LLP that may be confidential and/or privileged. If you are not the intended recipient, or an agent responsible for delivering it to the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete all electronic copies and destroy any hard copies.

Circular 230 Notice: In accordance with Treasury Regulations we notify you that any tax advice given herein (or in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or in any attachments).

Attention: This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

# EXHIBIT X

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*
*COMPETITIVE DECISION MAKING*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| NYKO TECHNOLOGIES, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> ENERGIZER HOLDINGS, INC.; EVEREADY BATTERY COMPANY, INC.; AND PERFORMANCE DESIGNED PRODUCTS LLC, <br><br> *Defendants*. | Civil Action No. 2:12-cv-03001 |

**REBUTTAL EXPERT REPORT
REGARDING DAMAGES**

**September 13, 2013**

Respectfully Submitted,

_____
W. Christopher Bakewell

**Exhibit X
Page 263**

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

*COMPETITIVE DECISION MAKING*

## TABLE OF CONTENTS

1   **Introduction** ...................................................................................................... **1**

   1.1   Qualifications and Experience ................................................. 1

   1.2   Overview of Assignment ......................................................... 2

   1.3   Summary of Opinions .............................................................. 4

        *Affirmative Opinion* ................................................................ 4

        *Analysis of Dr. Luna's Report* ............................................... 4

   1.4   Facts, Data and Information Considered .................................. 6

   1.5   Background ............................................................................... 6

   1.6   Overview of the '848 Patent ..................................................... 7

   1.7   Overview of Nyko ..................................................................... 8

        *Overview of the Nyko Charge Base 3 for PS3* ........................ 8

        *Overview of the Nyko Charge Base Black (and Charge Base Plus) for Microsoft Corporation ("Microsoft") Xbox 360* ........................ 9

   1.8   Overview of Defendants ......................................................... 11

        *Overview of Energizer* ........................................................... 11

        *Overview of Eveready* ........................................................... 12

        *Overview of PDP* ................................................................... 13

   1.9   Overview of Accused Products ............................................... 14

        *Overview of the Energizer PS3 Charging System* ................. 15

        *Overview of the Energizer Xbox 360 Charging System with Battery* ... 15

   1.10  Overview of the U.S. Video Game Industry ............................ 16

        *Overview of Microsoft* ........................................................... 18

        *Overview of Nintendo* ........................................................... 19

        *Overview of Sony* .................................................................. 19

        *Overview of Activision* ........................................................... 20

        *Overview of Turtle Beach* ...................................................... 20

2   **Overall Framework for the Patent Infringement Damages Analysis** ................. **21**

3   **Analysis of Lost Profits Damages** ................................................................... **22**

   3.1   Demand for the Patented Product ........................................... 23

   3.2   Acceptable Non-Infringing Alternatives Necessary to Satisfy Demand ......... 26

   3.3   Manufacturing and Marketing Capability Necessary to Exploit Demand ........ 30

   3.4   Ability to Quantify the Amount Lost Profits ........................... 31

4   **Reasonable Royalty Damages** ......................................................................... **32**

   4.1   The Hypothetical Negotiation ................................................ 33

   4.2   Recent Federal Circuit Case Law Guidance .......................... 35

**Exhibit X**
**Page 264**

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

*COMPETITIVE DECISION MAKING*

    4.3     Royalty Base ................................................................................ 36

    4.4     Form of Royalties ........................................................................ 37

**5     Quantitative Analysis of Reasonable Royalty Damages ............... 39**

    5.1     Market Approach ......................................................................... 40

    5.2     Market Approach: PDP Utility Patent Licenses ........................... 41

              *2005 PDP-Thorner License Agreement* ...................................... 41

              *2006 PDP-Immersion License Agreement* ................................... 42

              *2011 PDP-RPX Agreement* ........................................................ 44

    5.3     Market Approach: Other PDP Agreements ................................... 45

              *2010 PDP-Energizer Trademark Agreement* .............................. 46

              *Other PDP Agreements Not Involving Patent Rights* ................. 47

              *2006 PDP-Konami Agreement* .................................................. 50

    5.4     Market Approach: Conclusions .................................................... 51

    5.5     Cost Approach ............................................................................. 51

    5.6     Income Approach ........................................................................ 55

    5.7     Conclusions from the Quantitative Analysis ............................... 57

**6     Qualitative Analysis: the Georgia-Pacific Factors ....................... 57**

    6.1     The royalties received by the patentee .......................................... 58

    6.2     The rates paid by the licensee for the use of other patents comparable to the patent-in-suit ................................................................................. 58

    6.3     The nature and scope of the license .............................................. 58

    6.4     The licensor's established policy and marketing program ............... 59

    6.5     The commercial relationship between the licensor and the licensee ............... 59

    6.6     Convoyed and collateral sales ...................................................... 60

    6.7     The duration of the patent and the term of the license ..................... 61

    6.8     The established profitability of the patented product, its commercial success, and its current popularity ............................................................... 62

    6.9     Utility and advantages over old modes or devices, if any; and ....................... 66

    6.10   The nature of the intellectual property, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits of those who have used the invention .................................................... 66

              *Nature of the Invention and the Benefits to Users* .................... 66

              *Prior Art* ................................................................................ 66

              *Next-Best Options* .................................................................. 68

              *Summary of G-P Factors 9 and 10* .......................................... 68

    6.11   The extent to which the infringer has made use of the invention; evidence

**Exhibit X**

**Page 265**

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

*COMPETITIVE DECISION MAKING*

probative of the value of the use ................................................... 68

6.12  Profitability and industry royalty rates ................................. 69

6.13  Amounts creditable to the invention .................................... 70

6.14  The opinion of qualified experts .......................................... 71

6.15  The outcome of the hypothetical negotiation ....................... 72

**7    Reasonable Royalty Damages Conclusion** .................................. **74**

**8    Analysis of Dr. Luna's Report** ................................................... **75**

8.1   Dr. Luna's Lost Profits Damages Opinion is Improper and Unreasonable ...... 78

*Dr. Luna Did Not Consider that the '848 Patent Does Not Provide the Only
Basis for Consumer Demand for the Accused Products* ............................. 78

*Dr. Luna Assumes PDP Makes No Sales Without the '848 Patent* ............ 80

*Dr. Luna Inadequately Evaluated Other Non-Infringing Alternatives* ....... 81

*Dr. Luna Did Not Reallocate the Sales of Accused Products According to
Accepted Practices* ............................................................................. 90

*Dr. Luna's Evaluation of Nyko's Manufacturing and Marketing Capacity is
Insufficient and Unreliable* ................................................................. 91

*Dr. Luna's Estimate of Nyko's Incremental Profitability is Flawed and
Unsupportable* .................................................................................. 92

*Dr. Luna Does Not Consider Fundamental Economic Principles, Such as
Product Pricing and the Price Elasticity of Demand* .............................. 94

8.2   Dr. Luna's Reasonable Royalty Damages Opinion is Flawed and Unreasonable
96

*Dr. Luna's Reliance on the 2010 Trademark License between PDP and
Energizer as a Proxy for a Naked Patent License is Improper* ................. 97

*Dr. Luna's Reliance on Other PDP Agreements as Benchmarks for a
Naked Patent License to the '848 Patent is Improper* ............................ 97

*Dr. Luna Relies on Other Irrelevant Data Points in a Failed Effort to
Support Her Royalty Rate* ................................................................... 98

*Dr. Luna's Consideration of other Georgia-Pacific Factors is Also Flawed* ................................................................................................. 102

*Royalty Damages Conclusion* .......................................................... 105

**9    Reservation of Rights** ............................................................... **106**

**Exhibit X**
**Page 266**

*Highly Confidential – Attorneys' Eyes Only*

# 1  Introduction

## 1.1  Qualifications and Experience

1.  I am a Managing Director of Duff & Phelps, LLC ("D&P"), an international consulting firm founded in 1932 specializing in financial advisory services.[1]   My primary responsibility at D&P is to provide consulting services involving valuation and related issues in connection with technology-rich businesses and intellectual property ("IP").  I am the co-leader of the firm's intellectual property dispute practice, which was recently named the top practice of this type by the National Law Journal.  I also serve on the vision and strategy team of D&P's dispute practice.

2.  Over the course of my career, I have performed valuations of businesses and intangible assets, provided management consulting services related to the commercialization of intellectual property, as well as quantified damages in a variety of intellectual property related disputes; these areas comprise the focus of my professional practice.

3.  I earned a B.S. degree *magna cum laude* from Bradley University in Peoria, Illinois.  I also earned a MBA degree from the University of Maryland at College Park, where I was a Graduate Fellow.  I am an Accredited Senior Appraiser in Business Valuation, a professional designation of the American Society of Appraisers ("ASA").  Among other things, this designation requires 10,000 hours of documented experience in valuing assets and businesses; I acquired most of this experience through the valuation of intellectual property rights and technology-rich business enterprises.  I am a board member of the Houston chapter of the ASA.

4.  I am a Certified Licensing Professional, a professional designation of the Licensing Executives Society intended to distinguish those who have demonstrated experience, proficiency, knowledge, and exposure to licensing and commercialization of

---

[1] D&P's compensation is not contingent upon the outcome of this litigation.  D&P bills at hourly rates for the time incurred by its professional staff on this engagement.  My hourly billing rate is $595.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

intellectual property.  I earned this designation based upon my experience both as a management consultant, and as a real-world manager.  Earlier in my career, I held senior positions for a large industrial enterprise where my responsibilities included, among other things: financial reporting, financial analysis, market analysis, strategic planning, contract negotiation, as well as the general management of businesses.  Prior to and since this time, I have provided management consulting and financial advisory services to a wide range of leading firms.  Through these experiences, I gained substantial real-world experience in commercial issues involving technology-rich businesses; licensing and contract negotiation, as well as financial reporting and corporate finance.

5.    An updated copy of my *curriculum vitae*, including my current and past employment and professional affiliations, is included as Attachment A.  Described therein are my publications, which include a chapter covering the cost of capital in intellectual property damages (*Cost of Capital in Litigation*, Wiley 2011), as well as articles published in the professional journals of the Licensing Executives Society International, the American Society of Appraisers and National Association of Chartered Valuation Analysts.  I have been an invited speaker on topics involving intellectual property valuation and damages quantification.  An updated list of my trial and deposition testimony is included as Attachment B.

### 1.2    Overview of Assignment

6.    I have been retained as an expert on patent infringement damages and financial issues by the law firm of Sheppard Mullin Richter and Hampton LLP, on behalf of Energizer Holdings, Inc. ("Energizer"), Eveready Battery Company, Inc. ("Eveready"), and Performance Designed Products LLC ("PDP").  I have been requested to analyze damages in connection with allegations of patent infringement made by Nyko Technologies, Inc. ("Nyko").[2]  I have also been asked to review the August 9, 2013

---

[2] Amended Complaint for Patent Infringement, Civil Action No. 2:12-cv-03001, December 14, 2012.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

expert report submitted by Barbara C. Luna, Ph.D., who was retained by Nyko to offer an opinion regarding damages.[3]

7.  It is my understanding that, in this matter, PDP has agreed to indemnify Energizer and Eveready.  Therefore, I have evaluated damages stemming from PDP's alleged infringement.  For the most part, Dr. Luna uses this same approach.  However, as discussed in the rebuttal section of my report, Dr. Luna does calculate certain royalty damages associated with Energizer's battery sales.  This not only deviates from this approach in general, it is an economic windfall because these sales are not covered by the patent-in-suit.

8.  As a guideline for my analysis of patent infringement damages, I considered the framework described in the well-known cases styled *Georgia-Pacific Corp. v. United States Plywood Corp.* ("Georgia-Pacific") and *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.* ("Panduit"), other more recent guidance from the Court of Appeals for the Federal Circuit ("Federal Circuit"), as well as standard and accepted tools used in the valuation of intellectual property rights.[4]

9.  I understand that Nyko alleges that certain PDP's products infringe at least one claim of U.S. Patent No. 8,143,848 ("the 848 patent"), which is described in the following table:[5]

**Summary of the '848 Patent**

| U.S. Patent No. | Issue Date | Assignee | Title |
|---|---|---|---|
| 8,143,848 | March 27, 2012 | Nyko | Video Game Controller Charging System Having a Docking Structure |

---

[3]  Expert Report of Dr. Barbara C. Luna, August 9, 2013 (referred to herein as the "Luna Report").
[4]  *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (1971); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).
[5]  Amended Complaint for Patent Infringement, Civil Action No. 2:12-cv-03001, December 14, 2012, p. 3.

10.   For purposes of my work on this assignment, I have been asked to assume that the '848 patent is valid, enforceable and infringed.  If it is determined that the '848 patent is not valid, not enforceable or not infringed, there would be no damages for infringement.

11.   My expert opinions, as well as the bases for these opinions, are explained throughout this report and exhibits.  My determination of damages is based upon: (i) documentary evidence; (ii) customary methodologies of financial analysis and damages quantification; and (iii) evaluation of a hypothetical negotiation for the '848 patent between PDP and Nyko, as willing licensee and willing licensor, at the time of first alleged infringement (*i.e.*, during or around March 2012 when the '848 patent issued). I also understand that damages, if any, would not begin to accrue until April 5, 2012, the date when Nyko filed its complaint in this matter.

### 1.3    Summary of Opinions

#### Affirmative Opinion

12.   A reasonable royalty of $100,000 is more than adequate to compensate Nyko for PDP's alleged infringement of the '848 patent (see Exhibit 1.0).  Lost profits damages are not an appropriate remedy in this case due to a variety of considerations, not the least of which being the availability of non-infringing alternatives and substitute products.

13.   My damages opinions are based upon real-world licenses, consideration of the factors laid out in *Georgia-Pacific* (the "G-P Factors"), recent Federal Circuit guidance regarding reasonable royalty damages determination, and other standard tools that are regularly used to conduct a financial analysis.

#### Analysis of Dr. Luna's Report

14.   ██████████████████████████████████████████████████████████████
██████████████████████████████     ██████████████████████████████

---

[6] Luna Report, pp. 5 – 6.  It is my understanding that pre-judgment interest is a matter for the Court.  My damages calculations are exclusive of pre-judgment interest.  If requested, I am prepared to calculate pre-

**Exhibit X**
**Page 270**

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

███████████████████████████████████████████

████ █  ███████████████████████████████████████

███████████████████████████████████████[8]

15. Apparently recognizing that her lost profits damages theory is tenuous, Dr. Luna offers an alternative damages theory where she opines that Nyko is entitled to royalty damages of approximately $0.6 million during the damages period.[9]   Dr. Luna calculated this by applying a royalty rate of six percent to the entire market value of PDP's accused product sales.[10]

16. Dr. Luna's work does not present a realistic reconstruction of the marketplace assuming that infringement had not occurred.  Among other things, Dr. Luna did not consider or evaluate the possibility of non-infringing, substitute products.   She also did not demonstrate that Nyko had the manufacturing and marketing capacity to make any of PDP's accused product sales.

17. Dr. Luna's estimate of royalty damages is also flawed for numerous reasons.  To begin with, as is so with her lost profits damages estimate, Dr. Luna assumes with no foundation that the '848 patent covers the entirety of the accused products.  This leads her to apply a royalty rate to the entire market value of the accused products, as opposed to only the value specifically attributable to the novel features of the '848 patent.   In addition, her royalty rate is based upon license agreements that are not comparable to a bare patent license to the '848 patent.

18. The foregoing paragraphs provide only a high-level overview of some of my disagreements with Dr. Luna's work in this matter.  A more extensive discussion is provided throughout this expert report and its exhibits.

---

judgment interest.
[7] Luna Report, p. 3 and 5.  I have used a damages period of April 5, 2012 through January 12, 2014 for purposes of my calculations.
[8] Luna Report, p. 5.
[9] Luna Report, p. 6.
[10] Luna Report, p. 6-7 and Luna Schedules 2, 4 and 5.

# EXHIBIT Y

# NYKO TECHNOLOGIES, INC.

## *PLAINTIFF*

## V.

# ENERGIZER HOLDINGS, INC.

## AND

# PERFORMANCE DESIGNED PRODUCTS, INC.

## *DEFENDANT*

# EXPERT REPORT OF DR. BARBARA C. LUNA

# DATED AUGUST 9, 2013

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

## CONFIDENTIAL – ATTORNEYS' EYES ONLY

## QUALIFICATIONS

1)       I am a Senior Partner with the accounting and litigation services firm of White, Zuckerman, Warsavsky, Luna & Hunt ("White Zuckerman").   My practice focuses on accounting, economics, financial analysis and business valuation issues relating to liability and damages in litigation matters.  I have been retained, and testified, as an expert witness on numerous occasions.    I have opined on damages analyses, forensic accounting and financial issues in litigation matters many times.

2)       I have an M.S. and a Ph.D. in Applied Math from Harvard University and a B.A. from Wellesley College.  I am a CPA, a Certified Fraud Examiner, Certified in Financial Forensics, a Master Analyst in Financial Forensics, an Accredited Senior Appraiser in Business Valuation, a Certified Valuation Analyst and Accredited in Business Valuation.  I have testified as a forensic accounting, valuation and damages expert witness over 450 times at trials and arbitrations and over 500 times at depositions during the past 30 years.  A copy of my current curriculum vitae is attached to the report as Appendix 1.  Listings of my trial and deposition testimony for the past four years to the best of my recollection are attached to my report as Appendix 2.  A listing of my publications and articles for the past ten years is attached to the report as Appendix 3.

3)       Fees for my firm, White Zuckerman, for this report and analysis range from $195 per hour to $475 per hour depending on the level of experience of personnel.  My fees for time spent testifying are $475 per hour.  Our compensation is not contingent upon my testimony, or upon any outcomes or court proceedings.  I have no interest, either present or contemplated, in the parties on which the report, analysis and testimony may be based.

## DOCUMENTS CONSIDERED

4)      In connection with the preparation of this report, I have considered certain information

and documents that are listed in Exhibit A.  I have also spoken with Christopher Arbogast of

Nyko.

## ASSIGNMENT

5)      I was retained by counsel for Nyko Technologies, Inc. ("Nyko" or Plaintiff) to:

        a)      Determine the damages, if any, suffered by Nyko as a result of the actions of

Energizer Holdings, Inc. and Performance Designed Products, Inc. ("Energizer" and "PDP" or

(Defendants) relating to the alleged infringement of one or more claims of Nyko's U.S. Patent

No. 8,143,848 (the "'848 patent");

        b)      Analyze the report of Energizer and PDP's expert and prepare a rebuttal report;

        c)      Supplement my report as necessary for additional information provided after the

filing date of my preliminary report and update my report accordingly; and

        d)      Provide expert testimony on my opinions and conclusions.

## BACKGROUND

6)      Nyko provides and sells a video game controller charging system having a docking

structure covered by the '848 patent, which was issued on March 27, 2012.  Damages

claimed will begin April 5, 2012, when this lawsuit was filed a few days after patent issuance.

Nyko was founded in 1996.  Energizer and PDP provided and sold one or more video game

controller charging systems having a docking structure, including the Energizer Power & Play

for 360 charging system and the Energizer Power & Play for PS3 charging system (the

"infringing products"), which are allegedly covered or reasonably could be anticipated by one or more of the claims of the '848 patent.

7)    PDP's model numbers at issue sold in the U.S. are:

    a)    ACCEG06328, GS Energizer PS3 Chrg System, model EGS6328

    b)    ACCM53629, 360 Energizer Charger w/ Bat, model 3629

    c)    ACCP06328, Energizer PS3 Charging System,  model 6328

8)    Nyko's product sold in the U.S. covered under the '848 patent is:

    a)    Charge Base 3, model 83100

    This product relates to the PlayStation 3.

9)    Nyko believes the following additional Nyko products are at issue since Energizer displaced them and it was foreseeable that Nyko would have sold these additional products but for the sales of the infringing products.

    a)    Charge Base 360 Black, model 86074

    b)    Charge Base Plus (primarily for Walmart sales), model 86084

10)   PDP's corresponding charging system for the Xbox 360 is its 3629 model.

11)   Nyko is claiming lost profits relating to PDP's unit sales of the models EGS6328, 6328 and 3629.  Nyko is alternatively claiming reasonable royalties on these three PDP models. Figure 1 below illustrates the corresponding PDP and Nyko models.

### Figure 1

| Performance Design Products | | Nyko Technologies Products | |
|---|---|---|---|
| | Description | | Description |
| EGS6328 | GS Energizer PlayStation PS3 Chrg System | 83100 | PlayStation Charge Base 3 |
| 6328 | Energizer PlayStation PS3 Charging System | 83100 | PlayStation Charge Base 3 |
| 3629 | XBOX 360 Energizer Charger w/Bat | 86074/86084 | XBOX 360 Charge Base Black and Plus |

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING

## SUMMARY OF DAMAGES

12)    For purposes of this preliminary report, it is assumed that an injunction will be sought as of date of trial, January 12, 2014 and granted, so no future damages are being claimed.

### *Lost Profits Through Date of Trial*

13)    Nyko's lost profits claim relating to PDP's sales of the above products allegedly infringing on Nyko's '848 patent, and including convoyed sales, is $1,919,941 for the period April 5, 2012 through date of trial, anticipated to be January 12, 2014, before prejudgment interest and $2,130,478 including prejudgment interest based on one year Treasuries compounded annually.  Lost profits are based on PDP's sale of 738,524 allegedly infringing units of models EGS6328 and 6328 for the PlayStation 3, and model 3629 for the Xbox 360, during this period.  PDP's sales of these units negatively impacted Nyko's sales of its Charge Base 3, model 83100, for the PlayStation 3 and foreseeable comparable products Charge Base 360 Black and Plus, models 86074/86084, for the Xbox 360, considering Nyko's effective unit pricing of $12.99 per unit.  In addition, Nyko's lost convoyed sales of two rechargeable batteries and also a cable for the Walmart Plus at an effective price of $2.24, which are included in the 360 Black and Plus packaging.  The effective price of the convoyed units was determined based on the differential in price between Nyko's 83100 model for the PlayStation 3 and its 86074/86084 models for the Xbox 360.  Nyko's estimated incremental profit margin of 20%, based on incremental profits for 2011 through 2013 was then applied to these lost sales.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - COMPETITIVE DECISION MAKING